**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | | |
|---|---|---|---|
| NOFAR USA LLC, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | C.A. No. ~~_____~~1:24-cv-00870-JLH |
| | ) | | |
| BAREND VENTER, VENTER VENTURES | ) | | |
| LLC, BLUE SKY 1007 LLC, and THE | ) | | |
| VENTER FAMILY REVOCABLE TRUST, | ) | | |
| | ) | | |
| Defendants. | ) | | |

**FIRST AMENDED COMPLAINT**

Plaintiff Nofar USA LLC ("Nofar US" or "Plaintiff"), by and through its undersigned

attorneys, for its First Amended Complaint against Defendants Barend Venter ("Venter"), Venter

Ventures LLC ~~("Venter Ventures")~~, Blue Sky 1007 LLC, and The Venter Family Revocable Trust

(collectively, "Defendants"), alleges as follows:

**NATURE OF THE ACTION**

1. This case arises from a brazen fraud perpetrated by Venter ~~and others working in~~
~~concert with him,~~ who knowingly deceived Nofar US into buying Venter's struggling business by

making fraudulent and intentional misrepresentations.

2. Plaintiff Nofar US is an indirect subsidiary of O.Y. Nofar Energy Ltd. ("Nofar

Parent"), a global energy company ~~publicly traded~~publicly-traded in Israel. In 2021, Venter and

his business partner Ran Bujanover sold to Nofar US a majority stake in the California-based

energy company they had co-founded, comprised of two related entities—Blue Sky Utility LLC

~~(together with its affiliate~~and Blue Sky Utility Holdings LLC (together, "Blue Sky"). In

connection with the sale, Nofar US committed close to $100 million via cash consideration,

investments, and a loan facility, including millions of dollars paid to Venter.

3.      Blue Sky's Founders Venter and Bujanover—individually and on behalf of their respective wholly-owned limited liability company—effectuated the sale of the two Blue Sky entities by each executing two Membership Interest Purchase Agreements, dated May 25, 2021 (the "MIPA"), one for each Blue Sky entity being sold.[1]  The other MIPA parties are Nofar US and Blue Sky.  Through the MIPA transactions, Nofar US became the owner of 67% of Blue Sky, leaving Venter and Bujanover with 16.5% each.

4.      After the Closing, Nofar US realized it had been defrauded.  It learned that Venter grossly overstated Blue Sky's value to induce Nofar US to enter into the MIPA and commit roughly $100 million for the acquisition of Blue Sky, including millions pocketed by Venter directly.  Nofar US would never have agreed to spend such an amount had it known the true facts. Venter knew his representations were false, yet he made them anyway in an effort to inflate the purchase price and boost his own personal gain.

5.      In the MIPA, Venter made numerous false representations and warranties regarding Blue Sky and its business and financial performance.  ~~Those include~~Venter's misrepresentations ~~regarding~~pervaded the Financial Models incorporated in the MIPA, which were otherwise intended to provide Nofar US with visibility into Blue Sky's business performance.  Venter used inflated, made-up numbers for years 2019 and 2020, even though the models were provided in mid-2021—when the actual numbers were already available.  The ~~Financial Models also contained forward-looking misrepresentations, but not because they were over-optimistic regarding future performance.  Rather, the~~forecasts ~~contained~~ in the Financial Models, in turn, employed incorrect

---

[1]   The parties executed two substantively identical MIPAs on the same day, one for Blue Sky Utility LLC and another for Blue Sky Utility Holdings LLC.  ~~Those~~True and correct copies of those agreements are attached as **Exhibit 1** and **Exhibit 2**, respectively.  For convenience, this Complaint refers to both agreements together as the "MIPA."  Capitalized terms used but not defined herein have the meanings provided in the MIPA.

assumptions meant to artificially inflate Blue Sky's value. For example, Venter's models used electricity *production* levels to forecast revenue, ~~while he knew~~despite his knowledge that Blue Sky's revenue is predominantly determined by *subscribed tenants' consumption* of the produced electricity.

6.    Similarly fraudulent were Venter's intentional misrepresentations regarding Blue Sky's Financial Statements, Liabilities, Indebtedness, and customer subscription rates. In each of these categories, Nofar US has identified major discrepancies. Taken together, the misrepresentations massively inflated Blue Sky's value and induced Nofar US to commit close to $100 million for a business worth significantly less. Tellingly, when discussing the MIPA in September 2021—shortly after Closing—Blue Sky's then-CFO admitted in writing ~~shortly after Closing~~to Venter's partner that the way the sale under the MIPA was recorded "is really not 'by the book,'" ~~expressing the~~and expressed "hope" that the auditors will not "cause problems." ~~He added~~Even he confessed that all of the company's equity records must be "cleaned up" because they are "inaccurate."

7.    ~~Venter attempted to~~Knowing as much, Venter recognized he would need to cover his tracks after ~~committing the fraud, expressing the need to~~the sale, and admitted he should immediately wipe out his emails and "all history." He wrote to his partner in June 2021 that in case "something goes wrong in two years from now we will need to hand over ALL documentation and information," acknowledging his "exposure for the next 6 years." Venter cautioned that his "history" will reflect what he will "potentially need to mitigate." Fortunately, Venter's scheme to destroy evidence and evade scrutiny for his unlawful acts was not successful, or at least not in full.

8.      Venter agreed in the MIPA to indemnify Nofar US for the Damages it incurred from any fraud, misrepresentations, inaccuracies, and breaches of representations and warranties and agreements contained in the MIPA.  Nofar US has since sought such indemnification from Venter, consistent with the MIPA, but ~~he~~Venter has ~~to date~~ refused to comply.  Importantly, the representations and warranties in the MIPA were made jointly by, and as defined in the MIPA, the Founders (Venter included), the Selling Parties, and the Company.  Under the terms negotiated in the MIPA, each of those parties is "jointly and severally" liable to indemnify Nofar US for Damages caused by any breach of the representations and warranties.[2]

9.      By this action, Nofar US seeks to hold Venter and the companies with and through which he acted accountable for ~~his~~their obligations under the MIPA and for the Damages caused to Nofar US by the fraud, intentional misrepresentations, and breach of the MIPA's representations ~~and~~, warranties, and agreements.

**THE PARTIES**

10.      Plaintiff Nofar USA LLC is a Delaware limited liability company with its registered address at 1209 Orange Street, Wilmington, Delaware 19801.  Nofar USA LLC's sole member is Nofar Energy USA LP, a limited partnership registered in Israel.  Nofar USA LLC's ultimate indirect parent is O.Y. Nofar Energy Ltd., a company headquartered in Israel and publicly-traded on the Tel Aviv Stock Exchange.

11.      Defendant Barend Venter is an individual residing at 2144 Las Amigas Rd., Napa, California 94559.  He is one of the two Founders of Blue Sky under the MIPA.  Venter owns— through Defendant Venter Ventures LLC—a 16.5% share of Blue Sky (subject to a pledge). Venter is presently one of the Managers ~~on Blue Sky's Board and remains employed by~~of the two

---

[2]  Nofar US expressly reserves the right to sue any of the MIPA parties.

Blue Sky ~~at a salary~~entities, each a manager-managed California limited liability company.  Venter defines himself publicly as "a serial entrepreneur with several successful exits."  Venter is also the Founder and Chairman of another California company operating in the energy space, Bright Power, Inc. ("BPi").  According to Venter, he founded Blue Sky in 2009 to develop revenue sources for BPi.

12.     Defendant ~~Venter Ventures~~Blue Sky 1007 LLC ("BS1007") is a California limited liability company owned and controlled by Venter~~,~~ and is ~~the vehicle through which Venter holds his~~ a Selling Party under the MIPA.  Venter previously held certain membership ~~interest~~interests in Blue Sky.  ~~On~~ through BS1007 and, on information and belief, Defendant Venter is ~~the~~its sole member ~~of Defendant Venter Ventures, and its~~  BS1007's registered address is Venter's residence at 2144 Las Amigas Rd., Napa, California 94559.

13.     Defendant ~~Blue Sky 1007~~Venter Ventures LLC ("Venter Ventures") is a California limited liability company owned and controlled by Venter~~,~~ and is ~~a Selling Party under the MIPA.  Venter previously held—and may continue to hold—certain~~the vehicle through which Venter holds his membership interests in Blue Sky ~~through Blue Sky 1007 LLC~~.  On information and belief, Defendant Venter is the sole member of Defendant ~~Blue Sky 1007 LLC~~Venter Ventures, and its registered address is Venter's residence at 2144 Las Amigas Rd., Napa, California 94559.  On August 21, 2023, Defendants Venter and Venter Ventures executed two agreements—one for each Blue Sky entity—stating that Mr. Venter "desires to assign [and distribute] his entire interest in BS1007 to The Venter Family Revocable Trust."  Those agreements further provide that "immediately following" the distribution, The Venter Family Revocable Trust "desires to contribute the [entire interest in Blue Sky] to Venter Ventures LLC, a newly formed California limited liability company[.]"  The parties' intent was for Venter Ventures to step into BS1007's

shoes under the MIPA.  Consistent with that intent, on May 3, 2024, Venter Ventures filed a lawsuit against Nofar US in the Napa County Superior Court in California asserting a cause of action under the MIPA (in contravention of the MIPA's forum selection clause).  *See Barend Venter and Venter Ventures LLC v. Ofer Yannay, et. al.*, Case No. 24-CV-715 (Cal. Napa Super. Ct.).  In an order dated August 29, 2024, the Napa County Superior Court held that the cause of action Venter Ventures brought against Nofar US "arises out of and relates to the MIPA."  *Barend Venter and Venter Ventures LLC v. Ofer Yannay, et. al.*, Case No. 24-CV-715 (Cal. Napa Super. Ct., Aug. 29, 2024).[3]  On September 18, 2024, Venter Ventures filed an amended complaint against Nofar US in the Napa County Superior Court still asserting the same cause of action under the MIPA.  In subsequent court filings, Venter Ventures invoked the language of the MIPA to support its arguments.  By repeatedly seeking to exercise legal rights under the MIPA, Venter Ventures conceded that it is BS1007's successor-in-interest under the MIPA and that it assumed its rights and obligations thereunder consistent with the parties' intent.

14.     Defendant The Venter Family Revocable Trust (the "Venter Trust") is a California revocable trust for the benefit of Venter and his spouse with a registered address in Venter's residence at 2144 Las Amigas Rd., Napa, California 94559.  Venter previously held—and may continue to hold—certain membership interests in Blue Sky through ~~The Venter Family Revocable Trust.~~ the Venter Trust.  Like Venter Ventures, the Venter Trust is a successor-in-interest of BS1007 under the MIPA.  In a court filing in the Napa County Superior Court, Venter and Venter Ventures stated that "[t]his case is brought by Barend Venter and the Venter Family Trust," defining both "collectively" as "Venter," and made arguments under the MIPA on behalf of Barend

---

[3]   A true and correct copy of the Napa County Superior Court's order dated August 29, 2024 is attached as **Exhibit 3**.

Venter and the Venter Trust.  By seeking to exercise legal rights under the MIPA through the Venter Trust, Venter conceded that the Venter Trust is another successor-in-interest to BS1007 under the MIPA and that the Venter Trust assumed BS1007's rights and obligations thereunder.

**JURISDICTION AND VENUE**

15.    The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of different states or citizens of a state and citizens of a foreign state.

16.    The Court has personal jurisdiction over Defendants Venter and Blue Sky 1007 LLCBS1007 because each of them "consent[ed] to submit itself or himself exclusively to the personal jurisdiction of the Chancery Court of the State of Delaware or, if unavailable any federal court located in the State of Delaware, in either case, in the event any dispute arises out of this Agreement or any of the transactions contemplated hereby."  MIPA § 13.2.  Both also "agree[ed] that it or he will not attempt to deny or defeat the jurisdiction of such courts by motion or other request for leave from any such court[.]"  *Id*.  Here, Plaintiff pursues legal claims for which the Delaware Chancery Court of Chancery is "unavailable."  *Id*.[3]

17.    The Court has personal jurisdiction over Defendants Venter Ventures and The Venter Family Revocable Trust because, on information and belief, they are third party beneficiaries under the MIPA and are Blue Sky 1007 LLC's successors-in-interest in relation to the MIPA.  For example,the Venter Trust for the same reasons stated above.  Defendant Venter Ventures brought a claimconfirmed that it is BS1007's successor-in-interest by suing Nofar US for claims arising under the MIPA against Nofar US and Nofar Parent in the Superior Court of the State of California for the County of Napa (in contravention of the MIPA's forum selection clause),

_____

[3]  Plaintiff reserves the right to pursue appropriate claims against any of the Defendants and MIPA parties in the Delaware Court of Chancery.

~~and stated in its pleadings that The Venter Family Revocable Trust is also a party bringing that MIPA-related claim.~~and seeking to exercise rights thereunder.  *See* Ex. 3; *supra* at ¶ 13.  Further, in court filings in the Napa County Superior Court, Venter Ventures conceded that it is bound by the MIPA's forum selection clause (MIPA § 13.2)—which contains a consent to personal jurisdiction in this Court—alleging only that the clause is unenforceable because it contains a jury trial waiver.  Similarly, Venter sought to exercise legal rights under the MIPA through the Venter Trust, thereby conceding that the latter assumed BS1007's rights and obligations under the MIPA, which include § 13.2.  *Supra* at ¶ 14.

18.     Venue is proper in this district by agreement of the parties and because Defendants ~~directly or through their predecessors in interest, as applicable~~ submitted themselves to the jurisdiction of this Court and waived any objection to venue in this district where, as here, the "Chancery Court of the State of Delaware" is "unavailable."  MIPA § 13.2; *supra* at ¶¶ 16-17.

## FACTUAL ALLEGATIONS

### I.   Blue Sky

19.     Based in California, Blue Sky focuses on renewable energy solutions in the commercial and industrial space with a focus on multitenant real estate.  It aims to help businesses of all sizes achieve their environmental, social, and governance goals.  The core of Blue Sky's business is to provide its renewable energy solutions to shopping centers and their tenants.  At a high level, Blue Sky's ~~technology allows~~solutions allow the tenants to enjoy a discount on their utility bills in the form of credits from their utility provider.  Blue Sky, in turn, profits from those credits and related amounts.

## II.   The MIPA

20.   On May 25, 2021, Nofar US entered into the MIPA and acquired 67% of Blue Sky from Venter and his partner, Bujanover.  The other parties to the MIPA are Blue Sky, Defendant ~~Blue Sky 1007 LLC~~BS1007 (the sole member of which is Defendant Venter), and Bujanover's limited liability company, Yellow Tree Capital LLC ("Yellow Tree" and, together with BS1007, the "Selling Parties").  The Closing Date was July 1, 2021.

21.   After the transaction was completed, Nofar US held 67% of Blue Sky and Venter and Bujanover held 16.5% each.  Venter's interest was held through BS1007.  As consideration for the transaction, Nofar US committed close to $100 million as cash consideration, investments, and a loan facility, including millions of dollars paid to Venter.  At least $58 million of this amount was already deployed.  Specifically, the consideration was comprised of $6 million for the benefit of Venter and Bujanover, $6 million in potential bonuses to Venter and Bujanover, a $20 million investment in Blue Sky, and a $65 million loan facility for the benefit of Blue Sky.

22.   Nofar US only agreed to commit these significant amounts—including millions of dollars paid to Venter—based on binding representations and warranties Venter made in the MIPA regarding Blue Sky's financial and business performance.  *See* MIPA, Article III ("Representations and Warranties Regarding the Company").  Venter made these representations and warranties both in his personal capacity and through BS1007, of which he is the sole member.  Nofar US relied upon and was induced by these representations and warranties in entering into the MIPA.  The representations pertained to Blue Sky's financials, business operations, profitability, electricity production and consumption levels, and related matters.

23.   Those representations were crucial for Nofar US because Blue Sky's business is complex; assessing its value requires the analysis of data and factors that were accessible to Venter

and Bujanover, without effective visibility for Nofar US.  It was therefore pivotal that Venter and his partner be forthcoming and transparent, and negotiate in good faith.

24.      In Section 3.7(g) of the MIPA, Venter represented that:

The financial model of each Project is attached hereto as Schedule 3.7(g) (the "Financial Models") and reflect a good faith estimate of the anticipated revenues and costs of each Project Company.

25.      Schedule 3.7(g), in turn, expressly incorporated the Financial Models contained in the deal data room, stating that "[r]eference is made to the financial models provided in the data room prior to the date of the Agreement."  MIPA, Schedule 3.7(g).  Section 1.2(a) of the MIPA makes clear that the documents provided in the data room prior to the signing of the MIPA are finite and easily discernable, because such documents may "not removed [from the data room] at any time" after being uploaded thereto.  MIPA § 1.2(a).  Nofar US contemporaneously downloaded the entire data room and its contents are readily available, including the Financial Models incorporated in the MIPA.

26.      In Section 3.7(h) of the MIPA, Venter represented that:

The tariff collected from each Customer is in line with the Financial Models and the discount rate granted to each Customer is not expected to be amended, increased or altered in any way following the Closing.

27.      25. In Section 3.7(i) of the MIPA, Venter represented that:

Other than as set forth in Schedule 3.7(i) attached hereto, the total amount of electricity subscribed for by Customers of each applicable Project's electric output or equivalent virtual net energy metering credits is at least 125% of each applicable Project's total estimated annual electric production.

28.      26. In Section 3.13(a) of the MIPA, Venter represented that:

The Company has delivered or made available to Buyer true and complete copies of the unaudited balance sheets and other financial statements of the Company for the year ended December 31, 2020 (the "<u>Reference Date Balance Sheet</u>" and December 31, 2020 the "<u>Reference Date</u>") (collectively, the "<u>Financial Statements</u>"). The Financial Statements have been prepared in accordance with GAAP and the practices consistently applied by the Company in the preceding fiscal periods (except as may be indicated in the notes thereto to the contrary) and fairly present the financial condition, cash flows and results of operations of the Company for the periods and as of the dates set forth therein, subject to, in the case of the unaudited interim Financial Statements, the absence of information or notes not required by GAAP to be included in interim financial statements that, if furnished, would not, individually or in the aggregate, disclose any material obligation or liability not otherwise accrued for in such Financial Statements, and to normal year-end audit adjustments, none of which, individually or in the aggregate, is material.

29.    27. In Section 3.13(c) of the MIPA, Venter represented that:

The Company does not have any Liability except for (i) Liabilities set forth in the Reference Date Balance Sheet and (ii) Liabilities that have arisen after the Reference Date in the ordinary course of business (none of which was caused by any breach of Contract, breach of warranty, tort, infringement, or violation of a Legal Requirement by the Company).

30.    28. In Section 3.13(d) of the MIPA, Venter represented that:

Schedule 3.13(d) sets forth an accurate and complete list of all Company Indebtedness.

31.    29. In Section 3.26 of the MIPA, titled "Full Disclosure," Venter represented that:

All documents delivered or made available to the Buyer by or on behalf of the Company, the Subsidiaries and/or the Selling Parties in connection with this Agreement or any other Transaction Agreement, are complete and accurate in all material respects. Neither this Agreement (including the schedules hereto) nor any certificates made or delivered in connection herewith contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not false or misleading, in view of the circumstances in which they were made.

32.    Section 6.5 of the MIPA provides that:

Each Party shall, and shall cause their Affiliates and Representatives to, maintain in confidence the Confidential Information at all times and will not, directly or indirectly, use or disclose without the prior written consent of the other Parties any Confidential Information for its own benefit or for the benefit of any other Person or reveal or disclose any Confidential Information to any Person other than the other Parties and Representatives thereof.

33.     The term "Confidential Information" is defined in MIPA § 1.1 as, among other things:

any proprietary or confidential information relating to the products, services, business or affairs of [Blue Sky]…, including information relating to…(b) the identity of, or courses of dealings or contracts with, actual or potential business relations; (c) financial statements or other financial information; [and]…(v) Know-How.

34.     The term "Know-How," in turn, is defined as, among other things:  "trade secrets," "databases and other proprietary and confidential information," "business knowledge and materials," "customer and supplier lists and contact names," "pricing and cost information," and "financial, business and marketing plans and proposals."  MIPA § 1.1 (definition of "Know-How").

35.     30. FurtherNext, as stated *supra* at ¶ 16, the MIPA § 13.2 contains an exclusive forum selection clause, which provides in pertinent part that:

THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.  Each of the Parties (a) consents to submit itself or himself exclusively to the personal jurisdiction of the Chancery Court of the State of Delaware or, if unavailable any federal court located in the State of Delaware, in either case, in the event any dispute arises out of this Agreement or any of the transactions contemplated hereby, (b) agrees that it or he will not attempt to deny or defeat the jurisdiction of such courts by motion or other request for leave from any such court, (c) waives any claim that such proceedings have been brought in an inconvenient forum, and (d) agrees that it or he will not bring any Claim relating to

this Agreement in any court or other tribunal other than the Chancery Court of the State of Delaware or a federal court sitting in the State of Delaware.

36. ~~31.~~ Article VII of the MIPA deals with Venter's indemnification liability to Nofar US for breach of the MIPA and its representations and warranties. Section 7.1 of the MIPA provides that, subject to certain limitations not applicable here,

the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect, regardless of any investigation made by or on behalf of…the Buyer.

37. ~~32.~~ As is relevant here, Section 7.1 of the MIPA provides that the representations and warranties contained in Sections 3.7, 3.13, and 3.26 "shall survive until the date that is twenty four (24) months following the Closing Date." MIPA § 7.1. Venter and Nofar US entered into several amendments to the MIPA to extend this period, with the last and Seventh Amendment extending this period "to thirty (30) months following the Closing Date." Section 7.1 further provides that, notwithstanding the above, the right to seek indemnity on account of breached representations and warranties does not expire "if notice of the inaccuracy or breach thereof giving rise to such right of indemnity shall have been given to the Party against whom such indemnity may be sought prior to such time." *Id*.

38. ~~33.~~ On December 29, 2023, before the expiration of the 30-month period, Nofar US timely and properly delivered a Claim Notice to Venter, ~~through the Seller Representative~~ and BS1007.

39. ~~34.~~ Section 7.2(a) of the MIPA, in turn, provides in relevant part that:

the Company, the Selling Parties and the Founders ***jointly and severally***, shall indemnify and hold harmless Buyer and its Affiliates (including the Company on and following the Closing) and each of their respective officers, directors, managers, Affiliates, agents and employees (hereinafter referred to individually as a "<u>Buyer Indemnified Person</u>" and collectively as "<u>Buyer Indemnified Persons</u>")

from and against any and all losses, costs, damages, Liabilities, Taxes, claims, suits, proceedings, judgments, settlements and expenses (including reasonable fees and expenses of attorneys) (collectively, "<u>Damages</u>") incurred by Buyer Indemnified Persons arising from…"

(i)      any inaccuracy, misrepresentation or breach of, or default in connection with, any of the representations and warranties contained in Article III or Article IV or in any other Transaction Agreement, exhibit, schedule or certificate to, or delivered in connection with, this Agreement;

(ii)      any breach or violation of, failure to comply with, or default in connection with, any covenant or agreement made by or to be performed by the Selling Parties, the Founders or the Company in this Agreement or any exhibit, schedule or certificate to, or delivered in connection with, this Agreement;

[…]

(iv)      any inaccuracy contained in the Estimated Closing Statement, Primary Disbursement Schedule or Secondary Disbursement Schedule;

(v)      any Company Indebtedness or Company Transaction Expenses to the extent not paid by or on behalf of the Company as of the Closing;

(vi)      actual fraud, willful breach, intentional misrepresentation of a Selling Party, the Company or the Founders in connection with the making of any representation, warranty, covenant or agreement in this Agreement.

MIPA § 7.2(a) (emphasis added).

40. ~~35.~~ Only Section 7.2(a)(vi) requires the breach to be based on fraud or an intentional misrepresentation.  MIPA § 7.2(a)(vi).  All other violations described in Section 7.2(a) do not require fraud or intentional conduct to warrant indemnification.

41. ~~36.~~ While Blue Sky was one of the parties making representations under the MIPA, upon Closing it ~~becomes~~became entitled to indemnity from Venter, Bujanover, and the Selling Parties.  MIPA § 7.2(a) ("Buyer and its Affiliates (***including the Company on and following the Closing***)" are entitled to indemnity for breached representations and warranties) (emphasis added).

42. ~~37.~~ Venter's indemnity liability to Nofar US under MIPA §§ 7.2(a)(i)-(a)(v) is capped at $6 million (*i.e.*, the Aggregate Secondary Amount).  *See* MIPA § 7.2(e)(ii)(~~A~~a).  But as is relevant here, Venter's indemnity liability to Nofar US for fraud ~~and,~~ intentional

14

misrepresentations~~,~~ and willful breach under MIPA § 7.2(a)(vi) is not capped~~.~~ and "shall not be limited." *See* MIPA § 7.2(e)(ii)(B).

43. ~~38.~~To seek indemnification from one another, the MIPA parties:

> shall notify the Party providing indemnification hereunder (the "<u>Indemnitor</u>") in writing (such notice, a "<u>Claim Notice</u>") as soon as possible but in no event less than ten (10) Business Days following the Indemnitee's discovery of any matter (including if a Claim is filed against the Indemnitee) for which the Indemnitor may be liable to the Indemnitee under this Article VII. The failure of an Indemnitee to deliver a timely Claim Notice hereunder shall not affect its rights to indemnification hereunder, except to the extent that the Indemnitor is actually prejudiced by such failure to provide timely notice; provided that any Claim Notice must be delivered within the applicable survival period giving rise to the Claim.  MIPA § 7.3(a).

**III.  Nofar US Discovers Venter's Fraud, Intentional Misrepresentations, <u>Willful Breaches,</u> and Other Breaches of Representations And Warranties**

44. ~~39.~~The scale of Venter's fraud was revealed in the aftermath of the Closing.  After becoming Blue Sky's majority owner and gaining access to its records and information, Nofar US learned that Venter grossly overstated Blue Sky's value to ~~induce~~defraud Nofar US and induce it to enter into the MIPA and commit roughly $100 million for the acquisition of Blue Sky, including millions pocketed by Venter directly.   Venter knew his representations were false, yet he made them anyway in an effort to artificially inflate the purchase price and boost his own personal gain.

*A. Financial Models*

45. ~~40.~~One ~~of the methods used by~~way that Venter ~~to~~ fraudulently ~~inflate~~inflated Blue Sky's value was by feeding the Financial Models with false or ~~intentionally~~ misleading data or assumptions.  As noted *supra* at ¶~~24~~¶ 24-25, Venter represented in the MIPA that the Financial Models "reflect a good faith estimate of the anticipated revenues and costs of each Project Company."  MIPA § 3.7(g).  But the Financial Models were riddled with misrepresentations ~~in the~~

~~form of false or intentionally misleading  information that was~~and omissions that were known, or knowable, to Venter at the time the representations were made~~or, at a minimum, knowable~~.

46. ~~41.~~ An example of Venter's fraud is found in the Financial Models' revenue information for the years 2019 and 2020.  On information and belief, the MIPA's Financial Models were prepared in ~~mid 2021~~2021—when they were provided to Nofar US.  By then, Blue Sky already had ***actual*** financial and performance data for 2019 and 2020 and no projection work was required.  ~~Yet when~~When Nofar US gained full access to Blue Sky's actual records, it ~~learned~~was able to access Blue Sky's data for 2019 and 2020 and compare it with the data represented by Venter in the Financial Models.  That comparison showed that the 2019-2020 data provided by Venter in the ~~2021~~Financial Models, provided in 2021, was false and inflated.  For example, for a Blue Sky project named "Winery Square," the Financial Models overstated each of the applicable metrics:  the project's electricity production level, tenant consumption of electricity, and revenue, all as depicted below:

| WINERY SQUARE, 2019 | | | | | |
|---|---|---|---|---|---|
| Production | | Tenant Consumption Percentage | | Revenue | |
| Actual | Model | Actual | Model | Actual | Model |
| 450,144 | 465,972 | 65% | 100% | $38,731 | $98,260 |

47. ~~42.~~  Another example of Venter's fraud is a Blue Sky project named "Boronda Plaza."  There, the Financial Models correctly stated the tenant consumption of 100%, but artificially inflated the production value such that the consumption was indeed at 100%, but reflected an overall lower amount of electricity consumed.  The revenue presented in the Financial Models was, accordingly, almost double the true revenue:

| BORONDA PLAZA, 2019 | | | | | |
|---|---|---|---|---|---|
| Production | | Tenant Consumption Percentage | | Revenue | |
| Actual | Model | Actual | Model | Actual | Model |
| 940,504 | 1,764,544 | 100% | 100% | $183,994 | $346,380 |

48. Venter also misrepresented tenant tariffs in the Financial Models. MIPA §§ 3.7(g), 3.7(h). For example, for a Blue Sky project named "Hanford Mall," the Financial Models correctly state that subscribed tenant consumption is 100%, but falsely represent that the tenant tariff was double its true amount and inflate the electricity production data. Due to Venter's manipulation of the tariff and production components, the Financial Models represented an inflated revenue:

| HANFORD MALL, 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Production | | Tenant Consumption Percentage | | Tenant Tariff | | Revenue | |
| Actual | Model | Actual | Model | Actual | Model | Actual | Model |
| 2,451,002 | 2,935,593 | 100% | 100% | $0.0863 | $0.1661 | $211,461 | $487,672 |

49. 43. Multiple other similar instances of Venter's misrepresentations by providing false information exist for the years 2019 and 2020. When making these representations in the Financial Models, Venter knew—and had access to—the actual financial and performance data for Blue Sky's projects. But instead of providing Nofar US with the true data, Venter provided fabricated data to inflate the purchase price under the MIPA.

50. 44. But Venter's misrepresentations in the Financial Models are not limited to the years for which actual data existed at the time the representations were made. Venter's forward-looking projections, too, were fraudulent. The problem with these forward-looking representations is not, for example, that they were over-optimistic while actual performance turned out to be disappointing. Rather, the Financial Models' forward-looking aspects are fraudulent because they were fraudulently premised on intentionally misleading assumptions that were designed to produce in an effort to present Nofar US with inflated forecasts.

51. 45. For example, to calculate forecasted revenue, the Financial Models rely on electricity *production* as opposed to *consumption of the electricity produced*. Using the production

17

data point to calculate revenue is misleading because, as Venter knew at the time he made these representations, Blue Sky's revenue is derived from subscribed tenants' consumption, not Blue Sky's production.  Blue Sky's monetization is fractional for produced electricity that is not consumed by a subscribed tenant.  The Financial Models artificially unified the consumption and production components into one, baselessly assuming that ~~consumption is always at 100%~~100% of the produced electricity is always consumed by subscribed tenants.  For example, the purported "subscribed tenants consumption" levels the Financial Models predicted for Blue Sky's projects in 2021 is depicted below, alongside the subscribed tenants' actual consumption data for that year:

| % tenant consumption | |
| --- | --- |
| Actual | Predicted |
| 89% | 100% |
| 49% | 100% |
| 68% | 100% |
| 100% | 100% |
| 84% | 100% |
| 100% | 100% |
| 100% | 100% |
| 61% | 100% |
| 26% | 100% |
| 100% | 100% |
| 0% | 100% |
| 0% | 100% |
| 79% | 100% |

52.  ~~46.~~ The above cannot be excused as an over-optimistic forecast.  The Financial Models ~~represent that~~misrepresent that subscribe tenants' consumption in 2019 and 2020, too, was at 100%, even though actual consumption data was already available for those years at the time the representations were made.  Contemporaneous evidence shows that Venter had actual consumption data at the time he made the representations, and knew that consumption is often well below 100%.  For example, in a March 2021 email regarding a Blue Sky project named "San Dimas," a Blue Sky employee told Venter:  "I see significant drop in usage beginning of 2019." Yet Venter fraudulently ~~represented~~and intentionally misrepresented to Nofar US that

consumption in that project was at 100% in 2019.  The purported "tenant consumption" data for 2020 is depicted below, alongside the actual consumption for that year:

| % tenant consumption | |
| --- | --- |
| Actual | Predicted |
| 89% | 100% |
| 40% | 100% |
| 13% | 100% |
| 100% | 100% |
| 40% | 100% |
| 100% | 100% |
| 100% | 100% |
| 0% | 100% |
| 0% | 100% |
| 100% | 100% |
| 0% | |
| 0% | |
| 83% | 100% |

47. Multiple other instances of Venter's misrepresentations by providing false information exist in the Financial Models.

53. 48. Indeed, when making these representations in the Financial Models, it was known to Venter knew that Blue Sky's revenue is calculated based on subscribed tenants' consumption and not production.  Venter describes himself at the top of his public LinkedIn page as a "Veteran In Renewable Energy Industry," and has been involved in managing Blue Sky's business since at least 2009.  But instead of providing Nofar US with forecasts premised on appropriate assumptions, Venter knowingly and intentionally used inapplicable assumptions to inflate the purchase price under the MIPA.

54. Multiple other instances of Venter's misrepresentations by providing false information exist in the Financial Models.

B. *Subscription Rates*

55. ~~49.~~ Another ~~misrepresentation~~tactic Venter deployed to inflate Blue Sky's value was ~~providing~~to provide incorrect information regarding Blue Sky's subscription rates. For each one of Blue Sky's projects, the subscription rate reflects the percentage of electricity production allocated to tenants who subscribed to Blue Sky's program to receive credits on their electricity bills. Any unsubscribed portions will not be allocated to the tenants and thus result in ~~a~~ far lower revenue. Accordingly, subscription rates affect revenues. As noted *supra* at ¶ ~~25~~27, Venter represented in the MIPA that "[o]ther than as set forth in Schedule 3.7(i) attached hereto, the total amount of electricity subscribed for by Customers of each applicable Project's electric output or equivalent virtual net energy metering credits is at least 125% of each applicable Project's total estimated annual electric production." MIPA § 3.7(i).

~~50. That representation was false. Once Nofar US gained access to Blue Sky's records, it learned that the actual subscription rates for Blue Sky's projects were well below 125%. Those numbers cannot be excused or otherwise explained by Schedule 3.7(i).~~

56. Schedule 3.7(i) represented that seven projects had a subscription rate exceeding 125%:

| Schedule 3.7(i) | | | |
| Usage | | | |
| Summary - All Signed Up & Lease Controlled Tenants Usage | | | |
| Site | PVSyst | 12 Month Usage | % |
| --- | --- | --- | --- |
| San Dimas | 1,091,000 | 1,535,774 | 141% |
| Broadway | 783,801 | 367,005 | 47% |
| Bressi | 478,970 | 443,298 | 93% |
| Boronda | 1,750,585 | 1,972,717 | 113% |
| Winery | 473,355 | 572,854 | 121% |
| Clovis | 914,049 | 1,394,485 | 153% |
| Vail Ranch | 1,014,900 | 1,028,543 | 101% |
| Carmen Plaza | 1,036,800 | 1,035,489 | 100% |
| Esplanade | 2,677,000 | 3,522,019 | 132% |
| Felicita Town Center | 1,030,000 | 1,699,471 | 165% |
| Felicita Plaza | 441,800 | 1,110,937 | 251% |
| Ocean View Plaza | 1,382,806 | 1,561,876 | 113% |
| Puente Hills | 2,301,600 | 2,367,411 | 103% |
| Palmdale | 2,028,852 | 802,014 | 40% |
| Blue Oaks | 2,450,324 | 4,050,808 | 165% |
| Orland | 921,612 | 1,083,665 | 118% |
| Colusa | 927,812 | 1,047,283 | 113% |
| Hanford | 2,531,229 | 3,636,563 | 144% |
| YMCA | 316,700 | 389,982 | 123% |
| CT Montville | 172,000 | 166,010 | 97% |
| CT Willimatic | 153,566 | 158,066 | 103% |
| CT Stop&Shop | 123,618 | 124,870 | 101% |

57.     Once Nofar US gained access to Blue Sky's records, it learned that the actual subscription rates for six of the seven projects which Schedule 3.7(i) represented had a subscription rate exceeding 125% had, in reality, a lower subscription rate (Hanford is the sole exception). Accordingly, the representation in MIPA § 3.7(i) was false because there were six projects below 125% for which Schedule 3.7(i) does not state otherwise.  Separately, Schedule 3.7(i) also constitutes a breach of the representation in MIPA § 3.26 because it provided inaccurate, inflated usage data for the other listed projects.  *See* MIPA § 3.26 ("Neither this Agreement (***including the schedules hereto***) nor any certificates made or delivered in connection herewith contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not false or misleading, in view of the circumstances in which they were made." (emphasis added).

C. *Financial Statements and Liabilities*

58. ~~51. Another misrepresentation~~ Venter ~~deployed~~also intended to inflate Blue Sky's value ~~was~~by providing incorrect Financial Statements and Liabilities. As noted *supra* at ¶ ~~26~~28, Venter represented in the MIPA that Blue Sky "has delivered or made available to [Nofar US] true and complete copies" of GAAP-compliant Financial Statements ~~for the year ending December 31, 2020.~~that "have been prepared in accordance with GAAP" and "fairly present the financial condition, cash flows and results of operations of the Company[.]" MIPA § 3.13(a). The Financial Statements provided ~~were neither true nor complete~~did not meet this standard. Relatedly, Venter also represented in the MIPA that, subject to certain limitations, Blue Sky "does not have any Liability" except as set forth in the applicable Financial Statements. MIPA § 3.13(c). This representation, too, was false.

59. ~~52.~~ Upon gaining access to the actual financial information in Blue Sky's books and records following the sale, Nofar US discovered that the Financial Statements provided pursuant to the MIPA's representations had misleadingly understated Liabilities and were therefore not "prepared in accordance with GAAP" and did not "fairly present the financial condition." MIPA § 3.13(a). For example, (1) the Financial Statements' total amount of outstanding Liabilities as of June 30, 2021 omitted Liabilities amounting to $1,294,353; and (2) the difference between Blue Sky's accounts receivable and accounts payable in the Financial Statements is a negative amount of ($5,526,812), while in reality the difference was a negative amount of ($8,680,414). Further, Blue Sky's equity was in truth only $6,442,221 due to overinclusion of assets and undisclosed Indebtedness, not $23,373,241 as represented in the Financial Statements.

60. 53. Contemporaneous communications, that were not available to Nofar US at the time of the purchase, corroborate that the financials contained material misstatements. For example, in September 2021, Blue Sky's then-CFO admitted in writing that the way the sale under the MIPA was recorded "is really not 'by the book,'" expressing the "hope" that the auditors will not "cause problems." He ~~added~~admitted that all of the company's equity records must be "cleaned up" because they are "inaccurate." This admission comports with the significant equity discrepancy ~~discovered~~uncovered by Nofar US after the Closing Date. *See supra* at ¶ ~~52~~59.

61. 54. An example of the ~~concerning~~alarming methodologies employed to generate the MIPA's Financial Statements is found in a balance sheet statement prepared in March 2021, during the negotiations. Venter and his team prepared a statement titled "BSU LLC Consolidated Balance Statement" for "Q4 2020." A comparison of (1) that quarterly statement and (2) the annual Financial Statements provided to Nofar US under the MIPA, reveals that each of the many line items in the quarterly statement is equal to exactly 25% of the same line item on the annual statement. Of course this is not the case, as real quarterly statements accurately reflect changes in the financial condition of the reporting entity across the given timeframe. Changes in the entity's financial condition are calculated by comparing different quarterly reports. That is particularly the case in a renewable energy business, which is inherently seasonal due to sunlight levels and other factors. Venter and his team either (1) ~~created~~manufactured the annual statement by multiplying one quarterly statement by four; or (2) ~~created~~manufactured the quarterly statement by dividing the annual statement by four. Either of these practices is indicative of fraud:

```
                          BSU LLC
                 Consolidated Balance Sheet
                          Q4 2020


        Total Equity                            515,508.19
        TOTAL LIABILITIES & EQUITY            5,512,845.97


    MIPA 2020 "TOTAL LIABILITIES & EQUITY":  $22,051,383.89, i.e., 5,512,845.97 x 4.
```

     *D.*   *Indebtedness*

    62.   ~~55. Another misrepresentation Venter deployed to inflate~~Venter further inflated Blue Sky's value ~~was~~by concealing its Indebtedness. As noted *supra* at ¶ ~~28~~30, Venter represented in the MIPA that "Schedule 3.13(d) sets forth an accurate and complete list of all Company Indebtedness." MIPA § 3.13(d). The term "Company Indebtedness" is defined in the MIPA as, among other things, "deferred payment obligations" for "goods or services," "deferred compensation arrangements," "any indebtedness of another entity or person" that is "guaranteed, directly or indirectly by the Company or any Portfolio Company or Project Company," and "any other amounts owing in respect of" goods and services. MIPA § 1.1 (definition of "Company Indebtedness"). Consistent with this definition of the term "Company Indebtedness," Schedule 3.13(d) disclosed liabilities to various vendors and service providers, including, for example, GoGetIt (vendor and service provider) and Garret Law LLP (provider of legal services). *See* MIPA, Schedule 3.13(d):

```
                        Schedule 3.13

                 Indebtedness (as of May 20, 2021)

Outstanding
AP

                 Gogetit                          13,603
                 Garett                           75,974
                 Rent                            155,705
                 Novo                            106,170
                 Harmer                            1,235
                 Munibilling                       6,068
                 Yardi                            42,725
                 Sitelogiq                        71,133
                 Northstate                            -
                 Tax                              27,900
                 PbtS Refunding                  143,940
                 Total                           644,453
```

63.     But Schedule 3.13(d) was neither accurate nor complete~~.~~

as Venter represented.  While amounts owed to other vendors and service providers were

listed, strikingly

~~56. Strikingly~~ absent from Schedule 3.13(d)'s list of ~~"Outstanding AP" are the invoices

sent to Blue Sky~~ Company Indebtedness items are the amounts invoiced by Venter's other

company, ~~Bright Power Inc. ("BPi")~~, a vendor performing services for Blue Sky.  Tellingly,

Schedule 3.13(d) does disclose—under "CAPEX"—a $1.7 million loan purportedly owed to BPi,

while concealing millions in unpaid BPi invoices.  *See* MIPA, Schedule 3.13(d).

64.     Venter claims he founded BPi to generate revenue sources for Blue Sky and

remains to this day ~~its~~ BPi's "Founder, Owner & ~~Chairman~~ Chairmen [*sic*] of the Board~~.~~":

**Barend Venter**

Founder, Owner & Chairmen of the Board

Barend Venter is a serial entrepreneur with several successful exits. Barend is the Chairman of the Board at BPi that entered the renewable energy market in 2008 closing a $30M project portfolio with Treasury wines (Beringer, Etude, ASTI, Stags leap and Meridian wines) owed by Alliant Capital. Barend Venter also founded in 2009 and is the CEO of Blue Sky Utility which is an owner & operator of multitenant retail solar systems, strategically enabling REITs like Phillip Edison, Brixmor, ROIC, Investec and more. In 2021, Blue Sky Utility did a M&A transaction with Nofar Energy, public company, for just under $100M where he is still an owner and board member. As a veteran in the USA renewable energy industry, he provides consultation to the CEC and CPUC.

*See* About BPi, *available at*:  https://bpi-power.com/about-bpi (last visited Oct. 25, 2024).

65.     On information and belief, instead of submitting BPi's invoices for Blue Sky's payment on time, Venter accumulated numerous BPi invoices totaling millions of dollars from prior months and intentionally refrained from paying them.  Venter did so in anticipation of Nofar US's entry into Blue Sky following the execution of the MIPA, intending that Nofar will bear the costs for BPi's previously-rendered services.  Indeed, only in September 2021 did Venter cause BPi to seek payment from Blue Sky for these aged invoices totaling more than $3.7 million, some with a due date as far back as November 2020:



66.     ~~57.~~ On information and belief, the BPi invoices were not the only cost item Venter concealed and tried to secretly dump on Nofar US.

**IV.     Venter Attempts To Cover His Tracks And Destroy Evidence**

67.    ~~58.~~ After committing the acts discussed above, Venter tried to destroy any evidence of his wrongdoing.  On June 16, 2021, shortly after the signing of the MIPA but prior to the Closing Date, Venter wrote to his partner stating that ~~they~~ the duo should bury all of their records to ensure Nofar US never learns of their documents and emails.  Venter added that "if something goes wrong," he and his partner will both "be in the same boat and the same exposure for the next 6 years."  Specifically, Venter stated that "all the history is what you and I potentially need to mitigate."

68.    ~~59.~~ On December 28, 2021, Venter again wrote that "we need to move all emails from my account in January."  Fortunately, Venter's scheme to cover his tracks was not successful, or at least not in full.

**V.     Claim Notice**

69.    ~~60.~~ Consistent with the terms of the MIPA (as amended), on December 29, 2023, Nofar US timely and properly served a Claim Notice on Venter both personally and "in his capacity as sole member of Blue Sky 1007," pursuant to Section 7.3(a) of the MIPA.  Because Venter owns and controls all other Defendants, they are deemed to have been served with the Claim Notice.  In its Claim Notice, Nofar US sought indemnification from Venter due to his fraud, intentional misrepresentations, and other breaches of the MIPA's representations and warranties.

**VI.     Venter Uses and Discloses Confidential Information and Know-How**

70.    Since Nofar US confronted him about his fraud—and potentially even earlier—Venter began using his access to Blue Sky's Confidential Information and Know-How to Blue Sky's detriment, in an attempt to bully Nofar US into dropping its claims against him.  By so doing, Venter breached Section 6.5 of the MIPA.

71.     Among other adverse conduct and dealings, Venter caused BPi—of which he is the founder, owner, and Chairman—to sue Blue Sky in the Napa County Superior Court for nearly $2.7 million (Nofar US is not a party to that litigation).  On June 26, 2024, Venter filed personal declaration in support of that lawsuit, signed by him under penalty of perjury (the "Venter BPi Declaration").[4]  The Venter BPi Declaration improperly contained Confidential Information and Know-How which Venter is contractually required under the MIPA to "maintain in confidence" and is prohibited from "directly or indirectly, us[ig] or disclos[ing] without the prior written consent of the other Parties…for its own benefit or for the benefit of any other Person."  MIPA § 6.5.

72.     The Venter BPi Declaration disclosed the amounts of Blue Sky's "overhead expenses"; the compensation paid to Blue Sky's employees; Blue Sky's sensitive internal dealings and processes; Blue Sky's debts; Blue Sky's ability to compete in the marketplace and offer competitive terms to customers; Blue Sky's available financing and financial affairs; Blue Sky's "hurdle rate"; and data about Blue Sky's business performance and affairs.

73.     On information and belief, Venter breached—and continues to breach—Section 6.5 of the MIPA on multiple other occasions for the benefit of himself and BPi, including by disclosing Confidential Information and Know-How to BPi in breach of the MIPA.

**VII.     Venter Takes Actions to Destroy Blue Sky's Value**

74.     As noted above, Venter is the Chairman, owner, and founder of BPi, another company operating in the energy space.  *See supra* at ¶ 64.  BPi serves as Blue Sky's construction contractor and provides various services to the company on a regular basis in connection with its

---

[4]  *See Bright Power, Inc. v. Blue Sky Utilities LLC, et. al.*, Case No. 24-CV-547 (Cal. Napa Super. Ct.).  BPi named incorrect defendants and has not yet served its complaint.

energy projects.  In entering into the MIPA, Nofar US knew that Venter owns and controls BPi and both Venter and Nofar US knew that BPi plays a major role in Blue Sky's ability to establish and construct its energy projects.  Based on agreements and a decade-long course of dealings between Blue Sky and BPi, both Nofar US and Venter knew that BPi will continue to play a major role in Blue Sky's business.  The MIPA parties even expressly referred to BPi:  In the Amended and Restated Operating Agreement attached to the MIPA as Exhibit F, the parties agreed that Nofar US will not seek to solicit BPi's employees for at least three years.  *See* MIPA, Ex. F, § 3.4(b).

75.     But since at least February 2024, Venter has been causing BPi to bombard Blue Sky with a barrage of arbitrary payment demands, notices of default, and mechanic's liens.  On multiple occasions, Venter caused BPi to issue unwarranted notices of default and record liens against Blue Sky before payment was even due, knowing that doing so will disrupt Blue Sky's business, force it to post substantial cash bonds, and damage its relationships with its customers— thus harming Nofar US as the majority holder.  For example, Venter caused BPi to issue to Blue Sky unwarranted "30-day Notices of Default" in connection with certain of its energy projects on February 5, 2024, March 28, 2024, April 4, 2024, and August 22, 2024.  Further, Venter caused BPi to record liens against Blue Sky on March 8, 2024, April 11, 2024, April 12, 2024, and September 23, 2024, including before the 30-day notice period even expired.

76.     In each of these instances, the arbitrary actions Venter took through BPi risked placing Blue Sky in breach of the applicable lease agreements, causing it substantial reputational damage, and creating the false impression that Blue Sky does not pays it bills.  In connection with each of these instances, Venter was well-aware that his actions (executed through BPi) were arbitrary and unwarranted under the applicable agreements.

77.     Venter is taking those actions to undermine the value of Nofar US's acquisition under the MIPA, in order to exert pressure on Nofar US to "buy him out" and secure another windfall.  Venter made no effort to hide the fact that he is the one pulling the strings at BPi as its owner and Chairman.

## COUNT I:  FRAUD
### (against all Defendants)

78.     61. Nofar US realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

79.      Venter and BS1007 are among the MIPA's original parties and jointly made fraudulent representations and warranties therein.  Venter Ventures and the Venter Trust are BS1007's successors-in-interest under the MIPA and assumed its rights and liabilities thereunder.

80.     62. Under the MIPA, Venter and the other Defendants are jointly and severally liable to Nofar US together with Bujanover and Yellow Tree for any Damages resulting from actual fraud, willful breach, or intentional misrepresentation of a Selling Party, the Company, or the Founders in connection with the making of any representation, warranty, covenant, or agreement in the MIPA.

81.     The fraudulent conduct was intentionally, deliberately, and willfully committed by Venter, including through BS1007, of which Venter Ventures and the Venter Trust are successors-in-interest.  Venter owns, controls, and operates through BS1007, Venter Ventures, and the Venter Trust.

82.     63. As detailed above, Venter, Bujanover, the Selling Parties, and the Company made multiple false and misleading material misrepresentations and omissions before the execution of, and in connection with, the MIPA.

83. ~~64.~~ Venter, Bujanover, the Selling Parties, and the Company made those false and misleading material misrepresentations and omissions with knowledge of the true facts, or with reckless indifference to their truth or falsity, and with the intent to ~~induce~~defraud Nofar US and induce it to enter into the MIPA. MIPA § 3.26.

~~65. Venter, Bujanover, the Selling Parties, and the Company had a duty to speak and disclose to Nofar US the material information omitted because of their obligations under the MIPA and because they made partial, ambiguous, and misleading statements. Venter, Bujanover, the Selling Parties, and the Company represented in the MIPA that "[n]either this Agreement (including the schedules hereto) nor any certificates made or delivered in connection herewith contains any untrue statement of a material fact *or omits to state a material fact* necessary to make the statements herein or therein not false or misleading, in view of the circumstances in which they were made." MIPA § 3.26 (emphasis added).~~

84. ~~66.~~ Venter, Bujanover, the Selling Parties, and the Company actively suppressed and concealed material information.

85. ~~67.~~ Nofar US justifiably relied on the intentional misrepresentations in entering into the MIPA.

86. ~~68.~~ Because Nofar US's Damages are the direct result of intentional fraud and misrepresentations and willful breaches under MIPA § 7.2(a)(vi), the limitations set forth in MIPA § 7.2(e)(ii)(B) do not apply. Accordingly, Nofar US's Damages are not capped and "shall not be limited."

87. ~~69.~~ Pursuant to MIPA § 7.2(a), Defendants are required to indemnify Nofar US for its Damages arising from the above. Nonetheless, Venter and ~~Venter Ventures~~BS1007 (and, by implication, the other Defendants) have refused to satisfy their indemnity obligations and are in breach thereof.

88. ~~70.~~ Nofar US is accordingly entitled to its full damages exceeding $58,000,000, as well as its expenses and attorneys' fees, with the exact amount to be proven at trial.

## COUNT II: BREACH OF CONTRACT (INDEMNIFICATION)
### (against all Defendants)

89. ~~71.~~ Nofar US realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

90. ~~72.~~ The MIPA is a valid and enforceable contract. Nofar US performed all of its obligations under the MIPA and has not breached any provision of the MIPA.

91. Venter and BS1007 are among the MIPA's original parties. Venter Ventures and the Venter Trust are BS1007's successors-in-interest under the MIPA and assumed its rights and liabilities thereunder.

92. ~~73.~~ Under the MIPA, Venter and the other Defendants are jointly and severally liable to Nofar US together with Bujanover and Yellow Tree for any Damages resulting from a breach of any representations, warranties, covenants, or agreements under the MIPA.

93. ~~74.~~ Under the MIPA, Venter and the other Defendants are jointly and severally liable to Nofar US together with Bujanover and Yellow Tree for any Damages resulting from any inaccuracy contained in the applicable Financial Statements.

94. ~~75.~~ Under the MIPA, Venter and the other Defendants are jointly and severally liable to Nofar US together with Bujanover and Yellow Tree for any Damages resulting from any Company Indebtedness to the extent not paid by or on behalf of the Company as of the Closing.

95. ~~76.~~ As detailed above, the Founders, the Selling Parties, and the Company breached multiple representations, warranties, covenants, and agreements under the MIPA.

96. ~~77.~~ As further detailed above, there were various inaccuracies contained in the applicable Financial Statements, which fell below the standard required under the MIPA.

97. ~~78.~~ As further detailed above, there was Company Indebtedness not paid by or on behalf of the Company as of the Closing.

98. ~~79.~~ Pursuant to MIPA § 7.2(a), Defendants are required to indemnify Nofar US for its Damages arising from the above. Nonetheless, Venter and ~~Venter Ventures~~BS1007 (and, by implication, the other Defendants) have refused to satisfy their indemnity obligations and are in breach thereof.

99. ~~80.~~ Nofar US has suffered damages exceeding $58,000,000, as well as its expenses and attorneys' fees, with the exact amount to be proven at trial, as a direct and proximate result of the breaches.

## COUNT III: FRAUDULENT INDUCEMENT
### (against all Defendants)

100. ~~81.~~ Nofar US realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

101. The MIPA is a valid and enforceable contract. Nofar US performed all of its obligations under the MIPA and has not breached any provision of the MIPA.

102. Venter and BS1007 are among the MIPA's original parties and jointly made fraudulent representations and warranties therein. Venter Ventures and the Venter Trust are BS1007's successors-in-interest under the MIPA and assumed its rights and liabilities thereunder.

103. The fraudulent conduct was intentionally, deliberately, and willfully committed by Venter, including through BS1007, of which Venter Ventures and the Venter Trust are successors-in-interest. Venter owns, controls, and operates through BS1007, Venter Ventures, and the Venter Trust.

104. ~~82.~~ Before the sale and during due diligence, Venter and ~~Blue Sky 1007 LLC~~BS1007 (and, by implication, the remaining Defendants) jointly made numerous material

33

representations to Nofar US about Blue Sky. Among other things, ~~Venter's~~the material representations pertained to Blue Sky's Financial Statements, profitability, subscribed tenant consumption levels, Indebtedness, and past performance.

105. ~~83.~~ The representations made by Venter and ~~Blue Sky 1007 LLC~~BS1007 (and, by implication, the remaining Defendants) were materially false when made.

106. ~~84.~~ Venter and ~~Blue Sky 1007 LLC~~BS1007 (and, by implication, the remaining Defendants) knew that these representations were materially false when made.

107. ~~85.~~ Venter and ~~Blue Sky 1007 LLC~~BS1007 (and, by implication, the remaining Defendants) made the false representations with the intent to defraud Nofar US and induce Nofar US to sign the MIPA and close the transaction.

108. ~~86.~~ Nofar US justifiably relied on these intentionally false misrepresentations when entering into the MIPA, closing the transaction, and negotiating a final agreed-upon purchase price and other consideration components.

109. ~~87.~~ As a direct and proximate result of Nofar US's reliance and inducement based on these false and misleading representations, Nofar US has suffered damages exceeding $58,000,000, as well as its expenses and attorneys' fees, with the exact amount to be proven at trial.

<u>**COUNT IV: NEGLIGENT MISREPRESENTATION**</u>
**(against Venter)**

110. ~~88.~~ Nofar US realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

111. ~~89.~~ Before the sale and during due diligence, Venter made numerous material representations to Nofar US about Blue Sky. Among other things, Venter's material

representations pertained to Blue Sky's profitability, tenant consumption levels, indebtedness, and past performance.

112. 90. Venter's representations were materially false when made. Venter was negligent in making these representations, which he made without reasonable belief as to their truth. Venter knew or should have known, prior to signing the MIPA, that the data and assumptions comprising his representations were false or misleading.

113. 91. Venter had a pecuniary duty to provide accurate information because he made the representations at issue in the course of a business transaction in which he had a pecuniary interest. Accordingly, Venter had a duty to exercise reasonable care to provide Nofar US with accurate information.

114. 92. Nofar US justifiably relied on Venter's false misrepresentations when entering into the MIPA, closing the transaction, and negotiating a final agreed-upon purchase price and other consideration components.

115. 93. As a result of Venter's negligent misrepresentations, Nofar US has suffered damages exceeding $58,000,000, as well as its expenses and attorneys' fees, with the exact amount to be proven at trial.

**COUNT V: IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(against Venter)**

116. Nofar US realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

117. The MIPA is a valid and enforceable contract. Nofar US performed all of its obligations under the MIPA and has not breached any provision of the MIPA.

118. Implied covenants of good faith and fair dealing apply to the MIPA under Delaware law.

119. By entering into the MIPA, Defendant Venter impliedly covenanted that he would act in good faith and not take arbitrary and unreasonable actions to destroy or undermine Blue Sky's value, even after he was no longer a majority holder of Blue Sky following the execution of the MIPA.

120. In executing the MIPA, Nofar US had a reasonable expectation that Venter will not take advantage of his ownership and control of BPi—a major contractor, counterparty, and service provider—to harm Blue Sky and undermine its value. Had the parties to the MIPA expressly addressed the issue, they would have agreed that Venter would not cause BPi—a company he owns and controls—to undertake actions to harm Blue Sky and undermine its value, including by filing arbitrary notices of default and liens against Blue Sky.

121. By filing a personal declaration against Blue Sky on behalf of BPi, causing BPi to issue arbitrary notices of default and record unwarranted liens against Blue Sky, and taking other unwarranted adverse action against Blue Sky on behalf of BPi, Venter engaged in arbitrary and unreasonable conduct which had the effect of preventing Nofar US from receiving the fruits of its bargain under the MIPA.

122. Venter's arbitrary and unreasonable conduct breached the MIPA's implied covenants of good faith and fair dealing.

123. As a direct and proximate result of Venter's bad faith actions, Nofar US has suffered damages, as well as its expenses and attorneys' fees, with the exact amount to be proven at trial.

**COUNT VI: BREACH OF CONTRACT (CONFIDENTIAL INFORMATION)**
**(against Venter)**

124. Nofar US realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

125. The MIPA is a valid and enforceable contract. Nofar US performed all of its obligations under the MIPA and has not breached any provision of the MIPA.

126. Under Section 6.5 of the MIPA, Venter must keep Confidential Information (which includes Know-How) in confidence and is prohibited from disclosing or using such information to his own benefit of to the benefit of another party.

127. On June 26, 2024, Venter filed the Venter BPi Declaration using and disclosing Confidential Information and Know-How to BPi's benefit without authorization.

128. Venter disclosed Confidential Information and Know-How to BPi, used such information to his and BPi's benefit, and failed to maintain it in confidence.

129. Venter's actions were unauthorized and breached MIPA § 6.5.

130. As a direct and proximate result of Venter's breaches of MIPA § 6.5, Nofar US has suffered damages, as well as its expenses and attorneys' fees, with the exact amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Nofar US respectfully requests judgment in its favor as follows:

a) With respect to the First Cause of Action, an order awarding Nofar US its damages for fraud against all Defendants.

b) With respect to the Second Cause of Action, an order awarding Nofar US its damages for breach of contract against all Defendants.

c) With respect to the Third Cause of Action, an order awarding Nofar US its damages for fraudulent inducement against ~~Defendant Venter~~all Defendants.

d) With respect to the Fourth Cause of Action, an order awarding Nofar US its damages for negligent misrepresentation against Defendant Venter.

e)    With respect to the Fifth Cause of Action, an order awarding Nofar US its damages for breach of the implied covenant of good faith and fair dealing against Defendant Venter.

f)    With respect to the Sixth Cause of Action, an order awarding Nofar US its damages for breach of contract against Defendant Venter.

g)    e) Such further and other relief as the Court may deem to be just and proper.

 

 

 

    */s/ Michael A. Barlow*      

Michael A. Barlow (#3928)

OF COUNSEL:

Veronica B. Bartholomew (#6224)

QUINN EMANUEL URQUHART

Michael B. Carlinsky *

    & SULLIVAN, LLP

Yehuda Goor *

500 Delaware Avenue, Suite 220

QUINN EMANUEL URQUHART

Wilmington, Delaware 19801

    & SULLIVAN, LLP

(302) 302-4000

51 Madison Avenue, 22nd Floor

michaelbarlow@quinnemanuel.com

New York, New York 10010

veronicabartholomew@quinnemanuel.com

(212) 849-7000

michaelcarlinsky@quinnemanuel.com

*Attorneys for Plaintiff Nofar USA LLC*

yehudagoor@quinnemanuel.com

David M. Grable *

QUINN EMANUEL URQUHART

    & SULLIVAN, LLP

865 S. Figueroa St., 10th Floor

Los Angeles, California 90017

(213) 443-3000

davegrable@quinnemanuel.com

*\* pro hac vice forthcoming*

DATED:  ~~July~~October 25, 2024