# EXHIBIT 1

**MEMBERSHIP INTEREST SUBSCRIPTION AND PURCHASE AGREEMENT**

dated as of

May 25th, 2021

among

**NOFAR USA LLC**,

**BLUE SKY UTILITY, LLC,**

**BLUE SKY 1007, LLC**

**YELLOW TREE CAPITAL LLC**

**BAREND VENTER**

And

**RAN BUJANOVER**

**MEMBERSHIP INTEREST SUBSCRIPTION AND PURCHASE AGREEMENT**

   This MEMBERSHIP INTEREST SUBSCRIPTION AND PURCHASE AGREEMENT (this "Agreement"), dated as of May 25, 2021, is entered into by and among (i) Nofar USA LLC, a Delaware limited liability company ("Buyer"), (ii) Blue Sky Utility LLC, a California limited liability company (the "Company"), (iii) Blue Sky 1007, LLC, a California limited liability company ("Blue Sky 1007"), Yellow Tree Capital LLC, a California limited liability company ("Yellow Tree"), (iv) Mr. Barend Venter, in his capacity as sole member of Blue Sky 1007 ("Barend"), and (v) Mr. Ran Bujanover, in his capacity as member of Yellow Tree and representative of the Selling Parties ("Ran" or the "Seller Representative", as the context requires).

   Blue Sky 1007 and Yellow Tree, shall each be referred to as a "Selling Party" and collectively, as the "Selling Parties". Buyer, Company, the Selling Parties, Barend and the Seller Representative may also be referred to herein individually as a "Party" and collectively as the "Parties".

**RECITALS**

   WHEREAS, the Buyer wishes to purchase from Company a certain percentage of newly issued Membership Interests as set forth on Exhibit A-1 attached hereto (the "Issued Interests"), in exchange for the payment of the Primary Amount (as defined and as adjusted below), and all as further described in and subject to the provisions of this Agreement.

   WHEREAS, concurrently with the issuance by the Company of the Issued Interests, each Selling Party desires to sell to Buyer that certain percentage of such Selling Party's Membership Interests as further set forth in Exhibit A-2 attached hereto (collectively, the "Purchased Interests"), and Buyer desires to purchase the Purchased Interests from the Selling Parties, all upon the terms and subject to the conditions set forth herein;

   WHEREAS, prior to the Closing Date, (i) the Company and Palm Drive Associates, LLC ("PDA") shall enter into a Membership Interest Repurchase Agreement, in a form reasonably satisfactory to the Buyer; (ii) Buyer or one of its Affiliates, the Selling Parties and the Company shall enter into a Loan Agreement in the form attached hereto as Exhibit C (the "Nofar Loan Agreement") and into the Equity Pledge Agreement and the Asset Pledge Agreement; and (iii) Company and each Founder shall enter into an employment agreement (the "Employment Agreements"), each of which shall take effect at, and conditioned on the occurrence of, the Closing.

**AGREEMENT**

   NOW, THEREFORE, in consideration of and reliance upon the premises and the representations, warranties, covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

**ARTICLE I**
**Definitions.**

    1.1   <u>Definitions</u>.  As used in this Agreement the following terms have the following respective meanings:

"<u>Accounting Methodologies</u>" means the following methodologies: GAAP as in effect as of the day immediately preceding the Closing Date except, if applicable, for any exceptions to GAAP as may be set forth with particularity on Exhibit E-1, and, to the extent consistent with GAAP (or, if applicable, Exhibit E-1).

"<u>Accounting Referee</u>" has the meaning set forth in Section 2.10(c).

"<u>Affiliate</u>" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by or under common control with such first Person.  For purposes of this definition, a Person shall be deemed to control another Person if such first Person possesses, directly or indirectly, the power to direct or to cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" shall have correlative meanings, <u>provided</u>, <u>however</u>, that, in any event, any Person that owns directly or indirectly fifty percent (50%) or more of the securities having ordinary voting power for the election of directors or other governing body of a corporation or fiftypercent (50%) or more of the partnership or other ownership interests of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation orother Person.

"<u>Affiliate Loan</u>" shall mean such loan dated 29 December 2016 between Blue Sky 1007 LLC and Amalgamated Bank in the principal amount of USD 575,000, in connection with the construction and operation of the Clos du Val project.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allocation Schedule</u>" has the meaning set forth in Section 9.5.

"<u>Amended and Restated Operating Agreement</u>" means the Second Amended and Restated Operating Agreement of the Company, to be entered into as of the Closing Date by and between each Selling Party, each Founder, Buyer and the Company, substantially in the form attached hereto as <u>Exhibit F</u>.

"<u>Ancillary Agreements</u>" means any agreements and documents to be delivered in connection with this Agreement, including but not limited to the Nofar Loan Agreement, Membership Interest Repurchase Agreement, the Employment Agreements, the Escrow Agreement, the PPP Escrow Agreement, the Amended and Restated Operating Agreement, the Equity Pledge Agreement and the Asset Pledge Agreement.

"<u>Anti-Terrorism Law</u>" means each of (a) Executive Order No. 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism; (b) Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act); (c) the Money Laundering Control Act of 1986, Public Law 99-570; (iv) the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq, the Trading with the Enemy Act, 50 U.S.C. App. §§ 1 et seq, any executive order or regulation promulgated thereunder and administered by the Office of Foreign Assets Control ("<u>OFAC</u>") of the U.S. Department of the Treasury; and (v) any similar economic

sanctions or anti-money laundering law enacted and put in force in the United States of America prior to the Closing.

"Asset Pledge Agreement" has the meaning set forth in the Nofar Loan Agreement.

"Basket Amount" has the meaning set forth in Section 7.2(e)(i).

"Benefits Liabilities" means (a) all amounts and benefits, without duplication, paid, payable or to be provided by the Company or any Portfolio Company or Project Company to its directors, managers, officers, employees or other service providers resulting from or in connection with the execution of this Agreement or consummation of the transactions contemplated hereby, including any change of control, severance, transaction bonus or other similar payment rights of any director, manager, officer, employee or other service provider of the Company or any Portfolio Company or Project Company that are triggered, accelerated or become payable upon or in connection with the execution by the Company and the Selling Parties of this Agreement or the consummation of the transactions contemplated by this Agreement, whether paid or payable prior to, on or following the Closing Date, including all amounts paid or payable prior to, on or after the Closing Date to any person whose employment with the Company was terminated prior to the Closing Date, including any and all off-balance sheet liabilities and obligations of the Company with respect to any of the above; and (b) any obligation of the Company or any Portfolio Company or Project Company for the employer portion of any employment-related Taxes or other employer-related obligations arising with respect to the payment of the foregoing amounts, including any and all off-balance sheet liabilities and obligations with respect to any of the above.

"BS1007 Loan" shall mean such loan referred to in the promissory note dated 21 October 2020 in the principal amount of USD 700,000 between (i) Blue Sky 1007 LLC, as a lender, and (ii) the Company and Blue Sky Utility Holding LLC, as borrowers.

"Business Day" means (i) any day other than a Friday, Saturday, Sunday, federal holiday, and (ii) any day on which commercial banks in Los Angeles, California and Israel are open for general, non-automated business.

"Business Employee" means any individual employed, engaged or retained by the Company or any Portfolio Company or Project Company or any ERISA Affiliate, including any employee, consultant, independent contractor or director of the Company or any Portfolio Company or Project Company or any ERISA Affiliate.  For the avoidance of doubt, "Business Employee" includes any individual leased from or hired through another employer or any other Person to provide services to the Company.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Approvals" has the meaning set forth in Section 5.1, and as listed in Schedule 5.1 attached hereto. "Buyer Indemnified Persons" has the meaning set forth in Section 7.2(a).

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act of 2020, as in effect from time to time.

"Casualty Defect" means, with respect to any Project, any damage to such Project as a result of a casualty that has not been repaired and would reasonably be expected to interfere with (or

increase the cost beyond an immaterial increase) the development, construction, operation or maintenance of the Project unless repaired.

"Claim" means any action, suit, case, litigation, proceeding, claim, arbitration, charge, criminal prosecution, demand letter, finding of deficiency or non-compliance, adverse inspection report, notice of violation, notice of alleged liability, penalty, fine, sanction, subpoena, request for recall, request for remedial action, damages, liabilities and obligations of any nature whatsoever.

"Claim Notice" has the meaning set forth in Section 7.3(a).

"Closing" has the meaning set forth in Section 2.5.

"Closing Balance Sheet" has the meaning set forth in Section 2.10(a).

"Closing Date" has the meaning set forth in Section 2.5.

"Closing Date Indebtedness" means all Company Indebtedness outstanding as of immediately prior to the Closing.

"Closing Statement" has the meaning set forth in Section 2.10(a).

"Closing Working Capital" means, as of immediately prior to Closing: (a) the consolidated current assets of the Company, less (b) the consolidated current liabilities of the Company (excluding all current liabilities to the extent included within the calculation of Company Indebtedness, Company Transaction Expenses and Benefits Liabilities), in each case calculated in accordance with the Accounting Methodologies and presented on a basis consistent with the illustrative calculation of Closing Working Capital, calculated as though the Closing occurred on 31.12.2020, attached hereto as Exhibit E-2.

"COBRA" means the health continuation requirements under Section 4980B of the Code and any comparable state or foreign Legal Requirements.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Preamble.

"Company Approvals" has the meaning set forth in Section 3.1(g), and as listed in Schedule 3.1(g) attached hereto.

"Company Benefit Plan" has the meaning set forth in Section 3.17(a).

"Company Indebtedness" means, with regard to the Company, any Portfolio Company or Project Company, without duplication, all (a) indebtedness for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money (including credit card liabilities); (b) indebtedness evidenced by any note, bond, debenture, mortgage or other debt instrument, debt security or other similar instrument, or that is otherwise secured by an Encumbrance; (c) any earn-out or milestone agreements or other deferred payment obligations, including for the deferred purchase price of assets, property (including deferred rent or other deferred lease payments), goods or services, and including deferred compensation arrangements and underfunded employee benefit obligations; (d) accrued payroll

obligations, vacation accruals, severance obligations, retention bonuses and other compensatory payment obligations to directors, members, officers or Business Employees, together with the employer portion of any payroll or other Taxes associated with such payments, (e) obligations under leases that would be characterized as capital leases under GAAP or IFRS, (f) any dividends declared or committed but that remain unpaid, (g) obligations under any interest rate, currency or other hedging agreement (determined on the basis of actual, not notional, obligations), (h) obligations under conditional sale or other title retention agreements, (i) any obligation or liability  arising from cash/book overdrafts, (j) principal, interest (including default interest), premiums, penalties (including prepayment and early termination penalties and default penalties or judgments), breakage fees; (k) any indebtedness of another entity or person, the payment of which is (i) guaranteed, directly or indirectly by the Company or any Portfolio Company or Project Company; or (ii) secured, directly or indirectly, by a Lien against any right, title and interest in and to the business, properties, assets and rights of any kind, whether tangible or intangible, real or personal owned by the Company; (l) any Taxes the payment of which has been deferred by the Company under any COVID 19 Law; (m) any other amounts owing in respect of the items described in the foregoing clauses (a) through (l), including any and all off-balance sheet liabilities and obligations of the Company with respect to any of the above. Notwithstanding the foregoing, and for the avoidance of doubt, Company Transaction Expenses, and Benefits Liabilities shall be excluded from the definition of Company Indebtedness. Exhibit E-2 sets forth an example of the calculation of Company Indebtedness as of 31.12.2020.

"Company Intellectual Property" means all Intellectual Property owned by or licensed to the Company, any Portfolio Company or Project Company and all Intellectual Property otherwise relating to, used in or held for use in connection with the business of the Company, any Portfolio Company or Project Company.

"Company Transaction Expenses" means all costs, fees and expenses that are incurred by the Company and the Selling Parties in connection with the Transaction Agreements and the agreements contemplated hereby and thereby (including preliminary discussions, term sheet negotiations and discussions with any other Person) and the consummation of the transactions contemplated hereby and thereby.

"Confidential Information" means any proprietary or confidential information relating to the products, services, business or affairs of the Company (whether or not such information is embodied in writing or other physical form), including information relating to (a) personnel data; (b) the identity of, or courses of dealings or contracts with, actual or potential business relations; (c) financial statements or other financial information; (iv) Intellectual Property; (v) Know-How; and (d) information received by the Company from a Person that, to the Knowledge of the Selling Parties, is subject to the terms of a confidentiality, non-disclosure or similar agreement; provided, however, that "Confidential Information" shall not include information that: (i) is or becomes generally available to the public other than as a result of a disclosure by the Selling Parties or any of their Affiliates in violation of (A) the terms of this Agreement, (B) applicable Legal Requirements or (C) any other agreement between the Parties imposing an obligation of confidentiality; or (ii) is or becomes available to the Selling Parties or any of their Affiliates on a non-confidential basis from a source other than the Company or Buyer, provided that the source is not known to the Selling Parties (after due inquiry) to be bound by a confidentiality agreement with the Company or Buyer with respect to such information.

"Contract" means any written or oral agreement, contract, purchase order, sales order or other legally binding commitment, arrangement or undertaking, together with any amendments and modifications thereto.

"COVID-19 Assistance" means any (a) loan, advance, guarantee, extension of credit, credit enhancement, credit support, reduced interest rate, equity purchase or capital contribution, waiver or forgiveness of any obligation, payment deferral, tax deferral, tax filing deadline extension or any other kind of financial assistance, provided by, or on behalf of, a Governmental Authority or financial institution, or (b) Indebtedness, reimbursement obligation or other liability of any nature owed to, or on account of, or for the benefit of, a Governmental Authority or financial institution, in each case, in connection with COVID-19 or pursuant to COVID-19 Laws.

"COVID-19 Laws" means (a) Presidential Proclamation 9994 of March 13, 2020 Declaring a National Emergency Concerning the COVID-19 outbreak, (b) the CARES Act, (c) the Families First Coronavirus Response Act of 2020 as in effect from time to time and (iv) any related laws, orders, rules, rulings, proclamations, regulations, guidelines or FAQs issued or enacted by a Governmental Authority.

"Creditors" means such lenders, creditors (including the U.S. Small Business Administration), suppliers, services providers and third parties to which the Company owes the Creditors Funded Debt, which Creditors are listed in Schedule 1.1(b) attached hereto.

"Creditors Closing Repayment" means the repayment of the Funded Debt on Closing by the Buyer, on behalf of the Company.

"Customer" means any party to a Customer Agreement with any Project Company or an Affiliate thereof.

"Customer Agreement" shall mean each solar power and services agreement or solar power purchase agreement between a Project Company and a Customer.

"Damages" has the meaning set forth in Section 7.2(a).

"Data Agreements" has the meaning set forth in Section 3.19.

"Disclosure Schedules" means the disclosure schedules of the Selling Parties set forth in Schedule III.

"Dispute Notice" has the meaning set forth in Section 2.10(b).

"Disputed Items" has the meaning set forth in Section 2.10(b).

"Employment Agreements" has the meaning set forth in the Recitals.

"Encumbrance" means any lien, mortgage, pledge, claim, charge, right of way, security interest, option, right of first refusal or offer, easement, deed of trust, hypothecation, transfer restriction or other encumbrance.

"Environmental Attributes" means any and all credits, benefits, emissions reductions, offsets, and allowances, howsoever entitled, attributable to a PV System, the production of electrical energy from a PV System and its displacement of conventional energy generation, including (a) any avoided emissions of pollutants to the air, soil or water such as sulfur oxides (SOx), nitrogen oxides (NOx), carbon monoxide (CO) and other pollutants; (b) any avoided emissions of carbon dioxide (CO2), methane (CH4), nitrous oxide, hydrofluorocarbons, perfluorocarbons, sulfur hexafluoride and other greenhouse gases (GHGs) that have been determined by the United Nations Intergovernmental Panel on Climate Change, or otherwise by law, to contribute to the actual or potential threat of altering the Earth's climate by trapping heat in the atmosphere; and ( c ) the reporting rights to any Governmental Authority related to these avoided emissions, such as Green Tag Reporting Rights and Renewable Energy Credits. Green Tag Reporting Rights are the right of a party to report the ownership of accumulated Green Tags in compliance with federal or state law, if applicable, and to a federal or state agency or any other party, and include Green Tag Reporting Rights accruing under Section 1605 (b) of The Energy Policy Act of 1992 and any present or future federal, state, or local law , regulation or bill, and international or foreign emissions trading program. Without limiting the generality of the foregoing, Environmental Attributes include carbon trading credits, renewable energy credits or certificates, emissions reduction credits, investment credits, emissions allowances, green tags, tradeable renewable credits and Green-e® products.

"Environmental Laws" means any and all Legal Requirements relating to pollution, protection of the environment (including ambient air, indoor air, surface water, wetlands, groundwater, soil gas, land surface or subsurface strata), protection of threatened, endangered, special-status or other protected species, protection of natural resources and protection of human health and safety, including Legal Requirements relating to the presence, use, production, manufacture, generation, formulation, handling, transportation, treatment, storage, disposal, distribution, labeling, packaging, testing, processing, discharge, emission, release, threatened release, control, cleanup of or exposure to toxic or hazardous materials, substances, or wastes, and the regulations promulgated thereunder.

"Equity Pledge Agreement" has the meaning set forth in the Nofar Loan agreement.

"ERISA" has the meaning set forth in Section 3.17(a).

"ERISA Affiliate" has the meaning set forth in Section 3.17(a).

"Escrow Account" means the account into which the Escrow Agent has deposited the Escrow Amount in accordance with the Escrow Agreement.

"Escrow Agent" means Citi Bank or such other national recognized bank mutually agreed upon by Buyer and the Seller Representative.

"Escrow Agreement" means the escrow agreement entered into on the Closing Date by Buyer, Seller Representative and Escrow Agent, in a form reasonably satisfactory to the Buyer and the Seller Representative, and in accordance with the provisions herein.

"Estimated Benefits Liabilities" has the meaning set forth in Section 2.8(a).

"Estimated Closing Balance Sheet" has the meaning set forth in Section 2.8(a).

"Estimated Closing Date Indebtedness" has the meaning set forth in Section 2.8(a).

"Estimated Closing Statement" has the meaning set forth in Section 2.8(a).

"Estimated Closing Working Capital" has the meaning set forth in Section 2.8(a).

"Estimated Company Transaction Expenses" has the meaning set forth in Section 2.8(a).

"Export Control Laws" has the meaning set forth in Section 3.4(b).

"FCPA" has the meaning set forth in Section 3.4(c).

"Financial Statements" has the meaning set forth in Section 3.13(a).

"Founders" shall mean Ran Bujanover and Barend Venter.

"Funded Debt" or "Creditors' Funded Debt" means such portion of the Company Indebtedness listed in Schedule 1.1(b), which shall be repaid by Buyer, on behalf of the Company, on Closing, out of the proceeds of the Primary Amount, including, the PDA Loan, the BS1007 Loan, the SBA Loan, the Affiliate Loan, and the Salary Gap Payment (which shall be paid to the Company).

"Fundamental Representations" has the meaning set forth in Section 7.1.

"GAAP" means generally accepted accounting principles in the United States, as in effect as of December 31, 2020.

"GDPR" has the meaning set forth in the definition of Privacy Laws.

"Governmental Authority" means any United States or foreign, federal, state, local or other governmental, administrative or regulatory authority, agency, bureau, commission, department or other governmental or administrative instrumentality, subdivision, court, arbitrator, tribunal or body.

"Government Incentives" means any and all (a) depreciation benefits, (b) investment tax credits, (c) production tax credits and (d) similar tax credits or grants under federal, state or local law relating to the construction, ownership or production of energy.

"Hazardous Material" means any material or substance that is regulated, classified or otherwise described as a toxic or hazardous substance, waste or material or a pollutant or contaminant or infectious waste, or words of similar import, in any of the Environmental Laws, or chemicals or compounds that are otherwise subject to regulation, control or remediation, or for which liability can be imposed, under Environmental Laws, and includes asbestos and asbestos containing materials, petroleum (including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any mixture or by-product of any of the foregoing), per- and polyfluoroalkyl substances, toxic mold, pesticides, polychlorinated biphenyls, urea formaldehyde, radon gas and radioactive matter.

"IFRS" means International Financial Reporting Standards, as in effect from time to time, consistently applied throughout the applicable periods.

"Indemnitee" has the meaning set forth in Section 7.3(a).

"Indemnitor" has the meaning set forth in Section 7.3(a).

"Insider" has the meaning set forth in Section 3.5.

"Intellectual Property" means any and all registered and unregistered intellectual property rights as exist throughout the world, for all tangible embodiments (in all forms and media), for all versions and elements, in all languages, and for the entire duration of such rights, including any and all of the following items, together with all rights to sue at law or in equity or recover and retain damages and costs and attorney's fees for past, present, and future infringement, dilution, misappropriation or other violation of any of the foregoing, and all registrations, applications (or rights to apply), renewals, continuations, continuations-in-part, divisions, reissues or other extensions or modifications of legal protections thereof now existing and hereafter filed, issued or acquired:  (a) Know-How; (b) patents, patent disclosures, patent rights, patent applications and rights to inventions, discoveries, designs, technology, improvements, business and technical information methods, processes and art (whether or not patentable and whether or not reduced to practice); (c) trademarks, trade dress, trademark registrations, trademark applications, design marks, trade names and corporate names, Internet domain names, service marks, service mark registrations, service mark applications, logos, slogans, industrial designs, trade dress and other source identifiers, together with all translations, adaptations, derivations, and combinations thereof; (d) copyrights, moral rights, copyrightable works and subject matter (including Software), mask work rights, mask work applications, and mask work registrations, copyright registrations and copyright applications; (e) other proprietary rights arising under statutory or common law, contract, or otherwise; and (f) goodwill symbolized by or associated with any of the foregoing.

"Interim Period" has the meaning set forth in Section 6.1(a) below.

"IRS" means the U.S. Internal Revenue Service and any successor thereto.

"Know-How" means trade secrets and other data, discoveries, concepts, ideas, research and development, information, formulae, formulations, inventions (whether or not the subject matter of a patent right and including inventions conceived prior to the Closing Date but not documented as of the Closing Date) and invention disclosures, compositions, designs, drawings, plans, proposals, technical data, specifications, manufacturing and production processes and techniques, databases and other proprietary and confidential information, including technical, scientific, analytical, regulatory and business knowledge and materials, customer and supplier lists and contact names, pricing and cost information, financial, business and marketing plans and proposals, techniques, operating manuals and manufacturing and quality control procedures.

"Knowledge of the Selling Parties" or "Knowledge of the Company" or words of similar import, means the actual and constructive knowledge, including after due inquiry, of each of the Founders and Mr. Rafi Durst.

"Leases" has the meaning set forth in Section 3.8(a)(xiii).

"Leased Facilities" has the meaning set forth in Section 3.11.

"Leased Real Estate" has the meaning set forth in Section 3.11.

"Legal Requirement" means (a) any federal, state, local, municipal, foreign, international, multinational or administrative law, constitution, common law principle, ordinance, code, statute, injunction, rule, statute or governmental regulation; (b) any binding judicial or administrative interpretation of any of

the foregoing; (c) the terms and conditions of any agreement with a Governmental Authority; or (d) any governmental requirements or restrictions of any kind, or any rule, regulation or order promulgated thereunder.

"Lender" means any financing entity or bank which provided loans to any Project Company pursuant to the Loan Documents, and all as listed in Schedule 1.1(c) attached hereto.

"Liability" means any debt, liability, commitment, obligation, deficiency, Tax, penalty, assessment, fine, claim, cause of action or other loss, fee, cost or expense of any kind, character or nature whatsoever, whether asserted or unasserted, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated and whether due or to become due.

"Loan Documents" shall mean each loan agreement entered into by a Project Company and/or a Portfolio Company with a Lender, and each other Loan Documents as defined in such loan agreements (including any forbearance agreement).

"Material Adverse Effect" means any event, occurrence, fact, condition or change (including change of law) that, individually or in the aggregate, has, has had or would reasonably be expected to have a material adverse effect on (a) the business, assets, revenues, tax benefits, liabilities, tax liabilities, properties, condition (financial or otherwise), results of operations or prospects, and projects under development of the Company, any Portfolio Company and/or Project Company or its business, as presently conducted or as proposed to be conducted; except for any such effect resulting from (i) the announcement of the transactions contemplated by this Agreement; (ii) any action taken by the Company that is expressly set forth in this Agreement; or (iii) any action taken by the Company to comply with applicable Legal Requirements (provided however that any change of applicable Legal Requirements prior to Closing shall not be excluded from the definition of Material Adverse Effect).

"Material Contracts" has the meaning set forth in Section 3.8(a).

"Membership Interests" shall mean the membership interests of the Company.

"Net Secondary Amount" has the meaning set forth in Section 2.1.

"Nofar Loan Agreement" has the meaning set forth in the Recitals.

"Operating Agreement" means the Company's Amended and Restated Limited Liability Company Agreement dated as of January 1, 2019, as amended and in effect immediately prior to Closing.

"Order" means any charge, restraining order (whether temporary or permanent) or other order, writ, injunction (whether temporary or permanent), judgment, consent, decree, ruling, determination, directive, award or settlement, whether civil, criminal or administrative, of any Governmental Authority.

"Organizational Documents" means (a) the articles or certificate of incorporation and the bylaws of a corporation, (b) the certificate of formation or articles of organization and the operating or limited liability company agreement of a limited liability company, (c) the partnership agreement and any statement of partnership of a general partnership, (d) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (e) any charter or similar document adopted or filed in connection with

the creation, formation or organization of a Person, (f) any foreign equivalent of the foregoing and (g) any amendment to or restatement of any of the foregoing.

"Overlap Period" means a taxable year or other taxable period beginning on or before, and ending after, the Closing Date.

"Party" and "Parties" have the respective meanings set forth in the Preamble.

"Pass-Through Tax Return" means any income or franchise Tax Return filed by the Company in respect of a taxable year ending on or prior to the Closing Date to the extent that the Company is treated as a partnership or other pass-through entity for the purposes of such Tax Return.

"PDA Loan" shall refer to such Revolving Loan Agreement dated 1 January 2019 between Palm Drive Associates LLC ("PDA"), the Company and Blue Sky Utility Holdings LLC pursuant to which PDA extended a loan in principal of 5 million USD to the Company and Blue Sky Utility Holdings LLC.

"PDA Purchase Price" means the amount of USD 989,788 to be paid by Buyer, on Closing, on behalf of the Company directly to PDA, out of the proceeds of the Primary Amount, for the repurchase of all Membership Interests of PDA by the Company, pursuant to the Membership Interest Repurchase Agreement.

"Permit" means any approval, permit, license, certificate, franchise, permission, clearance, registration, filing, notice, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"Permitted Encumbrance" means Encumbrances created by or pursuant to the Project Documents, under the Amended and Restated Operating Agreement, and under federal and state securities Laws.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or other form of business or legal entity.

"Personal Data" means (a) any information or data relating to an identified or identifiable natural person including names, email addresses, phone numbers, job titles, employee identification numbers, location information, ZIP codes, Social Security Numbers, driver's license numbers, government identification numbers, birthdates, addresses, resumes, health information (as defined in 45 CFR § 160.103), credit or debit card numbers, financial account numbers, MAC addresses, IP addresses, unique device identifiers, Unique Identifier Headers (UDIH), serial numbers, account or authentication credentials, passwords and one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person or any other piece of information that allows the identification of a natural person or is otherwise considered personally identifiable information or personal information under Applicable Law; (b) any information or data collected in relation to on-line, mobile or other electronic activities or communications that can reasonably be associated with a particular Person, user, computer, mobile or other device, or instance of any application or mobile application; (c) any information or data collected in relation to off-line activities or communications that can reasonably be associated with or that derives from a particular Person, user, computer, mobile or other device or instance of any application or mobile application, (d) any device ID, device activity data or data collected from a networked physical object, and (e) any of the foregoing data that is aggregated, anonymized or de-identified.

"Post-Closing Period" means all taxable years or other taxable periods that end after the Closing Date and, with respect to the Overlap Period, the portion of such period after the Closing Date.

"Pre-Closing Period" means all taxable years or other taxable periods that end on or before the Closing Date and, with respect to the Overlap Period, the portion of such period ending on and including the Closing Date.

"Primary Amount" has the meaning set forth in Section 2.1 below.

"Primary Disbursement Schedule" has the meaning set forth in Section 2.8(k).

"Privacy Laws" means all applicable Legal Requirements, contractual obligations, self-regulatory standards, regulatory guidance, or written policies or terms of use of the Company that are related to privacy, security, data protection or Processing of Personal Data, including, state attorney general rules or regulations, the European Union General Data Protection Regulation (Regulation (EU) 2016/679) (the "GDPR"), the European Union ePrivacy Directive (Directive 2002/58/EC) and applicable implementing laws, the Federal Trade Commission Act, the California Consumer Privacy Act, the CAN-SPAM Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, Children's Online Privacy Protection Act, the Computer Fraud and Abuse Act, the Gramm Leach Bliley Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, state data security laws, state unfair or deceptive trade practices laws, state biometric privacy acts, state social security number protection laws, state data breach notification laws, and any Legal Requirements concerning requirements for website and mobile application privacy policies and practices, data or web scraping, cybersecurity disclosures in public filings, call or electronic monitoring or recording or any outbound communications (including, outbound calling and text messaging, telemarketing, and email marketing) (together with Personal Data, "Protected Data").

"Processing" means any operation or set of operations which is performed on Personal Data or on sets of Personal Data, whether or not by automated means, such as the receipt, access, acquisition, collection, recording, organization, compilation, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transfer, transmission, dissemination or otherwise making available, alignment or combination, restriction, disposal, erasure or destruction.

"Prohibited Payments" has the meaning set forth in Section 3.4(c).

"Prohibited Person" means (a) a Person on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Department of the Treasury or the Denied Persons List or Entity List administered by the U.S. Department of Commerce; (b) a Person on any list of sanctioned Persons administered by the European Union or Member of the European Union; (c) the government of any nation against which the United States imposes a trade embargo, including any agency or instrumentality thereof; or (d) a Person acting or purporting to act, directly or indirectly, on behalf of, or an entity that is majority owned or controlled by, any of the Persons covered by sub Sections (a), (b) or (c).

"Portfolio Companies" shall mean the entities owned solely or with other entities, directly or indirectly by the Company, and as listed in Schedule 1.1(c) attached hereto.

"<u>Project</u>" shall mean such projects owned and/or operated by the Company (directly or through its Subsidiaries), and as listed in Schedule 1.1(c) attached hereto, including such projects currently under development and construction by the Company (directly or indirectly).

"<u>Project Assets</u>" means all assets and properties of every kind, nature, character and description that are owned by the Company and/or any Portfolio Company and/or Project Company, with respect to each Project, including but not limited to:

(a)     the PV System(s) and

(b)     the right, title and interest in and to the Project Documents and any amendments or supplements thereto;

(c)     the deposits and advances, prepaid expenses and other prepaid items under any of the Project Documents;

(d)     the right, title and interest in, under or related to the Project Documents and any claims or other rights to payment thereunder;

(e)     unexpired warranties, if any, as of the applicable Closing Date, from third Persons (and claims thereunder) which relate specifically to any of the Project Assets;

(f)     all Government Incentives associated with the Project Assets;

(g)     all Environmental Attributes associated with the Project Assets;

(h)     the right to receive Tax exemptions, Tax reductions, Tax rebates, or other amounts from a Governmental Authority with respect to the Project Assets, and all pending applications therefor;

(i)     all books, records, files, manuals and similar documentation related to the Project Assets, but not including any entity books and records of Seller or its Affiliate transferring the Project Assets; and

(j)     any governmental approvals, Permits, licenses or other consents relating to the Project Assets, and all pending applications for the issuance or renewal of any of the same.

"<u>Project Companies</u>" shall mean the companies owned solely or with other entities, directly or indirectly by the Company, and as listed in Schedule 1.1(c) attached hereto.

"<u>Project Document</u>" shall mean collectively, with respect to each Project, (i) any Customer Agreement, (ii) any Leases, and documents ancillary thereto, including any attornment and forbearance agreement (iii) any Interconnection Agreement, (iv) any other Material Contract relating to each Project, (v) any agreements for the sale of renewable energy credits generated from the Project (vi) any Loan Document, and (viii) any EPC contracts and O&M agreements; (ix) any other amendment or agreement entered into in substitution or replacement of any thereof.

"<u>Protected Data</u>" has the meaning set forth in the definition of Privacy Laws.

DocuSign Envelope ID: BDEAEE0C-9083-4CB5-9466-364533A42A1F

"Prudent Industry Practice" means any of the practices, methods, specifications and standards of safety, as the same are used or approved by, at least, a majority of managers of independent solar power generation facilities in North America, similar in size and type to the Projects during the relevant time period.  Prudent Industry Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is intended to include acceptable practices, methods and acts generally accepted in North America as applicable to the management of independent power facilities, to be a spectrum of good and proper practices, methods and acts including taking reasonable steps to ensure that: (a) equipment, materials, resources, and supplies, are available to meet such PV System's needs; (b) maintenance and repairs are performed by knowledgeable, trained, and experienced personnel utilizing proper equipment; (c) appropriate monitoring and testing are performed to ensure equipment is functioning as designed; (d) equipment is not operated in a reckless manner, in violation of manufacturer's guidelines or in a manner unsafe to workers, the general public, or the interconnected system or otherwise contrary to applicable laws, permits and regulations.

"PPP Escrow Account" means the account into which the PPP Escrow Agent has deposited the PPP Loan amount in accordance with the PPP Escrow Agreement.

"PPP Escrow Agent" means Umpqua Bank.

"PPP Escrow Agreement" means the escrow agreement entered into on the Closing Date by Buyer, Company and Escrow Agent, in a form reasonably satisfactory to the Buyer and the Company.

"PPP Loan" shall mean loan authorized by the U.S. Small Business Administration on 5 April 2021 to the Company in the initial principal amount of USD 147,265.00, #21136887-09.

"Purchased Interests" has the meaning set forth in the Recitals.

"PV System" means a photovoltaic system, including the photovoltaic panels, storage system or equipment, racks, wiring and other electrical devices, conduit, weatherproof housings, hardware, one or more inverters, remote monitoring equipment, connectors, non-utility owned meters, disconnects and over current devices, rooftop and/or carport arrays.

"Recapture Event" means, an event that causes any disallowance, denial or recapture (whether in whole or in part) of any investment tax credits provided by Section 48(a)(1) of the Code or any successor provision thereto claimed by the Company.

"Reference Date" and "Reference Date Balance Sheet" have the respective meanings set forth in Section 3.13(a).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migration or disposing of a Hazardous Material.

"Representative" means, with respect to a particular Person, any director, manager, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Salary Gap Payment" shall mean as defined in Schedule 1.1(b) attached hereto.

"SBA Loan" shall refer to the loan authorized by the U.S. Small Business Administration on 9 March 2020 to the Company in the initial principal amount of USD 200,000.

"Secondary Amount" has the meaning set forth in Section 2.1.

"Secondary Disbursement Schedule" has the meaning set forth in Section 2.8(l) below.

"Sensitive Data" means (a) all Personal Data and (b) other Confidential Information or trade secret information.

"Seller Indemnified Persons" has the meaning set forth in Section 7.2(b).

"Selling Parties" has the meaning set forth in the Preamble.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other business entity of which a majority of the shares of voting securities is at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. With respect to the Company, the Subsidiaries shall be deemed to include all Portfolio Companies and Project Companies.

"Tail Policies" has the meaning set forth in Section 6.11.

"Tax Authority" means, with respect to any Tax, the Governmental Authority that imposes such Tax, and any agency charged with the administration or collection of such Tax.

"Tax Contest" means any deficiency, proposed adjustment, adjustment, assessment, audit, examination, litigation, inquiry or other administrative or court proceeding, suit, dispute or other claim relating to Taxes.

"Tax Incentive" has the meaning set forth in Section 3.15(l).

"Tax Return" means any and all reports, returns (including information returns), declarations, or statements relating to Taxes, including any schedule or attachment thereto and any amendment thereof, filed with or submitted to, or required to be filed with or submitted to, any Tax Authority in connection with the determination, assessment, collection or payment of Taxes or in connection with the administration, implementation or enforcement of or compliance with any legal requirement relating to any Tax.

"Tax" or "Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, unclaimed property, escheat, excise, severance, windfall profits, stamp, license, payroll, social security, withholding, goods and services tax and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest.

"Tax Representations" has the meaning set forth in Section 7.1.

DocuSign Envelope ID: BDEAEE0C-9082-4CB5-9466-364533A42A1F

"Third Party Claim" has the meaning set forth in Section 7.3(b).

"Third Party Consents" means such consents or notice which are to the Knowledge of the Selling Parties, to be obtained from or delivered to third parties in connection with the consummation of the transactions contemplated herein, and as listed in Schedule 2.6(h) attached hereto;

"Transaction Agreements" means (a) this Agreement, and (b) the Ancillary Agreements.

"Transfer Taxes" has the meaning set forth in Section 2.9(a)(x).

"Unresolved Items" has the meaning set forth in Section 2.10(c)

"Yellow Tree" has the meaning set forth in the Preamble.

1.2    Construction.

(a)    For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:  (i) words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders; (ii) references herein to "Articles," "Sections," "sub Sections" and other subdivisions, and to Exhibits, Schedules and other attachments, without reference to a document, are to the specified Articles, Sections, sub Sections and other subdivisions of, and Exhibits, Schedules and other attachments to, this Agreement; (iii) a reference to a sub Section or other subdivision without further reference to a Section is a reference to such sub Section or subdivision as contained in the same Section in which the reference appears; (iv) the words "herein", "hereof", "hereunder", "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision; (v) the words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation"; (vi) all accounting terms used and not defined herein have the respective meanings given to them under GAAP, if relating to a period prior to the Closing, or IFRS if relating to a period after the Closing (vii) any reference in this Agreement to $ or dollars means U.S. dollars; (viii) the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends and such phrase shall not mean simply "if."; and (ix) a document or other item shall only be deemed to have been "made available" to Buyer hereunder if the same has been uploaded to the online "data room" maintained for the transactions contemplated hereby at least five Business Days prior to the date hereof and not removed therefrom at any time thereafter.

(b)    Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(c)    Each Party acknowledges that it or he and its or his attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party or any similar rule operating against the drafter of an agreement shall not be applicable to the construction or interpretation of this Agreement.

## ARTICLE II
### Subscription and Purchase of Membership Interest

2.1     <u>Subscription for Membership Interests</u>.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Buyer shall make a certain capital contribution to the Company (the "**Primary Amount**"), as adjusted, and subject to the deductions and payments to third parties set forth in Section 2.8 below. The aggregation of the Primary Amount and of the additional capital contribution to be made by the Buyer on Closing to Blue Sky Utility Holdings LLC ("**BSUH**") shall amount in the aggregate to USD 20 million (the "**Aggregate Primary Amount**"). The exact allocation of the Aggregate Primary Amount between the Company and BSUH shall be determined by the Parties prior to Closing. In consideration for such contribution of the Primary Amount, the Company shall issue on Closing, to the Buyer, an amount of Membership Interests as reflected in <u>Exhibit A-1</u> attached hereto.

The Creditors' Closing Repayment and the PDA Purchase Price, to the extent payable, shall be paid directly by Buyer, on Closing, to the Creditors and to PDA (respectively) on behalf of the Company in accordance with the Primary Disbursement Schedule.

The Primary Amount, as adjusted pursuant to Section 2.8, shall be referred to as the "Net Primary Amount".

2.2     <u>Purchase and Sale</u>.  Upon the terms and subject to the conditions of this Agreement, simultaneously with the issuance and sale of the Issued Interests, on the Closing Date, each Selling Party shall sell, transfer, assign and deliver to Buyer, and Buyer shall purchase, acquire and accept from each Selling Party, the percentage of Membership Interests in the Company set forth opposite such Selling Party's name in <u>Exhibit A-2</u> (the "**Purchased Interests**"), in each case free and clear of all Encumbrances, other than Permitted Encumbrances.  The total aggregate purchase price for the Purchased Interests shall be equal to a certain amount (the "**Secondary Amount**"), subject to adjustment, deductions and payments to third parties, as provided in Section 2.8 and to be paid as provided in Section 2.9(a). The aggregation of the Secondary Amount and of the additional purchase price to be paid by the Buyer on Closing to the Selling Parties for the purchase of membership interests in BSUH shall amount in the aggregate to USD 6 million (the "**Aggregate Secondary Amount**"). The exact allocation of the Aggregate Secondary Amount with regard to the purchase of membership interests in the Company and BSUH shall be determined by the Parties prior to Closing. The purchase price for the Purchased Interests, to the extent paid and after all such adjustments contained herein, including pursuant to Section 7.6, is referred to herein as the "Net Secondary Amount".

2.3     <u>Percentage Interests.</u> Immediately after Closing, and following the subscription for the Issued Interests and the purchase of the Purchased Interests, Buyer shall hold a 67% percentage interest in the Company, on a fully diluted basis.

2.4     <u>Allocation of the Net Secondary Amount</u>. The Net Secondary Amount shall be allocated among and between the Selling Parties as follows: 50% to Blue Sky 1007 and 50% to Yellow Tree.

2.5     <u>Closing</u>.  The closing (the "<u>Closing</u>") of the subscription for the Issued Interests and of the purchase and sale of the Purchased Interests and the other transactions contemplated herein shall take place after the last of the conditions to Closing set forth in <u>Article IX</u> have been satisfied or waived (such waiver being made by the Party benefiting from such Closing condition) (other than conditions which, by their nature, are to be satisfied on the Closing Date, but subject to the satisfaction or waiver of such

conditions) and by electronic exchange of duly executed documents by the Parties hereto of the Closing Deliverables listed in Section 2.6 and Section 2.7 below (the date on which the Closing occurs, the "Closing Date").

2.6    Closing Deliveries by Company and Selling Parties. At or prior to the Closing, Company and Selling Parties shall deliver or cause to be delivered to Buyer the following:

(a)    the Amended and Restated Operating Agreement (which shall include an updated schedule of Members reflecting the transactions set forth in this Agreement), duly executed by the Selling Parties and the Founders;

(b)    a certificate of the Secretary of the Company, in form and substance reasonably acceptable to Buyer, certifying as accurate and complete attached copies of (i) the articles of organization of the Company, (ii) the Operating Agreement, (iii) the resolutions of the members of the Company approving the Transaction Agreements to which the Company is a party and the transactions contemplated hereby and thereby, (iv) the good standing of the Company in its jurisdiction of organization and each other jurisdiction in which such Person is required to be qualified to do business, and (v) the names and signatures of the members of the Company authorized to sign this Agreement and the Ancillary Agreements;

(c)    a membership interest transfer power, in a form reasonably satisfactory to the Buyer, duly executed in blank by each of Blue Sky 1007 and Yellow Tree, together with any other documents that are necessary to transfer to Buyer good and valid title to the Purchased Interests, free and clear of all Encumbrances except for Permitted Encumbrances;

(d)    the Estimated Closing Balance Sheet, the Estimated Closing Statement, the Primary Disbursement Schedule and the Secondary Disbursement Schedule;

(e)    a certificate signed by an officer of the Company, dated the Closing Date, (i) certifying the updated amount of the Closing Indebtedness of the Company (on a non-consolidated basis) as of Closing and (ii) certifying that all Closing Indebtedness (including without limitation, the Company Indebtedness listed in Schedule 3.13 attached hereto, but with respect to Company and BSUH only) was fully paid and discharged as of Closing by the Selling Parties and/or the Founders (the "**Advance Funding**"), and (iii) delivering proof of receipt of the Advance Funding by the respective entities listed in Schedule 3.13, all in a form reasonably satisfactory to the Buyer;

(f)    a certificate, signed by an officer of the Company, dated the Closing Date, certifying that (a) Schedule 2.10(f) attached hereto is a true and accurate description, updated as of Closing, of (i) all sources of funds promised or available to the Company in connection with the projects listed therein; and (ii) all intended use of such funds in connection with the projects listed therein, and (b) that there are no other costs or liabilities due to third parties in connection with the projects listed therein in order to render such projects fully operational in accordance with the relevant provisions of the Project Documents; and (c) certifying the amounts of funds already received and costs already disbursed, as of Closing in relation to the sources of funds and use of funds set forth in Schedule 2.10(f).

(g)    a certificate signed by an officer of the Company, dated the Closing Date, certifying that the conditions specified in Section 10.1 have been fulfilled, in a form reasonably satisfactory to the Buyer.

(h)      a certificate signed by the Company, Selling Parties and the Founders, dated the Closing Date, certifying that the conditions specified in Section 10.3(a), Section 10.3(b) and Section 10.3(d) have been fulfilled, in a form reasonably satisfactory to the Buyer.

(i)      Letters of termination, waiver and release dated as of the Closing Date, addressed to the Company from each of the parties set forth on Schedule 2.6(g) attached hereto, and in a form reasonably satisfactory to the Buyer;

(j)      copies of all Company Approvals and Third Party Consents, duly executed by the applicable consenting party (if applicable), and, in the case of the Company Approvals relating to the Leases, and as listed in Schedule 2.6(h) attached hereto;

(k)      waivers duly executed by all holders of pre-emptive rights, rights of first refusal, co-sale, tag along, and/or similar participation rights in the Company, the Portfolio Companies and the Project Companies, in connection with the subscription of the Issued Interests and the purchase and sale of the Purchased Interests, as listed in Schedule 2.6 (i) and in a form reasonably satisfactory to the Buyer.

(l)      the Tail Policies, effective as of the Closing Date;

(m)      the Escrow Agreement, duly executed by Company, the Seller Representative and the Escrow Agent;

(n)      PPP Escrow Agreement, duly executed by Company, and the PPP Escrow Agent;

(o)      a certificate in form and substance as prescribed by Treasury Regulations promulgated under Sections 1445 and 1446 of the Code from each Selling Party, stating that such Selling Party is not a "foreign person" within the meaning of such Code sections. If the Buyer does not receive such certifications on or before the Closing Date, the Buyer shall be permitted to withhold from the payments to be made pursuant to this Agreement any required withholding tax under Section 1445 or 1446 of the Code;

(p)      Membership Interest Repurchase Agreement between PDA and the Company, in in a form reasonably satisfactory to the Buyer, and a membership interest transfer power, in a form reasonably satisfactory to the Buyer, duly executed in blank by PDA, together with any other documents that are necessary to transfer to Company good and valid title to any and all equity or other interests PDA holds in the Company, free and clear of all Encumbrances other than Permitted Encumbrances;

(q)      Employment Agreements duly executed by each Founder and the Company, in a form reasonably satisfactory to the Buyer;

(r)      Nofar Loan Agreement duly executed by Company, in the form attached hereto as Exhibit C;

(s)      Equity Pledge Agreement and Asset Pledge Agreement, duly executed by the Selling Parties and the Company, each in a form reasonably satisfactory to the Buyer and each Selling Party and the Company;

(t)    Evidence reasonably satisfactory to the Buyer that the agreements listed in Schedule 2.6(q) attached hereto have been terminated.

(u)    Evidence reasonably satisfactory to the Buyer that the signatory rights in the Company's bank accounts have been amended to reflect the signatory rights attached hereto as Schedule 2.6(r);

(v)    Management Agreement between the Buyer or an Affiliate thereof, and the Company, in a form reasonably satisfactory to the Buyer and the Selling Parties;

(w)    any other documents and instruments reasonably requested by Buyer or its counsel in connection with the consummation of the transactions contemplated by this Agreement.

2.7    Closing Deliveries by Buyer.  At or prior to the Closing, Buyer shall deliver or cause to be delivered to Seller Representative the following:

(a)    the Amended and Restated Operating Agreement, duly executed by Buyer; and

(b)    the Escrow Agreement, duly executed by Buyer;

(c)    Buyer Approvals (if any), as listed in Schedule 2.7(c) attached hereto;

(d)    a certificate signed by Buyer, dated the Closing Date, certifying that the conditions specified in Section 10.2(a) and Section 10.2(b) have been satisfied;

(e)    appointment letters of officers and managers of the Company appointed by the Buyer;

(f)    Nofar Loan Agreement duly executed by Buyer and/or an Affiliate thereof;

(g)    Equity Pledge Agreement and Asset Pledge Agreement, in a form reasonably satisfactory to the Buyer and each Selling Party and the Company, duly executed by Buyer and/or an Affiliate thereof;

2.8    Pre-Closing Adjustment

(a)    In consideration for the issuance of the Issued Interests (in the Company and in BSUH), at the Closing, Buyer shall deliver the Aggregate Primary Amount to the Company and to BSUH, adjusted as follows:

(i)    Aggregate Primary Amount; *minus*

(ii)    The PDA Purchase Price; *minus*

(iii)    The Creditors' Closing Repayment, up to a maximum amount of USD 8.5 million (the "**Expected Creditor's Closing Repayment**") to the extent unpaid as of the Closing (it being agreed that such amount refers to the liabilities accrued to both the Company and BSUH); *minus*

(iv)    the Company Transaction Expenses, up to a maximum of USD 150,000, to the extent unpaid as of the Closing (the "**Expected Company Transaction Expenses**") (it being agreed that such amount refers to the liabilities accrued to both the Company and BSUH);

(b)    The exact allocation of the Aggregate Primary Amount between the Company and BSUH shall be determined by the Parties prior to Closing.

(c)    In addition, the Buyer shall pay, on behalf of the Company and BSUH, the Expected Creditors Closing Repayment, the PDA Purchase Price and the Expected Company Transaction Expenses directly to the respective payees, and in accordance with the information set forth in the Primary Disbursement Schedule.

(d)    In consideration for the issuance of the Purchased Interests in the Company and in BSUH, at the Closing, Buyer shall deliver the Net Aggregate Secondary Amount to the Company, adjusted as follows:

(i)    Aggregate Secondary Amount; *minus*

(ii)    Any Excess Creditors Closing Repayment amount; *minus*

(iii)    The Escrow Amount, *minus*

(iv)    The PPP Escrow Amount, *minus*

(i)    Any Excess Closing Indebtedness (it being agreed that such amount refers to the liabilities accrued to both the Company and BSUH); *minus*

(ii)    Any Closing WC Shortfall (it being agreed that such amount refers to the liabilities accrued to both the Company and BSUH); *minus*

(iii)    Any Excess Company Transaction Expenses (it being agreed that such amount refers to the liabilities accrued to both the Company and BSUH); *minus*

(iv)    Any Excess Benefits Liabilities (it being agreed that such amount refers to the liabilities accrued to both the Company and BSUH).

(e)    The exact allocation of the Aggregate Secondary Amount with regard to the purchase of membership interests in the Company and BSUH shall be determined by the Parties prior to Closing.

(f)    Not later than five (5) Business Days prior to the anticipated Closing Date, Company shall prepare and deliver to Buyer a consolidated balance sheet of the Company estimated as of the Closing Date (the "**Estimated Closing Balance Sheet**"), prepared in accordance with the Accounting Methodologies and presented on a basis consistent with the illustrative calculations set forth in <u>Exhibit E-1</u>, together with a schedule and worksheet (the "**Estimated Closing Statement**") confirming the Company's estimate as of the Closing Date, of (i) the Creditors Closing Repayment (the "**Estimated Creditors Closing Repayment**"); (ii) Closing Working Capital ascertained from the Estimated Closing

Balance Sheet (the "**Estimated Closing Working Capital**"); (iii) Closing Date Indebtedness (the "**Estimated Closing Date Indebtedness**"); (iv) Company Transaction Expenses (the "**Estimated Company Transaction Expenses**"); (v) Benefits Liabilities (the "**Estimated Benefits Liabilities**").

(g)    If, according to the Estimated Closing Statement:

(i)    the Estimated Creditors Closing Repayment exceeds USD 8.5 million (respectively, the "**Expected Creditors Closing Repayment**" and the "**Excess Creditors Closing Repayment**") (such amount being accounted for the Company and BSUH); and/or

(ii)    the Estimated Closing Indebtedness exceeds USD 0 (respectively, the "**Expected Closing Indebtedness**" and the "**Excess Closing Indebtedness**"); and/or

(iii)    the Estimated Closing Working Capital is less than USD 0 (respectively, the "**Expected Closing Working Capital**" and the "**Closing WC Shortfall**", and/or

(iv)    the Estimated Company Transaction Expenses exceed USD 150,000 (it being agreed that such amount refers to the liabilities accrued to both the Company and BSUH) (the "**Expected Company Transaction Expenses**" and the "**Excess Transaction Expenses**"; and/or

(v)    the Estimated Benefits Liabilities exceed 0 USD (it being agreed that such amount refers to the liabilities accrued to both the Company and BSUH) (respectively, the "**Expected Benefits Liabilities**", and the "**Excess Benefits Liabilities**"),

then, the Buyer shall pay 100% of such Excess Creditors Closing Repayment, and/or Excess Closing Indebtedness, and/or Closing WC Shortfall, and/or Excess Transaction Expenses and/or Excess Benefits Liabilities to the Company (on the account of the Secondary Amount, and provided such amounts do not exceed, in the aggregate, the Secondary Amount), and deduct such amounts from the Secondary Amount.

(h)    The Company shall use such proceeds resulting from the Excess Creditors Closing Repayment, Excess Closing Indebtedness, Closing WC Shortfall, Excess Transaction Expenses and/or Excess Benefits Liabilities to satisfy such additional liabilities of the Company to third parties/creditors, in accordance with the instructions of the Buyer.

(i)    Notwithstanding anything to the contrary in this Agreement, the total aggregate amount of the Aggregate Primary Amount and the Aggregate Secondary Amount, as adjusted in accordance with the terms hereof, that the Buyer shall be required to pay to the Company, BSUH and/or the Selling Parties (in the aggregate) shall never exceed USD 26 million, and the Buyer shall not be required to pay to the Company, BSUH and/or the Selling Parties (in the aggregate) any amount in excess of USD 26 million.

(j)    In connection with the foregoing, Seller Representative shall provide to Buyer, and shall cause the Company to provide to Buyer, at least 10 Business Days prior to the anticipated Closing Date, copies of, or access to, all books, records, receipts and other information and documentation reasonably necessary for Buyer to confirm Seller Representative's calculation of the Estimated Closing Working Capital, Estimated Closing Date Indebtedness, Estimated Creditors Closing Repayment, Estimated Company Transaction Expenses, Estimated Benefits Liabilities and Estimated Closing Date

Cash, including by providing Buyer with reasonable access to the accountants and other Representatives of the Selling Parties or the Company who assisted in preparing such estimates.

(k)    Together with the delivery of the Estimated Closing Balance Sheet and Estimated Closing Statement, Company shall deliver to Buyer a Schedule (the "Primary Disbursement Schedule"), certified by an officer of the Company and setting forth:

(i)    the portion of the Expected Creditors Closing Repayment set forth next to the name of each Person being repaid such portion of the Expected Creditors Closing Repayment;

(ii)    the payment of the PDA Purchase Price;

(iii)    the portion of the Expected Company Transaction Expenses set forth next to the name of each Person receiving such portion of the Expected Company Transaction Expenses;

(iv)    the portion of the Expected Benefits Liabilities to be paid to each recipient thereof (if any);

(v)    any Excess Creditors Closing Repayment, and/or Excess Closing Indebtedness, and/or Closing WC Shortfall, and/or Excess Transaction Expenses and/or Excess Benefits Liabilities to be paid to each third party/payee.

(vi)    detailed wire instructions for each Person listed on the Primary Disbursement Schedule.

(l)    Together with the delivery of the Estimated Closing Balance Sheet and Estimated Closing Statement, Seller Representative shall deliver to Buyer the Secondary Disbursement Schedule, certified by Seller Representative and setting forth:

(i)    the portion of the Net Secondary Amount withheld from the Selling Parties in respect of the  Escrow Amount;

(ii)    the amount of the PPP Loan Amount into the PPP Escrow Account;

(iii)    the amounts deducted from the Secondary Amount to account for the Excess Creditors Closing Repayment, and/or Excess Closing Indebtedness, and/or Closing WC Shortfall, and/or Excess Transaction Expenses and/or Excess Benefits Liabilities.

(iv)    the applicable portion of the Net Secondary Amount to be paid to each of the Selling Parties; and

(v)    detailed wire instructions for each Person listed on the Secondary Disbursement Schedule.

2.9    Closing Actions.

(a)    At the Closing, Buyer shall take the following actions:

(i)    Escrow Deposits.  Buyer shall deliver to the Escrow Agent, on the account of the Aggregate Secondary Amount, $1,000,000 (the "Escrow Amount"), by wire transfer of immediately available funds.

The Escrow Amount shall be used to satisfy any post-closing adjustment of the Secondary Amount and indemnification obligations of the Selling Parties and the Founders under this Agreement.

The Escrow Amount are portions of the Secondary Amount and shall be deducted from the Net Secondary Amount payable to the Selling Parties.  The Escrow Amount shall be held by the Escrow Agent until receipt by the Buyer of the audited financial statements of the Company for the year 2021, subject to the provisions below.

First Release. Within five (5) Business Days following the later of (i) the expiry of the fourth month following the Closing; and (ii) the determination of the Accounting Referee pursuant to 2.10(c) below (if any) (the "**First Release Date**"), in the event that (i)there is any Final Excess Creditors Closing Repayment and/or any Final Excess Closing Indebtedness and/or any Final Closing WC Shortfall and/or any Final Excess Transaction Expenses and/or any Final Excess Benefits Liabilities , and/or (ii) if there are outstanding claims of the Buyer against the Founders and/or the Selling Parties pursuant to Section 7.2 below, then the Buyer shall instruct the Escrow Agent to release any amount (up to the Escrow Amount) (x) to the Company, for the payment of any additional liabilities due by the Company to third parties, in accordance with the instructions of the Buyer; and/or (y) to the Buyer in accordance with the provisions of the Escrow Agreement for the payment of any indemnity claim under Section 7.2 below. Following such payments, the Escrow Agent shall promptly disburse to the Selling Parties (a) USD 500,000.00 minus (b) any amounts released to Buyer or the Company pursuant to the preceding sentence.

Second Release. Within twenty (20) Business Days following receipt of the audited financial statements of the Company for the year ending 31 December 2021 (the "Second Release Date"), Buyer shall instruct the Escrow Agent to release the remainder of the Escrow Amount to the Selling Parties, minus any amounts held back due to valid claims made by Buyer pursuant to Section 7.2 as of the Second Release Date. Any amounts held back on the Second Release Date shall be released to the Selling Parties if and to the extent any outstanding claims are resolved following the Second Release Date.

For the avoidance of doubt, the Escrow Amount may be used for the payment of any claim of the Buyer against the Selling Parties and/or the Founders, pursuant to Section 7.2 below and/or any post-closing adjustment of the Secondary Amount, at the Buyer's sole discretion. In the event of exhaustion of the Escrow Amount, the Selling Parties and the Founders shall indemnify the Buyer with respect to any post-closing adjustment and/or any indemnification claim pursuant to Section 7.2 below, within 30 days of the submission of such claim by the Buyer, and all subject to the Selling Parties and the Founders' limitations of liability pursuant to Section 7 below.

(ii)    PPP Escrow Deposits.  Buyer shall deliver to the PPP Escrow Agent, on the account of the Secondary Amount, the PPP Loan amount (the "PPP Escrow Amount"), in each case by wire transfer of immediately available funds.

The PPP Escrow Amount shall be held in escrow by the PPP Escrow Agent, in accordance with the terms of the PPP Escrow Agreement.

(iii) <u>Creditors' Closing Repayment</u>. Buyer shall pay on behalf of the Company the Expected Creditors' Closing Repayment by wire transfer of immediately available funds in accordance with the Primary Disbursement Schedule.

(iv) <u>PDA Purchase Price</u>. The Buyer shall pay, on behalf of the Company directly to PDA, out of the proceeds of the Primary Amount, the PDA Purchase Price.

(v) <u>Company Transaction Expenses</u>. Buyer shall pay on behalf of the Company the Expected Company Transaction Expenses by wire transfer of immediately available funds in accordance with the Disbursement Schedule.

(vi) <u>Benefits Liabilities</u>. Buyer shall pay to the Company or its payroll provider the Expected Benefits Liabilities by wire transfer of immediately available funds in accordance with the Primary Disbursement Schedule, and the Company or such payroll provider, as the case may be, shall, as part of the Company's next payroll process, deliver the applicable amount, less any required withholding, to each applicable payee of a Benefit Liability.

(vii) <u>Payment of the Net Primary Amount to the Company</u>. After the payments contemplated by Section 2.9(a)(i) through 2.9(a)(vi) are made, Buyer shall pay to Company, the Net Primary Amount, together with any amount deducted from the Secondary Amount pursuant to Section 2.10 below.

(viii) <u>Payment of the Secondary Amount to the Selling Parties</u>. After the payments contemplated by Section 2.9(a)(i) through 2.9(a)(vi) are made, Buyer shall pay to each Selling Party, in accordance with the allocation set forth in <u>Exhibit A-2</u>, the applicable portion of the Secondary Amount by wire transfer of immediately available funds to the accounts of the Selling Parties set forth in the Secondary Disbursement Schedule.

(ix) <u>Withholding Rights</u>. Buyer and the Company shall be entitled to deduct and withhold from any payment to any Person under this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment or any other Tax withholding obligation with respect to this Agreement under the Code or any provision of applicable Tax law and to collect any necessary Tax forms, including appropriate Forms W-8 or W-9, as applicable. To the extent that amounts are so withheld or deducted by Buyer or the Company, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made.

(x) <u>Transfer Taxes</u>. Any and all transfer, documentary, sales, use, stamp, registration and such other Taxes and fees (including penalties and interest) with respect to the issuance of the Issued Interests and the transfer of the Purchased Interests (collectively, "<u>Transfer Taxes</u>") shall be paid by the Selling Parties.

2.10 <u>Post-Closing Adjustments</u>.

(a) No later than the 90th day following the Closing Date, Buyer will prepare and deliver to Seller Representative a consolidated balance sheet of the Company as of the Closing (the "**Closing Balance Sheet**"), prepared in accordance with the Accounting Methodologies and presented on a basis consistent with the illustrative calculations set forth in <u>Exhibit E-1</u>, together with a statement (the

"**Closing Statement**") setting forth Buyer's good faith calculation of Creditors' Closing Repayment, Closing Working Capital, Closing Date Indebtedness, Company Transaction Expenses and Benefits Liabilities.

(b)    Seller Representative shall have 45 days following its receipt of the Closing Balance Sheet and the Closing Statement to deliver to Buyer any objections that Seller Representative (on behalf of the Selling Parties) may have to any of the matters set forth therein.  If Seller Representative does not deliver any written objections to Buyer within such ten Business Day period, the Selling Parties shall be deemed to have accepted the Closing Balance Sheet, the Closing Statement and the calculations set forth therein, and the Selling Parties shall have irrevocably waived any right to object thereto.  If Seller Representative does timely deliver such written objections (a "**Dispute Notice**"), which Dispute Notice specifies in reasonable detail, together with any supporting calculations, the nature and dollar amount of any disagreement so asserted and the proposed corrections (collectively, the "**Disputed Items**"), then, during the ten Business Days following Buyer's receipt of a Dispute Notice, Buyer and Seller Representative shall diligently and in good faith attempt to resolve in writing the Disputed Items.  Any Disputed Item resolved in writing by Buyer and Seller Representative will be deemed final, binding and conclusive on the Parties.

(c)    If Buyer and Seller Representative do not reach an agreement on all of the Disputed Items during such ten Business Day period, then, at the end of such period, Buyer and Seller Representative will simultaneously submit all unresolved Disputed Items (collectively, the "**Unresolved Items**") to a nationally recognized accounting firm mutually acceptable to Buyer and Seller Representative (the "**Accounting Referee**") to review and resolve such matters.  Each of Buyer and Seller Representative agrees to execute and deliver any engagement letter reasonably required by the Accounting Referee.  The Accounting Referee will determine each Unresolved Item (the amount of which may not be more favorable to Buyer than the related amount reflected in the Closing Statement nor more favorable to the Selling Parties than the related amount set forth in the Dispute Notice) as promptly as practicable, and Buyer and Seller Representative will instruct the Accounting Referee to endeavor to complete such process within a period of no more than twenty calendar days.  In making its determinations hereunder, the Accounting Referee shall act as an expert and not as an arbitrator.  The Accounting Referee may conduct such proceedings as the Accounting Referee believes, in its sole discretion, will assist in the determination of the Unresolved Items; provided, however, that, except as Buyer and Seller Representative may otherwise agree in writing, all communications between Buyer and Seller Representative or any of their respective Representatives, on the one hand, and the Accounting Referee, on the other hand, will be in writing with copies simultaneously delivered to the non-communicating Party.  Provided that Buyer and the Company have made available to Seller Representative and their Representatives in a timely manner all information relating to the Closing Statement reasonably requested by Seller Representative, then the Accounting Referee shall make its determination solely based on (i) the documentation submitted by, and presentations (any such documentation or presentation must be provided to the other Party prior to its submission or presentation to the Accounting Referee) made by Buyer and Seller Representative, (ii) the definitions of Creditors' Closing Repayment, Closing Working Capital, Closing Date Indebtedness, Company Transaction Expenses and Benefits Liabilities and (iii) consistent with the Accounting Methodologies. The Accounting Referee's determination of the Unresolved Items will be final, binding and conclusive on the Parties, absent manifest errors, and enforceable before a Governmental Authority, effective as of the date the Accounting Referee's written determination is received by Buyer and Seller Representative.  Each of Buyer and Seller Representative (on behalf of the Selling Parties) will bear their own legal, accounting and other fees and expenses of participating in such dispute resolution procedure.  The fees and expenses of the Accounting Referee incurred pursuant to this Section 2.10(c) shall be

allocated to be paid by Buyer, on the one hand, and Seller Representative (on behalf of the Selling Parties), on the other, based upon the percentage that the portion of the contested amount not awarded to each Party bears to the amount actually contested by such Party, as determined by the Accounting Referee.

(d)    Upon final determination of the adjustments to be made (if any), the Buyer or the Accounting Referee (as the case may be) will determine the final adjusted amounts of the Creditors Closing Repayment (the "**Final Creditors Closing Repayment**"), Closing Working Capital (the "**Final Closing Working Capital**"), Closing Date Indebtedness (the "**Final Closing Date Indebtedness**"), Company Transaction Expenses ("**Final Company Transaction Expenses**") and Estimated Benefits Liabilities (the "**Final Benefits Liabilities**").

(e)    If, upon final determination of such adjustments, it appears that:

(i)    the Final Creditors Closing Repayment exceeds the Estimated Creditors Closing Repayment (the "**Final Excess Creditors Closing Repayment**"); and/or

(ii)    the Final Closing Indebtedness exceeds the Estimated Closing Indebtedness (the "**Final Excess Closing Indebtedness**"); and/or

(iii)    the Final Closing Working Capital is less than the Estimated Closing Working Capital (the "**Final Closing WC Shortfall**"); and/or

(iv)    the Final Company Transaction Expenses exceed the Estimated Company Transaction Expenses (the "**Final Excess Transaction Expenses**";

(v)    the Final Benefits Liabilities exceed the Estimated Benefits Liabilities (the "**Final Excess Benefits Liabilities**"), and/or

then the Buyer shall instruct the Escrow Agent to pay the Company 100% of such Final Excess Creditors Closing Repayment and/or Final Excess Closing Indebtedness and/or Final Closing WC Shortfall and/or Final Excess Transaction Expenses and/or Final Excess Benefits Liabilities, out of the proceeds deposited in the Escrow Account, on the account of the Secondary Amount, subject to the provisions of Section 2.9 (a) (i) above.

In the event of exhaustion of the Escrow Amount, the Selling Parties and the Founders shall pay the remainder of the Final Excess Creditors Closing Repayment and/or Final Excess Closing Indebtedness and/or Final Closing WC Shortfall and/or Final Excess Transaction Expenses and/or Final Excess Benefits Liabilities to the Company, within 30 days of the submission of such claim by the Buyer, and all subject to the Selling Parties and the Founders' limitations of liability pursuant to Section 7 below.

(f)    Following such payment to the Company, the Company shall use such proceeds resulting from the Excess Creditors Closing Repayment, Excess Closing Indebtedness, Closing WC Shortfall, Excess Transaction Expenses and/or Excess Benefits Liabilities to satisfy such additional liabilities of the Company to third parties, in accordance with the instructions of the Buyer.

(g)    Any payments made pursuant to this Section 2.10(d) shall be treated as an adjustment to the Net Secondary Amount by the Parties for Tax purposes and shall be treated as such by the Parties on their Tax Returns.

(h)    Following the Closing and continuing until the Second Release Date, any amounts received by the Company with respect to the tax equity arrangements and other sources of funding, set forth on Schedule 2.10(h) and with respect to the specific projects listed in Schedule 2.10(h) shall be allocated as follows:

(i)    first, to replenish any amounts in the Escrow Account to the extent there is less than USD 1 million in the Escrow Account prior to the First Release Date and less than USD 500 thousand in the Escrow Account on or after the First Release Date; provided that in no event shall the funds in the Escrow Account exceed the Escrow Amount; and

(ii)    thereafter, to BS 1007 and Yellow Tree, pro rata in accordance with the allocation set forth on the Secondary Disbursement Schedule, and provided only that

(A)    the Company provided the Buyer with audited consolidated financial statements of the Company for the year ending 31 December 2020 in accordance with the provisions of Section 6.12 below; and

(B)    the Company provided the Buyer with the Company's reviewed financial statements for Q2 2021; and

(C)    all costs and liabilities mentioned in the "uses" column of Schedule 2.10 (f) were paid by the Company;

(D)    all sources of funding in the amount of at least all costs and liabilities mentioned in  2.10(h)(ii)(h)(C) above have been received by the Company; and

(E)    there are no outstanding claims of the Buyer pursuant to this Section 2.10 against the Company, the Founders and/or the Selling Parties.

## ARTICLE III
## Representations and Warranties Regarding the Company

The Company, the Selling Parties and the Founders hereby represent and warrant to Buyer as of the date hereof and as of the Closing Date as follows, except as set forth in Schedule III (the "Disclosure Schedule"), which disclosures shall be deemed to be representations and warranties as if made hereunder, as of the Effective Date and as of the Closing Date. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections and subsections contained in this Article III, and the disclosures in any section or subsection of the Disclosure Schedule shall qualify other sections and subsections in this Section 3 only to the extent it is reasonably apparent from a reading of the disclosure that such disclosure is applicable to such other sections and subsections.

3.1    Organization; Authorization; etc.

(a)    Each of the Company, the Portfolio Companies and the Project Companies is a limited liability company duly organized, validly existing and in good standing under the laws of its state of formation.  Each of the Company, the Portfolio Companies and the Project Companies has all requisite limited liability company power and authority to own, lease and operate its properties and assets and to carry on its business as it is now being conducted.  Each of the Company, the Portfolio Companies and

the Project Companies is in good standing and is duly qualified as a foreign entity to transact business in each jurisdiction in which the nature of the property owned or leased by it or the conduct of its business requires it to be so qualified.

(b)    Except for the Portfolio Companies and the Project Companies, the Company does not own or hold, directly or indirectly, any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for any equity interest or similar interest in, in any other Person.

(c)    Except as set forth in the organizational chart attached hereto as Schedule 3.1(c), none of the Company, the Portfolio Companies or the Project Companies has any Subsidiaries or owns, directly or indirectly, any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for any equity or similar interest in, any other Person.

(d)    Accurate and complete copies of (i) the articles of organization; (ii) the Operating Agreement; and (iii) minutes of meetings, or written consents in lieu of meetings, of the members, boards of directors or managers (or similar governing bodies) and committees of the boards of directors or managers (or similar governing bodies) (in each case, together with all amendments thereto) of the Company and its Subsidiaries have been delivered or made available to Buyer.  Neither the Company, nor any Portfolio Company and/or Project Company is not in default under or in violation of any provision of its organizational documents in any material respect.  There are no unpaid Transfer Taxes.

(e)    The Company has all requisite limited liability company power and authority to execute and deliver the Transaction Agreements to which it is a party, to perform its obligations thereunder and to consummate the transactions contemplated thereby.  The execution and delivery of the Transaction Agreements to which it is a party, the performance of the Company's obligations thereunder and the consummation of the transactions contemplated thereby have been duly and validly authorized by all necessary corporate or other action on the part of the Company.  The Transaction Agreements to which it is a party have been duly executed and delivered by the Company and (assuming due execution by the other parties thereto) constitute the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (ii) to the extent the indemnification provisions contained in the Operating Agreement may be limited by applicable federal or state securities laws.

(f)    The execution and delivery of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the articles of organization or other organizational documents of the Company, the Portfolio Companies and/or the Project Companies; (b) conflict with or result in a violation or breach of any provision of any Legal Requirement or Order applicable to the Company, the Portfolio Companies and/or the Project Companies; (c) except for the Third Party Consents listed in Schedule 3.1(f), require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which the Company the Portfolio Companies and/or the Project Companies are a party or by which the Company, the Portfolio Companies and/or the Project Companies are bound or to which any of their respective properties and assets are

subject (including any Material Contract) or any Permit affecting the properties, assets or business of the Company, the Portfolio Companies and/or the Project Companies and/or result in additional liabilities of the Company to pay bonuses or compensation to any Business Employee or any other third party; or (d) result in the creation or imposition of any Encumbrance on any properties or assets of the Company, the Portfolio Companies and/or the Project Companies.

(g)    No registrations, filings, applications, notices, consents, approvals, orders, qualifications, authorizations or waivers are required to be made, filed, given or obtained by the Company, the Portfolio Companies and/or the Project Companies with, to or from any Person, including any Governmental Authority, in connection with the execution and delivery of the Transaction Agreements by the Company or the Selling Parties or the consummation of the transactions contemplated hereby or thereby, except as set forth on Schedule 3.1(g) (the "Company Approvals").

3.2    Capitalization; Structure.

(a)    All of the issued and outstanding Membership Interests are held by the Selling Parties and PDA, immediately prior to Closing, in the amounts and percentages set forth in Exhibit A-1. All such Membership Interests are uncertificated and constitute one hundred percent (100%) of the total issued and outstanding limited liability company interests of the Company, on a Fully Diluted Basis.

(b)    The respective organizational documents of each Subsidiary have been made available to Buyer. The allocations and distributions of cash and proceeds in each such Subsidiary are set forth in each such organizational document.

(c)    Exhibit A-2 sets forth the capitalization of the Company immediately following the Closing including the number issued and outstanding Membership Interests and the holders of such Membership Interests. The Company does not have and has never had any issued or outstanding stock options, warrants or any other securities convertible or exchangeable into equity of the Company. There are no outstanding rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any Membership Interests, or any securities convertible into or exchangeable for Membership Interests.

(d)    The Membership Interests of the Company (including the Purchased Interests and the Membership Interests repurchased by the Company from PDA) (i) were duly authorized and validly issued in compliance with federal and applicable state and foreign Legal Requirements, free and clear of all Encumbrances and exempt from registration under all applicable federal and state securities laws and regulations; (ii) are fully paid and nonassessable, (iii) have not been issued in violation of any preemptive rights and (iv) are not subject to preemptive rights, rights of first refusal or similar rights created by statute, the Company's organizational documents or any agreement.  Except as set forth in the Membership Interest Repurchase Agreement, there are no (i) outstanding obligations of the Company to repurchase, redeem or otherwise acquire any securities of the Company or (ii) outstanding obligations of the Company to provide funds to or make an investment (in the form of a loan, capital contribution or otherwise) in the Company or any other Person. There are no other outstanding securities of the Company, including any debt securities or any options, profit interests, warrants, calls, commitments, agreements or other rights of any kind, giving any Person the right to acquire, or any securities that, upon conversion, exchange or exercise would give any Person the right to require the issuance, sale or transfer of, or obligations to issue, sell or transfer, or otherwise convertible, exercisable or exchangeable into, any limited liability company

DocuSign Envelope ID: BDEAEE0C-0082-4CB5-9466-364533A42A1F

interests or other equity interests in the Company. Except for the Membership Interests held by the Selling Parties and PDA, immediately prior to Closing, there are no authorized or outstanding equity interest or unit appreciation rights, phantom equity interest or unit plans, profit participation rights or other similar rights with respect to the Company.

(e)     Upon execution and delivery of the Amended and Restated Operating Agreement, the Issued Interests will be validly issued and duly authorized and upon payment of the Net Primary Amount on Closing, the Buyer will have good title to the Issued Interests free and clear of all Encumbrances except for Permitted Encumbrances.

(f)     The Membership Interests of each Portfolio Company and each Project Company were duly authorized and validly issued, fully paid and non-assessable without restriction on the rights of transfer thereof, except under the Project Documents. The Company and/or the respective Portfolio Company as set forth in Schedule 3.2(f) attached hereto has good and valid title to and is the lawful, legal, record and beneficial owner of the Membership Interest of each Portfolio Company and/or Project Company (respectively) free and clear of all Encumbrances other than Permitted Encumbrances. The Membership Interests of each Portfolio Company and each Project Company  (i) were duly authorized and validly issued in compliance with federal and applicable state and foreign Legal Requirements, free and clear of all Encumbrances and exempt from registration under all applicable federal and state securities laws and regulations; (ii)  have not been issued in violation of any preemptive rights and (iv) are not subject to preemptive rights, rights of first refusal or similar rights created by statute, other than as stated in the Project Documents.  There are no (i) outstanding obligations of each Portfolio Company and each Project Company to repurchase, redeem or otherwise acquire any securities of such Portfolio Company and/or Project Company or (ii) outstanding obligations to provide funds to or make an investment (in the form of a loan, capital contribution or otherwise) in the Portfolio Company and/or Project Company or any other Person. There are no other outstanding securities of the Portfolio Company and/or Project Company, including any debt securities or any options, profit interests, warrants, calls, commitments, agreements or other rights of any kind, giving any Person the right to acquire, or any securities that, upon conversion, exchange or exercise would give any Person the right to require the issuance, sale or transfer of, or obligations to issue, sell or transfer, or otherwise convertible, exercisable or exchangeable into, any limited liability company interests or other equity interests in the Company.  Immediately prior to Closing, except as set forth in Schedule 3.2(f) attached hereto, there are no authorized or outstanding equity interest or unit appreciation rights, phantom equity interest or unit plans, profit participation rights or other similar rights with respect to each Portfolio Company and/or Project Company.

(g)     The Company directly owns all or part of the outstanding Membership Interests of the Portfolio Companies, as set forth in the organizational chart attached hereto as Schedule 3.2(g), and the Portfolio Companies do not have any other securities of any class of membership interests issued, reserved for issuance or outstanding; (ii) except as may be set forth in their respective operating agreements, there are no existing options, warrants, calls, exchange rights, conversion rights, or other commitments, Contracts of any character made or granted by or binding upon the Portfolio Companies relating to the issuance of Membership Interests of the Portfolio Companies or to the issuance of any securities or obligations convertible into or exchangeable for, or giving any Person any right to subscribe for or acquire from the Portfolio Companies, any membership interests or other securities or obligations of the Portfolio Companies convertible into Project Membership Interests of the Portfolio Companies; and (iii) none of the Portfolio Companies now have or have ever had any Subsidiaries, except as set forth in Schedule 3.2(g) attached hereto.

(h)    Each Portfolio Company owns all of the outstanding Membership Interests of the respective Project Companies, as set forth in the organizational chart attached hereto as Schedule 3.2(h), and the Project Companies do not have any other securities of any class of membership interests issued, reserved for issuance or outstanding; (ii) except as may be set forth in their respective operating agreements, there are no existing options, warrants, calls, exchange rights, conversion rights, or other commitments, Contracts of any character made or granted by or binding upon the Project Companies relating to the issuance of Membership Interests of the Project Companies or to the issuance of any securities or obligations convertible into or exchangeable for, or giving any Person any right to subscribe for or acquire from the Project Companies, any membership interests or other securities or obligations of the Project Companies convertible into Membership Interests of the Project Companies; and (iii) none of the Project Companies now have or have ever had any Subsidiaries, except as set forth in Schedule 3.2(h) attached hereto.

(i)    The Company has never adopted, sponsored or maintained any option plan or any other plan or agreement providing for equity compensation (including profits interests) to any Person.

(j)    Except as set forth in Schedule 3.2(j), there are no change of control or similar rights, anti-dilution protections, accelerated vesting rights or other rights that the Selling Parties, any officer, employee or director of the Company, or any other Person would be entitled to exercise or invoke in connection with the Company, the Portfolio Companies and/or the Project Companies as a result of, or in connection with, the transactions contemplated by the Transaction Agreements or otherwise.

(k)    There are no voting trusts or other agreements or understandings to which the Company is a party with respect to the voting of the equity securities of the Company.  Following the Closing, no Person will have any right to receive limited liability company interests or other equity interests in the Company upon exercise, conversion or vesting of any right or convertible instrument.

3.3    Sole Purpose.  Since each applicable Portfolio Company's and Project Company's formation, (i) such Portfolio Company and/or Project Company has been engaged solely in the development, construction, ownership, operation or financing of its respective Project(s), (ii) no Portfolio Company or Project Company has incurred any Liabilities except those incurred in connection with its organization, the development, construction, operation and financing of the respective Project(s) or as otherwise previously disclosed, and (iii) to the Knowledge of the Selling Parties, no Portfolio Company and/or Project Company is a party to any Contract other than the Project Documents, in each case, to which such Project Company is a party.

3.4    Compliance with Laws; Permits.

(a)    The Company has not received written notice of a violation by the Company, the Portfolio Companies or any Project Companies of any Legal Requirement. To the Knowledge of the Selling Parties, none of the Company, the Portfolio Companies or any Project Company (i) is under investigation or inquiry with respect to the violation of any Legal Requirement or (ii)  is currently in violation of any Legal Requirement.

(b)    Neither the Company nor any of its officers or directors is a Prohibited Person. The Company has not engaged in a transaction involving, directly or indirectly, (i) a Prohibited Person, (ii) any country against which the United States imposes or has imposed a trade embargo, or (iii) Crimea, Cuba, Iran, North Korea or Syria.

(c)      Each of the Company, the Portfolio Companies and the Project Companies is in compliance with and none of then has received written notice of actual or alleged noncompliance with applicable Anti-Terrorism Laws, anti-bribery and anti-corruption laws, including the Foreign Corrupt Practices Act of 1977, as amended, and any rules or regulations thereunder (the "FCPA"), and any applicable comparable foreign Legal Requirement.  Neither the Company nor, to the Knowledge of the Selling Parties, any of its Subsidiary, directors, officers, employees, agents or consultants, or any other Person acting for, or on behalf of, the Company, directly or indirectly, has made, undertaken, offered to make, promised to make or authorized the payment or giving of any bribe, rebate, payoff, influence payment, kickback or other payment or gift of money or anything of value (including meals or entertainment), to any officer, employee or ceremonial office holder of any government or instrumentality thereof, any political party or supra-national organization (such as the United Nations), any political candidate, any royal family member or any other person who is connected or associated personally with any of the foregoing for the purpose of influencing any act or decision of such payee in his official capacity, inducing such payee to do or omit to do any act in violation of his lawful duty, securing any improper advantage or inducing such payee to use his influence with a government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality.

(d)      The Permits held by the Company, the Portfolio Companies and the Project Companies as of the Closing Date, constitute all material Permits that are required for the operation of the Company's, the Portfolio Company's and the Project Company's business as presently conducted.  All Permits held by the Company, the Portfolio Companies and the Project Companies are in full force and effect and no such Person is in default in any material respect thereof.  To the Knowledge of the Selling Parties, (i) there are no lawsuits, actions, administrative, arbitration or other proceedings or governmental investigations pending or, threatened against the Company, any Portfolio Company and/or any Project Company that could reasonably be expected to result in the revocation, cancellation, suspension or any other material adverse modification of any Permit held by the Company, the Portfolio Companies and the Project Companies nor (ii) is there any reasonable or legitimate basis for any such revocation, cancellation, suspension or adverse modification.  The Company, the Portfolio Companies and the Project Companies have not received written notice of any loss of or refusal to renew any Permit held by it.

3.5      Affiliate Transactions.  Other than as set forth in Schedule 3.5, none of the Company, the Project Companies or the Portfolio Companies is  a party to any Contract with (i) any Affiliate of the Company, (ii) any Selling Party or any Affiliate of any Selling Party, (iii) any Founder or an Affiliate or a member of the immediate family of any Founder or (iv) any of the Company's managers, officers, directors or employees (or members of their immediate families) or any Affiliate of one of the foregoing Persons (each, an "Insider"); (b) to the Knowledge of the Selling Parties, no Insider owns any direct or indirect interest of any kind in, or controls or is a manager, director, officer, employee or partner of or consultant to, or a lender to or borrower from, or has the right to participate in the profits of, any Person that is a competitor, supplier, customer, landlord, tenant, creditor or debtor of the Company; and (c) no material transaction has taken place between the Company and/or any Subsidiary, on the one hand, and any Insider, on the other hand, that will not have been discharged, terminated or otherwise consummated on or prior to the Closing Date with no further obligation on the part of the Company.

3.6      Title to Assets; Project Assets.

(a)      The Company and each Portfolio Company and Project Company has good, valid and marketable title to (in the case of owned assets) or a valid leasehold or licensed interest in all tangible

DocuSign Envelope ID: BDEAEE0C-9082-4CB5-9466-364533A42A1F

personal property, including all buildings, machinery, equipment, Project Assets, and all other material tangible assets, and all Company Intellectual Property, used by it in connection with its business as presently conducted, free and clear of any Encumbrance, other than Permitted Encumbrances. Neither the Company nor, to the Knowledge of the Selling Parties, any Portfolio Company or Project Company, is in default under any lease or license under which it leases or licenses personal property.

(b)    Such property and assets, including the Project Assets, are in satisfactory operating condition, subject to ordinary wear and tear, and are suitable for the purposes used.  The Project Assets and the assets of the Company, the Portfolio Companies and the Project Companies constitute all of the assets necessary to conduct the business of the Company, the Portfolio Companies and the Project Companies as currently conducted, and as proposed to be conducted as of the Closing Date pursuant to the terms of the Operating Agreement.  There has not occurred and, to the Knowledge of the Selling Parties, there is not expected to occur any circumstance or event that would (a) cause any Project Asset, asset of the Company, the Portfolio Companies and the Project Companies to cease to be owned, leased or licensed (as applicable) by them immediately after the Closing, or (b) interfere in any material respect with the current use, occupancy or operation of any such asset.

3.7    <u>Project Sites.</u>

(a)    None of the Company, the Portfolio Companies or the Project Companies own any real property; and

(b)    the rights of each Project Company under the Leases are sufficient for the operation of, the Projects in accordance with all Permits and the Customer Agreements;

(c)    to the Knowledge of Selling Parties, there are no soil, structural, subsurface or other natural or artificial conditions affecting any Leased Facility (including, in the case of any rooftop or canopy Project, any roofing, building, structural or systems conditions) or property subject to an easement that could reasonably be expected to materially adversely affect any Project Company's ability to use and conduct the operations on such real property.

(d)    To the Knowledge of the Selling Parties, there is no Casualty Defect (regardless of whether covered by insurance) that would materially and adversely affect any Project or Project Assets currently in operation.

(e)    To the Knowledge of the Selling Parties, there are no existing express third party options or rights to purchase any Project currently in operation.

(f)    Each PV System currently in operation was constructed and is being operated in accordance with Prudent Industry Practice.

(g)    The financial model of each Project is attached hereto as Schedule 3.7(g) (the "<u>Financial Models</u>") and reflect a good faith estimate of the anticipated revenues and costs of each Project Company.

(h)    The tariff collected from each Customer is in line with the Financial Models and the discount rate granted to each Customer is not expected to be amended, increased or altered in any way following the Closing.

(i)        Other than as set forth in Schedule 3.7(i) attached hereto, the total amount of electricity subscribed for by Customers of each applicable Project's electric output or equivalent virtual net energy metering credits is at least 125% of each applicable Project's total estimated annual electric production.

(j)        The Projects are, as of the Closing Date only, the only projects owned, developed, constructed and/or operated by the Company, the Portfolio Companies and the Project Companies.

3.8    Material Contracts; Project Documents

(a)        Schedule 3.8 sets forth a true and complete list of all of the following Contracts, (and, collectively with the Project Documents, the "Material Contracts"), with respect to the Company, the Portfolio Companies and the Project Companies:

(i)        Contracts that involve aggregate annual payments by or to the Company of more than $50,000;

(ii)        Contracts that evidence Company Indebtedness or pursuant to which an Encumbrance has been placed on any material asset or property of the Company;

(iii)        Contracts that (A) limit the ability of the Company or Affiliate of, or successor to, the Company, or, to the Knowledge of the Selling Parties, any executive officer of the Company, to compete in any line of business or with any Person or in any geographic area or during any period of time or to develop, market, sell, distribute or otherwise exploit Company services or products, (B) grant exclusive rights of any type or scope or rights of first refusal, rights of first negotiation or similar rights or terms to any Person, (C) require the Company or Affiliate of, or successor to, the Company or any Affiliate to use any supplier or other Person for all or substantially all of any of its material requirements or needs in any respect, (D) limit or purport to limit the ability of the Company or any or Affiliate of, or successor to, the Company and/or any Affiliate to solicit any customers, employees or clients of the other parties thereto, (E) require the Company and/or any Affiliate of, or successor to, the Company and/or any Affiliate to provide to the other parties thereto "most favored nation" pricing, or (F) require the Company and/or any Affiliate of, or successor to, the Company and/or any Affiliate to market or co-market any products or services of any other Person;

(iv)        Contracts executed for purposes of granting powers of attorney and proxies entered into by or granted to the Company, whether limited or general, revocable or irrevocable;

(v)        Contracts pursuant to which the Company obtains a right or license to use Intellectual Property other than generally available commercial products such as software and other "click-through" licenses;

(vi)        Contracts that create or relate to a partnership or joint venture to which the Company is a party, or pursuant to which the Company has any ownership interest in any other Person;

(vii)        Contracts for (A) the acquisition or disposition of any equity interests or material assets of the Company or any other Person or (B) any merger, recapitalization, redemption, reorganization or other similar transaction;

(viii)      Contracts for the employment of any director, officer, manager, employee or consultant of the Company or any other type of Contract with any director, officer, manager, employee or consultant of the Company that the Company has obligations towards as of and/or following the date of this Agreement, including any Contract requiring it to make a payment to any director, officer, manager, employee or consultant on account of any transaction contemplated by the Transaction Agreements or any Contract that is entered into in connection with the Transaction Agreements or to provide severance or retention compensation;

(ix)      Contracts with customers of the Company which involve payments to the Company in excess of USD 10,000 per year;

(x)      Contracts under which the Company has, directly or indirectly, made any advance, loan or extension of credit to any Person;

(xi)      Contracts for capital expenditures or the acquisition or construction of fixed assets for the benefit and use of the Company, the performance of which involves consideration in excess of $25,000 annually;

(xii)      Contracts for the purchase or sale of real property;

(xiii)      Contracts pursuant to which the Portfolio Companies or the Project Companies lease real estate from third parties (together, the "Leased Real Estate", and the facilities thereon, the "Leased Facilities") or personal property, all photovoltaic system rooftop license agreements, renewable energy generating system lease agreements, and site lease agreements (collectively, the "Leases");

(xiv)      Contracts between the Company, on the one hand, and any Affiliate of the Company, on the other hand;

(xv)      Contracts that cannot be terminated by the Company without penalty or liability on not more than thirty calendar days' notice; and

(xvi)      Contracts with one or more Governmental Authorities.

(b)      Each Material Contract constitutes a valid and binding obligation of the Company, and/or any Subsidiary enforceable against the Company and/or any Subsidiary in accordance with its terms and, to the Knowledge of the Selling Parties, against the counterparty thereto.  With respect to all such Material Contracts, neither the Company and/or any Subsidiary nor, to the Knowledge of the Selling Parties, any other party to any such Material Contract is in breach thereof beyond all notice and cure periods or material default thereunder.  True and complete copies of each Material Contract set forth in Section 3.8 (together with all amendments, waivers or other changes thereto) have been furnished or made available to Buyer, and, to the Knowledge of the Selling Parties, all of such Material Contracts are legal, valid and in full force and effect.

3.9    <u>Customers</u>.

(a)    <u>Schedule 3.9(a)</u> sets forth a list of the top ten (10) (by revenue) Customers of the Company for each of the two most recent fiscal years and year-to-date 2021 listed by revenue and the amount for which each such customer was invoiced during such period.

(b)    No Customer of the Company has delivered written notice (A) that it shall stop purchasing or materially decrease the volume of purchases of services from a Project Company or (B) requesting a material adverse change in the terms or prices at which such Customer purchases services from the Company.

3.10    <u>Suppliers</u>

(a)    The Company has delivered or made available to Buyer a current list of the ten (10) largest suppliers, service providers and vendors of the Company ("**Large Suppliers**").

(b)    None of the Large Suppliers have delivered written notice to the Company that it shall stop or materially decrease the rate of, supplying materials, products or services to the Company.

(c)    <u>Warranties</u>. The Company has made available to Buyer copies of each current warranty related to the solar photovoltaic panels, inverters, trackers, transformers (if applicable), roofs and data collection of each Project and the underlying PV System of such Project, and each such warranty is in full force and effect (other than as set forth in Schedule 3.10(c) attached hereto).

3.11    <u>Real Estate</u>

(a)    The Company does not own any real property and is not a lessor or sublessor under any lease or sublease of real property. <u>Schedule 3.11</u> lists (i) each lease or license for real property to which the Company (or any Portfolio Company or Project Company) is a party (together, the "<u>Leased Real Estate</u>" and the facilities thereon, the "<u>Leased Facilities</u>"); (ii) all subordination, non-disturbance and attornment agreements executed by the Company in respect of any Lease or that are binding on the Leased Real Estate. Except as set forth in Schedule 3.11 (a), there are no deeds of trusts or mortgages that could result in the removal of the Leased Facilities for which there is not a non-disturbance agreement in place.

(b)    Except as set forth in <u>Schedule 3.11(b)</u>, (i) the Company has not received any written notice of a default, offset or counterclaim of any Lease; and (ii) to the knowledge of the Selling Parties, no event has occurred, is pending, or to the Knowledge of the Selling Parties, is threatened, which, after the giving of notice, with lapse of time or otherwise, would constitute any such default or non-compliance by the Company and/or any Subsidiary or, to the Knowledge of the Selling Parties, any other party under such Lease, and no event has occurred that would give rise to a termination right under such Lease following all applicable notice and cure periods.

(c)    The Leases that relate to the leasing, rather than licensing, of real estate constitute all interests in real property, and the Leased Facilities constitute all facilities currently occupied, used or held for use in connection with the business of the Company and that are necessary for the continued operation of such business as currently conducted and the Company enjoys quiet and undisturbed possession of each Leased Facility.  Each Lease (i) is legal, valid, binding, enforceable and

in full force and effect against the Company or the Subsidiary that is the party thereto, as applicable, and, to the Company's Knowledge, against each other party thereto; and (ii) will continue to be legal, valid, binding, enforceable and in full force and effect against the Company or the Subsidiary that is the party thereto, as applicable, and, to the Company's Knowledge, against each other party thereto immediately following the Closing in accordance with the terms thereof as in effect immediately prior to the Closing. No party to any Lease has exercised any right of termination, extension, renewal, purchase option, expansion or right of first refusal with respect to any Lease, except as may be duly documented by amendment, modification or supplement to the applicable Lease.  To the Knowledge of the Selling Parties, all of the operational Leased Facilities and all mechanical systems and utility systems servicing such facilities are in good operating condition and repair (subject to normal wear and tear) free of roof leaks and material defects, are supplied with interconnection points and other services adequate for the operation of such facilities and the PV Systems and are in full compliance with all applicable zoning, building and land-use laws, codes, and requirements, without the requirement for variances, and do not encroach upon any easement which may burden the Leased Real Estate.  There is no Person other than the Company and/or the relevant Subsidiary that is in possession of any Leased Facility and there are no leases, subleases, licenses or other written or oral agreements granting to any Person the right of use or occupancy to any Leased Facility.  Neither the Company nor any Subsidiary has received written notice of any pending condemnation, expropriation, environmental, zoning or other land-use regulation proceeding with respect to the Leased Facilities.

3.12    Environmental Matters. Each of the Company and the Subsidiaries has been and is now in compliance with all applicable Environmental Laws. To the Knowledge of the Selling Parties, no Release or threatened Release of Hazardous Materials has occurred at the Leased Real Estate or as the result of the PV Systems thereon.  Neither the Company nor any Subsidiary has received written notice of any environmental Claim or actual or alleged noncompliance with, or Liability under, any Environmental Law with respect to the Leased Facilities.  To the Knowledge of the Selling Parties, the Company has not been required by any Governmental Authority or other Person to undertake any remedial or investigative action of any kind pursuant to any Environmental Law.

3.13    Financial Statements.

(a)    The Company has delivered or made available to Buyer true and complete copies of the unaudited balance sheets and other financial statements of the Company for the year ended December 31, 2020(the "Reference Date Balance Sheet" and December 31, 2020 the "Reference Date") (collectively, the "Financial Statements").  The Financial Statements have been prepared in accordance with GAAP and the practices consistently applied by the Company in the preceding fiscal periods (except as may be indicated in the notes thereto to the contrary) and fairly present the financial condition, cash flows and results of operations of the Company for the periods and as of the dates set forth therein, subject to, in the case of the unaudited interim Financial Statements, the absence of information or notes not required by GAAP to be included in interim financial statements that, if furnished, would not, individually or in the aggregate, disclose any material obligation or liability not otherwise accrued for in such Financial Statements, and to normal year-end audit adjustments, none of which, individually or in the aggregate, is material.

(b)    The Company makes commercially reasonable efforts to prepare and keep books, records and accounts that, accurately and fairly reflect the transactions and dispositions of its assets in all material respects.

(c)      The Company does not have any Liability except for (i) Liabilities set forth in the Reference Date Balance Sheet and (ii) Liabilities that have arisen after the Reference Date in the ordinary course of business (none of which was caused by any breach of Contract, breach of warranty, tort, infringement, or violation of a Legal Requirement by the Company).

(d)      Schedule 3.13(d) sets forth an accurate and complete list of all Company Indebtedness.

(e)      (i) Schedule 2.10 (f) sets forth an accurate and complete list, as of the Closing Date,  of (x) all sources of funds promised or available to the Company and/or already received by the Company in connection with the projects listed therein; and (y) all intended use of such funds, and all costs already disbursed in connection with the projects listed therein; (ii) there are no other costs or liabilities due to third parties in connection with the projects listed therein in order to render such projects fully operational in accordance with the relevant provisions of the Project Documents.

3.14      Absence of Certain Changes.  Except as set forth in Schedule 3.14, since December 31, 2020, the Company has conducted its business in the ordinary course of business and in substantially the same manner as previously conducted and there has not occurred any Material Adverse Effect or any damage to or destruction of any material asset of the Company, whether or not covered by insurance. Without limiting the generality of the foregoing, since December 31, 2020, there has not been any:

(a)      authorization, issuance, sale, delivery, or agreement to issue, sell or deliver, limited liability company interests, bonds or other securities (whether authorized and unissued or held in the treasury) of the Company, or purchase, redemption, dividend, retirement, grant, or agreement to grant any options, phantom equity, warrants, registration rights, dividend rights or other rights calling for the issuance, sale or delivery (including upon conversion, exchange or exercise) of limited liability company interests, bonds or other securities of the Company;

(b)      increase or promise to increase any compensation or benefit (including any severance, change of control or retention benefits) payable or to become payable by the Company to any shareholder, equityholder, director, manager, officer, or Business Employee of the Company, including the entry into any employment, severance, retention, change of control or similar Contract with any Business Employee, shareholder, equityholder, director, manager, officer, employee or individual independent contractor of the Company or material modification of any arrangement subject to Section 409A of the Code;

(c)      adoption or termination of, amendment to or increase in the payments or benefits under, any Company Benefit Plan;

(d)      declaration or payment of any dividend or other distribution or payment in respect of limited liability company interests, bonds or other securities of the Company;

(e)      amendment to the organizational documents of the Company;

(f)      sale (other than in the ordinary course of business), lease, license or other disposition of, or imposition of any Encumbrance on, any of the Company's assets or properties;

(g)      declaration or commitment of, entry into, amendment of, termination of, or receipt of notice of termination of any (i) employment, severance, redundancy, retention, incentive, change of control, joint venture, license or similar Contract of the Company; (ii) Material Contract or (iii) transaction between the Company, on the one hand, and any stockholder, member, manager, director, officer or partner, or any Affiliate of any such stockholder, member, manager, director, officer, or partner, of the Company, on the other hand;

(h)      declaration or commitment of, or entry into, amendment or renewal of any Contract with a customer under which the Company has provided or has promised to provide a discount outside of the ordinary course of business;

(i)      incurrence of or commitment to incur aggregate capital expenditures in excess of $5,000 individually or $20,000 in the aggregate;

(j)      borrowings or agreements to borrow by the Company, or guarantees by the Company of any indebtedness of any Person, except such borrowings, guarantees or other contingent financial obligations made in the ordinary course of business;

(k)      making of any loans, advances or capital contributions to, or investments in, any Person or payment of any fees or expenses of the Selling Parties or any Affiliate thereof;

(l)      (i) liquidation, dissolution, recapitalization or reorganization in any form of transaction; (ii) filing for bankruptcy or insolvency; or (iii) application for relief of debt or a moratorium on payments; and no other Person has taken any of the foregoing actions, in each case in respect of or on behalf of the Company;

(m)      change with respect to the methods, practices or timing for the collection of amounts owed to the Company, or payment of any amounts payable or other debts or obligations of the Company, including changing from current to long-term any liabilities of the Company;

(n)      cancellation, reduction or waiver of any material debt, claim or right of the Company;

(o)      modification, amendment or adjustment to or of the type or amount of insurance coverage maintained by the Company, including over its assets and properties;

(p)      material change in the accounting methods used by the Company;

(q)      (i) preparation, amendment or filing by or with respect to the Company, or any of its assets, of any Tax Return that is inconsistent with past practice; (ii) position taken, election made or revoked, or method adopted by or with respect to the Company that is inconsistent with positions taken, elections made or methods used in the preparing or filing of similar Tax Returns with respect to the Company or any such assets in prior periods; (iii) entry into, amendment or modification of any Tax sharing arrangement, Tax indemnity contract or similar contract or arrangement affecting the Company or any payments made under any Tax sharing arrangement, Tax indemnity contract or similar contract that are outside the ordinary course of business; (iv) waiver or extension of any statute of limitations with respect to Taxes; or (v) other similar action related to the filing of any Tax Return or the payment of any Tax; or

DocuSign Envelope ID: BDEAEE0C-9982-4CB5-9466-364533A42A1F

(r)     settlement, compromise or waiver by the Company of any Claim, including any Claim relating to Taxes.

(s)     agreement, whether oral or written, by the Company to do or cause to be done any of the foregoing (other than negotiations with Buyer and its Representatives regarding the transactions contemplated by the Transaction Agreements).

3.15     <u>Taxes</u>.

(a)     Except as set forth in Schedule 3.15(a), (i) the Company has timely filed all Tax Returns required to be filed by or with respect to the Company (taking into account any valid extensions of time to file) on or prior to the Closing Date, (ii) such Tax Returns were true, correct and complete and accurately reflected all liability for Taxes of the Company for the periods covered thereby, (iii) the Company has timely paid all Taxes  due and payable by, or with respect to, the income, assets or operations of the Company and (iv) the Company has not entered into or been requested to enter into any waivers of statutes of limitations in connection with any Taxes or Tax Returns or any extension of a period for the assessment of any Tax against the Company.   There are no liens for Taxes upon the assets of the Company except for liens securing payment of Taxes that are not yet due.

(b)     All Taxes that the Company is or was required by law to withhold and collect have been withheld, collected and paid over, in each case, in a timely manner, to the proper Tax Authorities and the Company has complied with all information reporting and backup withholding requirements, including the maintenance of required records with respect thereto, in connection with amounts paid to any employee, independent contractor, creditor, or other third party.  No withholding Taxes will be payable with respect to the payments made to the Selling Parties pursuant to this Agreement.  The Company (i) has not been a member of any consolidated, combined, affiliated, unitary or similar group for Tax purposes, and (ii) does not have any Liability for the Taxes of any other Person as a (A) result of being a member of any consolidated, combined, affiliated, unitary or similar group, or (B) transferee or successor, by contract or otherwise.  All of the U.S. federal income Tax Returns filed by or on behalf of the Company for all taxable periods ending on or before December 31, 2016 have either (i) been audited by and settled with the IRS or other applicable Tax Authority or (ii) the statute of limitations has expired.  All Taxes due with respect to any completed and settled Tax Contest have been paid in full.  The Company has not been the subject of any Tax Contest.  There is no Tax Contest that is pending or, to the Knowledge of the Selling Parties, threatened, with respect to any Taxes of the Company and no Tax Authority has given notice of the commencement of (or its intent to commence) any Tax Contest.

(c)     As of the Reference Date, the Company does not have any liabilities for unpaid Taxes attributable to Pre-Closing Periods that have not been accrued or reserved on the Reference Date Balance Sheet, whether asserted or, unasserted, contingent or otherwise, and the Company has not incurred any liability for Taxes attributable to Pre-Closing Periods other than in the ordinary course of business (or recognized any extraordinary gain) since the Reference Date.

(d)     Except as set forth in Schedule 3.15(d), the Company has not granted to any Person a power-of-attorney currently in force relating to Tax matters.

(e)     Except as set forth in Schedule 3.15(e), there are no Tax sharing, allocation, indemnification or similar agreements in effect as between the Company or any predecessor or Affiliate

thereof and any other party (including any predecessors or affiliates thereof) under which the Company could be liable for any Taxes or other claims of any party.

(f)     The Company has not applied for, been granted, or agreed to any accounting method change for which it will be required to take into account any adjustment under Section 481 of the Code or any similar provision of the Code or the corresponding Tax laws of any nation, state or locality; neither the IRS nor any other Tax Authority has proposed or purported to require any such adjustment or change in accounting method, and no such adjustment under Section 481 of the Code or the corresponding Tax laws of any nation, state or locality will be required of the Company upon the completion of, or by reason of, the transactions contemplated by this Agreement.

(g)     The Company has delivered or made available to Buyer copies of each of the Tax Returns for income Taxes filed on behalf of the Company.

(h)     The Company has not entered into any listed, reportable or substantially similar transactions for purposes of U.S. Treasury Regulations Section 1.6011-4, or any transaction requiring disclosure under a corresponding or similar provision of state, local or foreign law.  The Company has not participated in any transaction that did not have economic substance for purposes of Section 7701(o) of the Code.

(i)     There are no Tax rulings, requests for rulings or closing agreements relating to the Company, nor has any Company equityholder or anyone acting on behalf of the Company or any Company equityholder requested or received a ruling from any Tax Authority or signed a closing or other agreement with any Tax Authority.  The Company has provided to Buyer complete and correct copies of all private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests and any similar documents submitted by, received by or agreed to by or on behalf of any of the Company, and relating to Taxes for all taxable periods.

(j)     No Claim has been made by any Tax Authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction. The Company does not have nexus nor is it required to file Tax Returns in a jurisdiction where it does not file Tax Returns, whether or not the Company has a physical presence in such jurisdiction.  The Company is not and has not been subject to tax in any country other than its country of incorporation, organization or formation by virtue of having employees, a permanent establishment or other place of business in that country.

(k)     The Company is in compliance with all transfer pricing requirements in each jurisdiction applicable to the Company.  The Company has made available to Buyer all intercompany Contracts requested by Buyer relating to transfer pricing.

(l)     The Company is in compliance with all terms and conditions of any Tax holiday, Tax exemption or other Tax Incentive  (a "Tax Incentive") under any agreements between the Company and a Governmental Authority, and the consummation of the transactions contemplated by this Agreement will not have any adverse effect on the continued validity and effectiveness of any such Tax Incentive.

(m)     The Company has been classified as a partnership for U.S. federal and applicable state and local income Tax purposes at all times during its existence.  No election has been made under

Treasury Regulation Section 301.7701-3(c) or analogous provisions of state or local law to treat the Company as a corporation for income Tax purposes.

(n)    Except as set forth in Schedule 3.15(n), the Company has not:  (i) made any change in method of accounting from the period beginning on the inception of the Company and ending on the Closing Date; (ii) entered into any closing agreement as described in Section 7121 (or any similar provision of applicable Tax law) executed prior to the Closing; (iii)  entered into any installment sale or open transaction disposition made on or prior to the Closing relating to the assets of the Company; (iv) received any prepaid amount on or prior to the Closing; or (v) elected the cash method of accounting or long-term contract method of accounting prior to the Closing.

(o)    The Company uses the cash method of accounting for income Tax purposes.

(p)    The Company has not participated in an international boycott as defined in Section 999 of the Code.

(q)    The Company does not own, directly or indirectly, any interests in an entity that is or has been a "passive foreign investment company" within the meaning of Section 1297 of the Code or a "specified foreign corporation" as defined in Section 965(e) of the Code.  The Company has not transferred any intangible property the transfer of which would be subject to the rules of Section 367(d) of the Code.

(r)    A valid election under Section 754 of the Code (and any equivalent election under state or local law) with respect to the Company will be made prior to Closing.

(s)    Except as set forth in Schedule 3.15(s), none of the assets held by the Company are United States real property interests within the meaning of Section 897(c)(1) of the Code.

(t)    The Company has not made an election under Section 1101(g)(4) of the Bipartisan Budget Act of 2015, or any similar provision of state, local, or foreign law, with respect to any Tax Return.

(u)    Except as set forth on Schedule 3.15(t), the Company has not made any changes to its Tax accounting or reporting as a result of provisions in the CARES Act and, has not otherwise taken advantage of any loan or other programs under the CARES Act.

(v)    No event has occurred, and no circumstance or condition exists prior to Closing, that has resulted in, or that will or would reasonably be expected to result in, any Tax Liability of any Selling Party or of the Buyer with respect to their respective interests in the Company in connection with Recapture Events, including as a result of the consummation of the transactions contemplated hereunder.

Each of the representations and warranties set forth in this Section 3.15 are made with respect to any predecessors of the Company.

3.16    <u>Labor Matters</u>.

(a)    Schedule 3.16 (a) sets forth an accurate and complete list of all employees of the Company, including employees on authorized leave of absence, along with the start date, job title, location,

DocuSign Envelope ID: BDEAEE0C-0083-4CB5-9466-364533A42A1F

classification (*i.e.*, exempt or not exempt), status (*e.g.*, part-time, full-time, seasonal or temporary), annual salary, bonus (target and maximum), commission, accrued but unpaid vacation balances as of the date hereof, severance obligations and deferred compensation paid or payable to each such employee.

(b)　　The Portfolio Companies and the Project Companies have no employees.

(c)　　Except as previously disclosed in writing by the Company, the Company has not made any written or verbal promise or commitment to increase the compensation (whether salary, equity or incentive compensation, benefits or otherwise) payable to any Business Employee or otherwise modify the terms and conditions of employment of any such person.

(d)　　Schedule 3.16(a)(ii) sets forth an accurate and complete list of all independent contractors that provide services to the Company (including any individuals leased from or hired through another employer or any other Person to provide services to the Company), along with their compensation terms.

(e)　　The Company is and has been in compliance with all applicable Legal Requirements respecting employment and employment practices, including those applicable to terms and conditions of employment, discrimination in employment, worker classification (including the proper classification of workers as independent contractors and consultants and as exempt or non-exempt from overtime), wages and wage reporting, hours and occupational safety and health and employment practices, including the Immigration Reform and Control Act and any other applicable immigration or work permit laws or regulations, and is not engaged in any unfair labor practice. To the Knowledge of the Selling Parties, no Business Employee is obligated under any Contract (including licenses, covenants or commitments of any nature) that would interfere with such Business Employee's ability to conduct or promote the business of the Company. The Company has no Liability with respect to any misclassification of any person as an independent contractor rather than as an employee or any independent contractor as an employee, with respect to any employee leased from another employer, or with respect to any person currently or formerly classified as exempt from overtime and minimum wages

(f)　　To the Knowledge of the Selling Parties, (i) the Company has withheld all amounts required by Legal Requirements or Contract to be withheld from the wages, salaries, and other payments to employees; and is not liable for any arrears of wages, compensation, Taxes, penalties or other sums for failure to comply with any of the foregoing, (ii) the Company has paid in full to all Business Employees all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such individuals, and (iii) the Company is not liable for any payment to any trust or other fund or to any Governmental Authority with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the normal course of business and consistently with past practice). To the Knowledge of the Selling Parties, (A) there are no pending or threatened Claims against the Company under any workers' compensation plan or policy or for long term disability, and (B) Company does not have any obligations under COBRA with respect to any former employees or qualifying beneficiaries thereunder, except to provide such coverage at the individual's expense.

(g)　　No Business Employee is represented by a labor union, trade union, works council, or other employee representative; the Company is not a party to, or otherwise subject to, any collective bargaining agreement, trade union agreement, industry or national labor agreement, works

council, employee representative agreement, or information or consultation agreement with any labor union or similar organization and the Company has not experienced any labor dispute, strike, picketing, handbilling, work slowdown or work stoppage. To the Knowledge of the Selling Parties, (i) no petition has been filed or proceedings instituted by any Business Employee or group of Business Employees with any labor relations board seeking recognition of a bargaining representative, and (ii) there is no organizational effort currently being made or threatened in writing by, or on behalf of, any labor union to organize employees of the Company and no demand for recognition of employees of the Company has been made by, or on behalf of, any labor union. No consent of, consultation with, or the rendering of formal advice by, any labor or trade union, works council or other employee representative body is required for the Company to enter into this Agreement or to consummate any of the transactions contemplated by this Agreement.

(h)     There are no disputes or controversies pending or, to the Knowledge of the Selling Parties, threatened, between the Company and any of its Business Employees, which controversies have or would reasonably be expected to result in a Claim. Except as set forth in Schedule 3.16(h), no Claims or government audits are pending (or since January 1, 2018 have been settled or otherwise closed) against the Company regarding employment, including any with the Equal Employment Opportunity Commission or other Governmental Authority regulating the employment or compensation of individuals (or, with respect to discrimination, harassment, retaliation, or similar wrongdoing, pursuant to internal complaint procedures), and no Business Employee has made, since January 1, 2018, a written complaint of discrimination, harassment, retaliation or other similar wrongdoing, nor to the knowledge of the Company, made any oral complaint about the foregoing since January 1, 2020. Since January 1, 2018, the Company has not received any requests for, or conducted, any internal investigation of any officer or supervisor of the Company with respect to any such claims. Since the Company's inception, the Company has not entered into any settlement agreement related to allegations of sexual harassment, sexual misconduct, discrimination, or retaliation by any employee, contractor, director, officer or any other representative of any of Company.

(i)     To the Knowledge of the Selling Parties, no charge or complaint against the Company is pending or threatened under the Immigration Reform and Control Act of 1986, as amended.

(j)     The Company has not received written notice that any Business Employee has given notice to the Company that such Business Employee intends to terminate his or her relationship with the Company, and the Company has no present intention to terminate its relationship with any Business Employee. Except as set forth in Schedule 3.16(a), the employment of each of the employees of the Company is "at will" (and there are no employees of the Company located in a jurisdiction that does not recognize the "at will" employment concept) and the Company does not have any obligation to provide any severance or particular form or period of notice prior to terminating the employment of any of their respective employees. The agreement or arrangement with each independent contractor, consultant and advisor to the Company can be terminated immediately and without notice, without any liability to the Company (other than compensation owed for services performed through such termination date).

(k)     The Company has complied with local and State mandates, as the same may change from time to time, with respect to the COVID-19 pandemic as they relate to the protection of employees and independent contractors in the workplace with respect to the COVID-19 pandemic. To the Knowledge of the Selling Parties, the Company has not experienced any material employment-related liability due to the COVID-19 pandemic.

(l)    None of the Portfolio Companies or of the Project Companies have any employees or sponsor, maintain, participate in or contribute to any Company Benefit any Plan.

3.17    <u>Employee Benefits</u>.

(a)    <u>Schedule 3.17(a)</u> sets forth a complete list of each "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, ("<u>ERISA</u>") (whether or not subject to ERISA) and any other plan, policy, program practice, agreement, understanding or arrangement (whether written or oral) providing compensation or other benefits to any current or former Business Employee (or to any dependent or beneficiary thereof) of the Company or any ERISA Affiliate (as defined below), maintained, sponsored or contributed to by the Company or any ERISA Affiliate, or under which the Company or any ERISA Affiliate has or may have any obligation or Liability, including all employment or service relationship Contracts, retirement or supplemental retirement, relocation, repatriation, expatriation, commission, incentive, bonus, performance awards, termination notice, severance, change in control, deferred compensation, vacation, holiday, cafeteria, fringe benefit, vehicle allowance, medical, disability, profits interest, stock purchase, stock option, stock appreciation, phantom stock, restricted stock or other stock-based compensation plans, policies, programs, practices or arrangements (each a "<u>Company Benefit Plan</u>") and separately identifies any such plan, fund, program, agreement or arrangement primarily covering persons employed outside the United States (an "<u>International Employee Plan,</u>" including any agreement or arrangement that provides solely the benefits mandated by a Governmental Authority (a "<u>Mandated Plan</u>").  For purposes of this Agreement, "<u>ERISA Affiliate</u>" means any entity (whether or not incorporated) other than the Company that, together with the Company, is or has been required to be treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

(b)    Each Company Benefit Plan has been maintained and administered in accordance with its terms and in compliance with all Legal Requirements (including ERISA and the Code), and the Company and each ERISA Affiliate has performed all obligations required to be performed by it under and is not in default under or in violation of, and to the Knowledge of the Selling Parties, no other Person is in default under or in violation of, any of the Company Benefit Plans. There have been no Claims regarding any Company Benefit Plan (other than routine claims for benefits).

(c)    Neither the Company nor any ERISA Affiliate has ever maintained, contributed to, or had any Liability with respect to, any (i) "defined benefit plan" (as defined in section 3(35) of ERISA) or any other plan that is or was subject to the funding requirements of section 412 or 430 of the Code or section 302 or Title IV of ERISA, (ii) "multiemployer plan" (as defined in section 3(37) of ERISA), (iii) multiple employer plan (as described in section 413(c) of Code or section 210 of ERISA), (iv) "multiple employer welfare arrangement" (as defined in section 3(40) of ERISA), or (v) funded welfare benefit plan within the meaning of Section 419 of the Code.

(d)    No Company Benefit Plan or other contract, agreement, plan or arrangement covering any one or more individuals contains any provision or is subject to any Legal Requirements that, in connection with any of the transactions contemplated by this Agreement or upon related, concurrent or subsequent employment termination, or in combination with any other event, would (i) increase, accelerate or vest any compensation or benefit, (ii) require severance, termination or retention payments, (iii) provide any term of employment or compensation guaranty, (iv) forgive any indebtedness, (v) require or provide any payment or compensation subject to Section 280G of the Code (and no such payment or

compensation has previously been made), or (vi) promise or provide any Tax gross ups or indemnification, whether under Sections 409A or 4999 of the Code or otherwise. No equityholder or Business Employee has been promised or paid any bonus or incentive compensation related to the transactions contemplated hereby

(e)     Each International Employee Plan (i) has been maintained and administered in all material respects in accordance with its terms and with all Legal Requirements, (ii) if intended to qualify for special Tax treatment, meets all requirements for such treatment, (iii) is fully funded or book reserved in accordance with applicable Laws, and (iv) if required to be registered, has been registered with the appropriate Governmental Authorities and in all material respects has been maintained in good standing with the appropriate Governmental Authorities. No International Employee Plans are "defined benefit" pension plans (as defined in ERISA, whether or not subject to ERISA) or required to be treated as a defined benefit plan under GAAP. The Company complies and has complied in all material respects with respect to its obligations under Mandated Plans.

3.18     <u>Intellectual Property</u>.

(a)     <u>Schedule 3.18(a)</u> sets forth all Intellectual Property owned or in-licensed by the Company and/or any Subsidiary. The Intellectual Property set forth in <u>Schedule 3.18(a)</u> constitutes all the Intellectual Property used in or necessary for the conduct of the business of the Company and/or any Subsidiary as now conducted and as presently proposed to be conducted. Each of the Company and the Subsidiaries has the right to use all Intellectual Property used or held for use in connection with the business of the Company and/or any Subsidiary as currently conducted or proposed to be conducted. Each of the Company and the Subsidiaries has taken all necessary and desirable action to maintain and protect each item of Intellectual Property that it owns, licenses or uses, or that it has owned, licensed or used.

(b)     No Intellectual Property was registered by the Company and/or any Subsidiary, and no application for registration has been made by the Company and/or any Subsidiary.

(c)     Neither the Company, the Subsidiaries nor any Selling Party does and has interfered with, infringed, misappropriated or violated the Intellectual Property rights of any third party, and, to the Knowledge of the Selling Parties, no third party has interfered with, infringed, misappropriated or violated any Company Intellectual Property rights. Neither the Company, the Subsidiaries nor any Selling Party has received or delivered within the last five years any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that the Company (or any Subsidiary or Selling Party) or such third party, as applicable, must license or refrain from using any Intellectual Property).

(d)     Except with respect to licenses of software (i) generally available for an annual or one-time license fee of no more than $10,000, (ii) distributed as "freeware" or (iii) distributed via Internet access without charge and for use without charge, <u>Schedule 3.18(d)</u> sets forth a list, complete and accurate as of the date hereof, of all agreements pursuant to which the Company and/or any Subsidiary licenses in, or otherwise is authorized to use, Intellectual Property used in the conduct of the business of the Company and/or any Subsidiary as now conducted or as presently proposed to be conducted.

(e)     Each of the Company and the Subsidiaries has at all times enforced a policy of requiring employees, officers, directors, consultants and contractors with responsibility for the

development or implementation of Intellectual Property or who may be exposed to any trade secret or confidential information to execute proprietary information, confidentiality and assignment agreements substantially in the Company's standard forms that have been provided to Buyer, which assignments assign to the Company exclusive ownership of any work or work product and any Intellectual Property rights that are developed by the employee, officer, director, consultant or contractor, as applicable, and all such employees, officers, directors, consultants and contractors have executed such agreements. No trade secret or confidential Know-How that may be material to the Company and/or any Subsidiary or its business has been disclosed or authorized to be disclosed to any third party, other than pursuant to a non-disclosure agreement that adequately protects the Company's and/or any Subsidiary's or other party's proprietary interests in and to such trade secrets and confidential Know-How.

3.19    Privacy and Cybersecurity.  Each of the Company and the Subsidiaries is complying with and has at all times complied with all applicable Privacy Laws, Contracts  (or portions thereof) to which the Company or any of the Subsidiaries is a party that are applicable to the Processing of Sensitive Data (collectively, "Data Agreements"), and all other representations, statements, and commitments that the Company or any of the Subsidiaries has made to Persons with respect to such Personal Data.

3.20    Regulatory Matters.

(a)    No director, manager, officer or service provider of the Company or its Affiliates or any Subsidiary has made any untrue statement of a material fact or a fraudulent statement to any Governmental Authority, failed to disclose any material fact required to be disclosed to any Governmental Authority, or committed an act, made a statement or failed to make a statement that, at the time such act, statement or omission was made, could reasonably be expected to provide a basis for any Governmental Authority to invoke its enforcement policies regarding such matters.

(b)    All applications and other documents submitted by the Company and any Subsidiary to Governmental Authorities in connection with a Permit were true and correct in all material respects as of the date of submission, and any updates, changes, corrections or modification to such applications and other documents required under applicable Legal Requirements have been submitted and were true and correct in all material respects at the time of submission.

(c)    Qualifying Facility Status. Each Project is a "qualifying facility" as defined in the regulations of the Federal Energy Regulatory Commission (FERC) at 18 C.F.R. § 292.101(b)(1) that also qualifies for the regulatory exemptions from the Federal Power Act (FPA) set forth at 18 C.F.R. § 292.601(c), including the exemption from regulation under Sections 205 and 206 of the FPA set forth at 18 C.F.R. § 292.601(c)(1), the regulatory exemptions from the Public Utility Holding Company Act of 2005 set forth at 18 C.F.R. § 292.602(b) and the exemptions from certain state laws and regulations as set forth in 18 C.F.R. Section 292.602(c).

(d)    FERC Qualification. As of the Closing Date, each of the Company and the Subsidiaries shall be in compliance with all applicable FERC regulations. To the extent required under FERC regulations to obtain or preserve qualifying facility status, each Project Company shall file with FERC a notice of self-certification, or obtain from FERC an order granting certification, with respect to such status in each case on or before the Closing Date.

(e)    Regulation under Federal Power Act. The transactions contemplated herein do not require FERC approval and will not cause the Buyer to become subject to, or not exempt from,

DocuSign Envelope ID: BDEAEE0C-9982-4CB5-9466-364533A42A1F

regulation under the Federal Power Act, the Public Utility Regulatory Policies Act of 1978 or the Public Utility Holding Company Act of 2005.

(f)    CFIUS.  Neither the Company not any Subsidiary is a U.S. business that (i) produces, designs, tests, manufactures, fabricates, or develops one more "critical technologies," (ii) performs functions with respect to "covered investment critical infrastructure," or (iii) maintains or collects, directly or indirectly, "sensitive personal data" of U.S. citizens, in each case as such terms are defined in the Defense Production Act of 1950, as amended, including all implementing regulations thereof.

(g)    State Utility Regulation. Each of the Company and the Subsidiaries has been and is now in compliance with all applicable state utility regulations. Solely as the result of the execution and delivery of the Transaction Agreements, the consummation of the transactions contemplated by the Transaction Agreements, or the performance of obligations under the Transaction Agreements (other than with respect to the exercise of remedies), and the generation and sale of electricity from any Project, the Buyer and/or the Company and/or any Subsidiary will not become subject to, or not exempt from, (i) regulation as a "public utility" or any comparable term under any Legal Requirement or (ii) state laws or regulations respecting the rates of electric utilities, and the financial and organizational regulation of electric utilities.

3.21    Litigation; Claims.

(a)    Except as set forth in Schedule 3.21(a), there is no Claim pending or, to the Knowledge of the Selling Parties, threatened against the Company and/or any Subsidiary or, to the Knowledge of the Selling Parties, any Claim pending or threatened against any of the Company's and/or any Subsidiary's current or former equityholders, officers, directors or managers (solely in their capacities as such).  Except as set forth in Schedule 3.21(a), there are no Orders outstanding against the Company and/or any Subsidiary or any of its properties, assets or businesses that have not been satisfied.  Neither the Company nor any Subsidiary is a party to any Claim in which it is a plaintiff or is otherwise seeking relief. To the Knowledge of the Selling Parties, there is no fact or circumstance that, either alone or together with other facts and circumstances, could reasonably be expected to give rise to any Claim or Order against, relating to or affecting the Company and/or any Subsidiary or any of its assets or properties that, if adversely decided, would be reasonably likely to result in a Liability to the Company and/or any Subsidiary.

(b)    To the Knowledge of the Selling Parties, no event has occurred, and no circumstance or condition exists, that has resulted in, or that will or would reasonably be expected to result in, any claim for indemnification, reimbursement, contribution or the advancement of expenses by any Business Employee (other than a claim for reimbursement by the Company, in the ordinary course of business, of travel expenses or other out-of-pocket expenses of a routine nature incurred by such Business Employee in the course of performing such Business Employee's duties for the Company) pursuant to: (i) the terms of the organizational documents of the Company and/or any Subsidiary; (ii) any indemnification agreement or other Contract between the Company and/or any Subsidiary and any such Business Employee; or (iii) any applicable Legal Requirement.  To the Knowledge of the Selling Parties, there is no event, circumstance or other basis that could give rise to any obligation of the Company and/or any Subsidiary to indemnify any of its officers or managers under its organizational documents or any Person under any contract to which the Company and/or any Subsidiary is a party.

(c)      To the Knowledge of the Selling Parties, no event has occurred, and no circumstance or condition exists, that has resulted in, or that will or would reasonably be expected to result in, any Liability of the Company and/or any Subsidiary to any current, former or alleged equityholder in such Person's capacity (or alleged capacity) as an equityholder of the Company and/or any Subsidiary.

(d)      No condemnation is pending or, to the Knowledge of the Selling Parties, threatened with respect to any Project, or any portion thereof, and no unrepaired Casualty Defect exists with respect to any Project or any portion thereof (regardless of whether covered by insurance).

3.22    <u>Insurance</u>.  <u>Schedule 3.22</u> sets forth all current policies of insurance and bonds of the Company and any Subsidiary (including material self-insurance arrangements), together with all material information relating to each such policy (including insurance limits, deductibles and premiums paid by the Company under each such policy).  All of the insurance policies are in full force and effect and provide coverage as may be required by Legal Requirements or by Contracts to which the Company and/or any Subsidiary is a party.  As of the date of this Agreement, there is no material claim pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds.  All premiums due and payable under all such policies and bonds have been paid, and each of the Company and the Subsidiaries is otherwise in compliance with the terms of such policies and bonds.  No termination, cancellation or non-renewal of, or material premium increase with respect to, any of such policies has been threatened in writing.

3.23    <u>Bank Accounts, etc.; Officers, Managers and Directors</u>.  <u>Schedule 3.23(a)</u> sets forth a true and complete list of all banks in which the Company and the Subsidiaries have an account or safe deposit box, all credit and similar cards in the Company's or Subsidiary's name or for which the Company is liable and all cellular phone accounts in the Company's or Subsidiary's name or for which the Company or any Subsidiary is liable, including in each case the names of all Persons authorized to draw thereon, use or who have access thereto, as applicable.

3.24    <u>Grants, Incentives and Subsidies</u>.  Except as set forth in <u>Schedule 3.24</u>, (a) neither Company nor any Subsidiary has received any grants, incentives or subsidies from any Governmental Authority, and (b) neither Company nor any Subsidiary is subject to any obligation to pay royalties in connection with the sales of products or the provision of its services.

3.25    <u>Brokers, Finders, etc</u>.  Except as set forth in <u>Schedule 3.25</u>, neither the Company nor any Subsidiary nor party acting on its behalf has employed, paid or become obligated to pay any fee or commission to any valid claim of any broker, finder or other similar intermediary in connection with the transactions contemplated by the Transaction Agreements.

3.26    <u>Full Disclosure</u>. All documents delivered or made available to the Buyer by or on behalf of the Company, the Subsidiaries  and/or the Selling Parties in connection with this Agreement or any other Transaction Agreement, are complete and accurate in all material respects. Neither this Agreement (including the schedules hereto) nor any certificates made or delivered in connection herewith contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not false or misleading, in view of the circumstances in which they were made.

**ARTICLE IV**
**<u>Representations and Warranties Regarding the Selling Parties</u>**

Each Selling Party and Founder, hereby represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

4.1    <u>Organization; Authorization; etc</u>

(a)    Such Selling Party has all requisite power and authority to execute and deliver the Transaction Agreements to which it is a party, to perform his obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of the Transaction Agreements to which such Selling Party is a party, the performance of such Selling Party's obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action on the part of such Selling Party. Each Transaction Agreement to which such Selling Party is a party has been duly executed and delivered by such Selling Party and (assuming due execution by the other parties thereto) constitute the legal, valid and binding obligation of such Selling Party, enforceable against such Selling Party in accordance with their terms.

(b)    The execution, delivery and performance of the Transaction Agreements do not, and the consummation of the transactions contemplated hereby and thereby will not, conflict with, or result in the imposition of an Encumbrance upon, or result in any breach or violation of or default under (with or without notice or lapse of time, or both), or give rise to any right of termination, cancellation, modification or acceleration, or any obligation or loss of any benefit under or in respect of (i) any Contract to which such Selling Party is a party or to which any of his properties or assets are bound or (ii) any Legal Requirement or Order to which such Selling Party is subject.

(c)    No registrations, filings, applications, notices, consents, approvals, orders, qualifications or waivers are required to be made, filed, given or obtained by such Selling Party with, to or from any Person, including any Governmental Authority, in connection with the execution and delivery of the Transaction Agreements or the consummation of the transactions contemplated hereby and thereby.

4.2    <u>Title to Shares; Selling Parties</u>.

(a)    The Membership Interests set forth on <u>Exhibit A-1</u> (including the Membership Interests owned by PDA) constitute 100% of the total issued and outstanding Membership Interests of the Company.  Such Selling Party (a) owns of record and beneficially, and has good and valid title to, the Membership Interests set forth opposite its name on <u>Exhibit A-1</u>, free and clear of any Encumbrances other than Permitted Encumbrances, and (b) has the absolute and unrestricted right, power and authority to sell, contribute and deliver its Purchased Interests to Buyer pursuant to the terms of this Agreement. Such Selling Party has not at any time before the date hereof sold, transferred, conveyed, disposed, pledged or otherwise hypothecated such Purchased Interests.  Such Selling Party has full and exclusive power to vote the Membership Interests owned by it and is not party to (a) any option, warrant, purchase right, right of first refusal, call, put or other Contract (other than this Agreement) that could require such Selling Party to sell, transfer or otherwise dispose of his Membership Interests or (b) any voting trust, proxy or other contract relating to the voting of his Membership Interests.

(b)    Barend hereby represents that he  owns 100% of the total issued and outstanding equity interests of Blue Sky Utility 1007. Ran hereby represents that he owns, jointly with his spouse, 100% of the total issued and outstanding equity interests of Yellow Tree. Such Founder (i) owns of record and beneficially, and has good and valid title to, the equity interests of its respective Selling Party, as applicable,

free and clear of any Encumbrances, and (ii) has the absolute and unrestricted right, power and authority to execute the Transaction Agreements on behalf of such Selling Party.  Such Founder has not at any time before the date hereof sold, transferred, conveyed, disposed, pledged or otherwise hypothecated such equity interests of its respective Selling Party, as applicable.  Such Founder has full and exclusive power to vote the equity interests of the Selling Party owned by it.

4.3     <u>Litigation; Orders</u>.    There is no pending or, to the Knowledge of the Selling Parties, threatened Claims, either at law or in equity, that would, individually or in the aggregate, reasonably be expected to (i) impair in any material respect the ability of the Selling Parties to perform their obligations under the Transaction Agreements or (ii) prevent, impede or delay the consummation of the transactions contemplated by the Transaction Agreements.

4.4     <u>Brokers, Finders, etc</u>.  Except as set forth in <u>Schedule 4.4</u>, no Selling Party and no party acting on the behalf of a Selling Party has employed, paid or become obligated to pay any fee or commission to any broker, finder, consultant or other intermediary in connection with the transactions contemplated by the Transaction Agreements who might be entitled to a fee or commission from the Selling Parties or the Company in connection with such transactions.

## ARTICLE V
## Representations and Warranties of Buyer

Buyer hereby represents and warrants to the Selling Parties, as of the date hereof and the Closing Date, as follows:

5.1     <u>Incorporation; Authorization; etc.</u>.

(a)      Buyer is a corporation formed under the laws of Delaware and is duly organized, validly existing and in good standing under the laws of such jurisdiction.  Buyer has all requisite corporate power and authority to own, lease, and operate its properties and assets and to carry on its business as it is now being conducted.  Buyer is not in default under or in violation of any provision of its organizational documents.

(b)      Buyer has all requisite corporate power and authority to execute and deliver the Transaction Agreements and Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of the Transaction Agreements and Ancillary Agreements to which Buyer is a party, the performance of Buyer's obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the Board of Directors of Buyer and no other corporate proceeding or action on the part of Buyer, the Board of Directors of Buyer or the stockholders of Buyer are necessary therefor.  The Transaction Agreements and each Ancillary Agreement to which Buyer is a party have been duly executed and delivered by Buyer and (assuming due execution by the other parties thereto) constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their terms.

(c)      The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not, and the consummation of the transactions contemplated hereby and thereby will not, conflict with, or result in the imposition of an Encumbrance upon, or result in any breach or violation of or default under (with or without notice or lapse of time, or both), or give rise to

any right of termination, cancellation, modification or acceleration, or any obligation or loss of any benefit under or in respect of (i) any provision of the organizational documents of Buyer, (ii) any Contract to which Buyer is a party or to which any of its properties or assets are bound or (iii) any Legal Requirement or Order to which Buyer is subject.

(d)    No registrations, filings, applications, notices, consents, approvals, orders, qualifications or waivers are required to be made, filed, given or obtained by Buyer with, to or from any Person, including any Governmental Authority, in connection with the execution and delivery of the Transaction Agreements or the Ancillary Agreements to which Buyer is a party or the consummation of the transactions contemplated hereby and thereby, except for those set forth in <u>Schedule 5.1</u> (the "<u>Buyer Approvals</u>").

(e)    Buyer is not a person or entity with whom U.S. persons or entities are restricted from doing business under OFAC or under any U.S. statute, executive order (including, without limitation, the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism), or other governmental action. Buyer has satisfied itself as to the full observance of the laws of its jurisdiction related to this Agreement and the transactions completed hereby, including (i) the legal requirements within its jurisdiction for the acquisition of the Issued Interests and the Purchased Interests, (ii) any foreign exchange restrictions applicable to such acquisition, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, acquisition or transfer of the Issued Interests and the Purchased Interests.

(f)    Buyer represents that through its Representatives it has had an opportunity to ask questions and receive answers from the Company regarding the business, properties and financial information of the Company and to obtain additional information to the extent the Company possessed such information necessary to verify the accuracy of any information furnished to it or to which it had access.

(g)    Buyer understands that neither the Purchased Interests nor the Issued Interests are registered under federal or state securities Laws on the ground that the sale provided for in this Agreement and the issuance of securities hereunder is exempt from registration under the Securities Act pursuant to Section 4(2) thereof, and that the Company's and the Selling Parties' reliance on such exemption is based on the Buyer's representations set forth herein.

(h)    Buyer is experienced in evaluating and investing in securities of solar development companies and acknowledges that Buyer can bear the economic risk of its investment, and has such knowledge and experience in financial business matters that it is capable of evaluating the merits and risks of the investment in the Issued Interests and the Purchased Interests.

(i)    This Agreement is made with Buyer in reliance upon Buyer's representation to the Company, which by Buyer's execution of this Agreement Buyer herby confirms, that the interests to be acquired by Buyer will be acquired for investment for such Buyer's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of any applicable Legal Requirement, and that Buyer has no present intention of selling, granting any participation in, or otherwise distributing the same in a manner that would violate any applicable Legal Requirement. By executing this Agreement, Buyer further represents that it does not have any contract, undertaking,

DocuSign Envelope ID: BDEAEE0C-9982-4CB5-9466-364533A42A1F

agreement or arrangement with any person to sell transfer or grant participations to such person or to any third party with respect to the Issued Interests or the Purchased Interests.

5.2     None of the foregoing representations and warranties contained in this Article V contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not false or misleading, in view of the circumstances in which they were made.

## ARTICLE VI
## Covenants of the Company, Selling Parties and Buyer

6.1     Conduct of Business

(a)     The Selling Parties covenant and agree that, during the period from the date of this Agreement until the earlier to occur of the Closing or the termination of this Agreement in accordance with Article XI (the "**Interim Period**"), the Selling Parties shall (i) operate the Company, or cause each Portfolio Company and Project Company to operate, in the ordinary course of business consistent with past practice and in compliance with all applicable Laws, (ii) use their respective commercially reasonable efforts to preserve the Company's, each Portfolio Company's and each Project Company's organization intact, to keep available the services of their current officers, employees and consultants and to maintain good relations with customers, suppliers, employees, contractors, distributors and others having dealings with the Company and (iii) continue to make all necessary and material filings and payments with Governmental Authorities in connection with the operation of the Company, the Portfolio Companies and the Project Companies in a timely manner and use its commercially reasonable efforts to maintain in effect all existing Permits , the Portfolio Companies and/or the Project Companies as currently conducted and/or as proposed to be conducted.

(b)     Without limiting the foregoing, from the date hereof until the Closing Date, the Selling Parties shall cause the Company, any Portfolio Company and any Project Company to:

(i)     preserve and maintain all Permits required for the conduct of the Company in the same manner as of the date hereof;

(ii)     pay all debts, Taxes and other obligations when due;

(iii)     maintain all properties, Project Assets, and assets owned, operated or used by it in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(iv)     defend and protect its properties and assets from infringement or usurpation;

(v)     perform all of its obligations under all Contracts relating to or affecting its properties, assets or business;

(vi)     maintain its books and records in accordance with past practice;

(vii)     comply in all material respects with all applicable Laws; and

(viii)    not to take or permit any action that would cause any of the changes, events or conditions described in Section 3.14 to occur.

(c)    Each of the Company, the Portfolio Companies and the Project Companies shall not (and the Selling Parties shall procure that the Company shall not) without the prior written consent of the Buyer, carry out any of the following, unless such action is necessary solely at the level of the Project Companies and/or the Portfolio Companies in order to avoid any Recapture Event, and such action is expressly required by the tax equity investors, in accordance with the provisions of the Project Documents:

(i)    issue or sell any membership interest, options or other securities or seek, negotiate or agree to any investment, whether direct or indirect, in the equity of the Company, the Portfolio Companies and/or the Project Companies;

(ii)    effect any recapitalization, reclassification, split, reverse split, combination or like change in the capitalization of the Company, the Portfolio Companies and the Project Companies;

(iii)    amend or restate the organizational documents of the Company;

(iv)    enter into any merger, consolidation, share exchange, reorganization or similar transaction;

(v)    incur any capital expenditure, except in the Company's ordinary course of business consistent with past practice;

(vi)    dispose of or agree to dispose of (or grant any option in respect of) any part of the assets of the Company (including any Company Intellectual Property), or create any Encumbrance on any part of the assets of the Company;

(vii)    enter into any financing agreement;

(viii)    assume or incur any liabilities or indebtedness except in the ordinary course of business consistent with past practice and existing overdraft facilities at the Company's bank;

(ix)    enter into or be a party to any transaction with any Member, Affiliate, Insider or interested party;

(x)    enter into any contract or agreement that restricts the conduct of the Company's business, including undertakings with respect to exclusivity, commitment to minimum purchase levels and non-competition;

(xi)    enter into any agreement or take any action that is likely to cause any of the representations and warranties of the Company under this Agreement not to be true and correct in all material respects as of the Closing without change, or that is likely to affect the Company's ability to perform and comply with its obligations and covenants hereunder as necessary to effect the consummation of the transactions herein;

(xii)    enter into any unusual or irregular contract or commitment or grant or agree to grant any lease or third party right in respect of any properties, make any loan or enter into any leasing or other agreement or arrangements or payment on deferred terms;

(xiii)    commence a lawsuit other than: (i) for the routine collection of bills; or (ii) in such cases where the Company in good faith determines that failure to commence suit would result in a material impairment of a valuable aspect of its business;

(xiv)    declare, accrue, make or pay any dividend or other distribution, or repay, redeem or repurchase, or allow to be repaid, redeemed or repurchased, any share capital of the Company;

(xv)    accelerate the vesting of any capital stock or securities convertible into capital stock of the Company;

(xvi)    pay any special bonus or special remuneration to any member, manager, officer, employee or consultant of the Company, or increase the salaries, wages or benefits (including equity-based compensation) of its shareholders, directors, officer, employees or consultants;

(xvii)    hire or make an offer to hire any new employee, enter into any new, or amend any existing, employment, severance or consulting agreement, or promote or change the title of any of its employees;

(xviii)    enter into, terminate or amend any rulings, compromises or other agreements with a tax authority, make or change any material tax election, change a method of tax accounting, settle or compromise any material tax liability, or amend any tax returns;

(xix)    cancel, terminate or materially modify any insurance policy providing coverage for events, occurrences or accidents occurring prior to the Closing Date; or

(xx)    agree or undertake to do any of the above.

The Selling Parties shall have the right to cure any breach or inaccuracy of a representation or warranty made pursuant to Article III or Article IV of the Agreement at any time during the Interim Period by providing written notice to Buyer of the breach or inaccuracy and reasonable evidence of the cure thereof on or before Closing.

6.2    Regulatory Approval. The Parties shall co-operate in submitting the applications, notices and filings (if any) necessary for obtaining the Regulatory Approvals listed in Schedule 6.2 attached hereto, and shall use their best efforts to take, or cause to be taken, all actions necessary to obtain the same.

6.3    Access to Information. From the date hereof until the Closing, the Company and the Selling Parties shall (a) afford Buyer and its Representatives reasonable access during normal business hours to and the right to inspect all of the properties, assets, premises, books and records, Contracts and other documents and data related to the Company; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Company as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of the Selling Parties and the Company to cooperate with Buyer in its investigation of the Company,.  Any investigation pursuant to this Section 6.3

shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the Selling Parties or the Company.

6.4    <u>Public Announcements</u>.  The Selling Parties and the Founders agree that any press release or public announcement concerning the transactions contemplated by the Transaction Agreements shall not be issued by the Selling Parties, the Founders or any of their Affiliates without the prior written consent of Buyer, which consent shall not be unreasonably conditioned, withheld, or delayed, except any such release or public announcement that may be required by an applicable Legal Requirement, in which case the Selling Parties shall make commercially reasonable efforts to allow Buyer reasonable time to comment on such release or announcement in advance of its issuance.

6.5    <u>Confidentiality; Access</u>.    Each Party shall, and shall cause their Affiliates and Representatives to, maintain in confidence the Confidential Information at all times and will not, directly or indirectly, use or disclose without the prior written consent of the other Parties any Confidential Information for its own benefit or for the benefit of any other Person or reveal or disclose any Confidential Information to any Person other than the other Parties and Representatives thereof.  The foregoing confidentiality restrictions shall not apply, however, to any Confidential Information (a) in the public domain through no unauthorized act or failure to act by the disclosing Party, (b) lawfully disclosed to the disclosing Party by a third party who possessed the information without any obligation of confidentiality, (c) known previously by such disclosing Party or lawfully developed by such disclosing Party independent of any disclosure by the other Parties, (d) in the event that such disclosing Party becomes legally compelled or is otherwise required by applicable Legal Requirements to disclose any such Confidential Information, provided that the disclosing Party shall deliver to the other Parties written notice of such compulsion or requirement to make commercially reasonable efforts to provide sufficient opportunity for the other Parties to act to protect such Confidential Information from such disclosure, (e) obligation to disclose such information to carry out its obligations and enforce its rights hereunder; and (f) obligation of the Buyer to disclose such Confidential Information as a result of Buyer or any Affiliate thereof being a public company which shares are traded on a stock exchange. Except to the extent prohibited by applicable Legal Requirements, upon the termination of this Agreement, if a Party requests in writing that any Confidential Information be returned, the other Parties will and will cause their Affiliates and Representatives to, turn over, return or destroy all Confidential Information in any form (including all copies and reproductions thereof) in such Parties' possession or control.

6.6    <u>Reasonable Efforts.</u> During the Interim Period, the Parties shall use all commercially reasonable efforts to take, or cause to be taken, all actions necessary to consummate the transactions contemplated by this Agreement and the Transaction Agreements, including making all filings and obtaining all consents, if any, required to be filed or obtained by such Party, in a timely manner. Notwithstanding anything to the contrary in this Agreement, the Buyer shall not have any obligation to: (a) divest or agree to divest any of its businesses, product lines or assets, or to take or agree to take any other action or agree to any material limitation or restriction on any of its businesses, product lines or assets that would impair Buyer's ability to conduct its business as conducted as of the date hereof, or cause any of its subsidiaries or affiliates to do the same; (b) contest any Proceedings relating to this Agreement or the Transaction Agreements; or(c) agree to any material covenants, obligations or liabilities with any Governmental Authority that would impair Buyer's ability to conduct its business as conducted as of the date hereof.

6.7    <u>No Negotiation.</u> During the Interim Period, neither the Company nor the Selling Parties shall, directly or indirectly, solicit, encourage or enter into any negotiation, discussion or contract, with any

DocuSign Envelope ID: BDEAEE0C-9982-4CB5-9466-364533A42A1F

party, with respect to the sale of any securities of the Company, or any other transaction the results of which may impede or contradict the transactions contemplated herein or result in breach of any of the representations, warranties, or covenants of the Selling Parties or the Company set out herein.

6.8     Communications with Employees. During the Interim Period, neither the Company nor the Sellers shall (and shall procure that none of their respective representatives) communicate with any employee or contractor of the Company regarding post-Closing employment matters with the Buyer, unless such communications are made at the direction of Buyer or otherwise with the prior written approval of the Buyer, which shall not be unreasonably withheld.

6.9     Use of Proceeds; Budget Plan. The proceeds of the Primary Amount shall be used by the Company in accordance with the annual budget to be adopted in accordance with the Amended and Restated Operating Agreement, and in the form attached hereto as Schedule 6.9.

6.10     Bonus to Employees. Subject to the fulfillment of certain conditions set forth in Schedule 6.10 attached hereto, the Buyer shall cause the Company to distribute a bonus payment to certain Company's employees in the aggregate amounts set forth on Schedule 6.10, and according to an allocation among such employees to be agreed to prior to Closing, and all subject to the execution and delivery by each designated employee of an undertaking in a form reasonably satisfactory to the Buyer and the Company.

6.11     Tail Policies.  Prior to or simultaneously with the Closing, the Company shall purchase prepaid tail insurance policies that provide directors and officers and errors and omissions liability insurance coverage for the Company, the Portfolio Companies and the officers, directors, managers, general partners or similar functionaries of each of them, on terms no less favorable than the corresponding policies maintained by the Company and the Portfolio Companies immediately prior to the Closing, for a period of not less than six years following the Closing Date with respect to claims arising from acts, events or omissions that occurred at or prior to the Closing (such policies, the "Tail Policies").

6.12     Audited Financial Statements. The Parties shall make best efforts to procure that audited financial statements of the Company for the year ending 31 December 2020 be prepared and delivered to Buyer, in accordance with IFRS and on a consolidated basis, as promptly as possible after Closing. The costs for the preparation of the audited financial statements of the Company shall be divided equally between the Company and the Buyer.


## ARTICLE VII
## Indemnification

7.1     Survival of Representations, Warranties and Covenants.  Subject to the limitations and other provisions of this Agreement, including the provisions of this Article VII, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect, regardless of any investigation made by or on behalf of the Company, the Selling Parties or Buyer, as follows:  (a) the representations and warranties contained in Section 3.1 (Organization; Authorization; etc.), Section 3.2 (Capitalization; Structure), Section 3.4(a) (Compliance with Laws), Section 3.25 (Brokers, Finders, etc.), Article IV (Representations and Warranties regarding the Selling Parties) and Article V (Representations and Warranties of Buyer) shall survive the Closing until the fifth anniversary of the Closing Date, (b) the representations and warranties contained in Section 3.15 (Taxes) (the "Tax Representations") shall survive

the Closing until ninety calendar days after expiration of the statute of limitations applicable to the underlying facts and circumstances (including any extensions thereof), (clauses (a) and (b) together, being the "Fundamental Representations") and (c) all other representations and warranties shall survive until the date that is twenty four (24) months following the Closing Date.

The covenants and agreements of the Parties contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall survive the Closing in accordance with their respective terms.  Notwithstanding the preceding sentences, any breach of representation, warranty, covenant or agreement in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to the preceding sentences, if notice of the inaccuracy or breach thereof giving rise to such right of indemnity shall have been given to the Party against whom such indemnity may be sought prior to such time; provided that any such representation, warranty, covenant or agreement shall only survive with respect to the specific facts and circumstances giving rise to the alleged inaccuracy or breach.

7.2    Indemnification.

(a)    Indemnification by Selling Parties and the Founders.  Subject to the limitations set forth in this Article VII, the Company, the Selling Parties and the Founders jointly and severally, shall indemnify and hold harmless Buyer and its Affiliates (including the Company on and following the Closing) and each of their respective officers, directors, managers, Affiliates, agents and employees (hereinafter referred to individually as a "Buyer Indemnified Person" and collectively as "Buyer Indemnified Persons") from and against any and all losses, costs, damages, Liabilities, Taxes, claims, suits, proceedings, judgments, settlements and expenses (including reasonable fees and expenses of attorneys) (collectively, "Damages") incurred by Buyer Indemnified Persons arising from (or arising from any Third Party Claim containing allegations that, if true, would constitute):

(i)    any inaccuracy, misrepresentation or breach of, or default in connection with, any of the representations and warranties contained in Article III or Article IV or in any other Transaction Agreement, exhibit, schedule or certificate to, or delivered in connection with, this Agreement;

(ii)    any breach or violation of, failure to comply with, or default in connection with, any covenant or agreement made by or to be performed by the Selling Parties, the Founders or the Company in this Agreement or any exhibit, schedule or certificate to, or delivered in connection with, this Agreement;

(iii)    any Taxes (A) of or with respect to the Company or any of its income, assets or operations that are attributable to any Pre-Closing Period; (B) for which the Company has any liability attributable to any Pre-Closing Period under Treasury Regulations Section 1.1502-6 or under any comparable or similar provision of state, local or foreign Laws as a result of being a member of an affiliated, consolidated, combined, unitary or similar group on or prior to the Closing Date, (C) for which the Company has any liability attributable to any Pre-Closing Period as a transferee or successor, pursuant to any contractual obligation or otherwise, which Tax is related to the operations of the Company on or prior to the Closing Date or an event or transaction occurring before the Closing; or (D) the payment of which has been deferred by the Company under any COVID-19 Law; provided, however, except to the extent provided in Section **Error! Reference source not found.** (Indemnification of Company), the indemnification obligations set forth in this Section 7.2(a) shall not cover or apply to any and all losses, costs, damages, Liabilities,

DocuSign Envelope ID: BDEAEE0C-0082-4CB5-9466-364533A42A1F

Taxes, claims, suits, proceedings, judgments, settlements and expenses (including reasonable fees and expenses of attorneys) (collectively, "**Damages**") incurred by Buyer Indemnified Persons arising from (or arising from any Third Party Claim containing allegations that, if true, would constitute) any claims of tax equity investors in connection with any additional tax liabilities, loss of tax credits and/or Recapture Event, whether arising prior to, on or after Closing;

(iv)     any inaccuracy contained in the Estimated Closing Statement, Primary Disbursement Schedule or Secondary Disbursement Schedule;

(v)     any Company Indebtedness or Company Transaction Expenses to the extent not paid by or on behalf of the Company as of the Closing;

(vi)     actual fraud, willful breach, intentional misrepresentation of a Selling Party, the Company or the Founders in connection with the making of any representation, warranty, covenant or agreement in this Agreement.

(b)     <u>Indemnification by the Company</u>. The Company shall indemnify and hold harmless the Buyer Indemnified Persons from and against any and all Damages incurred by Buyer Indemnified Persons arising from (or arising from any Third Party Claim containing allegations that, if true, would constitute) any claims of tax equity investors in connection with any additional tax liabilities, loss of tax credits and/or Recapture Event resulting from the consummation of this Agreement and any transactions contemplated herein.  For the avoidance of doubt, the Damages subject to the indemnification by the Company under this Section **Error! Reference source not found.** shall not include any Damages resulting from any diminution of value of the Company or its assets or of the Buyer Indemnified Persons' investment in the Company arising out of or resulting from any claims of tax equity investors or other Third Parties or the performance by the Company of its indemnification obligations to such tax equity investors or other Third Parties.

(c)     Notwithstanding anything to the contrary, in the event of claim of the Buyer Indemnified Person under this Section, the Buyer Indemnified Person shall seek indemnification from the following indemnitors, in the following order, all subject to limitations of Sub-Section (d) below: (i) first, against the Selling Parties and the Founders (including out of the proceeds deposited in the Escrow Account); and (iii) second, against the Company.

(d)     <u>Indemnification by Buyer and Buyer Parties</u>.  Subject to the limitations set forth in this Article VII, the Buyer and O.Y. Nofar Energy Ltd. shall jointly and severally indemnify and hold harmless Selling Parties, the Founders and their Affiliates (including the Company on and following the Closing) and each of their respective officers, directors, managers, Affiliates, agents and employees (hereinafter referred to individually as a "<u>Seller Indemnified Person</u>" and collectively as "<u>Seller Indemnified Persons</u>") from and against any and all Damages incurred by Seller Indemnified Persons arising out of, relating to or in connection with (or arising out of or relating to any Third Party Claim containing allegations that, if true, would constitute):

(i)     any breach or violation of, failure to comply with, or default in connection with, any covenant or agreement made by or to be performed by the Buyer in this Agreement or in any other the Transaction Agreement, exhibit, schedule or certificate to, or delivered in connection with, this Agreement; and

DocuSign Envelope ID: BDEAEE0C-0033-4CB5-9466-364533A42A1F

(ii)    fraud, willful breach or intentional misrepresentation on the part of the Buyer or, as applicable, its respective Affiliates.

(e)    Limitations on Liability.

(i)    No Indemnitor shall have any liability under Section 7.2(a)(i) or Section 7.2(b), as applicable, unless and until the aggregate amount of Damages suffered by Buyer Indemnified Person(s) or the Seller Indemnified Person(s), as the case may be, exceeds $50,000.00 (the "Basket Amount"), after which all Damages from the first dollar shall be recoverable by the applicable Buyer Indemnified Person(s) or the Seller Indemnified Person(s), as the case may be; provided, however, that the Basket Amount shall not apply to claims for indemnification with respect to a misrepresentation or breach of, or default in connection with, any of the Fundamental Representations.

(ii)    The aggregate amount of all Damages for which each Selling Party and Founder shall be liable, jointly and severally, under (A) Section 7.2(a)(i) through Section 7.2 (a)(v) shall not exceed 100% of the Aggregate Secondary Amount, and (B) under Section 7.2(a)(vi) (fraud) shall not be limited.

(iii)    The aggregate amount of all Damages for which the Company shall be liable under (A) Section 7.2(a)(i) through Section 7.2 (a)(v) and Section 7.2 (b) shall not exceed 100% of the aggregate of the Aggregate Primary Amount, and (B) under Section 7.2(a)(vi) (fraud) shall not be limited.

7.3    Indemnification Procedure.

(a)    Non-Third-Party Claims.  The Person seeking indemnification hereunder (the "Indemnitee") shall notify the Party providing indemnification hereunder (the "Indemnitor") in writing (such notice, a "Claim Notice") as soon as possible but in no event less than ten (10) Business Days following the Indemnitee's discovery of any matter (including if a Claim is filed against the Indemnitee) for which the Indemnitor may be liable to the Indemnitee under this Article VII.  The failure of an Indemnitee to deliver a timely Claim Notice hereunder shall not affect its rights to indemnification hereunder, except to the extent that the Indemnitor is actually prejudiced by such failure to provide timely notice; provided that any Claim Notice must be delivered within the applicable survival period giving rise to the Claim.

(b)    Third Party Claims.  With respect to any Claim (other than a Claim made with respect to Taxes, which is governed by Section 9.4) made by a third Person (a "Third Party Claim") against an Indemnitee for which the Indemnitee will seek indemnification from the Indemnitor hereunder, after delivery of the respective Claim Notice, the Indemnitor shall be entitled (if it so elects), at its own cost, risk and expense, (a) to take control of the defense and investigation of such Claim, (b) to employ and engage legal counsel of its own choice to handle and defend the same (unless the Indemnitee has been advised by counsel that there exists an actual or potential conflict of interest between the Indemnitee and counsel chosen by the Indemnitor (including one or more legal defenses or counterclaims available to it or to other indemnified parties that are different from or additional to those available to the indemnifying parties) that makes it inappropriate in the reasonable judgment of the indemnified party for the same counsel to represent both the indemnified party and the indemnifying parties), in which event the Indemnitee shall be entitled, at the Indemnitor's cost, risk and expense, to reasonable fees of not more than one separate counsel of the Indemnitee's own choosing), and (c) to compromise or settle such Claim, which compromise

DocuSign Envelope ID: BDEAEE0C-0082-4CB5-9466-364533A42A1F

or settlement shall be made only with the written consent of the Indemnitee, such consent not to be unreasonably delayed or withheld, unless (A) there is no finding or admission against Indemnitee of any violation of the rights of any Person and it is not reasonably expected to have an effect on any other Claims that may be made against the Indemnitee, (B) the sole relief provided is monetary damages that are paid in full by the Indemnitor and the Indemnitee is otherwise released in full from such Claim and all other claims, known or unknown of such third Person, (C) the Indemnitee will have no liability with respect to any compromise or settlement of such Claims effected without its consent and (D) the compromise or settlement of such Claim without the consent of the Indemnitee will not adversely affect the Tax liability of the Indemnitee or any of its Affiliates.  After notice from the Indemnitor to the Indemnitee of its election to assume the defense of a Claim, the Indemnitor will not, as long as it diligently conducts such defense, be liable to the Indemnitee for any fees of other counsel with respect to the defense of such claim, except as otherwise provided in this Section 7.3(b) with respect to possible conflicts of interest between the Indemnitee and Indemnitor's counsel.  If the Indemnitor fails to notify the Indemnitee that the Indemnitor will assume the defense of such Claim within fifteen calendar days after delivery by the Indemnitee of the Claim Notice (or such shorter period as may be required in connection with the underlying Claim), the Indemnitee will (upon delivering notice to such effect to the Indemnitor) have the right to undertake the defense, compromise or settlement of such Claim on behalf of and for the account and risk of the Indemnitor, and Indemnitor shall reimburse the Indemnitee for the reasonable expenses of counsel engaged by Indemnitee to defend such Claim.  The Party undertaking the defense, compromise or settlement of the Third Party Claim will keep the other Party reasonably informed of the progress of any such defense, compromise or settlement, and the Indemnitor and Indemnitee shall cooperate (at the Indemnitor's expense) in the investigation, trial and defense of such Third Party Claim and any appeal arising therefrom, and the Indemnitee may, at its own cost, monitor and further participate in the investigation, trial and defense of such Third Party Claim and any appeal arising therefrom.  To the extent that there is an inconsistency between this Section 7.3 and Article IX as to any Tax matter, the provisions of Article IX shall control.

7.4     No Right of Contribution.  The Selling Parties shall not make any claim for contribution from the Company with respect to any indemnity claims arising under or in connection with this Agreement to the extent that any Buyer Indemnified Person is entitled to indemnification hereunder for such claim, and the Selling Parties hereby waive any such right of contribution from the Company, except with respect to any Selling Party's right to indemnification with respect to any third-party claim incurred in such Selling Party's capacity as a Manager of the Company under the organizational documents of the Company as in effect from time to time.

7.5     Effect of Investigation; Reliance.  The right to indemnification, recovery of Damages or any other remedy of the Buyer will not be affected under this Agreement with respect to any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time prior to the Closing Date, with respect to the accuracy or inaccuracy of or compliance with any representation, warranty, covenant or agreement made by the Selling Parties or the Company or any other matter, unless the Selling Party can demonstrate (with written evidence) that the Buyer or the applicable indemnified party had knowledge of, or was aware prior to the Closing Date of such fact (excluding any accounting inaccuracy or discrepancy in the financial statements or books of the Company disclosed by the Buyer) giving rise to the Buyer's Claim.

7.6     Characterization of Payments.  Any payments made to any party pursuant to this Article VII shall constitute an adjustment of the Net Secondary Amount for Tax purposes and shall be treated as such

DocuSign Envelope ID: BDEAEE0C-9982-4CB5-9466-364533A42A1F

by the Parties on their Tax Returns unless otherwise required by a change in law occurring after the date hereof, a closing agreement with an applicable Tax Authority or a final, non-appealable judgment of a court of competent jurisdiction.

7.7     Limitations Not Applicable.  Notwithstanding anything to the contrary set forth in this Agreement, none of the limitations set forth in this Article VII, whether time-based, monetary or otherwise, including the survival periods set forth in Section 7.1 and the limitations in Section 7.2(d), shall apply to any Damages, or any indemnification obligations thereto, resulting from the intentional misrepresentation or fraud of a Party hereto.

## ARTICLE VIII
## Waiver and Release

8.1     Effective as of the Closing, each of the Selling Parties and of the Founders unconditionally, absolutely and irrevocably fully waives, releases and forever discharges the Company and the Buyer from any and all disputes, claims, actions, demands, proceedings, contracts, damages, costs, expenses obligations, payments, debts and liabilities of any nature whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which the Selling Party or the Founder now has, has ever had or may hereafter have against the Company arising prior to the Closing or on account of or arising out of any matter, cause or event occurring prior to the Closing (including, any rights to dividends, distributions, repayment of loans or reimbursement from the Company), whether pursuant to its incorporation documents, bylaws or any other charter documents, contract, Legal Requirement (including under any Employment Laws) or otherwise and whether or not relating to claims pending on, or asserted after, the Closing; provided, however, and notwithstanding the foregoing, nothing contained herein shall operate to release any Selling Party's rights under any "key man" life insurance or disability insurance policy for which such Selling Party is a beneficiary or any obligation of (a) the Company with respect to any Employment Agreement, and/or its indemnification obligations to the Selling Parties with respect to any third-party claim made against any such Selling Party in its capacity as  a Manager of the Company under the organizational documents of the Company as in effect from time to time; or (b) the Buyer arising under this Agreement, the Escrow Agreement or any of the other Transaction Agreements or any other agreement entered into between Buyer and any Selling Party in connection with the transactions contemplated hereby.

## ARTICLE IX
## Tax Matters

9.1     Tax Returns.

(a)     All Taxes that relate to the Overlap Period shall be apportioned between the Pre-Closing Period and the Post-Closing Period as follows:  (i) in the case of property or ad valorem taxes, the amount allocable to the portion of the period ending on the Closing Date shall equal the amount of such property or ad valorem Taxes for such entire Overlap Period multiplied by a fraction, the numerator of which is the number of calendar days during the Overlap Period that are in the portion of such Overlap Period ending on the Closing Date and the denominator of which is the number of calendar days in the Overlap Period, and (ii) in the case of all other Taxes, as determined from the books and records of the Company as though the taxable year of the Company terminated at the close of business on the Closing Date. For purposes of computing the Taxes attributable to the two portions of a taxable period pursuant to this Section 9.1(a), the amount of any item that is taken into account only once for each taxable period

DocuSign Envelope ID: BDEAEE0C-0083-4CB5-9466-364533A42A1F

(e.g., the benefit of graduated tax rates, exemption amounts, etc.) shall be allocated between the two portions of the period in proportion to the number of days in each portion.

(b)       The Company shall make (i) a "push-out" election under Section 6226 of the Code with respect to any Pass-Through Tax Return for a Pre-Closing Period and a Code Section 754 election for the Pass-Through Tax Return that includes the Closing Date.  The Company shall adopt the interim closing of the books method under Section 706 of the Code for purposes of allocation income for the period through the Closing Date and after the Closing Date on the Pass-Through Tax Return that includes the Closing Date.

9.2    Cooperation with Respect to Tax Returns.  Buyer and the Selling Parties shall furnish or cause to be furnished to each other, and each at their own expense, as promptly as practicable, such information (including access to books and records) and assistance, including making employees available on a mutually convenient basis to provide additional information and explanations of any material provided, relating to the Company as is reasonably necessary for the filing of any Tax Return, for the preparation for any audit, and for the prosecution or defense of any claim, suit or proceeding relating to any adjustment or proposed adjustment with respect to Taxes.  Buyer or the Company shall retain in its possession, and shall provide the Selling Parties reasonable access to (including the right to make copies of), such supporting books and records and any other materials that the Selling Parties may specify with respect to Tax matters relating to any taxable period ending on or prior to the Closing Date until for a period of seven years following the Closing Date.  After such time, Buyer may dispose of such material.

9.3    Disputes.  Except as otherwise provided herein, any dispute as to any matter covered hereby shall be resolved by the Accounting Referee, the fees and expenses of which shall be borne equally by the Selling Parties, on the one hand, and Buyer, on the other hand.

9.4    Tax Contest.  On and after the Closing Date, Buyer shall have the sole right to control, defend, settle, compromise or contest any Tax Contest relating to a Tax Return of the Company;  provided, however, that if the Selling Parties would be required to indemnify Buyer for any Taxes, losses, claims or expenses arising from a Tax Contest, and such Tax Contest relates to a Tax Return of the Company, Seller Representative, at the sole expense of the Selling Parties, shall have the right to participate in any such Tax Contest.

9.5    Allocation of Net Secondary Amount.  Buyer shall prepare a draft of the allocation of the purchase price for the Purchased Interests (as determined for U.S. federal income tax purposes) among the Company's assets   in accordance with Sections 755 and 1060 of the Code and the U.S. Treasury Regulations thereunder (and any similar provisions of state, local, or non-U.S. law, as appropriate) and the methodology set forth on Schedule 9.5 attached hereto (the "Allocation Schedule").  Buyer shall deliver such draft allocation to Seller Representative within 90 days after the Closing Date.  Seller Representative shall have 30 days following receipt of Buyer's draft Allocation Schedule to review and approve or dispute the Allocation Schedule.  If Seller Representative and Buyer are unable to agree as to the Allocation Schedule by a date that is no later than 30 days following the delivery of the Allocation Schedule to Seller Representative, the items in dispute regarding the Allocation Schedule shall be promptly resolved pursuant to Section 9.3.  The parties agree to cooperate with each other in the preparation of the Allocation Schedule, and to furnish the other party with such information as such other party reasonably requests, for purposes of determining the Allocation Schedule.  Neither the Buyer nor the Selling Parties shall take any Tax position inconsistent with such Allocation Schedule, except to the extent otherwise required by law.  Any subsequent

allocation necessary as a result of an adjustment to the Net Secondary Amount to be paid pursuant to Section 2.10 shall be determined in a manner consistent with the Allocation Schedule.

**ARTICLE X**
**Conditions to Closing**

10.1    Conditions to Obligations of the Company, the Selling Parties and Buyer.  The respective obligations of the Company, the Selling Parties and Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by both Parties:

(a)    No Injunctions or Other Legal Restraints.  No injunction or other legal restraint or prohibition enacted, entered, promulgated, enforced or issued by any governmental authority preventing the consummation of the Closing shall have been issued and continue to be in effect.

(b)    Absence of Proceedings.  There shall not be pending or threatened any action or proceeding challenging or seeking to restrain or prohibit the Closing or any other transaction contemplated by this Agreement or the Ancillary Agreements.

10.2    Conditions to Obligations of the Company and Selling Parties.  The obligation of the Selling Parties and Company to consummate the transactions contemplated by this Agreement is subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by the Selling Parties (in their sole and absolute discretion):

(a)    Buyer shall have performed in all material respects the covenants and agreements required to be performed by it under this Agreement and any documents or agreements contemplated hereby at or prior to the Closing;

(b)    The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all respects (if qualified by materiality) or in all material respects (if not so qualified) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects); and

(c)    The Selling Parties shall have received from Buyer each of the items set forth in Section 2.7.

10.3    Conditions to Obligations of Buyer.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by Buyer (in its sole discretion):

(a)    The Company and the Selling Parties shall have performed in all material respects the covenants and agreements required to be performed by them under this Agreement and the other Transaction Agreements at or prior to the Closing;

(b)　　The representations and warranties of the Company, of the Founder Parties and of the Selling Parties set forth in this Agreement shall be true and correct in all respects (if qualified by materiality) or in all material respects (if not so qualified) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects);

(c)　　There shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect; prior to the Closing, the Selling Parties shall notify the Buyer of any Material Adverse Effect and shall use commercial reasonable efforts (for a reasonable period of time) to mitigate any losses, damages, costs, obligations, liabilities, expenses, in connection therewith; provided, however, that the Selling Parties shall decide in their reasonable discretion whether to threaten or commence litigation in connection with their mitigation obligation. Notwithstanding the foregoing, and solely for purposes of this Section 10.3(c), any event, occurrence, fact, condition or change (including change of law) shall under no circumstances constitute a Material Adverse Effect unless and until it could reasonably be expected to result in a detriment to the Company, any Portfolio Company and/or Project Company or its business, as presently conducted or as proposed to conducted, of not less than USD 700,000 when aggregated with all other events, occurrence, facts, conditions or changes (including changes of law) meeting the definition of Material Adverse Effect.

(d)　　None of the Founders shall have terminated his involvement or employment with the Company or expressed his intention to do so prior to the Closing Date; and

(e)　　Buyer shall have received from the Selling Parties each of the items listed in Section 2.6.

### ARTICLE XI
### Termination

11.1　　<u>Conditions of Termination</u>.　This Agreement may be terminated at any time prior to the Closing:

(a)　　by mutual written agreement of the Company, the Selling Parties and Buyer;

(b)　　by the Company, the Selling Parties or Buyer if (i) any court of competent jurisdiction or other Governmental Authority shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such Order shall have become final and non-appealable; provided, however, that the Party seeking to terminate this Agreement pursuant to this clause (i) shall have used all reasonable best efforts to have such Order vacated; provided, however, that the right to terminate this Agreement under this clause (ii) shall not be available to any Party whose breach or failure to fulfill any obligation under this Agreement  has been the cause of, or resulted in, the failure of the Closing.

(c)　　by Buyer, if the Selling Parties or Company shall have breached in any material respect any of their respective representations or warranties or shall have breached or failed to perform or comply with any of their respective covenants or agreements in this Agreement in any material respect

and such breach or failure cannot be cured or has not been cured within thirty calendar days after the giving of written notice by Buyer to the Selling Parties specifying such breach or failure;

(d)    by the Selling Parties, if Buyer shall have breached in any material respect any of its representations or warranties or shall have breached or failed to perform or comply with any of its covenants or agreements in this Agreement in any material respect and such breach or failure cannot be cured or has not been cured within thirty calendar days after the giving of written notice by the Selling Parties to Buyer specifying such breach or failure.

(e)    by Buyer, on the one hand, or the Selling Parties, on the other hand, if Buyer and the Selling Parties cannot agree on the definitive terms of Sections 7.4, 7.6 and 7.7 of the Amended and Restated Operating Agreement and if Buyer, on the one hand, or the Selling Parties, on the other hand, reasonably determine in good faith that the parties will not be able to agree on the definitive terms of Sections 7.4, 7.6 and 7.7 of the Amended and Restated Operating Agreement in a timely manner.

(f)    Automatically, in the event that the Closing has not occurred prior to the date that is six (6) weeks after this Agreement has been fully executed by all parties hereto (the "**Long Stop Date**"), unless such date is postponed (i) by the Buyer, at its sole discretion, for an additional period of up to 4 weeks; and/or (ii) by mutual agreement in writing of the Buyer and the Selling Parties.

11.2    <u>Effect of Termination</u>.  Subject to this Section 11.2, in the event of the termination of this Agreement, this Agreement shall become void and have no further force and effect, and the transactions contemplated by this Agreement shall be abandoned without any further action or Liabilities of any Party; provided, however, the following provisions shall survive such termination, subject to any limitations set forth therein.

## ARTICLE XII
## Seller Representative

12.1    <u>Seller Representative; Power of Attorney</u>.  The Selling Parties hereby irrevocably appoint, authorize and direct Seller Representative to act as the representative, agent, proxy, and attorney-in-fact for all the Selling Parties for purposes under this Agreement including the full power and authority on the Selling Parties' behalf (a) to negotiate disputes arising under, or relating to, this Agreement and the other agreements, instruments, and documents contemplated hereby or executed in connection herewith, (b) to agree to and enter into settlements and compromises of any such disputes, (c) to act for the Selling Parties with respect to the execution, delivery and performance of the Escrow Agreement, (d) to direct the disbursement to the Selling Parties of, any funds received on behalf of the Selling Parties under this Agreement or otherwise, (e) to execute and deliver any amendment or waiver to this Agreement and the other agreements, instruments, and documents contemplated hereby or thereby or executed in connection herewith or therewith, (f) to exercise in Seller Representative's discretion, all rights and powers expressly conferred on Seller Representative hereunder and (g) to take all other actions to be taken by or on behalf of the Selling Parties in connection with this Agreement and the other agreements, instruments, and documents contemplated hereby or executed in connection herewith or therewith.  The Selling Parties further agree that such agency and proxy are coupled with an interest, are therefore irrevocable without the consent of Seller Representative and shall survive the death, incapacity, bankruptcy, dissolution or liquidation of any Seller.  All decisions and actions by Seller Representative shall be binding upon all the Selling Parties, and no Seller Party shall have the right to object, dissent, protest or otherwise contest the

same. Seller Representative shall have no duties or obligations hereunder except those set forth herein and such duties and obligations shall be determined solely by the express provisions of this Agreement. In addition, Seller Representative shall have all such incidental powers as may be necessary or desirable to carry into effect the provisions of this Section 12.1, including, at the expense of the Selling Parties, to retain attorneys, accountants and other advisors to assist Seller Representative in the performance of Seller Representative's duties, or the exercise of Seller Representative's rights and powers, hereunder.

**ARTICLE XIII**
**Miscellaneous**

13.1    Notices.

(a)    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given or made (i) three Business Days after being sent by registered or certified mail, return receipt requested, (ii) upon delivery, if hand delivered, (iii) two Business Days after being sent by prepaid overnight courier with guaranteed delivery, with a record of receipt, or (iv) upon transmission with confirmed delivery if sent by facsimile or email before 5:00 p.m. recipient's local time on a Business Day, otherwise on the next Business Day, in each case, to the appropriate address or number as set forth below.

(b)    Notices to the Selling Parties shall be addressed to the addresses set forth on Exhibit A.

with a copy (which shall not constitute notice) to:

Garrett Stiepel Ryder LLP
3200 Bristol Street, Suite 850
Costa Mesa, CA 92626
Attention: Allyssa Holcomb, Esq.
Email: aholcomb@garrettllp.com

(c)    Notices to Buyer shall be addressed to:

Nofar USA LLC,
c/o The Corporation Trust Company,
1209 Orange Street, Wilmington,
New Castle County, Delaware 19801

with a copy (which shall not constitute notice) to:

WilmerHale
7 World Trade Center
250 Greenwich Street
New York, NY 10007 USA
Attn: Tal Hacohen
Email: tal.hacohen@wilmerhale.com
and

Barnea, Jaffa, Lande & Co,
Electra City Tower, Floor 21

DocuSign Envelope ID: BDEAEE0C-9082-4CB5-9466-364533A42A1F

> 58, Harakevet Street
> Tel Aviv, Israel
> Attn: Samuel Henri Samuel, Adv.
> Email: ssamuel@barlaw.co.il

       (d)      Each of the Parties may designate a different address for notices by delivering written notice to the other Party in accordance with this Section 13.1.

     13.2    <u>Governing Law; Consent to Jurisdiction; Waiver of Jury</u>.  THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.  Each of the Parties (a) consents to submit itself or himself exclusively to the personal jurisdiction of the Chancery Court of the State of Delaware or, if unavailable any federal court located in the State of Delaware, in either case, in the event any dispute arises out of this Agreement or any of the transactions contemplated hereby, (b) agrees that it or he will not attempt to deny or defeat the jurisdiction of such courts by motion or other request for leave from any such court, (c) waives any claim that such proceedings have been brought in an inconvenient forum, and (d) agrees that it or he will not bring any Claim relating to this Agreement in any court or other tribunal other than the Chancery Court of the State of Delaware or a federal court sitting in the State of Delaware.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT OR HE MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) IT OR HE UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (III) IT OR HE MAKES SUCH WAIVER VOLUNTARILY, AND (IV) IT OR HE HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 13.2.

     13.3    <u>Further Assurances.</u> Each of the Parties hereto shall perform such further acts and execute such further documents as may reasonably be necessary to carry out and give full effect to the provisions of this Agreement and the intentions of the parties as reflected thereby.

     13.4    <u>Entire Agreement</u>.  This Agreement, the schedules and exhibits hereto, the other Transaction Agreements and the Ancillary Agreements contain the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior agreements, understandings, and negotiations, both written and oral, among the parties with respect to the subject matter of this Agreement, including for the avoidance of doubt the Term Sheet dated March 17th, 2021 between the Buyer (or an Affiliate thereof) and the Company.

     13.5    <u>Expenses</u>.  Except as otherwise provided in this Agreement, each Party shall be responsible for and shall pay all costs and expenses incurred by such Party in connection with entering into this Agreement and the transactions contemplated by this Agreement.

13.6    <u>Counterparts</u>.  This Agreement may be executed and delivered by facsimile, email or electronic signature service (*e.g.*, DocuSign) and in two or more counterparts, all of which shall be considered one and the same agreement.

13.7    <u>Successors and Assigns; Binding Effect</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the other Party; provided, however, that following the Closing Buyer may assign any or all of its rights, interests and obligations hereunder (a) in connection with the sale of all or substantially all of the assets of or any business combination transaction involving Buyer (whether pursuant to a merger, consolidation, sale of equity interests or otherwise) or (b) to any of its Affiliates without any prior written consent of the Selling Parties; provided, further, however, that notwithstanding such assignment, Buyer shall remain liable for any default by its assignee of any of its obligations hereunder.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors or assigns, heirs, legatees, distributees, executors, administrators and guardians.

13.8    <u>Amendments and Waivers</u>.  This Agreement, and each of the terms and provisions of this Agreement, may be modified, waived or amended, to the extent permitted by law and, if applicable, approved by the board of directors or similar governing body of the Selling Parties and Buyer, by an instrument or instruments in writing signed by each of the Parties (providing that Seller Representative may execute any such instrument or instruments on behalf of the Selling Parties)  The failure of any Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part of this Agreement or the right of any Party thereafter to enforce each and every such provision.  The waiver by any Party of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.

13.9    <u>Headings; No Third Party Beneficiaries</u>.  Except as expressly set forth in Section 7.3, neither this Agreement nor any of the provisions herein is intended to confer upon any Person other than the Parties (and their successors and assigns as permitted by Section 13.7) any rights or remedies hereunder.

13.10    <u>Severability</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Legal Requirement, (a) such provision will be fully severable, (b) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by such provision or its severance herefrom and (c) in lieu of such provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such provision as may be possible.

13.11    <u>Headings</u>.  The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

13.12    <u>Specific Performance</u>.  The rights and remedies of the Parties hereto shall be cumulative (and not alternative).  Each Party hereby agrees that, in the event of any breach or threatened breach by the other Party of any covenant or obligation contained in this Agreement, the non-breaching Party shall be entitled (in addition to any other remedy that may be available to them, whether in law or equity, including monetary damages) to:  (a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation, and/or (b) an injunction restraining such breach or threatened breach.  Each Party further agrees that the other Party shall not be required to obtain, furnish or post any

DocuSign Envelope ID: BDEAEE0C-0983-4CB5-9466-364533A42A1F

bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 13.12, and each Party irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

13.13    <u>Construction</u>.  Each Party acknowledges and agrees it has had the opportunity to draft, review and edit the language of this Agreement and that no presumption for or against any Party arising out of drafting all or any part of this Agreement will be applied in any dispute relating to, in connection with or involving this Agreement.  Accordingly, the Parties hereby waive the benefit of any rule of law or any legal decision that would require, in cases of uncertainty, that the language of a contract should be interpreted most strongly against the Party who drafted such language.

**[*REMAINDER OF PAGE LEFT BLANK INTENTIONALLY*]**

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**BUYER**:

**NOFAR USA LLC**

By: Tomer Droval
Name: Tomer Droval
Title: Director of Business Development

By: Shahar
Name: Shahar
Title: vp

For purposes of Section 7.2(c) of this Agreement:

**O.Y. NOFAR ENERGY LTD.**

By: Tomer Droval
Name: Tomer Droval
Title: Director of Business Development

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**COMPANY**

**BLUE SKY UTILITY LLC**

By: _____

Name: Barend Venter

Title:

By: _____

Name: Ran Bujanover

Title:    President, Blue Sky Utility LLC, Member

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**SELLER REPRESENTATIVE**:

_____
RAN BUJANOVER

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**SELLING PARTY**:

**BLUE SKY 1007, LLC**

By: _____

Name: Barend Venter
Title: Member

**SELLING PARTY**:

**YELLOW TREE CAPITAL LLC**

By: _____

Name: Ran Bujanover
Title: Member

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**FOUNDER**:

DocuSigned by:

_Ran Bu_

EDDED412B7A4407

**RAN BUJANOVER**

**FOUNDER**:

DocuSigned by:

_Barend Venter_

**BAREND VENTER**

**Exhibit A-1 and A-2**

Schedule of Membership Interests

| Name and Address of Member | Number of Membership Interests Held Immediately Prior to the Closing | Percentage Membership Interest Owned Immediately Prior to the Closing / Pro Rata Allocation | Number of Purchased Interests to be sold/issued | Percentage Membership Interest Owned Immediately After Closing / Pro Rata Allocation |
|---|---|---|---|---|
| Nofar USA LLC<br><br>c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801 | N/A | 0.0% | N/A | 67.0% |
| Blue Sky 1007, LLC<br><br>860 R Napa Valley Corporate Way, P.O. Box 5571 Napa, CA 94581 | N/A | 47.5% | N/A | 16.5% |
| Yellow Tree Capital<br><br>860 R Napa Valley Corporate Way, P.O. Box 5571 Napa, CA 94581 | N/A | 47.5% | N/A | 16.5% |
| Palm Drive Associates, LLC<br><br>21600 Oxnard Street, Suite 1200 Woodland Hills, CA 91367 | N/A | 5.0% | N/A | 0.0% |
| **Total** | | | | |

**Exhibit B**

N/A

**Exhibit C**

Nofar Loan Agreement

Attached.

# LOAN AGREEMENT

This LOAN AGREEMENT (the "*Agreement*") is entered into as of [_____] 2021, by and between Nofar USA LLC, a Delaware limited liability company and [_____], a [_____] (collectively, the "*Lender*"), and Blue Sky Utility LLC, a California limited liability company ("*BSU*"), and Blue Sky Utility Holding LLC a California limited liability company ("*BSUH*") (BSU and BSUH are referred to herein, jointly and severally, and individually or collectively, as the context requires, as "*Borrower*").

## RECITALS

Borrower wishes to obtain credit from Lender, and Lender desires to extend credit to Borrower. This Agreement sets forth the terms on which Lender will advance funds to Borrower, and Borrower will repay the amounts owing to Lender.

## AGREEMENT

In order to induce the Lender to make the Advances and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, Lender and Borrower hereby agree as follows:

1.    **DEFINITIONS AND CONSTRUCTION.**

    1.1    **Interpretation; MIPA**. As used in this Agreement, the following terms shall have the following definitions in Section 1.2 below. Capitalized terms not expressly defined herein shall have the meaning ascribed thereto in the MIPA.

    1.2    **Definitions.**

    "*Advance*" means an advance of funds under the Loan.

    "*Affiliate*" has the meaning set forth in the MIPA.

    "*A&R Operating Agreement*" means the Second Amended and Restated Operating Agreement of each of BSU and BSUH, of even date herewith.

    "*Asset Pledge*" has the meaning set forth in the Asset Pledge Agreement.

    "*Asset Pledge Agreement*" shall mean that asset pledge agreement to be executed between the Lender and the Borrower, and dated on or about the date hereof, for the pledge of the Collateral for the benefit of the Lender, and a signed copy of which is attached hereto as Exhibit C.

    "*Availability Period*" has the meaning set forth in Section 2.1.4 below.

    "*Available Cash*" means the total amount of distributable cash and cash equivalents then held by the Borrower, after (a) payment of amounts necessary to satisfy and discharge all liabilities and obligations of the Borrower that are then due and payable, and (b) such other reasonable reserves as the Board of Borrower, in good faith, may determine to satisfy liabilities and obligations which are pending or reasonably expected (in compliance with the annual budget of the Borrower) and for a period of up to 6 months.

    "*Borrower's Books*" means all of Borrower's books and records including: ledgers; records concerning Borrower's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, tape files, and the equipment containing such information.

"***Business Day***" means (i) any day other than a Friday, Saturday, Sunday, federal holiday, and (ii) any day on which commercial banks in Los Angeles, California and Israel are open for general, non-automated business.

"***Charter Documents***" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"***Closing Date***" has the meaning set forth in the MIPA.

"***Code***" means the Uniform Commercial Code, as the same may from time to time be enacted and in effect in the State of New York.

"***Collateral***" means all assets and property, whether now owned by or owing to, or hereafter acquired by or arising in favor of, the Company (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Company, and regardless of where located, and all as more fully described in the Asset Pledge Agreement.

"***Commitment***" means sixty five million US dollars ($65 million).

"***Contingent Obligation***" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another, including, without limitation, any such obligation directly or indirectly guaranteed, endorsed, co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards, or merchant services issued or provided for the account of that Person; and (iii) all obligations arising under any interest rate, currency or commodity swap agreement, interest rate cap agreement, interest rate collar agreement, or other agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; <u>provided</u> that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"***Credit Extension***" means each Advance, or any other extension of credit by Lender for the benefit of Borrower hereunder.

"***Default***" means an event or condition which would (with the expiry of a grace period, the giving of notice or the making of any determination under this Agreement, or any combination of them) constitute an Event of Default.

"***Eligible Operational Costs***" shall mean operational costs of the Borrower, approved by the Board of the Borrower, in accordance with its respective A&R Operating Agreement, in the annual budget plan of the Borrower, and designated therein as costs to be funded by the proceeds of Advances.

"***Eligible Project***" means each independently operated solar energy generating and storage facility project in which Borrower has a direct or indirect interest, as of the Closing Date, or obtains a direct or indirect interest following the Closing Date, including, without limitation, all equipment, and interconnection lines and facilities associated with such project, as reasonably approved by Lender from time to time.

"***Eligible Project Costs***" shall mean the total costs necessary to develop and construct the Eligible Projects through their commercial operation date, and, as the case may be, to purchase such Eligible Projects, as reasonably approved by Lender from time to time.

"***Equity Interests***" means all right, title and interest in the membership interests owned by BS1007 and Yellow Tree, in each Borrower, whether now outstanding or issued in the future.

"***Equity Pledge***" has the meaning set forth in the Equity Pledge Agreement.

"***Equity Pledge Agreement***" means that certain Equity Pledge Agreement executed by each Pledgor to secure the Loan pursuant to which, among other things, all of the Equity Interests shall be pledged to Lender, and all supplements, amendments, modifications, renewals, substitutions and replacements thereof. A signed copy of Equity Pledge Agreement is attached hereto as <u>Exhibit D</u>.

"***Event of Default***" means any one or more of the events specified in Section 7.

"***FATCA***" means as defined in:

(a)     sections 1471 to 1474 of the US Internal Revenue Code of 1986 or any associated regulations;

(b)     any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)     any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"***FATCA Deduction***" means a deduction or withholding from a payment under this Agreement required by FATCA.

"***FATCA Exempt Party***" means a party that is entitled to receive payments free from any FATCA Deduction.

"***Financial Covenants***" shall mean such covenants of the Borrower as set forth in <u>Exhibit B</u> attached hereto.

"***Financial Models***" has the meaning set forth in <u>Exhibit B</u>.

"***Forecast Test Period***" has the meaning set forth in <u>Exhibit B</u> attached hereto.

"***Forecast Financial Test***" has the meaning set forth in <u>Exhibit B</u> attached hereto.

"***Historic Test Period***" has the meaning set forth in <u>Exhibit B</u> attached hereto.

"***Historic Financial Test***" has the meaning set forth in <u>Exhibit B</u> attached hereto.

"***IFRS***" means International Financial Reporting Standards, as in effect from time to time, consistently applied throughout the applicable periods.

"***Indebtedness***" means, with respect to any Person, (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar

instruments, (c) all capital lease obligations, account receivables securitization programs, off-balance sheet loans or similar off-balance sheet financing products, (d) all Contingent Obligations, (e) all preferred equity interests issued by such Person and which by the terms thereof could be (at the request of the holders thereof or otherwise) subject to mandatory sinking fund payments, redemption or other acceleration, and (f) all Indebtedness of the types referred to above of any partnership or joint venture in which such Person is a general partner or joint venturer, except to the extent that Indebtedness is expressly made non-recourse to such Person.

*"Insolvency Proceeding"* means any proceeding commenced by or against any person or entity under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, or proceedings seeking reorganization, arrangement, dissolution, winding up, or other relief.

*"Lender Expenses"* means all reasonable attorneys' fees and expenses incurred by Lender in amending, enforcing or defending the Loan Documents (including reasonable fees and expenses of appeal), incurred before, during and after an Insolvency Proceeding, whether or not suit is brought.

*"Lien"* means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

*"Loan"* means the loan to be made by Lender to Borrower under this Agreement and all other amounts secured by the Loan Documents, which shall be up to the amount of the Commitment.

*"Loan Documents"* means, collectively, this Agreement, any note or notes executed by Borrower, the Equity Pledge Agreement, the Asset Pledge Agreement and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time, but expressly excluding the A&R Operating Agreement of each Borrower and the MIPA.

*"Loan Party"* shall refer collectively to the Borrower and the Pledgors.

*"Material Adverse Effect"* means any set of circumstances or events which (a) has or could reasonably be expected to have any material adverse effect upon the validity or enforceability of any material provision of this Agreement, or any Loan Document or any Transaction Document, (b) is or could reasonably be expected to be material and adverse to the assets, properties, condition (financial or otherwise) or business operations of the Borrower or any Subsidiary, (c) materially impairs or could reasonably be expected to materially impair the ability of the Borrower or any Subsidiary, to perform its obligations hereunder or under any other Loan Document, Transaction Document or Project Document (d) materially impairs or could reasonably be expected to materially impair the priority of the Lender's security interest in any Collateral or Equity Interest or (e) materially impairs or could reasonably be expected to materially impair the ability of the Lender to enforce any of its legal remedies pursuant to this Agreement, the Transaction Documents or any other Loan Document. Notwithstanding the foregoing, a set of circumstances or events (either individually or in the aggregate) described in the immediately preceding sentence shall under no circumstances constitute a Material Adverse Effect unless and until it could reasonably be expected to result in a detriment to Lender equal to the greater of (i) an amount equal to two percent (2%) of the then-outstanding principal balance of the Loan (provided that such 2% amount shall be capped at USD 500,000) and (ii) USD 250,000.

*"Maturity Date"* means the earlier of (a) the completion of 11 calendar years as of the Closing Date and (b) any date on which the entire Loan is required to be paid in full, by acceleration or otherwise, under this Agreement or any of the other Loan Documents.

*"MIPA"* means each of the Membership Interest Subscription and Purchase Agreements of even date herewith between either Borrower, and each of Blue Sky 1007 LLC, Yellow Tree Capital LLC, Mr. Barend Venter, Mr. Ran Bujanover and Nofar USA LLC.

*"Negotiable Collateral"* means all of Borrower's present and future letters of credit of which it is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and Borrower's Books relating to any of the foregoing.

*"Obligations"* means all debt, principal, interest, Lender Expenses and other amounts owed to Lender by Borrower pursuant to this Agreement or any other Loan Document, whether absolute or contingent, due or to become due, now existing or hereafter arising, including any interest that accrues after the commencement of an Insolvency Proceeding.

*"Person"* means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

*"Pledgor"* means each of Blue Sky 1007 LLC and Yellow Tree Capital LLC, and any other member of the Borrower (other than Lender or any of its Affiliates).

*"Project Documents"* has the meaning set forth in the MIPA.

*"Subsidiary"* of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of voting stock is at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower and shall include all Portfolio Companies and Project Companies.

*"Tax"* means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

*"Tax Deduction"* means a deduction or withholding for or on account of Tax from a payment under this Agreement**.**

*"Transaction Documents"*, means the Loan Documents, the MIPA, the A&R Operating Agreement and all documents related or ancillary thereto.

**1.3     Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with IFRS, and all calculations made hereunder shall be made in accordance with IFRS.  When used herein, the terms "financial statements" shall include the notes, if any, and schedules thereto.

**1.4     Lender.** A reference to a "Lender" shall mean a reference to any one or both of the entities mentioned in the preamble, as a Lender, as the context requires. The Lender shall decide, when required, to fund any Advance to the Borrower through either one of the entities, at its sole discretion. The Lender shall inform the Borrower in advance, when required, to which of these two entities any repayment shall be made by the Borrower.

**2.     LOAN AND TERMS OF PAYMENT.**

**2.1     Credit Extensions.**

**2.1.1.     Promise to Pay.**  Borrower promises to pay to Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to Borrower, together with interest on the unpaid principal amount of such Credit Extensions at rates at the times in accordance with the terms hereof.

**2.1.2.     Joint and Several Liability**. The liability of each of the Borrowers for the Obligations and all other obligations of the Borrower hereunder shall be joint and several. Accordingly, either Borrower shall be joint and severally liable to the Lender for any Obligation due by the other Borrower under the terms hereof.

**2.1.3.     Advances**.  Subject to and upon the terms and conditions of this Agreement, Borrower may, during the Availability Period, request Advances and Lender shall make Advances to Borrower in an aggregate outstanding principal amount not to exceed the Commitment;

provided, that the Borrower shall be entitled to request an Advance only once per calendar month of the Availability Period.

Amounts repaid or prepaid on the Advances under the Loan may be reborrowed. All Advances, together with all accrued but unpaid interest thereon, shall be immediately due and payable on the Maturity Date.

Whenever Borrower desires an Advance, Borrower will notify Lender by electronic mail communication, at least five Business Days prior to the day that the Advance is to be made, substantially in the form attached hereto as Exhibit A (the "**Advance Request**").

Notwithstanding the foregoing, Lender shall have the right to terminate its obligation to make Advances under this Agreement immediately and without notice upon the occurrence of an Event of Default.

2.1.4.  **Availability Period**. Borrower shall be entitled to submit Advance Requests during the period beginning on the Closing Date through and including the date that is forty (40) months following the Closing Date ("**Availability Period**"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, including all accrued and unpaid interest thereto and all fees and other amounts owing by Borrower to Lender with respect thereto, will be due and payable upon the Maturity Date.

2.1.5.  **Interest Rates, Payments, and Calculations.**

2.1.5.1.  **Intentionally Deleted**.

2.1.5.2.  **Intentionally Deleted**.

2.1.5.3.  **Interest Rates.** The Advances shall bear interest, on the outstanding principal amount thereof, at a rate equal to 9% per annum (the "**Interest Rate**").

2.1.5.4.  **Default Rate.** All Obligations shall bear interest, at a default rate equal to the Interest Rate + 5% per annum (in either case, the "**Default Rate**"), in the event that (i) any payment is not made when due (as from the first day of delayed payment), and/or (ii) upon the occurrence and during the continuance of any other Event of Default listed in Section 7.2 to 7.13 below (following the expiration of the initial grace period only, and not during any extended grace period).

2.1.5.5.  **Interest**. Interest on the then-outstanding principal amount of all Advances shall accrue and be compounded on a quarterly basis, by becoming a part of the Obligations, and such interest shall thereafter accrue interest at the rate then applicable hereunder.

2.1.5.6.  **Computation.** All interest chargeable shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

2.1.5.7.  **Payments**. Borrower promises to pay to the order of Lender, on or prior to the Maturity Date, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to Borrower hereunder. Subject to Section 2.1.5.8 below, the Borrower undertakes to use all Available Cash then held by the Borrower and the Subsidiaries from time to time to repay the Obligations then outstanding, on a full cash sweep basis. The Borrower shall be prohibited to pay out of the Available Cash, any amount to any third party, other than (i) the Obligations; or (ii) with the prior written consent of the Lender. Borrower shall also pay interest on the unpaid principal amount of

such Credit Extensions at rates in accordance with the terms hereof. Borrower shall repay, in lawful money of the United States of America, the entire outstanding principal balance, and all accrued and unpaid interest, in full on the Maturity Date.

2.1.5.8. Whenever Borrower shall repay any Obligations hereunder, Borrower will notify Lender by electronic communication, substantially in the form attached hereto as Exhibit A. The minimum amount of each repayment of Obligation by the Borrower to the Lender shall be USD 250,000, except in the case of any prepayment of the entire outstanding principal and interest owed of the Loan. The parties acknowledge and agree that, due to the fact that the amount of Available Cash at any given time is dependent on Borrower's operations and reserves, setting a fixed payment schedule is not feasible. Accordingly, prior to the Maturity Date and except in the case of any prepayment of the entire outstanding principal and interest owed under the Loan, Borrower shall in no event be required to make any repayments of the Obligations unless and until any time at which there is at least USD 250,000 of Available Cash, and payment shall be made within seven (7) days after there is at least USD 250,000 of Available Cash. Any payment of an Advance and interest, occurring after the 7th day of the date there is at least USD 250,000 of Available Cash in the Borrower shall bear interest at the Default Rate, until repaid in full. Borrower shall be permitted to repay the Obligations, in whole or in part, at any time without the payment of any prepayment penalty or fee.

2.1.5.9. **Withholding**. In the event the Borrower is required to make a Tax Deduction or otherwise withhold taxes from any payment to Lender hereunder, the Borrower shall promptly notify the Lender and give Lender an opportunity to, and Borrower shall cooperate with Lender in its efforts to, reduce or eliminate such withholding. Any portion of payments withheld pursuant to Borrower's obligations under local, state or federal law shall be deemed paid to Lender and shall reduce the principal or interest balance, as applicable, of the Loan.

If the Borrower is required to make a Tax Deduction, it must make the minimum Tax Deduction allowed by law and must make any payment required in connection with that Tax Deduction within the time allowed by law. Notwithstanding anything to the contrary herein, the Borrower shall not be liable to the Lender for any insufficiency of amounts withheld or a failure to withhold. If the Borrower did not withhold sufficient amounts from any payment (excluding any related penalty or interest) ("**Withholding Shortfall Amount**"), and the Withholding Shortfall Amount was transferred to the Lender, the Borrower may, at its option, (a) draw on the Loan to cover such Withholding Shortfall Amount but the principal or interest balance of the Loan shall not be increased by the Withholding Shortfall Amount or (b) reduce any subsequent payments payable by the Borrower to the Lender by the Withholding Shortfall Amount.

Within thirty (30) days of making either a Tax Deduction or a payment required in connection with a Tax Deduction, the Borrower must deliver to the Lender evidence satisfactory to that Lender that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

2.2 **Crediting Payments.** Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 12:00 PM (Eastern time) shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day. Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue

and be payable for the period of such extension.

    **2.3**     **Term.** This Agreement shall become effective on the Closing Date and, shall continue in full force and effect for so long as any Obligations and/or any other obligation hereunder remain outstanding. Notwithstanding termination, Lender's Lien on the Collateral and Equity Interest shall remain in effect for so long as any Obligations and/or any other obligation hereunder are outstanding, excluding any Contingent Obligations (such Contingent Obligations not being related to the Obligations under this Agreement).

    **3.**     **CONDITIONS OF LOANS.**

    **3.1**     **Conditions Precedent to all Credit Extensions.** The obligation of Lender to make each Credit Extension, is subject to the fulfillment of all the following conditions, on a cumulative basis, to the reasonable satisfaction of the Lender (subject to Lender's right to waive any of such conditions in writing):

    **(a)**     timely receipt by Lender of the Advance Request as provided in Section 2.1.2, during the Availability Period;

    **(b)**     the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of such Advance Request and on the effective date of each Credit Extension as though made at and as of each such date; The making of each Credit Extension shall be deemed to be a representation and warranty by Borrower on the date of such Credit Extension as to the accuracy of the facts referred to in this Section 3.1;

    **(c)**     no breach of this Agreement (including any covenants), the Loan Documents, the Transaction Documents, or the Project Documents by the Loan Parties, the Subsidiaries or any Affiliate thereto is outstanding and/or remain uncured;

    **(d)**     no Default or Event of Default shall have occurred or would result from such Credit Extension;

    **(e)**     the Equity Pledge and the Asset Pledge shall continue to be binding and enforceable, validly perfected, registered and in effect;

    **(f)**     the Borrower shall have provided to the Lender all up-to-date Financial Models in accordance with Section 6.10 below with respect to Eligible Projects (provided, however, that updated Financial Models need not be provided more frequently than once per quarter for any Eligible Project unless Borrower requests any Advance(s) with respect to such Eligible Project more frequently than once in any such quarter) and evidence reasonably satisfactory to the Lender in reasonable detail that (i) prior to the Advance, during the Historic Test Period, the Borrower had complied with all Historic Financial Test; and (ii) there is no good faith reason to believe (in the Lender's sole but reasonable discretion) that, based on the updated Financial Models, the Borrower will not meet the Forecast Financial Test;

    **(g)**     the Borrower shall provide evidence reasonably satisfactory to the Lender in reasonable detail that the Advance is designated to fund Eligible Project Costs and/or Eligible Operational Costs in accordance with Section 6.1 below;

    **(h)**     the Borrower shall have delivered to the Lender, concurrently with its Advance Request, a certification from a duly appointed and authorized officer of Borrower certifying the satisfaction and accuracy of each of the foregoing conditions as of such date; and

    **(i)**     To the extent requested by Lender, the Borrower shall have provided the Lender with detailed reports, from an audit firm and/or a technical advisor, and in a form reasonably satisfactory to the Lender, certifying that the Financial Covenants are met by the Borrower, provided that Borrower shall under no circumstances be obligated to incur costs in connection with any such reports applicable to any requested Advance in excess of USD

10,000 per quarter. Upon expiry of a specific quarter, any unused amount out of the USD 10,000 quarterly amount shall be rolled over to the next quarters , and may be used at the request of the Lender for the purpose of the delivery and provision of such details reports set forth above.

## 4.    CREATION OF ASSET PLEDGE AND EQUITY PLEDGE.

**4.1**    For the purpose of securing the Loan, on or prior to the Closing Date (i) the Borrower and the Lender shall enter into the Asset Pledge Agreement and (ii) the Lender and each of the Pledgors shall enter into the Equity Pledge Agreement. As a condition to Closing and to the extension of the first Advance, all pledges and securities set forth in the Asset Pledge Agreement and the Equity Pledge Agreement shall be registered and perfected.

**4.2**    The Lender shall be entitled to request any future additional member of the Borrower (other than Lender or Nofar USA LLC or its Affiliates), and as a condition to any transfer and/or issuance of membership interests to a new member, to execute and deliver an equity pledge agreement in terms substantially equivalent to the terms of the Equity Pledge Agreement. Notwithstanding the foregoing, if Lender assigns its interest in this Agreement pursuant to Section 11.2 to a Person that is not an Affiliate of Nofar USA LLC, but Nofar USA LLC or its Affiliate remains a member of Borrower, then such member of Borrower shall either (i) be obligated, as a condition to the effectiveness of any such assignment, to execute and deliver an equity pledge agreement to such assignee on terms substantially equivalent to the terms of the Equity Pledge Agreement; or (ii) obtain confirmation from the assignee that none of the equity interests held in the Borrower by its members be pledged for the benefit of the assignee.

**4.3**    **Delivery of Additional Documentation Required; Authorization.**  The Borrower shall from time to time execute and deliver to Lender all Negotiable Collateral, all financing statements and other documents that Lender may reasonably request, in form reasonably satisfactory to Lender, to perfect and continue the perfection of the Asset Pledge (and as the case may be, of the Equity Pledge) and in order to fully consummate all of the transactions contemplated under the Loan Documents. The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to authenticate and file in any relevant jurisdiction any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Asset Pledge (and as the case may be, of the Equity Pledge), including, without limitation, a description of the Collateral as "all assets of the Borrower, wherever located, whether now owned or hereafter acquired" or words of like import, and (iii) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Collateral relates, provided that any such fixture filing related to real property must comply with the applicable terms of the Project Documents.

**4.4**    **Collection Account.**

**(a)**    After the occurrence and during the continuance of an Event of Default, the Borrower shall wire transfer to an account maintained by the Lender (the "**Collection Account**"), no less frequently than daily (and whether or not there are then any outstanding Obligations), all cash receipts and collections received by Borrower from all sources, including, without limitation, the following: (i) all available cash receipts from the sale of inventory (including without limitation, proceeds of credit card charges) and other assets (whether or not constituting Collateral); (ii) all proceeds of collections of accounts receivable; and (iii) all net proceeds, and all other cash payments received by the Borrower from any Person or from any source or other transaction or event.

**(b)**    The Collection Account shall at all times during the continuance of an Event of Default be under the sole dominion and control of the Lender. The Borrower hereby acknowledge and agree that (i) so long as an Event of Default has occurred and is continuing, such Borrower have no right of withdrawal from the Collection Account, (ii) the funds on deposit in the Collection Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Collection Account shall be applied to the Obligations as provided in this Agreement. In the event that, notwithstanding the provisions of this Section 4.3, any such Borrower receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Borrower for the Lender, shall not be commingled with any of such Borrower's other funds or deposited in any account of such Borrower and shall, not later than the Business Day after receipt thereof, be deposited into the Collection Account or dealt with in such other fashion as Borrower may be instructed by the Lender.

5.       **REPRESENTATIONS AND WARRANTIES.**

The Borrower represents and warrants as follows:

**5.1     Due Organization and Qualification.** Borrower and each Subsidiary is duly organized, validly existing, and in good standing under the laws of its state of formation and is duly qualified and in good standing in every other jurisdiction where the conduct of its business or its ownership or location of its properties requires such qualification.

**5.2     Due Authorization; Enforceability; No Conflict.**

**(a)**       Each of the Borrower and the other Loan Parties has the full power and authority to execute and deliver this Agreement and the other Loan Documents to which it is a party and to perform all of the obligations hereunder and thereunder, and all necessary action has been taken to execute and deliver this Agreement and the other Loan Documents to which it is a party and, with respect to the Borrower, to make the borrowings hereunder. The Loan Documents to which Borrower is a party have been duly executed and delivered by Borrower and constitute a legal, valid and binding obligation of Borrower, enforceable in accordance with their respective terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

**(b)**       The execution, delivery and performance by Borrower of this Agreement and the other Loan Documents to which it is a party, and the creation of all Liens provided for herein and therein: (i) are not in contravention of any provision of Borrower's Charter Documents, as applicable; (ii) will not violate any law or regulation, or any order or decree of any court or governmental instrumentality, in each case applicable to Borrower, in any material respect; (iii) will not conflict with or result in the breach or termination of, constitute a default under, or accelerate any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which Borrower or any Subsidiary is a party or by which Borrower, any Subsidiary or any of their property is bound; (iv) will not result in the creation or imposition of any Lien upon any of the property of Borrower or of the Subsidiaries other than those in favor of the Lender; (v) do not require the consent or approval of any governmental body, agency, authority or any other Person except such consents as have been obtained; and (vi) will not result in any claims of third parties (including tax equity investors) in connection with any additional tax liabilities, loss of tax credits and/or Recapture Event resulting from the consummation of this Agreement and any transactions contemplated herein (provided that Lender hereby agrees that Borrower may request, from time to time, the Lender to deliver to and for the benefit of any tax equity investor a commercially reasonable forbearance agreement pursuant to which, Lender agrees to forbear during the applicable recapture period from taking any action or exercising any remedy (at law or in equity) under the Loan Documents that could result in a Recapture Event to the tax equity investor and the Lender shall not unreasonably withhold its consent to such request).

**(c)**       (i) All Transaction Documents, Loan Documents, Project Documents, Material Contracts, agreements, leases, instruments or other documents to which Borrower or any other Loan Party or any Subsidiary, or any Affiliate is a party are valid and enforceable and in full force and effect, and (ii) to the Borrowers' actual knowledge, no other party to any such contracts or agreements, is in breach or violation of, or default under, any such agreement, and (iii) no event has occurred, is pending or threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a breach or default by Borrower or, to the Borrowers' actual knowledge, any other party under such contract or agreement.

**(d)**       No resolution or action was made by the Borrower, any other Loan Party, any Subsidiary, or any Affiliate thereto in breach of the Charter Documents of the Borrower, or of the MIPA. Neither the Founders, the Selling Party nor the Borrower are in breach of any of the provisions of the MIPA.

**5.3     Compliance with Laws.** Neither Borrower has received written notice of a violation by either Borrower or any Subsidiary thereof of any applicable laws, rules, statues, regulations and ordinances in all material respects.

5.4    **Government Consents.**    Borrower and each Subsidiary has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of its business as currently conducted or proposed to be conducted.

5.5    **No Prior Encumbrances; Asset Pledge and Equity Pledge.**    Borrower has valid title to its property, free and clear of Liens except as otherwise disclosed (as the case may be) in the Asset Pledge Agreement. To Borrower's actual knowledge and except as otherwise disclosed to Lender prior to the date hereof, as of the Closing Date, the provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral and on all the Equity Interests in favor of the Lender, and, upon the filing of appropriate financing statements, such Liens will constitute, to the extent required by the Loan Documents, perfected and continuing Liens on the Collateral and on the Equity Interests, securing the Obligations and any other obligation hereunder, enforceable against the Borrower, the Pledgors, the Subsidiaries and all third parties, and having priority over all other Liens on the Collateral and on the Equity Interests. The security interests granted to the Lender pursuant to the Asset Pledge Agreement and the Equity Pledge Agreement, will at all times constitute valid, perfected and enforceable sole first priority security interests in favor of Lender, subject to no other security interest, mortgage, lien or encumbrance.

5.6    **Litigation.**    There is no litigation, administrative proceeding, investigation, claim or other legal action (including any proceeding under any state or federal bankruptcy or insolvency law) pending or, to the knowledge of Borrower, threatened against any Loan Party, any Subsidiary or any Affiliate that (a) if adversely determined could reasonably expected to render invalid the Loan Documents, the Project Documents or the Transaction Documents or the right of any Loan Party or Subsidiary or Affiliate to enter into the Loan Documents, the Project Documents or the Transaction Documents and consummate the transactions contemplated thereby, or (b) could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. No Loan Party or Subsidiary is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and no Borrower has knowledge of any Person contemplating the filing of any such petition against it.

5.7    **No Material Adverse Change in Financial Statements.**    All consolidated financial statements and other financial information of Borrower and Subsidiaries that Lender has received from Borrower fairly present in all material respects Borrower's and Subsidiaries' financial condition as of the date thereof.  There has not been a material adverse change in the consolidated financial condition of Borrower and Subsidiaries since the date of the most recent of such financial statements submitted to Lender. Except as otherwise disclosed in the Financial Statements or otherwise in writing to Lender, there are no material liabilities (fixed or contingent) affecting any Borrower, the Portfolio Companies or the Project Companies. The Borrower has no knowledge of any circumstances that could reasonably be expected to raise concern with regard to the Borrower's or any Subsidiary's ability to continue as a going concern.

5.8    **Solvency, Payment of Debts.**    Immediately after the consummation of the transactions contemplated hereby, and immediately following the making of any Advances hereunder, (a) the fair value of the assets of Borrower, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (b) Borrower will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured, and (c) Borrower will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

5.9    **Regulatory Compliance.**    None of Borrower or any of their Subsidiaries is or is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940.  Borrower is not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System).  Neither Borrower nor any of its Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation, and neither Borrower nor any of its Subsidiaries is in default with respect to any judgment, writ, injunction, decree or order of any governmental authority, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

5.10    **Taxes.**  Except as otherwise disclosed in the MIPA, Borrower and each of its Subsidiaries has filed or caused to be filed all tax returns required to be filed, and has paid, or has made adequate provision for the payment of, all taxes reflected therein or otherwise required to be paid, except for such taxes that are being contested in good faith and by proper proceedings and against which adequate reserves are being maintained.

5.11    **Project Documents.** (a) Each copy of a Project Document delivered to the Lender under this Agreement is a true and complete copy of such Project Document and there is no other agreement or document in connection with, or arrangements which amend, supplement or affect any Project Document in any material respect; (b) There is no dispute in connection with any Project Document which, if adversely determined, would, or would be reasonably likely to, have a Material Adverse Effect; (c) The Project Documents include all agreements required for the design, construction, ownership (to the extent relevant), operation and maintenance of the Eligible Projects; (d) Borrower is not aware of any existing fact or circumstance that is reasonably likely to prevent the achievement of the commercial operation of any Project, as reflected in each Financial Model.

5.12    **Full Disclosure.**  No information contained in this Agreement, the other Loan Documents, or any written statement furnished by or on behalf of any Loan Party pursuant to the terms of or in connection with this Agreement, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in any material respect at the time and in light of the circumstances under which made.

6.    **COVENANTS.**

The Borrower shall, and shall cause its Subsidiaries to, do all of the following:

6.1    **Use of Proceeds.** The proceeds of the Advances shall be used by Borrower (a) to contribute funds to Portfolio Companies or Project Companies, the proceeds of which will be used by the Portfolio Companies (or Project Company) to fund Eligible Project Costs as such costs are incurred or billed at the milestones described in the Financial Model for the applicable Eligible Project approved by Lender in its reasonable discretion or, if any material deviation from such Financial Model is proposed, as such amended Financial Model is approved by Lender in its reasonable discretion, and (b) for Eligible Operational Costs. Material deviations from any Financial Model shall be submitted in writing to Lender and Lender shall have ten (10) Business Days to review and respond to any such request, such approval not to be unreasonably withheld, conditioned or delayed.  No part of the proceeds of any Credit Extension will be used, directly or indirectly, for any purpose that would constitute a violation of any law, rule or regulation.

6.2    **Books and Records**.  Keep proper books of record and account in which full, true and correct entries in conformity with IFRS and all requirements of law are made of all dealings and transactions in relation to its business and activities.

6.3    **Financial Covenants.** The Borrower shall at all times comply with the financial covenants set forth in Exhibit B attached hereto.

6.4    **Charter Documents.** The Borrower shall, and shall cause its Members and Managers to act, at all times, in accordance with the provisions of its Charter Documents.

6.5    **Further Assurances.**  At any time and from time to time execute and deliver such further instruments and take such further action as may reasonably be requested by Lender in writing to ensure perfection and priority of the Liens created or intended to be created hereby and by the other Loan Documents, all at the expense of the Borrower.

6.6    **Notice of Certain Events**. Borrower shall  promptly notify Lender of (a) upon actually becoming aware of same, any Default or Event of Default, including any event or circumstance which causes any information which has previously been provided by Borrower to Lender to include an untrue statement of material fact or to omit to state any material fact or any fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect, and, in such event, Borrower shall

promptly furnish to Lender updated or revised information which will correct such untrue material statement or include such material omitted fact; (b) any written notice of default received by Borrower or any Portfolio Company or Project Company under obligations relating to any Eligible Project or otherwise material to Borrower's or a Portfolio Company's or Project Company's business; and (c) any threatened or pending legal, judicial or regulatory proceedings, including any dispute between any Borrower and/or any Portfolio Company or Project Company and any governmental authority, affecting any Borrower and/or any Portfolio Company, Project Company, or Eligible Project.

6.7 **Furnishing Notices Regarding Eligible Projects**. Each Borrower shall deliver to Lender a copy of any notice or correspondence that is received or given by such Borrower (or its agents or representatives) concerning any Eligible Project from or to any governmental authority or from or to any insurance company that could reasonably be expected to negatively affect the financial condition of any Borrower or any Portfolio Company or Project Company and/or Lender's security interest under the Loan Documents, within three (3) Business Days after such notice is received or sent.

6.8 **Proceedings to Enjoin or Prevent the Operation of any Eligible Project**. If any action, suit or proceeding is filed or otherwise commenced seeking to enjoin or otherwise prevent or declare unlawful the operation of any Eligible Project, or if any other action, suit or proceeding alleging the violation of any law by any Borrower or a Portfolio Company or Project Company with respect to any Eligible Project is filed or otherwise commenced, Borrower shall, at its sole expense, proceed with commercially reasonable diligence to contest the same.

6.9 **Amendments and Modifications to Eligible Project Agreements**. Without the prior written consent of Lender, in Lender's reasonable discretion, no Borrower or Subsidiary shall materially modify, amend or supplement any Material Contracts relating to an Eligible Project or permit any other Party to do the same.

6.10 **Financial Statement**s

(a) Without derogating from any provisions of the A&R Operating Agreement, within forty five (45) days after the end of each calendar quarter during the term of the Loan, Borrower shall furnish to Lender a quarterly report consisting of (i) a balance sheet showing the Borrower's financial position, (ii) profit and loss statements and (iii) a statement of cash flows, in each case as of the end of such quarter, the preceding three quarters and the corresponding quarter from the prior Fiscal Year, and in each case prepared in accordance with IFRS ("**Quarterly Financial Statements**").

(b) Within one hundred twenty (120) days after the end of each Fiscal Year, the Borrower shall furnish to Borrower audited financial statements. The financial statements shall be audited and reported thereon by the Accounting Firm and shall include (A) a balance sheet showing the Borrower's financial position as of the end of such Fiscal Year and comparison to the preceding Fiscal Year, (B) profit and loss statements for such Fiscal Year and comparison to the preceding fiscal year, and (C) a statement of cash flows for such Fiscal Year and comparison to the preceding Fiscal Year, all prepared in accordance with IFRS ("**Annual Financial Statements**").

(c) Borrower shall promptly deliver to Lender such additional reasonably requested information regarding any Borrower, the Subsidiaries and any Eligible Projects and in no event later than within thirty (30) days after receipt of Lender's written request therefor.

(d) Access to Books and Records. Borrower shall permit Lender and its agents and representatives, upon prior reasonable notice and during normal business hours, to examine all of the records, books and papers of each Borrower, any Project Holdco and any Project Company.

(e) Financial Models. Borrower shall provide Lender, with up-to-date Financial Models for the Borrower and/or any Subsidiary and/or Eligible Project, certified by an officer of the Borrower, upon prior reasonable notice, and no less than once per each calendar year.

6.11 **FATCA Information.**

(a) Subject to paragraph (c) below, each Party shall, within ten (10) Business Days of a reasonable request by another Party:

(i)    confirm to that other Party whether it is a FATCA Exempt Party; or not a FATCA Exempt Party.

(ii)    supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA;

(iii)    supply to that other Party such information that Lender may request to satisfy any reporting obligations that is has in respect of the OECD Common Reporting Standards;

(iv)    supply to the other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime;

and for the avoidance of doubt, any information received by Lender pursuant to paragraphs (ii) to (iv) above may be disclosed by Lender, within any filings it is required to make to a regulatory authority.

(b)    If a Party confirms to another Party that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c)    Paragraph (a) above shall not oblige any Lender to do anything, which would or might in its reasonable opinion constitute a breach of any applicable law, any fiduciary duty or any duty of confidentiality.

(d)    If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with the above, then such Party shall be treated for the purposes of this Agreement (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

**6.12    Taxes**. Borrower and each Subsidiary shall file all tax returns required to be filed, and shall pay all taxes reflected therein or otherwise required to be paid, in connection with the Loan, in a timely manner and in compliance with all applicable laws.

**6.13    Compliance with Laws; Contracts.**  Borrower shall comply in all material respects with all statutes, laws, ordinances and government rules and regulations to which it is subject, and perform and comply with each provision of all agreements, contracts or other instruments to which it is a party.

**6.14    Indemnification**. Each Borrower shall, jointly and severally, indemnify, defend and hold Lender harmless from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever, including the reasonable fees and expenses of Lender's counsel ("**Losses**"), incurred by Lender in connection with (a) any investigative, administrative, mediation, arbitration, or judicial proceeding, whether or not Lender is designated a party thereto, commenced or threatened at any time (including after the repayment of the Loan) in any way related to the execution, delivery or performance of any Loan Document or to the Equity Interests or the fact that Lender or Borrower was party to the transactions contemplated by the Loan Documents, (b) any proceeding instituted by any Person claiming a Lien against the Equity Interests and/or against the Collateral, (c) any brokerage commissions or finder's fees claimed by any broker or other party in connection with the Loan or the Equity Interests, or any of the transactions contemplated in the Loan Documents and/or (d) any other action or inaction of any of any Borrower's owners or affiliates (other than Lender) or any Subsidiary and/or any clients, customers, suppliers of the Borrower or third party, except for losses caused by Lender's fraud, gross negligence or willful misconduct.

**7.    EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an Event of Default under this Agreement:

**7.1    Payment Default.**  If Borrower fails to pay any of the Obligations when due and such failure has continued for a period of ten (10) days after written notice thereof from Lender to Borrower (provided that no notice and cure period shall apply with respect to the payment due on the Maturity Date);

7.2 **Misrepresentations.** If (a) any misrepresentation or misstatement exists when made or deemed made now or hereafter in any warranty or representation set forth herein or in any certificate delivered to Lender pursuant to this Agreement or any other Loan Document and (b) such misrepresentation or misstatement would be reasonably expected to have a Material Adverse Effect.

7.3 **Covenant Default.** If Borrower or any Subsidiary and/or Affiliate fails to perform any obligation or violates any of the covenants contained in Section 6 of this Agreement, including any Financial Covenant, or fails or neglects to perform, keep, or observe any other material term, provision, condition, covenant, or agreement contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrower and Lender, and such failure has continued for a period of thirty (30) days after written notice thereof from Lender to Borrower; provided, however, that if (i) the Borrower's default is , in the Lender's reasonable good faith opinion, capable of being cured within an additional 30 days cure period; and (ii) the Borrower already made best efforts, within the first 30 days period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 30 days to complete the remedy of such breach;

7.4 **Failure of Agreement.** If this Agreement or any other Loan Document shall for any reason fail to create a valid and perfected security interest in any collateral purported to be covered thereby, or be subject to any security interest in each case except as permitted by the terms of this Agreement or such other Loan Document, or this Agreement or any of the other Loan Documents shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability thereof, and such event has continued for a period of ten (10) days after written notice thereof from Lender to Borrower; provided, however, that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional 10 days cure period; and (ii) the Borrower already made best efforts, within the first 10 days period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 10 days to complete the remedy of such breach;

7.5 **Cross Default**. If there is a breach beyond applicable notice and cure periods, by a Loan Party, a Subsidiary or any Affiliate of Borrower, under any Transaction Document and/or Project Document which (with regard to a breach of a Project Document), that is reasonably likely to have a Material Adverse Effect, and such breach has continued for a period of ten (10) days after written notice thereof from Lender to Borrower; provided, however, that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional 10 days cure period; and (ii) the Borrower already made best efforts, within the first 10 days period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 10 days to complete the remedy of such breach;

7.6 **Other Agreements.** If there is a default or other failure to perform in any agreement to which any Loan Party or Subsidiary is a party or by which it is bound resulting in the acceleration by a third party of the maturity of any Indebtedness of such Loan Party that is reasonably likely to have a Material Adverse Effect, and such default or failure has continued for a period equal to the lesser of (i) thirty (30) days after written notice thereof from Lender to Borrower; and (ii) any such other cure period granted by a third party to the Borrower for the cure of such default which resulted in the acceleration of the maturity of such Indebtedness, less three (3) business days; provided, however, that if (y) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional cure period equal to the applicable period of time mentioned above; and (z) the Borrower already made best efforts, within such cure period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period equal to the applicable period of time mentioned above, to complete the remedy of such breach;

7.7 **Attachment.** If any material portion of Loan Party's or Subsidiary's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) days, or if any Loan Party or Subsidiary is enjoined, restrained, or in any way prevented by court order from continuing to conduct its business affairs and the same is not removed, discharged or rescinded within thirty (30) days, or if a judgment or other claim, which judgment becomes a lien or encumbrance upon any portion of any Loan Party's or Subsidiary's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any Loan Party's or Subsidiary's assets by the United States Government, or any

department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and, in each case the same is not paid within thirty (30) days after such Loan Party or Subsidiary receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by such Loan Party or Subsidiary (provided that no Credit Extensions will be required to be made during such cure period), and provided, further that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional cure period equal to 30 days; and (ii) the Borrower already made best efforts, within such cure period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 30 days to complete the remedy of such breach.

**7.8    Judgments.** If a final, non-appealable judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least $500,000 shall be rendered against any Loan Party or Subsidiary and shall remain unsatisfied and unstayed for a period of thirty (30) days (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment); and provided, further that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional cure period equal to 30 days; and (ii) the Borrower already made best efforts, within such cure period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 30 days to complete the remedy of such breach.

**7.9    Involuntary Bankruptcy or Other Proceeding**. Commencement of an involuntary case or other proceeding against any Loan Party, any Subsidiary that seeks liquidation, reorganization or other relief with respect to it or its Debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeks the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of sixty (60) days; or an order for relief against any Loan Party, any Subsidiary shall be entered in any such case under the Federal Bankruptcy Code and such order is not reversed or dismissed within sixty (60) days; and provided, that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional cure period equal to 30 days; and (ii) the Borrower already made best efforts, within such cure period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 30 days to complete the remedy of such breach.

**7.10    Voluntary Petitions, Etc**. Commencement by any Loan Party or any Subsidiary of a voluntary Insolvency Proceeding or other case or proceeding seeking liquidation, reorganization or other relief with respect to itself or its Indebtedness or other liabilities under any bankruptcy, insolvency or other similar law or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for it or any of its property, or consent by any Loan Party, any Subsidiary to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or the making by any Loan Party, any Subsidiary of a general assignment for the benefit of creditors, or the failure by any Loan Party, or any Subsidiary, or the admission by any of them in writing of being insolvent or of its inability, to pay its Indebtedness or other liabilities generally as they become due, or any action by any Loan Party, or any Subsidiary to authorize or effect any of the foregoing.

**7.11    Material Adverse Effect**. Any event or series of events occurs which, in the good faith, reasonable opinion of the Lender, has or is reasonably likely to have a Material Adverse Effect, and such event has continued for a period of three (3) days after written notice thereof from Lender to Borrower; Notwithstanding the aforesaid, wherever under this Section 7, there is an Event of Default (other than under this Section 7.11) which has or is reasonably likely to have a Material Adverse Effect, then the longer cure period set forth in such other Section shall be applicable (and the shorter cure period applicable under this Section 7.11 shall not apply) as long as and provided that, in the Lender's reasonable good faith opinion, the application of the longer cure period does not negatively harm the interests of the Lender;

**7.12    Material Business Disruption**. Any Loan Party, or any Subsidiary is enjoined, restrained or in any way prevented by order of a court or regulatory agency from continuing to conduct its business, which event could reasonably be expected to have a Material Adverse Effect, and such event has continued for a period of three (3) days after written notice thereof from Lender to Borrower;  Notwithstanding the aforesaid, wherever under this

Section 7, there is an Event of Default (other than under this Section 7.12) which has or is reasonably likely to have a Material Adverse Effect, then the longer cure period set forth in such other Section shall be applicable (and the shorter cure period applicable under this Section 7.12 shall not apply) as long as and provided that, in the Lender's reasonable good faith opinion, the application of the longer cure period does not negatively harm the interests of the Lender;

**7.13    Government Liens**. If (a) a notice of Lien, levy or assessment is filed of record with respect to any Loan Party's or Subsidiary's assets, the Equity Interests or the assets of any Eligible Project by any governmental authority, or any department, agency or instrumentality thereof, or if any taxes or debts owing at any time hereafter to any governmental authority, department, agency or instrumentality becomes a Lien upon any of any Loan Party's or Subsidiary's assets, the Equity Interests or the assets of any Eligible Project and the same is not paid on the payment date thereof and (b) such situation could reasonably be expected to have a Material Adverse Effect, and such situation has continued for a period of thirty (30) days after written notice thereof from Lender to Borrower; and provided, that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional cure period equal to 30 days; and (ii) the Borrower already made best efforts, within such cure period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 30 days to complete the remedy of such breach

## 8.    LENDER'S RIGHTS AND REMEDIES.

**8.1    Rights and Remedies.** Upon the occurrence and during the continuance of an Event of Default, all outstanding Obligations shall bear interest at the Default Rate, and the Lender may, at its election, without prior notice (but with notice advising Borrower of such election) of its election and without demand, do any one or more of the following, all of which are authorized by Borrower and each other Loan Party (provided that Lender shall make any election of remedies in its reasonable, good faith discretion):

**(a)**    Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable, whereupon the same shall immediately become due and payable (provided that upon the occurrence of an Event of Default described in Section 7.9 and Section 7.10, all Obligations shall become immediately due and payable without any action by Lender);

**(b)**    Terminate the Commitment and cease advancing money or extending credit to or for the benefit of Borrower under this Agreement or under any other agreement between Borrower and Lender;

**(c)**    Settle or adjust disputes and claims directly with account debtors for amounts, upon terms and in whatever order that Lender reasonably considers advisable;

**(d)**    Make such payments and do such acts as Lender considers necessary or reasonable to protect its security interest in the Collateral and the Equity Interests. Each Loan Party agrees to assemble the Collateral and the Equity Interests if Lender so requires, and to make such documents and/or the Collateral or the Equity Interests available to Lender as Lender may designate. Each Loan Party authorizes Lender to enter the premises where the Collateral and/or the Equity Interests are located (unless located is a personal residence), to take and maintain possession of the Collateral and/or the Equity Interests, or any part of the foregoing, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Lender's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. With respect to any Loan Party's owned premises (unless such owned premises is a personal residence), such Loan Party hereby grants Lender a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise;

**(e)**    Dispose of the Collateral and/or the Equity Interests at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Loan Party's premises) as is commercially reasonable, and apply any proceeds to the Obligations in whatever manner or order Lender deems appropriate, in each case, in compliance with applicable law;

**(f)**    Lender may credit bid and purchase at any public sale, in compliance with applicable law; and

**(g)**   Any deficiency that exists after disposition of the Collateral and/or the Equity Interests as provided above will be paid immediately by Borrower.

**8.2   Power of Attorney.**   Effective only upon the occurrence and during the continuance of an Event of Default, each Loan Party hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees), and Borrower shall cause each Subsidiary to appoint Lender, as such Loan Party's and/or Subsidiary's true and lawful attorney to:   (a) send requests for verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b) endorse such Loan Party's name on any checks or other forms of payment or security that may come into Lender's possession; (c) sign Loan Party's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (d) dispose of any Collateral or Equity Interests; (e)  settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; and (f) to file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral or Equity Interests without the signature of such Loan Party where permitted by law; provided Lender may exercise such power of attorney to sign the name of such Loan Party on any of the documents described in clause (f) above regardless of whether an Event of Default has occurred and is continuing.  The appointment of Lender as each Loan Party's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations and/or other obligations hereunder have been fully repaid and performed and Lender's obligation to provide Credit Extensions hereunder is terminated.

**8.3   Payments Collection.**   At any time after the occurrence and during the continuance of an Event of Default, Lender may notify any Person owing funds (provided that such funds are part of Lender's security for the Loan) to any Loan Party of Lender's security interest in such funds and verify the amount so owing.  Each Loan Party shall collect all amounts owing to such Loan Party for Lender, receive in trust all payments as Lender's trustee, and immediately deliver such payments to Lender in their original form as received from the account debtor, with proper endorsements for deposit.

**8.4   Lender's Liability for Collateral and Equity Interests.**   Except to the extent resulting from the gross negligence, willful misconduct or willful violation of applicable law by Lender, Lender shall not in any way or manner be liable or responsible for:  (a) the safekeeping of the Collateral and the Equity Interests; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  Except to the extent resulting from the gross negligence, willful misconduct or willful violation of applicable law by Lender, all risk of loss, damage or destruction of the Collateral or the Equity Interests shall be borne by Borrower.

**8.5   Remedies Cumulative.**   Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on Borrower's part shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the specific instance and for the specific purpose for which it was given.

**8.6   Demand; Protest.**   Except as and to the extent expressly otherwise required by this Agreement, each Loan Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which such Loan Party may in any way be liable.

**9.   NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and shall be personally

delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or by electronic mail to the Loan Parties or to Lender, as the case may be, at its addresses set forth below:

If to any Loan Party:

With a copy to:

If to Lender:

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

### 10.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  Jurisdiction shall lie in the federal courts located in New York County, State of New York.  LENDER AND EACH LOAN PARTY ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED.  EACH OF THEM, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT, WITH COUNSEL OF THEIR CHOICE, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY RELATED INSTRUMENT OR LOAN DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY COURSE OF CONDUCT, DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTION OF ANY OF THEM.  THESE PROVISIONS SHALL NOT BE DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR ANY LOAN PARTY, EXCEPT BY A WRITTEN INSTRUMENT EXECUTED BY EACH OF THEM.

### 11.    GENERAL PROVISIONS.

**11.1    Joint and Several Liability.** The liability of each of the Borrowers for the Obligations shall be joint and several.

**11.2    Successors and Assigns.** This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by any Loan Party without Lender's prior written consent, which consent may be granted or withheld in Lender's sole discretion. Provided that (a) the assignee (i) has  expertise in lending within the commercial solar industry and/or in the project finance industry and (ii) has the ability to fund all Advances up to the maximum Commitment amount in accordance with the terms of this Agreement, and (b) subject to the provisions of Section 4.2 above,  Lender shall have the right without the consent of, but with notice to, Borrower to sell, assign, transfer, negotiate, or grant participation in all or any part of, or any interest in, Lender's obligations, rights and benefits hereunder. Notwithstanding the aforesaid, in the event that all Advances under the Commitment have been exhausted and/or after the expiry of the Availability Period, the Lender shall be entitled at its sole discretion, to assign all or any part of, or any interest in, Lender's obligations, rights and benefits hereunder, and the conditions set forth in this Section 11.2 (a) above shall not apply.

**11.3    Indemnification.**  The Loan Parties shall defend, indemnify and hold harmless Lender and its officers, employees, and agents against:  (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all losses or Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and Borrower whether under this Agreement, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by Lender's fraud,  gross negligence or willful misconduct.

**11.4    Time of Essence.**  Time is of the essence for the performance of all obligations set forth in this Agreement.

**11.5    Severability of Provisions.**  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**11.6    Amendments in Writing, Integration.**  Neither this Agreement nor the Loan Documents can be amended, waived or terminated orally, but must be in writing signed by Lender and Borrower.  All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

**11.7    Counterparts.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

**11.8    Survival.**  All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions to Borrower.  The obligations of the Loan Parties to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 11.3 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

**11.9    Relationship.**  The parties acknowledge and agree that, as of the date of this Agreement, Nofar USA LLC is a member of each borrower and nothing in this Agreement shall in any event modify the terms of the A&R Operating Agreement of either Borrower and/or Nofar USA LLC's obligations either such A&R Operating Agreement.

**11.10    Reinstatement.**  This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Borrower or any Loan Party for liquidation or reorganization, should the Borrower or any Loan Party become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Borrower's or Loan Party's property and assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of any Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**11.11    Prima Facie Evidence**.  Accounts maintained by the Lender in connection with this Agreement are prima facie evidence of the matters to which they relate.

*[signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first above written.

**BORROWER:**

Blue Sky Utility LLC
By: _____

Name:

**BORROWER:**

Blue Sky Utility Holding LLC
By: _____

Name:

**PLEDGOR:**

Blue Sky 1007 LLC
By: _____

Name:

**PLEDGOR:**

Yellow Tree Capital LLC
By: _____

Name:

**LENDER:**

**NOFAR USA LLC**

By: _____

Name:

**[LENDER]**

By: _____

Name:

DocuSign Envelope ID: BDEAEE06-9822-4CB5-9466-364533A42A15

EXHIBIT A

LOAN PAYMENT/ADVANCE REQUEST FORM

TO: _____ (LENDER)                                    DATE: _____

EMAIL/FAX: _____                                          TIME: _____

FROM: _____
                                    (BORROWER)
REQUESTED BY: _____
                          AUTHORIZED SIGNER'S NAME

AUTHORIZED SIGNATURE: _____

PHONE NUMBER: _____

TO ACCOUNT # _____


REQUESTED TRANSACTION TYPE          REQUEST DOLLAR AMOUNT
                                    $_____
PRINCIPAL INCREASE (ADVANCE)        $_____
PRINCIPAL PAYMENT (ONLY)            $_____
INTEREST PAYMENT (ONLY)             $_____
PRINCIPAL AND INTEREST (PAYMENT)    $_____


DATE OF REQUESTED PAYMENT/ADVANCE: _____




All representations and warranties stated in the Loan Agreement are true, correct and complete in all material respects as of the date of the request for an Advance confirmed by this Loan Payment/Advance Form; provided, however, that those representations and warranties expressly referring to another date shall be true, correct and complete in all material respects as of such date.

{10764870.2}

<u>EXHIBIT B</u>

FINANCIAL COVENANTS

1.  <u>Historic Financial Test</u>

As part of this "**Historic Financial Test**", the Borrower shall demonstrate compliance, upon each Advance Request, to the reasonable satisfaction of the Lender, that all the following conditions are met with respect to each Borrower and each Subsidiary, with respect to the Historic Test Period:

1.1.    The total amount of electricity subscribed for by Customers of each applicable Project's electric output or equivalent virtual net energy metering credits is not in breach of any provisions of any Project Document and is at least 95% of each applicable Project's total estimated annual electric production;

1.2.    The aggregate distributions received by Borrower from all Operating Projects (in compliance with the Project Documents and such Subsidiaries' Charter Documents) meet the financial projections of the Borrower, as reflected in the corresponding Financial Models (as defined below) as approved by the Lender, from time to time.

"**Historic Test Period**" shall mean a period of 12 months preceding the date of the Advance Request.

"**Operating Project**" means a Project placed in service.

"**Financial Model**" shall mean the Eligible Project updated business plan and cash flow projection, to be provided by Borrower's management prior to the disbursement of any Advance, in the form of a Microsoft Excel file (or any other form to be agreed between the parties), and as reasonably approved by the Lender.

2.  <u>Forecast Financial Test</u>

As part of the "**Forecast Financial Test**", the Borrower shall demonstrate compliance, upon each Advance Request, to the reasonable satisfaction of the Lender, that all the following conditions are met with respect to the Borrower and each Subsidiary, with respect to the Forecast Test Period, based on the Financial Models:

2.1.    The Maturity Date for the repayment of the requested Advance is no later than the date of the completion of 11 calendar years as of the Closing Date.

2.2.    The Project IRR with respect to each Eligible Project is at least 6.2%; and

2.3.    The Equity IRR with respect to each Eligible Project is at least 13.5%.

"**Forecast Test Period**" shall mean the entire period of commercial operation of each Eligible Project.

"**Project IRR**" shall mean, as reflected in the Financial Model, the projected internal rate of return with respect to each Eligible Project (not including tax equity investment and senior debt), during the Forecast Test Period.

"**Equity IRR**" shall mean, as reflected in the Financial Model, the projected internal rate of return of the Borrower with respect to each Eligible Project, (including tax equity investment and including senior debt), during the Forecast Test Period.

EXHIBIT C

ASSET PLEDGE AGREEMENT

{10764870.2}

EXHIBIT D

EQUITY PLEDGE AGREEMENT

**Exhibit D**

N/A

**Exhibit E-1 and E-2**

Accounting Methodologies; Closing Working Capital

Attached.

**Non-audited balance sheet as at 31 Dec. 2020 - Blue Sky Utility LLC**

| USD '000 | Net debt | Working capital | Excluded | Total balance |
|---|---|---|---|---|
| **Current assets** | | | | |
| Cash and Cash Equivalents | 124 | - | - | 124 |
| Accounts receivable | | | | |
| *Billed Receivables* | - | 43 | - | 43 |
| *Accounts Receivable O&M* | - | 142 | - | 142 |
| *Accounts Receivable Other* | - | 231 | - | 231 |
| *Unbilled Receivables* | - | 2 | - | 2 |
| Other Current Assets | | | | |
| *Other Current Assets* | - | 20 | - | 20 |
| *O&M Receivable - BPI* | - | 39 | - | 39 |
| *Prepaid Assets* | - | 85 | - | 85 |
| *DFC - Current Portion* | 10 | - | - | 10 |
| **Total current assets** | 134 | 561 | - | 695 |
| **Non current assets** | | | | |
| Property and equipment, net | - | - | 15,146 | 15,146 |
| Other Assets | | | | |
| *Restricted Cash - O&M Reserve* | 81 | - | - | 81 |
| *Restricted Cash - Min Pymt Res* | 709 | - | - | 709 |
| *Restricted Cash - Inverter Res.* | 42 | - | - | 42 |
| *Notes Receivable* | 22 | - | - | 22 |
| *Deferred Financing Costs* | 294 | - | - | 294 |
| Investment in Subsidiaries | - | - | 14 | 14 |
| Intercompany Receivables | 5,048 | - | - | 5,048 |
| **Total non-current assets** | 6,197 | - | 15,160 | 21,356 |
| **Totals assets** | 6,330 | 561 | 15,160 | 22,051 |
| **Current liabilities** | | | | |
| Other Current Liabilities | | | | |
| *Accounts Payable* | - | 1,457 | - | 1,457 |
| *Due to BPI* | - | 736 | - | 736 |
| *Accrued Liabilities* | - | 198 | - | 198 |
| *Taxes Payable* | - | 3 | - | 3 |
| *LT Debt - Current Portion* | 369 | - | - | 369 |
| *Interest Payable* | 311 | - | - | 311 |
| *Rent Payable* | - | 192 | - | 192 |
| *Management Fee Liability* | - | 132 | - | 132 |
| **Total current liabilities** | 680 | 2,718 | - | 3,398 |
| **Non current liabilities** | | | | |
| Deferred Revenue | - | 3,696 | - | 3,696 |
| Long-term Debt | | | | |
| *PPP Loan* | 140 | - | - | 140 |
| *Loan Payable - Generate* | 54 | - | - | 54 |
| *SBA Loan* | 200 | - | - | 200 |
| *S. Venter Loan* | 400 | - | - | 400 |
| *Amalgamated Bank Loans* | 9,701 | - | - | 9,701 |
| Other LT Liabilities | 2,400 | - | - | 2,400 |
| **Total non current liabilities** | 12,895 | 3,696 | - | 16,592 |
| **Total liabilities** | 13,575 | 6,414 | - | 19,989 |
| **Total equity** | - | - | 2,062 | 2,062 |
| **Total liabilities and equity** | 13,575 | 6,414 | 2,062 | 22,051 |

*Notes*

*Restricted deposits*
*Restricted deposits*
*Restricted deposits*

*Investment in Subs*
*Intercompany rece*

*Deferred Revenues to be excluded from Net Cash or Working Capital*

---

**Non-audited balance sheet as at 31 Dec. 2020 - Blue Sky Utility Holdings LLC**

| USD '000 | Net debt | Working capital | Excluded | Total balance |
|---|---|---|---|---|
| **Current assets** | | | | |
| Cash and Cash Equivalents | 46 | - | - | 46 |
| Accounts receivable | | | | |
| *Billed Receivables* | - | 171 | - | 171 |
| *Unbilled Receivables* | - | 11 | - | 11 |
| Other Current Assets | - | 28 | - | 28 |
| **Total current assets** | 46 | 210 | - | 256 |
| **Non current assets** | | | | |
| Property and equipment, net | - | - | 23,016 | 23,016 |
| Other Assets | | | | |
| *Restricted Cash - O&M Reserve* | 67 | - | - | 67 |
| *Restricted Cash - Min Pymt Res* | 410 | - | - | 410 |
| *Restricted Cash - Inverter Res.* | 7 | - | - | 7 |
| *Lease Escrow Deposit* | 16 | - | - | 16 |
| *Deferred Financing Costs* | 243 | - | - | 243 |
| Intercompany Receivables | 2,353 | - | - | 2,353 |
| **Total non-current assets** | 3,095 | - | 23,016 | 26,112 |
| **Total assets** | 3,141 | 210 | 23,016 | 26,368 |
| **Current liabilities** | | | | |
| Other Current Liabilities | | | | |
| *Accounts Payable* | - | 2,053 | - | 2,053 |
| *Accrued Liabilities* | - | 131 | - | 131 |
| *Taxes Payable* | - | 33 | - | 33 |
| *Distribution Payable* | - | 8 | - | 8 |
| *Interest Payable* | 675 | - | - | 675 |
| *Rent Payable* | - | 245 | - | 245 |
| **Total current liabilities** | 675 | 2,470 | - | 3,145 |
| **Non current liabilities** | | | | |
| Long-term Debt | | | | |
| *Due to Deferred Development Fee* | - | 720 | - | 720 |
| *Deferred Revenue* | - | 1 | - | 1 |
| *Long-term Debt* | 14,586 | - | - | 14,586 |
| Other LT Liabilities | 3,906 | - | - | 3,906 |
| **Total non current liabilities** | 18,493 | 721 | - | 19,214 |
| **Total liabilities** | 19,168 | 3,191 | - | 22,359 |
| **Total equity** | - | - | 4,009 | 4,009 |
| **Total liabilities and equity** | 19,168 | 3,191 | 4,009 | 26,368 |

*Notes*

*Restricted deposits to be excluded from Net Cash or Working Capital*
*Restricted deposits to be excluded from Net Cash or Working Capital*
*Restricted deposits to be excluded from Net Cash or Working Capital*
*Lease deposits to be excluded from Net Cash or Working Capital*

*Intercompany receivables to be excluded or part of the Net Debt.*

*Deferred Development Fee to be excluded from Net Cash or Working Capital*
*Deferred Revenues to be excluded from Net Cash or Working Capital*

*Intercompany payables to be excluded or part of the Net debt.*

---

**Additional agreed off-balnce sheet liabilities as at 21 May 2021**

| USD '000 | Net debt | Working capital | Excluded | Total balance |
|---|---|---|---|---|
| CDV loan (Amalgamated) | 430 | - | - | 430 |
| PDA Shares Purchase | 990 | - | - | 990 |
| Salary Gap Payment | 1,597 | - | - | 1,597 |
| **Total additional agreed off-balnce sheet liabilities** | 3,017 | - | - | 3,017 |

*Notes*

**Exhibit F**

Amended and Restated Operating Agreement

Attached.

# SECOND AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## BLUE SKY UTILITY, LLC

### Dated as of _____ __. 2021

---

THE SALE OF INTERESTS DESCRIBED IN AND REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION AND/OR QUALIFICATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.  IN ADDITION, TRANSFER OF THE INTERESTS IS SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH HEREIN.  THE INTERESTS MAY NOT BE OFFERED FOR SALE OR SOLD EXCEPT (I) IN COMPLIANCE WITH THE TERMS AND CONDITIONS SET FORTH HEREIN AND (II) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND/OR QUALIFICATION UNDER THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS OR UNDER CIRCUMSTANCES THAT DO NOT REQUIRE REGISTRATION OR QUALIFICATION UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS.

## SCHEDULE & EXHIBITS

Exhibit A        Information on Members and Ownership of Membership Interests and Capital Account Balances as of immediately prior to the Effective Date and as of the Effective Date

Exhibit B        Current Projects and Pipeline Projects

Exhibit C        Budget Plan

Exhibit D        List of Existing Contracts with Affiliates

Exhibit E        Listing of Managers and Officers[1]

---

[1] Note to Draft: Officers to be discussed further.

{10764887.2}

ActiveUS 186356799v.13

# SECOND AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## BLUE SKY UTILITY, LLC

THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "***Agreement***") of BLUE SKY UTILITY, LLC, a California limited liability company (the "***Company***"), is made and entered into as of _____ __, 2021 (the "***Effective Date***"), by and between the Members that are listed as such on the signature pages hereto.

## <u>Recitals</u>

A.      The Company was formed by virtue of Articles of Organization (the "***Articles***"), filed with the Secretary of State of the State of California on May 11, 2009, under the name BLUE SKY UTILITY, LLC.

B.      The Company and its Affiliate Blue Sky Utility Holding, LLC, a California limited liability company ("***BSUH***"), (a) currently develop, fund, construct, own, operate, manage and maintain rooftop solar power generation and energy efficiency assets located on and serving multitenant retail centers, as further described in <u>Exhibit B</u> under the heading "Current Projects" (the "***Current Projects***"), (b) have a pipeline of projects for the development, funding, construction, ownership, operation, management and maintenance of rooftop and carport solar power generation and storage facilities and energy efficiency and cogeneration assets that will be located on and serve multitenant retail centers, as further described in <u>Exhibit B</u> under the heading "Pipeline Projects" (the "***Pipeline Projects***"), and (c) intend to seek additional locations for the development, funding, construction, ownership, operation, management and maintenance of rooftop solar power generation and storage facilities ("***Future Projects***" and, together with the Current Projects and Pipeline Projects, the "***Projects***").

C.      The original Limited Liability Company Agreement of the Company was entered into on May 11, 2009 (the "***Original Agreement***") by Barend Venter ("***Barend***"). The Original Agreement was amended and restated in its entirety by that certain Amended and Restated Limited Liability Company Agreement dated as of October 28, 2015 (the "***Amended and Restated Agreement***") between Barend and Yellow Tree Capital LLC, a California limited liability company ("***Yellow Tree***") wholly owned by Ran Bujanover ("***Bujanover***").  Effective December 31, 2017, Barend transferred all of his interest in the Company to Blue Sky 1007, LLC, a California limited liability company wholly owned by Barend ("***BS1007***").

D.      On January 1, 2019, following the admission of Palm Drive Associates, LLC ("***PDA***") as a member of the Company, Yellow Tree, BS1007 and PDA entered into an Amended and Restated Limited Liability Company Agreement of the Company (the "***Amended LLCA***"), at which time the Membership Interests in the Company were held as set forth in the applicable section of <u>Exhibit A</u> hereto.

ActiveUS 186356799v.13

E.     Immediately prior to the Effective Date: (a) Nofar USA LLC, a Delaware limited liability company ("*Nofar*"), (i) subscribed for newly issued Membership Interests from the Company, and (ii) purchased a certain amount of Membership Interests from BS1007 and Yellow Tree, all as further described in, and pursuant to the terms and conditions contained in, that certain Membership Interest Subscription and Purchase Agreement dated as of _____, 2021, and (b) PDA sold all of its Membership Interests to the Company pursuant to the Membership Interest Repurchase Agreement such that as of the Effective Date, the Membership Interests in the Company are held as set forth in Exhibit A(2) hereto.

F.     As of the Effective Date, the parties hereto desire to amend, restate, replace and supersede any and all prior limited liability company agreements governing the Company in their entirety, including the Amended LLCA, and to set forth herein, establish and provide for the respective economic and other rights of the current Members of the Company, the management and governance of the Company, and such other terms and conditions as the Members deem appropriate.

## Agreement

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to adopt this Agreement in its entirety and to continue the Company as a limited liability company under the Act upon the following terms and conditions:

## ARTICLE I
## DEFINITIONS

Section 1.1.   Definitions.   Unless otherwise defined herein, capitalized terms used throughout this Agreement shall have the respective meanings set forth below:

"*Accounting Firm*" means the Company's primary independent accounting firm, which shall be any nationally or regionally recognized firm of certified public accountants selected by Simple Majority Approval.[2]

"*Act*" means the California Revised Uniform Limited Liability Company Act, and any successor statute, as the same may be amended from time to time.

"*Adjusted Capital Account Deficit*" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the next to the last sentence of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the

---

[2] Note to Draft: Ran/Barend/Nofar to agree on the initial Accounting Firm prior to signing this Agreement (firm to have necessary capabilities, including preparing books and records in accordance with GAAP and IFRS).

DocuSign Envelope ID: BDEAEE06-9822-4CB5-9466-364533A42A1F

Treasury Regulations after taking into account any changes during such year in Company Minimum Gain and Member Minimum Gain; and

(b)    debit to such Capital Account the items described in Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"*Affiliate*" means, with respect to any designated Person, any other Person that directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such designated Person.   The term "*control*" (including the terms "*controlled by*" or "*under common control with*") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract, or otherwise; provided, however, that, in any event, any Person that owns directly or indirectly fifty percent (50%) or more of the securities having ordinary voting power for the election of directors or other governing body of a corporation or fifty percent (50%) or more of the partnership or other ownership interests of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

"*Agreement*" has the meaning set forth in the Preamble hereof, as the same may be amended, modified or supplemented from time to time.

"*Audit Rules*" means Chapter 63 of the Code, together with any applicable Regulations or other guidance thereunder or successor provisions thereto, and any similar provisions of state, local, or non-U.S. law, including regulations, guidance or provisions issued or enacted after the date hereof.

"*Bankruptcy*" of a Person means the occurrence of any of the following events: (i) the filing by such Person of a voluntary case or the seeking of relief under any chapter of Title 11 of the United States Bankruptcy Code, as now constituted or hereafter amended (the "*Bankruptcy Code*"), (ii) the making by such Person of a general assignment for the benefit of its creditors, the admission in writing by such Person of its inability to pay its debts as they mature, the filing by such Person of an application for, or consent to, the appointment of any receiver or a permanent or interim trustee of such Person or of all or any portion of its property, including the appointment or authorization of a trustee, receiver or agent under applicable Law or under a contract to take charge of its property for the purposes of enforcing a lien against such property or for the purpose of general administration of such property for the benefit of its creditors, the filing by such Person of a petition seeking a reorganization of its financial affairs or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt or liquidation Law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such Law or statute, (vi) an involuntary case is commenced against such Person by the filing of a petition under any chapter of Title 11 of the Bankruptcy Code and within sixty (60) days after the filing thereof either the petition is not dismissed or the order for

ActiveUS 186356799v.13

DocuSign Envelope ID: BDEAEE06-9822-4CB5-9466-364533A42A1F

relief is not stayed or dismissed, (vii) an order, judgment or decree is entered appointing a receiver or a permanent or interim trustee of such Person or of all or any portion of its property, including the entry of an order, judgment or decree appointing or authorizing a trustee, receiver or agent to take charge of the property of such Person for the purpose of enforcing a lien against such property or for the purpose of general administration of such property for the benefit of the creditors of such Person, and such order, judgment or decree shall continue unstayed and in effect for a period of sixty (60) days, or (viii) an order, judgment or decree is entered, without the approval or consent of such Person, approving or authorizing the reorganization, insolvency, readjustment of debt or liquidation of such Person under any such Law or statute, and such order, judgment or decree shall continue unstayed and in effect for a period of sixty (60) days.

"***Barend***" has the meaning set forth in the Recitals.

"***Board***" has the meaning set forth in Section 8.1(a).

"***BPI***" means Bright Power, Inc., a California corporation partially owned by Barend.

"***BS1007***" has the meaning set forth in the Recitals.

"***BS1007 Manager***" has the meaning set forth in Section 8.1(c)(ii).

"***BSUH***" has the meaning set forth in the Recitals.

"***Budget Plan***" has the meaning set forth in Section 8.13(a).

"***Bujanover***" means, collectively, Ran and Anat Bujanover, or either of them, as the case may be.

"***Business***" has the meaning set forth in Section 2.3.

"***Business Day***" means any day other than Saturday, Sunday or any day that is a legal holiday or a day on which banking institutions in New York, California or Israel are authorized by Law or governmental action to close. For avoidance of doubt, Friday will be deemed a Business Day (except for any Friday that is also a federal or state banking holiday in New York, California or Israel).

"***Capital Account***" has the meaning set forth in Section 4.2(a).

"***Capital Contribution***" means, with respect to any Member, the amount of money and Gross Asset Value of any property contributed to the Company from time to time with respect to the Membership Interests in the Company held, purchased or otherwise acquired by such Member.

"***Capital Event***" has the meaning set forth in Section 10.3.

"***Certificate of Cancellation***" has the meaning set forth in Section 10.5(a).

ActiveUS 186356799v.13

"**_Claims_**" means all claims, suits, demands, injunctions, actions, causes of action, assessments, cleanup and remedial obligations, judgments, awards, liabilities, losses (including amounts paid in settlement of claims), damages (including any consequential, punitive, incidental or special damages recovered by any third party), fines, fees, taxes, penalties, costs and expenses of every kind and character (including litigation costs and reasonable attorneys' fees).

"**_Code_**" means the United States Internal Revenue Code of 1986, as amended from time to time.

"**_Company_**" has the meaning set forth in the Preamble.

"**_Company Minimum Gain_**" has the meaning ascribed to the term "partnership minimum gain" in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"**_Company Tax Returns_**" has the meaning set forth in <u>Section 7.6</u>.

"**_Confidential Information_**" has the meaning set forth in <u>Section 11.12</u>.

"**_Current Projects_**" has the meaning set forth in the Recitals.

"**_Depreciation_**" means for each Fiscal Year or part thereof, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for United States federal income tax purposes with respect to an asset for such Fiscal Year or part thereof; except that if the Gross Asset Value of an asset differs from its adjusted basis for United States federal income tax purposes anytime during such Fiscal Year, the depreciation, amortization, or other cost recovery deduction for such Fiscal Year or part thereof shall be an amount which bears the same ratio to such Gross Asset Value as the United States federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or part thereof bears to such adjusted tax basis. If such asset has a zero adjusted tax basis, Depreciation with respect to such asset shall be determined under a method reasonably selected by the Managers with the consent of Nofar.

"**_Disposition_**" by a Member means any sale, assignment or other disposition of all rights, title and interest in and to such Member's Membership Interests.

"**_Distributable Cash_**" means the total amount of cash available to be distributed by the Company to the Members, which shall be calculated as: (a) the total amount of distributable cash and cash equivalents then held by the Company and its Subsidiaries, <u>minus</u> (b) the amount necessary to satisfy and discharge all liabilities and obligations of the Company that are then due, pending or are reasonably expected (including all obligations of the Company under the Nofar Loan Agreement and any other Member Loans), and such other reasonable reserves as the Board in good faith may determine; each of the foregoing as determined by the Board and subject to and in accordance with applicable Laws.

"**_Economic Capital Account_**" means, for each Member, such Member's Capital Account balance increased by such Member's share of "minimum gain" and of "partner nonrecourse debt

minimum gain" (as determined pursuant to Treasury Regulation Sections 1.704-2(g) and 1.704-2(i)(5), respectively).

"***Economic Risk of Loss***" shall have the meaning specified in Treasury Regulations Section 1.752-2.

"***Effective Date***" has the meaning set forth in the Preamble.

"***Equity Interest***" means (i) any capital stock of a corporation, any partnership interest, any limited liability company interest and any other equity interest; (ii) any security or right convertible into, exchangeable for, or evidencing the right to subscribe for any such stock, equity interest or security referred to in clause (i) and (iii) any stock appreciation right, contingent value right or similar security or right that is derivative of or otherwise gives any Person the right to receive any economic benefit or right similar to or derived from any such stock, equity interest or security referred to in clause (i) or (ii).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means any entity, trade or business, whether or not incorporated, which together with another entity, trade or business, would be deemed a "single employer" within the meaning of Section 4001 of ERISA or Sections 414(b), (c), (m) or (o) of the Code.

"***Family Member***" of an individual means a spouse or child of such individual.

"***FERC***" means the Federal Energy Regulatory Commission.

"***Fiscal Year***" has the meaning set forth in Section 7.1.

"***GAAP***" means United States generally accepted accounting principles as in effect from time to time, consistently applied throughout the applicable period.

"***Governmental Entity***" means any domestic or foreign federal, state, municipal or local governmental or regulatory authority, agency, commission, body, court or other legislative, executive or judicial governmental entity.

"***Gross Asset Value***" means, with respect to any asset, the asset's adjusted tax basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be such asset's gross fair market value (as determined by the Board) at the time of such contribution;

(b)    The Gross Asset Value shall be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that the depreciation deduction taken into account each Fiscal Year for purposes of adjusting the Gross Asset Value of an asset shall be the amount of Depreciation with respect to such asset taken into account for purposes of computing Net Profits or Net Losses for the Fiscal Year;

DocuSign Envelope ID: B0EAEE06-9822-4CB5-9466-364533A42A1F

(c)     Without limiting the generality of the foregoing and subparagraph (f), below, the Gross Asset Values of all Company assets may be adjusted to equal their respective gross fair market values, as determined by the Managers, as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution, (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company assets or money as consideration for a Membership Interest in the Company, and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Managers (A) reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company and (B) such adjustments are approved by the Managers;

(d)     The Gross Asset Value of any asset distributed to a Member by the Company shall be such asset's gross fair market value at the time of such distribution;

(e)     The Gross Asset Value of any Company asset shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such asset pursuant to Section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and pursuant to paragraph (f) of the definition of "Net Profits" and "Net Losses" and Section 5.2(g); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (e) to the extent the Managers determine that an adjustment pursuant to subparagraph (c) immediately above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (e); and

(f)     The Gross Asset Value of all Company assets shall be adjusted upon the events in the manner specified in Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) or (s).

(g)     On the date hereof, immediately prior to the acquisition of a Membership Interest in the Company by Nofar, the Gross Asset Value of the Company's assets shall be adjusted pursuant to clause (c) above to equal their fair market value.

"***IFRS***" means International Financial Reporting Standards, as in effect from time to time, consistently applied throughout the applicable periods.

"***IRS***" means the Internal Revenue Service.

"***Laws***" means, collectively, any federal, state, local or foreign law, statute or ordinance, common law, or any rule, regulation, standard, judgment, order, writ, injunction, decree, arbitration award, agency requirement, license or Permit issued, promulgated, enforced or entered into by any Governmental Entity.

"***Liquidation***" has the meaning set forth in Section 10.2.

"***Manager***" or "***Managers***" has the meaning set forth in Section 8.1(a).

ActiveUS 186356799v.13

"***Member***" or "***Members***" means the Persons named in the signature pages hereto as "Members," in each case in their capacity as members of the Company within the meaning of the Act, and any other Person that has been admitted as a member of the Company pursuant to the terms hereof.

"***Member Loan***" means any loan made by a Member or its Affiliates to the Company, including any loan made in accordance with Section 4.1(a)(iii) and under the Nofar Loan Agreement, subject to the other terms and conditions of this Agreement.

"***Member Minimum Gain***" has the meaning ascribed to the term "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i)(2).

"***Member Nonrecourse Debt***" has the meaning ascribed to the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"***Member Nonrecourse Deductions***" means items of Company loss, deduction, or Code Section 705(a)(2)(b) expenditures that are attributable to Member Nonrecourse Debt within the meaning of Treasury Regulations Section 1.704-2(i).

"***Membership Interest***" means the limited liability company interest of a Member in the Company, which shall consist of the Member's Capital Account and rights to an allocation of income, gain, credit, deduction and loss and to distributions of the Company, in each case as herein provided, and which interest entitles such Member to receive information and to consent to or approve such actions or omissions of the Company or another Member with respect to which the consent or approval of such Member is permitted or expressly required hereunder or required under the Act, and all other rights and obligations of such Member.

"***Membership Interest Purchase Agreement***" means that certain _____ dated of even date herewith between the Company and PDA.

"***Net Profits***" and "***Net Losses***" means, for any period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

      (a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses shall be added to such taxable income or loss;

      (b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Losses shall be subtracted from Net Profits or Net Losses;

      (c)    Gains or losses resulting from any disposition of Company asset with respect to which gains or losses are recognized for federal income tax purposes shall be

{10764887.2}                                      - 8 -

computed with reference to the Gross Asset Value of the Company asset disposed of, notwithstanding the fact that the adjusted tax basis of such Company asset differs from its Gross Asset Value;

(d)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing the taxable income or loss, there will be taken into account Depreciation;

(e)    If the Gross Asset Value of any Company asset is adjusted pursuant to the definition of "Gross Asset Value," the amount of the adjustment will be taken into account as gain or loss from the disposition of the asset for purposes of computing Net Profits or Net Losses;

(f)    If an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or 743(b) of the Code is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses to the extent not taken into account under paragraph (e); and

(g)    Notwithstanding any other provision of this subsection, any items of income, gain, loss or deduction that are specially allocated pursuant to this Agreement shall not be taken into account in computing Net Profits or Net Losses.

"*Nofar*" has the meaning set forth in the Recitals.

"*Nofar Loan Agreement*" means that certain Loan Agreement, dated as of the Effective Date, by and among [Nofar], the Company and BSUH.

"*Nofar Manager*" has the meaning set forth in Section 8.1(c)(i).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.752-1(a)(2).

"*Notice*" has the meaning set forth in Section 11.1.

"*Offered Interests*" has the meaning set forth in Section 9.5(a).

"*Officers*" has the meaning set forth in Section 8.8.

"*Partnership Representative*" has the meaning set forth in Section 7.7(a).

"*PDA*" has the meaning set forth in the Recitals.

ActiveUS 186356799v.13

"***Percentage Interest***" means, with respect to each Member and subject to the earlier Disposition of Membership Interests by a Member consistent with the terms hereof, the percentage set forth opposite such Member's name under the column entitled "Percentage Interest" on Exhibit A(2).

"***Permit***" means any authorization, license, certification, approval, consent, registration or permit issued or granted by or under the authority of any Governmental Entity or pursuant to any Laws.

"***Permitted Investments***" means (i) domestic or Eurodollar time deposits, money market instruments or certificates of deposit with banks rated at least "A" by Standard & Poor's Ratings Services or Moody's Investors Service, Inc., (ii) commercial paper of industrial corporations rated at least "A-1" by Standard & Poor's Ratings Services or "P-1" by Moody's Investors Services, Inc., (iii) direct obligations of, or obligations unconditionally guaranteed by, the United States of America or an agency or instrumentality thereof and backed by the full faith and credit of the United States of America, or (iv) mutual funds that invest primarily in the securities described in (i) through (iii) above; provided that, in each case, the respective investment can be liquidated and converted into cash within two Business Days following the request therefor by the Board, acting by Simple Majority Approval.

"***Permitted Transferee***" means (a) a trust, the trustee of which is such Person and/or any Family Member of such Person, (b) a corporation, partnership, or limited liability company, all of the stockholders, partners, or members of which are at all times only such Person and/or Family Members of such Person, or (c) the Family Members of such Person by will or by the laws of intestate succession.

"***Person***" means any natural person, corporation, company, partnership (general or limited), limited liability company, trust or other entity.

"***Pipeline Projects***" has the meaning set forth in the Recitals.

"***Projects***" has the meaning set forth in the Recitals.

"***Project Company***" means any company, whether existing as of the Effective Date or established thereafter, that is a direct or indirect Subsidiary of the Company or BSUH and that owns and/or operates, directly or indirectly, a Project.

"***Proposal***" has the meaning set forth in Section 8.13(c).

"***Proposed Transfer***" has the meaning set forth in Section 9.4(a).

"***Prudent Industry Practice***" means any of the practices, methods and acts engaged in or approved by managers of independent power generation facilities in North America similar in size and type to the Projects during the relevant time period, or any of the practices, methods and acts which, in the exercise of commercially reasonable judgment in light of the facts known at the time a decision was made by the Company, any Manager or any Officer on behalf of the Company, could have been expected to accomplish the desired result at a reasonable cost

consistent with good management practices utilized by similar facilities in the independent power industry. Prudent Industry Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is intended to include acceptable practices, methods and acts generally accepted in North America as applicable to the management of independent power facilities.

"***Purchase Offer***" has the meaning set forth in <u>Section 9.5(a)</u>.

"***PURPA***" means Public Utility Regulatory Policies Act of 1978, as amended, and FERC's implementing regulations related thereto.

"***Qualifying Facility***" **or** "***QF***" means a qualifying small power production facility as defined under PURPA and 16 USC §796(17)(C).

"***Recapture Event***" means an event that causes any disallowance, denial or recapture (whether in whole or in part) of a Tax Credit claimed by the Company by the United States Department of the Treasury, the IRS, or any other Governmental Entity.

"***Representatives***" means, with respect to any Person, the managing member(s), officers, directors, employees, representatives or agents (including investment bankers, financial advisors, attorneys, accountants, brokers and other advisors) of such Person, to the extent that such officer, director, employee, representative or agent of such Person is acting in his or her capacity as an officer, director, employee, representative or agent of such Person.

"***Required Notice***" has the meaning set forth in <u>Section 6.3</u>.

"***Simple Majority Approval***" of an action to be taken by the Board means affirmative votes representing more than 50% of the total votes cast with respect to such action. A Manager shall only be entitled to cast votes if such Manager is present at a meeting of the Board or is executing a written consent of the Board in lieu of a meeting, as the case may be.

"***Subsidiary***" of a Person means any other Person whose equity interests are held, in whole or in part, directly or indirectly, by such first Person.

"***Super-Majority Approval***" has the meaning set forth in <u>Section 8.1(e)</u>.

"***Target Balance***" means, for each Member at any point in time, either (i) a positive amount equal to the net amount, if any, the Member would be entitled to receive or (ii) a negative amount equal to the net amount the Member would be required to pay or contribute to the Company or to any third party, assuming, in each case that (A) the Company sold all of its assets for an aggregate purchase price equal to their aggregate Gross Asset Value (assuming for this purpose only that the Gross Asset Value of any asset that secures a liability that is treated as "nonrecourse" for purposes of Treasury Regulation Section 1.1001-2 is no less than the amount of such liability that is allocated to such asset in accordance with Treasury Regulation Section 1.704-2(d)(2)); (B) all liabilities of the Company were paid in accordance with their terms from the amounts specified in clause (A) of this sentence; (C) any Member that was obligated to contribute any amount to the Company pursuant to this Agreement or otherwise (including the

ActiveUS 186356799v.13

amount a Member would be obligated to pay to any third party pursuant to the terms of any liability or pursuant to any guaranty, indemnity or similar ancillary agreement or arrangement entered into in connection with any liability of the Company) contributed such amount to the Company; (D) all liabilities of the Company that were not completely repaid pursuant to clause (B) of this sentence were paid in accordance with their terms from the amounts specified in clause (C) of this sentence; and (E) the balance, if any, of any amounts held by the Company was distributed in accordance with Section 6.1.

"**_Tax Credits_**" means the investment tax credits provided by Section 48(a)(1) of the Code or any successor provision thereto.

"**_Termination Date_**" has the meaning set forth in Section 2.4.

"**_Third Party_**" has the meaning set forth in Section 9.5(a).

"**_Transfer_**" has the meaning set forth in Section 9.1.

"**_Transfer Notice_**" has the meaning set forth in Section 9.4(b).

"**_Transfer Price_**" has the meaning set forth in Section 9.4(b).

"**_Treasury Regulations_**" means the regulations promulgated under the Code, as such regulations are in effect on the date hereof.

"**_Withholding Payment_**" has the meaning set forth in Section 6.3.

"**_Yellow Tree_**" has the meaning set forth in the Recitals.

"**_Yellow Tree Manager_**" has the meaning set forth in Section 8.1(c)(iii).

Section 1.2.    References; Gender; Number; Certain Phrases; Construction and Interpretation.    All references in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" are to an Article, Section, Exhibit or Schedule of this Agreement, and any reference to a subsection or other subdivision, without further reference to a Section, is a reference to such subsection or subdivision as contained in the same Section in which the reference appears, in each case unless the context requires otherwise.    The words "this Agreement," "hereof," "hereunder," "herein," "hereby," "thereof," "thereunder," or words of similar import refer to this Agreement as a whole and not to a particular Article, Section, subsection, clause or other subdivision hereof, unless the context requires otherwise.    Whenever the context requires, the words used herein include the masculine, feminine and neuter gender, and the singular and the plural.    The words "include," "includes" and "including" mean "include, without limitation," "includes, without limitation," and "including, without limitation," respectively.    Any reference in this Agreement to $ or dollars shall mean U.S. dollars.    Words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders.    Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.    Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action

may be validly taken on or by the next day that is a Business Day.  Each Party acknowledges that it, he or she and its, her or his attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party or any similar rule operating against the drafter of an agreement shall not be applicable to the construction or interpretation of this Agreement.

## ARTICLE II
## FORMATION; OFFICES; TERM

Section 2.1.    <u>Formation and Continuation of the Company</u>.  The Company was formed on January 19, 2017, by virtue of the filing of the Articles with the Secretary of State of the State of California.  The Members hereby acknowledge the continuation of the Company as a limited liability company pursuant to the Act.  This Agreement is effective as of the Effective Date and supersedes and replaces entirely all prior agreements governing the operations of the Company and the rights and obligations of its Members and any prior members, including the Original Agreement and the Amended LLCA.  The rights and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein, and the terms of this Agreement will control over the Act in the event of any inconsistencies, to the extent permitted by the Act.  As of the Effective Date, all powers of persons designated as "authorized persons" under the Act shall cease, and the Managers hereupon become the designated "authorized persons" and shall continue as the designated "authorized persons" within the meaning of the Act.

Section 2.2.    <u>Name, Office and Registered Agent</u>.

(a)    The name of the Company shall be "BLUE SKY UTILITY, LLC" or such other name or names as may be agreed to by Super-Majority Approval from time to time; <u>provided</u>, <u>however</u>, that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."  The principal office of the Company as of the Effective Date is located at 860 R Napa Valley Corporate Way, Napa, CA 94558.  The Board may at any time and from time to time agree by Simple Majority Approval to change the location of the principal office of the Company to any other location; provided that the Board shall give prompt written notice of any such change to all Members and the registered agent of the Company; and provided, further, that any proposed change in the location of the then-existing principal office of the Company to a location that would increase the one-way commute of either the BS1007 Manager or the Yellow Tree Manager (as compared to the then-existing principal office of the Company) by more than thirty (30) minutes shall require the prior written consent of such Manager.

(b)    The registered agent of the Company for service of process is New Season Corporate Services, and the registered office of the Company is 4600 Larson Way, Sacramento, CA 95822.  The registered office and registered agent may be changed at any time and from time to time by Simple Majority Approval in accordance with the Act, provided that the Managers give prompt written notice of any such change to all Members.  The registered agent's primary duty as such is to forward to the Company at its principal office and place of business any notice that is served on it as registered agent.

Section 2.3.    Purpose.  The purposes and business of the Company and BSUH are to (a) own, hold, develop, construct, operate, maintain, manage, provide or obtain financing for, and sell or otherwise dispose of the Projects (and the assets connected therewith) or the output of the Projects, (b) pursue additional projects that are similar to or incidental to the Projects, as determined by and subject to approval of the Board, and (c) otherwise do all things reasonably necessary, advisable or appropriate in connection with all of the foregoing (the foregoing in this Section 2.3, the "**Business**").  The Company may engage in any kind of activity and perform and carry out contracts of any kind necessary to, or in connection with or convenient or incidental to, the accomplishment of such purpose, so long as such activities and contracts may be lawfully carriedon or performed by a limited liability company under the applicable Laws of the State of California.

Section 2.4.    Term.  The term of the Company commenced on January 19, 2017, and shall continue until the date that the Company is dissolved pursuant to Section 10.1 (the "**Termination Date**").

Section 2.5.    Organizational and Fictitious Name Filings; Preservation of Limited Liability.  The Managers shall cause the Company to register or qualify as a foreign limited liability company, and file such fictitious or trade names, statements or certificates in such jurisdictions and offices, as necessary or appropriate for the conduct of the Company's business.  The Managers may take any and all other actions as may be reasonably necessary or appropriate to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the applicable Laws of California and any other state or jurisdiction other than California in which the Company engages in business, owns or operates property or otherwise engages in any activity that would require a qualification to do business in such jurisdiction, to continue the Company as a limited liability company, and to protect the limited liability of the Members as contemplated by the Act.

Section 2.6.    No Partnership Intended.  Other than for purposes of determining the status of the Company under the Code and the applicable Treasury Regulations and under any applicable state, municipal or other income tax Law or regulation, the Members intend that the Company not be a partnership, limited partnership or joint venture and this Agreement shall not be construed to suggest otherwise.

## ARTICLE III
## RIGHTS AND OBLIGATIONS OF THE MEMBERS

Section 3.1.    Members; Membership Interest.

(a)    The Company shall have as Members only those Persons who have been properly admitted as Members pursuant to the terms of this Agreement, including any proposed assignee of a Member.

(i)    Immediately prior to the Effective Date, BS1007, Yellow Tree and PDA were the only Members of the Company.  BS1007 is wholly owned and controlled by Barend.  Yellow Tree is owned and controlled 50% by Ran Bujanover and 50% by Anat

Bujanover (husband and wife).  Effective on the Effective Date (subject to the Disposition of Membership Interests by a Member in accordance with the terms of this Agreement), the Members of the Company shall be as listed on Exhibit A(2), and each Member holds the Membership Interests and Percentage Interest listed opposite such Member's name on Exhibit A(2).

(ii)    If a Member Disposes of all of its Membership Interest pursuant to and in accordance with the terms of this Agreement (including to the Company), the Disposing Member shall automatically cease to be a Member and shall have no further rights or obligations under this Agreement (but such Disposition shall not have any effect on the rights and obligations of such Member, or of the Company in respect of such Member, under any other agreement or arrangement between such Member and the Company).  If Nofar Disposes of all of its Membership Interests hereunder, it may, but shall not be obligated to, sell, transfer or assign all of its right, title and interest in and to the Nofar Loan Agreement.

(b)    The Membership Interests shall (i) have the rights and obligations ascribed to such Membership Interests in this Agreement and the Act, (ii) be Transferable only in accordance with the terms of this Agreement and the Act and upon recordation of such Transfer in the register of Membership Interest in Exhibit A(2), and (iii) be personal property.

(c)    From and after the Effective Date (until a Disposition of Membership Interests occurs pursuant to and in accordance with the terms hereof), the Company shall be entitled to treat the registered holder of a Membership Interest, as shown in Exhibit A(2), as a Member for all purposes of this Agreement, and the Managers shall record in Exhibit A(2) any security interest of a secured party pursuant to any security interest granted by a Member that is permitted by this Agreement.  Each Membership Interest shall be a "security" governed by and within the meaning of Article 8 of the California Uniform Commercial Code – Investment Securities (including Section 8102(a)(15) thereof) and applicable federal securities Laws.

(d)    The Membership Interests shall initially be uncertificated.  Upon the request of a Member holding uncertificated Membership Interests, such Member shall be entitled to have a certificate signed by or in the name of the Company, by any Officer designated by the Board, representing the number of Membership Interests held by such Member.  Such certificate shall be in such form as the Board may determine, to the extent consistent with applicable Laws, the Articles and this Agreement.  Any or all of such signatures on any certificate representing one or more Membership Interests may be a facsimile, engraved or printed, to the extent permitted by applicable Laws.

(e)    In the event that the Company issues certificates representing Membership Interests in accordance with Section 3.1(d), then in addition to any other legend required by applicable Laws, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE

{10764887.2}                          - 15 -

OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT, AS AMENDED FROM TIME TO TIME.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

Any certificates representing Membership Interests shall be replaced, at the expense of the Company, with certificates or instruments not bearing the legends required by this Section 3.1(e) at such time as they are no longer required for purposes of applicable securities Laws; provided that the Company may condition such replacement of certificates upon the receipt of an opinion of securities counsel reasonably satisfactory to the Company.

(f) The Board may direct that a new certificate representing one or more Membership Interests be issued in place of any certificate theretofore issued by the Company alleged to have been lost, stolen or destroyed, upon delivery to the Board of an affidavit of the owner or owners of such certificate, setting forth such allegation. The Board may require the owner of such lost, stolen or destroyed certificate, or his or her legal representative, to give the Company a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate.

(g) The Board may appoint one or more transfer agents, one or more exchange agents and one or more registrars with respect to the Membership Interests, and may require all certificates representing one or more Membership Interests to bear the signature of any such transfer agents, exchange agents or registrars. Upon surrender to the Company or the transfer agent of the Company, if any, of a certificate for one or more Membership Interests, duly endorsed or accompanied by appropriate evidence of succession, assignment or authority to transfer, in compliance with the provisions of this Agreement, the Company shall issue a new certificate representing one or more Membership Interests to the Person entitled thereto, cancel the old certificate and record the transaction upon its books. Subject to the provisions of the Articles and this Agreement, the Board may prescribe such additional rules and regulations as it may deem appropriate relating to the issuance, Transfer and registration of Membership Interests.

ActiveUS 186356799v.13

Section 3.2.    Meetings.

(a)    Except as otherwise permitted by this Agreement, all actions of the Members shall be taken at meetings of the Members, any which meeting may be called from time to time by any Member for any reason as set forth in Section 3.2(c).  The Members may conduct at such meeting any Company business that is permitted under the Act or this Agreement.  Meetings of Members shall be held at a reasonable time and place (within or outside of the State of California) as shall be specified in the notice of meeting delivered to the Members. Upon the request of any Member, any meeting of the Members pursuant to this Section 3.2 may be held virtually via conference call or video conferencing.  Accurate minutes of any meeting of the Members shall be taken and filed with the minute books of the Company.  Promptly following each meeting of the Members, the minutes of the meeting shall be sent to the Managers and each Member.

(b)    The presence in person or by proxy of Members representing a majority of the then-outstanding Percentage Interests shall constitute a quorum for purposes of transacting business at any meeting of the Members, provided that a representative of Nofar, on the one hand, and BS1007 or Yellow Tree, on the other hand, must be present at any meeting of the Members to constitute a quorum at such meeting. If a quorum is not present due to the absence of BS1007 and Yellow Tree, then the meeting of the Members shall be adjourned to a time and date not more than ten (10) days following the originally scheduled meeting in accordance with the terms of Section 3.2(a) and 3.2(c), at which meeting the presence of BS1007 or Yellow Tree shall not be required to constitute a quorum, provided that the requirements of Section 3.2(a) and 3.2(c) have been met. Except as otherwise provided in this Agreement, with respect to those matters required or permitted to be voted upon by the Members, the affirmative vote of a majority of the then-outstanding Membership Interests shall be required to approve any such matter, in addition to any other approval required by this Agreement or the Act.  Members may participate in a meeting of the Members by means of conference telephone, video conferencing or similar communications equipment that permits all persons participating in the meeting to speak to and hear each other.  Such participation shall constitute presence in person at such meeting.

(c)    Written notice stating the place, day and hour of the meeting of the Members, and the purpose or purposes for which the meeting is called, shall be delivered either personally, via electronic mail or facsimile or by mail to each Member of record entitled to vote at such meeting not less than five (5) days nor more than thirty (30) days prior to the meeting. Notwithstanding the foregoing, meetings of the Members may be held without notice so long as all the Members are present in person or by proxy (unless such presence is solely to dispute the effectiveness of the notice provided with respect to such meeting).  The attendance of any Member at a meeting shall constitute waiver of notice of such meeting, except when a Member attends the meeting for the express purpose of objecting to the effectiveness of the notice provided with respect to such meeting.

(d)    Except as otherwise provided in this Agreement, any action of the Company on which the Members are required or permitted to vote may be authorized or approved by the Members without a meeting if a written consent is executed and delivered by

Members holding the aggregate Percentage Interests required for the taking of such action; provided that a draft of such written consent shall first be circulated to all of the Members at least ten (10) Business Days prior to the taking of the respective action. Each Member agrees to respond to any written request as promptly as practicable after delivery of such request for consent. If any Member does not respond within five (5) Business Days after delivery of the draft consent, a second written request shall be sent to such non-responding Member. If BS1007 and/or Yellow Tree fails to provide a response within five (5) Business Days of delivery of such second written request for consent, such non-responding Member will be deemed to have consented to the applicable action. The Members agree that if the applicable action must be taken promptly, the time periods set forth herein will be reduced to the maximum amount of Business Days practicable. In no instance where action is authorized by written consent pursuant to this Section 3.2(d) need a meeting of Members be called or noticed; provided, however, a copy of the action taken by written consent must be sent promptly to all Members and all actions by written consent shall be filed with the minute books of the Company.

Section 3.3.    No Management Rights. Except as otherwise provided herein, and for the avoidance of doubt, except for any Member who is also a Manager when acting in its capacity as Manager pursuant hereto, no Member shall have any right, power or authority to take part in the management or control of the business of, or transact any business for or on behalf of, the Company, to sign for or on behalf of the Company or to bind the Company in any manner whatsoever. Neither the Managers nor any Member shall hold out or represent to any third party that any Member, except the Managers, acting in their capacity as Managers of the Company pursuant hereto, has any such power or right or that any Member is anything other than a member in the Company (provided that if a Member serves as a Manager, its rights in its capacity as a Manager shall not be limited by this sentence and are instead addressed in Article VIII). A Member shall not be deemed to be participating in the control of the business of the Company by virtue of its possessing or exercising any rights set forth in this Agreement or the Act or any other agreement relating to the Company.

Section 3.4.    Other Activities of Members.

(a)    Notwithstanding any duty otherwise existing at law or in equity, but in all cases subject to Article VIII and any other agreement (including any employment agreement) to which a relevant Person is a party, each Member and its Affiliates, officers, directors, managers and equityholders may presently or in the future engage or be involved in, or possess an economic or other interest in, other business ventures, product or service offerings, transactions, investments and other business or strategic relationships, independently or with others, including with entities other than the Company or Affiliates of the Company, and such activities shall not constitute any violation of any duty, fiduciary or otherwise, of such Member or its Affiliates, officers, directors, managers or equityholders to the Company, any of its Affiliates or any other Member, and, subject to Section 3.4(b), neither the Company nor any of the other Members shall have any rights by virtue of this Agreement in and to such other business ventures or the profits derived from them; provided, however, that from the date hereof until the later of (i) the third anniversary of the Effective Date and (ii) the third anniversary of the date on which BS1007 or Yellow Tree, as the case may be, ceases to be a Member, neither such Member nor any of its Affiliates, officers, directors, managers or equityholders shall be permitted, directly or indirectly,

to (i) engage in any such activity, business venture, product or service offering or transaction, or hold any investment in or have any other commercial involvement or relationship with any entity, that competes with the Company, BSUH, any Project Company, any Project or the Business, (ii) request, induce or attempt to influence, directly or indirectly, any employee or consultant of the Company, BSUH, or any Project Company to leave the employ of such entity, or in any way interfere with the relationship between such entity and any employee or consultant thereof, (iii) induce or attempt to induce, directly or indirectly, any customer, supplier, distributor, licensee or other business relation of the Company, BSUH or any Project Company to cease or curtail its business with such Person, or in any way interfere with the relationship between any such customer, supplier, distributor, licensee or business relation and such Person, or (iv) hire, retain or attempt to hire or retain any employee or consultant of the Company, BSUH or any Project Company.  Bujanover and Barend hereby agree that if Yellow Tree or BS1007, as the case may be, ceases to be a Member hereunder, Bujanover or Barend, as the case may be, shall execute and deliver to the Company an acknowledgement, in form and substance reasonably acceptable to the Company, pursuant to which such Person agrees to comply with the obligations set forth in this Section 3.4(a).

(b)     Until the later of (i) the third anniversary of the Effective Date and (ii) the third anniversary of the date on which Nofar ceases to be a Member, (x) Nofar shall not request, induce or attempt to influence, directly or indirectly, any employee or consultant of the Company, BSUH, any Project Company or BPI to leave the employ of such entity, or in any way interfere with the relationship between such entity and any employee or consultant thereof; and (y) the Company shall not request, induce or attempt to influence, directly or indirectly, any employee or consultant of BPI to leave the employ of BPI, or in any way interfere with the relationship between BPI and any employee or consultant thereof.  Nofar agrees that if Nofar ceases to be a Member hereunder, it shall cause its parent company to execute and deliver to the Company an acknowledgement, in form and substance reasonably acceptable to the Company, pursuant to which such Person agrees to comply with the obligations set forth in this Section 3.4(b).

(c)     Except as set forth below in this Section 3.4(c) or otherwise in this Agreement, none of the Members or their Affiliates shall be obligated to inform the Company or any other Member of any, or to present to the Company any, opportunity, relationship or investment in any other business venture or transaction, and the Company and each Member hereby renounces any interest in any such opportunity, relationship or investment of another Member and any expectancy that such opportunity, relationship or investment of another Member will be offered to it, and the Parties expressly waive, to the fullest extent permitted by applicable Laws, any rights to assert any claim that such involvement breaches any fiduciary or other duty or obligation owed to the Company or any Member; provided, however, that the foregoing shall not affect any Member's obligations with respect to, and no Member or any of their respective Affiliates shall be permitted to use, Confidential Information of the Company or BSUH or any other Company or BSUH property in connection with any such opportunity, relationship or investment.  Notwithstanding the foregoing, (i) each Member shall be obligated to, and shall cause its Affiliates to, inform the Company of each opportunity that such Member or its Affiliate becomes aware of or that is presented to it and that relates specifically to the development, construction, operation and maintenance of rooftop self-generation renewable

energy, energy storage and services ancillary thereto, with respect to real property in the United States of America zoned for commercial multi-tenant retail locations, and in each case consistent with the Business as conducted as of the date hereof; and (ii) BS1007, Yellow Tree, Bujanover and Barend shall, and shall cause their Affiliates to, inform the Company of each opportunity such Person becomes aware of or that is presented to it and that relates to the development, construction, ownership, operation, maintenance, management, or financing of self-generation renewable energy, energy storage and services ancillary thereto, with respect to real property in the United States of America zoned for commercial or industrial (or mixed commercial-industrial) locations, whether multi-tenant, single-tenant or no tenant (each such opportunity described in the foregoing subclauses (i) and (ii), a "**Business Opportunity**").  Any Business Opportunity presented to the Board in accordance with the preceding sentence and that is not a Project may be approved by Simple Majority Approval, with respect to any such Business Opportunity presented by BS1007, Yellow Tree, Ran or Barend, or Super-Majority Approval with respect to any such Business Opportunity presented by Nofar, and any Business Opportunity approved by the Board as set forth herein shall thereafter be deemed a Project for all purposes under this Agreement, including the Budget Plan.  For clarity, any Business Opportunity that is already a Project shall be subject to Section 8.13(b).

(d)      Notwithstanding anything to the contrary contained herein, the activities disclosed on Schedule 3.4(d) shall in all events be permitted to continue through and until the Termination Date.

Section 3.5.    No Right to Withdraw.  Except as otherwise provided in this Agreement, so long as a Member continues to hold any Membership Interests, no Member shall have any right to voluntarily resign or otherwise withdraw from the Company without the prior written consent of all remaining Members of the Company, in their sole and absolute discretion. As soon as any Member ceases to hold any Membership Interests, such Person shall no longer be a Member.

Section 3.6.    Limitation of Liability of Members.  Each Member's liability shall be limited as set forth in the Act and other applicable Law.  Except as otherwise required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and none of the Members shall be obligated personally for any of such debts, obligations or liabilities solely by reason of being a Member of the Company, unless such debt, obligation or liability arises as a result of a breach or violation of such Member's obligations to the Company, whether hereunder or under any other agreement between such Member and the Company, or any reckless or intentional violation of Law or fraud of such Member.

Section 3.7.    Deficit upon Liquidation.  Upon the dissolution, liquidation, winding-up or termination of the Company, none of the Members shall be liable to the Company, to the other Members, to the creditors of the Company or to any other third party for or on account of any deficit in its Capital Account, nor shall such deficits be deemed assets of the Company.

Section 3.8.    Company Property; Membership Interests.  All property owned by the Company, whether real or personal, tangible or intangible and wherever located, shall be deemed

to be owned by the Company and no Member, individually, shall have any ownership of such property.

Section 3.9.    <u>Retirement, Resignation, Expulsion, Bankruptcy, Death or Dissolution of a Member</u>.   The retirement, resignation, expulsion, Bankruptcy, death or dissolution of a Member shall not, in and of itself, dissolve the Company.  The personal representative of the bankrupt or deceased Member shall, for the purpose of settling the estate, have all of the rights of such Member, including the same rights and subject to the same limitations that such Member would have had under the provisions of this Agreement to Transfer its Membership Interest.  The personal representative of a Member shall not become a substituted Member except as provided in this Agreement.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 4.1.    <u>Additional Funding; Capital Contributions</u>.

(a)     Each Member shall be deemed to have made the Capital Contributions to the Company set forth opposite the name of such Member in <u>Exhibit A(2)</u>.  In the event that the Board by Simple Majority Approval determines that additional capital or credit support is required by the Company, it will be funded through the following mechanisms approved by the Board in the following order of priority:

(i)     first, by drawing under the Nofar Loan Agreement; provided, that, at such time that (A) borrowings under the Nofar Loan Agreement have met or exceeded $40,000,000.00 in the aggregate, (B) Projects generating at least 70 megawatts have achieved a commercial operation date, and (C) Projects expected to generate at least 30 megawatts are under construction, the BS1007 Manager and the Yellow Tree Manager may propose to the Board alternative sources of financing to be considered by the Board in good faith, and any such alternative financing may be approved by Simple Majority Approval (it being agreed that the Nofar Manager shall not be required to consider, and the Company will not undertake, any such loan that the Nofar Manager determines in good faith will adversely affect Nofar, any of its Affiliates or the Nofar Loan);

(ii)     second, to the extent that available credit under the Nofar Loan Agreement is exhausted or unavailable, by credit facilities or other credit support from third party lenders selected by, and on terms and conditions approved by, Simple Majority Approval;

(iii)     third, to the extent available credit from third party lenders is exhausted or unavailable on terms acceptable to the Board, then the Board may, by Simple Majority Approval, seek additional loans from the Members, in each case in accordance with each Member's Percentage Interest and bearing interest at a rate of 4% per annum; provided, that if a Member elects not to, or is unable to, lend to the Company the full amount it is entitled to lend according to its Percentage Interest, the other Members may make additional loans to the Company to make up the shortfall, which loans shall bear interest at a rate equal to the lower of (x) 14% per annum and (y) the highest interest rate then permitted under applicable Laws; and

(iv)    fourth, in the event Member Loans have been exhausted or are unavailable, or the Board determines not to undertake any additional Member Loans, the Board may, subject to unanimous approval of the Members, request additional capital from the Members in the form of additional Capital Contributions.  In such event, the Company shall notify each Member in writing of the Capital Contribution being requested by such Member and the additional Membership Interests to be issued to each Member in respect of its Capital Contribution.  If any Member does not make its respective Capital Contribution hereunder within thirty days following delivery of the Company's written notice, the other Members shall be permitted to increase their respective Capital Contributions to make up for such shortfall (with each other Member being permitted to contribute its pro rata percentage (calculated as though only such contributing Members are members in the Company) of the shortfall), and the respective Percentage Interests of the Members shall be modified accordingly.

Section 4.2.    Capital Accounts.

(a)    There shall be established and maintained throughout the full term of the Company in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv) for each Member, a capital account (a "*Capital Account*") which shall be credited with (i) such Member's Capital Contributions, (ii) allocations of income and gain to such Member pursuant to Section 5.1 and Section 5.2, (iii) the amount of any Company liabilities assumed by such Member or which are secured by any property distributed by the Company to such Member and (iv) such Member's share of any upward basis adjustment caused by a recapture of a Tax Credit as described in Treasury Regulations Section 1.704-1(b)(2)(iv)(*j*).  Each Member's Capital Account shall be debited with (i) the amount of cash and the Gross Asset Value of other property distributed to such Member, (ii) allocations of deductions and losses to such Member pursuant to Section 5.1 and Section 5.2, (iii) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company and (iv) such Member's share of any downward basis adjustment attributable to a Tax Credit as described in Treasury Regulations Section 1.704-1(b)(2)(iv)(*j*).

(b)    The Capital Account balance of each Member as of the Effective Date is as set forth in Exhibit A(2).

(c)    If a Member Disposes of all or a portion of its Membership Interest is in accordance with the terms of this Agreement, the Person acquiring such Membership Interests shall succeed to the Capital Account of the Disposing Member to the extent it relates to the Membership Interest so Disposed of.

(d)    The provisions of this Agreement relating to maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulation and modified or supplemented, if needed, to fully incorporate any relevant provisions thereof.

(e)    If any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the

Company by reason thereof, except as may be required by applicable Laws or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement or applicable Laws.

Section 4.3.    No Third Party Beneficiary.  To the fullest extent permitted by applicable Laws, no creditor or other third party having dealings with the Company shall have the right to enforce the right or obligation of any Member to make Capital Contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the parties hereto and their respective successors and permitted assigns.  None of the rights or obligations of the Members herein set forth to make Capital Contributions or loans to the Company shall be deemed an asset of the Company for any purpose by any creditor or other third party, nor may such rights or obligations be sold, transferred or assigned by the Company or pledged or encumbered by the Company to secure any debt or other obligation of the Company or of any of the Members.

# ARTICLE V
## ALLOCATIONS

Section 5.1.    Profit and Loss Allocations.

(a)    Except as provided in Section 5.2, which shall be applied prior to this Section 5.1, Net Profits and Net Losses of the Company for any Fiscal Year (or other period) shall be allocated among the Members in such proportions and in such amounts as may be necessary so that following such allocations, the Economic Capital Account balance of each Member (as adjusted to reflect all required allocations pursuant to Section 5.2 and all distributions made to such Member during the applicable period) equals such Member's then Target Balance.

(b)    If the amount of Net Profits or Net Losses allocable to the Members pursuant to Section 5.1(a) for a period is insufficient to allow the Economic Capital Account balance of each Member to equal such Member's Target Balance, such Net Profits or Net Losses shall be allocated among the Members in such a manner as to decrease the differences between the Members' respective Adjusted Capital Account balances and their respective Target Balances in proportion to such differences.

(c)    Notwithstanding Section 5.1(a), allocations of Net Losses to a Member shall be made only to the extent that such allocations of Net Losses will not cause or increase an Adjusted Capital Account Deficit for that Member.  Any Net Losses not allocated to a Member because of the foregoing sentence shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of Net Losses under the previous sentence) in accordance with the relative Percentage Interests of such other Members.  Any Net Losses reallocated under this provision shall be taken into account in computing subsequent allocations of Net Profits and Net Losses so that the net aggregate amount of  Net Profits and Net Losses allocated to each Member, to the extent possible, shall be equal to the amount that would have

been allocated to each such Member if no reallocation of losses had occurred under this provision.

(d)    For purposes of maintaining the Capital Accounts of the Members pursuant to <u>Section 4.2</u>, all items of Company credits (including Tax Credits) shall be allocated in the same manner as the allocations of book items of Company gross income are made pursuant to <u>Section 5.1</u>.

Section 5.2.    <u>Regulatory Allocations</u>.  Notwithstanding any other provision of this Agreement, the following special allocations shall be made in the following order:

(a)    *Minimum Gain Chargeback*.  If there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, as determined under Treasury Regulations Section 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This <u>Section 5.2(a)</u> is intended to comply with the "minimum gain chargeback" requirements of Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    *Chargeback Attributable to Member Nonrecourse Debt*.  If there is a net decrease in Member Minimum Gain during any Fiscal Year, each Member with a share of Member Minimum Gain at the beginning of such Fiscal Year shall be specially allocated items of income and gain for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4) and (5).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2)(i). This <u>Section 5.2(b)</u> is intended to comply with the "partner nonrecourse debt minimum gain chargeback" requirements of Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    *Qualified Income Offset*.  If any Member unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which results in an Adjusted Capital Account Deficit for the Member, such Member shall be allocated items of income and book gain in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible; provided, that an allocation pursuant to this <u>Section 5.2(c)</u> shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided in this <u>Article V</u> have been tentatively made as if this <u>Section 5.2(c)</u> were not in the Agreement. This <u>Section 5.2(c)</u> is intended to constitute a "qualified income offset" as provided by Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)  *Member Nonrecourse Deductions*.  Member Nonrecourse Deductions shall be allocated among the Members who bear the Economic Risk of Loss for the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in the ratio in which they share Economic Risk of Loss for such Member Nonrecourse Debt.  This provision is to be interpreted in a manner consistent with the requirements of Treasury Regulations Section 1.704-2(b)(4) and (i)(1).

(e)  *Nonrecourse Deductions*.  Any Nonrecourse Deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall  be specially allocated to the Members in accordance with their respective Percentage Interests.

(f)  In the event that items of income, gain, loss or deduction are allocated to one or more Members pursuant to any of subsections (a) through (e) above (the "***Original Allocation***"), subsequent items of income, gain, loss or deduction will first be allocated (subject to the provisions of subsections (a) through (e)) to the Members in a manner designed to result in each Member having a Capital Account balance equal to what it would have been had the Original Allocation not occurred; provided, however, that no such allocation shall be made pursuant to this subsection (f) if (i) the Original Allocation had the effect of offsetting a prior Original Allocation or (ii) the Original Allocation likely (in the opinion of the Company's accountants) will be offset by another Original Allocation in the future (*e.g.*, an Original Allocation of "nonrecourse deductions" under subsection (e) that likely will be offset by a subsequent "minimum gain chargeback" under subsection (a)).

(g)  *Regulatory Allocations*.  The allocations set forth in this <u>Section 5.2</u> (the "***Regulatory Allocations***") are intended to comply with certain requirements of the applicable Treasury Regulations promulgated under Code Section 704(b).

Section 5.3.    <u>Tax Allocations</u>.

(a)  Except as otherwise provided in this <u>Section 5.3</u>, allocations of tax items of Company income, gain, credits, deductions and losses and Tax Credits for any period shall be allocated in the same manner as the corresponding allocations of book items of  Company income, gain, credits, deductions and losses were made for such period pursuant to <u>Section 5.1</u> (as a component of Net Profits or Net Losses) or <u>Section 5.2</u>.

(b)  Notwithstanding <u>Section 5.3(a)</u>, if, as a result of contributions of property by a Member to the Company or an adjustment to the Gross Asset Value of Company assets, there exists a variation between the adjusted basis of an item of Company property for federal income tax purposes and such property's Gross Asset Value, allocations of income, gain, loss, and deduction shall, solely for tax purposes, be allocated among the Members so as to take into account such variation using a method set forth in Treasury Regulations Section 1.704-3 as determined by the Board with the consent of Nofar.

(c)  Subject to the terms of this Agreement, any elections or other decisions relating to Capital Accounts (including allocations pursuant to <u>Section 5.1</u>) and tax allocations (including allocations pursuant to this <u>Section 5.3</u>) shall be made by Partnership Representative.

DocuSign Envelope ID: BDEAEE06-9822-4CB5-9466-364533A42A1F

Allocations pursuant to this <u>Section 5.3</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of book income, gain, deductions or losses or distributions pursuant to any provision of this Agreement.

Section 5.4.    <u>Dispositions or Changes in Company Interest</u>.    If the respective Membership Interests of the existing Members in the Company change or if a Member Disposes of its Membership Interests to any other Person in compliance with this Agreement, or if the Company adjusts the Gross Asset Value of its assets, then, the date of the change, Disposition or adjustment shall be treated as the end of a Fiscal Year, all income, gains, credits (including Tax Credits), losses, deductions, and other tax items resulting from the operations of the Company shall be allocated to the period before such date and after such date using the closing of the books method in accordance with Section 706 of the Code, unless otherwise determined by the Partnership Representative.

## ARTICLE VI
## DISTRIBUTIONS

Section 6.1.    <u>Distributions</u>.  From time to time following the Effective Date, the Board shall determine whether to cause the Company to distribute any Distributable Cash to the Members.  For the avoidance of doubt, no distributions shall be made to the Members until the Company has repaid in full all Member Loans, including any and all principal and accrued but unpaid interest, costs and expenses outstanding under the Nofar Loan Agreement.  Except as provided in <u>Sections 6.6</u>, <u>6.7</u> and <u>10.3</u>, distributions of Distributable Cash to the Members shall be made as follows:

(a)    First, until a total amount of $40,000,000 has been distributed to the Members, all distributions of Distributable Cash shall be made 50% to Nofar, 35% to BS1007 and 15% to Yellow Tree; and

(b)    Thereafter, all distributions of Distributable Cash shall be made in proportion to the Members' respective Percentage Interests.

Section 6.2.    <u>Withdrawal of Capital</u>.  No Member shall have the right to withdraw capital from the Company or to receive or demand distributions or return of its Capital Contributions by the Company until the Company is dissolved in accordance with  this Agreement and applicable provisions of the Act, and then such distribution or return of capital shall be made in accordance with Article X.  No Member shall be entitled to demand or receive any interest on its Capital Contributions.

Section 6.3.    <u>Withholding Taxes</u>.  If the Company incurs any obligation to pay any amount in respect of any taxes (including withholding taxes imposed on any Member's or former Member's share of the Company's items of income or gain or pursuant to the Audit Rules that is attributable to such Member (including any Imputed Underpayment) or such Member's predecessor), and any interest, penalties or additions to such taxes, or the amount of cash or other property to which the Company otherwise would be entitled is reduced as a result of withholding

or payment by other parties in satisfaction of any such amounts, the Company may withhold such amounts and make such payments to taxing authorities as are necessary to ensure compliance with such tax Laws (any such amount paid over, a "***Withholding Payment***"). The Company shall, no later than March 31 of the calendar year following the calendar year in which a Withholding Payment is made, provide each Member with written notice that such Withholding Payment has been paid ("***Required Notice***"). Any funds withheld by reason of this <u>Section 6.3</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. If the Company did not withhold from actual distributions any such amounts the Company may, at its option, (a) require the Member to which the Withholding Payment related to reimburse the Company for such Withholding Payment; or (b) reduce any subsequent distributions by the amount of such Withholding Payment. This obligation of a Member to reimburse the Company for any Withholding Payment shall continue after such Member Disposes of or liquidates its Membership Interest in the Company, but only with respect to obligations that relate to the period through the date of such Disposition or liquidation. Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have. The obligations of this <u>Section 6.3</u>, including a Member's obligation to reimburse the Company, shall survive any liquidation and dissolution of the Company, any Transfer or liquidation of a Member's interest in the Company or the Member ceasing to be a Member of the Company; provided, however, that in the event the Company fails to timely provide any Member a Required Notice, such Member's obligation to reimburse the Company shall survive for a period of three (3) years after the date the Required Notice was to be delivered. If any Member ceases to be a Member, such Member shall keep the Company advised of its contact information until the expiration of such Member's obligation under this <u>Section 6.3</u>.

Section 6.4.  <u>Distributions in Kind</u>.  Unless approved by Super-Majority Approval, there shall be no distributions of the assets of the Company (other than cash) in kind.

Section 6.5.  <u>Limitation upon Distributions</u>.  Notwithstanding the provisions of this Agreement, including the foregoing provisions of this <u>Article VI</u>, to the contrary, no distribution shall be made: (a) if such distribution would violate any contract or agreement to which the Company is then a party or any Laws then applicable to the Company; (b) to the extent that making such distribution would be inconsistent with the Budget Plan then in effect; or (c) to the extent that the cash available to the Company is insufficient to permit such distribution.

Section 6.6.  <u>Proceeds from a Capital Event or Liquidation</u>.  In the event of a Capital Event or Liquidation, distributions shall be made to Members in accordance with <u>Section 10.3</u>.

Section 6.7.  <u>Distributions with Respect to Taxes</u>.

(a)  Within ninety (90) days after the conclusion of each Fiscal Year, if the Board (based on input from the Company's accountant) (1) determines there to be any taxable income of the Company allocable to any of the Members and (2) reasonably determines that the Company has sufficient available cash to fund its working capital needs for the following six months (after taking into account the following provisions), the Company shall make a

distribution to each Member (a "***Tax Distribution***") which is equal to the amount by which (A) the product of (i) the highest combined marginal Federal and State of California income tax rates imposed on the taxable income of individuals who are residents of California for tax purposes (taking into account the character of the taxable income allocated to the Members); and (ii) the Company's taxable income for federal income tax purposes allocated to such Member for such Fiscal Year, exceeds (B) the aggregate amount of distributions made by the Company to such Member pursuant to Section 6.1 with respect to such Fiscal Year; provided, however, that the Board shall make such Tax Distributions quarterly (subject to the conditions in (1) and (2) above in this Section 6.7(a)) in order to facilitate the Members' ability to make quarterly estimated tax payments with respect to the taxable income of the Company allocated to them, and in determining and making the required Tax Distribution after the end of each Fiscal Year, the Company shall make appropriate adjustments to reflect the actual results of such Fiscal Year and take into account any quarterly Tax Distributions made during such Fiscal Year.

(b)    The amount of any Tax Distributions made to a Member under Section 6.7(a) shall be treated as an advance and shall offset against future distributions to which such Member is entitled under Section 6.1 and Section 10.2 (but not this Section 6.7) as quickly as possible in such a manner that, immediately after any distribution has been made pursuant to Section 6.1 or Section 10.2, the cumulative amount of distributions that have actually been received by each Member pursuant to Section 6.7(a), Section 6.1, and Section 10.2 equals (to the extent possible) the distributions that such Member would have received if all amounts distributed by the Company (including amounts distributed pursuant to Section 6.7(a)) had been distributed in the absence of this Section 6.7.

## ARTICLE VII
## ACCOUNTING AND RECORDS

Section 7.1.    <u>Fiscal Year</u>.  The fiscal year of the Company shall be the calendar year (the "***Fiscal Year***").  Unless otherwise required by the Code, the Company shall have the same Fiscal Year for income tax and for financial and accounting purposes.

Section 7.2.    <u>Books and Records and Inspection</u>.

(a)    The Board shall cause the Company to keep full and accurate books of account, financial records and supporting documents, which shall reflect, completely, accurately and in reasonable detail, each transaction of the Company and such other matters as are usually entered into the records or maintained by Persons engaged in a business of like character or as are required by applicable Law, and all other documents and writings of the Company.  The books of account, financial records, and supporting documents and the other documents and writings of the Company shall be kept and maintained at the principal office of the Company. The financial records and reports of the Company shall be kept in accordance with IFRS and with GAAP and kept on an accrual basis.

(b)    In addition to and without limiting the generality of Section 7.2(a), the Board shall cause the Company to keep at its principal office:

ActiveUS 186356799v.13

(i)    true and full information regarding the status of the business and financial condition of the Company, including financial statements for the three most recent years;

(ii)    promptly after becoming available, a copy of the Company's federal, state, and local income tax returns for each year;

(iii)    a current list of the name and last known business, residence or mailing address of each Member and the Managers;

(iv)    a copy of this Agreement and the Articles, and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which this Agreement and such Articles and all amendments thereto have been executed;

(v)    true and full information regarding the amount of cash and a description and statement of the agreed value of any other property and services contributed by each Member and which each Member has agreed to contribute in the future, and the date upon which each became a Member;

(vi)    copies of records and supporting documents relating to expenses incurred by the Managers or its Affiliates on behalf of the Company and subject to reimbursement pursuant to Section 8.4;

(vii)    copies of records that would enable a Member to determine the Member's relative shares of the Company's distributions and the Member's relative voting rights; and

(viii)    any other records required by Section 17701.13 of the Act.

(c)    All books and records of the Company shall be open to inspection and copying by any of the Members, former members or their authorized Representatives during normal business hours and at such Member's or former member's expense, for any purpose reasonably related to such Member's interest, or such former member's prior interest, in the Company, and the Managers shall maintain the books and records of the Company for a period of five (5) years following the dissolution of the Company. A Member may provide the Company with written notice prior to the expiration of such five (5)-year period if the Member desires to make copies of such books and records prior to destruction thereof. The Members' or their authorized Representatives' rights under this Section 7.2(c) shall continue during the five (5)-year period despite termination or expiration of this Agreement. For avoidance of doubt, no former member of the Company shall be permitted to inspect or copy any books or records of the Company that do not specifically relate to the period in which such former member held an interest in the Company and that are not reasonably required by such Person in connection with such Person's prior ownership of an interest in the Company.

Section 7.3.    Bank Accounts, Notes and Drafts.

ActiveUS 186356799v.13

(a)     All funds not required for the immediate needs of the Company, including the repayment of Member Loans or other loans and the financing of Projects, shall be placed in Permitted Investments, which investments shall have a maturity appropriate for the anticipated cash flow needs of the Company. All Company funds shall be deposited and held in accounts which are in the name of the Company and separate from all other accounts maintained by the Managers and the Members. The Company's funds shall not be commingled with any other funds of any other Person, including any Manager, any Member or any Affiliate of a Manager or a Member.

(b)     Members acknowledge that the Managers may maintain Company funds in accounts, money market funds, certificates of deposit, or other liquid assets in excess of the insurance provided by the Federal Deposit Insurance Corporation or other depository insurance institutions and that the Managers shall not be accountable or liable for any loss of such funds resulting from failure or insolvency of the depository institution, except in instances of reckless or intentional violation of any Law or fraud by any Manager.

(c)     Checks, notes, drafts and other orders for the payment of money shall be signed by such Persons as the Managers may authorize from time to time after the Effective Date.  Any such authorization, whether explicit or implicit, prior to the Effective Date shall be void and of no effect from and after the Effective Date. When the Managers so authorize, the signature of any such Person may be a facsimile.

Section 7.4.    <u>Financial Statements</u>. **[TO BE DISCUSSED]**

Section 7.5.    <u>Partnership Status and Tax Elections</u>.  It is the intent of the Members that the Company be a partnership for United States federal, state and local income tax purposes. The Members hereby agree not to elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar state statute and agree not to elect for the Company to be treated as a corporation, or an association taxable as a corporation, under the Code or any similar state statute.

Section 7.6.    <u>Company Tax Returns</u>.  **[TO BE DISCUSSED]**

Section 7.7.    <u>Tax Audits</u>. **[TO BE DISCUSSED]**

**ARTICLE VIII**
**MANAGEMENT**

Section 8.1.    <u>Managers</u>.

(a)     The Company is a "manager-managed" limited liability company within the meaning of the Act.  Except as otherwise provided in <u>Section 8.1(b)</u>, the powers of the Company shall be exercised by or under the authority of, and the business and  affairs of the Company shall be managed under the direction of, a board of managers (each a "***Manager***" and, collectively, the "***Board***"), which shall have the same role in the governance of the Company as a board of directors of a Delaware corporation, subject to the other terms, conditions and

ActiveUS 186356799v.13

limitations set forth in this Agreement, and which shall take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company set forth in <u>Section 2.3</u>. In addition, the Board may appoint Officers as specified in <u>Section 8.8</u> below.

(b)    The number of Managers constituting the Board shall initially be set at five (5) Managers.  No single Manager may bind the Company, and the Board shall have the power to act only collectively in the manner specified herein.  The Managers shall vote on matters presented to the Board as set forth in <u>Section 8.6</u>.

(c)    The Members agree to vote their respective Membership Interests to elect the following individuals to serve as Managers:

(i)    Three (3) persons designated by Nofar from time to time, which individuals shall initially be those set forth in <u>Exhibit E</u> (each such person, a "***Nofar Manager***"), and one of whom shall act as Chairperson of each meeting of the Board; and

(ii)    Barend Venter, who is hereby designated by BS1007 as the "***BS1007 Manager***", for so long as BS1007 or one of its Permitted Transferees is a Member; and

(iii)    Ran Bujanover, who is hereby designated by Yellow Tree as the "***Yellow Tree Manager***", for so long as Yellow Tree or one of its Permitted Transferees is a Member.

(d)    Without limitation of the foregoing, it is understood and acknowledged that the Board shall provide the following services to the Company:

(i)    review all applicable Laws containing or establishing compliance requirements in connection with the operation and maintenance of the Projects and applicable to the Company and assist the Company in securing and complying with, as appropriate, all permits, licenses and government authorizations and approvals necessary for the ownership, operation and maintenance of the Projects (and renewals and replacements of the same);

(ii)    maintain operating logs and reports documenting the performance of its obligations under this Agreement, all consistent with Prudent Industry Practices, including maintaining information reasonably necessary to verify any calculations made pursuant to this Agreement;

(iii)    deliver to the Company copies of any notices received by any of the Managers on the Company's behalf and provide information necessary for the Company to create reports required to be produced by the Company, and deliver any information related to any Project or the Company as any Member may reasonably request;

(iv)    maintain true, complete and accurate cost ledgers and accounting records for the Company in accordance with IFRS and GAAP applicable to the Projects and this Agreement and reflect the services provided and expenses paid or incurred by the Company pursuant to this Agreement or in connection with the Projects;

(v)     provide (or arrange for the provision of) such operating and maintenance and engineering consulting for the Projects as may be necessary or desirable from time to time in accordance with Prudent Industry Practices; and

(vi)     respond in a reasonably timely manner to written requests for information regarding the Projects from the Members to the extent such information is reasonably accessible to the Managers.

(e)     Each Manager covenants and agrees that it shall not, cause or permit the Company to do or take, or cause the Company to authorize or allow any Project Company to do or take, or consent to any Project Company or Project doing or taking, any of the following actions without obtaining prior Super-Majority Approval:

(i)     issue Membership Interests to any Person, or issue any equity interests in any Project Company to any Person (except that the issuance of equity interests in any Project Company to any tax equity investor shall require only Simple Majority Approval);

(ii)     make any loan, advance or capital contribution in any Person, except to the extent approved or authorized in the Budget Plan;

(iii)     amend the definition of "Permitted Investments" in this Agreement;

(iv)     initiate or consummate an initial public offering or make a public offering and sale of the Membership Interests or any other securities of the Company; or

(v)     engage in any business or activity other than that described in Section 2.3.

For purposes of this Agreement, "**_Super-Majority Approval_**" of an action to be taken by the Board means affirmative votes representing more than 66% of the total votes cast with respect to such action, including at least one of the BS1007 Manager or the Yellow Tree Manager, subject to Section 8.6(d) and Section 8.6(f); provided, however, that the affirmative vote of neither the BS1007 Manager nor the Yellow Tree Manager shall be required for any action of the Board during a period in which the aggregate Membership Interests of BS1007 and Yellow Tree are less than 16%, it being agreed that during any such period in which the aggregate Membership Interests of BS1007 and Yellow Tree are less than 16%, all references in this Agreement to "Super-Majority Approval" shall be deemed amended to "Simple Majority Approval" without any further action required by any party hereto.

(f)     Neither the Board nor any Manager nor any Officer shall have any authority to, and each Manager covenants and agrees that it shall not, cause or permit the Company to do or take, or cause the Company to authorize or allow any Project Company to do or take, or consent to any Project Company or Project doing or taking, any of the following actions without the prior written consent of all of the Members:

(i)     enter into or amend any agreement between the Company or any of the Project Companies, on the one hand, and any Member of the Company, any Manager or any Affiliate or Family Member of a Member or Manager, on the other hand (except that any borrowings under the Nofar Loan Agreement shall not require the approval of BS1007 or Yellow Tree, and any other financing contemplated by Section 4.1(a) shall only require the approvals set forth in such Section);

(ii)    dissolve, wind-up or liquidate the Company or any of the Project Companies or initiate a Bankruptcy proceeding involving the Company or any of the Project Companies;

(iii)   amend the Articles in a manner that would disproportionately adversely affect any Member relative to any other Member.

(g)     Without derogating from any employment agreement between the Company and each of Barend and Bujanover, and without derogating from Section 3.4(a) above, each Manager shall devote all such time, effort and skill to the Company's and BSUH's business affairs as is necessary and proper to promote the Company's and BSUH's welfare and success in accordance with Prudent Industry Practice.  Without limiting the foregoing, the Members expressly acknowledge and agree that each Nofar Manager (and Barend and Bujanover, if and when either such individual is no longer an employee of the Company or BSUH) has or may have other business activities and may engage in other business activities for his or her own account and for the accounts of others, and such Nofar Manager (and Barend and Bujanover, if and when either such individual is no longer an employee of the Company or BSUH) shall not be bound to devote all of his or her business time to the affairs of the Company and BSUH; provided that each Manager acknowledges and agrees that prompt attention to such Manager's obligations under this Agreement, including, without limitation, such Manager's obligations under Section 8.1(e) and Section 8.5, shall be necessary and proper to promote the Company's and BSUH's welfare and success in accordance with Prudent Industry Practice; and provided, further, that the foregoing shall not supersede or in any way affect such Person's other obligations under this Agreement, including under Section 3.4.

(h)     Notwithstanding any duty otherwise existing at law or in equity, each Manager shall act in good faith and in the best interests of the Company at all times and in accordance with the covenants and agreements made in this Agreement; provided, however, that the Nofar Managers shall not be required to prefer the business or properties of the Company over the business or properties of any other entity in which any such Manager or any of his or her Affiliates may have an interest; provided further, however, that the Nofar Managers shall nevertheless comply with their obligations under Section 8.6(f); and provided further, that the Managers shall cause the Company to use its reasonable efforts (for a reasonable period of time) to cure any default by the Company under any agreement to which the Company is a party, including an Event of Default (as defined in the Nofar Loan Agreement) under the Nofar Loan Agreement, or to avoid any imminent such default or Event of Default by the Company (it being agreed that the foregoing shall not limit or affect any of the lender's rights under the Nofar Loan Agreement, or any of Nofar's rights under any other agreement between Nofar and the Company).  In carrying out his or her duties hereunder, except as otherwise provided in this

Agreement, no Manager shall be liable to the Company or to any Member for such Manager's good faith actions or omissions (including actions taken or omitted to be taken in good faith in accordance with the consent of the appropriate parties) or for any errors of judgment, in each case to the extent believed in good faith by such Manager to be within the scope of authority conferred by this Agreement, but nothing herein shall relieve a Manager for any liability for fraud or a reckless or intentional violation of Law in the performance of such Manager's duties under this Agreement.

(i)     Except as otherwise provided in this Agreement:

(i)     each of the Members and each Manager shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any other Person who is a Member, Manager or any Officer or employee of the Company, or by any other individual as to matters the Members or the Managers reasonably believe are within such other individual's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distribution to the Members might properly be paid;

(ii)    the Managers shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent or other paper or document, but each Manager, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit; and

(iii)   the Managers shall not be required to take any action hereunder, nor shall any other provision of this Agreement be deemed to impose a duty on any Manager to take any action, if the Managers shall reasonably determine, or shall have been advised by counsel, that such action is contrary to any applicable Law or this Agreement.

Section 8.2.    Board Committees.    The Board may establish such committees as the Board shall approve, and each such committee shall have the authority as the Board shall so determine from time to time. The number and composition of each committee of the Board shall be determined from time to time by the Board; *provided*, that, each of the Members shall have the right to appoint a number of Managers to any committee directly proportionate to the composition of the Board.

Section 8.3.    No Compensation of the Managers.    During the period serving as Manager, the Company will reimburse each Manager on a timely basis for reasonable and appropriately incurred out-of-pocket expenses incurred on behalf of the Company, including without limitation amounts paid to third-party non-Affiliate consultants and contractors engaged to perform services on behalf of the Company as permitted hereunder.    Except for any compensation payable to a Manager pursuant to any other agreement between the Company and such Manager, the Managers shall not be entitled to any other compensation in respect of their service to the Company as Managers.

Section 8.4.    Removal or Resignation of the Managers.

(a)    A Manager may only be removed by the Member that designated such Manager, except that (i) subject to subclause (ii), for so long as Yellow Tree and BS1007 are Members, Yellow Tree shall not remove Ran Bujanover as its appointed Manager and BS1007 shall not remove Barend as its appointed Manager, unless such Person becomes unable to fulfill his duties as a Manager, in which case the respective Member shall appoint a replacement Manager reasonably acceptable to Nofar, and (ii) a Manager may otherwise be removed by the remainder of the Board for "cause"; provided, however, that, upon the removal of a Manager, only the Member that appointed the removed Manager shall be entitled to appoint such Manager's replacement, which, in the case of replacement of the BS1007 Manager or Yellow Tree Manager, shall be subject to the reasonable approval of Nofar. For purposes of this Section 8.4, "cause" means (a) reckless or intentional violation of Law or fraud by the Manager in the performance of its duties and obligations under this Agreement; (b) violation of any applicable Law caused by the Manager's dereliction of its duty which violation is reasonably expected to have a material adverse effect on the Company, including any environmental Law, if such violation is not remedied within thirty (30) days of notice; provided, that if such violation is not capable of being remedied within such time period, such violation is not remedied within a reasonable period of time (having due regard for the circumstances of the violation); (c) breach of any material provision of this Agreement caused by the Manager's dereliction of its duty that is not cured within thirty (30) days of notice; provided, that if such breach is not capable of being cured within such time period such breach is not cured within a reasonable period of time (having due regard to the circumstances of the breach); (d) the Bankruptcy or dissolution of a Manager; or (e) any action or omission by a Manager that would cause the Company to be in violation of any applicable Law.

(b)    A Manager may resign at any time from the Board by delivering a written resignation to the Board. Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make it effective. A resignation of a Manager shall constitute "removal" of such Manager for purposes of Section 8.4(a) and, upon the resignation of a Manager (except for any such resignation following an event that constitutes "cause" as described above), or if there shall be a vacancy on the Board as a result of the death of a Manager, a new Manager shall be selected by the Member who appointed or was deemed to have appointed the former Manager under Section 8.1(c) above, subject to Section 8.4(a). Notwithstanding the foregoing, if at any time a Member that appointed a Manager under Section 8.1(c) no longer holds a Membership Interest, the remaining Members shall, as soon as reasonably practicable, determine whether to (i) affirm the Manager appointed by such former Member or (ii) remove and replace such Manager by naming a successor Manager mutually agreeable to such remaining Members. If such a successor Manager is selected, the former Manager will resign and assign its rights as Manager to such successor Manager and shall have no further rights or obligations under this Agreement, except with respect to actions taken or failed to have been taken prior to such resignation and except that the provisions of Sections 11.1 (Notices), 11.5 (Severability), 11.7 (Entire Agreement), 11.8 (Public Statements), 11.9 (Governing Law), 11.11 (Counterparts) and 11.12 (Confidentiality) shall survive such resignation.

DocuSign Envelope ID: BDEAEE06-9822-4CB5-9466-364533A42A1F

Section 8.5.    Signing Authority; Third Party Reliance.  Any document or instrument to be executed and delivered by or on behalf of the Company shall require the signature of a Nofar Manager, on the one hand, and a BS1007 Manager or Yellow Tree Manager, on the other hand; provided, however, that the Board may from time to time, by Simple Majority Approval, modify the foregoing signatory rights in the Company.  Third parties dealing with the Company shall be entitled to rely conclusively on the power and authority of the Managers so to execute such documents and instruments.  No third Person dealing with the Company shall be required to ascertain whether any Manager is acting in accordance with the provisions of this Agreement.  All third Persons may rely on a document executed by the Managers as set forth herein as binding on the Company.

Section 8.6.    Meetings of the Board; Voting.

(a)    The Board shall meet at such time and at such place as the Board may designate, *provided* that such meetings shall occur no less than once per calendar quarter. Managers may participate in a meeting of the Board at the offices of the Company or such other place as may be determined from time to time by the Board or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to speak and to hear each other, and such participation in a meeting shall constitute presence in person at such meeting. Upon the request of any Manager, any meeting of the Managers pursuant to this Section 8.6 may be held virtually via conference call or video conferencing.  Written notice of each meeting (which may be delivered electronically) of the Board shall be given to each Manager at least five (5) Business Days prior to each such meeting.

(b)    Any Manager then in office may call a special meeting of the Board upon at least ten (10) days' written notice (such notice shall state the purpose or purposes for which such meeting is being called) if the meeting is to be held in person or five (5) Business Days' written notice if the meeting is to be held by telephone communications, video conference or other communication device.  Notwithstanding the foregoing, Managers may participate in a special meeting of the Board at the offices of the Company or such other place as may be determined from time to time by the Board by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to speak and to hear each other, and such participation in a meeting shall constitute presence in person at such meeting. Any Manager may waive such notice as to himself, including by being present at a meeting (unless such presence is solely to dispute that proper notice was given).

(c)    Each Manager voting on an action to be taken by the Company, whether at a meeting of the Board or by written consent, shall be able to cast a number of votes equal to the Percentage Interest of the Member that appointed such Manager (but, for purposes of clarity, the maximum amount of votes that can collectively be cast by all of the Managers appointed by a Member shall not exceed the Percentage Interest of such Member).  A Manager shall only be entitled to cast votes if such Manager is present at a meeting of the Board or is executing a written consent of the Board in lieu of a meeting, as the case may be.

(d)    The presence of Managers at a meeting of the Board representing a majority of the then-outstanding Percentage Interests shall constitute a quorum for the conduct of

{10764887.2}                                  - 36 -

DocuSign Envelope ID: BDEAEE06-9822-4CB5-9466-364533A42A1F

business at such meeting; provided that a Nofar Manager, on the one hand, and the BS1007 Manager or the Yellow Tree Manager, on the other hand, must be present at each meeting of the Board for a quorum to exist at such meeting.  If a quorum is not present due to the absence of the BS1007 Manager and the Yellow Tree Manager, then the meeting of the Board shall be adjourned to a time and date not more than ten (10) days following the originally scheduled meeting in accordance with the terms of <u>Section 8.6(a)</u> and <u>Section 8.6(b)</u>, at which meeting the presence of the BS1007 Manager and the Yellow Tree Manager shall not be required to constitute a quorum, provided that the requirements of <u>Section 8.6(a)</u> and <u>Section 8.6(b)</u> have been met.  Unless otherwise set forth in this Agreement, any action to be taken by the Company for which the approval of the Board is required or permitted shall require Simple Majority Approval.

(e)     Managers may vote at a meeting of the Board or any committee thereof either in person or by proxy executed in writing (which, for the avoidance of doubt, may be given by Electronic Transmission) by such Manager. Proxies for use at any meeting of the Board or any committee thereof or in connection with the taking of any action by written consent shall be filed with the Board, before or at the time of the meeting or execution of the written consent as the case may be. No proxy shall be valid after eleven months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and that the proxy is coupled with an interest.

(f)     Unless otherwise restricted by this Agreement, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if Managers representing the required vote with respect to such action vote in favor of such action by written consent, which written consent shall be circulated to all of the Managers at least ten (10) Business Days prior to the taking of such action.  The BS1007 Manager and Yellow Tree Manager each agrees to respond to any written request for consent hereunder within five (5) Business Days after delivery of such request for consent.  If either such Manager does not respond within such five (5)-Business Day period, a second written request shall be sent to such non-responding Manager.  If the BS1007 Manager or Yellow Tree Manager, as the case may be, fails to provide a response within five (5) Business Days after delivery of such second written request for consent, such non-responding Manager will be deemed to have consented to the applicable action.  The Managers agree that if the applicable action must be taken promptly, the time periods set forth herein will be reduced to the maximum amount of Business Days practicable.

Section 8.7.   <u>Certain Standards</u>.

(a)     The Members and Managers shall perform their obligations (and shall cause their respective Affiliates to perform their respective obligations) under this Agreement in accordance with applicable Laws and shall promptly notify the Company and the other Members in writing of any failure thereof.

(b)     Without limiting the duty of the Members and the Managers to act in good faith and in a commercially reasonable manner, and except as expressly provided otherwise in this Agreement, the Members recognize and agree that if a Member or a Manager appointed by

{10764887.2}                                            - 37 -

such Member takes any action or fails to take any action (which action or failure to act is not in breach of a specific provision of this Agreement) pursuant to the terms of this Agreement, including a failure to provide discretionary capital or loans pursuant to this Agreement or otherwise, even if such action or inaction is motivated solely by what such Member perceives to be in its own best interest or such Manager perceives to be in the best interest of the designating Member and not necessarily in the best interest of the other Members or of the Company, such Member's or such Manager's taking or failing to take such action shall not in and of itself be deemed a breach of any of its duties or obligations, including without limitation, fiduciary duties, if any, owed to the other Members or to the Company.

(c)     Notwithstanding anything that is or may appear to be to the contrary in applicable Law or contained in this Agreement, the Members recognize and agree that from time to time any Member or Manager appointed by such Member has the right to refuse to consent to or approve any act or decision to be made by the Company:

(i)     even if such refusal prevents the Company from pursuing its stated purpose;

(ii)     whether or not such refusal to consent or approve is motivated by what such Member perceives to be in its own best interest or such Manager perceives to be in the best interest of the appointing Member and not necessarily in the best interest of the other Members or of the Company; and

(iii)     such refusal shall not be deemed to be a breach of such Member's or such Manager's duties or obligations, including fiduciary duties, owed to the other Members or to the Company, except in each case for breaches of duties to act in good faith.

Section 8.8.    Officers.   The Board may, from time to time as they deem advisable and by Simple Majority Approval, appoint, remove or change officers of the Company (the "**Officers**") and assign, in writing, titles (including CEO, President, Vice President, Secretary and Treasurer) and authority to each such person.  Unless the Board decides otherwise by Simple Majority Approval, if the title assigned to an Officer is one commonly used for officers of a business corporation formed under the Act, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.  Upon the Effective Date, the Managers hereby appoint the Officers as listed in Exhibit E. Subject to any delegation made to an Officer pursuant to a written employment agreement between the Company and such Officer (but subject to any termination or amendment to such agreement in accordance with its terms), any delegation pursuant to this Section 8.8 may be amended or revoked at any time by Simple Majority Approval;  in such event, the Managers will update Exhibit E accordingly.  Except as otherwise provided in this Section 8.6, all Officers shall serve at the discretion of and subject to the direction of the Board.

Section 8.9.    Contracts with Affiliates.   Subject to Section 8.1(e)(i), the Company may enter into contracts and agreements with any Member, any Manager, or any Affiliate or Family Member of any Member or Manager (other than the Company) for the rendering of services, the sale or lease of any product or other property, or any other transaction necessary or appropriate

ActiveUS 186356799v.13

for the operation of the Company's business consistent with its purposes stated herein (each, a "**Related Party Agreement**")  The Member or Manager that is a party (or whose Family Member or Affiliate is a party) to such Related Party Agreement shall inform the other Members, in writing, of any negotiations between the Company or any of its Affiliates, on the one hand, and such Member, Manager, Affiliate or Family Member of such Member or Manager, on the other hand, and must provide, ina timely manner, any information reasonably requested by the other Members regarding said negotiations and transaction terms.  Exhibit D lists all current Related Party Agreements.  The Managers will update Exhibit D promptly following the execution of any additional Related Party Agreements.

Section 8.10.  Insurance.  The Company shall, and shall cause the Projects to, acquire and maintain (including making changes to coverage and carriers) such casualty, general liability (including product liability), property damage and other types of insurance with respect to the Project and/or the operations of the Company, as is required by all contracts to which the Company and/or the Projects are party to, and such additional insurance as may otherwise be determined by the Managers to be necessary or advisable from time to time.

Section 8.11.  Duties; Indemnification.

(a)    No Member or Manager shall have any duty to the Company or any Member except as expressly set forth in this Agreement or as required by applicable Law.  A Member or Manager acting under this Agreement shall not be liable to the Company or to any Member or other Person bound by this Agreement for its good faith reliance on the provisions of this Agreement or for any act or omission performed or omitted in good faith on behalf of the Company (and in a manner reasonably believed to be within the scope of such Person's authority hereunder), except in the case of reckless or intentional violation of Law or fraud by such Person, or a breach of such Person's obligations under this Agreement.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Manager or Member otherwise existing at law or in equity to the Company or its Members or Manager, are agreed by the Company, the Managers and the Members to replace such other duties and liabilities of such Manager or Member.

(b)    To the fullest extent permitted by applicable Law, each Member, Manager, Officer, Partnership Representative and their respective Affiliates, officer, directors, managers, employees and agents shall  be entitled to indemnification from the Company for any Claims incurred by such Person by reason of any act or omission performed or omitted by such Person in performing its duties hereunder or relating to the Company's activities or business, in each case, subject to and in accordance with the terms of this Agreement, provided that: (i) any such act or omission was undertaken in good faith on behalf of the Company and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company; (ii) any such act or omission was reasonably believed to be within the scope of authority conferred on such Person by this Agreement; (iii) any such act or omission was not in willful breach of this Agreement and (iv) with respect to any criminal action or proceeding, such Person had no reasonable cause to believe his action or omission was unlawful, except that no Person shall be entitled to be indemnified in respect of any damages or loss incurred by such Person by reason of fraud or reckless or intentional violation of Law in the performance of its duties under this

DocuSign Envelope ID: BDEAEE06-9822-4CB5-9466-364533A42A1F

Agreement; provided, however, that any indemnity under this Section 8.11(b) shall be provided out of and to the extent of Company assets only (including the proceeds of any insurance policy), and no Member shall have any personal liability on account thereof, including without limitation, any obligation to contribute money or other property to the Company.

(c)     Except in instances of a reckless or intentional violation of Law or fraud by any Manager or any Member or in the case of any breach by any Member or Manager of this Agreement or any other agreement between such Member or Manager and the Company, neither the Managers nor any Member shall be liable to the Company or to another Member for any lost profits or any special, incidental, exemplary, indirect or consequential damages of any nature, whether arising under contract, tort (including negligence), strict liability or otherwise.

Section 8.12.   Tax Credit Matters.

Notwithstanding any provision of this Agreement to the contrary, the Managers shall not, and shall cause each of its Affiliates not to, cause or permit the Company or any Person acting on behalf of the Company to take any action that would result in, or refrain, and shall cause each of its Affiliates to refrain, from taking any action reasonably within its control that is necessary to prevent, all or any portion of the Project failing to qualify for Tax Credits.

Section 8.13.   Budget Plan.

(a)     The budget and business plan of the Company, as it exists on the Effective Date for the remainder of Fiscal Year 2021 and as modified thereafter in accordance with Section 8.13(b) (in all such cases, the "**Budget Plan**"), is attached hereto as Exhibit C.   The Budget Plan shall set forth separate budgets for (i) the overhead of the Company and (ii) the Projects, and in each case shall include detailed capital and operating expense budgets, cash flow projections and profit and loss projections.

(b)     At least thirty (30) days before the end of each Fiscal Year, the CEO shall prepare and deliver to the Company and each Member a revised Budget Plan for the upcoming Fiscal Year in accordance with Section 11.1.   The Budget Plan shall be subject to Simple Majority Approval; provided, however, that with respect to the portion of each Budget Plan relating to the Projects: (i) any proposed deviation from a Budget Plan presented by the CEO that would involve a reduction in the aggregate amount of megawatts to be developed as Projects in such fiscal year will require Super-Majority Approval; and (ii) any proposed Projects contained in a Budget Plan that conform to the terms, conditions and covenants contained in the Nofar Loan Agreement shall be deemed approved without requiring Simple Majority Approval.   If a Budget Plan for any Fiscal Year is not adopted by Simple Majority Approval, then the Budget Plan then in effect shall continue to be the Budget Plan for the upcoming Fiscal Year and the Board shall continue to operate the Company in accordance with the Budget Plan then in effect until a revised Budget Plan is approved by Simple Majority Approval.

(c)     From time to time a Member or Manager may present to the Board one or more proposals for capital upgrades or other ideas to improve the performance and operational efficiency and reliability of any Project that are outside of the Budget Plan (each, a "**Proposal**").

{10764887.2}

- 40 -

The Board will review all Proposals in good faith and will consider their potential impact on the Distributable Cash of the Company, and the implementation of any Proposal will be subject to Simple Majority Approval.  If such approval is obtained, the Managers will update the Budget Plan accordingly.

(d)    If at the end of any Fiscal Year, the aggregate amount of megawatts produced by the Projects is less than 50% of the amount set forth in the Budget Plan for such Fiscal year, all references in Section 8.1(e)(i), Section 8.1(e)(ii) and Section 8.13(b) to "Super Majority Approval" shall thereafter be deemed amended to "Simple Majority Approval" without any further action required by any party hereto.

Section 8.14.    Company Counsel.  The Board shall cause the Company to engage a U.S.-based law firm with attorneys licensed in the United States for all commercial transactions concerning Projects located in the United States.  The Company's preferred counsel for such purposes is Garrett Stiepel Ryder LLP.

### ARTICLE IX
### TRANSFERS

Section 9.1.    Transfers Generally Prohibited.

(a)    Until the earlier of (a) the fifth anniversary of the Effective Date and (b) the date that the Company and the Project Companies have collectively placed Projects in service that generate 100 megawatts of power in the aggregate, neither BS1007 nor Yellow Tree shall sell, transfer, assign, convey, pledge, mortgage, encumber, hypothecate or otherwise dispose of (each, a "*Transfer*") all or any part of its Membership Interests or any interest, rights or obligations with respect thereto, whether directly or indirectly by the Transfer by Bujanover or Barend of direct or indirect ownership interests in the applicable Member, in each case except as provided in this Article IX.   Any attempted Transfer by BS1007 or Yellow Tree (or by Bujanover or Barend, as the case may be), other than in strict accordance with this Article IX, shall be null and void, *ab* initio, and the purported transferee shall have no rights as a Member or otherwise in or to the Membership Interest.

(b)    Any Disposition or other Transfer, including by consolidation, merger, or reorganization, of any of the equity interests of BS1007 or Yellow Tree shall constitute a "Transfer" for purposes of this Article IX.   In addition, all Capital Events shall constitute "Transfers" for purposes of this Article IX.

Section 9.2.    Certain Permitted Transfers.  Notwithstanding the general restriction on Transfers under Section 9.1(a), BS1007 and Yellow Tree shall be entitled to Transfer their respective Membership Interests as follows, in each case subject to the other terms and conditions of this Agreement, including Section 9.3:

(a)    with Simple Majority Approval of the Board;

(b)     to a Permitted Transferee (provided, however, that such Permitted Transferee shall not be permitted to further Transfer such Membership Interests except in accordance with Section 9.2(a) or Section 9.2(c));

(c)     in accordance with Section 9.4, Section 9.5 or Section 9.6.

Section 9.3.     Conditions to Transfers and Admission as Members.  A Transfer shall only be permitted hereunder, and a transferee of all or part of a Membership Interest pursuant to a Transfer made in accordance with this Agreement, whether by assignment or by operation of law, shall only be admitted to the Company as a substitute or additional Member, upon satisfaction of the requirements in Section 9.1 and the following, in each case as determined by (or waived by) the Board by Simple Majority Approval:

(a)     the Transferring Member and the prospective transferee each execute, acknowledge and deliver to the Company instruments of Transfer and assignment with respect to such Transfer and such other instruments as are reasonably necessary and satisfactory in form and substance to the Board to effect such Transfer and to confirm the Transferring Member's intention that the transferee become a Member in its place in respect of the Membership Interests Transferred;

(b)     the transferee executes, adopts and acknowledges this Agreement (or a joinder hereto or, with respect to any Member acquiring additional interests, a confirmation that such additional interests continue to be bound by this Agreement), and executes such other agreements as the Board may reasonably deem necessary or appropriate to confirm the undertaking of the transferee to be bound by the terms of this Agreement and to assume the obligations of Member under this Agreement in respect of the Transferred Membership Interests;

(c)     confirmation that the Transfer will not violate any applicable securities Laws or any other applicable federal or state Laws or the order of any court having jurisdiction over the Company or any of its assets;

(d)     confirmation that the Transfer will not cause the Company to be classified as a corporation or publicly traded partnership for tax purposes;

(e)     confirmation that the Transfer will not result in any Project ceasing to be a Qualifying Facility eligible for the QF Exemption;

(f)     confirmation that the Transfer does not require the Company to register as an "investment company" under the Investment Company Act of 1940, as amended;

(g)     confirmation that the Transfer will not result in a Recapture Event, unless the transferor has agreed in writing to indemnify the other Members against any adverse effects in a manner acceptable to the other Members;

(h)     the Company shall have received (i) either a copy of a nonforeign affidavit provided to the transferee by the transferor in accordance with Code Section 1446(f)(2) or evidence that any tax required to be deducted and withheld pursuant to Code Section 1446(f)(1)

ActiveUS 186356799v.13

has been so deducted and withheld and properly remitted, and (ii) any other tax forms reasonably requested by the Company; and

(i)    confirmation that the Transfer will not cause all or part of the assets of the Company to be "tax-exempt use property" within the meaning of Section 168(h) of the Code or to be subject to the alternative depreciation system under Section 168(g) of the Code.

Section 9.4.    <u>Right to Compel Participation in Certain Transfers</u>.

(a)    If Nofar proposes, in any transaction or series of related transactions, to Transfer all of its Membership Interests in the Company to a bona fide third party that is not an Affiliate or Permitted Transferee (a "***Third Party***") (a "***Proposed Transfer***"), Nofar may, at its option, require either of BS1007 and/or Yellow Tree to Transfer all of the Membership Interests owned or held by them to such third party for the same consideration per Membership Interest, and otherwise on the same terms and conditions, as the Proposed Transfer.  For the avoidance of doubt, this <u>Section 9.4</u> shall not apply to transfers by Nofar of its Membership Interests to an Affiliate.

(b)    Nofar shall provide a written notice (a "***Transfer Notice***") of such Proposed Transfer as promptly as practicable after commencing negotiations regarding such Proposed Transfer.  The Transfer Notice shall set forth all of the material terms and conditions of the Proposed Transfer, including the purchase price per Membership Interest (the "***Transfer Price***") to be Transferred, and notification from Nofar that it is exercising its rights under this <u>Section 9.4</u> with respect to the Proposed Transfer.  Within five days after Nofar's delivery of the Transfer Notice, each other Member shall deliver to Nofar (A) the certificate or certificates evidencing all the Membership Interests owned or held by such Member, if any, duly endorsed in blank or accompanied by written instruments of transfer in form satisfactory to Nofar, executed by such Member, and (B) a special irrevocable power-of-attorney authorizing Nofar, on behalf of such Member, to Transfer all such Membership Interests pursuant to the terms of the Proposed Transfer and to take all such actions as shall be necessary or appropriate in order to consummate such sale or disposition, including executing any document or instrument in connection with the Proposed Transfer on behalf of such Member.  From time to time thereafter, as and when required in connection with the Proposed Transfer, each other Member shall deliver to Nofar such other documents and instruments required to be delivered in connection with the Proposed Transfer, duly executed by such Member to the extent applicable.

(c)    Promptly after the consummation of the Proposed Transfer, Nofar shall notify each other Member of such consummation and shall remit to each other Member the total consideration to which such Member is entitled in connection with the Proposed Transfer, less a prorated portion of the expenses (including legal expenses) incurred by Nofar and the Company in connection with the Proposed Transfer.  In connection with a Proposed Transfer, Nofar may, but shall not be obligated to, Transfer all of its right, title and interest in and to the Nofar Loan Agreement.

(d)    If at any time Nofar abandons the Proposed Transfer, then Nofar shall return to each other Member all certificates evidencing Membership Interests that such Member

ActiveUS 186356799v.13

delivered to Nofar pursuant to <u>Section 9.4(b)</u> and all powers of attorney granted by such other Members to Nofar shall terminate and be of no further force or effect.

(e)    Anything herein to the contrary notwithstanding, Nofar shall have no obligation to any other Member to sell or otherwise dispose of any Membership Interests pursuant to this <u>Section 9.4</u> or as a result of any decision by Nofar not to accept or consummate any Proposed Transfer with respect to its Membership Interests, it being understood that any and all such decisions shall be made by Nofar in its sole and individual discretion.  None of the other Members shall be entitled to offer any Membership Interests directly to any Third Party in connection with a Proposed Transfer, it being understood that all such Transfers shall be made only on the terms and pursuant to the procedures set forth in this <u>Section 9.4</u>.  Nothing in this <u>Section 9.4</u> shall affect any of the obligations of any of the Members under any other provision of this Agreement.

Section 9.5.    <u>Tag-Along Right</u>.

(a)    With respect to any Proposed Transfer, BS1007 and/or Yellow Tree may, at its option, participate in the Proposed Transfer by Transferring all of the Membership Interests owned or held by them to such third party for the same consideration per Membership Interest, and otherwise on the same terms and conditions, as the Proposed Transfer.  For the avoidance of doubt, this <u>Section 9.5</u> shall not apply to transfers by Nofar of its Membership Interests to an Affiliate.

(b)    Nofar shall provide a Transfer Notice as promptly as practicable after commencing negotiations regarding such Proposed Transfer.  The Transfer Notice shall set forth all of the material terms and conditions of the Proposed Transfer, including the Transfer Price, to be Transferred.  Within twenty (20) days after Nofar's delivery of the Transfer Notice, each other Member shall deliver to Nofar written notice indicating whether such Member desires to exercise its right to participate in the Proposed Transfer pursuant to <u>Section 9.5(a)</u>. If a Member does elect to participate in the Proposed Transfer, such Member shall also deliver to Nofar a special irrevocable power-of-attorney authorizing Nofar, on behalf of such Member, to Transfer all such Membership Interests pursuant to the terms of the Proposed Transfer and to take all such actions as shall be necessary or appropriate in order to consummate such sale or disposition, including executing any document or instrument in connection with the Proposed Transfer on behalf of such Member.  From time to time thereafter, as and when required in connection with the Proposed Transfer, each other Member shall deliver to Nofar such other documents and instruments required to be delivered in connection with the Proposed Transfer, duly executed by such Member to the extent applicable.

(c)    Promptly after the consummation of the Proposed Transfer, Nofar shall notify each other Member of such consummation and shall remit to each other Member the total consideration to which such Member is entitled in connection with the Proposed Transfer, less a prorated portion of the expenses (including legal expenses) incurred by Nofar and the Company in connection with the Proposed Transfer.

ActiveUS 186356799v.13

(d)     Anything herein to the contrary notwithstanding, Nofar shall have no obligation to any other Member to sell or otherwise dispose of any Membership Interests pursuant to this <u>Section 9.5</u> or as a result of any decision by Nofar not to accept or consummate any Proposed Transfer with respect to its Membership Interests, it being understood that any and all such decisions shall be made by Nofar in its sole and individual discretion.

Section 9.6.    <u>Right of First Refusal</u>.

(a)     Subject to <u>Section 9.1(a)</u>, if BS1007 or Yellow Tree receives a binding offer (the "***Purchase Offer***") to validly Transfer all or a portion of such Member's Membership Interests (the "***Offered Interests***") to a Third Party, then such Member (the "***Transferring Member***") shall deliver written notice to Nofar regarding such Purchase Offer, which notice shall include a copy of the Purchase Offer.

(b)     Nofar shall have twenty (20) days to submit to the Transferring Member an offer to purchase all or any portion of the Offered Interests on the same terms and conditions per Membership Interests as are set forth in the Purchase Offer.  In such event, the parties shall consummate such purchase and sale as promptly as practicable thereafter, at which time Nofar shall deliver to the Transferring Member the consideration payable in respect of the Offered Interests being acquired and the Transferring Member shall deliver to Nofar certificates representing such Offered Interests, if any, and any other documents and instruments reasonably requested by Nofar in connection with such purchase and sale.

(c)     If Nofar elects not to purchase all of the Offered Interests, then, at any time prior to the 60th Business Day following the date of the Transferring Member's initial written notice to Nofar, the Transferring Member may sale the remaining portion of the Offered Interests to the Third Party on the same terms and conditions as are contained in the Purchase Offer.

(d)     If the Transferring Member has not Transferred all of the Offered Interests by the end of the 60-Business Day period set forth in subclause (c), then the Transferring Member shall not Transfer any remaining Offered Units unless it shall have re-offered them to Nofar in accordance with this <u>Section 9.5</u>.  Any transferee of the Offered Interests shall be bound by and subject to the terms and conditions of this Agreement applicable to the Transferring Member.

(e)     All offers made by Nofar shall be subject to the Transferring Member delivering the Offered Interest free from all encumbrances (other than encumbrances created by this Agreement) and together with all rights attaching to them.

# ARTICLE X
## DISSOLUTION AND WINDING-UP

Section 10.1.  <u>Events of Dissolution</u>. The Company shall be dissolved and its affairs shall be wound up upon the first to occur of any of the following:

(a)    the unanimous written consent of the Members to dissolve and terminate the Company;

(b)    the entry of a decree of judicial dissolution under the Act; or

(c)    at any time there are no members of the Company unless the Company is continued in accordance with the Act.

Section 10.2.  <u>Distribution of Assets</u>.  Upon the occurrence of one of the events set forth in <u>Section 10.1</u> (a "***Liquidation***"), Nofar shall select and appoint a liquidator (the "***Liquidator***"), and the Liquidator shall proceed diligently to wind-up the affairs of the Company and shall make final distributions as provided herein and in the Act by the later of the end of the Company Taxable year in whichsuch event occurs or ninety (90) days after such event.  The Liquidator shall sell any and all Company property, including to Members.  The Liquidator shall first pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including Member Loans and all expenses incurred in Liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent, conditional or unmatured liabilities in such amount and for such term as the liquidators may reasonably determine) in the order of priority as provided by Law.  Items of income and gain for the taxable year in which the Liquidation occurs shall first be allocated to the Members such that, to the extent possible, each Member's Capital Account is in the ratio of their respective Percentage Interests.

Section 10.3.  <u>Distributions upon Liquidation or Capital Event</u>.  Upon any Liquidation, the balance of the assets of the Company in Liquidation, or the proceeds of such Capital Event, as applicable, shall be distributed to the Members in accordance with <u>Section 6.1</u>.  "***Capital Event***" means (1) any consolidation, reorganization, membership interest exchange, sale of membership interests or merger of the Company with or into any other company or other entity or person, or any other corporate reorganization, in which the equity owners of the Company immediately prior to such transaction, own less than fifty percent (50%) of the voting power of the surviving entity (or if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger, stock exchange, or reorganization; or (2) any other transaction or series of related transactions to which the Company is/are a party in which in excess of fifty percent (50%) of the Company's voting power is transferred to one or more third parties or (3) or a sale, lease or other disposition of all or substantially all of the assets of the Company.  The distribution of cash and/or property to a Member in accordance with the provisions of this <u>Section 10.3</u> constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member on its Membership Interest in the Company of all the Company's property and constitutes a compromise to which all Members have consented within the meaning of the Act.

Section 10.4.  <u>Negative Capital Accounts</u>.  If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company are insufficient to return the positive Capital Account balance (if any) of each Member, such Member shall have no recourse against the Company or any other Member.

ActiveUS 186356799v.13

Section 10.5. <u>De-Commissioning of the Projects</u>.  Any obligations for the de-commissioning of any Project will be the obligations of the Company, and the Members shall have no responsibility or liability relating thereto.

Section 10.6. <u>In-Kind Distributions</u>.  There shall be no distribution of assets of the Company in kind without the prior written consent of all of the Members.

Section 10.7. <u>Certificate of Cancellation</u>.

(a)    When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, a Certificate of Cancellation (the "***Certificate of Cancellation***") shall be executed and filed by the liquidators with the Secretary of State of the State of California, which certificate shall set forth the information required by the Act.

(b)    Upon the filing of the Certificate of Cancellation, the existence of the Company shall cease.

# ARTICLE XI
## MISCELLANEOUS

Section 11.1. <u>Notices</u>.  Unless otherwise provided herein, any offer, acceptance, election, approval, consent, certification, request, waiver, notice or other communication required or permitted to be given under this Agreement (collectively referred to as a "***Notice***"), shall be in writing and deemed delivered (a) upon receipt, if delivered in person, (b) three Business Days after delivery by registered or certified mail with postage prepaid and return receipt requested, (c) the next Business Day if transmitted by recognized overnight courier service with charges prepaid, or (d) upon delivery by facsimile or email transmission, if transmitted prior to 5:00 p.m. recipient's local time on a Business Day, otherwise the following Business Day, in each case directed to the intended recipient at the address of such Member set forth in <u>Exhibit A(2)</u>, or at such other address as any Member hereafter may designate to the others in accordance with a Notice under this <u>Section 11.1</u>.

Section 11.2. <u>Amendments</u>.

(a)    Except as otherwise provided in this <u>Section 11.2</u>, this Agreement may not be modified or amended in a manner that disproportionately adversely affects any Member relative to the other Members without the prior written consent of such disproportionately affected Member.  The consent to and execution of any such written instrument shall not be unreasonably withheld or delayed by the applicable Member.

(b)    Notwithstanding <u>Section 11.2(a)</u>, a Manager may amend <u>Exhibit A(2)</u> to reflect the following transactions occurring during the applicable time period: a resignation or withdrawal of a Member from the Company in accordance with the terms of this Agreement, a Transfer of a Membership Interest in accordance with the terms of this Agreement, the admission of a new Member in accordance with the terms of this Agreement, or a change in the Percentage

ActiveUS 186356799v.13

Interest resulting from any of the foregoing events.  The Manager making such amendments will give the Members prompt notice thereof.  Any reference in this Agreement to <u>Exhibit A(2)</u> shall be deemed to be a reference to <u>Exhibit A(2)</u> as amended and in effect from time to time.

(c)    Notwithstanding <u>Section 11.2(a)</u>, a Manager may amend <u>Exhibit E</u> to the extent required by this Agreement.  The Manager making such amendments will give the Members prompt notice thereof.  Any reference in this Agreement to <u>Exhibit E</u> shallbe deemed to be a reference to <u>Exhibit E</u> as amended and in effect from time to time.

Section 11.3.    <u>Partition</u>.  Each of the Members hereby irrevocably waives, to the extent it may lawfully do so, any right that such Member may have to maintain any action for partition with respect to the Company property.

Section 11.4.    <u>Waivers and Modifications</u>.  Any waiver or consent, express, implied or deemed, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company or any action inconsistent with this Agreement is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company or any other such action. Failure on the part of a Person to insist in any one or more instances upon strict performance of any provisions of this Agreement, to take advantage of any of its rights hereunder, or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that Person or its rights with respect to that default until the applicable statute of limitations period has lapsed.  All waivers and consents hereunder shall be in writing and shall be delivered to the other Members in the manner set forth in <u>Section 11.1</u>.  All remedies afforded under this Agreement shall be taken and construed as cumulative and in addition to every remedy provided for herein and by applicable Law.

Section 11.5.    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions thereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 11.6.    <u>Successors; No Third-Party Beneficiaries</u>.  This Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors and permitted assigns.  Nothing in this Agreement shall provide any benefit to any third party or entitle any third party to any Claim, it being the intent of the Members that this Agreement shall not be construed as a third-party beneficiary contract.

Section 11.7.    <u>Entire Agreement</u>.  This Agreement, including the Exhibits and Schedules attached hereto or incorporated herein by reference, constitutes the entire agreement of the Members with respect to the matters covered herein.  This Agreement supersedes all prior agreements and oral understandings among the parties hereto with respect to such matters.

Section 11.8.    <u>Public Statements</u>.  No Member shall issue a public announcement, statement or other disclosure relating to the Company, any Project Company or any Project

DocuSign Envelope ID: BDEAEE06-9822-4CB5-9466-364533A42A1F

without the written consent of the other Members unless, based upon the advice of legal counsel to the issuing Member, such public announcement, statement or other disclosure is required by any Laws or by obligations pursuant to any listing agreement with any national securities exchange in order to discharge such Member's disclosure obligations, in which case the issuing Member may release such statement and, upon such release, shall promptly furnish the other Members with a copy thereof. Without limiting the generality of the foregoing, each Member, upon the request of another Member, shall provide to such Member, and such Member shall have the right to review in advance all information relating to the transactions contemplated by the transaction documents that appear in any filing made in connection with the transactions contemplated hereby or thereby.

Section 11.9.   <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the applicable Laws of the State of California, excluding any conflict of Laws rule or principle that might refer the governance or construction of this Agreement to the Law of another jurisdiction.  Any mediation, arbitration or lawsuit involving any dispute or matter arising under or relating to this Agreement may only be brought before the appropriate tribunal or court in Napa County California, unless the parties to the mediation, arbitration or lawsuit otherwise agree.  All Members hereby consent to the exercise of personal jurisdiction by any such tribunal or court with respect to any such proceeding.

Section 11.10. <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

Section 11.11. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which may be delivered by facsimile transmission or electronically in portable document format (PDF) format and each of which shall be an original but all of which together will constitute one instrument, binding upon all parties hereto, notwithstanding that all such parties may not have executed the same counterpart.

Section 11.12. <u>Confidentiality</u>.   The Members acknowledge and agree that this Agreement, the terms and conditions set forth herein and therein, and all documents and information obtained by a Member from another Member, Manager or the Company in connection with the transactions contemplated hereby and thereby, including any and all information they may have or obtain concerning the Company and its assets, business, operations or prospects (collectively, the "***Confidential Information***") are to be kept confidential, and the Members shall, and shall cause their respective Affiliates and Representatives to, use all due care to hold confidential and not use in any manner detrimental to the Company or either Member any and all Confidential Information <u>provided</u>, <u>however</u>, that Confidential Information shall not include information that (a) is or becomes generally available to the public other than as a result of a disclosure by a Member or any of its Representatives in violation of this Agreement, (b) becomes available to a Member or any of its Representatives on a non-confidential basis prior to its disclosure by the Company or its Representatives or (c) is independently developed by a Member without reference to the Confidential Information.  Notwithstanding anything to

{10764887.2}                                - 49 -

the contrary, a party or any of its Affiliates or Representatives may disclose Confidential Information to the extent that it (1) is required or requested to be disclosed as a result of any applicable Laws or rule or regulation of any stock exchange, (2) is required or requested by the IRS or any other taxing authority in connection with the Project or Tax Credits relating thereto, including in connection with a request for any private letter ruling, any determination letter or any audit, (3) is voluntarily disclosed by a Member to the IRS or other Governmental Entity with jurisdiction over such Member in connection with such authority's review or approval of the transactions contemplated by this Agreement, or (4) is disclosed on a similarly confidential basis by such a Member to its officers, directors, partners, members, shareholders, advisors, employees, auditors and legal counsel and other Affiliates on a need-to-know basis, provided such Member directs such recipients to keep such Confidential Information confidential under the same terms as provided herein. If a Member is required is advised by legal counsel that disclosure or delivery of Confidential Information is required by Law, legal process, regulation, judicial or administrative order or requirements of a securities exchange, such disclosing Member will provide the Managers (if the Confidential Information relates to the Company) or the impacted Member (if the Confidential Information is personal information of such Member) with prompt notice (unless such notice is prohibited by Law or otherwise impractical) so that the Managers or impacted Member (as applicable) may seek a protective order or other appropriate remedy at the sole cost of the impacted Member (as applicable) seeking such protective order or appropriate remedy or waive compliance with the non-disclosure provisions of this <u>Section 11.12</u> with respect to the information required to be disclosed. If such protective order or other remedy is not obtained, or the Managers or impacted Member waives compliance with the non-disclosure provisions of this <u>Section 11.12</u> with respect to the information required to be disclosed, the disclosing Member will furnish only that portion of such information that it is advised by counsel is legally required to be furnished and will use its commercially reasonable efforts, at the Company's or impacted Member's expense, to obtain reliable assurance that confidential treatment will be accorded such information. In the event that a Member is requested by any banking, securities, securities exchange or other regulatory or self-regulatory organization in connection with any general audit, examination or inquiry of a Member or its regulated Affiliates to disclose Confidential Information, such Member may disclose or deliver any Confidential Information to such authority that such Member reasonably concludes is responsive to such request; <u>provided</u> that such disclosing Member shall advise such authority of the confidential nature of such Confidential Information. Notwithstanding anything herein to the contrary, nothing in this Agreement shall be construed to prevent any Person (including all employees, representatives and agents of such Person) from disclosing to any and all Persons, without limitation of any kind, the United States federal income "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4 and applicable U.S. state and local Law). Nothing herein shall be construed as prohibiting a party hereunder from using such Confidential Information in connection with (i) any claim against another Member or the Company hereunder, (ii) any exercise by a party hereunder of any of its rights hereunder or (iii) a disposition by a Member of all or a portion of its Membership Interest or a disposition of an Equity Interest in such Member or its Affiliates, provided that such potential purchaser shall have entered into a confidentiality agreement with respect to Confidential Information on customary terms used in confidentiality

agreements in connection with corporate acquisitions before any such information may be disclosed.

Section 11.13. <u>Joint Efforts</u>. To the full extent permitted by applicable Law, neither this Agreement nor any ambiguity or uncertainty herein will be construed against any of the parties hereto, whether under any rule of construction or otherwise. On the contrary, this Agreement has been prepared by the joint efforts of the respective attorneys for, and has been reviewed by, each of the parties hereto.

Section 11.14. <u>Specific Performance</u>. The Members agree that irreparable damage will result if this Agreement is not performed in accordance with its terms, and the Members agree that any damages available at law for a breach of this Agreement would not be an adequate remedy. Therefore, to the full extent permitted by applicable Law, the provisions hereof and the obligations of the Members hereunder shall be enforceable in a court of equity, or other tribunal with jurisdiction, by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies and all other remedies provided for in this Agreement shall, however, be cumulative and not exclusive and shall be in addition to any other remedies that a Member may have under this Agreement, at law or in equity, without proof of damages or posting a bond.

Section 11.15. <u>Survival</u>. All indemnities and reimbursement obligations made pursuant to this Agreement shall survive dissolution and liquidation of the Company until expiration of the longest applicable statute of limitations (including extensions and waivers) with respect to the matter for which a Person would be entitled to be indemnified or reimbursed, as the case may be.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties have caused this Second Amended and Restated Limited Liability Company Agreement to be signed by their respective duly authorized officers as of the date first above written.

**<u>MEMBERS:</u>**

**Blue Sky 1007, LLC**,
a California limited liability company


By:_____
Name: Barend Venter
Title:   Member


**Yellow Tree Capital LLC**
a California limited liability company


By:_____
Name: Ran Bujanover
Title:   Member



**NOFAR USA LLC**
a Delaware limited liability company


By:_____
Name:
Title:

DocuSign Envelope ID: BDEAEE06-9822-4CB5-9466-364533A42A1F

**MANAGERS:**

_____

Barend Venter (in his capacity as Manager and
in his individual capacity for all applicable
purposes under this Agreement, including
Section 3.4(a))

_____

Ran Bujanover (in his capacity as Manager and
in his individual capacity for all applicable
purposes under this Agreement, including
Section 3.4(a))

_____

[NAME]

_____

[NAME]

_____

[NAME]

ActiveUS 186356799v.13

**EXHIBIT A**
**LISTING OF MEMBERS, PERCENTAGE INTERESTS, CAPITAL ACCOUNT BALANCES AND SECURITY INTERESTS**

(1)    Immediately prior to the Effective Date:

| Member Names | Percentage Interest | Capital Account Balance | Security Interest |
|---|---|---|---|
| Blue Sky 1007, LLC | 57.5% | $ | None |
| Yellow Tree Capital LLC | 37.5% | $ | None |
| Palm Drive Associates LLC | 5% | | |

(2)    As of the Effective Date:

| Member Names | Percentage Interest | Capital Account Balance | Security Interest |
|---|---|---|---|
| Blue Sky 1007, LLC<br>860 R Napa Valley Corporate Way<br>P.O. Box 5571 Napa, CA 94581<br>Attention: Barend Venter<br>Email: barend@blueskyutility.com<br>Facsimile: 707-754-2553 | 16.5% | $[_____] | |
| Yellow Tree Capital LLC<br>860 R Napa Valley Corporate Way<br>P.O. Box 5571 Napa, CA 94581<br>Attention: Ran Bujanover<br>Email: ran@blueskyutility.com<br>Facsimile: 707-754-2553 | 16.5% | $[_____] | |
| [NOFAR BLOCKER] | 67% | $[_____] | None |

**EXHIBIT B**

**PROJECTS**

<u>Current Projects</u>

| Project | Location | Size (MW) | Retail Market |
|---|---|---|---|
| Passco Hanford Mall | Hanford, CA | 1.6 | SCE |
| Phillips Edison & Co - Winery Plaza | Fairfield, CA | 0.3 | PG&E |
| Orland North State Grocer | Orland, CA | 0.6 | PG&E |
| Colusa North State Grocer | Colusa, CA | 0.6 | PG&E |
| Phillips Edison & Co. - Boronda Plaza | Salinas, CA | 1.1 | PG&E |
| Paytner Reality - Clovis Commons | Clovis, CA | 0.5 | PG&E |
| Brixmor - San Dimas Plaza | San Dimas, CA | 0.6 | SCE |
| Phillips Edison & Co - Broadway | Santa Maria, CA | 0.4 | PG&E |
| DRA - Esplanade Center | Oxnard, CA | 1.4 | SCE |
| Shea Properties - Bressi Village | Carlsbad, CA | 0.3 | SDG&E |
| YMCA Shasta | Redding, CA | 0.2 | REU |
| Brixmor – Vail Ranch | Temecula, CA | 0.6 | SCE |
| Brixmor – Carmen Plaza | Camarillo, CA | 0.6 | SCE |
| Brixmor – Ocean View | San Clamente, CA | 0.5 | SDG&E |
| Brixmor – Felicita Plaza | Escondido, CA | 0.3 | SDG&E |
| Brixmor – Felicita Town Center | Escondido, CA | 0.6 | SDG&E |
| Brixmor – Plaza by the Sea | San Clamente, CA | N/A | SDG&E |
| Brixmor – Puente Hills | Rowland Heights, CA | 1.4 | SCE |
| Merlone Geier Partners - Palmsdale | Palmsdale, CA | 1.1 | SCE |
| Merlone Geier Partners - Blue Oak | Rocklin, CA | 1.5 | PG&E |
| CT Batch 1 | Enfield, Willimantic, Montville, CT | 0.4 | Eversource |

<u>Pipeline Projects</u>

| | |
|---|---|
| Brixmor – Arbor Faire | Fresno, CA |
| Hanford Mall Battery (SGIP Grant $1.7M) | Hanford, CA |
| Brixmor – Santa Paula | Santa Paula, CA |
| Brixmor – Montebello | Montebello, CA |
| Brixmor – Gateway (Santa Fe) | Santa Fe Springs, CA |
| Brixmor – Bristol Plaza | Santa Ana, CA |
| Phillips Edison & Co - Driftwood Village | Ontario, CA |
| Phillips Edison & Co - Upper Deerfield | Bridgeton, NJ |
| Phillips Edison & Co - Plaza 23 | Pompton Plains, NJ |
| Phillips Edison & Co - Ceres | Fresno, CA |

{10764887.2}                                      Exhibit B

| | |
|---|---|
| ROIC - Diamond Hills | Diamond Bar, CA |
| ROIC - Fullerton Crossroads | Fullerton, CA |
| ROIC - Jackson Square | Hayward, CA |
| ROIC - Santa Teresa Village | San Jose, CA |
| ROIC - Creekside Plaza | Poway, CA |
| ROIC - Hawthorne Crossings | San Diego, CA |
| ROIC - Desert Springs | Palm Desert, CA |
| ROIC - Marketplace Del Rio | Oceanside, CA |
| Phillips Edison & Co - Five Town Plaza | Springfield, MA |
| Phillips Edison & Co - Carriagetown Plaza | Amesbury, MA |
| Phillips Edison & Co - Cushing Plaza | Cohasset, MA |
| Phillips Edison & Co - Highland Plaza | Easton, MA |
| Phillips Edison & Co - Shaw's Plaza Easton | Easton, MA |
| Phillips Edison & Co - Sudbury Crossing | Sudbury, MA |
| MGP - Mountaingate Plaza | Simi Valley, CA |
| MGP - Hayward | Hayward, CA |
| Investec - Camarillo | Camarillo, CA |
| Investec - Central Shopping Center | Camarillo, CA |
| Investec - De Se Re III | Goleta, CA |
| Investec - Downey Landing | Downey, CA |
| Investec - Five Cities | Arroyo Grande, CA |
| Investec - Mesa Center | Santa Barbara, CA |
| Investec - Plaza at Sunbow | Chula Vista, CA |
| Investec - Skypark Plaza | Chico, CA |
| DLC - Oxom | Oxom Hill, MD |
| DLC - Eastover | Oxom Hill, MD |
| DLC - Beach | Peekskill, NY |
| DLC - Shoppes at South Hills | Poughkeepsie, NY |

Exhibit B

**EXHIBIT C**

**BUDGET PLAN**

To be mutually agreed by the parties prior to MIPA closing.

**EXHIBIT D**

**AFFILIATE TRANSACTIONS**

| | | Counter Parties | |
|---|---|---|---|
| Project Agreements | EPC | O&M | Development Services Agreement |
| Blue Sky Utility 2017 LLC | Bright Power Inc. | Bright Power Inc. | Blue Sky Utility LLC |
| Blue Sky Utility- Sub 1 LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2017 II LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2017 III LLC | Bright Power Inc. | Bright Power Inc. | Blue Sky Utility LLC |
| Blue Sky Utility 2018 I LLC | Bright Power Inc. | Bright Power Inc. | Blue Sky Utility LLC |
| Blue Sky Utility 2018 II LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2018 III LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2018 IV LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2018 V LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2018 VI LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 I LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 II LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 III LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 IV LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 V LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 VI LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 VII LLC | Bright Power Inc. | Bright Power Inc. | |

| | | Bright Power | |
| --- | --- | --- | --- |
| Blue Sky Utility 2019 VIII LLC | Bright Power Inc. | Inc. | |
| Blue Sky Utility 2019 XI LLC | Bright Power Inc. | Bright Power Inc. | Blue Sky Utility LLC |
| Blue Sky Utility 2020 I LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2020 II LLC | Bright Power Inc. | Bright Power Inc. | |

| | Counter Party |
| --- | --- |
| | Asset Mangement |
| Holding Companies Agreements | Agreement |
| Blue Sky Utility Portfolio I 2017 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio II 2017 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio III 2017 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio I 2018 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio II 2018 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio I 2020 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio II 2020 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio III 2020 LLC | Blue Sky Utility LLC |

| Development Agreements | BSU Party | Counter Party | Scope |
| --- | --- | --- | --- |
| Limited Notice to Proceed | Blue Sky Utility LLC | Bright Power Inc. | DLC NE Assets |
| Limited Notice to Proceed | Blue Sky Utility LLC | Bright Power Inc. | PECO NE Assets |

{10764887.2}                              Exhibit D

DocuSign Envelope ID: BDEAEE0G-9822-4CB5-9466-364533A42A1F

# EXHIBIT E

## LISTING OF MANAGERS AND OFFICERS

| NAME | TITLE |
| --- | --- |
| Barend Venter | CEO, Manager |
| Ran Bujanover | President, Manager |
| [Nofar Manager] | Manager |
| [Nofar Manager] | Manager |
| [Nofar Manager] | Manager |

{10764887.2}                    Exhibit E

ActiveUS 186356799v.13

Schedule 3.4(c)

Permitted Activities of Ran, Barend and Affiliates

1.  Bright Power, Inc., as a general contractor, shall be permitted to continue its business relating to engineering, procurement and construction of solar projects (but not the development and/or ownership of renewable energy projects or power storage, or any other business similar to the Business).  Bright Power, Inc. shall also be permitted to continue with component manufacturing, roofing as a roofing contractor and electrical and an electrical contractor.

2.  Ran, Barend and/or each of their spouses may, for their personal ownership, acquire, develop, construct and own solar facilities and storage on real property they own, in whole or in part, individually or in their capacity as trustees of personal or family trusts, including, without limitation, Clos du Val.

**Schedule 1.1(b)**

**Creditors to whom Creditor Fund Debt is owed**

| Creditor Fund Debt | Lender | Amount Outstanding as of May 21, 2021 |
|---|---|---|
| PDA Loan | Palm Drive Associates, LLC | $5,749,896.83 |
| Blue Sky 1007 Loan | Blue Sky 1007, LLC | $732,831.39 |
| SBA Loan | The Small Business Administration | $205,168.20 |
| Affiliate Loan | Amalgamated Bank | $430,031.52 |
| Salary Gap Payment | Blue Sky Utility, LLC | $1,597,402.51* |

**\*Salary Gap Payments in the amount of $1,597,402.51 are payable to the following (the "Salary Gap Payment Recipients"):**

| | |
|---|---|
| Blue Sky 1007 LLC | $ 749,951.25 |
| Yellow Tree Capital LLC | $ 749,951.26 |
| Johann Smit | $ 60,000.00 |
| John Ruiz | $ 10,000.00 |
| Daniel Pino | $ 5,000.00 |
| Courtney Lafayett | $ 7,000.00 |
| Rapahael Durst | $ 10,000.00 |
| Elani Moss | $ 4,000.00 |
| Joanne Ferreira | $ 1,000.00 |
| Ruchelle Briel | $ 500.00 |

**Schedule 1.1(c)**

**Projects**

**CURRENT PROJECTS**

| | Project Name | Location | MW | Lender | Project C |
|---|---|---|---|---|---|
| 1. | Winery Square | Fairfield, CA | 0.3 | New Resource Bank | Blue Sky |
| 2. | Hanford Mall | Hanford, CA | 1.6 | New Resource Bank | Blue Sky |
| 3. | NSG Colusa | Colusa, CA | 0.6 | New Resource Bank | Blue Sky |
| 4. | NSG Orland | Orland, CA | 0.6 | New Resource Bank | Blue Sky |
| 5. | Boronda Plaza | Salinas, CA | 1.1 | New Resource Bank | Blue Sky |
| 6. | Vail Ranch | Temecula, CA | 0.6 | The Wunder Company | Blue Sky |
| 7. | Carmen Plaza | Camarillo, CA | 0.6 | The Wunder Company | Blue Sky |
| 8. | Ocean View | San Clemente, CA | 0.5 | The Wunder Company | Blue Sky |
| 9. | Felicita Plaza | Escondido, CA | 0.3 | The Wunder Company | Blue Sky |
| 10. | Puente Hills Town Center | Rowland Heights, CA | 1.4 | The Wunder Company | Blue Sky |
| 11. | Palmdale Marketplace | Palmdale, CA | 1.1 | The Wunder Company | Blue Sky |
| 12. | Felicita Town Center | Escondido, CA | 0.3 | The Wunder Company | Blue Sky |
| 13. | Plaza by the Sea | San Clemente, CA | NA | The Wunder Company | Blue Sky |

{10764729.5}

| 14. | Montville Commons | Montville, CT | 0.1 | | The Wunder Company | Blue Sky |
|---|---|---|---|---|---|---|
| 15. | Willimantic Plaza | Willimantic, CT | 0.1 | | The Wunder Company | Blue Sky |
| 16. | Stop & Shop Plaza | Enfield, CT | 0.1 | | The Wunder Company | Blue Sky |
| 17. | Blue Oak Town Center | Rocklin, CA | 1.5 | | The Wunder Company | Blue Sky |
| 18. | Clovis Commons | Clovis, CA | 0.5 | | Amalgamated Bank | Blue Sky |
| 19. | San Dimas Plaza | San Dimas, CA | 0.6 | | Amalgamated Bank | Blue Sky |
| 20. | Esplanade Shopping Center | Oxnard, CA | 1.4 | | Amalgamated Bank | Blue Sky |
| 21. | Broadway Center | Santa Maria, CA | 0.4 | | Amalgamated Bank | Blue Sky |
| 22. | Bressi Ranch | Carlsbad, CA | 0.3 | | Amalgamated Bank | Blue Sky |
| 23. | YMCA Shasta | Redding, CA | 0.2 | | Amalgamated Bank | Blue Sky |

**PIPELINE PROJECTS**. Note: The following projects, unlike the "Current Projects" described above, have not yet achieved notice to start construction.

| 24. | Arbor Faire | Fresno, CA | 0.6 |
|---|---|---|---|
| 25. | Hanford Mall Battery | Hanford, CA | 2 |
| 26. | Santa Paula | Santa Paula, CA | 1.1 |
| 27. | Montebello | Montebello, CA | 1.6 |
| 28. | Gateway (Santa Fe) | Santa Fe Springs, CA | 0.8 |
| 29. | Bristol Plaza | Santa Ana, CA | 0.7 |
| 30. | Driftwood Village | Ontario, CA | 0.6 |
| 31. | Upper Deerfield | Bridgeton, NJ | 0.9 |
| 32. | Plaza 23 | Pompton Plains, NJ | 1.1 |
| 33. | Ceres | Fresno, CA | 0.5 |

| 34. | Diamond Hills | Diamond Bar, CA | 1.3 |
| 35. | Fullerton Crossroads | Fullerton, CA | 0.8 |
| 36. | Jackson Square | Hayward, CA | 0.8 |
| 37. | Santa Teresa Village | San Jose, CA | 1 |
| 38. | Creekside Plaza | Poway, CA | 1.2 |
| 39. | Hawthorne Crossings | San Diego, CA | 0.9 |
| 40. | Desert Springs | Palm Desert, CA | 2.2 |
| 41. | Marketplace Del Rio | Oceanside, CA | 1.1 |
| 42. | Five Town Plaza | Springfield, MA | 2.6 |
| 43. | Carriagetown Plaza | Amesbury, MA | 0.9 |
| 44. | Cushing Plaza | Cohasset, MA | 1 |
| 45. | Highland Plaza | Easton, MA | 2.1 |
| 46. | Shaw's Plaza Easton | Easton, MA | 1.9 |
| 47. | Sudbury Crossing | Sudbury, MA | 1.2 |
| 48. | Mountaingate Plaza | Simi Valley, CA | 1.1 |
| 49. | Hayward | Hayward, CA | 0.7 |
| 50. | Camarillo | Camarillo, CA | 1 |
| 51. | Central Shopping Center | Camarillo, CA | 0.7 |
| 52. | De Se Re III | Goleta, CA | 0.4 |
| 53. | Downey Landing | Downey, CA | 2.5 |
| 54. | Five Cities | Arroyo Grande, CA | 1 |
| 55. | Mesa Center | Santa Barbara, CA | 0.4 |
| 56. | Plaza at Sunbow | Chula Vista, CA | 0.8 |
| 57. | Oxom | Oxom Hill, MD | 1.2 |
| 58. | Eastover | Oxom Hill, MD | 0.6 |
| 59. | Beach | Peekskill, NY | 1.3 |
| 60. | Shoppes at South Hills | Poughkeepsie, NY | 1.4 |

**Schedule 2.6(g)**

**Letters of Termination**

1. Palm Drive Associates, LLC
2. Blue Sky 1007, LLC
3. Amalgamated Bank

**Schedule 2.6(h)**

**Required Third Party Consents**

1.  The consent of each of the "Lenders" identified on Schedule 1.1(c) is required in connection with the transactions contemplated by this Agreement.

2.  The consent of each of the "Tax Equity Investors" identified on Schedule 1.1(c) is required in connection with the transactions contemplated by this Agreement.

**Schedule 2.6(i)**

**Preemptive Rights Waivers**

None.

**Schedule 2.6(q)**

**Termination of Certain Agreements**

1. Indemnity Agreement, dated as of December 29, 2016, between Blue Sky Utility, LLC and Blue Sky 1007, LLC.

**Schedule 2.6(r)**

**Signatories**

Buyer to provide.

**Schedule 2.10(f)**

**Sources and Uses**

**Sources and Use**

| | | Uses | Sources | | | | Net |
|---|---|---|---|---|---|---|---|
| | | | TEI | Debt | Total Sources | | |
| | Boronda | 147,898 | | - | - | - | 147,898 |
| | Carmen Plaza 2 | 481,985 | | 524,015 | 119,340 | 643,356 | (161,371) |
| | Vail Ranch Center | 296,677 | | 68,011 | - | 68,011 | 228,666 |
| | Felicita Plaza | 229,655 | | 254,612 | 525,652 | 780,264 | (550,609) |
| | Felicita Town Center | 882,530 | | 596,525 | 396,066 | 992,591 | (110,061) |
| | Puente Hills | 925,698 | | 1,795,782 | 245,000 | 2,040,782 | (1,115,084) |
| | Ocean View | 735,884 | | 539,942 | 394,817 | 934,760 | (198,876) |
| | Palmdale | 1,817,156 | | 1,384,268 | 371,453 | 1,755,720 | 61,436 |
| | Williamantic | 224,641 | | 149,670 | 22,467 | 172,137 | 52,504 |
| | Stop & Shop | 252,619 | | 178,081 | 22,467 | 200,548 | 52,071 |
| | Montville Commons | 272,690 | | 201,526 | 22,467 | 223,992 | 48,698 |
| | Blue Oak | 2,269,053 | | 1,832,119 | 1,713,171 | 3,545,290 | (1,276,237) |
| | Rent Escrow | 111,000 | | | | - | 111,000 |
| | Contingency Share | - | | | | 347,167 | (347,167) |
| | Prepayment on SGIP | - | | | | 85,000 | (85,000) |
| | Red bridge | 38,715 | | | | - | 38,715 |
| | | | | | | - | - |
| | | | | | | | |
| | **Total** | **8,686,202** | | **7,524,552** | **3,832,899** | **11,789,617** | **(3,103,416)** |

**Schedule 3.1(c)**

**Organizational Chart**











## As of 4/30/2021 – Blue Sky Utility, LLC and Direct Subsidiaries





























As of 12/31/2020 – Blue Sky Utility Portfolio III 2020 LLC



**Schedule 3.1(f)**

**Third Party Consents**

Notice to each of the following parties is required in connection with the transactions contemplated by the Agreement:

- Bressi Retail, LLC (landlord of the Bressi Ranch project in Carlsbad, CA)
- Hanford Mall 2020, LLC (landlord of the Hanford Mall project in Hanford, CA)
- Winery Square Station LP (landlord of the Winery Plaza project in Fairfield, CA)
- Boronda Station LLC (landlord of the Boronda Plaza project in Salinas, CA)
- Broadway Pavilion Station LLC (landlord of the Broadway Center project in Santa Maria, CA)

The consent of each of the following parties is required in connection with the transactions contemplated by the Agreement:

- The consent of each of the "Lenders" identified on Schedule 1.1(c) is required in connection with the transactions contemplated by this Agreement.

- The consent of each of the "Tax Equity Investors" identified on Schedule 1.1(c) is required in connection with the transactions contemplated by this Agreement.

**Schedule 3.1(g)**

**Company Approvals**

Schedule 3.1(f) is incorporated herein by reference.

**Schedule 3.2(c)**

**Post-Closing Capitalization**

| Member | Percentage Interest |
|---|---|
| Nofar USA, LLC | 67.0% |
| Blue Sky 1007, LLC | 16.5% |
| Yellow Tree Capital, LLC | 16.5% |

**Schedule 3.2(f)**

None.

**Schedule 3.2(g)**

**Organizational Chart**

Schedule 3.1(c) is incorporated herein by reference.

**Schedule 3.2(h)**

**Organizational Chart**

Schedule 3.1(c) is incorporated herein by reference.

**Schedule 3.2(j)**

Schedule 3.1(f) is incorporated herein by reference.

**Schedule 3.5**

**Affiliate Transactions**

1. Bright Power, Inc., as a general contractor, conducts its business relating to engineering, procurement and construction of solar projects, component manufacturing, roofing as a roofing contractor and electrical as an electrical contractor.

2. Ran, Barend and/or each of their spouses from time to time, for their personal ownership, acquire, develop, construct and own solar facilities and storage on real property they own, in whole or in part, individually or in their capacity as trustees of personal or family trusts, including, without limitation, Clos du Val.

| | | | Counter Parties | | |
|---|---|---|---|---|---|
| | Project Agreements | EPC | O&M | Development Services Agreement | |
| | Blue Sky Utility 2017 LLC | Bright Power Inc. | Bright Power In | Blue Sky Utility LLC | |
| | Blue Sky Utility- Sub 1 LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2017 II LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2017 III LLC | Bright Power Inc. | Bright Power In | Blue Sky Utility LLC | |
| | Blue Sky Utility 2018 I LLC | Bright Power Inc. | Bright Power In | Blue Sky Utility LLC | |
| | Blue Sky Utility 2018 II LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2018 III LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2018 IV LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2018 V LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2018 VI LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 I LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 II LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 III LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 IV LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 V LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 VI LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 VII LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 VIII LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 XI LLC | Bright Power Inc. | Bright Power In | Blue Sky Utility LLC | |
| | Blue Sky Utility 2020 I LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2020 II LLC | Bright Power Inc. | Bright Power Inc. | | |
| | | | | | |
| | | | | | |
| | | | Counter Party Asset Mangement Agreement | | |
| | Holding Companies Agreements | | | | |
| | Blue Sky Utility Portfolio I 2017 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio II 2017 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio III 2017 | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio I 2018 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio II 2018 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio I 2020 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio II 2020 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio III 2020 | Blue Sky Utility LLC | | | |
| | | | | | |
| | Development Agreements | BSU Party | Counter Party | Scope | |
| | Limited Notice to Proceed | Blue Sky Utility LLC | Bright Power In | DLC NE Assets | |
| | Limited Notice to Proceed | Blue Sky Utility LLC | Bright Power In | PECO NE Assets | |

**Schedule 3.7(g)**

**Financial Models**

Reference is made to the financial models provided in the data room prior to the date of the Agreement.

**Schedule 3.7(i)**

**Usage**

**Summary - All Signed Up & Lease Controlled Tenants Usage**

| Site | PVSyst | 12 Month Usage | % |
|------|-------|---------------|---|
| San Dimas | 1,091,000 | 1,535,774 | 141% |
| Broadway | 783,801 | 367,005 | 47% |
| Bressi | 478,970 | 443,298 | 93% |
| Boronda | 1,750,585 | 1,972,717 | 113% |
| Winery | 473,355 | 572,854 | 121% |
| Clovis | 914,049 | 1,394,485 | 153% |
| Vail Ranch | 1,014,900 | 1,028,543 | 101% |
| Carmen Plaza | 1,036,800 | 1,035,489 | 100% |
| Esplanade | 2,677,000 | 3,522,019 | 132% |
| Felicita Town Center | 1,030,000 | 1,699,471 | 165% |
| Felicita Plaza | 441,800 | 1,110,937 | 251% |
| Ocean View Plaza | 1,382,806 | 1,561,876 | 113% |
| Puente Hills | 2,301,600 | 2,367,411 | 103% |
| Palmdale | 2,028,852 | 802,014 | 40% |
| Blue Oaks | 2,450,324 | 4,050,808 | 165% |
| Orland | 921,612 | 1,083,665 | 118% |
| Colusa | 927,812 | 1,047,283 | 113% |
| Hanford | 2,531,229 | 3,636,563 | 144% |
| YMCA | 316,700 | 389,982 | 123% |
| CT Montville | 172,000 | 166,010 | 97% |
| CT Willimatic | 153,566 | 158,066 | 103% |
| CT Stop&Shop | 123,618 | 124,870 | 101% |
| | 25,002,379.00 | 30,071,139.06 | 120% |

**Schedule 3.8**

**Material Contracts**

(a)(i)

(ii)

1.  PDA Loan Agreement

2.  Affiliate Loan

3.  SBA Loan

4.  BS1007 Loan

5.  PPP Loan

6.  Loan Documents

7.  All Agreements with the "Lenders" identified on Schedule 1.1(c)

(iii)

1.  Schedule 3.2(j) is incorporated herein by reference.

(iv)

1.  The Company grants powers of attorney to the "Tax Equity Investors" identified on Schedule 1.1(c).

(v)

1.  Schedule 3.18(d) is incorporated herein by reference.

(vi)

1.  The Operating Agreements with respect to the entities identified as "Portfolio Co."s on Schedule 1.1(c) are incorporated herein by reference.

(vii)

1.  Schedule 1.1(c) is incorporated herein by reference.

(viii)

None.

(ix)

All of the Company's SSPA's potentially result in payments by Customers to the Company in excess of $10,000 per year.

Development Agreement between Company and Generate Capital (and its related agreements)

(x)

None.

(xi)

None.

(xii)

None.

(xiii)

    1.   Schedule 3.11 is incorporated herein by reference.

(xiv)

    1.   Schedule 3.5 is incorporated herein by reference.

(xv)

    1.   Subsections (ii) and (vii) are incorporated herein by reference.

(xvi)

    1.   SBA Loan

    2.   PPP Loan

**Schedule 3.9(a)**

**Customers**

|  |  | 2021 | Net Revenue |
|---|---|---|---|
| 1 | Hanford | | $ 121,765.50 |
| 2 | PAQ Food4Less | | $ 53,905.95 |
| 3 | Colusa | | $ 39,572.56 |
| 4 | Orland | | $ 33,642.64 |
| 5 | YMCA | | $ 28,049.38 |
| 6 | Clovis: TJ Maxx | | $ 12,864.82 |
| 7 | Broadway: Party City | | $ 7,044.50 |
| 8 | Clovis: Mad Duck | | $ 6,306.45 |
| 9 | Clovis: Subway | | $ 4,879.57 |
| 10 | Broadway: CAM5 | | $ 4,455.98 |

|  |  | 2020 | Net Revenue |
|---|---|---|---|
| 1 | PAQ Food4Less | | $ 240,560.59 |
| 2 | Hanford | | $ 211,194.14 |
| 3 | Colusa | | $ 172,510.03 |
| 4 | Orland | | $ 167,584.41 |
| 5 | YMCA | | $ 54,049.92 |
| 6 | Clovis: Office Depot | | $ 23,888.23 |
| 7 | Bressi: Bevmo | | $ 15,892.43 |
| 8 | Winery: Cenerios | | $ 14,306.53 |
| 9 | Winery: Frank & Yuens | | $ 11,080.57 |
| 10 | Clovis: Nothing Bundt | | $ 11,004.73 |

| | | 2019 | Net Revenue |
|---|---|---|---|
| 1 | Hanford | | $ 464,041.36 |
| 2 | PAQ Food4Less | | $ 200,623.21 |
| 3 | Orland | | $ 172,314.17 |
| 4 | Colusa | | $ 140,027.71 |
| 5 | Clovis: Office Depot | | $ 39,674.63 |
| 6 | Clovis: Mad Duck | | $ 33,335.00 |
| 7 | Clovis: Nothing Bundt | | $ 16,549.00 |
| 8 | Clovis:CAM8 | | $ 16,466.00 |
| 9 | Winery: CAM1 | | $ 15,364.24 |
| 10 | Winery: Anytime Fitness M1 | | $ 14,269.07 |

**Schedule 3.10(c)**

**Warranties**

Sunpreme Solar, the panel manufacturer of the panels at Hanford Mall, no longer functions as an operating business.

**Schedule 3.11**

**Leases**

| | Project Name | Location | Landlord/Licensor | Tenant/Licensee | Document Type | Original Date |
|---|---|---|---|---|---|---|
| | **CURRENT PROJECTS** | | | | | |
| 1. | Winery Square | Fairfield, CA | Winery Square Station LP | Blue Sky Utility 2017, LLC | License | June 17, 2016 |
| 2. | Hanford Mall | Hanford, CA | Hanford Mall 2020, LLC | Blue Sky Utility 2017 II, LLC | Lease | February 1, 2016 |
| 3. | NSG Colusa | Colusa, CA | Gregory Partners, L.P., Hart Snyder Holdings, LLC, David C. Lee, Bruno's Property Management, LLC, Clayton K. Lee Family Living Trust, and John. McNamee and Susan Diane McNamee, husband and wife, as joint tenants | Blue Sky Utility 2017 III, LLC | Lease | September 12, 2016 |
| 4. | NSG Orland | Orland, CA | XYZ Orland, LLC | Blue Sky Utility – Sub 1, LLC | Lease | September 12, 2016 |
| 5. | Boronda Plaza | Salinas, CA | Boronda Station LLC | Blue Sky Utility 2018 I, LLC | License | February 15, 2017 |
| 6. | Vail Ranch | Temecula, CA | Brixmor GA Vail Ranch, LP | Blue Sky Utility 2019 VI LLC | Lease | July 22, 2019 |
| 7. | Carmen Plaza | Camarillo, CA | Brixmor Holdings 1 SPE, LLC | Blue Sky Utility 2019 II  LLC | Lease | July 22, 2019 |
| 8. | Ocean View | San Clemente, CA | California Property Owner I, LLC | Blue Sky Utility 2019 IV  LLC | Lease | July 22, 2019 |

| 9. | Felicita Plaza | Escondido, CA | California Property Owner I, LLC | Blue Sky Utility 2019 III LLC | Lease | July 22, 2019 |
| 10. | Puente Hills Town Center | Rowland Heights, CA | Brixmor Property Owner II, LLC | Blue Sky Utility 2019 VII LLC | Lease | September 30, 2019 |
| 11. | Palmdale Marketplace | Palmdale, CA | MGP X Properties, LLC | Blue Sky Utility 2020 I LLC | Lease | May 15, 2020 |
| 12. | Felicita Town Center | Escondido, CA | Brixmor Felicita Town Center LLC | Blue Sky Utility 2019 V LLC | Lease | September 30, 2019 |
| 13. | Plaza by the Sea | San Clemente, CA | Brixmor Plaza By The Sea LLC | Blue Sky Utility 2019 VIII LLC | Lease | September 30, 2019 |
| 14. | Montville Commons | Montville, CT | Montville Station LLC | Blue Sky Utility 2019 IX LLC | License | October 29, 2019 |
| 15. | Willimantic Plaza | Willimantic, CT | Willimantic Station LLC | Blue Sky Utility 2019 IX LLC | License | October 29, 2019 |
| 16. | Stop & Shop Plaza | Enfield, CT | Enfield Station LLC | Blue Sky Utility 2019 IX LLC | License | October 29, 2019 |
| 17. | Blue Oak Town Center | Rocklin, CA | MGP X Properties, LLC | Blue Sky Utility 2020 II LLC | Lease | May 13, 2020 |
| 18. | Clovis Commons | Clovis, CA | RLO, LLC, Clovis Commons LLC, and Willow Herndon Partners, LLC, collectively as tenants in common | Blue Sky Utility 2018 II, LLC | Lease | December 18, 2017 |
| 19. | San Dimas Plaza | San Dimas, CA | Brixmor GA San Dimas, LP | Blue Sky Utility 2018 IV, LLC | Lease | December 18, 2017 |
| 20. | Esplanade Shopping Center | Oxnard, CA | California Property Owner I, LLC | Blue Sky Utility 2018 III, LLC | Lease | December 18, 2017 |
| 21. | Broadway Center | Santa Maria, CA | Broadway Pavilion Station LLC | Blue Sky Utility 2018 V, LLC | License | September 12, 2016 |

| 22. | Bressi Ranch | Carlsbad, CA | Bressi Retail, LLC | Blue Sky Utility 2018 VI, LLC | Lease | October 24, 2018 |
| 23. | YMCA Shasta | Redding, CA | Shasta County Young Men's Christian Association (YMCA) | Blue Sky Utility 2019 I, LLC | Lease | May 1, 2017 |

**PIPELINE PROJECTS**

| 24. | Arbor Faire | Fresno, CA | Brixmor Arbor Faire Owner, LP | Blue Sky Utility Holding, LLC | Lease | 9/30/19 |
| 30. | Driftwood Village | Ontario, CA | Driftwood Village Station LLC | Blue Sky Utility LLC | License | 9/12/16 |
| 34. | Diamond Hills | Diamond Bar, CA | ROIC Diamond Hills Plaza, LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 35. | Fullerton Crossroads | Fullerton, CA | ROIC Fullerton Crossroads, LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 36. | Jackson Square | Hayward, CA | ROIC California LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 37. | Santa Teresa Village | San Jose, CA | ROIC California, LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 38. | Creekside Plaza | Poway, CA | ROIC Creekside Plaza LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 39. | Hawthorne Crossings | San Diego, CA | ROIC California, LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 40. | Desert Springs | Palm Desert, CA | ROIC California, LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 41. | Marketplace Del Rio | Oceanside, CA | ROIC California LLC | Blue Sky Utility LLC | Lease | 5/6/21 |

**Schedule 3.11 (a)**

Colusa - There is an outstanding mortgage on the NS building

Hanford - change of ownership resulted in new loan issuance to LL. Currently no SNDA has been provided

**Schedule 3.11(b)**

{10764729.5}

None.

**Schedule 3.13**

**Indebtedness (as of May 20, 2021)**

**Outstanding AP**

| | | |
|---|---|---:|
| | Gogetit | 13,603 |
| | Garett | 75,974 |
| | Rent | 155,705 |
| | Novo | 106,170 |
| | Harmer | 1,235 |
| | Munibilling | 6,068 |
| | Yardi | 42,725 |
| | Sitelogiq | 71,133 |
| | Northstate | - |
| | Tax | 27,900 |
| | PbtS Refunding | 143,940 |
| | **Total** | **644,453** |

**Loans**

| | | |
|---|---|---:|
| | PDA Mezz | 5,767,221 |
| | BS 1007 | 734,990 |
| | CDV | 430,032 |
| | SBA loan | 205,397 |
| | PDA purchase | 989,788 |
| | Salary gap | 1,597,403 |
| | Reserve Gap | 170,066 |
| | **Total** | **9,894,896** |

**CAPEX**

| | | |
|---|---|---:|
| | BPI | 1,708,643 |
| | TEI payments | 80,196 |
| | **Total** | **1,788,839** |

**Total Uses**      **12,328,187**

Subsidiary Loans:

| Project | Lender | Original |
|---|---|---:|
| Hanford | Amalgamated | 2,165,000 |
| Winery | Amalgamated | 600,000 |
| Boronda | Amalgamated | 1,800,000 |
| Clovis | Amalgamated | 960,000 |
| Espalanade | Amalgamated | 1,640,000 |
| San dimas | Amalgamated | 762,000 |

| | | |
|---|---|---|
| Broadway | Amalgamated | 761,000 |
| Bressi | Amalgamated | 650,000 |
| YMCA | Amalgamated | 535,000 |
| Colusa | Amalgamated | 1,200,000 |
| Orland | Amalgamated | 1,200,000 |
| Blue Oak | Wunder | 4,700,000 |
| CT | Wunder | 674,000 |
| Plaza by the sea | Wunder | 302,950 |
| Felicita Town Center | Wunder | 1,295,500 |
| Palmdale | Wunder | 1,708,000 |
| Puente Hills | Wunder | 2,450,000 |
| Vail Ranch | Wunder | 950,000 |
| Ocean View | Wunder | 705,000 |
| Carmen Plaza | Wunder | 960,000 |
| Felicita Plaza | Wunder | 565,000 |

**Schedule 3.15(a)**

**Tax Matters**

None.

**Schedule 3.15(d)**

The Company has granted power-of-attorney to certain tax equity partners pursuant to the Company's tax equity arrangements.

**Schedule 3.15(e)**

All of the Company's tax equity partnerships, each of which has been disclosed in documentation provided in the data room prior to the date of the Agreement.

**Schedule 3.15(f)**

Blue Sky Utility, LLC changed its method of accounting in 2017.

**Schedule 3.15(n)**

None.

**Schedule 3.15(s)**

None.

**Schedule 3.16(a)**

None.

**Schedule 3.16(a)(i)**

**Employees**

Diego Monson $21.00/hour

Cruz Ruiz $21.00/hour

Antonio Torres $21.00/hour

**Schedule 3.16(a)(ii)**

**Independent Contractors**

Rafi Durst, $12,500 per month

Nancy Zinder $65.00/Hr

Salvador Estrada $21.00/Hr


Elani Moss $2,100/month

Joanne Ferreira $800/month

Ruchelle Briel $1000/month

Monique Harcourt  $700/month

| Personnel Name | Start Date | Job Title | | Location |
|---|---|---|---|---|
| Raphael Durst | 2/14/2021 | CFO | | California |
| Nancy Zinder | 4/6/2018 | Tax Consultant | | Chicago |
| Salvador Estrada | | Independent Contractor | Panel Cleaner | California |
| Diego Monzon | | Independent Contractor | Panel Cleaner | California |
| Cruz Ruiz | | Independent Contractor | Panel Cleaner | California |
| Antonio Torres | 9/3/2019 | Independent Contractor | Technical Assistant | California |
| Elani Moss | 6/24/2020 | Independent Contractor | Billing Manager | South Africa |
| Joanne Ferreira | 3/15/2021 | Independent Contractor | Billing Specialist | South Africa |
| Ruchelle Briel | 9/4/2020 | Independent Contractor | Sales Assistant | South Africa |

| Monique Harcourt | 5/10/2021 | Independant Contractor | Billing Administration | South Africa |

**Schedule 3.16(h)**

None.

**Schedule 3.17(a)**

**Employee Benefit Plans**

The Company pays a portion of the premiums for employees under its Health Coverage Participation program.

The Company offers employees paid vacation based on such employee's tenure with the Company.

**Schedule 3.18(a)**

**Intellectual Property**

None.

**Schedule 3.18(d)**

**Licensed Intellectual Property**

Yardi

Go-Get-It

Munibilling

Utility API

**Schedule 3.21(a)**

None.

**Schedule 3.22**

**Insurance**

Ran Bujanover and Barend Venter each are the beneficiaries of "key man" insurance policies taken out with respect to the life and/or disability of the other.

| Location | Project Name | Property Damage Limit | Bodily Injury Limit | Total Insurable Value | Rated Capacity (kW DC) | Mount (ground/ roof/ carport) |
|---|---|---|---|---|---|---|
| 955 West Texas St, Fairfield, CA 94533 | Winery Square | $950,000 | $10,000 | $960,000 | 293.1 | Roof |
| 1675 W. Lacey Blvd, Hanford, CA 93230 | Hanford Mall | $4,200,000 | $300,000 | $4,500,000 | 1621.7 | Roof |
| 1015-1017 Bridge St, Colusa, CA 95932 | NSG Colusa | $1,675,070 | $150,000 | $1,825,070 | 574 | Roof & Carport |
| 35 E. Walker St, Orland, CA 95963 | NSG Orland | $1,627,113 | $150,000 | $1,777,113 | 575 | Roof & Carport |
| 1576 N. Sanborn Rd. Salinas, CA 93905 | Boronda Plaza | $2,600,000 | $300,000 | $2,900,000 | 1068 | Roof & Carport |
| 31685-31845 Hwy 79 S., Temecula, CA 92592 | Vail Ranch | $1,533,595 | $130,000 | $1,663,595 | 604.71 | Roof |
| 311-487 Carmen Drive, Camarillo, CA 93010 | Carmen Plaza | $1,462,152 | $130,000 | $1,592,152 | 623.88 | Roof |
| 638 Camino de Los Mares, San Clemente, CA 92673 | Ocean View | $995,420 | $100,000 | $1,095,420 | 341.62 | Roof |
| 329-421 West Felicita Avenue & South Cen, Escondido, CA 92025 | Felicita Plaza | $716,922 | $85,000 | $801,922 | 273.6 | Roof |
| 1600 S. Azusa Ave, Rowland Heights, CA 91748 | Puente Hills Town Center | $3,702,869 | $315,000 | $4,017,869 | 1429.56 | Roof |
| 39340 10th St. W, Palmdale, CA 93551 | Palmdale Marketplace | $2,776,974 | $230,000 | $3,006,974 | 1051.2 | Roof |
| 1855 South Centre City Parkway, Escondido, CA 92025 | Felicita Town Center | $1,785,000 | $195,000 | $1,980,000 | 640.68 | Roof |
| 616 Camino De Los Mares, San Clamente, CA 92673 | Plaza by the Sea | $535,000 | $55,000 | $590,000 | 177.84 | Roof |
| 2020 Norwich-New London Turn, Montville, CT 06382 | Montville Commons | $515,000 | $36,000 | $875,000 | 142.835 | Roof |
| 1743 Main Street, Willimatic, CT 06226 | Willimatic Station | $362,000 | $32,000 | $394,000 | 121.275 | Roof |

| Address | Name | | | | |
|---|---|---|---|---|---|
| 54 Hazard Avenue, Enfield, CT 06082 | Stop & Shop | $436,000 | $26,000 | $462,000 | 93.555 | Roof |
| 6600 Lonetree Blvd., Rocklin, CA 95765 | Blue Oak Town Center | $4,985,000 | $700,000 | $5,685,000 | 1999.98 | Roof & Carport |
| 775 W Herndon Ave, Clovis, California 93612 | Clovis Commons | $1,800,000 | $200,000 | $2,000,000 | 505.44 | Roof |
| 853-1073 West Arrow Hwy, San Dimas, CA 91773 | San Dimas Plaza | $2,100,000 | $150,000 | $2,250,000 | 603.72 | Roof |
| 195 W Esplanade Dr, Oxnard, California 93036 | Esplanade Shopping Center | $4,000,000 | $350,000 | $4,350,000 | 1557.09 | Roof |
| 2440 South Broadway Santa Maria, CA 93454 | Broadway Center | $1,400,000 | $150,000 | $1,550,000 | 437.88 | Roof |
| 2622 Gateway Road, Carlsbad, CA 92009 | Bressi Ranch | $1,100,000 | $85,000 | $1,185,000 | 277.68 | Roof & Carport |
| 1155 Court St, Redding, CA 96001 | YMCA | $800,000 | $70,000 | $870,000 | 220.37 | Carport |

**Schedule 3.23**

**Bank Accounts**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Checking at Amalgmated XXXXX3537 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX1863 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX1905 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2085 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3695 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3794 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2457 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2390 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3380 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3515 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3422 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3526 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2184 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5336 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5344 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5351 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5369 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5914 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3548 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5930 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3559 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3133 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5955 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3570 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3141 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5971 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Checking at Amalgmated XXXXX3581 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3262 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3273 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3295 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX7663 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX7674 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX7685 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2275 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2283 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2580 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6819 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX9973 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX4357 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6897 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX7812 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX7652 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX0507 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6670 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX2568 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX4166 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6436 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX2465 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX1839 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX5520 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX4048 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6886 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX9388 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX5264 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |

| Checking at Umpqua XXXXX0233 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
|---|---|---|---|---|---|---|---|
| Checking at Umpqua XXXXX6465 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |

**Schedule 3.24**

**Government Grants**

SGIP Equity Incentive reserved in connection with the Hanford Battery Project, details of which have been provided to Buyer in the virtual data room.

**Schedule 3.25**

**Brokers**

None.

**Schedule 4.4**

**Brokers**

None.

**Schedule 5.1**

**Buyer Approvals**

[Buyer to provide.]

**Schedule  6.2**

**Regulatory Approvals**

None.

**Schedule 6.9**

**Annual Budget**

[Annual budget contemplated under the Amended and Restated Operating Agreement to be attached hereto.]

**Schedule 6.10**

**Bonuses to Employees**

Notwithstanding anything to the contrary in the Agreement, Buyer and the Selling Parties agree that Schedule 6.10 will be prepared by mutual written agreement of Buyer and the Selling Parties prior to the Closing; provided, however, that the final Schedule 6.10 shall include the following provisions:

- To the extent that from the Closing until no later than July 1, 2022 the Company shall commence the installment of 30MWP to be calculated as the aggregate of Wp of nameplate solar and Wh of energy storage of the 2021 Portfolio (as defined in that certain Term Sheet for Proposed Investment in Blue Sky Utility, LLC and Blue Sky Utility Holding, LLC, dated as of March 17, 2021, between Blue Sky Utility, LLC and O.Y. Nofar Energy Ltd.), Yellow Tree  and BS1007 shall be entitled to receive one-time  deferred purchase payments equal to $1,00,000 USD each, payable by the Company in addition to any other proceeds or compensation contemplated by this Agreement or the Amended and Restated Operating Agreement (the "**Initial Bonus**").

- In the event that from the Closing until no later than April 1, 2023 the Company shall commence the installment of an additional 50MWP to be calculated as the aggregate of Wp of nameplate solar and Wh of energy storage , Yellow Tree  and BS1007 shall be entitled to receive  additional one-time deferred purchase payment equal to $1,00,000 USD each, payable by the Company in addition to the Initial Bonus and any other proceeds or compensation contemplated by this Agreement or the Amended and Restated Operating Agreement (the "Second Bonus" and, together with the Initial Bonus, the "**Bonus Payments**").

- Upon achieving each of the Bonus Payments, an additional amount equal to $1,000,000 USD with respect to each Bonus Payment shall be payable by the Company to the employees of the Company, to be paid and allocated among such employees in accordance with the terms of this Schedule 6.10.

**Schedule 9.5**

**Allocation Schedule**

[Buyer to prepare initial draft.]

# EXHIBIT 2

**MEMBERSHIP INTEREST SUBSCRIPTION AND PURCHASE AGREEMENT**

dated as of

May 25th, 2021

among

**NOFAR USA LLC,**

**BLUE SKY UTILITY HOLDING, LLC,**

**BLUE SKY 1007, LLC**

**YELLOW TREE CAPITAL LLC**

**BAREND VENTER**

And

**RAN BUJANOVER**

**MEMBERSHIP INTEREST SUBSCRIPTION AND PURCHASE AGREEMENT**

This MEMBERSHIP INTEREST SUBSCRIPTION AND PURCHASE AGREEMENT (this "Agreement"), dated as of May 25, 2021, is entered into by and among (i) Nofar USA LLC, a Delaware limited liability company ("Buyer"), (ii) Blue Sky Utility Holding, LLC, a California limited liability company (the "Company"), (iii) Blue Sky 1007, LLC, a California limited liability company ("Blue Sky 1007"), Yellow Tree Capital LLC, a California limited liability company ("Yellow Tree"), (iv) Mr. Barend Venter, in his capacity as sole member of Blue Sky 1007 ("Barend"), and (v) Mr. Ran Bujanover, in his capacity as member of Yellow Tree and representative of the Selling Parties ("Ran" or the "Seller Representative", as the context requires).

Blue Sky 1007 and Yellow Tree, shall each be referred to as a "Selling Party" and collectively, as the "Selling Parties". Buyer, Company, the Selling Parties, Barend and the Seller Representative may also be referred to herein individually as a "Party" and collectively as the "Parties".

**RECITALS**

WHEREAS, the Buyer wishes to purchase from Company a certain percentage of newly issued Membership Interests as set forth on Exhibit A-1 attached hereto (the "Issued Interests"), in exchange for the payment of the Primary Amount (as defined and as adjusted below), and all as further described in and subject to the provisions of this Agreement.

WHEREAS, concurrently with the issuance by the Company of the Issued Interests, each Selling Party desires to sell to Buyer that certain percentage of such Selling Party's Membership Interests as further set forth in Exhibit A-2 attached hereto (collectively, the "Purchased Interests"), and Buyer desires to purchase the Purchased Interests from the Selling Parties, all upon the terms and subject to the conditions set forth herein;

WHEREAS, prior to the Closing Date, (i) the Company and Palm Drive Associates, LLC ("PDA") shall enter into a Membership Interest Repurchase Agreement, in a form reasonably satisfactory to the Buyer; (ii) Buyer or one of its Affiliates, the Selling Parties and the Company shall enter into a Loan Agreement in the form attached hereto as Exhibit C (the "Nofar Loan Agreement") and into the Equity Pledge Agreement and the Asset Pledge Agreement; and (iii) Company and each Founder shall enter into an employment agreement (the "Employment Agreements"), each of which shall take effect at, and conditioned on the occurrence of, the Closing.

**AGREEMENT**

NOW, THEREFORE, in consideration of and reliance upon the premises and the representations, warranties, covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

# ARTICLE I
## Definitions.

1.1 <u>Definitions</u>.  As used in this Agreement the following terms have the following respective meanings:

"<u>Accounting Methodologies</u>" means the following methodologies: GAAP as in effect as of the day immediately preceding the Closing Date except, if applicable, for any exceptions to GAAP as may be set forth with particularity on Exhibit E-1, and, to the extent consistent with GAAP (or, if applicable, Exhibit E-1).

"<u>Accounting Referee</u>" has the meaning set forth in Section 2.10(c).

"<u>Affiliate</u>" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by or under common control with such first Person.  For purposes of this definition, a Person shall be deemed to control another Person if such first Person possesses, directly or indirectly, the power to direct or to cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" shall have correlative meanings, <u>provided</u>, <u>however</u>, that, in any event, any Person that owns directly or indirectly fifty percent (50%) or more of the securities having ordinary voting power for the election of directors or other governing body of a corporation or fiftypercent (50%) or more of the partnership or other ownership interests of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation orother Person.

"<u>Affiliate Loan</u>" shall mean such loan dated 29 December 2016 between Blue Sky 1007 LLC and Amalgamated Bank in the principal amount of USD 575,000, in connection with the construction and operation of the Clos du Val project.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allocation Schedule</u>" has the meaning set forth in Section 9.5.

"<u>Amended and Restated Operating Agreement</u>" means the Second Amended and Restated Operating Agreement of the Company, to be entered into as of the Closing Date by and between each Selling Party, each Founder, Buyer and the Company, substantially in the form attached hereto as <u>Exhibit F</u>.

"<u>Ancillary Agreements</u>" means any agreements and documents to be delivered in connection with this Agreement, including but not limited to the Nofar Loan Agreement, Membership Interest Repurchase Agreement, the Employment Agreements, the Escrow Agreement, the PPP Escrow Agreement, the Amended and Restated Operating Agreement, the Equity Pledge Agreement and the Asset Pledge Agreement.

"<u>Anti-Terrorism Law</u>" means each of (a) Executive Order No. 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism; (b) Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act); (c) the Money Laundering Control Act of 1986, Public Law 99-570; (iv) the International

Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq, the Trading with the Enemy Act, 50 U.S.C. App. §§ 1 et seq, any executive order or regulation promulgated thereunder and administered by the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury; and (v) any similar economic sanctions or anti-money laundering law enacted and put in force in the United States of America prior to the Closing.

"Asset Pledge Agreement" has the meaning set forth in the Nofar Loan Agreement.

"Basket Amount" has the meaning set forth in Section 7.2(e)(i).

"Benefits Liabilities" means (a) all amounts and benefits, without duplication, paid, payable or to be provided by the Company or any Portfolio Company or Project Company to its directors, managers, officers, employees or other service providers resulting from or in connection with the execution of this Agreement or consummation of the transactions contemplated hereby, including any change of control, severance, transaction bonus or other similar payment rights of any director, manager, officer, employee or other service provider of the Company or any Portfolio Company or Project Company that are triggered, accelerated or become payable upon or in connection with the execution by the Company and the Selling Parties of this Agreement or the consummation of the transactions contemplated by this Agreement, whether paid or payable prior to, on or following the Closing Date, including all amounts paid or payable prior to, on or after the Closing Date to any person whose employment with the Company was terminated prior to the Closing Date, including any and all off-balance sheet liabilities and obligations of the Company with respect to any of the above; and (b) any obligation of the Company or any Portfolio Company or Project Company for the employer portion of any employment-related Taxes or other employer-related obligations arising with respect to the payment of the foregoing amounts, including any and all off-balance sheet liabilities and obligations with respect to any of the above.

"BS1007 Loan" shall mean such loan referred to in the promissory note dated 21 October 2020 in the principal amount of USD 700,000 between (i) Blue Sky 1007 LLC, as a lender, and (ii) the Company and Blue Sky Utility, LLC, as borrowers.

"Business Day" means (i) any day other than a Friday, Saturday, Sunday, federal holiday, and (ii) any day on which commercial banks in Los Angeles, California and Israel are open for general, non-automated business.

"Business Employee" means any individual employed, engaged or retained by the Company or any Portfolio Company or Project Company or any ERISA Affiliate, including any employee, consultant, independent contractor or director of the Company or any Portfolio Company or Project Company or any ERISA Affiliate. For the avoidance of doubt, "Business Employee" includes any individual leased from or hired through another employer or any other Person to provide services to the Company.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Approvals" has the meaning set forth in Section 5.1, and as listed in Schedule 5.1 attached hereto. "Buyer Indemnified Persons" has the meaning set forth in Section 7.2(a).

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act of 2020, as in effect from time to time.

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

"Casualty Defect" means, with respect to any Project, any damage to such Project as a result of a casualty that has not been repaired and would reasonably be expected to interfere with (or increase the cost beyond an immaterial increase) the development, construction, operation or maintenance of the Project unless repaired.

"Claim" means any action, suit, case, litigation, proceeding, claim, arbitration, charge, criminal prosecution, demand letter, finding of deficiency or non-compliance, adverse inspection report, notice of violation, notice of alleged liability, penalty, fine, sanction, subpoena, request for recall, request for remedial action, damages, liabilities and obligations of any nature whatsoever.

"Claim Notice" has the meaning set forth in Section 7.3(a).

"Closing" has the meaning set forth in Section 2.5.

"Closing Balance Sheet" has the meaning set forth in Section 2.10(a).

"Closing Date" has the meaning set forth in Section 2.5.

"Closing Date Indebtedness" means all Company Indebtedness outstanding as of immediately prior to the Closing.

"Closing Statement" has the meaning set forth in Section 2.10(a).

"Closing Working Capital" means, as of immediately prior to Closing: (a) the consolidated current assets of the Company, less (b) the consolidated current liabilities of the Company (excluding all current liabilities to the extent included within the calculation of Company Indebtedness, Company Transaction Expenses and Benefits Liabilities), in each case calculated in accordance with the Accounting Methodologies and presented on a basis consistent with the illustrative calculation of Closing Working Capital, calculated as though the Closing occurred on 31.12.2020, attached hereto as Exhibit E-2.

"COBRA" means the health continuation requirements under Section 4980B of the Code and any comparable state or foreign Legal Requirements.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Preamble.

"Company Approvals" has the meaning set forth in Section 3.1(g), and as listed in Schedule 3.1(g) attached hereto.

"Company Benefit Plan" has the meaning set forth in Section 3.17(a).

"Company Indebtedness" means, with regard to the Company, any Portfolio Company or Project Company, without duplication, all (a) indebtedness for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money (including credit card liabilities); (b) indebtedness evidenced by any note, bond, debenture, mortgage or other debt instrument, debt security or other similar instrument, or that is otherwise secured by an Encumbrance; (c) any earn-out or milestone agreements or other deferred payment obligations, including for the deferred purchase price of assets,

property (including deferred rent or other deferred lease payments), goods or services, and including deferred compensation arrangements and underfunded employee benefit obligations; (d) accrued payroll obligations, vacation accruals, severance obligations, retention bonuses and other compensatory payment obligations to directors, members, officers or Business Employees, together with the employer portion of any payroll or other Taxes associated with such payments, (e) obligations under leases that would be characterized as capital leases under GAAP or IFRS, (f) any dividends declared or committed but that remain unpaid, (g) obligations under any interest rate, currency or other hedging agreement (determined on the basis of actual, not notional, obligations), (h) obligations under conditional sale or other title retention agreements, (i) any obligation or liability arising from cash/book overdrafts, (j) principal, interest (including default interest), premiums, penalties (including prepayment and early termination penalties and default penalties or judgments), breakage fees; (k) any indebtedness of another entity or person, the payment of which is (i) guaranteed, directly or indirectly by the Company or any Portfolio Company or Project Company; or (ii) secured, directly or indirectly, by a Lien against any right, title and interest in and to the business, properties, assets and rights of any kind, whether tangible or intangible, real or personal owned by the Company; (l) any Taxes the payment of which has been deferred by the Company under any COVID 19 Law; (m) any other amounts owing in respect of the items described in the foregoing clauses (a) through (l), including any and all off-balance sheet liabilities and obligations of the Company with respect to any of the above. Notwithstanding the foregoing, and for the avoidance of doubt, Company Transaction Expenses, and Benefits Liabilities shall be excluded from the definition of Company Indebtedness. Exhibit E-2 sets forth an example of the calculation of Company Indebtedness as of 31.12.2020.

"Company Intellectual Property" means all Intellectual Property owned by or licensed to the Company, any Portfolio Company or Project Company and all Intellectual Property otherwise relating to, used in or held for use in connection with the business of the Company, any Portfolio Company or Project Company.

"Company Transaction Expenses" means all costs, fees and expenses that are incurred by the Company and the Selling Parties in connection with the Transaction Agreements and the agreements contemplated hereby and thereby (including preliminary discussions, term sheet negotiations and discussions with any other Person) and the consummation of the transactions contemplated hereby and thereby.

"Confidential Information" means any proprietary or confidential information relating to the products, services, business or affairs of the Company (whether or not such information is embodied in writing or other physical form), including information relating to (a) personnel data; (b) the identity of, or courses of dealings or contracts with, actual or potential business relations; (c) financial statements or other financial information; (iv) Intellectual Property; (v) Know-How; and (d) information received by the Company from a Person that, to the Knowledge of the Selling Parties, is subject to the terms of a confidentiality, non-disclosure or similar agreement; provided, however, that "Confidential Information" shall not include information that: (i) is or becomes generally available to the public other than as a result of a disclosure by the Selling Parties or any of their Affiliates in violation of (A) the terms of this Agreement, (B) applicable Legal Requirements or (C) any other agreement between the Parties imposing an obligation of confidentiality; or (ii) is or becomes available to the Selling Parties or any of their Affiliates on a non-confidential basis from a source other than the Company or Buyer, provided that the source is not known to the Selling Parties (after due inquiry) to be bound by a confidentiality agreement with the Company or Buyer with respect to such information.

"Contract" means any written or oral agreement, contract, purchase order, sales order or other legally binding commitment, arrangement or undertaking, together with any amendments and modifications thereto.

"COVID-19 Assistance" means any (a) loan, advance, guarantee, extension of credit, credit enhancement, credit support, reduced interest rate, equity purchase or capital contribution, waiver or forgiveness of any obligation, payment deferral, tax deferral, tax filing deadline extension or any other kind of financial assistance, provided by, or on behalf of, a Governmental Authority or financial institution, or (b) Indebtedness, reimbursement obligation or other liability of any nature owed to, or on account of, or for the benefit of, a Governmental Authority or financial institution, in each case, in connection with COVID-19 or pursuant to COVID-19 Laws.

"COVID-19 Laws" means (a) Presidential Proclamation 9994 of March 13, 2020 Declaring a National Emergency Concerning the COVID-19 outbreak, (b) the CARES Act, (c) the Families First Coronavirus Response Act of 2020 as in effect from time to time and (iv) any related laws, orders, rules, rulings, proclamations, regulations, guidelines or FAQs issued or enacted by a Governmental Authority.

"Creditors" means such lenders, creditors (including the U.S. Small Business Administration), suppliers, services providers and third parties to which the Company owes the Creditors Funded Debt, which Creditors are listed in Schedule 1.1(b) attached hereto.

"Creditors Closing Repayment" means the repayment of the Funded Debt on Closing by the Buyer, on behalf of the Company.

"Customer" means any party to a Customer Agreement with any Project Company or an Affiliate thereof.

"Customer Agreement" shall mean each solar power and services agreement or solar power purchase agreement between a Project Company and a Customer.

"Damages" has the meaning set forth in Section 7.2(a).

"Data Agreements" has the meaning set forth in Section 3.19.

"Disclosure Schedules" means the disclosure schedules of the Selling Parties set forth in Schedule III.

"Dispute Notice" has the meaning set forth in Section 2.10(b).

"Disputed Items" has the meaning set forth in Section 2.10(b).

"Employment Agreements" has the meaning set forth in the Recitals.

"Encumbrance" means any lien, mortgage, pledge, claim, charge, right of way, security interest, option, right of first refusal or offer, easement, deed of trust, hypothecation, transfer restriction or other encumbrance.

"Environmental Attributes" means any and all credits, benefits, emissions reductions, offsets, and allowances, howsoever entitled, attributable to a PV System, the production of electrical energy from a PV System and its displacement of conventional energy generation, including (a) any avoided emissions of pollutants to the air, soil or water such as sulfur oxides (SOx), nitrogen oxides (NOx), carbon monoxide (CO) and other pollutants; (b) any avoided emissions of carbon dioxide (CO2), methane (CH4), nitrous oxide, hydrofluorocarbons, perfluorocarbons, sulfur hexafluoride and other greenhouse gases (GHGs) that have been determined by the United Nations Intergovernmental Panel on Climate Change, or otherwise by law, to contribute to the actual or potential threat of altering the Earth's climate by trapping heat in the atmosphere; and ( c ) the reporting rights to any Governmental Authority related to these avoided emissions, such as Green Tag Reporting Rights and Renewable Energy Credits.  Green Tag Reporting Rights are the right of a party to report the ownership of accumulated Green Tags in compliance with federal or state law, if applicable, and to a federal or state agency or any other party, and include Green Tag Reporting Rights accruing under Section 1605 (b) of The Energy Policy Act of 1992 and any present or future federal, state, or local law , regulation or bill, and international or foreign emissions trading program. Without limiting the generality of the foregoing, Environmental Attributes include carbon trading credits, renewable energy credits or certificates, emissions reduction credits, investment credits, emissions allowances, green tags, tradeable renewable credits and Green-e® products.

"Environmental Laws" means any and all Legal Requirements relating to pollution, protection of the environment (including ambient air, indoor air, surface water, wetlands, groundwater, soil gas, land surface or subsurface strata), protection of threatened, endangered, special-status or other protected species, protection of natural resources and protection of human health and safety, including Legal Requirements relating to the presence, use, production, manufacture, generation, formulation, handling, transportation, treatment, storage, disposal, distribution, labeling, packaging, testing, processing, discharge, emission, release, threatened release, control, cleanup of or exposure to toxic or hazardous materials, substances, or wastes, and the regulations promulgated thereunder.

"Equity Pledge Agreement" has the meaning set forth in the Nofar Loan agreement.

"ERISA" has the meaning set forth in Section 3.17(a).

"ERISA Affiliate" has the meaning set forth in Section 3.17(a).

"Escrow Account" means the account into which the Escrow Agent has deposited the Escrow Amount in accordance with the Escrow Agreement.

"Escrow Agent" means Citi Bank or such other national recognized bank mutually agreed upon by Buyer and the Seller Representative.

"Escrow Agreement" means the escrow agreement entered into on the Closing Date by Buyer, Seller Representative and Escrow Agent, in a form reasonably satisfactory to the Buyer and the Seller Representative, and in accordance with the provisions herein.

"Estimated Benefits Liabilities" has the meaning set forth in Section 2.8(a).

"Estimated Closing Balance Sheet" has the meaning set forth in Section 2.8(a).

"Estimated Closing Date Indebtedness" has the meaning set forth in Section 2.8(a).

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE129Z

"<u>Estimated Closing Statement</u>" has the meaning set forth in Section 2.8(a).

"<u>Estimated Closing Working Capital</u>" has the meaning set forth in Section 2.8(a).

"<u>Estimated Company Transaction Expenses</u>" has the meaning set forth in Section 2.8(a).

"<u>Export Control Laws</u>" has the meaning set forth in Section 3.4(b).

"<u>FCPA</u>" has the meaning set forth in Section 3.4(c).

"<u>Financial Statements</u>" has the meaning set forth in Section 3.13(a).

"<u>Founders</u>" shall mean Ran Bujanover and Barend Venter.

"<u>Funded Debt</u>" or "<u>Creditors' Funded Debt</u>" means such portion of the Company Indebtedness listed in Schedule 1.1(b), which shall be repaid by Buyer, on behalf of the Company, on Closing, out of the proceeds of the Primary Amount, including, the PDA Loan, the BS1007 Loan, the SBA Loan, the Affiliate Loan, and the Salary Gap Payment (which shall be paid to the Company).

"<u>Fundamental Representations</u>" has the meaning set forth in Section 7.1.

"<u>GAAP</u>" means generally accepted accounting principles in the United States, as in effect as of December 31, 2020.

"<u>GDPR</u>" has the meaning set forth in the definition of Privacy Laws.

"<u>Governmental Authority</u>" means any United States or foreign, federal, state, local or other governmental, administrative or regulatory authority, agency, bureau, commission, department or other governmental or administrative instrumentality, subdivision, court, arbitrator, tribunal or body.

"<u>Government Incentives</u>" means any and all (a) depreciation benefits, (b) investment tax credits, (c) production tax credits and (d) similar tax credits or grants under federal, state or local law relating to the construction, ownership or production of energy.

"<u>Hazardous Material</u>" means any material or substance that is regulated, classified or otherwise described as a toxic or hazardous substance, waste or material or a pollutant or contaminant or infectious waste, or words of similar import, in any of the Environmental Laws, or chemicals or compounds that are otherwise subject to regulation, control or remediation, or for which liability can be imposed, under Environmental Laws, and includes asbestos and asbestos containing materials, petroleum (including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any mixture or by-product of any of the foregoing), per- and polyfluoroalkyl substances, toxic mold, pesticides, polychlorinated biphenyls, urea formaldehyde, radon gas and radioactive matter.

"<u>IFRS</u>" means International Financial Reporting Standards, as in effect from time to time, consistently applied throughout the applicable periods.

"<u>Indemnitee</u>" has the meaning set forth in Section 7.3(a).

"<u>Indemnitor</u>" has the meaning set forth in Section 7.3(a).

"<u>Insider</u>" has the meaning set forth in Section 3.5.

"<u>Intellectual Property</u>" means any and all registered and unregistered intellectual property rights as exist throughout the world, for all tangible embodiments (in all forms and media), for all versions and elements, in all languages, and for the entire duration of such rights, including any and all of the following items, together with all rights to sue at law or in equity or recover and retain damages and costs and attorney's fees for past, present, and future infringement, dilution, misappropriation or other violation of any of the foregoing, and all registrations, applications (or rights to apply), renewals, continuations, continuations-in-part, divisions, reissues or other extensions or modifications of legal protections thereof now existing and hereafter filed, issued or acquired: (a) Know-How; (b) patents, patent disclosures, patent rights, patent applications and rights to inventions, discoveries, designs, technology, improvements, business and technical information methods, processes and art (whether or not patentable and whether or not reduced to practice); (c) trademarks, trade dress, trademark registrations, trademark applications, design marks, trade names and corporate names, Internet domain names, service marks, service mark registrations, service mark applications, logos, slogans, industrial designs, trade dress and other source identifiers, together with all translations, adaptations, derivations, and combinations thereof; (d) copyrights, moral rights, copyrightable works and subject matter (including Software), mask work rights, mask work applications, and mask work registrations, copyright registrations and copyright applications; (e) other proprietary rights arising under statutory or common law, contract, or otherwise; and (f) goodwill symbolized by or associated with any of the foregoing.

"<u>Interim Period</u>" has the meaning set forth in Section 6.1(a) below.

"<u>IRS</u>" means the U.S. Internal Revenue Service and any successor thereto.

"<u>Know-How</u>" means trade secrets and other data, discoveries, concepts, ideas, research and development, information, formulae, formulations, inventions (whether or not the subject matter of a patent right and including inventions conceived prior to the Closing Date but not documented as of the Closing Date) and invention disclosures, compositions, designs, drawings, plans, proposals, technical data, specifications, manufacturing and production processes and techniques, databases and other proprietary and confidential information, including technical, scientific, analytical, regulatory and business knowledge and materials, customer and supplier lists and contact names, pricing and cost information, financial, business and marketing plans and proposals, techniques, operating manuals and manufacturing and quality control procedures.

"<u>Knowledge of the Selling Parties</u>" or "<u>Knowledge of the Company</u>" or words of similar import, means the actual and constructive knowledge, including after due inquiry, of each of the Founders and Mr. Rafi Durst.

"<u>Leases</u>" has the meaning set forth in Section 3.8(a)(xiii).

"<u>Leased Facilities</u>" has the meaning set forth in Section 3.11.

"<u>Leased Real Estate</u>" has the meaning set forth in Section 3.11.

"<u>Legal Requirement</u>" means (a) any federal, state, local, municipal, foreign, international, multinational or administrative law, constitution, common law principle, ordinance, code, statute, injunction, rule, statute or governmental regulation; (b) any binding judicial or administrative interpretation of any of

DocuSign Envelope ID: 7D167BD1-05D9-495A-AE2E-53E52EDE1297

the foregoing; (c) the terms and conditions of any agreement with a Governmental Authority; or (d) any governmental requirements or restrictions of any kind, or any rule, regulation or order promulgated thereunder.

"Lender" means any financing entity or bank which provided loans to any Project Company pursuant to the Loan Documents, and all as listed in Schedule 1.1(c) attached hereto.

"Liability" means any debt, liability, commitment, obligation, deficiency, Tax, penalty, assessment, fine, claim, cause of action or other loss, fee, cost or expense of any kind, character or nature whatsoever, whether asserted or unasserted, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated and whether due or to become due.

"Loan Documents" shall mean each loan agreement entered into by a Project Company and/or a Portfolio Company with a Lender, and each other Loan Documents as defined in such loan agreements (including any forbearance agreement).

"Material Adverse Effect" means any event, occurrence, fact, condition or change (including change of law) that, individually or in the aggregate, has, has had or would reasonably be expected to have a material adverse effect on (a) the business, assets, revenues, tax benefits, liabilities, tax liabilities, properties, condition (financial or otherwise), results of operations or prospects, and projects under development of the Company, any Portfolio Company and/or Project Company or its business, as presently conducted or as proposed to be conducted; except for any such effect resulting from (i) the announcement of the transactions contemplated by this Agreement; (ii) any action taken by the Company that is expressly set forth in this Agreement; or (iii) any action taken by the Company to comply with applicable Legal Requirements (provided however that any change of applicable Legal Requirements prior to Closing shall not be excluded from the definition of Material Adverse Effect).

"Material Contracts" has the meaning set forth in Section 3.8(a).

"Membership Interests" shall mean the membership interests of the Company.

"Net Secondary Amount" has the meaning set forth in Section 2.1.

"Nofar Loan Agreement" has the meaning set forth in the Recitals.

"Operating Agreement" means the Company's Amended and Restated Limited Liability Company Agreement dated as of January 1, 2019, as amended and in effect immediately prior to Closing.

"Order" means any charge, restraining order (whether temporary or permanent) or other order, writ, injunction (whether temporary or permanent), judgment, consent, decree, ruling, determination, directive, award or settlement, whether civil, criminal or administrative, of any Governmental Authority.

"Organizational Documents" means (a) the articles or certificate of incorporation and the bylaws of a corporation, (b) the certificate of formation or articles of organization and the operating or limited liability company agreement of a limited liability company, (c) the partnership agreement and any statement of partnership of a general partnership, (d) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (e) any charter or similar document adopted or filed in connection with

the creation, formation or organization of a Person, (f) any foreign equivalent of the foregoing and (g) any amendment to or restatement of any of the foregoing.

"Overlap Period" means a taxable year or other taxable period beginning on or before, and ending after, the Closing Date.

"Party" and "Parties" have the respective meanings set forth in the Preamble.

"Pass-Through Tax Return" means any income or franchise Tax Return filed by the Company in respect of a taxable year ending on or prior to the Closing Date to the extent that the Company is treated as a partnership or other pass-through entity for the purposes of such Tax Return.

"PDA Loan" shall refer to such Revolving Loan Agreement dated 1 January 2019 between Palm Drive Associates LLC ("PDA"), the Company and Blue Sky Utility, LLC pursuant to which PDA extended a loan in principal of 5 million USD to the Company and Blue Sky Utility, LLC.

"PDA Purchase Price" means the amount of USD 989,788 to be paid by Buyer, on Closing, on behalf of the Company directly to PDA, out of the proceeds of the Primary Amount, for the repurchase of all Membership Interests of PDA by the Company, pursuant to the Membership Interest Repurchase Agreement.

"Permit" means any approval, permit, license, certificate, franchise, permission, clearance, registration, filing, notice, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"Permitted Encumbrance" means Encumbrances created by or pursuant to the Project Documents, under the Amended and Restated Operating Agreement, and under federal and state securities Laws.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or other form of business or legal entity.

"Personal Data" means (a) any information or data relating to an identified or identifiable natural person including names, email addresses, phone numbers, job titles, employee identification numbers, location information, ZIP codes, Social Security Numbers, driver's license numbers, government identification numbers, birthdates, addresses, resumes, health information (as defined in 45 CFR § 160.103), credit or debit card numbers, financial account numbers, MAC addresses, IP addresses, unique device identifiers, Unique Identifier Headers (UDIH), serial numbers, account or authentication credentials, passwords and one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person or any other piece of information that allows the identification of a natural person or is otherwise considered personally identifiable information or personal information under Applicable Law; (b) any information or data collected in relation to on-line, mobile or other electronic activities or communications that can reasonably be associated with a particular Person, user, computer, mobile or other device, or instance of any application or mobile application; (c) any information or data collected in relation to off-line activities or communications that can reasonably be associated with or that derives from a particular Person, user, computer, mobile or other device or instance of any application or mobile application, (d) any device ID, device activity data or data collected from a networked physical object, and (e) any of the foregoing data that is aggregated, anonymized or de-identified.

"Post-Closing Period" means all taxable years or other taxable periods that end after the Closing Date and, with respect to the Overlap Period, the portion of such period after the Closing Date.

"Pre-Closing Period" means all taxable years or other taxable periods that end on or before the Closing Date and, with respect to the Overlap Period, the portion of such period ending on and including the Closing Date.

"Primary Amount" has the meaning set forth in Section 2.1 below.

"Primary Disbursement Schedule" has the meaning set forth in Section 2.8(k).

"Privacy Laws" means all applicable Legal Requirements, contractual obligations, self-regulatory standards, regulatory guidance, or written policies or terms of use of the Company that are related to privacy, security, data protection or Processing of Personal Data, including, state attorney general rules or regulations, the European Union General Data Protection Regulation (Regulation (EU) 2016/679) (the "GDPR"), the European Union ePrivacy Directive (Directive 2002/58/EC) and applicable implementing laws, the Federal Trade Commission Act, the California Consumer Privacy Act, the CAN-SPAM Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, Children's Online Privacy Protection Act, the Computer Fraud and Abuse Act, the Gramm Leach Bliley Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, state data security laws, state unfair or deceptive trade practices laws, state biometric privacy acts, state social security number protection laws, state data breach notification laws, and any Legal Requirements concerning requirements for website and mobile application privacy policies and practices, data or web scraping, cybersecurity disclosures in public filings, call or electronic monitoring or recording or any outbound communications (including, outbound calling and text messaging, telemarketing, and email marketing) (together with Personal Data, "Protected Data").

"Processing" means any operation or set of operations which is performed on Personal Data or on sets of Personal Data, whether or not by automated means, such as the receipt, access, acquisition, collection, recording, organization, compilation, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transfer, transmission, dissemination or otherwise making available, alignment or combination, restriction, disposal, erasure or destruction.

"Prohibited Payments" has the meaning set forth in Section 3.4(c).

"Prohibited Person" means (a) a Person on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Department of the Treasury or the Denied Persons List or Entity List administered by the U.S. Department of Commerce; (b) a Person on any list of sanctioned Persons administered by the European Union or Member of the European Union; (c) the government of any nation against which the United States imposes a trade embargo, including any agency or instrumentality thereof; or (d) a Person acting or purporting to act, directly or indirectly, on behalf of, or an entity that is majority owned or controlled by, any of the Persons covered by sub Sections (a), (b) or (c).

"Portfolio Companies" shall mean the entities owned solely or with other entities, directly or indirectly by the Company, and as listed in Schedule 1.1(c) attached hereto.

"Project" shall mean such projects owned and/or operated by the Company (directly or through its Subsidiaries), and as listed in Schedule 1.1(c) attached hereto, including such projects currently under development and construction by the Company (directly or indirectly).

"Project Assets" means all assets and properties of every kind, nature, character and description that are owned by the Company and/or any Portfolio Company and/or Project Company, with respect to each Project, including but not limited to:

(a) the PV System(s) and

(b) the right, title and interest in and to the Project Documents and any amendments or supplements thereto;

(c) the deposits and advances, prepaid expenses and other prepaid items under any of the Project Documents;

(d) the right, title and interest in, under or related to the Project Documents and any claims or other rights to payment thereunder;

(e) unexpired warranties, if any, as of the applicable Closing Date, from third Persons (and claims thereunder) which relate specifically to any of the Project Assets;

(f) all Government Incentives associated with the Project Assets;

(g) all Environmental Attributes associated with the Project Assets;

(h) the right to receive Tax exemptions, Tax reductions, Tax rebates, or other amounts from a Governmental Authority with respect to the Project Assets, and all pending applications therefor;

(i) all books, records, files, manuals and similar documentation related to the Project Assets, but not including any entity books and records of Seller or its Affiliate transferring the Project Assets; and

(j) any governmental approvals, Permits, licenses or other consents relating to the Project Assets, and all pending applications for the issuance or renewal of any of the same.

"Project Companies" shall mean the companies owned solely or with other entities, directly or indirectly by the Company, and as listed in Schedule 1.1(c) attached hereto.

"Project Document" shall mean collectively, with respect to each Project, (i) any Customer Agreement, (ii) any Leases, and documents ancillary thereto, including any attornment and forbearance agreement (iii) any Interconnection Agreement, (iv) any other Material Contract relating to each Project, (v) any agreements for the sale of renewable energy credits generated from the Project (vi) any Loan Document, and (viii) any EPC contracts and O&M agreements; (ix) any other amendment or agreement entered into in substitution or replacement of any thereof.

"Protected Data" has the meaning set forth in the definition of Privacy Laws.

"Prudent Industry Practice" means any of the practices, methods, specifications and standards of safety, as the same are used or approved by, at least, a majority of managers of independent solar power generation facilities in North America, similar in size and type to the Projects during the relevant time period.  Prudent Industry Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is intended to include acceptable practices, methods and acts generally accepted in North America as applicable to the management of independent power facilities, to be a spectrum of good and proper practices, methods and acts including taking reasonable steps to ensure that: (a) equipment, materials, resources, and supplies, are available to meet such PV System's needs; (b) maintenance and repairs are performed by knowledgeable, trained, and experienced personnel utilizing proper equipment; (c) appropriate monitoring and testing are performed to ensure equipment is functioning as designed; (d) equipment is not operated in a reckless manner, in violation of manufacturer's guidelines or in a manner unsafe to workers, the general public, or the interconnected system or otherwise contrary to applicable laws, permits and regulations.

"PPP Escrow Account" means the account into which the PPP Escrow Agent has deposited the PPP Loan amount in accordance with the PPP Escrow Agreement.

"PPP Escrow Agent" means Umpqua Bank.

"PPP Escrow Agreement" means the escrow agreement entered into on the Closing Date by Buyer, Company and Escrow Agent, in a form reasonably satisfactory to the Buyer and the Company.

"PPP Loan" shall mean loan authorized by the U.S. Small Business Administration on 5 April 2021 to the Company in the initial principal amount of USD 147,265.00, #21136887-09.

"Purchased Interests" has the meaning set forth in the Recitals.

"PV System" means a photovoltaic system, including the photovoltaic panels, storage system or equipment, racks, wiring and other electrical devices, conduit, weatherproof housings, hardware, one or more inverters, remote monitoring equipment, connectors, non-utility owned meters, disconnects and over current devices, rooftop and/or carport arrays.

"Recapture Event" means, an event that causes any disallowance, denial or recapture (whether in whole or in part) of any investment tax credits provided by Section 48(a)(1) of the Code or any successor provision thereto claimed by the Company.

"Reference Date" and "Reference Date Balance Sheet" have the respective meanings set forth in Section 3.13(a).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migration or disposing of a Hazardous Material.

"Representative" means, with respect to a particular Person, any director, manager, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Salary Gap Payment" shall mean as defined in Schedule 1.1(b) attached hereto.

"Ṣ̲B̲A̲ ̲L̲o̲a̲n̲" shall refer to the loan authorized by the U.S. Small Business Administration on 9 March 2020 to the Company in the initial principal amount of USD 200,000.

"S̲e̲c̲o̲n̲d̲a̲r̲y̲ ̲A̲m̲o̲u̲n̲t̲" has the meaning set forth in Section 2.1.

"S̲e̲c̲o̲n̲d̲a̲r̲y̲ ̲D̲i̲s̲b̲u̲r̲s̲e̲m̲e̲n̲t̲ ̲S̲c̲h̲e̲d̲u̲l̲e̲" has the meaning set forth in Section 2.8(I) below.

"S̲e̲n̲s̲i̲t̲i̲v̲e̲ ̲D̲a̲t̲a̲" means (a) all Personal Data and (b) other Confidential Information or trade secret information.

"S̲e̲l̲l̲e̲r̲ ̲I̲n̲d̲e̲m̲n̲i̲f̲i̲e̲d̲ ̲P̲e̲r̲s̲o̲n̲s̲" has the meaning set forth in Section 7.2(b).

"S̲e̲l̲l̲i̲n̲g̲ ̲P̲a̲r̲t̲i̲e̲s̲" has the meaning set forth in the Preamble.

"S̲u̲b̲s̲i̲d̲i̲a̲r̲y̲" of a Person means a corporation, partnership, limited liability company, or other business entity of which a majority of the shares of voting securities is at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. With respect to the Company, the Subsidiaries shall be deemed to include all Portfolio Companies and Project Companies.

 "Tail Policies" has the meaning set forth in Section 6.11.

"T̲a̲x̲ ̲A̲u̲t̲h̲o̲r̲i̲t̲y̲" means, with respect to any Tax, the Governmental Authority that imposes such Tax, and any agency charged with the administration or collection of such Tax.

"T̲a̲x̲ ̲C̲o̲n̲t̲e̲s̲t̲" means any deficiency, proposed adjustment, adjustment, assessment, audit, examination, litigation, inquiry or other administrative or court proceeding, suit, dispute or other claim relating to Taxes.

"T̲a̲x̲ ̲I̲n̲c̲e̲n̲t̲i̲v̲e̲" has the meaning set forth in Section 3.15(I).

"T̲a̲x̲ ̲R̲e̲t̲u̲r̲n̲" means any and all reports, returns (including information returns), declarations, or statements relating to Taxes, including any schedule or attachment thereto and any amendment thereof, filed with or submitted to, or required to be filed with or submitted to, any Tax Authority in connection with the determination, assessment, collection or payment of Taxes or in connection with the administration, implementation or enforcement of or compliance with any legal requirement relating to any Tax.

"T̲a̲x̲" or "T̲a̲x̲e̲s̲" means all taxes, assessments, charges, duties, fees, levies or other governmental charges, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, unclaimed property, escheat, excise, severance, windfall profits, stamp, license, payroll, social security, withholding, goods and services tax and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest.

"T̲a̲x̲ ̲R̲e̲p̲r̲e̲s̲e̲n̲t̲a̲t̲i̲o̲n̲s̲" has the meaning set forth in Section 7.1.

"Third Party Claim" has the meaning set forth in Section 7.3(b).

"Third Party Consents" means such consents or notice which are to the Knowledge of the Selling Parties, to be obtained from or delivered to third parties in connection with the consummation of the transactions contemplated herein, and as listed in Schedule 2.6(h) attached hereto;

"Transaction Agreements" means (a) this Agreement, and (b)  the Ancillary Agreements.

"Transfer Taxes" has the meaning set forth in Section 2.9(a)(x).

"Unresolved Items" has the meaning set forth in Section 2.10(c)

 "Yellow Tree" has the meaning set forth in the Preamble.

1.2    Construction.

(a)    For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:  (i) words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders; (ii) references herein to "Articles," "Sections," "sub Sections" and other subdivisions, and to Exhibits, Schedules and other attachments, without reference to a document, are to the specified Articles, Sections, sub Sections and other subdivisions of, and Exhibits, Schedules and other attachments to, this Agreement; (iii) a reference to a sub Section or other subdivision without further reference to a Section is a reference to such sub Section or subdivision as contained in the same Section in which the reference appears; (iv) the words "herein", "hereof", "hereunder", "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision; (v) the words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation"; (vi) all accounting terms used and not defined herein have the respective meanings given to them under GAAP, if relating to a period prior to the Closing, or IFRS if relating to a period after the Closing (vii) any reference in this Agreement to $ or dollars means U.S. dollars; (viii) the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends and such phrase shall not mean simply "if."; and (ix) a document or other item shall only be deemed to have been "made available" to Buyer hereunder if the same has been uploaded to the online "data room" maintained for the transactions contemplated hereby at least five Business Days prior to the date hereof and not removed therefrom at any time thereafter.

(b)    Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(c)    Each Party acknowledges that it or he and its or his attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party or any similar rule operating against the drafter of an agreement shall not be applicable to the construction or interpretation of this Agreement.

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

## ARTICLE II
## Subscription and Purchase of Membership Interest

2.1     Subscription for Membership Interests.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Buyer shall make a certain capital contribution to the Company (the "**Primary Amount**"), as adjusted, and subject to the deductions and payments to third parties set forth in Section 2.8 below. The aggregation of the Primary Amount and of the additional capital contribution to be made by the Buyer on Closing to Blue Sky Utility, LLC ("**BSU**") shall amount in the aggregate to USD 20 million (the "**Aggregate Primary Amount**"). The exact allocation of the Aggregate Primary Amount between the Company and BSU shall be determined by the Parties prior to Closing. In consideration for such contribution of the Primary Amount, the Company shall issue on Closing, to the Buyer, an amount of Membership Interests as reflected in Exhibit A-1 attached hereto.

The Creditors' Closing Repayment and the PDA Purchase Price, to the extent payable, shall be paid directly by Buyer, on Closing, to the Creditors and to PDA (respectively) on behalf of the Company in accordance with the Primary Disbursement Schedule.

The Primary Amount, as adjusted pursuant to Section 2.8, shall be referred to as the "Net Primary Amount".

2.2     Purchase and Sale.  Upon the terms and subject to the conditions of this Agreement, simultaneously with the issuance and sale of the Issued Interests, on the Closing Date, each Selling Party shall sell, transfer, assign and deliver to Buyer, and Buyer shall purchase, acquire and accept from each Selling Party, the percentage of Membership Interests in the Company set forth opposite such Selling Party's name in Exhibit A-2 (the "**Purchased Interests**"), in each case free and clear of all Encumbrances, other than Permitted Encumbrances.  The total aggregate purchase price for the Purchased Interests shall be equal to a certain amount (the "**Secondary Amount**"), subject to adjustment, deductions and payments to third parties, as provided in Section 2.8 and to be paid as provided in Section 2.9(a). The aggregation of the Secondary Amount and of the additional purchase price to be paid by the Buyer on Closing to the Selling Parties for the purchase of membership interests in BSU shall amount in the aggregate to USD 6 million (the "**Aggregate Secondary Amount**"). The exact allocation of the Aggregate Secondary Amount with regard to the purchase of membership interests in the Company and BSU shall be determined by the Parties prior to Closing. The purchase price for the Purchased Interests, to the extent paid and after all such adjustments contained herein, including pursuant to Section 7.6, is referred to herein as the "Net Secondary Amount".

2.3     Percentage Interests. Immediately after Closing, and following the subscription for the Issued Interests and the purchase of the Purchased Interests, Buyer shall hold a 67% percentage interest in the Company, on a fully diluted basis.

2.4     Allocation of the Net Secondary Amount. The Net Secondary Amount shall be allocated among and between the Selling Parties as follows: 50% to Blue Sky 1007 and 50% to Yellow Tree.

2.5     Closing.  The closing (the "Closing") of the subscription for the Issued Interests and of the purchase and sale of the Purchased Interests and the other transactions contemplated herein shall take place after the last of the conditions to Closing set forth in Article IX have been satisfied or waived (such waiver being made by the Party benefiting from such Closing condition) (other than conditions which, by their nature, are to be satisfied on the Closing Date, but subject to the satisfaction or waiver of such

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

conditions) and by electronic exchange of duly executed documents by the Parties hereto of the Closing Deliverables listed in Section 2.6 and Section 2.7 below (the date on which the Closing occurs, the "Closing Date").

> 2.6    Closing Deliveries by Company and Selling Parties. At or prior to the Closing, Company and Selling Parties shall deliver or cause to be delivered to Buyer the following:

> (a)    the Amended and Restated Operating Agreement (which shall include an updated schedule of Members reflecting the transactions set forth in this Agreement), duly executed by the Selling Parties and the Founders;

> (b)    a certificate of the Secretary of the Company, in form and substance reasonably acceptable to Buyer, certifying as accurate and complete attached copies of (i) the articles of organization of the Company, (ii) the Operating Agreement, (iii) the resolutions of the members of the Company approving the Transaction Agreements to which the Company is a party and the transactions contemplated hereby and thereby, (iv) the good standing of the Company in its jurisdiction of organization and each other jurisdiction in which such Person is required to be qualified to do business, and  (v) the names and signatures of the members of the Company authorized to sign this Agreement and the Ancillary Agreements;

> (c)    a membership interest transfer power, in a form reasonably satisfactory to the Buyer, duly executed in blank by each of Blue Sky 1007 and Yellow Tree, together with any other documents that are necessary to transfer to Buyer good and valid title to the Purchased Interests, free and clear of all Encumbrances except for Permitted Encumbrances;

> (d)    the Estimated Closing Balance Sheet, the Estimated Closing Statement, the Primary Disbursement Schedule and the Secondary Disbursement Schedule;

> (e)    a certificate signed by an officer of the Company, dated the Closing Date, (i) certifying the updated amount of the Closing Indebtedness of the Company (on a non-consolidated basis) as of Closing and (ii) certifying that all Closing Indebtedness (including without limitation, the Company Indebtedness listed in Schedule 3.13 attached hereto, but with respect to Company and BSU only) was fully paid and discharged as of Closing by the Selling Parties and/or the Founders (the "**Advance Funding**"), and (iii) delivering proof of receipt of the Advance Funding by the respective entities listed in Schedule 3.13, all in a form reasonably satisfactory to the Buyer;

> (f)    a certificate, signed by an officer of the Company, dated the Closing Date, certifying that (a) Schedule 2.10(f) attached hereto is a true and accurate description, updated as of Closing, of (i) all sources of funds promised or available to the Company in connection with the projects listed therein; and (ii) all intended use of such funds in connection with the projects listed therein, and (b) that there are no other costs or liabilities due to third parties in connection with the projects listed therein in order to render such projects fully operational in accordance with the relevant provisions of the Project Documents; and (c) certifying the amounts of funds already received and costs already disbursed, as of Closing in relation to the sources of funds and use of funds set forth in Schedule 2.10(f).

> (g)    a certificate signed by an officer of the Company, dated the Closing Date, certifying that the conditions specified in Section 10.1  have been fulfilled, in a form reasonably satisfactory to the Buyer.

(h)     a certificate signed by the Company, Selling Parties and the Founders, dated the Closing Date, certifying that the conditions specified in Section 10.3(a), Section 10.3(b) and Section 10.3(d) have been fulfilled, in a form reasonably satisfactory to the Buyer.

(i)     Letters of termination, waiver and release dated as of the Closing Date, addressed to the Company from each of the parties set forth on Schedule 2.6(g) attached hereto, and in a form reasonably satisfactory to the Buyer;

(j)     copies of all Company Approvals and Third Party Consents, duly executed by the applicable consenting party (if applicable), and, in the case of the Company Approvals relating to the Leases, and as listed in Schedule 2.6(h) attached hereto;

(k)     waivers duly executed by all holders of pre-emptive rights, rights of first refusal, co-sale, tag along, and/or similar participation rights in the Company, the Portfolio Companies and the Project Companies, in connection with the subscription of the Issued Interests and the purchase and sale of the Purchased Interests, as listed in Schedule 2.6 (i) and in a form reasonably satisfactory to the Buyer.

(l)     the Tail Policies, effective as of the Closing Date;

(m)     the Escrow Agreement, duly executed by Company, the Seller Representative and the Escrow Agent;

(n)     PPP Escrow Agreement, duly executed by Company, and the PPP Escrow Agent;

(o)     a certificate in form and substance as prescribed by Treasury Regulations promulgated under Sections 1445 and 1446 of the Code from each Selling Party, stating that such Selling Party is not a "foreign person" within the meaning of such Code sections. If the Buyer does not receive such certifications on or before the Closing Date, the Buyer shall be permitted to withhold from the payments to be made pursuant to this Agreement any required withholding tax under Section 1445 or 1446 of the Code;

(p)     Membership Interest Repurchase Agreement between PDA and the Company, in in a form reasonably satisfactory to the Buyer, and a membership interest transfer power, in a form reasonably satisfactory to the Buyer, duly executed in blank by PDA, together with any other documents that are necessary to transfer to Company good and valid title to any and all equity or other interests PDA holds in the Company, free and clear of all Encumbrances other than Permitted Encumbrances;

(q)     Employment Agreements duly executed by each Founder and the Company, in a form reasonably satisfactory to the Buyer;

(r)     Nofar Loan Agreement duly executed by Company, in the form attached hereto as Exhibit C;

(s)     Equity Pledge Agreement and Asset Pledge Agreement, duly executed by the Selling Parties and the Company, each in a form reasonably satisfactory to the Buyer and each Selling Party and the Company;

(t)     Evidence reasonably satisfactory to the Buyer that the agreements listed in Schedule 2.6(q) attached hereto have been terminated.

(u)     Evidence reasonably satisfactory to the Buyer that the signatory rights in the Company's bank accounts have been amended to reflect the signatory rights attached hereto as Schedule 2.6(r);

(v)     Management Agreement between the Buyer or an Affiliate thereof, and the Company, in a form reasonably satisfactory to the Buyer and the Selling Parties;

(w)     any other documents and instruments reasonably requested by Buyer or its counsel in connection with the consummation of the transactions contemplated by this Agreement.

2.7     Closing Deliveries by Buyer.  At or prior to the Closing, Buyer shall deliver or cause to be delivered to Seller Representative the following:

(a)     the Amended and Restated Operating Agreement, duly executed by Buyer; and

(b)     the Escrow Agreement, duly executed by Buyer;

(c)     Buyer Approvals (if any), as listed in Schedule 2.7(c) attached hereto;

(d)     a certificate signed by Buyer, dated the Closing Date, certifying that the conditions specified in Section 10.2(a) and Section 10.2(b) have been satisfied;

(e)     appointment letters of officers and managers of the Company appointed by the Buyer;

(f)     Nofar Loan Agreement duly executed by Buyer and/or an Affiliate thereof;

(g)     Equity Pledge Agreement and Asset Pledge Agreement, in a form reasonably satisfactory to the Buyer and each Selling Party and the Company, duly executed by Buyer and/or an Affiliate thereof;

2.8     Pre-Closing Adjustment

(a)     In consideration for the issuance of the Issued Interests (in the Company and in BSU), at the Closing, Buyer shall deliver the Aggregate Primary Amount to the Company and to BSU, adjusted as follows:

(i)     Aggregate Primary Amount; *minus*

(ii)     The PDA Purchase Price; *minus*

(iii)     The Creditors' Closing Repayment, up to a maximum amount of USD 8.5 million (the "**Expected Creditor's Closing Repayment**") to the extent unpaid as of the Closing (it being agreed that such amount refers to the liabilities accrued to both the Company and BSU); *minus*

(iv)    the Company Transaction Expenses, up to a maximum of USD 150,000, to the extent unpaid as of the Closing (the "**Expected Company Transaction Expenses**") (it being agreed that such amount refers to the liabilities accrued to both the Company and BSU);

(b)    The exact allocation of the Aggregate Primary Amount between the Company and BSU shall be determined by the Parties prior to Closing.

(c)    In addition, the Buyer shall pay, on behalf of the Company and BSU, the Expected Creditors Closing Repayment, the PDA Purchase Price and the Expected Company Transaction Expenses directly to the respective payees, and in accordance with the information set forth in the Primary Disbursement Schedule.

(d)    In consideration for the issuance of the Purchased Interests in the Company and in BSU, at the Closing, Buyer shall deliver the Net Aggregate Secondary Amount to the Company, adjusted as follows:

(i)    Aggregate Secondary Amount; *minus*

(ii)    Any Excess Creditors Closing Repayment amount; *minus*

(iii)    The Escrow Amount, *minus*

(iv)    The PPP Escrow Amount, *minus*

(i)    Any Excess Closing Indebtedness (it being agreed that such amount refers to the liabilities accrued to both the Company and BSU); *minus*

(ii)    Any Closing WC Shortfall (it being agreed that such amount refers to the liabilities accrued to both the Company and BSU); *minus*

(iii)    Any Excess Company Transaction Expenses (it being agreed that such amount refers to the liabilities accrued to both the Company and BSU); *minus*

(iv)    Any Excess Benefits Liabilities (it being agreed that such amount refers to the liabilities accrued to both the Company and BSU).

(e)    The exact allocation of the Aggregate Secondary Amount with regard to the purchase of membership interests in the Company and BSU shall be determined by the Parties prior to Closing.

(f)    Not later than five (5) Business Days prior to the anticipated Closing Date, Company shall prepare and deliver to Buyer a consolidated balance sheet of the Company estimated as of the Closing Date (the "**Estimated Closing Balance Sheet**"), prepared in accordance with the Accounting Methodologies and presented on a basis consistent with the illustrative calculations set forth in Exhibit E-1, together with a schedule and worksheet (the "**Estimated Closing Statement**") confirming the Company's estimate as of the Closing Date, of (i) the Creditors Closing Repayment (the "**Estimated Creditors Closing Repayment**"); (ii) Closing Working Capital ascertained from the Estimated Closing

Balance Sheet (the "**Estimated Closing Working Capital**"); (iii) Closing Date Indebtedness (the "**Estimated Closing Date Indebtedness**"); (iv) Company Transaction Expenses (the "**Estimated Company Transaction Expenses**"); (v) Benefits Liabilities (the "**Estimated Benefits Liabilities**").

(g)    If, according to the Estimated Closing Statement:

(i)    the Estimated Creditors Closing Repayment exceeds USD 8.5 million (respectively, the "**Expected Creditors Closing Repayment**" and the "**Excess Creditors Closing Repayment**") (such amount being accounted for the Company and BSU); and/or

(ii)    the Estimated Closing Indebtedness exceeds USD 0 (respectively, the "**Expected Closing Indebtedness**" and the "**Excess Closing Indebtedness**"); and/or

(iii)    the Estimated Closing Working Capital is less than USD 0 (respectively, the "**Expected Closing Working Capital**" and the "**Closing WC Shortfall**", and/or

(iv)    the Estimated Company Transaction Expenses exceed USD 150,000 (it being agreed that such amount refers to the liabilities accrued to both the Company and BSU) (the "**Expected Company Transaction Expenses**" and the "**Excess Transaction Expenses**"; and/or

(v)    the Estimated Benefits Liabilities exceed 0 USD (it being agreed that such amount refers to the liabilities accrued to both the Company and BSU) (respectively, the "**Expected Benefits Liabilities**", and the "**Excess Benefits Liabilities**"),

then, the Buyer shall pay 100% of such Excess Creditors Closing Repayment, and/or Excess Closing Indebtedness, and/or Closing WC Shortfall, and/or Excess Transaction Expenses and/or Excess Benefits Liabilities to the Company (on the account of the Secondary Amount, and provided such amounts do not exceed, in the aggregate, the Secondary Amount), and deduct such amounts from the Secondary Amount.

(h)    The Company shall use such proceeds resulting from the Excess Creditors Closing Repayment, Excess Closing Indebtedness, Closing WC Shortfall, Excess Transaction Expenses and/or Excess Benefits Liabilities to satisfy such additional liabilities of the Company to third parties/creditors, in accordance with the instructions of the Buyer.

(i)    Notwithstanding anything to the contrary in this Agreement, the total aggregate amount of the Aggregate Primary Amount and the Aggregate Secondary Amount, as adjusted in accordance with the terms hereof, that the Buyer shall be required to pay to the Company, BSU and/or the Selling Parties (in the aggregate) shall never exceed USD 26 million, and the Buyer shall not be required to pay to the Company, BSU and/or the Selling Parties (in the aggregate) any amount in excess of USD 26 million.

(j)    In connection with the foregoing, Seller Representative shall provide to Buyer, and shall cause the Company to provide to Buyer, at least 10 Business Days prior to the anticipated Closing Date, copies of, or access to, all books, records, receipts and other information and documentation reasonably necessary for Buyer to confirm Seller Representative's calculation of the Estimated Closing Working Capital, Estimated Closing Date Indebtedness, Estimated Creditors Closing Repayment, Estimated Company Transaction Expenses, Estimated Benefits Liabilities and Estimated Closing Date

Cash, including by providing Buyer with reasonable access to the accountants and other Representatives of the Selling Parties or the Company who assisted in preparing such estimates.

(k)    Together with the delivery of the Estimated Closing Balance Sheet and Estimated Closing Statement, Company shall deliver to Buyer a Schedule (the "Primary Disbursement Schedule"), certified by an officer of the Company and setting forth:

(i)    the portion of the Expected Creditors Closing Repayment set forth next to the name of each Person being repaid such portion of the Expected Creditors Closing Repayment;

(ii)    the payment of the PDA Purchase Price;

(iii)    the portion of the Expected Company Transaction Expenses set forth next to the name of each Person receiving such portion of the Expected Company Transaction Expenses;

(iv)    the portion of the Expected Benefits Liabilities to be paid to each recipient thereof (if any);

(v)    any Excess Creditors Closing Repayment, and/or Excess Closing Indebtedness, and/or Closing WC Shortfall, and/or Excess Transaction Expenses and/or Excess Benefits Liabilities to be paid to each third party/payee.

(vi)    detailed wire instructions for each Person listed on the Primary Disbursement Schedule.

(l)    Together with the delivery of the Estimated Closing Balance Sheet and Estimated Closing Statement, Seller Representative shall deliver to Buyer the Secondary Disbursement Schedule, certified by Seller Representative and setting forth:

(i)    the portion of the Net Secondary Amount withheld from the Selling Parties in respect of the  Escrow Amount;

(ii)    the amount of the PPP Loan Amount into the PPP Escrow Account;

(iii)    the amounts deducted from the Secondary Amount to account for the Excess Creditors Closing Repayment, and/or Excess Closing Indebtedness, and/or Closing WC Shortfall, and/or Excess Transaction Expenses and/or Excess Benefits Liabilities.

(iv)    the applicable portion of the Net Secondary Amount to be paid to each of the Selling Parties; and

(v)    detailed wire instructions for each Person listed on the Secondary Disbursement Schedule.

2.9    Closing Actions.

(a)    At the Closing, Buyer shall take the following actions:

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

(i)      Escrow Deposits.  Buyer shall deliver to the Escrow Agent, on the account of the Aggregate Secondary Amount, $1,000,000 (the "Escrow Amount"), by wire transfer of immediately available funds.

The Escrow Amount shall be used to satisfy any post-closing adjustment of the Secondary Amount and indemnification obligations of the Selling Parties and the Founders under this Agreement.

The Escrow Amount are portions of the Secondary Amount and shall be deducted from the Net Secondary Amount payable to the Selling Parties.  The Escrow Amount shall be held by the Escrow Agent until receipt by the Buyer of the audited financial statements of the Company for the year 2021, subject to the provisions below.

First Release. Within five (5) Business Days following the later of (i) the expiry of the fourth month following the Closing; and (ii) the determination of the Accounting Referee pursuant to 2.10(c) below (if any) (the "**First Release Date**"), in the event that (i)there is any Final Excess Creditors Closing Repayment and/or any Final Excess Closing Indebtedness and/or any Final Closing WC Shortfall and/or any Final Excess Transaction Expenses and/or any Final Excess Benefits Liabilities , and/or (ii) if there are outstanding claims of the Buyer against the Founders and/or the Selling Parties pursuant to Section 7.2 below, then the Buyer shall instruct the Escrow Agent to release any amount (up to the Escrow Amount) (x) to the Company, for the payment of any additional liabilities due by the Company to third parties, in accordance with the instructions of the Buyer; and/or (y) to the Buyer in accordance with the provisions of the Escrow Agreement for the payment of any indemnity claim under Section 7.2 below. Following such payments, the Escrow Agent shall promptly disburse to the Selling Parties (a) USD 500,000.00 minus (b) any amounts released to Buyer or the Company pursuant to the preceding sentence.

Second Release. Within twenty (20) Business Days following receipt of the audited financial statements of the Company for the year ending 31 December 2021 (the "Second Release Date"), Buyer shall instruct the Escrow Agent to release the remainder of the Escrow Amount to the Selling Parties, minus any amounts held back due to valid claims made by Buyer pursuant to Section 7.2 as of the Second Release Date. Any amounts held back on the Second Release Date shall be released to the Selling Parties if and to the extent any outstanding claims are resolved following the Second Release Date.

For the avoidance of doubt, the Escrow Amount may be used for the payment of any claim of the Buyer against the Selling Parties and/or the Founders, pursuant to Section 7.2 below and/or any post-closing adjustment of the Secondary Amount, at the Buyer's sole discretion. In the event of exhaustion of the Escrow Amount, the Selling Parties and the Founders shall indemnify the Buyer with respect to any post-closing adjustment and/or any indemnification claim pursuant to Section 7.2 below, within 30 days of the submission of such claim by the Buyer, and all subject to the Selling Parties and the Founders' limitations of liability pursuant to Section 7 below.

(ii)      PPP Escrow Deposits.  Buyer shall deliver to the PPP Escrow Agent, on the account of the Secondary Amount, the PPP Loan amount (the "PPP Escrow Amount"), in each case by wire transfer of immediately available funds.

The PPP Escrow Amount shall be held in escrow by the PPP Escrow Agent, in accordance with the terms of the PPP Escrow Agreement.

(iii)    <u>Creditors' Closing Repayment</u>.  Buyer shall pay on behalf of the Company the Expected Creditors' Closing Repayment by wire transfer of immediately available funds in accordance with the Primary Disbursement Schedule.

(iv)    <u>PDA Purchase Price</u>. The Buyer shall pay, on behalf of the Company directly to PDA, out of the proceeds of the Primary Amount, the PDA Purchase Price.

(v)    <u>Company Transaction Expenses</u>.  Buyer shall pay on behalf of the Company the Expected Company Transaction Expenses by wire transfer of immediately available funds in accordance with the Disbursement Schedule.

(vi)    <u>Benefits Liabilities</u>.  Buyer shall pay to the Company or its payroll provider the Expected Benefits Liabilities by wire transfer of immediately available funds in accordance with the Primary Disbursement Schedule, and the Company or such payroll provider, as the case may be, shall, as part of the Company's next payroll process, deliver the applicable amount, less any required withholding, to each applicable payee of a Benefit Liability.

(vii)    <u>Payment of the Net Primary Amount to the Company</u>. After the payments contemplated by Section 2.9(a)(i) through 2.9(a)(vi) are made, Buyer shall pay to Company, the Net Primary Amount, together with any amount deducted from the Secondary Amount pursuant to Section 2.10 below.

(viii)    <u>Payment of the Secondary Amount to the Selling Parties</u>.  After the payments contemplated by Section 2.9(a)(i) through 2.9(a)(vi) are made, Buyer shall pay to each Selling Party, in accordance with the allocation set forth in <u>Exhibit A-2</u>, the applicable portion of the Secondary Amount by wire transfer of immediately available funds to the accounts of the Selling Parties set forth in the Secondary Disbursement Schedule.

(ix)    <u>Withholding Rights</u>.  Buyer and the Company shall be entitled to deduct and withhold from any payment to any Person under this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment or any other Tax withholding obligation with respect to this Agreement under the Code or any provision of applicable Tax law and to collect any necessary Tax forms, including appropriate Forms W-8 or W-9, as applicable.  To the extent that amounts are so withheld or deducted by Buyer or the Company, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made.

(x)    <u>Transfer Taxes</u>.  Any and all transfer, documentary, sales, use, stamp, registration and such other Taxes and fees (including penalties and interest) with respect to the issuance of the Issued Interests and the transfer of the Purchased Interests (collectively, "<u>Transfer Taxes</u>") shall be paid by the Selling Parties.

2.10    <u>Post-Closing Adjustments</u>.

(a)    No later than the 90th day following the Closing Date, Buyer will prepare and deliver to Seller Representative a consolidated balance sheet of the Company as of the Closing (the "**Closing Balance Sheet**"), prepared in accordance with the Accounting Methodologies and presented on a basis consistent with the illustrative calculations set forth in <u>Exhibit E-1</u>, together with a statement (the

"**Closing Statement**") setting forth Buyer's good faith calculation of Creditors' Closing Repayment, Closing Working Capital, Closing Date Indebtedness, Company Transaction Expenses and Benefits Liabilities.

(b)     Seller Representative shall have 45 days following its receipt of the Closing Balance Sheet and the Closing Statement to deliver to Buyer any objections that Seller Representative (on behalf of the Selling Parties) may have to any of the matters set forth therein.  If Seller Representative does not deliver any written objections to Buyer within such ten Business Day period, the Selling Parties shall be deemed to have accepted the Closing Balance Sheet, the Closing Statement and the calculations set forth therein, and the Selling Parties shall have irrevocably waived any right to object thereto.  If Seller Representative does timely deliver such written objections (a "**Dispute Notice**"), which Dispute Notice specifies in reasonable detail, together with any supporting calculations, the nature and dollar amount of any disagreement so asserted and the proposed corrections (collectively, the "**Disputed Items**"), then, during the ten Business Days following Buyer's receipt of a Dispute Notice, Buyer and Seller Representative shall diligently and in good faith attempt to resolve in writing the Disputed Items.  Any Disputed Item resolved in writing by Buyer and Seller Representative will be deemed final, binding and conclusive on the Parties.

(c)     If Buyer and Seller Representative do not reach an agreement on all of the Disputed Items during such ten Business Day period, then, at the end of such period, Buyer and Seller Representative will simultaneously submit all unresolved Disputed Items (collectively, the "**Unresolved Items**") to a nationally recognized accounting firm mutually acceptable to Buyer and Seller Representative (the "**Accounting Referee**") to review and resolve such matters.  Each of Buyer and Seller Representative agrees to execute and deliver any engagement letter reasonably required by the Accounting Referee.  The Accounting Referee will determine each Unresolved Item (the amount of which may not be more favorable to Buyer than the related amount reflected in the Closing Statement nor more favorable to the Selling Parties than the related amount set forth in the Dispute Notice) as promptly as practicable, and Buyer and Seller Representative will instruct the Accounting Referee to endeavor to complete such process within a period of no more than twenty calendar days.  In making its determinations hereunder, the Accounting Referee shall act as an expert and not as an arbitrator.  The Accounting Referee may conduct such proceedings as the Accounting Referee believes, in its sole discretion, will assist in the determination of the Unresolved Items; provided, however, that, except as Buyer and Seller Representative may otherwise agree in writing, all communications between Buyer and Seller Representative or any of their respective Representatives, on the one hand, and the Accounting Referee, on the other hand, will be in writing with copies simultaneously delivered to the non-communicating Party.  Provided that Buyer and the Company have made available to Seller Representative and their Representatives in a timely manner all information relating to the Closing Statement reasonably requested by Seller Representative, then the Accounting Referee shall make its determination solely based on (i) the documentation submitted by, and presentations (any such documentation or presentation must be provided to the other Party prior to its submission or presentation to the Accounting Referee) made by Buyer and Seller Representative, (ii) the definitions of Creditors' Closing Repayment, Closing Working Capital, Closing Date Indebtedness, Company Transaction Expenses and Benefits Liabilities and (iii) consistent with the Accounting Methodologies. The Accounting Referee's determination of the Unresolved Items will be final, binding and conclusive on the Parties, absent manifest errors, and enforceable before a Governmental Authority, effective as of the date the Accounting Referee's written determination is received by Buyer and Seller Representative.  Each of Buyer and Seller Representative (on behalf of the Selling Parties) will bear their own legal, accounting and other fees and expenses of participating in such dispute resolution procedure.  The fees and expenses of the Accounting Referee incurred pursuant to this Section 2.10(c) shall be

allocated to be paid by Buyer, on the one hand, and Seller Representative (on behalf of the Selling Parties), on the other, based upon the percentage that the portion of the contested amount not awarded to each Party bears to the amount actually contested by such Party, as determined by the Accounting Referee.

(d)    Upon final determination of the adjustments to be made (if any), the Buyer or the Accounting Referee (as the case may be) will determine the final adjusted amounts of the Creditors Closing Repayment (the "**Final Creditors Closing Repayment**"), Closing Working Capital (the "**Final Closing Working Capital**"), Closing Date Indebtedness (the "**Final Closing Date Indebtedness**"), Company Transaction Expenses ("**Final Company Transaction Expenses**") and Estimated Benefits Liabilities (the "**Final Benefits Liabilities**").

(e)    If, upon final determination of such adjustments, it appears that:

(i)    the Final Creditors Closing Repayment exceeds the Estimated Creditors Closing Repayment (the "**Final Excess Creditors Closing Repayment**"); and/or

(ii)    the Final Closing Indebtedness exceeds the Estimated Closing Indebtedness (the "**Final Excess Closing Indebtedness**"); and/or

(iii)    the Final Closing Working Capital is less than the Estimated Closing Working Capital (the "**Final Closing WC Shortfall**"); and/or

(iv)    the Final Company Transaction Expenses exceed the Estimated Company Transaction Expenses (the "**Final Excess Transaction Expenses**";

(v)    the Final Benefits Liabilities exceed the Estimated Benefits Liabilities (the "**Final Excess Benefits Liabilities**"), and/or

then the Buyer shall instruct the Escrow Agent to pay the Company 100% of such Final Excess Creditors Closing Repayment and/or Final Excess Closing Indebtedness and/or Final Closing WC Shortfall and/or Final Excess Transaction Expenses and/or Final Excess Benefits Liabilities, out of the proceeds deposited in the Escrow Account, on the account of the Secondary Amount, subject to the provisions of Section 2.9 (a) (i) above.

In the event of exhaustion of the Escrow Amount, the Selling Parties and the Founders shall pay the remainder of the Final Excess Creditors Closing Repayment and/or Final Excess Closing Indebtedness and/or Final Closing WC Shortfall and/or Final Excess Transaction Expenses and/or Final Excess Benefits Liabilities to the Company, within 30 days of the submission of such claim by the Buyer, and all subject to the Selling Parties and the Founders' limitations of liability pursuant to Section 7 below.

(f)    Following such payment to the Company, the Company shall use such proceeds resulting from the Excess Creditors Closing Repayment, Excess Closing Indebtedness, Closing WC Shortfall, Excess Transaction Expenses and/or Excess Benefits Liabilities to satisfy such additional liabilities of the Company to third parties, in accordance with the instructions of the Buyer.

(g)    Any payments made pursuant to this Section 2.10(d) shall be treated as an adjustment to the Net Secondary Amount by the Parties for Tax purposes and shall be treated as such by the Parties on their Tax Returns.

(h)      Following the Closing and continuing until the Second Release Date, any amounts received by the Company with respect to the tax equity arrangements and other sources of funding, set forth on Schedule 2.10(h) and with respect to the specific projects listed in Schedule 2.10(h) shall be allocated as follows:

(i)      first, to replenish any amounts in the Escrow Account to the extent there is less than USD 1 million in the Escrow Account prior to the First Release Date and less than USD 500 thousand in the Escrow Account on or after the First Release Date; provided that in no event shall the funds in the Escrow Account exceed the Escrow Amount; and

(ii)      thereafter, to BS 1007 and Yellow Tree, pro rata in accordance with the allocation set forth on the Secondary Disbursement Schedule, and provided only that

(A)      the Company provided the Buyer with audited consolidated financial statements of the Company for the year ending 31 December 2020 in accordance with the provisions of Section 6.12 below; and

(B)      the Company provided the Buyer with the Company's reviewed financial statements for Q2 2021; and

(C)      all costs and liabilities mentioned in the "uses" column of Schedule 2.10 (f) were paid by the Company;

(D)      all sources of funding in the amount of at least all costs and liabilities mentioned in  2.10(h)(ii)(h)(C) above have been received by the Company; and

(E)      there are no outstanding claims of the Buyer pursuant to this Section 2.10 against the Company, the Founders and/or the Selling Parties.

## ARTICLE III
## Representations and Warranties Regarding the Company

The Company, the Selling Parties and the Founders hereby represent and warrant to Buyer as of the date hereof and as of the Closing Date as follows, except as set forth in Schedule III (the "Disclosure Schedule"), which disclosures shall be deemed to be representations and warranties as if made hereunder, as of the Effective Date and as of the Closing Date. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections and subsections contained in this Article III, and the disclosures in any section or subsection of the Disclosure Schedule shall qualify other sections and subsections in this Section 3 only to the extent it is reasonably apparent from a reading of the disclosure that such disclosure is applicable to such other sections and subsections.

3.1      Organization; Authorization; etc.

(a)      Each of the Company, the Portfolio Companies and the Project Companies is a limited liability company duly organized, validly existing and in good standing under the laws of its state of formation.  Each of the Company, the Portfolio Companies and the Project Companies has all requisite limited liability company power and authority to own, lease and operate its properties and assets and to carry on its business as it is now being conducted.  Each of the Company, the Portfolio Companies and

the Project Companies is in good standing and is duly qualified as a foreign entity to transact business in each jurisdiction in which the nature of the property owned or leased by it or the conduct of its business requires it to be so qualified.

(b)    Except for the Portfolio Companies and the Project Companies, the Company does not own or hold, directly or indirectly, any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for any equity interest or similar interest in, in any other Person.

(c)    Except as set forth in the organizational chart attached hereto as Schedule 3.1(c), none of the Company, the Portfolio Companies or the Project Companies has any Subsidiaries or owns, directly or indirectly, any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for any equity or similar interest in, any other Person.

(d)    Accurate and complete copies of (i) the articles of organization; (ii) the Operating Agreement; and (iii) minutes of meetings, or written consents in lieu of meetings, of the members, boards of directors or managers (or similar governing bodies) and committees of the boards of directors or managers (or similar governing bodies) (in each case, together with all amendments thereto) of the Company and its Subsidiaries have been delivered or made available to Buyer.  Neither the Company, nor any Portfolio Company and/or Project Company is not in default under or in violation of any provision of its organizational documents in any material respect.  There are no unpaid Transfer Taxes.

(e)    The Company has all requisite limited liability company power and authority to execute and deliver the Transaction Agreements to which it is a party, to perform its obligations thereunder and to consummate the transactions contemplated thereby.  The execution and delivery of the Transaction Agreements to which it is a party, the performance of the Company's obligations thereunder and the consummation of the transactions contemplated thereby have been duly and validly authorized by all necessary corporate or other action on the part of the Company.  The Transaction Agreements to which it is a party have been duly executed and delivered by the Company and (assuming due execution by the other parties thereto) constitute the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (ii) to the extent the indemnification provisions contained in the Operating Agreement may be limited by applicable federal or state securities laws.

(f)    The execution and delivery of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the articles of organization or other organizational documents of the Company, the Portfolio Companies and/or the Project Companies; (b) conflict with or result in a violation or breach of any provision of any Legal Requirement or Order applicable to the Company, the Portfolio Companies and/or the Project Companies; (c) except for the Third Party Consents listed in Schedule 3.1(f), require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which the Company the Portfolio Companies and/or the Project Companies are a party or by which the Company, the Portfolio Companies and/or the Project Companies are bound or to which any of their respective properties and assets are

subject (including any Material Contract) or any Permit affecting the properties, assets or business of the Company, the Portfolio Companies and/or the Project Companies and/or result in additional liabilities of the Company to pay bonuses or compensation to any Business Employee or any other third party; or (d) result in the creation or imposition of any Encumbrance on any properties or assets of the Company, the Portfolio Companies and/or the Project Companies.

(g)    No registrations, filings, applications, notices, consents, approvals, orders, qualifications, authorizations or waivers are required to be made, filed, given or obtained by the Company, the Portfolio Companies and/or the Project Companies with, to or from any Person, including any Governmental Authority, in connection with the execution and delivery of the Transaction Agreements by the Company or the Selling Parties or the consummation of the transactions contemplated hereby or thereby, except as set forth on Schedule 3.1(g) (the "Company Approvals").

3.2    Capitalization; Structure.

(a)    All of the issued and outstanding Membership Interests are held by the Selling Parties and PDA, immediately prior to Closing, in the amounts and percentages set forth in Exhibit A-1. All such Membership Interests are uncertificated and constitute one hundred percent (100%) of the total issued and outstanding limited liability company interests of the Company, on a Fully Diluted Basis.

(b)    The respective organizational documents of each Subsidiary have been made available to Buyer. The allocations and distributions of cash and proceeds in each such Subsidiary are set forth in each such organizational document.

(c)    Exhibit A-2 sets forth the capitalization of the Company immediately following the Closing including the number issued and outstanding Membership Interests and the holders of such Membership Interests. The Company does not have and has never had any issued or outstanding stock options, warrants or any other securities convertible or exchangeable into equity of the Company. There are no outstanding rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any Membership Interests, or any securities convertible into or exchangeable for Membership Interests.

(d)    The Membership Interests of the Company (including the Purchased Interests and the Membership Interests repurchased by the Company from PDA) (i) were duly authorized and validly issued in compliance with federal and applicable state and foreign Legal Requirements, free and clear of all Encumbrances and exempt from registration under all applicable federal and state securities laws and regulations; (ii) are fully paid and nonassessable, (iii) have not been issued in violation of any preemptive rights and (iv) are not subject to preemptive rights, rights of first refusal or similar rights created by statute, the Company's organizational documents or any agreement.  Except as set forth in the Membership Interest Repurchase Agreement, there are no (i) outstanding obligations of the Company to repurchase, redeem or otherwise acquire any securities of the Company or (ii) outstanding obligations of the Company to provide funds to or make an investment (in the form of a loan, capital contribution or otherwise) in the Company or any other Person. There are no other outstanding securities of the Company, including any debt securities or any options, profit interests, warrants, calls, commitments, agreements or other rights of any kind, giving any Person the right to acquire, or any securities that, upon conversion, exchange or exercise would give any Person the right to require the issuance, sale or transfer of, or obligations to issue, sell or transfer, or otherwise convertible, exercisable or exchangeable into, any limited liability company

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE129Z

interests or other equity interests in the Company.  Except for the Membership Interests held by the Selling Parties and PDA, immediately prior to Closing, there are no authorized or outstanding equity interest or unit appreciation rights, phantom equity interest or unit plans, profit participation rights or other similar rights with respect to the Company.

(e)    Upon execution and delivery of the Amended and Restated Operating Agreement, the Issued Interests will be validly issued and duly authorized and upon payment of the Net Primary Amount on Closing, the Buyer will have good title to the Issued Interests free and clear of all Encumbrances except for Permitted Encumbrances.

(f)    The Membership Interests of each Portfolio Company and each Project Company were duly authorized and validly issued, fully paid and non-assessable without restriction on the rights of transfer thereof, except under the Project Documents. The Company and/or the respective Portfolio Company as set forth in Schedule 3.2(f) attached hereto has good and valid title to and is the lawful, legal, record and beneficial owner of the Membership Interest of each Portfolio Company and/or Project Company (respectively) free and clear of all Encumbrances other than Permitted Encumbrances. The Membership Interests of each Portfolio Company and each Project Company  (i) were duly authorized and validly issued in compliance with federal and applicable state and foreign Legal Requirements, free and clear of all Encumbrances and exempt from registration under all applicable federal and state securities laws and regulations; (ii)  have not been issued in violation of any preemptive rights and (iv) are not subject to preemptive rights, rights of first refusal or similar rights created by statute, other than as stated in the Project Documents.  There are no (i) outstanding obligations of each Portfolio Company and each Project Company to repurchase, redeem or otherwise acquire any securities of such Portfolio Company and/or Project Company or (ii) outstanding obligations to provide funds to or make an investment (in the form of a loan, capital contribution or otherwise) in the Portfolio Company and/or Project Company or any other Person. There are no other outstanding securities of the Portfolio Company and/or Project Company, including any debt securities or any options, profit interests, warrants, calls, commitments, agreements or other rights of any kind, giving any Person the right to acquire, or any securities that, upon conversion, exchange or exercise would give any Person the right to require the issuance, sale or transfer of, or obligations to issue, sell or transfer, or otherwise convertible, exercisable or exchangeable into, any limited liability company interests or other equity interests in the Company.  Immediately prior to Closing, except as set forth in Schedule 3.2(f) attached hereto, there are no authorized or outstanding equity interest or unit appreciation rights, phantom equity interest or unit plans, profit participation rights or other similar rights with respect to each Portfolio Company and/or Project Company.

(g)    The Company directly owns all or part of the outstanding Membership Interests of the Portfolio Companies, as set forth in the organizational chart attached hereto as Schedule 3.2(g), and the Portfolio Companies do not have any other securities of any class of membership interests issued, reserved for issuance or outstanding; (ii) except as may be set forth in their respective operating agreements, there are no existing options, warrants, calls, exchange rights, conversion rights, or other commitments, Contracts of any character made or granted by or binding upon the Portfolio Companies relating to the issuance of Membership Interests of the Portfolio Companies or to the issuance of any securities or obligations convertible into or exchangeable for, or giving any Person any right to subscribe for or acquire from the Portfolio Companies, any membership interests or other securities or obligations of the Portfolio Companies convertible into Project Membership Interests of the Portfolio Companies; and (iii) none of the Portfolio Companies now have or have ever had any Subsidiaries, except as set forth in Schedule 3.2(g) attached hereto.

(h)    Each Portfolio Company owns all of the outstanding Membership Interests of the respective Project Companies, as set forth in the organizational chart attached hereto as Schedule 3.2(h), and the Project Companies do not have any other securities of any class of membership interests issued, reserved for issuance or outstanding; (ii) except as may be set forth in their respective operating agreements, there are no existing options, warrants, calls, exchange rights, conversion rights, or other commitments, Contracts of any character made or granted by or binding upon the Project Companies relating to the issuance of Membership Interests of the Project Companies or to the issuance of any securities or obligations convertible into or exchangeable for, or giving any Person any right to subscribe for or acquire from the Project Companies, any membership interests or other securities or obligations of the Project Companies convertible into Membership Interests of the Project Companies; and (iii) none of the Project Companies now have or have ever had any Subsidiaries, except as set forth in Schedule 3.2(h) attached hereto.

(i)    The Company has never adopted, sponsored or maintained any option plan or any other plan or agreement providing for equity compensation (including profits interests) to any Person.

(j)    Except as set forth in Schedule 3.2(j), there are no change of control or similar rights, anti-dilution protections, accelerated vesting rights or other rights that the Selling Parties, any officer, employee or director of the Company, or any other Person would be entitled to exercise or invoke in connection with the Company, the Portfolio Companies and/or the Project Companies as a result of, or in connection with, the transactions contemplated by the Transaction Agreements or otherwise.

(k)    There are no voting trusts or other agreements or understandings to which the Company is a party with respect to the voting of the equity securities of the Company.  Following the Closing, no Person will have any right to receive limited liability company interests or other equity interests in the Company upon exercise, conversion or vesting of any right or convertible instrument.

3.3    Sole Purpose.  Since each applicable Portfolio Company's and Project Company's formation, (i) such Portfolio Company and/or Project Company has been engaged solely in the development, construction, ownership, operation or financing of its respective Project(s), (ii) no Portfolio Company or Project Company has incurred any Liabilities except those incurred in connection with its organization, the development, construction, operation and financing of the respective Project(s) or as otherwise previously disclosed, and (iii) to the Knowledge of the Selling Parties, no Portfolio Company and/or Project Company is a party to any Contract other than the Project Documents, in each case, to which such Project Company is a party.

3.4    Compliance with Laws; Permits.

(a)    The Company has not received written notice of a violation by the Company, the Portfolio Companies or any Project Companies of any Legal Requirement. To the Knowledge of the Selling Parties, none of the Company, the Portfolio Companies or any Project Company (i) is under investigation or inquiry with respect to the violation of any Legal Requirement or (ii)  is currently in violation of any Legal Requirement.

(b)    Neither the Company nor any of its officers or directors is a Prohibited Person. The Company has not engaged in a transaction involving, directly or indirectly, (i) a Prohibited Person, (ii) any country against which the United States imposes or has imposed a trade embargo, or (iii) Crimea, Cuba, Iran, North Korea or Syria.

(c)      Each of the Company, the Portfolio Companies and the Project Companies is in compliance with and none of then has received written notice of actual or alleged noncompliance with applicable Anti-Terrorism Laws, anti-bribery and anti-corruption laws, including the Foreign Corrupt Practices Act of 1977, as amended, and any rules or regulations thereunder (the "FCPA"), and any applicable comparable foreign Legal Requirement.  Neither the Company nor, to the Knowledge of the Selling Parties, any of its Subsidiary, directors, officers, employees, agents or consultants, or any other Person acting for, or on behalf of, the Company, directly or indirectly, has made, undertaken, offered to make, promised to make or authorized the payment or giving of any bribe, rebate, payoff, influence payment, kickback or other payment or gift of money or anything of value (including meals or entertainment), to any officer, employee or ceremonial office holder of any government or instrumentality thereof, any political party or supra-national organization (such as the United Nations), any political candidate, any royal family member or any other person who is connected or associated personally with any of the foregoing for the purpose of influencing any act or decision of such payee in his official capacity, inducing such payee to do or omit to do any act in violation of his lawful duty, securing any improper advantage or inducing such payee to use his influence with a government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality.

(d)      The Permits held by the Company, the Portfolio Companies and the Project Companies as of the Closing Date, constitute all material Permits that are required for the operation of the Company's, the Portfolio Company's and the Project Company's business as presently conducted.  All Permits held by the Company, the Portfolio Companies and the Project Companies are in full force and effect and no such Person is in default in any material respect thereof.  To the Knowledge of the Selling Parties, (i) there are no lawsuits, actions, administrative, arbitration or other proceedings or governmental investigations pending or, threatened against the Company, any Portfolio Company and/or any Project Company that could reasonably be expected to result in the revocation, cancellation, suspension or any other material adverse modification of any Permit held by the Company, the Portfolio Companies and the Project Companies nor (ii) is there any reasonable or legitimate basis for any such revocation, cancellation, suspension or adverse modification.  The Company, the Portfolio Companies and the Project Companies have not received written notice of any loss of or refusal to renew any Permit held by it.

3.5      Affiliate Transactions.  Other than as set forth in Schedule 3.5, none of the Company, the Project Companies or the Portfolio Companies is  a party to any Contract with (i) any Affiliate of the Company, (ii) any Selling Party or any Affiliate of any Selling Party, (iii) any Founder or an Affiliate or a member of the immediate family of any Founder or (iv) any of the Company's managers, officers, directors or employees (or members of their immediate families) or any Affiliate of one of the foregoing Persons (each, an "Insider"); (b) to the Knowledge of the Selling Parties, no Insider owns any direct or indirect interest of any kind in, or controls or is a manager, director, officer, employee or partner of or consultant to, or a lender to or borrower from, or has the right to participate in the profits of, any Person that is a competitor, supplier, customer, landlord, tenant, creditor or debtor of the Company; and (c) no material transaction has taken place between the Company and/or any Subsidiary, on the one hand, and any Insider, on the other hand, that will not have been discharged, terminated or otherwise consummated on or prior to the Closing Date with no further obligation on the part of the Company.

3.6      Title to Assets; Project Assets.

(a)      The Company and each Portfolio Company and Project Company has good, valid and marketable title to (in the case of owned assets) or a valid leasehold or licensed interest in all tangible

personal property, including all buildings, machinery, equipment, Project Assets, and all other material tangible assets, and all Company Intellectual Property, used by it in connection with its business as presently conducted, free and clear of any Encumbrance, other than Permitted Encumbrances. Neither the Company nor, to the Knowledge of the Selling Parties, any Portfolio Company or Project Company, is in default under any lease or license under which it leases or licenses personal property.

(b)    Such property and assets, including the Project Assets, are in satisfactory operating condition, subject to ordinary wear and tear, and are suitable for the purposes used.  The Project Assets and the assets of the Company, the Portfolio Companies and the Project Companies constitute all of the assets necessary to conduct the business of the Company, the Portfolio Companies and the Project Companies as currently conducted, and as proposed to be conducted as of the Closing Date pursuant to the terms of the Operating Agreement.  There has not occurred and, to the Knowledge of the Selling Parties, there is not expected to occur any circumstance or event that would (a) cause any Project Asset, asset of the Company, the Portfolio Companies and the Project Companies to cease to be owned, leased or licensed (as applicable) by them immediately after the Closing, or (b) interfere in any material respect with the current use, occupancy or operation of any such asset.

3.7    Project Sites.

(a)    None of the Company, the Portfolio Companies or the Project Companies own any real property; and

(b)    the rights of each Project Company under the Leases are sufficient for the operation of, the Projects in accordance with all Permits and the Customer Agreements;

(c)    to the Knowledge of Selling Parties, there are no soil, structural, subsurface or other natural or artificial conditions affecting any Leased Facility (including, in the case of any rooftop or canopy Project, any roofing, building, structural or systems conditions) or property subject to an easement that could reasonably be expected to materially adversely affect any Project Company's ability to use and conduct the operations on such real property.

(d)    To the Knowledge of the Selling Parties, there is no Casualty Defect (regardless of whether covered by insurance) that would materially and adversely affect any Project or Project Assets currently in operation.

(e)    To the Knowledge of the Selling Parties, there are no existing express third party options or rights to purchase any Project currently in operation.

(f)    Each PV System currently in operation was constructed and is being operated in accordance with Prudent Industry Practice.

(g)    The financial model of each Project is attached hereto as Schedule 3.7(g) (the "Financial Models") and reflect a good faith estimate of the anticipated revenues and costs of each Project Company.

(h)    The tariff collected from each Customer is in line with the Financial Models and the discount rate granted to each Customer is not expected to be amended, increased or altered in any way following the Closing.

(i)      Other than as set forth in Schedule 3.7(i) attached hereto, the total amount of electricity subscribed for by Customers of each applicable Project's electric output or equivalent virtual net energy metering credits is at least 125% of each applicable Project's total estimated annual electric production.

(j)      The Projects are, as of the Closing Date only, the only projects owned, developed, constructed and/or operated by the Company, the Portfolio Companies and the Project Companies.

3.8    <u>Material Contracts; Project Documents</u>

(a)      Schedule 3.8 sets forth a true and complete list of all of the following Contracts, (and, collectively with the Project Documents, the "<u>Material Contracts</u>"), with respect to the Company, the Portfolio Companies and the Project Companies:

(i)      Contracts that involve aggregate annual payments by or to the Company of more than $50,000;

(ii)      Contracts that evidence Company Indebtedness or pursuant to which an Encumbrance has been placed on any material asset or property of the Company;

(iii)      Contracts that (A) limit the ability of the Company or Affiliate of, or successor to, the Company, or, to the Knowledge of the Selling Parties, any executive officer of the Company, to compete in any line of business or with any Person or in any geographic area or during any period of time or to develop, market, sell, distribute or otherwise exploit Company services or products, (B) grant exclusive rights of any type or scope or rights of first refusal, rights of first negotiation or similar rights or terms to any Person, (C) require the Company or Affiliate of, or successor to, the Company or any Affiliate to use any supplier or other Person for all or substantially all of any of its material requirements or needs in any respect, (D) limit or purport to limit the ability of the Company or any or Affiliate of, or successor to, the Company and/or any Affiliate to solicit any customers, employees or clients of the other parties thereto, (E) require the Company and/or any Affiliate of, or successor to, the Company and/or any Affiliate to provide to the other parties thereto "most favored nation" pricing, or (F) require the Company and/or any Affiliate of, or successor to, the Company and/or any Affiliate to market or co-market any products or services of any other Person;

(iv)      Contracts executed for purposes of granting powers of attorney and proxies entered into by or granted to the Company, whether limited or general, revocable or irrevocable;

(v)      Contracts pursuant to which the Company obtains a right or license to use Intellectual Property other than generally available commercial products such as software and other "click-through" licenses;

(vi)      Contracts that create or relate to a partnership or joint venture to which the Company is a party, or pursuant to which the Company has any ownership interest in any other Person;

(vii)      Contracts for (A) the acquisition or disposition of any equity interests or material assets of the Company or any other Person or (B) any merger, recapitalization, redemption, reorganization or other similar transaction;

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

(viii)     Contracts for the employment of any director, officer, manager,  employee or consultant of the Company or any other type of Contract with any director, officer, manager, employee or consultant of the Company that the Company has obligations towards as of and/or following the date of this Agreement, including any Contract requiring it to make a payment to any director, officer, manager, employee or consultant on account of any transaction contemplated by the Transaction Agreements or any Contract that is entered into in connection with the Transaction Agreements or to provide severance or retention compensation;

(ix)     Contracts with customers of the Company which involve payments to the Company in excess of USD 10,000 per year;

(x)     Contracts under which the Company has, directly or indirectly, made any advance, loan or extension of credit to any Person;

(xi)     Contracts for capital expenditures or the acquisition or construction of fixed assets for the benefit and use of the Company, the performance of which involves consideration in excess of $25,000 annually;

(xii)     Contracts for the purchase or sale of real property;

(xiii)     Contracts pursuant to which the Portfolio Companies or the Project Companies lease real estate from third parties (together, the "Leased Real Estate", and the facilities thereon, the "Leased Facilities") or personal property, all photovoltaic system rooftop license agreements, renewable energy generating system lease agreements, and site lease agreements (collectively, the "Leases");

(xiv)     Contracts between the Company, on the one hand, and any Affiliate of the Company, on the other hand;

(xv)     Contracts that cannot be terminated by the Company without penalty or liability on not more than thirty calendar days' notice; and

(xvi)     Contracts with one or more Governmental Authorities.

(b)     Each Material Contract constitutes a valid and binding obligation of the Company, and/or any Subsidiary enforceable against the Company and/or any Subsidiary in accordance with its terms and, to the Knowledge of the Selling Parties, against the counterparty thereto.  With respect to all such Material Contracts, neither the Company and/or any Subsidiary nor, to the Knowledge of the Selling Parties, any other party to any such Material Contract is in breach thereof beyond all notice and cure periods or material default thereunder.  True and complete copies of each Material Contract set forth in Section 3.8 (together with all amendments, waivers or other changes thereto) have been furnished or made available to Buyer, and, to the Knowledge of the Selling Parties, all of such Material Contracts are legal, valid and in full force and effect.

3.9    <u>Customers</u>.

(a)    <u>Schedule 3.9(a)</u> sets forth a list of the top ten (10) (by revenue) Customers of the Company for each of the two most recent fiscal years and year-to-date 2021 listed by revenue and the amount for which each such customer was invoiced during such period.

(b)    No Customer of the Company has delivered written notice (A) that it shall stop purchasing or materially decrease the volume of purchases of services from a Project Company or (B) requesting a material adverse change in the terms or prices at which such Customer purchases services from the Company.

3.10    <u>Suppliers</u>

(a)    The Company has delivered or made available to Buyer a current list of the ten (10) largest suppliers, service providers and vendors of the Company ("**Large Suppliers**").

(b)    None of the Large Suppliers have delivered written notice to the Company that it shall stop or materially decrease the rate of, supplying materials, products or services to the Company.

(c)    <u>Warranties</u>. The Company has made available to Buyer copies of each current warranty related to the solar photovoltaic panels, inverters, trackers, transformers (if applicable), roofs and data collection of each Project and the underlying PV System of such Project, and each such warranty is in full force and effect (other than as set forth in Schedule 3.10(c) attached hereto).

3.11    <u>Real Estate</u>

(a)    The Company does not own any real property and is not a lessor or sublessor under any lease or sublease of real property.  <u>Schedule 3.11</u> lists (i) each lease or license for real property to which the Company (or any Portfolio Company or Project Company) is a party (together, the "<u>Leased Real Estate</u>" and the facilities thereon, the "<u>Leased Facilities</u>"); (ii)  all subordination, non-disturbance and attornment agreements executed by the Company in respect of any Lease or that are binding on the Leased Real Estate. Except as set forth in Schedule 3.11 (a), there are no deeds of trusts or mortgages that could result in the removal of the Leased Facilities for which there is not a non-disturbance agreement in place.

(b)    Except as set forth in <u>Schedule 3.11(b)</u>, (i) the Company has not received any written notice of a default, offset or counterclaim of any Lease; and (ii) to the knowledge of the Selling Parties, no event has occurred, is pending, or to the Knowledge of the Selling Parties, is threatened, which, after the giving of notice, with lapse of time or otherwise, would constitute any such default or non-compliance by the Company and/or any Subsidiary or, to the Knowledge of the Selling Parties, any other party under such Lease, and no event has occurred that would give rise to a termination right under such Lease following all applicable notice and cure periods.

(c)    The Leases that relate to the leasing, rather than licensing, of real estate constitute all interests in real property, and the Leased Facilities constitute all facilities currently occupied, used or held for use in connection with the business of the Company and that are necessary for the continued operation of such business as currently conducted and the Company enjoys quiet and undisturbed possession of each Leased Facility.  Each Lease (i) is legal, valid, binding, enforceable and

in full force and effect against the Company or the Subsidiary that is the party thereto, as applicable, and, to the Company's Knowledge, against each other party thereto; and (ii) will continue to be legal, valid, binding, enforceable and in full force and effect against the Company or the Subsidiary that is the party thereto, as applicable, and, to the Company's Knowledge, against each other party thereto immediately following the Closing in accordance with the terms thereof as in effect immediately prior to the Closing. No party to any Lease has exercised any right of termination, extension, renewal, purchase option, expansion or right of first refusal with respect to any Lease, except as may be duly documented by amendment, modification or supplement to the applicable Lease.  To the Knowledge of the Selling Parties, all of the operational Leased Facilities and all mechanical systems and utility systems servicing such facilities are in good operating condition and repair (subject to normal wear and tear) free of roof leaks and material defects, are supplied with interconnection points and other services adequate for the operation of such facilities and the PV Systems and are in full compliance with all applicable zoning, building and land-use laws, codes, and requirements, without the requirement for variances, and do not encroach upon any easement which may burden the Leased Real Estate.  There is no Person other than the Company and/or the relevant Subsidiary that is in possession of any Leased Facility and there are no leases, subleases, licenses or other written or oral agreements granting to any Person the right of use or occupancy to any Leased Facility.  Neither the Company nor any Subsidiary has received written notice of any pending condemnation, expropriation, environmental, zoning or other land-use regulation proceeding with respect to the Leased Facilities.

3.12     Environmental Matters. Each of the Company and the Subsidiaries has been and is now in compliance with all applicable Environmental Laws.  To the Knowledge of the Selling Parties, no Release or threatened Release of Hazardous Materials has occurred at the Leased Real Estate or as the result of the PV Systems thereon.  Neither the Company nor any Subsidiary has received written notice of any environmental Claim or actual or alleged noncompliance with, or Liability under, any Environmental Law with respect to the Leased Facilities.  To the Knowledge of the Selling Parties, the Company has not been required by any Governmental Authority or other Person to undertake any remedial or investigative action of any kind pursuant to any Environmental Law.

3.13     Financial Statements.

(a)     The Company has delivered or made available to Buyer true and complete copies of the unaudited balance sheets and other financial statements of the Company for the year ended December 31, 2020(the "Reference Date Balance Sheet" and December 31, 2020 the "Reference Date") (collectively, the "Financial Statements").  The Financial Statements have been prepared in accordance with GAAP and the practices consistently applied by the Company in the preceding fiscal periods (except as may be indicated in the notes thereto to the contrary) and fairly present the financial condition, cash flows and results of operations of the Company for the periods and as of the dates set forth therein, subject to, in the case of the unaudited interim Financial Statements, the absence of information or notes not required by GAAP to be included in interim financial statements that, if furnished, would not, individually or in the aggregate, disclose any material obligation or liability not otherwise accrued for in such Financial Statements, and to normal year-end audit adjustments, none of which, individually or in the aggregate, is material.

(b)     The Company makes commercially reasonable efforts to prepare and keep books, records and accounts that, accurately and fairly reflect the transactions and dispositions of its assets in all material respects.

(c)      The Company does not have any Liability except for (i) Liabilities set forth in the Reference Date Balance Sheet and (ii) Liabilities that have arisen after the Reference Date in the ordinary course of business (none of which was caused by any breach of Contract, breach of warranty, tort, infringement, or violation of a Legal Requirement by the Company).

(d)      Schedule 3.13(d) sets forth an accurate and complete list of all Company Indebtedness.

(e)      (i) Schedule 2.10 (f) sets forth an accurate and complete list, as of the Closing Date,  of (x) all sources of funds promised or available to the Company and/or already received by the Company in connection with the projects listed therein; and (y) all intended use of such funds, and all costs already disbursed in connection with the projects listed therein; (ii) there are no other costs or liabilities due to third parties in connection with the projects listed therein in order to render such projects fully operational in accordance with the relevant provisions of the Project Documents.

3.14    Absence of Certain Changes.  Except as set forth in Schedule 3.14, since December 31, 2020, the Company has conducted its business in the ordinary course of business and in substantially the same manner as previously conducted and there has not occurred any Material Adverse Effect or any damage to or destruction of any material asset of the Company, whether or not covered by insurance. Without limiting the generality of the foregoing, since December 31, 2020, there has not been any:

(a)      authorization, issuance, sale, delivery, or agreement to issue, sell or deliver, limited liability company interests, bonds or other securities (whether authorized and unissued or held in the treasury) of the Company, or purchase, redemption, dividend, retirement, grant, or agreement to grant any options, phantom equity, warrants, registration rights, dividend rights or other rights calling for the issuance, sale or delivery (including upon conversion, exchange or exercise) of limited liability company interests, bonds or other securities of the Company;

(b)      increase or promise to increase any compensation or benefit (including any severance, change of control or retention benefits) payable or to become payable by the Company to any shareholder, equityholder, director, manager, officer, or Business Employee of the Company, including the entry into any employment, severance, retention, change of control or similar Contract with any Business Employee, shareholder, equityholder, director, manager, officer, employee or individual independent contractor of the Company or material modification of any arrangement subject to Section 409A of the Code;

(c)      adoption or termination of, amendment to or increase in the payments or benefits under, any Company Benefit Plan;

(d)      declaration or payment of any dividend or other distribution or payment in respect of limited liability company interests, bonds or other securities of the Company;

(e)      amendment to the organizational documents of the Company;

(f)      sale (other than in the ordinary course of business), lease, license or other disposition of, or imposition of any Encumbrance on, any of the Company's assets or properties;

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

(g)  declaration or commitment of, entry into, amendment of, termination of, or receipt of notice of termination of any (i) employment, severance, redundancy, retention, incentive, change of control, joint venture, license or similar Contract of the Company; (ii) Material Contract or (iii) transaction between the Company, on the one hand, and any stockholder, member, manager, director, officer or partner, or any Affiliate of any such stockholder, member, manager, director, officer, or partner, of the Company, on the other hand;

(h)  declaration or commitment of, or entry into, amendment or renewal of any Contract with a customer under which the Company has provided or has promised to provide a discount outside of the ordinary course of business;

(i)  incurrence of or commitment to incur aggregate capital expenditures in excess of $5,000 individually or $20,000 in the aggregate;

(j)  borrowings or agreements to borrow by the Company, or guarantees by the Company of any indebtedness of any Person, except such borrowings, guarantees or other contingent financial obligations made in the ordinary course of business;

(k)  making of any loans, advances or capital contributions to, or investments in, any Person or payment of any fees or expenses of the Selling Parties or any Affiliate thereof;

(l)  (i) liquidation, dissolution, recapitalization or reorganization in any form of transaction; (ii) filing for bankruptcy or insolvency; or (iii) application for relief of debt or a moratorium on payments; and no other Person has taken any of the foregoing actions, in each case in respect of or on behalf of the Company;

(m)  change with respect to the methods, practices or timing for the collection of amounts owed to the Company, or payment of any amounts payable or other debts or obligations of the Company, including changing from current to long-term any liabilities of the Company;

(n)  cancellation, reduction or waiver of any material debt, claim or right of the Company;

(o)  modification, amendment or adjustment to or of the type or amount of insurance coverage maintained by the Company, including over its assets and properties;

(p)  material change in the accounting methods used by the Company;

(q)  (i) preparation, amendment or filing by or with respect to the Company, or any of its assets, of any Tax Return that is inconsistent with past practice; (ii) position taken, election made or revoked, or method adopted by or with respect to the Company that is inconsistent with positions taken, elections made or methods used in the preparing or filing of similar Tax Returns with respect to the Company or any such assets in prior periods; (iii) entry into, amendment or modification of any Tax sharing arrangement, Tax indemnity contract or similar contract or arrangement affecting the Company or any payments made under any Tax sharing arrangement, Tax indemnity contract or similar contract that are outside the ordinary course of business; (iv) waiver or extension of any statute of limitations with respect to Taxes; or (v) other similar action related to the filing of any Tax Return or the payment of any Tax; or

(r)      settlement, compromise or waiver by the Company of any Claim, including any Claim relating to Taxes.

(s)      agreement, whether oral or written, by the Company to do or cause to be done any of the foregoing (other than negotiations with Buyer and its Representatives regarding the transactions contemplated by the Transaction Agreements).

3.15    <u>Taxes</u>.

(a)      Except as set forth in Schedule 3.15(a), (i) the Company has timely filed all Tax Returns required to be filed by or with respect to the Company (taking into account any valid extensions of time to file) on or prior to the Closing Date, (ii) such Tax Returns were true, correct and complete and accurately reflected all liability for Taxes of the Company for the periods covered thereby, (iii) the Company has timely paid all Taxes  due and payable by, or with respect to, the income, assets or operations of the Company and (iv) the Company has not entered into or been requested to enter into any waivers of statutes of limitations in connection with any Taxes or Tax Returns or any extension of a period for the assessment of any Tax against the Company.  There are no liens for Taxes upon the assets of the Company except for liens securing payment of Taxes that are not yet due.

(b)      All Taxes that the Company is or was required by law to withhold and collect have been withheld, collected and paid over, in each case, in a timely manner, to the proper Tax Authorities and the Company has complied with all information reporting and backup withholding requirements, including the maintenance of required records with respect thereto, in connection with amounts paid to any employee, independent contractor, creditor, or other third party.  No withholding Taxes will be payable with respect to the payments made to the Selling Parties pursuant to this Agreement.  The Company (i) has not been a member of any consolidated, combined, affiliated, unitary or similar group for Tax purposes, and (ii) does not have any Liability for the Taxes of any other Person as a (A) result of being a member of any consolidated, combined, affiliated, unitary or similar group, or (B) transferee or successor, by contract or otherwise.  All of the U.S. federal income Tax Returns filed by or on behalf of the Company for all taxable periods ending on or before December 31, 2016 have either (i) been audited by and settled with the IRS or other applicable Tax Authority or (ii) the statute of limitations has expired.  All Taxes due with respect to any completed and settled Tax Contest have been paid in full.  The Company has not been the subject of any Tax Contest.  There is no Tax Contest that is pending or, to the Knowledge of the Selling Parties, threatened, with respect to any Taxes of the Company and no Tax Authority has given notice of the commencement of (or its intent to commence) any Tax Contest.

(c)      As of the Reference Date, the Company does not have any liabilities for unpaid Taxes attributable to Pre-Closing Periods that have not been accrued or reserved on the Reference Date Balance Sheet, whether asserted or, unasserted, contingent or otherwise, and the Company has not incurred any liability for Taxes attributable to Pre-Closing Periods other than in the ordinary course of business (or recognized any extraordinary gain) since the Reference Date.

(d)      Except as set forth in Schedule 3.15(d), the Company has not granted to any Person a power-of-attorney currently in force relating to Tax matters.

(e)      Except as set forth in Schedule 3.15(e), there are no Tax sharing, allocation, indemnification or similar agreements in effect as between the Company or any predecessor or Affiliate

thereof and any other party (including any predecessors or affiliates thereof) under which the Company could be liable for any Taxes or other claims of any party.

(f)    The Company has not applied for, been granted, or agreed to any accounting method change for which it will be required to take into account any adjustment under Section 481 of the Code or any similar provision of the Code or the corresponding Tax laws of any nation, state or locality; neither the IRS nor any other Tax Authority has proposed or purported to require any such adjustment or change in accounting method, and no such adjustment under Section 481 of the Code or the corresponding Tax laws of any nation, state or locality will be required of the Company upon the completion of, or by reason of, the transactions contemplated by this Agreement.

(g)    The Company has delivered or made available to Buyer copies of each of the Tax Returns for income Taxes filed on behalf of the Company.

(h)    The Company has not entered into any listed, reportable or substantially similar transactions for purposes of U.S. Treasury Regulations Section 1.6011-4, or any transaction requiring disclosure under a corresponding or similar provision of state, local or foreign law.  The Company has not participated in any transaction that did not have economic substance for purposes of Section 7701(o) of the Code.

(i)    There are no Tax rulings, requests for rulings or closing agreements relating to the Company, nor has any Company equityholder or anyone acting on behalf of the Company or any Company equityholder requested or received a ruling from any Tax Authority or signed a closing or other agreement with any Tax Authority.  The Company has provided to Buyer complete and correct copies of all private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests and any similar documents submitted by, received by or agreed to by or on behalf of any of the Company, and relating to Taxes for all taxable periods.

(j)    No Claim has been made by any Tax Authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction. The Company does not have nexus nor is it required to file Tax Returns in a jurisdiction where it does not file Tax Returns, whether or not the Company has a physical presence in such jurisdiction.  The Company is not and has not been subject to tax in any country other than its country of incorporation, organization or formation by virtue of having employees, a permanent establishment or other place of business in that country.

(k)    The Company is in compliance with all transfer pricing requirements in each jurisdiction applicable to the Company.  The Company has made available to Buyer all intercompany Contracts requested by Buyer relating to transfer pricing.

(l)    The Company is in compliance with all terms and conditions of any Tax holiday, Tax exemption or other Tax Incentive  (a "Tax Incentive") under any agreements between the Company and a Governmental Authority, and the consummation of the transactions contemplated by this Agreement will not have any adverse effect on the continued validity and effectiveness of any such Tax Incentive.

(m)    The Company has been classified as a partnership for U.S. federal and applicable state and local income Tax purposes at all times during its existence.  No election has been made under

Treasury Regulation Section 301.7701-3(c) or analogous provisions of state or local law to treat the Company as a corporation for income Tax purposes.

(n)     Except as set forth in Schedule 3.15(n), the Company has not:  (i) made any change in method of accounting from the period beginning on the inception of the Company and ending on the Closing Date; (ii) entered into any closing agreement as described in Section 7121 (or any similar provision of applicable Tax law) executed prior to the Closing; (iii)  entered into any installment sale or open transaction disposition made on or prior to the Closing relating to the assets of the Company; (iv) received any prepaid amount on or prior to the Closing; or (v) elected the cash method of accounting or long-term contract method of accounting prior to the Closing.

(o)     The Company uses the cash method of accounting for income Tax purposes.

(p)     The Company has not participated in an international boycott as defined in Section 999 of the Code.

(q)     The Company does not own, directly or indirectly, any interests in an entity that is or has been a "passive foreign investment company" within the meaning of Section 1297 of the Code or a "specified foreign corporation" as defined in Section 965(e) of the Code.  The Company has not transferred any intangible property the transfer of which would be subject to the rules of Section 367(d) of the Code.

(r)     A valid election under Section 754 of the Code (and any equivalent election under state or local law) with respect to the Company will be made prior to Closing.

(s)     Except as set forth in Schedule 3.15(s), none of the assets held by the Company are United States real property interests within the meaning of Section 897(c)(1) of the Code.

(t)     The Company has not made an election under Section 1101(g)(4) of the Bipartisan Budget Act of 2015, or any similar provision of state, local, or foreign law, with respect to any Tax Return.

(u)     Except as set forth on Schedule 3.15(t), the Company has not made any changes to its Tax accounting or reporting as a result of provisions in the CARES Act and, has not otherwise taken advantage of any loan or other programs under the CARES Act.

(v)     No event has occurred, and no circumstance or condition exists prior to Closing, that has resulted in, or that will or would reasonably be expected to result in, any Tax Liability of any Selling Party or of the Buyer with respect to their respective interests in the Company in connection with Recapture Events, including as a result of the consummation of the transactions contemplated hereunder.

Each of the representations and warranties set forth in this Section 3.15 are made with respect to any predecessors of the Company.

3.16    Labor Matters.

(a)     Schedule 3.16 (a) sets forth an accurate and complete list of all employees of the Company, including employees on authorized leave of absence, along with the start date, job title, location,

classification (*i.e.*, exempt or not exempt), status (*e.g.*, part-time, full-time, seasonal or temporary), annual salary, bonus (target and maximum), commission, accrued but unpaid vacation balances as of the date hereof, severance obligations and deferred compensation paid or payable to each such employee.

(b)    The Portfolio Companies and the Project Companies have no employees.

(c)    Except as previously disclosed in writing by the Company, the Company has not made any written or verbal promise or commitment to increase the compensation (whether salary, equity or incentive compensation, benefits or otherwise) payable to any Business Employee or otherwise modify the terms and conditions of employment of any such person.

(d)    Schedule 3.16(a)(ii) sets forth an accurate and complete list of all independent contractors that provide services to the Company (including any individuals leased from or hired through another employer or any other Person to provide services to the Company), along with their compensation terms.

(e)    The Company is and has been in compliance with all applicable Legal Requirements respecting employment and employment practices, including those applicable to terms and conditions of employment, discrimination in employment, worker classification (including the proper classification of workers as independent contractors and consultants and as exempt or non-exempt from overtime), wages and wage reporting, hours and occupational safety and health and employment practices, including the Immigration Reform and Control Act and any other applicable immigration or work permit laws or regulations, and is not engaged in any unfair labor practice. To the Knowledge of the Selling Parties, no Business Employee is obligated under any Contract (including licenses, covenants or commitments of any nature) that would interfere with such Business Employee's ability to conduct or promote the business of the Company. The Company has no Liability with respect to any misclassification of any person as an independent contractor rather than as an employee or any independent contractor as an employee, with respect to any employee leased from another employer, or with respect to any person currently or formerly classified as exempt from overtime and minimum wages

(f)    To the Knowledge of the Selling Parties, (i) the Company has withheld all amounts required by Legal Requirements or Contract to be withheld from the wages, salaries, and other payments to employees; and is not liable for any arrears of wages, compensation, Taxes, penalties or other sums for failure to comply with any of the foregoing, (ii) the Company has paid in full to all Business Employees all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such individuals, and (iii) the Company is not liable for any payment to any trust or other fund or to any Governmental Authority with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the normal course of business and consistently with past practice). To the Knowledge of the Selling Parties, (A) there are no pending or threatened Claims against the Company under any workers' compensation plan or policy or for long term disability, and (B) Company does not have any obligations under COBRA with respect to any former employees or qualifying beneficiaries thereunder, except to provide such coverage at the individual's expense.

(g)    No Business Employee is represented by a labor union, trade union, works council, or other employee representative; the Company is not a party to, or otherwise subject to, any collective bargaining agreement, trade union agreement, industry or national labor agreement, works

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

council, employee representative agreement, or information or consultation agreement with any labor union or similar organization and the Company has not experienced any labor dispute, strike, picketing, handbilling, work slowdown or work stoppage. To the Knowledge of the Selling Parties, (i) no petition has been filed or proceedings instituted by any Business Employee or group of Business Employees with any labor relations board seeking recognition of a bargaining representative, and (ii) there is no organizational effort currently being made or threatened in writing by, or on behalf of, any labor union to organize employees of the Company and no demand for recognition of employees of the Company has been made by, or on behalf of, any labor union. No consent of, consultation with, or the rendering of formal advice by, any labor or trade union, works council or other employee representative body is required for the Company to enter into this Agreement or to consummate any of the transactions contemplated by this Agreement.

(h)       There are no disputes or controversies pending or, to the Knowledge of the Selling Parties, threatened, between the Company and any of its Business Employees, which controversies have or would reasonably be expected to result in a Claim. Except as set forth in Schedule 3.16(h), no Claims or government audits are pending (or since January 1, 2018 have been settled or otherwise closed) against the Company regarding employment, including any with the Equal Employment Opportunity Commission or other Governmental Authority regulating the employment or compensation of individuals (or, with respect to discrimination, harassment, retaliation, or similar wrongdoing, pursuant to internal complaint procedures), and no Business Employee has made, since January 1, 2018, a written complaint of discrimination, harassment, retaliation or other similar wrongdoing, nor to the knowledge of the Company, made any oral complaint about the foregoing since January 1, 2020. Since January 1, 2018, the Company has not received any requests for, or conducted, any internal investigation of any officer or supervisor of the Company with respect to any such claims. Since the Company's inception, the Company has not entered into any settlement agreement related to allegations of sexual harassment, sexual misconduct, discrimination, or retaliation by any employee, contractor, director, officer or any other representative of any of Company.

(i)       To the Knowledge of the Selling Parties, no charge or complaint against the Company is pending or threatened under the Immigration Reform and Control Act of 1986, as amended.

(j)       The Company has not received written notice that any Business Employee has given notice to the Company that such Business Employee intends to terminate his or her relationship with the Company, and the Company has no present intention to terminate its relationship with any Business Employee. Except as set forth in Schedule 3.16(a), the employment of each of the employees of the Company is "at will" (and there are no employees of the Company located in a jurisdiction that does not recognize the "at will" employment concept) and the Company does not have any obligation to provide any severance or particular form or period of notice prior to terminating the employment of any of their respective employees. The agreement or arrangement with each independent contractor, consultant and advisor to the Company can be terminated immediately and without notice, without any liability to the Company (other than compensation owed for services performed through such termination date).

(k)       The Company has complied with local and State mandates, as the same may change from time to time, with respect to the COVID-19 pandemic as they relate to the protection of employees and independent contractors in the workplace with respect to the COVID-19 pandemic. To the Knowledge of the Selling Parties, the Company has not experienced any material employment-related liability due to the COVID-19 pandemic.

(l)      None of the Portfolio Companies or of the Project Companies have any employees or sponsor, maintain, participate in or contribute to any Company Benefit any Plan.

3.17    <u>Employee Benefits</u>.

(a)      <u>Schedule 3.17(a)</u> sets forth a complete list of each "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, ("<u>ERISA</u>") (whether or not subject to ERISA) and any other plan, policy, program practice, agreement, understanding or arrangement (whether written or oral) providing compensation or other benefits to any current or former Business Employee (or to any dependent or beneficiary thereof) of the Company or any ERISA Affiliate (as defined below), maintained, sponsored or contributed to by the Company or any ERISA Affiliate, or under which the Company or any ERISA Affiliate has or may have any obligation or Liability, including all employment or service relationship Contracts, retirement or supplemental retirement, relocation, repatriation, expatriation, commission, incentive, bonus, performance awards, termination notice, severance, change in control, deferred compensation, vacation, holiday, cafeteria, fringe benefit, vehicle allowance, medical, disability, profits interest, stock purchase, stock option, stock appreciation, phantom stock, restricted stock or other stock-based compensation plans, policies, programs, practices or arrangements (each a "<u>Company Benefit Plan</u>") and separately identifies any such plan, fund, program, agreement or arrangement primarily covering persons employed outside the United States (an "<u>International Employee Plan</u>," including any agreement or arrangement that provides solely the benefits mandated by a Governmental Authority (a "<u>Mandated Plan</u>"). For purposes of this Agreement, "<u>ERISA Affiliate</u>" means any entity (whether or not incorporated) other than the Company that, together with the Company, is or has been required to be treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

(b)      Each Company Benefit Plan has been maintained and administered in accordance with its terms and in compliance with all Legal Requirements (including ERISA and the Code), and the Company and each ERISA Affiliate has performed all obligations required to be performed by it under and is not in default under or in violation of, and to the Knowledge of the Selling Parties, no other Person is in default under or in violation of, any of the Company Benefit Plans. There have been no Claims regarding any Company Benefit Plan (other than routine claims for benefits).

(c)      Neither the Company nor any ERISA Affiliate has ever maintained, contributed to, or had any Liability with respect to, any (i) "defined benefit plan" (as defined in section 3(35) of ERISA) or any other plan that is or was subject to the funding requirements of section 412 or 430 of the Code or section 302 or Title IV of ERISA, (ii) "multiemployer plan" (as defined in section 3(37) of ERISA), (iii) multiple employer plan (as described in section 413(c) of Code or section 210 of ERISA), (iv) "multiple employer welfare arrangement" (as defined in section 3(40) of ERISA), or (v) funded welfare benefit plan within the meaning of Section 419 of the Code.

(d)      No Company Benefit Plan or other contract, agreement, plan or arrangement covering any one or more individuals contains any provision or is subject to any Legal Requirements that, in connection with any of the transactions contemplated by this Agreement or upon related, concurrent or subsequent employment termination, or in combination with any other event, would (i) increase, accelerate or vest any compensation or benefit, (ii) require severance, termination or retention payments, (iii) provide any term of employment or compensation guaranty, (iv) forgive any indebtedness, (v) require or provide any payment or compensation subject to Section 280G of the Code (and no such payment or

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

compensation has previously been made), or (vi) promise or provide any Tax gross ups or indemnification, whether under Sections 409A or 4999 of the Code or otherwise.  No equityholder or Business Employee has been promised or paid any bonus or incentive compensation related to the transactions contemplated hereby

(e)    Each International Employee Plan (i) has been maintained and administered in all material respects in accordance with its terms and with all Legal Requirements, (ii) if intended to qualify for special Tax treatment, meets all requirements for such treatment, (iii) is fully funded or book reserved in accordance with applicable Laws, and (iv) if required to be registered, has been registered with the appropriate Governmental Authorities and in all material respects has been maintained in good standing with the appropriate Governmental Authorities.  No International Employee Plans are "defined benefit" pension plans (as defined in ERISA, whether or not subject to ERISA) or required to be treated as a defined benefit plan under GAAP. The Company complies and has complied in all material respects with respect to its obligations under Mandated Plans.

3.18    Intellectual Property.

(a)    Schedule 3.18(a) sets forth all Intellectual Property owned or in-licensed by the Company and/or any Subsidiary.  The Intellectual Property set forth in Schedule 3.18(a) constitutes all the Intellectual Property used in or necessary for the conduct of the business of the Company and/or any Subsidiary as now conducted and as presently proposed to be conducted.  Each of the Company and the Subsidiaries has the right to use all Intellectual Property used or held for use in connection with the business of the Company and/or any Subsidiary as currently conducted or proposed to be conducted. Each of the Company and the Subsidiaries has taken all necessary and desirable action to maintain and protect each item of Intellectual Property that it owns, licenses or uses, or that it has owned, licensed or used.

(b)    No Intellectual Property was registered by the Company and/or any Subsidiary, and no application for registration has been made by the Company and/or any Subsidiary.

(c)    Neither the Company, the Subsidiaries nor any Selling Party does and has interfered with, infringed, misappropriated or violated the Intellectual Property rights of any third party, and, to the Knowledge of the Selling Parties, no third party has interfered with, infringed, misappropriated or violated any Company Intellectual Property rights.  Neither the Company, the Subsidiaries nor any Selling Party has received or delivered within the last five years any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that the Company (or any Subsidiary or Selling Party) or such third party, as applicable, must license or refrain from using any Intellectual Property).

(d)    Except with respect to licenses of software (i) generally available for an annual or one-time license fee of no more than $10,000, (ii) distributed as "freeware" or (iii) distributed via Internet access without charge and for use without charge, Schedule 3.18(d) sets forth a list, complete and accurate as of the date hereof, of all agreements pursuant to which the Company and/or any Subsidiary licenses in, or otherwise is authorized to use, Intellectual Property used in the conduct of the business of the Company and/or any Subsidiary as now conducted or as presently proposed to be conducted.

(e)    Each of the Company and the Subsidiaries has at all times enforced a policy of requiring employees, officers, directors, consultants and contractors with responsibility for the

development or implementation of Intellectual Property or who may be exposed to any trade secret or confidential information to execute proprietary information, confidentiality and assignment agreements substantially in the Company's standard forms that have been provided to Buyer, which assignments assign to the Company exclusive ownership of any work or work product and any Intellectual Property rights that are developed by the employee, officer, director, consultant or contractor, as applicable, and all such employees, officers, directors, consultants and contractors have executed such agreements. No trade secret or confidential Know-How that may be material to the Company and/or any Subsidiary or its business has been disclosed or authorized to be disclosed to any third party, other than pursuant to a non-disclosure agreement that adequately protects the Company's and/or any Subsidiary's or other party's proprietary interests in and to such trade secrets and confidential Know-How.

3.19    Privacy and Cybersecurity. Each of the Company and the Subsidiaries is complying with and has at all times complied with all applicable Privacy Laws, Contracts  (or portions thereof) to which the Company or any of the Subsidiaries is a party that are applicable to the Processing of Sensitive Data (collectively, "Data Agreements"), and all other representations, statements, and commitments that the Company or any of the Subsidiaries has made to Persons with respect to such Personal Data.

3.20    Regulatory Matters.

(a)    No director, manager, officer or service provider of the Company or its Affiliates or any Subsidiary has made any untrue statement of a material fact or a fraudulent statement to any Governmental Authority, failed to disclose any material fact required to be disclosed to any Governmental Authority, or committed an act, made a statement or failed to make a statement that, at the time such act, statement or omission was made, could reasonably be expected to provide a basis for any Governmental Authority to invoke its enforcement policies regarding such matters.

(b)    All applications and other documents submitted by the Company and any Subsidiary to Governmental Authorities in connection with a Permit were true and correct in all material respects as of the date of submission, and any updates, changes, corrections or modification to such applications and other documents required under applicable Legal Requirements have been submitted and were true and correct in all material respects at the time of submission.

(c)    Qualifying Facility Status. Each Project is a "qualifying facility" as defined in the regulations of the Federal Energy Regulatory Commission (FERC) at 18 C.F.R. § 292.101(b)(1) that also qualifies for the regulatory exemptions from the Federal Power Act (FPA) set forth at 18 C.F.R. § 292.601(c), including the exemption from regulation under Sections 205 and 206 of the FPA set forth at 18 C.F.R. § 292.601(c)(1), the regulatory exemptions from the Public Utility Holding Company Act of 2005 set forth at 18 C.F.R. § 292.602(b) and the exemptions from certain state laws and regulations as set forth in 18 C.F.R. Section 292.602(c).

(d)    FERC Qualification. As of the Closing Date, each of the Company and the Subsidiaries shall be in compliance with all applicable FERC regulations. To the extent required under FERC regulations to obtain or preserve qualifying facility status, each Project Company shall file with FERC a notice of self-certification, or obtain from FERC an order granting certification, with respect to such status in each case on or before the Closing Date.

(e)    Regulation under Federal Power Act. The transactions contemplated herein do not require FERC approval and will not cause the Buyer to become subject to, or not exempt from,

regulation under the Federal Power Act, the Public Utility Regulatory Policies Act of 1978 or the Public Utility Holding Company Act of 2005.

(f)    CFIUS.  Neither the Company not any Subsidiary is a U.S. business that (i) produces, designs, tests, manufactures, fabricates, or develops one more "critical technologies," (ii) performs functions with respect to "covered investment critical infrastructure," or (iii) maintains or collects, directly or indirectly, "sensitive personal data" of U.S. citizens, in each case as such terms are defined in the Defense Production Act of 1950, as amended, including all implementing regulations thereof.

(g)    State Utility Regulation. Each of the Company and the Subsidiaries has been and is now in compliance with all applicable state utility regulations. Solely as the result of the execution and delivery of the Transaction Agreements, the consummation of the transactions contemplated by the Transaction Agreements, or the performance of obligations under the Transaction Agreements (other than with respect to the exercise of remedies), and the generation and sale of electricity from any Project, the Buyer and/or the Company and/or any Subsidiary will not become subject to, or not exempt from, (i) regulation as a "public utility" or any comparable term under any Legal Requirement or (ii) state laws or regulations respecting the rates of electric utilities, and the financial and organizational regulation of electric utilities.

3.21    Litigation; Claims.

(a)    Except as set forth in Schedule 3.21(a), there is no Claim pending or, to the Knowledge of the Selling Parties, threatened against the Company and/or any Subsidiary or, to the Knowledge of the Selling Parties, any Claim pending or threatened against any of the Company's and/or any Subsidiary's current or former equityholders, officers, directors or managers (solely in their capacities as such).  Except as set forth in Schedule 3.21(a), there are no Orders outstanding against the Company and/or any Subsidiary or any of its properties, assets or businesses that have not been satisfied.  Neither the Company nor any Subsidiary is a party to any Claim in which it is a plaintiff or is otherwise seeking relief. To the Knowledge of the Selling Parties, there is no fact or circumstance that, either alone or together with other facts and circumstances, could reasonably be expected to give rise to any Claim or Order against, relating to or affecting the Company and/or any Subsidiary or any of its assets or properties that, if adversely decided, would be reasonably likely to result in a Liability to the Company and/or any Subsidiary.

(b)    To the Knowledge of the Selling Parties, no event has occurred, and no circumstance or condition exists, that has resulted in, or that will or would reasonably be expected to result in, any claim for indemnification, reimbursement, contribution or the advancement of expenses by any Business Employee (other than a claim for reimbursement by the Company, in the ordinary course of business, of travel expenses or other out-of-pocket expenses of a routine nature incurred by such Business Employee in the course of performing such Business Employee's duties for the Company) pursuant to: (i) the terms of the organizational documents of the Company and/or any Subsidiary; (ii) any indemnification agreement or other Contract between the Company and/or any Subsidiary and any such Business Employee; or (iii) any applicable Legal Requirement.  To the Knowledge of the Selling Parties, there is no event, circumstance or other basis that could give rise to any obligation of the Company and/or any Subsidiary to indemnify any of its officers or managers under its organizational documents or any Person under any contract to which the Company and/or any Subsidiary is a party.

(c)    To the Knowledge of the Selling Parties, no event has occurred, and no circumstance or condition exists, that has resulted in, or that will or would reasonably be expected to result in, any Liability of the Company and/or any Subsidiary to any current, former or alleged equityholder in such Person's capacity (or alleged capacity) as an equityholder of the Company and/or any Subsidiary.

(d)    No condemnation is pending or, to the Knowledge of the Selling Parties, threatened with respect to any Project, or any portion thereof, and no unrepaired Casualty Defect exists with respect to any Project or any portion thereof (regardless of whether covered by insurance).

3.22    <u>Insurance</u>.  <u>Schedule 3.22</u> sets forth all current policies of insurance and bonds of the Company and any Subsidiary (including material self-insurance arrangements), together with all material information relating to each such policy (including insurance limits, deductibles and premiums paid by the Company under each such policy).  All of the insurance policies are in full force and effect and provide coverage as may be required by Legal Requirements or by Contracts to which the Company and/or any Subsidiary is a party.  As of the date of this Agreement, there is no material claim pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds.  All premiums due and payable under all such policies and bonds have been paid, and each of the Company and the Subsidiaries is otherwise in compliance with the terms of such policies and bonds.  No termination, cancellation or non-renewal of, or material premium increase with respect to, any of such policies has been threatened in writing.

3.23    <u>Bank Accounts, etc.; Officers, Managers and Directors</u>.  <u>Schedule 3.23(a)</u> sets forth a true and complete list of all banks in which the Company and the Subsidiaries have an account or safe deposit box, all credit and similar cards in the Company's or Subsidiary's name or for which the Company is liable and all cellular phone accounts in the Company's or Subsidiary's name or for which the Company or any Subsidiary is liable, including in each case the names of all Persons authorized to draw thereon, use or who have access thereto, as applicable.

3.24    <u>Grants, Incentives and Subsidies</u>.  Except as set forth in <u>Schedule 3.24</u>, (a) neither Company nor any Subsidiary has received any grants, incentives or subsidies from any Governmental Authority, and (b) neither Company nor any Subsidiary is subject to any obligation to pay royalties in connection with the sales of products or the provision of its services.

3.25    <u>Brokers, Finders, etc</u>.  Except as set forth in <u>Schedule 3.25</u>, neither the Company nor any Subsidiary nor party acting on its behalf has employed, paid or become obligated to pay any fee or commission to any valid claim of any broker, finder or other similar intermediary in connection with the transactions contemplated by the Transaction Agreements.

3.26    <u>Full Disclosure</u>. All documents delivered or made available to the Buyer by or on behalf of the Company, the Subsidiaries  and/or the Selling Parties in connection with this Agreement or any other Transaction Agreement, are complete and accurate in all material respects. Neither this Agreement (including the schedules hereto) nor any certificates made or delivered in connection herewith contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not false or misleading, in view of the circumstances in which they were made.

**ARTICLE IV**
**<u>Representations and Warranties Regarding the Selling Parties</u>**

Each Selling Party and Founder, hereby represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

4.1    <u>Organization; Authorization; etc</u>

(a)    Such Selling Party has all requisite power and authority to execute and deliver the Transaction Agreements to which it is a party, to perform his obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of the Transaction Agreements to which such Selling Party is a party, the performance of such Selling Party's obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action on the part of such Selling Party. Each Transaction Agreement to which such Selling Party is a party has been duly executed and delivered by such Selling Party and (assuming due execution by the other parties thereto) constitute the legal, valid and binding obligation of such Selling Party, enforceable against such Selling Party in accordance with their terms.

(b)    The execution, delivery and performance of the Transaction Agreements do not, and the consummation of the transactions contemplated hereby and thereby will not, conflict with, or result in the imposition of an Encumbrance upon, or result in any breach or violation of or default under (with or without notice or lapse of time, or both), or give rise to any right of termination, cancellation, modification or acceleration, or any obligation or loss of any benefit under or in respect of (i) any Contract to which such Selling Party is a party or to which any of his properties or assets are bound or (ii) any Legal Requirement or Order to which such Selling Party is subject.

(c)    No registrations, filings, applications, notices, consents, approvals, orders, qualifications or waivers are required to be made, filed, given or obtained by such Selling Party with, to or from any Person, including any Governmental Authority, in connection with the execution and delivery of the Transaction Agreements or the consummation of the transactions contemplated hereby and thereby.

4.2    <u>Title to Shares; Selling Parties.</u>

(a)    The Membership Interests set forth on <u>Exhibit A-1</u> (including the Membership Interests owned by PDA) constitute 100% of the total issued and outstanding Membership Interests of the Company.  Such Selling Party (a) owns of record and beneficially, and has good and valid title to, the Membership Interests set forth opposite its name on <u>Exhibit A-1</u>, free and clear of any Encumbrances other than Permitted Encumbrances, and (b) has the absolute and unrestricted right, power and authority to sell, contribute and deliver its Purchased Interests to Buyer pursuant to the terms of this Agreement. Such Selling Party has not at any time before the date hereof sold, transferred, conveyed, disposed, pledged or otherwise hypothecated such Purchased Interests.  Such Selling Party has full and exclusive power to vote the Membership Interests owned by it and is not party to (a) any option, warrant, purchase right, right of first refusal, call, put or other Contract (other than this Agreement) that could require such Selling Party to sell, transfer or otherwise dispose of his Membership Interests or (b) any voting trust, proxy or other contract relating to the voting of his Membership Interests.

(b)    Barend hereby represents that he  owns 100% of the total issued and outstanding equity interests of Blue Sky Utility 1007. Ran hereby represents that he owns, jointly with his spouse, 100% of the total issued and outstanding equity interests of Yellow Tree. Such Founder (i) owns of record and beneficially, and has good and valid title to, the equity interests of its respective Selling Party, as applicable,

free and clear of any Encumbrances, and (ii) has the absolute and unrestricted right, power and authority to execute the Transaction Agreements on behalf of such Selling Party. Such Founder has not at any time before the date hereof sold, transferred, conveyed, disposed, pledged or otherwise hypothecated such equity interests of its respective Selling Party, as applicable. Such Founder has full and exclusive power to vote the equity interests of the Selling Party owned by it.

4.3     Litigation; Orders.  There is no pending or, to the Knowledge of the Selling Parties, threatened Claims, either at law or in equity, that would, individually or in the aggregate, reasonably be expected to (i) impair in any material respect the ability of the Selling Parties to perform their obligations under the Transaction Agreements or (ii) prevent, impede or delay the consummation of the transactions contemplated by the Transaction Agreements.

4.4     Brokers, Finders, etc.  Except as set forth in Schedule 4.4, no Selling Party and no party acting on the behalf of a Selling Party has employed, paid or become obligated to pay any fee or commission to any broker, finder, consultant or other intermediary in connection with the transactions contemplated by the Transaction Agreements who might be entitled to a fee or commission from the Selling Parties or the Company in connection with such transactions.

## ARTICLE V
## Representations and Warranties of Buyer

Buyer hereby represents and warrants to the Selling Parties, as of the date hereof and the Closing Date, as follows:

5.1     Incorporation; Authorization; etc..

(a)     Buyer is a corporation formed under the laws of Delaware and is duly organized, validly existing and in good standing under the laws of such jurisdiction. Buyer has all requisite corporate power and authority to own, lease, and operate its properties and assets and to carry on its business as it is now being conducted. Buyer is not in default under or in violation of any provision of its organizational documents.

(b)     Buyer has all requisite corporate power and authority to execute and deliver the Transaction Agreements and Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of the Transaction Agreements and Ancillary Agreements to which Buyer is a party, the performance of Buyer's obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the Board of Directors of Buyer and no other corporate proceeding or action on the part of Buyer, the Board of Directors of Buyer or the stockholders of Buyer are necessary therefor. The Transaction Agreements and each Ancillary Agreement to which Buyer is a party have been duly executed and delivered by Buyer and (assuming due execution by the other parties thereto) constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their terms.

(c)     The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not, and the consummation of the transactions contemplated hereby and thereby will not, conflict with, or result in the imposition of an Encumbrance upon, or result in any breach or violation of or default under (with or without notice or lapse of time, or both), or give rise to

DocuSign Envelope ID: 7D467BD1-0E59-495A-AF2E-53E52EDE1297

any right of termination, cancellation, modification or acceleration, or any obligation or loss of any benefit under or in respect of (i) any provision of the organizational documents of Buyer, (ii) any Contract to which Buyer is a party or to which any of its properties or assets are bound or (iii) any Legal Requirement or Order to which Buyer is subject.

(d)     No registrations, filings, applications, notices, consents, approvals, orders, qualifications or waivers are required to be made, filed, given or obtained by Buyer with, to or from any Person, including any Governmental Authority, in connection with the execution and delivery of the Transaction Agreements or the Ancillary Agreements to which Buyer is a party or the consummation of the transactions contemplated hereby and thereby, except for those set forth in <u>Schedule 5.1</u> (the "<u>Buyer Approvals</u>").

(e)     Buyer is not a person or entity with whom U.S. persons or entities are restricted from doing business under OFAC or under any U.S. statute, executive order (including, without limitation, the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism), or other governmental action. Buyer has satisfied itself as to the full observance of the laws of its jurisdiction related to this Agreement and the transactions completed hereby, including (i) the legal requirements within its jurisdiction for the acquisition of the Issued Interests and the Purchased Interests, (ii) any foreign exchange restrictions applicable to such acquisition, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, acquisition or transfer of the Issued Interests and the Purchased Interests.

(f)     Buyer represents that through its Representatives it has had an opportunity to ask questions and receive answers from the Company regarding the business, properties and financial information of the Company and to obtain additional information to the extent the Company possessed such information necessary to verify the accuracy of any information furnished to it or to which it had access.

(g)     Buyer understands that neither the Purchased Interests nor the Issued Interests are registered under federal or state securities Laws on the ground that the sale provided for in this Agreement and the issuance of securities hereunder is exempt from registration under the Securities Act pursuant to Section 4(2) thereof, and that the Company's and the Selling Parties' reliance on such exemption is based on the Buyer's representations set forth herein.

(h)     Buyer is experienced in evaluating and investing in securities of solar development companies and acknowledges that Buyer can bear the economic risk of its investment, and has such knowledge and experience in financial business matters that it is capable of evaluating the merits and risks of the investment in the Issued Interests and the Purchased Interests.

(i)     This Agreement is made with Buyer in reliance upon Buyer's representation to the Company, which by Buyer's execution of this Agreement Buyer herby confirms, that the interests to be acquired by Buyer will be acquired for investment for such Buyer's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of any applicable Legal Requirement, and that Buyer has no present intention of selling, granting any participation in, or otherwise distributing the same in a manner that would violate any applicable Legal Requirement. By executing this Agreement, Buyer further represents that it does not have any contract, undertaking,

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

agreement or arrangement with any person to sell transfer or grant participations to such person or to any third party with respect to the Issued Interests or the Purchased Interests.

5.2    None of the foregoing representations and warranties contained in this Article V contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not false or misleading, in view of the circumstances in which they were made.

## ARTICLE VI
## <u>Covenants of the Company, Selling Parties and Buyer</u>

6.1    <u>Conduct of Business</u>

(a)    The Selling Parties covenant and agree that, during the period from the date of this Agreement until the earlier to occur of the Closing or the termination of this Agreement in accordance with Article XI (the "**Interim Period**"), the Selling Parties shall (i) operate the Company, or cause each Portfolio Company and Project Company to operate, in the ordinary course of business consistent with past practice and in compliance with all applicable Laws, (ii) use their respective commercially reasonable efforts to preserve the Company's, each Portfolio Company's and each Project Company's organization intact, to keep available the services of their current officers, employees and consultants and to maintain good relations with customers, suppliers, employees, contractors, distributors and others having dealings with the Company and (iii) continue to make all necessary and material filings and payments with Governmental Authorities in connection with the operation of the Company, the Portfolio Companies and the Project Companies in a timely manner and use its commercially reasonable efforts to maintain in effect all existing Permits , the Portfolio Companies and/or the Project Companies as currently conducted and/or as proposed to be conducted.

(b)    Without limiting the foregoing, from the date hereof until the Closing Date, the Selling Parties shall cause the Company, any Portfolio Company and any Project Company to:

(i)    preserve and maintain all Permits required for the conduct of the Company in the same manner as of the date hereof;

(ii)    pay all debts, Taxes and other obligations when due;

(iii)    maintain all properties, Project Assets, and assets owned, operated or used by it in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(iv)    defend and protect its properties and assets from infringement or usurpation;

(v)    perform all of its obligations under all Contracts relating to or affecting its properties, assets or business;

(vi)    maintain its books and records in accordance with past practice;

(vii)    comply in all material respects with all applicable Laws; and

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

(viii)    not to take or permit any action that would cause any of the changes, events or conditions described in Section 3.14 to occur.

(c)    Each of the Company, the Portfolio Companies and the Project Companies shall not (and the Selling Parties shall procure that the Company shall not) without the prior written consent of the Buyer, carry out any of the following, unless such action is necessary solely at the level of the Project Companies and/or the Portfolio Companies in order to avoid any Recapture Event, and such action is expressly required by the tax equity investors, in accordance with the provisions of the Project Documents:

(i)    issue or sell any membership interest, options or other securities or seek, negotiate or agree to any investment, whether direct or indirect, in the equity of the Company, the Portfolio Companies and/or the Project Companies;

(ii)    effect any recapitalization, reclassification, split, reverse split, combination or like change in the capitalization of the Company, the Portfolio Companies and the Project Companies;

(iii)    amend or restate the organizational documents of the Company;

(iv)    enter into any merger, consolidation, share exchange, reorganization or similar transaction;

(v)    incur any capital expenditure, except in the Company's ordinary course of business consistent with past practice;

(vi)    dispose of or agree to dispose of (or grant any option in respect of) any part of the assets of the Company (including any Company Intellectual Property), or create any Encumbrance on any part of the assets of the Company;

(vii)    enter into any financing agreement;

(viii)    assume or incur any liabilities or indebtedness except in the ordinary course of business consistent with past practice and existing overdraft facilities at the Company's bank;

(ix)    enter into or be a party to any transaction with any Member, Affiliate, Insider or interested party;

(x)    enter into any contract or agreement that restricts the conduct of the Company's business, including undertakings with respect to exclusivity, commitment to minimum purchase levels and non-competition;

(xi)    enter into any agreement or take any action that is likely to cause any of the representations and warranties of the Company under this Agreement not to be true and correct in all material respects as of the Closing without change, or that is likely to affect the Company's ability to perform and comply with its obligations and covenants hereunder as necessary to effect the consummation of the transactions herein;

DocuSign Envelope ID: 7D167BD1-0ED9-495A-AF2E-53E52EDE1297

(xii)    enter into any unusual or irregular contract or commitment or grant or agree to grant any lease or third party right in respect of any properties, make any loan or enter into any leasing or other agreement or arrangements or payment on deferred terms;

(xiii)    commence a lawsuit other than: (i) for the routine collection of bills; or (ii) in such cases where the Company in good faith determines that failure to commence suit would result in a material impairment of a valuable aspect of its business;

(xiv)    declare, accrue, make or pay any dividend or other distribution, or repay, redeem or repurchase, or allow to be repaid, redeemed or repurchased, any share capital of the Company;

(xv)    accelerate the vesting of any capital stock or securities convertible into capital stock of the Company;

(xvi)    pay any special bonus or special remuneration to any member, manager, officer, employee or consultant of the Company, or increase the salaries, wages or benefits (including equity-based compensation) of its shareholders, directors, officer, employees or consultants;

(xvii)    hire or make an offer to hire any new employee, enter into any new, or amend any existing, employment, severance or consulting agreement, or promote or change the title of any of its employees;

(xviii)    enter into, terminate or amend any rulings, compromises or other agreements with a tax authority, make or change any material tax election, change a method of tax accounting, settle or compromise any material tax liability, or amend any tax returns;

(xix)    cancel, terminate or materially modify any insurance policy providing coverage for events, occurrences or accidents occurring prior to the Closing Date; or

(xx)    agree or undertake to do any of the above.

The Selling Parties shall have the right to cure any breach or inaccuracy of a representation or warranty made pursuant to Article III or Article IV of the Agreement at any time during the Interim Period by providing written notice to Buyer of the breach or inaccuracy and reasonable evidence of the cure thereof on or before Closing.

6.2    <u>Regulatory Approval</u>. The Parties shall co-operate in submitting the applications, notices and filings (if any) necessary for obtaining the Regulatory Approvals listed in <u>Schedule 6.2</u> attached hereto, and shall use their best efforts to take, or cause to be taken, all actions necessary to obtain the same.

6.3    <u>Access to Information</u>. From the date hereof until the Closing, the Company and the Selling Parties shall (a) afford Buyer and its Representatives reasonable access during normal business hours to and the right to inspect all of the properties, assets, premises, books and records, Contracts and other documents and data related to the Company; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Company as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of the Selling Parties and the Company to cooperate with Buyer in its investigation of the Company,.  Any investigation pursuant to this Section 6.3

shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the Selling Parties or the Company.

6.4     Public Announcements.    The Selling Parties and the Founders agree that any press release or public announcement concerning the transactions contemplated by the Transaction Agreements shall not be issued by the Selling Parties, the Founders or any of their Affiliates without the prior written consent of Buyer, which consent shall not be unreasonably conditioned, withheld, or delayed, except any such release or public announcement that may be required by an applicable Legal Requirement, in which case the Selling Parties shall make commercially reasonable efforts to allow Buyer reasonable time to comment on such release or announcement in advance of its issuance.

6.5     Confidentiality; Access.    Each Party shall, and shall cause their Affiliates and Representatives to, maintain in confidence the Confidential Information at all times and will not, directly or indirectly, use or disclose without the prior written consent of the other Parties any Confidential Information for its own benefit or for the benefit of any other Person or reveal or disclose any Confidential Information to any Person other than the other Parties and Representatives thereof.  The foregoing confidentiality restrictions shall not apply, however, to any Confidential Information (a) in the public domain through no unauthorized act or failure to act by the disclosing Party, (b) lawfully disclosed to the disclosing Party by a third party who possessed the information without any obligation of confidentiality, (c) known previously by such disclosing Party or lawfully developed by such disclosing Party independent of any disclosure by the other Parties, (d) in the event that such disclosing Party becomes legally compelled or is otherwise required by applicable Legal Requirements to disclose any such Confidential Information, provided that the disclosing Party shall deliver to the other Parties written notice of such compulsion or requirement to make commercially reasonable efforts to provide sufficient opportunity for the other Parties to act to protect such Confidential Information from such disclosure, (e) obligation to disclose such information to carry out its obligations and enforce its rights hereunder; and (f) obligation of the Buyer to disclose such Confidential Information as a result of Buyer or any Affiliate thereof being a public company which shares are traded on a stock exchange. Except to the extent prohibited by applicable Legal Requirements, upon the termination of this Agreement, if a Party requests in writing that any Confidential Information be returned, the other Parties will and will cause their Affiliates and Representatives to, turn over, return or destroy all Confidential Information in any form (including all copies and reproductions thereof) in such Parties' possession or control.

6.6     Reasonable Efforts.    During the Interim Period, the Parties shall use all commercially reasonable efforts to take, or cause to be taken, all actions necessary to consummate the transactions contemplated by this Agreement and the Transaction Agreements, including making all filings and obtaining all consents, if any, required to be filed or obtained by such Party, in a timely manner. Notwithstanding anything to the contrary in this Agreement, the Buyer shall not have any obligation to: (a) divest or agree to divest any of its businesses, product lines or assets, or to take or agree to take any other action or agree to any material limitation or restriction on any of its businesses, product lines or assets that would impair Buyer's ability to conduct its business as conducted as of the date hereof, or cause any of its subsidiaries or affiliates to do the same; (b) contest any Proceedings relating to this Agreement or the Transaction Agreements; or(c) agree to any material covenants, obligations or liabilities with any Governmental Authority that would impair Buyer's ability to conduct its business as conducted as of the date hereof.

6.7     No Negotiation.    During the Interim Period, neither the Company nor the Selling Parties shall, directly or indirectly, solicit, encourage or enter into any negotiation, discussion or contract, with any

party, with respect to the sale of any securities of the Company, or any other transaction the results of which may impede or contradict the transactions contemplated herein or result in breach of any of the representations, warranties, or covenants of the Selling Parties or the Company set out herein.

6.8    <u>Communications with Employees</u>. During the Interim Period, neither the Company nor the Sellers shall (and shall procure that none of their respective representatives) communicate with any employee or contractor of the Company regarding post-Closing employment matters with the Buyer, unless such communications are made at the direction of Buyer or otherwise with the prior written approval of the Buyer, which shall not be unreasonably withheld.

6.9    <u>Use of Proceeds; Budget Plan.</u> The proceeds of the Primary Amount shall be used by the Company in accordance with the annual budget to be adopted in accordance with the Amended and Restated Operating Agreement, and in the form attached hereto as Schedule 6.9.

6.10    <u>Bonus to Employees.</u> Subject to the fulfillment of certain conditions set forth in Schedule 6.10 attached hereto, the Buyer shall cause the Company to distribute a bonus payment to certain Company's employees in the aggregate amounts set forth on Schedule 6.10, and according to an allocation among such employees to be agreed to prior to Closing, and all subject to the execution and delivery by each designated employee of an undertaking in a form reasonably satisfactory to the Buyer and the Company.

6.11    <u>Tail Policies</u>.    Prior to or simultaneously with the Closing, the Company shall purchase prepaid tail insurance policies that provide directors and officers and errors and omissions liability insurance coverage for the Company, the Portfolio Companies and the officers, directors, managers, general partners or similar functionaries of each of them, on terms no less favorable than the corresponding policies maintained by the Company and the Portfolio Companies immediately prior to the Closing, for a period of not less than six years following the Closing Date with respect to claims arising from acts, events or omissions that occurred at or prior to the Closing (such policies, the "<u>Tail Policies</u>").

6.12    <u>Audited Financial Statements</u>. The Parties shall make best efforts to procure that audited financial statements of the Company for the year ending 31 December 2020 be prepared and delivered to Buyer, in accordance with IFRS and on a consolidated basis, as promptly as possible after Closing. The costs for the preparation of the audited financial statements of the Company shall be divided equally between the Company and the Buyer.

**ARTICLE VII**
**<u>Indemnification</u>**

7.1    <u>Survival of Representations, Warranties and Covenants</u>.    Subject to the limitations and other provisions of this Agreement, including the provisions of this Article VII, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect, regardless of any investigation made by or on behalf of the Company, the Selling Parties or Buyer, as follows:  (a) the representations and warranties contained in Section 3.1 (Organization; Authorization; etc.), Section 3.2 (Capitalization; Structure), Section 3.4(a) (Compliance with Laws), Section 3.25 (Brokers, Finders, etc.), Article IV (Representations and Warranties regarding the Selling Parties) and Article V (Representations and Warranties of Buyer) shall survive the Closing until the fifth anniversary of the Closing Date, (b) the representations and warranties contained in Section 3.15 (Taxes) (the "<u>Tax Representations</u>") shall survive

the Closing until ninety calendar days after expiration of the statute of limitations applicable to the underlying facts and circumstances (including any extensions thereof), (clauses (a) and (b) together, being the "Fundamental Representations") and (c) all other representations and warranties shall survive until the date that is twenty four (24) months following the Closing Date.

The covenants and agreements of the Parties contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall survive the Closing in accordance with their respective terms. Notwithstanding the preceding sentences, any breach of representation, warranty, covenant or agreement in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to the preceding sentences, if notice of the inaccuracy or breach thereof giving rise to such right of indemnity shall have been given to the Party against whom such indemnity may be sought prior to such time; provided that any such representation, warranty, covenant or agreement shall only survive with respect to the specific facts and circumstances giving rise to the alleged inaccuracy or breach.

7.2    Indemnification.

(a)    Indemnification by Selling Parties and the Founders. Subject to the limitations set forth in this Article VII, the Company, the Selling Parties and the Founders jointly and severally, shall indemnify and hold harmless Buyer and its Affiliates (including the Company on and following the Closing) and each of their respective officers, directors, managers, Affiliates, agents and employees (hereinafter referred to individually as a "Buyer Indemnified Person" and collectively as "Buyer Indemnified Persons") from and against any and all losses, costs, damages, Liabilities, Taxes, claims, suits, proceedings, judgments, settlements and expenses (including reasonable fees and expenses of attorneys) (collectively, "Damages") incurred by Buyer Indemnified Persons arising from (or arising from any Third Party Claim containing allegations that, if true, would constitute):

(i)    any inaccuracy, misrepresentation or breach of, or default in connection with, any of the representations and warranties contained in Article III or Article IV or in any other Transaction Agreement, exhibit, schedule or certificate to, or delivered in connection with, this Agreement;

(ii)    any breach or violation of, failure to comply with, or default in connection with, any covenant or agreement made by or to be performed by the Selling Parties, the Founders or the Company in this Agreement or any exhibit, schedule or certificate to, or delivered in connection with, this Agreement;

(iii)    any Taxes (A) of or with respect to the Company or any of its income, assets or operations that are attributable to any Pre-Closing Period; (B) for which the Company has any liability attributable to any Pre-Closing Period under Treasury Regulations Section 1.1502-6 or under any comparable or similar provision of state, local or foreign Laws as a result of being a member of an affiliated, consolidated, combined, unitary or similar group on or prior to the Closing Date, (C) for which the Company has any liability attributable to any Pre-Closing Period as a transferee or successor, pursuant to any contractual obligation or otherwise, which Tax is related to the operations of the Company on or prior to the Closing Date or an event or transaction occurring before the Closing; or (D) the payment of which has been deferred by the Company under any COVID-19 Law; provided, however, except to the extent provided in Section **Error! Reference source not found.** (Indemnification of Company), the indemnification obligations set forth in this Section 7.2(a) shall not cover or apply to any and all losses, costs, damages, Liabilities,

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

Taxes, claims, suits, proceedings, judgments, settlements and expenses (including reasonable fees and expenses of attorneys) (collectively, "**Damages**") incurred by Buyer Indemnified Persons arising from (or arising from any Third Party Claim containing allegations that, if true, would constitute) any claims of tax equity investors in connection with any additional tax liabilities, loss of tax credits and/or Recapture Event, whether arising prior to, on or after Closing;

(iv)     any inaccuracy contained in the Estimated Closing Statement, Primary Disbursement Schedule or Secondary Disbursement Schedule;

(v)     any Company Indebtedness or Company Transaction Expenses to the extent not paid by or on behalf of the Company as of the Closing;

(vi)     actual fraud, willful breach, intentional misrepresentation of a Selling Party, the Company or the Founders in connection with the making of any representation, warranty, covenant or agreement in this Agreement.

(b)     Indemnification by the Company. The Company shall indemnify and hold harmless the Buyer Indemnified Persons from and against any and all Damages incurred by Buyer Indemnified Persons arising from (or arising from any Third Party Claim containing allegations that, if true, would constitute) any claims of tax equity investors in connection with any additional tax liabilities, loss of tax credits and/or Recapture Event resulting from the consummation of this Agreement and any transactions contemplated herein.  For the avoidance of doubt, the Damages subject to the indemnification by the Company under this Section **Error! Reference source not found.** shall not include any Damages resulting from any diminution of value of the Company or its assets or of the Buyer Indemnified Persons' investment in the Company arising out of or resulting from any claims of tax equity investors or other Third Parties or the performance by the Company of its indemnification obligations to such tax equity investors or other Third Parties.

(c)     Notwithstanding anything to the contrary, in the event of claim of the Buyer Indemnified Person under this Section, the Buyer Indemnified Person shall seek indemnification from the following indemnitors, in the following order, all subject to limitations of Sub-Section (d) below: (i) first, against the Selling Parties and the Founders (including out of the proceeds deposited in the Escrow Account); and (iii) second, against the Company.

(d)     Indemnification by Buyer and Buyer Parties.  Subject to the limitations set forth in this Article VII, the Buyer and O.Y. Nofar Energy Ltd. shall jointly and severally indemnify and hold harmless Selling Parties, the Founders and their Affiliates (including the Company on and following the Closing) and each of their respective officers, directors, managers, Affiliates, agents and employees (hereinafter referred to individually as a "Seller Indemnified Person" and collectively as "Seller Indemnified Persons") from and against any and all Damages incurred by Seller Indemnified Persons arising out of, relating to or in connection with (or arising out of or relating to any Third Party Claim containing allegations that, if true, would constitute):

(i)     any breach or violation of, failure to comply with, or default in connection with, any covenant or agreement made by or to be performed by the Buyer in this Agreement or in any other the Transaction Agreement, exhibit, schedule or certificate to, or delivered in connection with, this Agreement; and

(ii)     fraud, willful breach or intentional misrepresentation on the part of the Buyer or, as applicable, its respective Affiliates.

(e)     <u>Limitations on Liability</u>.

(i)     No Indemnitor shall have any liability under Section 7.2(a)(i) or Section 7.2(b), as applicable, unless and until the aggregate amount of Damages suffered by Buyer Indemnified Person(s) or the Seller Indemnified Person(s), as the case may be, exceeds $50,000.00 (the "<u>Basket Amount</u>"), after which all Damages from the first dollar shall be recoverable by the applicable Buyer Indemnified Person(s) or the Seller Indemnified Person(s), as the case may be; provided, however, that the Basket Amount shall not apply to claims for indemnification with respect to a misrepresentation or breach of, or default in connection with, any of the Fundamental Representations.

(ii)     The aggregate amount of all Damages for which each Selling Party and Founder shall be liable, jointly and severally, under (A) Section 7.2(a)(i) through Section 7.2 (a)(v) shall not exceed 100% of the Aggregate Secondary Amount, and (B) under Section 7.2(a)(vi) (fraud) shall not be limited.

(iii)     The aggregate amount of all Damages for which the Company shall be liable under (A) Section 7.2(a)(i) through Section 7.2 (a)(v) and Section 7.2 (b) shall not exceed 100% of the aggregate of the Aggregate Primary Amount, and (B) under Section 7.2(a)(vi) (fraud) shall not be limited.

7.3     <u>Indemnification Procedure</u>.

(a)     <u>Non-Third-Party Claims</u>.  The Person seeking indemnification hereunder (the "<u>Indemnitee</u>") shall notify the Party providing indemnification hereunder (the "<u>Indemnitor</u>") in writing (such notice, a "<u>Claim Notice</u>") as soon as possible but in no event less than ten (10) Business Days following the Indemnitee's discovery of any matter (including if a Claim is filed against the Indemnitee) for which the Indemnitor may be liable to the Indemnitee under this Article VII.  The failure of an Indemnitee to deliver a timely Claim Notice hereunder shall not affect its rights to indemnification hereunder, except to the extent that the Indemnitor is actually prejudiced by such failure to provide timely notice; provided that any Claim Notice must be delivered within the applicable survival period giving rise to the Claim.

(b)     <u>Third Party Claims</u>.  With respect to any Claim (other than a Claim made with respect to Taxes, which is governed by Section 9.4) made by a third Person (a "<u>Third Party Claim</u>") against an Indemnitee for which the Indemnitee will seek indemnification from the Indemnitor hereunder, after delivery of the respective Claim Notice, the Indemnitor shall be entitled (if it so elects), at its own cost, risk and expense, (a) to take control of the defense and investigation of such Claim, (b) to employ and engage legal counsel of its own choice to handle and defend the same (unless the Indemnitee has been advised by counsel that there exists an actual or potential conflict of interest between the Indemnitee and counsel chosen by the Indemnitor (including one or more legal defenses or counterclaims available to it or to other indemnified parties that are different from or additional to those available to the indemnifying parties) that makes it inappropriate in the reasonable judgment of the indemnified party for the same counsel to represent both the indemnified party and the indemnifying parties), in which event the Indemnitee shall be entitled, at the Indemnitor's cost, risk and expense, to reasonable fees of not more than one separate counsel of the Indemnitee's own choosing), and (c) to compromise or settle such Claim, which compromise

or settlement shall be made only with the written consent of the Indemnitee, such consent not to be unreasonably delayed or withheld, unless (A) there is no finding or admission against Indemnitee of any violation of the rights of any Person and it is not reasonably expected to have an effect on any other Claims that may be made against the Indemnitee, (B) the sole relief provided is monetary damages that are paid in full by the Indemnitor and the Indemnitee is otherwise released in full from such Claim and all other claims, known or unknown of such third Person, (C) the Indemnitee will have no liability with respect to any compromise or settlement of such Claims effected without its consent and (D) the compromise or settlement of such Claim without the consent of the Indemnitee will not adversely affect the Tax liability of the Indemnitee or any of its Affiliates.  After notice from the Indemnitor to the Indemnitee of its election to assume the defense of a Claim, the Indemnitor will not, as long as it diligently conducts such defense, be liable to the Indemnitee for any fees of other counsel with respect to the defense of such claim, except as otherwise provided in this Section 7.3(b) with respect to possible conflicts of interest between the Indemnitee and Indemnitor's counsel.  If the Indemnitor fails to notify the Indemnitee that the Indemnitor will assume the defense of such Claim within fifteen calendar days after delivery by the Indemnitee of the Claim Notice (or such shorter period as may be required in connection with the underlying Claim), the Indemnitee will (upon delivering notice to such effect to the Indemnitor) have the right to undertake the defense, compromise or settlement of such Claim on behalf of and for the account and risk of the Indemnitor, and Indemnitor shall reimburse the Indemnitee for the reasonable expenses of counsel engaged by Indemnitee to defend such Claim.  The Party undertaking the defense, compromise or settlement of the Third Party Claim will keep the other Party reasonably informed of the progress of any such defense, compromise or settlement, and the Indemnitor and Indemnitee shall cooperate (at the Indemnitor's expense) in the investigation, trial and defense of such Third Party Claim and any appeal arising therefrom, and the Indemnitee may, at its own cost, monitor and further participate in the investigation, trial and defense of such Third Party Claim and any appeal arising therefrom.  To the extent that there is an inconsistency between this Section 7.3 and Article IX as to any Tax matter, the provisions of Article IX shall control.

7.4     No Right of Contribution.  The Selling Parties shall not make any claim for contribution from the Company with respect to any indemnity claims arising under or in connection with this Agreement to the extent that any Buyer Indemnified Person is entitled to indemnification hereunder for such claim, and the Selling Parties hereby waive any such right of contribution from the Company, except with respect to any Selling Party's right to indemnification with respect to any third-party claim incurred in such Selling Party's capacity as a Manager of the Company under the organizational documents of the Company as in effect from time to time.

7.5     Effect of Investigation; Reliance.  The right to indemnification, recovery of Damages or any other remedy of the Buyer will not be affected under this Agreement with respect to any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time prior to the Closing Date, with respect to the accuracy or inaccuracy of or compliance with any representation, warranty, covenant or agreement made by the Selling Parties or the Company or any other matter, unless the Selling Party can demonstrate (with written evidence) that the Buyer or the applicable indemnified party had knowledge of, or was aware prior to the Closing Date of such fact (excluding any accounting inaccuracy or discrepancy in the financial statements or books of the Company disclosed by the Buyer) giving rise to the Buyer's Claim.

7.6     Characterization of Payments.  Any payments made to any party pursuant to this Article VII shall constitute an adjustment of the Net Secondary Amount for Tax purposes and shall be treated as such

by the Parties on their Tax Returns unless otherwise required by a change in law occurring after the date hereof, a closing agreement with an applicable Tax Authority or a final, non-appealable judgment of a court of competent jurisdiction.

7.7    <u>Limitations Not Applicable</u>.  Notwithstanding anything to the contrary set forth in this Agreement, none of the limitations set forth in this Article VII, whether time-based, monetary or otherwise, including the survival periods set forth in Section 7.1 and the limitations in Section 7.2(d), shall apply to any Damages, or any indemnification obligations thereto, resulting from the intentional misrepresentation or fraud of a Party hereto.

**ARTICLE VIII**
**Waiver and Release**

8.1    Effective as of the Closing, each of the Selling Parties and of the Founders unconditionally, absolutely and irrevocably fully waives, releases and forever discharges the Company and the Buyer from any and all disputes, claims, actions, demands, proceedings, contracts, damages, costs, expenses obligations, payments, debts and liabilities of any nature whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which the Selling Party or the Founder now has, has ever had or may hereafter have against the Company arising prior to the Closing or on account of or arising out of any matter, cause or event occurring prior to the Closing (including, any rights to dividends, distributions, repayment of loans or reimbursement from the Company), whether pursuant to its incorporation documents, bylaws or any other charter documents, contract, Legal Requirement (including under any Employment Laws) or otherwise and whether or not relating to claims pending on, or asserted after, the Closing; provided, however, and notwithstanding the foregoing, nothing contained herein shall operate to release any Selling Party's rights under any "key man" life insurance or disability insurance policy for which such Selling Party is a beneficiary or any obligation of (a) the Company with respect to any Employment Agreement, and/or its indemnification obligations to the Selling Parties with respect to any third-party claim made against any such Selling Party in its capacity as  a Manager of the Company under the organizational documents of the Company as in effect from time to time; or (b) the Buyer arising under this Agreement, the Escrow Agreement or any of the other Transaction Agreements or any other agreement entered into between Buyer and any Selling Party in connection with the transactions contemplated hereby.

**ARTICLE IX**
**Tax Matters**

9.1    <u>Tax Returns</u>.

(a)    All Taxes that relate to the Overlap Period shall be apportioned between the Pre-Closing Period and the Post-Closing Period as follows:  (i) in the case of property or ad valorem taxes, the amount allocable to the portion of the period ending on the Closing Date shall equal the amount of such property or ad valorem Taxes for such entire Overlap Period multiplied by a fraction, the numerator of which is the number of calendar days during the Overlap Period that are in the portion of such Overlap Period ending on the Closing Date and the denominator of which is the number of calendar days in the Overlap Period, and (ii) in the case of all other Taxes, as determined from the books and records of the Company as though the taxable year of the Company terminated at the close of business on the Closing Date. For purposes of computing the Taxes attributable to the two portions of a taxable period pursuant to this Section 9.1(a), the amount of any item that is taken into account only once for each taxable period

(e.g., the benefit of graduated tax rates, exemption amounts, etc.) shall be allocated between the two portions of the period in proportion to the number of days in each portion.

(b)    The Company shall make (i) a "push-out" election under Section 6226 of the Code with respect to any Pass-Through Tax Return for a Pre-Closing Period and a Code Section 754 election for the Pass-Through Tax Return that includes the Closing Date.  The Company shall adopt the interim closing of the books method under Section 706 of the Code for purposes of allocation income for the period through the Closing Date and after the Closing Date on the Pass-Through Tax Return that includes the Closing Date.

9.2    <u>Cooperation with Respect to Tax Returns</u>.  Buyer and the Selling Parties shall furnish or cause to be furnished to each other, and each at their own expense, as promptly as practicable, such information (including access to books and records) and assistance, including making employees available on a mutually convenient basis to provide additional information and explanations of any material provided, relating to the Company as is reasonably necessary for the filing of any Tax Return, for the preparation for any audit, and for the prosecution or defense of any claim, suit or proceeding relating to any adjustment or proposed adjustment with respect to Taxes.  Buyer or the Company shall retain in its possession, and shall provide the Selling Parties reasonable access to (including the right to make copies of), such supporting books and records and any other materials that the Selling Parties may specify with respect to Tax matters relating to any taxable period ending on or prior to the Closing Date until for a period of seven years following the Closing Date.  After such time, Buyer may dispose of such material.

9.3    <u>Disputes</u>.  Except as otherwise provided herein, any dispute as to any matter covered hereby shall be resolved by the Accounting Referee, the fees and expenses of which shall be borne equally by the Selling Parties, on the one hand, and Buyer, on the other hand.

9.4    <u>Tax Contest</u>.  On and after the Closing Date, Buyer shall have the sole right to control, defend, settle, compromise or contest any Tax Contest relating to a Tax Return of the Company;  provided, however, that if the Selling Parties would be required to indemnify Buyer for any Taxes, losses, claims or expenses arising from a Tax Contest, and such Tax Contest relates to a Tax Return of the Company, Seller Representative, at the sole expense of the Selling Parties, shall have the right to participate in any such Tax Contest.

9.5    <u>Allocation of Net Secondary Amount</u>.  Buyer shall prepare a draft of the allocation of the purchase price for the Purchased Interests (as determined for U.S. federal income tax purposes) among the Company's assets   in accordance with Sections 755 and 1060 of the Code and the U.S. Treasury Regulations thereunder (and any similar provisions of state, local, or non-U.S. law, as appropriate) and the methodology set forth on Schedule 9.5 attached hereto (the "<u>Allocation Schedule</u>").  Buyer shall deliver such draft allocation to Seller Representative within 90 days after the Closing Date.  Seller Representative shall have 30 days following receipt of Buyer's draft Allocation Schedule to review and approve or dispute the Allocation Schedule.  If Seller Representative and Buyer are unable to agree as to the Allocation Schedule by a date that is no later than 30 days following the delivery of the Allocation Schedule to Seller Representative, the items in dispute regarding the Allocation Schedule shall be promptly resolved pursuant to Section 9.3.  The parties agree to cooperate with each other in the preparation of the Allocation Schedule, and to furnish the other party with such information as such other party reasonably requests, for purposes of determining the Allocation Schedule.  Neither the Buyer nor the Selling Parties shall take any Tax position inconsistent with such Allocation Schedule, except to the extent otherwise required by law.  Any subsequent

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

allocation necessary as a result of an adjustment to the Net Secondary Amount to be paid pursuant to Section 2.10 shall be determined in a manner consistent with the Allocation Schedule.

## ARTICLE X
## Conditions to Closing

10.1    Conditions to Obligations of the Company, the Selling Parties and Buyer.  The respective obligations of the Company, the Selling Parties and Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by both Parties:

(a)    No Injunctions or Other Legal Restraints.  No injunction or other legal restraint or prohibition enacted, entered, promulgated, enforced or issued by any governmental authority preventing the consummation of the Closing shall have been issued and continue to be in effect.

(b)    Absence of Proceedings.  There shall not be pending or threatened any action or proceeding challenging or seeking to restrain or prohibit the Closing or any other transaction contemplated by this Agreement or the Ancillary Agreements.

10.2    Conditions to Obligations of the Company and Selling Parties.  The obligation of the Selling Parties and Company to consummate the transactions contemplated by this Agreement is subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by the Selling Parties (in their sole and absolute discretion):

(a)    Buyer shall have performed in all material respects the covenants and agreements required to be performed by it under this Agreement and any documents or agreements contemplated hereby at or prior to the Closing;

(b)    The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all respects (if qualified by materiality) or in all material respects (if not so qualified) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects); and

(c)    The Selling Parties shall have received from Buyer each of the items set forth in Section 2.7.

10.3    Conditions to Obligations of Buyer.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by Buyer (in its sole discretion):

(a)    The Company and the Selling Parties shall have performed in all material respects the covenants and agreements required to be performed by them under this Agreement and the other Transaction Agreements at or prior to the Closing;

(b)    The representations and warranties of the Company, of the Founder Parties and of the Selling Parties set forth in this Agreement shall be true and correct in all respects (if qualified by materiality) or in all material respects (if not so qualified) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects);

(c)    There shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect; prior to the Closing, the Selling Parties shall notify the Buyer of any Material Adverse Effect and shall use commercial reasonable efforts (for a reasonable period of time) to mitigate any losses, damages, costs, obligations, liabilities, expenses, in connection therewith; provided, however, that the Selling Parties shall decide in their reasonable discretion whether to threaten or commence litigation in connection with their mitigation obligation. Notwithstanding the foregoing, and solely for purposes of this Section 10.3(c), any event, occurrence, fact, condition or change (including change of law) shall under no circumstances constitute a Material Adverse Effect unless and until it could reasonably be expected to result in a detriment to the Company, any Portfolio Company and/or Project Company or its business, as presently conducted or as proposed to conducted, of not less than USD 700,000 when aggregated with all other events, occurrence, facts, conditions or changes (including changes of law) meeting the definition of Material Adverse Effect.

(d)    None of the Founders shall have terminated his involvement or employment with the Company or expressed his intention to do so prior to the Closing Date; and

(e)    Buyer shall have received from the Selling Parties each of the items listed in Section 2.6.

## ARTICLE XI
## Termination

11.1    <u>Conditions of Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of the Company, the Selling Parties and Buyer;

(b)    by the Company, the Selling Parties or Buyer if (i) any court of competent jurisdiction or other Governmental Authority shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such Order shall have become final and non-appealable; provided, however, that the Party seeking to terminate this Agreement pursuant to this clause (i) shall have used all reasonable best efforts to have such Order vacated; provided, however, that the right to terminate this Agreement under this clause (ii) shall not be available to any Party whose breach or failure to fulfill any obligation under this Agreement  has been the cause of, or resulted in, the failure of the Closing.

(c)    by Buyer, if the Selling Parties or Company shall have breached in any material respect any of their respective representations or warranties or shall have breached or failed to perform or comply with any of their respective covenants or agreements in this Agreement in any material respect

and such breach or failure cannot be cured or has not been cured within thirty calendar days after the giving of written notice by Buyer to the Selling Parties specifying such breach or failure;

(d)      by the Selling Parties, if Buyer shall have breached in any material respect any of its representations or warranties or shall have breached or failed to perform or comply with any of its covenants or agreements in this Agreement in any material respect and such breach or failure cannot be cured or has not been cured within thirty calendar days after the giving of written notice by the Selling Parties to Buyer specifying such breach or failure.

(e)      by Buyer, on the one hand, or the Selling Parties, on the other hand, if Buyer and the Selling Parties cannot agree on the definitive terms of Sections 7.4, 7.6 and 7.7 of the Amended and Restated Operating Agreement and if Buyer, on the one hand, or the Selling Parties, on the other hand, reasonably determine in good faith that the parties will not be able to agree on the definitive terms of Sections 7.4, 7.6 and 7.7 of the Amended and Restated Operating Agreement in a timely manner.

(f)      Automatically, in the event that the Closing has not occurred prior to the date that is six (6) weeks after this Agreement has been fully executed by all parties hereto (the "**Long Stop Date**"), unless such date is postponed (i) by the Buyer, at its sole discretion, for an additional period of up to 4 weeks; and/or (ii) by mutual agreement in writing of the Buyer and the Selling Parties.

11.2    <u>Effect of Termination</u>.  Subject to this Section 11.2, in the event of the termination of this Agreement, this Agreement shall become void and have no further force and effect, and the transactions contemplated by this Agreement shall be abandoned without any further action or Liabilities of any Party; provided, however, the following provisions shall survive such termination, subject to any limitations set forth therein.

## ARTICLE XII
## Seller Representative

12.1    <u>Seller Representative; Power of Attorney</u>.  The Selling Parties hereby irrevocably appoint, authorize and direct Seller Representative to act as the representative, agent, proxy, and attorney-in-fact for all the Selling Parties for purposes under this Agreement including the full power and authority on the Selling Parties' behalf (a) to negotiate disputes arising under, or relating to, this Agreement and the other agreements, instruments, and documents contemplated hereby or executed in connection herewith, (b) to agree to and enter into settlements and compromises of any such disputes, (c) to act for the Selling Parties with respect to the execution, delivery and performance of the Escrow Agreement, (d) to direct the disbursement to the Selling Parties of, any funds received on behalf of the Selling Parties under this Agreement or otherwise, (e) to execute and deliver any amendment or waiver to this Agreement and the other agreements, instruments, and documents contemplated hereby or thereby or executed in connection herewith or therewith, (f) to exercise in Seller Representative's discretion, all rights and powers expressly conferred on Seller Representative hereunder and (g) to take all other actions to be taken by or on behalf of the Selling Parties in connection with this Agreement and the other agreements, instruments, and documents contemplated hereby or executed in connection herewith or therewith.  The Selling Parties further agree that such agency and proxy are coupled with an interest, are therefore irrevocable without the consent of Seller Representative and shall survive the death, incapacity, bankruptcy, dissolution or liquidation of any Seller.  All decisions and actions by Seller Representative shall be binding upon all the Selling Parties, and no Seller Party shall have the right to object, dissent, protest or otherwise contest the

same. Seller Representative shall have no duties or obligations hereunder except those set forth herein and such duties and obligations shall be determined solely by the express provisions of this Agreement. In addition, Seller Representative shall have all such incidental powers as may be necessary or desirable to carry into effect the provisions of this Section 12.1, including, at the expense of the Selling Parties, to retain attorneys, accountants and other advisors to assist Seller Representative in the performance of Seller Representative's duties, or the exercise of Seller Representative's rights and powers, hereunder.

**ARTICLE XIII**
**<u>Miscellaneous</u>**

13.1    <u>Notices</u>.

(a)    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given or made (i) three Business Days after being sent by registered or certified mail, return receipt requested, (ii) upon delivery, if hand delivered, (iii) two Business Days after being sent by prepaid overnight courier with guaranteed delivery, with a record of receipt, or (iv) upon transmission with confirmed delivery if sent by facsimile or email before 5:00 p.m. recipient's local time on a Business Day, otherwise on the next Business Day, in each case, to the appropriate address or number as set forth below.

(b)    Notices to the Selling Parties shall be addressed to the addresses set forth on <u>Exhibit A</u>.

with a copy (which shall not constitute notice) to:

Garrett Stiepel Ryder LLP
3200 Bristol Street, Suite 850
Costa Mesa, CA 92626
Attention: Allyssa Holcomb, Esq.
Email: aholcomb@garrettllp.com

(c)    Notices to Buyer shall be addressed to:

Nofar USA LLC,
c/o The Corporation Trust Company,
1209 Orange Street, Wilmington,
New Castle County, Delaware 19801

with a copy (which shall not constitute notice) to:

WilmerHale
7 World Trade Center
250 Greenwich Street
New York, NY 10007 USA
Attn: Tal Hacohen
Email: tal.hacohen@wilmerhale.com
and

Barnea, Jaffa, Lande & Co,
Electra City Tower, Floor 21

58, Harakevet Street
Tel Aviv, Israel
Attn: Samuel Henri Samuel, Adv.
Email: ssamuel@barlaw.co.il

(d)     Each of the Parties may designate a different address for notices by delivering written notice to the other Party in accordance with this Section 13.1.

13.2    <u>Governing Law; Consent to Jurisdiction; Waiver of Jury</u>.  THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.  Each of the Parties (a) consents to submit itself or himself exclusively to the personal jurisdiction of the Chancery Court of the State of Delaware or, if unavailable any federal court located in the State of Delaware, in either case, in the event any dispute arises out of this Agreement or any of the transactions contemplated hereby, (b) agrees that it or he will not attempt to deny or defeat the jurisdiction of such courts by motion or other request for leave from any such court, (c) waives any claim that such proceedings have been brought in an inconvenient forum, and (d) agrees that it or he will not bring any Claim relating to this Agreement in any court or other tribunal other than the Chancery Court of the State of Delaware or a federal court sitting in the State of Delaware.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT OR HE MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) IT OR HE UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (III) IT OR HE MAKES SUCH WAIVER VOLUNTARILY, AND (IV) IT OR HE HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 13.2.

13.3    <u>Further Assurances.</u> Each of the Parties hereto shall perform such further acts and execute such further documents as may reasonably be necessary to carry out and give full effect to the provisions of this Agreement and the intentions of the parties as reflected thereby.

13.4    <u>Entire Agreement</u>.   This Agreement, the schedules and exhibits hereto, the other Transaction Agreements and the Ancillary Agreements contain the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior agreements, understandings, and negotiations, both written and oral, among the parties with respect to the subject matter of this Agreement, including for the avoidance of doubt the Term Sheet dated March 17th, 2021 between the Buyer (or an Affiliate thereof) and the Company.

13.5    <u>Expenses</u>.   Except as otherwise provided in this Agreement, each Party shall be responsible for and shall pay all costs and expenses incurred by such Party in connection with entering into this Agreement and the transactions contemplated by this Agreement.

13.6    <u>Counterparts</u>.  This Agreement may be executed and delivered by facsimile, email or electronic signature service (*e.g.*, DocuSign) and in two or more counterparts, all of which shall be considered one and the same agreement.

13.7    <u>Successors and Assigns; Binding Effect</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the other Party; provided, however, that following the Closing Buyer may assign any or all of its rights, interests and obligations hereunder (a) in connection with the sale of all or substantially all of the assets of or any business combination transaction involving Buyer (whether pursuant to a merger, consolidation, sale of equity interests or otherwise) or (b) to any of its Affiliates without any prior written consent of the Selling Parties; provided, further, however, that notwithstanding such assignment, Buyer shall remain liable for any default by its assignee of any of its obligations hereunder.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors or assigns, heirs, legatees, distributees, executors, administrators and guardians.

13.8    <u>Amendments and Waivers</u>.  This Agreement, and each of the terms and provisions of this Agreement, may be modified, waived or amended, to the extent permitted by law and, if applicable, approved by the board of directors or similar governing body of the Selling Parties and Buyer, by an instrument or instruments in writing signed by each of the Parties (providing that Seller Representative may execute any such instrument or instruments on behalf of the Selling Parties)  The failure of any Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part of this Agreement or the right of any Party thereafter to enforce each and every such provision.  The waiver by any Party of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.

13.9    <u>Headings; No Third Party Beneficiaries</u>.  Except as expressly set forth in Section 7.3, neither this Agreement nor any of the provisions herein is intended to confer upon any Person other than the Parties (and their successors and assigns as permitted by Section 13.7) any rights or remedies hereunder.

13.10    <u>Severability</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Legal Requirement, (a) such provision will be fully severable, (b) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by such provision or its severance herefrom and (c) in lieu of such provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such provision as may be possible.

13.11    <u>Headings</u>.  The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

13.12    <u>Specific Performance</u>.  The rights and remedies of the Parties hereto shall be cumulative (and not alternative).  Each Party hereby agrees that, in the event of any breach or threatened breach by the other Party of any covenant or obligation contained in this Agreement, the non-breaching Party shall be entitled (in addition to any other remedy that may be available to them, whether in law or equity, including monetary damages) to:  (a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation, and/or (b) an injunction restraining such breach or threatened breach.  Each Party further agrees that the other Party shall not be required to obtain, furnish or post any

bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 13.12, and each Party irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

13.13    <u>Construction</u>.  Each Party acknowledges and agrees it has had the opportunity to draft, review and edit the language of this Agreement and that no presumption for or against any Party arising out of drafting all or any part of this Agreement will be applied in any dispute relating to, in connection with or involving this Agreement.  Accordingly, the Parties hereby waive the benefit of any rule of law or any legal decision that would require, in cases of uncertainty, that the language of a contract should be interpreted most strongly against the Party who drafted such language.

### [*REMAINDER OF PAGE LEFT BLANK INTENTIONALLY*]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**BUYER**:

**NOFAR USA LLC**

By: *Tomer Droval*
Name: Tomer Droval
Title: Director of Business Development

By: *Shahar*
Name:
Title: vp

For purposes of Section 7.2(c) of this Agreement:

**O.Y. NOFAR ENERGY LTD.**

By: *Tomer Droval*
Name: Tomer Droval
Title:  Director of Business Development

DocuSign Envelope ID: DA87E317-D474-4810-9B6D-60BF75240BAE

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

COMPANY

**BLUE SKY UTILITY HOLDING, LLC**

By: *Barend Venter*
Name: Barend Venter
Title:        CEO

By: _____
Name:
Title:

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**COMPANY**

**BLUE SKY UTILITY HOLDING, LLC**

By: _____
Name: Barend Venter
Title: President, Blue Sky Utility LLC, Member

By: _____
Name: Ran Bujanover
Title: President, Blue Sky Utility LLC, Member

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**SELLER REPRESENTATIVE**:

DocuSigned by:

*Ran Bujanover*

RAN BUJANOVER

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**SELLING PARTY**:

**BLUE SKY 1007, LLC**

By: _Barend Venter_ _____
Name: Barend Venter
Title: Member

**SELLING PARTY**:

**YELLOW TREE CAPITAL LLC**

By:_____
Name: Ran Bujanover
Title: Member

DocuSign Envelope ID: 7D167BD1-0ED9-495A-AF2E-53E52EDE1297

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**SELLING PARTY**:

**BLUE SKY 1007, LLC**

By:_____
Name: Barend Venter
Title: Member

**SELLING PARTY**:

**YELLOW TREE CAPITAL LLC**

By:_____
Name: Ran Bujanover
Title: Member

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**FOUNDER**:

DocuSigned by:

*Ran Bujanover*

F00ED412B7A6407

**RAN BUJANOVER**

**FOUNDER**:

_____

**BAREND VENTER**

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

**FOUNDER**:

_____

**RAN BUJANOVER**

**FOUNDER**:

DocuSigned by:

*Barend Venter*

—423432C02938484...

**BAREND VENTER**

**Exhibit A-1 and A-2**

Schedule of Membership Interests

| Name and Address of Member | Number of Membership Interests Held Immediately Prior to the Closing | Percentage Membership Interest Owned Immediately Prior to the Closing / Pro Rata Allocation | Number of Purchased Interests to be sold/issued | Percentage Membership Interest Owned Immediately After Closing / Pro Rata Allocation |
|---|---|---|---|---|
| Nofar USA LLC<br><br>c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801 | N/A | 0.0% | N/A | 67.0% |
| Blue Sky 1007, LLC<br><br>860 R Napa Valley Corporate Way, P.O. Box 5571 Napa, CA 94581 | N/A | 47.5% | N/A | 16.5% |
| Yellow Tree Capital<br><br>860 R Napa Valley Corporate Way, P.O. Box 5571 Napa, CA 94581 | N/A | 47.5% | N/A | 16.5% |
| Palm Drive Associates, LLC<br><br>21600 Oxnard Street, Suite 1200 Woodland Hills, CA 91367 | N/A | 5.0% | N/A | 0.0% |
| **Total** | | | | |

DocuSign Envelope ID: 7D167BD1-0ED9-495A-AF2E-53F52EDF1297

## EXHIBIT B

[N/A]

EXHIBIT C

Loan Agreement

[Attached]

# LOAN AGREEMENT

This LOAN AGREEMENT (the "*Agreement*") is entered into as of [_____] 2021, by and between Nofar USA LLC, a Delaware limited liability company and [_____], a [_____] (collectively, the "*Lender*"), and Blue Sky Utility LLC, a California limited liability company ("*BSU*"), and Blue Sky Utility Holding LLC a California limited liability company ("*BSUH*") (BSU and BSUH are referred to herein, jointly and severally, and individually or collectively, as the context requires, as "*Borrower*").

## RECITALS

Borrower wishes to obtain credit from Lender, and Lender desires to extend credit to Borrower. This Agreement sets forth the terms on which Lender will advance funds to Borrower, and Borrower will repay the amounts owing to Lender.

## AGREEMENT

In order to induce the Lender to make the Advances and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, Lender and Borrower hereby agree as follows:

1.    **DEFINITIONS AND CONSTRUCTION.**

   1.1    **Interpretation; MIPA**. As used in this Agreement, the following terms shall have the following definitions in Section 1.2 below. Capitalized terms not expressly defined herein shall have the meaning ascribed thereto in the MIPA.

   1.2    **Definitions.**

   "*Advance*" means an advance of funds under the Loan.

   "*Affiliate*" has the meaning set forth in the MIPA.

   "*A&R Operating Agreement*" means the Second Amended and Restated Operating Agreement of each of BSU and BSUH, of even date herewith.

   "*Asset Pledge*" has the meaning set forth in the Asset Pledge Agreement.

   "*Asset Pledge Agreement*" shall mean that asset pledge agreement to be executed between the Lender and the Borrower, and dated on or about the date hereof, for the pledge of the Collateral for the benefit of the Lender, and a signed copy of which is attached hereto as Exhibit C.

   "*Availability Period*" has the meaning set forth in Section 2.1.4 below.

   "*Available Cash*" means the total amount of distributable cash and cash equivalents then held by the Borrower, after (a) payment of amounts necessary to satisfy and discharge all liabilities and obligations of the Borrower that are then due and payable, and (b) such other reasonable reserves as the Board of Borrower, in good faith, may determine to satisfy liabilities and obligations which are pending or reasonably expected (in compliance with the annual budget of the Borrower) and for a period of up to 6 months.

   "*Borrower's Books*" means all of Borrower's books and records including: ledgers; records concerning Borrower's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, tape files, and the equipment containing such information.

"**Business Day**" means (i) any day other than a Friday, Saturday, Sunday, federal holiday, and (ii) any day on which commercial banks in Los Angeles, California and Israel are open for general, non-automated business.

"**Charter Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Closing Date**" has the meaning set forth in the MIPA.

"**Code**" means the Uniform Commercial Code, as the same may from time to time be enacted and in effect in the State of New York.

"**Collateral**" means all assets and property, whether now owned by or owing to, or hereafter acquired by or arising in favor of, the Company (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Company, and regardless of where located, and all as more fully described in the Asset Pledge Agreement.

"**Commitment**" means sixty five million US dollars ($65 million).

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another, including, without limitation, any such obligation directly or indirectly guaranteed, endorsed, co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards, or merchant services issued or provided for the account of that Person; and (iii) all obligations arising under any interest rate, currency or commodity swap agreement, interest rate cap agreement, interest rate collar agreement, or other agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"**Credit Extension**" means each Advance, or any other extension of credit by Lender for the benefit of Borrower hereunder.

"**Default**" means an event or condition which would (with the expiry of a grace period, the giving of notice or the making of any determination under this Agreement, or any combination of them) constitute an Event of Default.

"**Eligible Operational Costs**" shall mean operational costs of the Borrower, approved by the Board of the Borrower, in accordance with its respective A&R Operating Agreement, in the annual budget plan of the Borrower, and designated therein as costs to be funded by the proceeds of Advances.

"**Eligible Project**" means each independently operated solar energy generating and storage facility project in which Borrower has a direct or indirect interest, as of the Closing Date, or obtains a direct or indirect interest following the Closing Date, including, without limitation, all equipment, and interconnection lines and facilities associated with such project, as reasonably approved by Lender from time to time.

"***Eligible Project Costs***" shall mean the total costs necessary to develop and construct the Eligible Projects through their commercial operation date, and, as the case may be, to purchase such Eligible Projects, as reasonably approved by Lender from time to time.

"***Equity Interests***" means all right, title and interest in the membership interests owned by BS1007 and Yellow Tree, in each Borrower, whether now outstanding or issued in the future.

"***Equity Pledge***" has the meaning set forth in the Equity Pledge Agreement.

"***Equity Pledge Agreement***" means that certain Equity Pledge Agreement executed by each Pledgor to secure the Loan pursuant to which, among other things, all of the Equity Interests shall be pledged to Lender, and all supplements, amendments, modifications, renewals, substitutions and replacements thereof. A signed copy of Equity Pledge Agreement is attached hereto as Exhibit D.

"***Event of Default***" means any one or more of the events specified in Section 7.

"***FATCA***" means as defined in:

(a)    sections 1471 to 1474 of the US Internal Revenue Code of 1986 or any associated regulations;

(b)    any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)    any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"***FATCA Deduction***" means a deduction or withholding from a payment under this Agreement required by FATCA.

"***FATCA Exempt Party***" means a party that is entitled to receive payments free from any FATCA Deduction.

"***Financial Covenants***" shall mean such covenants of the Borrower as set forth in Exhibit B attached hereto.

"***Financial Models***" has the meaning set forth in Exhibit B.

"***Forecast Test Period***" has the meaning set forth in Exhibit B attached hereto.

"***Forecast Financial Test***" has the meaning set forth in Exhibit B attached hereto.

"***Historic Test Period***" has the meaning set forth in Exhibit B attached hereto.

"***Historic Financial Test***" has the meaning set forth in Exhibit B attached hereto.

"***IFRS***" means International Financial Reporting Standards, as in effect from time to time, consistently applied throughout the applicable periods.

"***Indebtedness***" means, with respect to any Person, (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar

instruments, (c) all capital lease obligations, account receivables securitization programs, off-balance sheet loans or similar off-balance sheet financing products, (d) all Contingent Obligations, (e) all preferred equity interests issued by such Person and which by the terms thereof could be (at the request of the holders thereof or otherwise) subject to mandatory sinking fund payments, redemption or other acceleration, and (f) all Indebtedness of the types referred to above of any partnership or joint venture in which such Person is a general partner or joint venturer, except to the extent that Indebtedness is expressly made non-recourse to such Person.

*"Insolvency Proceeding"* means any proceeding commenced by or against any person or entity under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, or proceedings seeking reorganization, arrangement, dissolution, winding up, or other relief.

*"Lender Expenses"* means all reasonable attorneys' fees and expenses incurred by Lender in amending, enforcing or defending the Loan Documents (including reasonable fees and expenses of appeal), incurred before, during and after an Insolvency Proceeding, whether or not suit is brought.

*"Lien"* means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

*"Loan"* means the loan to be made by Lender to Borrower under this Agreement and all other amounts secured by the Loan Documents, which shall be up to the amount of the Commitment.

*"Loan Documents"* means, collectively, this Agreement, any note or notes executed by Borrower, the Equity Pledge Agreement, the Asset Pledge Agreement and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time, but expressly excluding the A&R Operating Agreement of each Borrower and the MIPA.

*"Loan Party"* shall refer collectively to the Borrower and the Pledgors.

*"Material Adverse Effect"* means any set of circumstances or events which (a) has or could reasonably be expected to have any material adverse effect upon the validity or enforceability of any material provision of this Agreement, or any Loan Document or any Transaction Document, (b) is or could reasonably be expected to be material and adverse to the assets, properties, condition (financial or otherwise) or business operations of the Borrower or any Subsidiary, (c) materially impairs or could reasonably be expected to materially impair the ability of the Borrower or any Subsidiary, to perform its obligations hereunder or under any other Loan Document, Transaction Document or Project Document (d) materially impairs or could reasonably be expected to materially impair the priority of the Lender's security interest in any Collateral or Equity Interest or (e) materially impairs or could reasonably be expected to materially impair the ability of the Lender to enforce any of its legal remedies pursuant to this Agreement, the Transaction Documents or any other Loan Document. Notwithstanding the foregoing, a set of circumstances or events (either individually or in the aggregate) described in the immediately preceding sentence shall under no circumstances constitute a Material Adverse Effect unless and until it could reasonably be expected to result in a detriment to Lender equal to the greater of (i) an amount equal to two percent (2%) of the then-outstanding principal balance of the Loan (provided that such 2% amount shall be capped at USD 500,000) and (ii) USD 250,000.

*"Maturity Date"* means the earlier of (a) the completion of 11 calendar years as of the Closing Date and (b) any date on which the entire Loan is required to be paid in full, by acceleration or otherwise, under this Agreement or any of the other Loan Documents.

*"MIPA"* means each of the Membership Interest Subscription and Purchase Agreements of even date herewith between either Borrower, and each of Blue Sky 1007 LLC, Yellow Tree Capital LLC, Mr. Barend Venter, Mr. Ran Bujanover and Nofar USA LLC.

*"Negotiable Collateral"* means all of Borrower's present and future letters of credit of which it is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and Borrower's Books relating to any of the foregoing.

*"Obligations"* means all debt, principal, interest, Lender Expenses and other amounts owed to Lender by Borrower pursuant to this Agreement or any other Loan Document, whether absolute or contingent, due or to become due, now existing or hereafter arising, including any interest that accrues after the commencement of an Insolvency Proceeding.

*"Person"* means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

*"Pledgor"* means each of Blue Sky 1007 LLC and Yellow Tree Capital LLC, and any other member of the Borrower (other than Lender or any of its Affiliates).

*"Project Documents"* has the meaning set forth in the MIPA.

*"Subsidiary"* of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of voting stock is at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower and shall include all Portfolio Companies and Project Companies.

*"Tax"* means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

*"Tax Deduction"* means a deduction or withholding for or on account of Tax from a payment under this Agreement**.**

*"Transaction Documents"*, means the Loan Documents, the MIPA, the A&R Operating Agreement and all documents related or ancillary thereto.

**1.3    Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with IFRS, and all calculations made hereunder shall be made in accordance with IFRS. When used herein, the terms "financial statements" shall include the notes, if any, and schedules thereto.

**1.4    Lender.** A reference to a "Lender" shall mean a reference to any one or both of the entities mentioned in the preamble, as a Lender, as the context requires. The Lender shall decide, when required, to fund any Advance to the Borrower through either one of the entities, at its sole discretion. The Lender shall inform the Borrower in advance, when required, to which of these two entities any repayment shall be made by the Borrower.

**2.    LOAN AND TERMS OF PAYMENT.**

**2.1    Credit Extensions.**

**2.1.1.    Promise to Pay.**  Borrower promises to pay to Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to Borrower, together with interest on the unpaid principal amount of such Credit Extensions at rates at the times in accordance with the terms hereof.

**2.1.2.    Joint and Several Liability**. The liability of each of the Borrowers for the Obligations and all other obligations of the Borrower hereunder shall be joint and several. Accordingly, either Borrower shall be joint and severally liable to the Lender for any Obligation due by the other Borrower under the terms hereof.

**2.1.3.    Advances**.  Subject to and upon the terms and conditions of this Agreement, Borrower may, during the Availability Period, request Advances and Lender shall make Advances to Borrower in an aggregate outstanding principal amount not to exceed the Commitment;

provided, that the Borrower shall be entitled to request an Advance only once per calendar month of the Availability Period.

Amounts repaid or prepaid on the Advances under the Loan may be reborrowed. All Advances, together with all accrued but unpaid interest thereon, shall be immediately due and payable on the Maturity Date.

Whenever Borrower desires an Advance, Borrower will notify Lender by electronic mail communication, at least five Business Days prior to the day that the Advance is to be made, substantially in the form attached hereto as Exhibit A (the "**Advance Request**").

Notwithstanding the foregoing, Lender shall have the right to terminate its obligation to make Advances under this Agreement immediately and without notice upon the occurrence of an Event of Default.

**2.1.4.    Availability Period**. Borrower shall be entitled to submit Advance Requests during the period beginning on the Closing Date through and including the date that is forty (40) months following the Closing Date ("**Availability Period**"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, including all accrued and unpaid interest thereto and all fees and other amounts owing by Borrower to Lender with respect thereto, will be due and payable upon the Maturity Date.

**2.1.5.    Interest Rates, Payments, and Calculations.**

**2.1.5.1.    Intentionally Deleted**.

**2.1.5.2.    Intentionally Deleted**.

**2.1.5.3.    Interest Rates.** The Advances shall bear interest, on the outstanding principal amount thereof, at a rate equal to 9% per annum (the "**Interest Rate**").

**2.1.5.4.    Default Rate.** All Obligations shall bear interest, at a default rate equal to the Interest Rate + 5% per annum (in either case, the "**Default Rate**"), in the event that (i) any payment is not made when due (as from the first day of delayed payment), and/or (ii) upon the occurrence and during the continuance of any other Event of Default listed in Section 7.2 to 7.13 below (following the expiration of the initial grace period only, and not during any extended grace period).

**2.1.5.5.    Interest.** Interest on the then-outstanding principal amount of all Advances shall accrue and be compounded on a quarterly basis, by becoming a part of the Obligations, and such interest shall thereafter accrue interest at the rate then applicable hereunder.

**2.1.5.6.    Computation.** All interest chargeable shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

**2.1.5.7.    Payments.** Borrower promises to pay to the order of Lender, on or prior to the Maturity Date, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to Borrower hereunder. Subject to Section 2.1.5.8 below, the Borrower undertakes to use all Available Cash then held by the Borrower and the Subsidiaries from time to time to repay the Obligations then outstanding, on a full cash sweep basis. The Borrower shall be prohibited to pay out of the Available Cash, any amount to any third party, other than (i) the Obligations; or (ii) with the prior written consent of the Lender. Borrower shall also pay interest on the unpaid principal amount of

such Credit Extensions at rates in accordance with the terms hereof. Borrower shall repay, in lawful money of the United States of America, the entire outstanding principal balance, and all accrued and unpaid interest, in full on the Maturity Date.

2.1.5.8. Whenever Borrower shall repay any Obligations hereunder, Borrower will notify Lender by electronic communication, substantially in the form attached hereto as <u>Exhibit A</u>. The minimum amount of each repayment of Obligation by the Borrower to the Lender shall be USD 250,000, except in the case of any prepayment of the entire outstanding principal and interest owed under the Loan. The parties acknowledge and agree that, due to the fact that the amount of Available Cash at any given time is dependent on Borrower's operations and reserves, setting a fixed payment schedule is not feasible. Accordingly, prior to the Maturity Date and except in the case of any prepayment of the entire outstanding principal and interest owed under the Loan, Borrower shall in no event be required to make any repayments of the Obligations unless and until any time at which there is at least USD 250,000 of Available Cash, and payment shall be made within seven (7) days after there is at least USD 250,000 of Available Cash. Any payment of an Advance and interest, occurring after the 7th day of the date there is at least USD 250,000 of Available Cash in the Borrower shall bear interest at the Default Rate, until repaid in full. Borrower shall be permitted to repay the Obligations, in whole or in part, at any time without the payment of any prepayment penalty or fee.

2.1.5.9. **Withholding**. In the event the Borrower is required to make a Tax Deduction or otherwise withhold taxes from any payment to Lender hereunder, the Borrower shall promptly notify the Lender and give Lender an opportunity to, and Borrower shall cooperate with Lender in its efforts to, reduce or eliminate such withholding. Any portion of payments withheld pursuant to Borrower's obligations under local, state or federal law shall be deemed paid to Lender and shall reduce the principal or interest balance, as applicable, of the Loan.

If the Borrower is required to make a Tax Deduction, it must make the minimum Tax Deduction allowed by law and must make any payment required in connection with that Tax Deduction within the time allowed by law. Notwithstanding anything to the contrary herein, the Borrower shall not be liable to the Lender for any insufficiency of amounts withheld or a failure to withhold. If the Borrower did not withhold sufficient amounts from any payment (excluding any related penalty or interest) ("**Withholding Shortfall Amount**"), and the Withholding Shortfall Amount was transferred to the Lender, the Borrower may, at its option, (a) draw on the Loan to cover such Withholding Shortfall Amount but the principal or interest balance of the Loan shall not be increased by the Withholding Shortfall Amount or (b) reduce any subsequent payments payable by the Borrower to the Lender by the Withholding Shortfall Amount.

Within thirty (30) days of making either a Tax Deduction or a payment required in connection with a Tax Deduction, the Borrower must deliver to the Lender evidence satisfactory to that Lender that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

**2.2    Crediting Payments.** Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 12:00 PM (Eastern time) shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day. Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

and be payable for the period of such extension.

      **2.3**    **Term.** This Agreement shall become effective on the Closing Date and, shall continue in full force and effect for so long as any Obligations and/or any other obligation hereunder remain outstanding. Notwithstanding termination, Lender's Lien on the Collateral and Equity Interest shall remain in effect for so long as any Obligations and/or any other obligation hereunder are outstanding, excluding any Contingent Obligations (such Contingent Obligations not being related to the Obligations under this Agreement).

## 3.    CONDITIONS OF LOANS.

      **3.1**    **Conditions Precedent to all Credit Extensions.** The obligation of Lender to make each Credit Extension, is subject to the fulfillment of all the following conditions, on a cumulative basis, to the reasonable satisfaction of the Lender (subject to Lender's right to waive any of such conditions in writing):

      **(a)**    timely receipt by Lender of the Advance Request as provided in Section 2.1.2, during the Availability Period;

      **(b)**    the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of such Advance Request and on the effective date of each Credit Extension as though made at and as of each such date;  The making of each Credit Extension shall be deemed to be a representation and warranty by Borrower on the date of such Credit Extension as to the accuracy of the facts referred to in this Section 3.1;

      **(c)**    no breach of this Agreement (including any covenants), the Loan Documents, the Transaction Documents, or the Project Documents by the Loan Parties, the Subsidiaries or any Affiliate thereto is outstanding and/or remain uncured;

      **(d)**    no Default or Event of Default shall have occurred or would result from such Credit Extension;

      **(e)**    the Equity Pledge and the Asset Pledge shall continue to be binding and enforceable, validly perfected, registered and in effect;

      **(f)**    the Borrower shall have provided to the Lender all up-to-date Financial Models in accordance with Section 6.10 below with respect to Eligible Projects (provided, however, that updated Financial Models need not be provided more frequently than once per quarter for any Eligible Project unless Borrower requests any Advance(s) with respect to such Eligible Project more frequently than once in any such quarter) and evidence reasonably satisfactory to the Lender in reasonable detail that (i) prior to the Advance, during the Historic Test Period, the Borrower had complied with all Historic Financial Test; and (ii) there is no good faith reason to believe (in the Lender's sole but reasonable discretion) that, based on the updated Financial Models, the Borrower will not meet the Forecast Financial Test;

      **(g)**    the Borrower shall provide evidence reasonably satisfactory to the Lender in reasonable detail that the Advance is designated to fund Eligible Project Costs and/or Eligible Operational Costs in accordance with Section 6.1 below;

      **(h)**    the Borrower shall have delivered to the Lender, concurrently with its Advance Request, a certification from a duly appointed and authorized officer of Borrower certifying the satisfaction and accuracy of each of the foregoing conditions as of such date; and

      **(i)**    To the extent requested by Lender, the Borrower shall have provided the Lender with detailed reports, from an audit firm and/or a technical advisor, and in a form reasonably satisfactory to the Lender, certifying that the Financial Covenants are met by the Borrower, provided that Borrower shall under no circumstances be obligated to incur costs in connection with any such reports applicable to any requested Advance in excess of USD

10,000 per quarter. Upon expiry of a specific quarter, any unused amount out of the USD 10,000 quarterly amount shall be rolled over to the next quarters , and may be used at the request of the Lender for the purpose of the delivery and provision of such details reports set forth above.

4.    **CREATION OF ASSET PLEDGE AND EQUITY PLEDGE.**

4.1    For the purpose of securing the Loan, on or prior to the Closing Date (i) the Borrower and the Lender shall enter into the Asset Pledge Agreement and (ii) the Lender and each of the Pledgors shall enter into the Equity Pledge Agreement. As a condition to Closing and to the extension of the first Advance, all pledges and securities set forth in the Asset Pledge Agreement and the Equity Pledge Agreement shall be registered and perfected.

4.2    The Lender shall be entitled to request any future additional member of the Borrower (other than Lender or Nofar USA LLC or its Affiliates), and as a condition to any transfer and/or issuance of membership interests to a new member, to execute and deliver an equity pledge agreement in terms substantially equivalent to the terms of the Equity Pledge Agreement. Notwithstanding the foregoing, if Lender assigns its interest in this Agreement pursuant to Section 11.2 to a Person that is not an Affiliate of Nofar USA LLC, but Nofar USA LLC or its Affiliate remains a member of Borrower, then such member of Borrower shall either (i) be obligated, as a condition to the effectiveness of any such assignment, to execute and deliver an equity pledge agreement to such assignee on terms substantially equivalent to the terms of the Equity Pledge Agreement; or (ii) obtain confirmation from the assignee that none of the equity interests held in the Borrower by its members be pledged for the benefit of the assignee.

4.3    **Delivery of Additional Documentation Required; Authorization.**  The Borrower shall from time to time execute and deliver to Lender all Negotiable Collateral, all financing statements and other documents that Lender may reasonably request, in form reasonably satisfactory to Lender, to perfect and continue the perfection of the Asset Pledge (and as the case may be, of the Equity Pledge) and in order to fully consummate all of the transactions contemplated under the Loan Documents. The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to authenticate and file in any relevant jurisdiction any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Asset Pledge (and as the case may be, of the Equity Pledge), including, without limitation, a description of the Collateral as "all assets of the Borrower, wherever located, whether now owned or hereafter acquired" or words of like import, and (iii) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Collateral relates, provided that any such fixture filing related to real property must comply with the applicable terms of the Project Documents.

4.4    **Collection Account.**

(a)    After the occurrence and during the continuance of an Event of Default, the Borrower shall wire transfer to an account maintained by the Lender (the "**Collection Account**"), no less frequently than daily (and whether or not there are then any outstanding Obligations), all cash receipts and collections received by Borrower from all sources, including, without limitation, the following: (i) all available cash receipts from the sale of inventory (including without limitation, proceeds of credit card charges) and other assets (whether or not constituting Collateral); (ii) all proceeds of collections of accounts receivable; and (iii) all net proceeds, and all other cash payments received by the Borrower from any Person or from any source or other transaction or event.

(b)    The Collection Account shall at all times during the continuance of an Event of Default be under the sole dominion and control of the Lender.  The Borrower hereby acknowledge and agree that (i) so long as an Event of Default has occurred and is continuing, such Borrower have no right of withdrawal from the Collection Account, (ii) the funds on deposit in the Collection Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Collection Account shall be applied to the Obligations as provided in this Agreement.  In the event that, notwithstanding the provisions of this Section 4.3, any such Borrower receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Borrower for the Lender, shall not be commingled with any of such Borrower's other funds or deposited in any account of such Borrower and shall, not later than the Business Day after receipt thereof, be deposited into the Collection Account or dealt with in such other fashion as Borrower may be instructed by the Lender.

DocuSign Envelope ID: 7D167BD1-0ED9-495A-AF2E-53E52EDE1297

5.    **REPRESENTATIONS AND WARRANTIES.**

The Borrower represents and warrants as follows:

5.1    **Due Organization and Qualification.**  Borrower and each Subsidiary is duly organized, validly existing, and in good standing under the laws of its state of formation and is duly qualified and in good standing in every other jurisdiction where the conduct of its business or its ownership or location of its properties requires such qualification.

5.2    **Due Authorization; Enforceability; No Conflict.**

**(a)**    Each of the Borrower and the other Loan Parties has the full power and authority to execute and deliver this Agreement and the other Loan Documents to which it is a party and to perform all of the obligations hereunder and thereunder, and all necessary action has been taken to execute and deliver this Agreement and the other Loan Documents to which it is a party and, with respect to the Borrower, to make the borrowings hereunder.  The Loan Documents to which Borrower is a party have been duly executed and delivered by Borrower and constitute a legal, valid and binding obligation of Borrower, enforceable in accordance with their respective terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

**(b)**    The execution, delivery and performance by Borrower of this Agreement and the other Loan Documents to which it is a party, and the creation of all Liens provided for herein and therein: (i) are not in contravention of any provision of Borrower's Charter Documents, as applicable; (ii) will not violate any law or regulation, or any order or decree of any court or governmental instrumentality, in each case applicable to Borrower, in any material respect; (iii) will not conflict with or result in the breach or termination of, constitute a default under, or accelerate any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which Borrower or any Subsidiary is a party or by which Borrower, any Subsidiary or any of their property is bound; (iv) will not result in the creation or imposition of any Lien upon any of the property of Borrower or of the Subsidiaries other than those in favor of the Lender; (v) do not require the consent or approval of any governmental body, agency, authority or any other Person except such consents as have been obtained; and (vi) will not result in any claims of third parties (including tax equity investors) in connection with any additional tax liabilities, loss of tax credits and/or Recapture Event resulting from the consummation of this Agreement and any transactions contemplated herein (provided that Lender hereby agrees that Borrower may request, from time to time, the Lender to deliver to and for the benefit of any tax equity investor a commercially reasonable forbearance agreement pursuant to which, Lender agrees to forbear during the applicable recapture period from taking any action or exercising any remedy (at law or in equity) under the Loan Documents that could result in a Recapture Event to the tax equity investor and the Lender shall not unreasonably withhold its consent to such request).

**(c)**    (i) All Transaction Documents, Loan Documents, Project Documents, Material Contracts, agreements, leases, instruments or other documents to which Borrower or any other Loan Party or any Subsidiary, or any Affiliate is a party are valid and enforceable and in full force and effect, and (ii) to the Borrowers' actual knowledge, no other party to any such contracts or agreements, is in breach or violation of, or default under, any such agreement, and (iii) no event has occurred, is pending or threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a breach or default by Borrower or, to the Borrowers' actual knowledge, any other party under such contract or agreement.

**(d)**    No resolution or action was made by the Borrower, any other Loan Party, any Subsidiary, or any Affiliate thereto in breach of the Charter Documents of the Borrower, or of the MIPA. Neither the Founders, the Selling Party nor the Borrower are in breach of any of the provisions of the MIPA.

5.3    **Compliance with Laws.** Neither Borrower has received written notice of a violation by either Borrower or any Subsidiary thereof of any applicable laws, rules, statues, regulations and ordinances in all material respects.

**5.4     Government Consents.**  Borrower and each Subsidiary has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of its business as currently conducted or proposed to be conducted.

**5.5     No Prior Encumbrances; Asset Pledge and Equity Pledge.**  Borrower has valid title to its property, free and clear of Liens except as otherwise disclosed (as the case may be) in the Asset Pledge Agreement. To Borrower's actual knowledge and except as otherwise disclosed to Lender prior to the date hereof, as of the Closing Date, the provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral and on all the Equity Interests in favor of the Lender, and, upon the filing of appropriate financing statements, such Liens will constitute, to the extent required by the Loan Documents, perfected and continuing Liens on the Collateral and on the Equity Interests, securing the Obligations and any other obligation hereunder, enforceable against the Borrower, the Pledgors, the Subsidiaries and all third parties, and having priority over all other Liens on the Collateral and on the Equity Interests. The security interests granted to the Lender pursuant to the Asset Pledge Agreement and the Equity Pledge Agreement, will at all times constitute valid, perfected and enforceable sole first priority security interests in favor of Lender, subject to no other security interest, mortgage, lien or encumbrance.

**5.6     Litigation.**  There is no litigation, administrative proceeding, investigation, claim or other legal action (including any proceeding under any state or federal bankruptcy or insolvency law) pending or, to the knowledge of Borrower, threatened against any Loan Party, any Subsidiary or any Affiliate that (a) if adversely determined could reasonably expected to render invalid the Loan Documents, the Project Documents or the Transaction Documents or the right of any Loan Party or Subsidiary or Affiliate to enter into the Loan Documents, the Project Documents or the Transaction Documents and consummate the transactions contemplated thereby, or (b) could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. No Loan Party or Subsidiary is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and no Borrower has knowledge of any Person contemplating the filing of any such petition against it.

**5.7     No Material Adverse Change in Financial Statements.**  All consolidated financial statements and other financial information of Borrower and Subsidiaries that Lender has received from Borrower fairly present in all material respects Borrower's and Subsidiaries' financial condition as of the date thereof.  There has not been a material adverse change in the consolidated financial condition of Borrower and Subsidiaries since the date of the most recent of such financial statements submitted to Lender. Except as otherwise disclosed in the Financial Statements or otherwise in writing to Lender, there are no material liabilities (fixed or contingent) affecting any Borrower, the Portfolio Companies or the Project Companies. The Borrower has no knowledge of any circumstances that could reasonably be expected to raise concern with regard to the Borrower's or any Subsidiary's ability to continue as a going concern.

**5.8     Solvency, Payment of Debts.**  Immediately after the consummation of the transactions contemplated hereby, and immediately following the making of any Advances hereunder, (a) the fair value of the assets of Borrower, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (b) Borrower will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured, and (c) Borrower will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

**5.9     Regulatory Compliance.**  None of Borrower or any of their Subsidiaries is or is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940.  Borrower is not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System).  Neither Borrower nor any of its Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation, and neither Borrower nor any of its Subsidiaries is in default with respect to any judgment, writ, injunction, decree or order of any governmental authority, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**5.10    Taxes.** Except as otherwise disclosed in the MIPA, Borrower and each of its Subsidiaries has filed or caused to be filed all tax returns required to be filed, and has paid, or has made adequate provision for the payment of, all taxes reflected therein or otherwise required to be paid, except for such taxes that are being contested in good faith and by proper proceedings and against which adequate reserves are being maintained.

**5.11    Project Documents.** (a) Each copy of a Project Document delivered to the Lender under this Agreement is a true and complete copy of such Project Document and there is no other agreement or document in connection with, or arrangements which amend, supplement or affect any Project Document in any material respect; (b) There is no dispute in connection with any Project Document which, if adversely determined, would, or would be reasonably likely to, have a Material Adverse Effect; (c) The Project Documents include all agreements required for the design, construction, ownership (to the extent relevant), operation and maintenance of the Eligible Projects; (d) Borrower is not aware of any existing fact or circumstance that is reasonably likely to prevent the achievement of the commercial operation of any Project, as reflected in each Financial Model.

**5.12    Full Disclosure.** No information contained in this Agreement, the other Loan Documents, or any written statement furnished by or on behalf of any Loan Party pursuant to the terms of or in connection with this Agreement, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in any material respect at the time and in light of the circumstances under which made.

6.    **COVENANTS.**

The Borrower shall, and shall cause its Subsidiaries to, do all of the following:

**6.1    Use of Proceeds.** The proceeds of the Advances shall be used by Borrower (a) to contribute funds to Portfolio Companies or Project Companies, the proceeds of which will be used by the Portfolio Companies (or Project Company) to fund Eligible Project Costs as such costs are incurred or billed at the milestones described in the Financial Model for the applicable Eligible Project approved by Lender in its reasonable discretion or, if any material deviation from such Financial Model is proposed, as such amended Financial Model is approved by Lender in its reasonable discretion, and (b) for Eligible Operational Costs. Material deviations from any Financial Model shall be submitted in writing to Lender and Lender shall have ten (10) Business Days to review and respond to any such request, such approval not to be unreasonably withheld, conditioned or delayed.  No part of the proceeds of any Credit Extension will be used, directly or indirectly, for any purpose that would constitute a violation of any law, rule or regulation.

**6.2    Books and Records.** Keep proper books of record and account in which full, true and correct entries in conformity with IFRS and all requirements of law are made of all dealings and transactions in relation to its business and activities.

**6.3    Financial Covenants.** The Borrower shall at all times comply with the financial covenants set forth in Exhibit B attached hereto.

**6.4    Charter Documents.** The Borrower shall, and shall cause its Members and Managers to act, at all times, in accordance with the provisions of its Charter Documents.

**6.5    Further Assurances.** At any time and from time to time execute and deliver such further instruments and take such further action as may reasonably be requested by Lender in writing to ensure perfection and priority of the Liens created or intended to be created hereby and by the other Loan Documents, all at the expense of the Borrower.

**6.6    Notice of Certain Events.** Borrower shall  promptly notify Lender of (a) upon actually becoming aware of same, any Default or Event of Default, including any event or circumstance which causes any information which has previously been provided by Borrower to Lender to include an untrue statement of material fact or to omit to state any material fact or any fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect, and, in such event, Borrower shall

promptly furnish to Lender updated or revised information which will correct such untrue material statement or include such material omitted fact; (b) any written notice of default received by Borrower or any Portfolio Company or Project Company under obligations relating to any Eligible Project or otherwise material to Borrower's or a Portfolio Company's or Project Company's business; and (c) any threatened or pending legal, judicial or regulatory proceedings, including any dispute between any Borrower and/or any Portfolio Company or Project Company and any governmental authority, affecting any Borrower and/or any Portfolio Company, Project Company, or Eligible Project.

6.7 **Furnishing Notices Regarding Eligible Projects**. Each Borrower shall deliver to Lender a copy of any notice or correspondence that is received or given by such Borrower (or its agents or representatives) concerning any Eligible Project from or to any governmental authority or from or to any insurance company that could reasonably be expected to negatively affect the financial condition of any Borrower or any Portfolio Company or Project Company and/or Lender's security interest under the Loan Documents, within three (3) Business Days after such notice is received or sent.

6.8 **Proceedings to Enjoin or Prevent the Operation of any Eligible Project**. If any action, suit or proceeding is filed or otherwise commenced seeking to enjoin or otherwise prevent or declare unlawful the operation of any Eligible Project, or if any other action, suit or proceeding alleging the violation of any law by any Borrower or a Portfolio Company or Project Company with respect to any Eligible Project is filed or otherwise commenced, Borrower shall, at its sole expense, proceed with commercially reasonable diligence to contest the same.

6.9 **Amendments and Modifications to Eligible Project Agreements**. Without the prior written consent of Lender, in Lender's reasonable discretion, no Borrower or Subsidiary shall materially modify, amend or supplement any Material Contracts relating to an Eligible Project or permit any other Party to do the same.

6.10 **Financial Statements**

(a) Without derogating from any provisions of the A&R Operating Agreement, within forty five (45) days after the end of each calendar quarter during the term of the Loan, Borrower shall furnish to Lender a quarterly report consisting of (i) a balance sheet showing the Borrower's financial position, (ii) profit and loss statements and (iii) a statement of cash flows, in each case as of the end of such quarter, the preceding three quarters and the corresponding quarter from the prior Fiscal Year, and in each case prepared in accordance with IFRS ("**Quarterly Financial Statements**").

(b) Within one hundred twenty (120) days after the end of each Fiscal Year, the Borrower shall furnish to Borrower audited financial statements. The financial statements shall be audited and reported thereon by the Accounting Firm and shall include (A) a balance sheet showing the Borrower's financial position as of the end of such Fiscal Year and comparison to the preceding fiscal year, (B) profit and loss statements for such Fiscal Year and comparison to the preceding fiscal year, and (C) a statement of cash flows for such Fiscal Year and comparison to the preceding Fiscal Year, all prepared in accordance with IFRS ("**Annual Financial Statements**").

(c) Borrower shall promptly deliver to Lender such additional reasonably requested information regarding any Borrower, the Subsidiaries and any Eligible Projects and in no event later than within thirty (30) days after receipt of Lender's written request therefor.

(d) Access to Books and Records. Borrower shall permit Lender and its agents and representatives, upon prior reasonable notice and during normal business hours, to examine all of the records, books and papers of each Borrower, any Project Holdco and any Project Company.

(e) Financial Models. Borrower shall provide Lender, with up-to-date Financial Models for the Borrower and/or any Subsidiary and/or Eligible Project, certified by an officer of the Borrower, upon prior reasonable notice, and no less than once per each calendar year.

6.11 **FATCA Information.**

(a) Subject to paragraph (c) below, each Party shall, within ten (10) Business Days of a reasonable request by another Party:

(i)    confirm to that other Party whether it is a FATCA Exempt Party; or not a FATCA Exempt Party.

(ii)    supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA;

(iii)    supply to that other Party such information that Lender may request to satisfy any reporting obligations that is has in respect of the OECD Common Reporting Standards;

(iv)    supply to the other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime;

and for the avoidance of doubt, any information received by Lender pursuant to paragraphs (ii) to (iv) above may be disclosed by Lender, within any filings it is required to make to a regulatory authority.

(b)    If a Party confirms to another Party that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c)    Paragraph (a) above shall not oblige any Lender to do anything, which would or might in its reasonable opinion constitute a breach of any applicable law, any fiduciary duty or any duty of confidentiality.

(d)    If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with the above, then such Party shall be treated for the purposes of this Agreement (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

**6.12    Taxes**. Borrower and each Subsidiary shall file all tax returns required to be filed, and shall pay all taxes reflected therein or otherwise required to be paid, in connection with the Loan, in a timely manner and in compliance with all applicable laws.

**6.13    Compliance with Laws; Contracts.** Borrower shall comply in all material respects with all statutes, laws, ordinances and government rules and regulations to which it is subject, and perform and comply with each provision of all agreements, contracts or other instruments to which it is a party.

**6.14    Indemnification**. Each Borrower shall, jointly and severally, indemnify, defend and hold Lender harmless from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever, including the reasonable fees and expenses of Lender's counsel ("**Losses**"), incurred by Lender in connection with (a) any investigative, administrative, mediation, arbitration, or judicial proceeding, whether or not Lender is designated a party thereto, commenced or threatened at any time (including after the repayment of the Loan) in any way related to the execution, delivery or performance of any Loan Document or to the Equity Interests or the fact that Lender or Borrower was party to the transactions contemplated by the Loan Documents, (b) any proceeding instituted by any Person claiming a Lien against the Equity Interests and/or against the Collateral, (c) any brokerage commissions or finder's fees claimed by any broker or other party in connection with the Loan or the Equity Interests, or any of the transactions contemplated in the Loan Documents and/or (d) any other action or inaction of any of any Borrower's owners or affiliates (other than Lender) or any Subsidiary and/or any clients, customers, suppliers of the Borrower or third party, except for losses caused by Lender's fraud, gross negligence or willful misconduct.

**7.    EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an Event of Default under this Agreement:

**7.1    Payment Default.** If Borrower fails to pay any of the Obligations when due and such failure has continued for a period of ten (10) days after written notice thereof from Lender to Borrower (provided that no notice and cure period shall apply with respect to the payment due on the Maturity Date);

7.2    **Misrepresentations.** If (a) any misrepresentation or misstatement exists when made or deemed made now or hereafter in any warranty or representation set forth herein or in any certificate delivered to Lender pursuant to this Agreement or any other Loan Document and (b) such misrepresentation or misstatement would be reasonably expected to have a Material Adverse Effect.

7.3    **Covenant Default.** If Borrower or any Subsidiary and/or Affiliate fails to perform any obligation or violates any of the covenants contained in Section 6 of this Agreement, including any Financial Covenant, or fails or neglects to perform, keep, or observe any other material term, provision, condition, covenant, or agreement contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrower and Lender, and such failure has continued for a period of thirty (30) days after written notice thereof from Lender to Borrower; provided, however, that if (i) the Borrower's default is , in the Lender's reasonable good faith opinion, capable of being cured within an additional 30 days cure period; and (ii) the Borrower already made best efforts, within the first 30 days period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 30 days to complete the remedy of such breach;

7.4    **Failure of Agreement.** If this Agreement or any other Loan Document shall for any reason fail to create a valid and perfected security interest in any collateral purported to be covered thereby, or be subject to any security interest in each case except as permitted by the terms of this Agreement or such other Loan Document, or this Agreement or any of the other Loan Documents shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability thereof, and such event has continued for a period of ten (10) days after written notice thereof from Lender to Borrower; provided, however, that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional 10 days cure period; and (ii) the Borrower already made best efforts, within the first 10 days period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 10 days to complete the remedy of such breach;

7.5    **Cross Default.** If there is a breach beyond applicable notice and cure periods, by a Loan Party, a Subsidiary or any Affiliate of Borrower, under any Transaction Document and/or Project Document which (with regard to a breach of a Project Document), that is reasonably likely to have a Material Adverse Effect, and such breach has continued for a period of ten (10) days after written notice thereof from Lender to Borrower; provided, however, that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional 10 days cure period; and (ii) the Borrower already made best efforts, within the first 10 days period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 10 days to complete the remedy of such breach;

7.6    **Other Agreements.** If there is a default or other failure to perform in any agreement to which any Loan Party or Subsidiary is a party or by which it is bound resulting in the acceleration by a third party of the maturity of any Indebtedness of such Loan Party that is reasonably likely to have a Material Adverse Effect, and such default or failure has continued for a period equal to the lesser of (i) thirty (30) days after written notice thereof from Lender to Borrower; and (ii) any such other cure period granted by a third party to the Borrower for the cure of such default which resulted in the acceleration of the maturity of such Indebtedness, less three (3) business days; provided, however, that if (y) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional cure period equal to the applicable period of time mentioned above; and (z) the Borrower already made best efforts, within such cure period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period equal to the applicable period of time mentioned above, to complete the remedy of such breach;

7.7    **Attachment.** If any material portion of Loan Party's or Subsidiary's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) days, or if any Loan Party or Subsidiary is enjoined, restrained, or in any way prevented by court order from continuing to conduct its business affairs and the same is not removed, discharged or rescinded within thirty (30) days, or if a judgment or other claim, which judgment becomes a lien or encumbrance upon any portion of any Loan Party's or Subsidiary's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any Loan Party's or Subsidiary's assets by the United States Government, or any

department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and, in each case the same is not paid within thirty (30) days after such Loan Party or Subsidiary receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by such Loan Party or Subsidiary (provided that no Credit Extensions will be required to be made during such cure period), and provided, further that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional cure period equal to 30 days; and (ii) the Borrower already made best efforts, within such cure period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 30 days to complete the remedy of such breach.

**7.8    Judgments.**  If a final, non-appealable judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least $500,000 shall be rendered against any Loan Party or Subsidiary and shall remain unsatisfied and unstayed for a period of thirty (30) days (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment); and provided, further that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional cure period equal to 30 days; and (ii) the Borrower already made best efforts, within such cure period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 30 days to complete the remedy of such breach.

**7.9    Involuntary Bankruptcy or Other Proceeding**. Commencement of an involuntary case or other proceeding against any Loan Party, any Subsidiary that seeks liquidation, reorganization or other relief with respect to it or its Debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeks the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of sixty (60) days; or an order for relief against any Loan Party, any Subsidiary shall be entered in any such case under the Federal Bankruptcy Code and such order is not reversed or dismissed within sixty (60) days; and provided, that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional cure period equal to 30 days; and (ii) the Borrower already made best efforts, within such cure period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 30 days to complete the remedy of such breach.

**7.10    Voluntary Petitions, Etc**. Commencement by any Loan Party or any Subsidiary of a voluntary Insolvency Proceeding or other case or proceeding seeking liquidation, reorganization or other relief with respect to itself or its Indebtedness or other liabilities under any bankruptcy, insolvency or other similar law or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for it or any of its property, or consent by any Loan Party, any Subsidiary to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or the making by any Loan Party, any Subsidiary of a general assignment for the benefit of creditors, or the failure by any Loan Party, or any Subsidiary, or the admission by any of them in writing of being insolvent or of its inability, to pay its Indebtedness or other liabilities generally as they become due, or any action by any Loan Party, or any Subsidiary to authorize or effect any of the foregoing.

**7.11    Material Adverse Effect**. Any event or series of events occurs which, in the good faith, reasonable opinion of the Lender, has or is reasonably likely to have a Material Adverse Effect, and such event has continued for a period of three (3) days after written notice thereof from Lender to Borrower; Notwithstanding the aforesaid, wherever under this Section 7, there is an Event of Default (other than under this Section 7.11) which has or is reasonably likely to have a Material Adverse Effect, then the longer cure period set forth in such other Section shall be applicable (and the shorter cure period applicable under this Section 7.11 shall not apply) as long as and provided that, in the Lender's reasonable good faith opinion, the application of the longer cure period does not negatively harm the interests of the Lender;

**7.12    Material Business Disruption**. Any Loan Party, or any Subsidiary is enjoined, restrained or in any way prevented by order of a court or regulatory agency from continuing to conduct its business, which event could reasonably be expected to have a Material Adverse Effect, and such event has continued for a period of three (3) days after written notice thereof from Lender to Borrower;  Notwithstanding the aforesaid, wherever under this

Section 7, there is an Event of Default (other than under this Section 7.12) which has or is reasonably likely to have a Material Adverse Effect, then the longer cure period set forth in such other Section shall be applicable (and the shorter cure period applicable under this Section 7.12 shall not apply) as long as and provided that, in the Lender's reasonable good faith opinion, the application of the longer cure period does not negatively harm the interests of the Lender;

       **7.13**    **Government Liens**. If (a) a notice of Lien, levy or assessment is filed of record with respect to any Loan Party's or Subsidiary's assets, the Equity Interests or the assets of any Eligible Project by any governmental authority, or any department, agency or instrumentality thereof, or if any taxes or debts owing at any time hereafter to any governmental authority, department, agency or instrumentality becomes a Lien upon any of any Loan Party's or Subsidiary's assets, the Equity Interests or the assets of any Eligible Project and the same is not paid on the payment date thereof and (b) such situation could reasonably be expected to have a Material Adverse Effect, and such situation has continued for a period of thirty (30) days after written notice thereof from Lender to Borrower; and provided, that if (i) such default is, in the Lender's reasonable good faith opinion, capable of being cured within an additional cure period equal to 30 days; and (ii) the Borrower already made best efforts, within such cure period, to diligently cure such breach to the fullest possible extent, then Lender shall grant to Borrower an additional cure period of 30 days to complete the remedy of such breach

    **8.**    **LENDER'S RIGHTS AND REMEDIES.**

       **8.1**    **Rights and Remedies.** Upon the occurrence and during the continuance of an Event of Default, all outstanding Obligations shall bear interest at the Default Rate, and the Lender may, at its election, without prior notice (but with notice advising Borrower of such election) of its election and without demand, do any one or more of the following, all of which are authorized by Borrower and each other Loan Party (provided that Lender shall make any election of remedies in its reasonable, good faith discretion):

       **(a)**    Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable, whereupon the same shall immediately become due and payable (provided that upon the occurrence of an Event of Default described in Section 7.9 and Section 7.10, all Obligations shall become immediately due and payable without any action by Lender);

       **(b)**    Terminate the Commitment and cease advancing money or extending credit to or for the benefit of Borrower under this Agreement or under any other agreement between Borrower and Lender;

       **(c)**    Settle or adjust disputes and claims directly with account debtors for amounts, upon terms and in whatever order that Lender reasonably considers advisable;

       **(d)**    Make such payments and do such acts as Lender considers necessary or reasonable to protect its security interest in the Collateral and the Equity Interests. Each Loan Party agrees to assemble the Collateral and the Equity Interests if Lender so requires, and to make such documents and/or the Collateral or the Equity Interests available to Lender as Lender may designate. Each Loan Party authorizes Lender to enter the premises where the Collateral and/or the Equity Interests are located (unless located is a personal residence), to take and maintain possession of the Collateral and/or the Equity Interests, or any part of the foregoing, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Lender's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. With respect to any Loan Party's owned premises (unless such owned premises is a personal residence), such Loan Party hereby grants Lender a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise;

       **(e)**    Dispose of the Collateral and/or the Equity Interests at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Loan Party's premises) as is commercially reasonable, and apply any proceeds to the Obligations in whatever manner or order Lender deems appropriate, in each case, in compliance with applicable law;

       **(f)**    Lender may credit bid and purchase at any public sale, in compliance with applicable law; and

**(g)**     Any deficiency that exists after disposition of the Collateral and/or the Equity Interests as provided above will be paid immediately by Borrower.

**8.2     Power of Attorney.**  Effective only upon the occurrence and during the continuance of an Event of Default, each Loan Party hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees), and Borrower shall cause each Subsidiary to appoint Lender, as such Loan Party's and/or Subsidiary's true and lawful attorney to:  (a) send requests for verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b) endorse such Loan Party's name on any checks or other forms of payment or security that may come into Lender's possession; (c) sign Loan Party's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (d) dispose of any Collateral or Equity Interests; (e)  settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; and (f) to file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral or Equity Interests without the signature of such Loan Party where permitted by law; provided Lender may exercise such power of attorney to sign the name of such Loan Party on any of the documents described in clause (f) above regardless of whether an Event of Default has occurred and is continuing.  The appointment of Lender as each Loan Party's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations and/or other obligations hereunder have been fully repaid and performed and Lender's obligation to provide Credit Extensions hereunder is terminated.

**8.3     Payments Collection.**  At any time after the occurrence and during the continuance of an Event of Default, Lender may notify any Person owing funds (provided that such funds are part of Lender's security for the Loan) to any Loan Party of Lender's security interest in such funds and verify the amount so owing.  Each Loan Party shall collect all amounts owing to such Loan Party for Lender, receive in trust all payments as Lender's trustee, and immediately deliver such payments to Lender in their original form as received from the account debtor, with proper endorsements for deposit.

**8.4     Lender's Liability for Collateral and Equity Interests.**  Except to the extent resulting from the gross negligence, willful misconduct or willful violation of applicable law by Lender, Lender shall not in any way or manner be liable or responsible for:  (a) the safekeeping of the Collateral and the Equity Interests; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  Except to the extent resulting from the gross negligence, willful misconduct or willful violation of applicable law by Lender, all risk of loss, damage or destruction of the Collateral or the Equity Interests shall be borne by Borrower.

**8.5     Remedies Cumulative.**  Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on Borrower's part shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the specific instance and for the specific purpose for which it was given.

**8.6     Demand; Protest.**  Except as and to the extent expressly otherwise required by this Agreement, each Loan Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which such Loan Party may in any way be liable.

**9.     NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and shall be personally

delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or by electronic mail to the Loan Parties or to Lender, as the case may be, at its addresses set forth below:

> If to any Loan Party:

> With a copy to:

> If to Lender:

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

## 10.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. Jurisdiction shall lie in the federal courts located in New York County, State of New York. LENDER AND EACH LOAN PARTY ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH OF THEM, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT, WITH COUNSEL OF THEIR CHOICE, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY RELATED INSTRUMENT OR LOAN DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY COURSE OF CONDUCT, DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTION OF ANY OF THEM. THESE PROVISIONS SHALL NOT BE DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR ANY LOAN PARTY, EXCEPT BY A WRITTEN INSTRUMENT EXECUTED BY EACH OF THEM.

## 11.    GENERAL PROVISIONS.

11.1    **Joint and Several Liability.** The liability of each of the Borrowers for the Obligations shall be joint and several.

11.2    **Successors and Assigns.** This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by any Loan Party without Lender's prior written consent, which consent may be granted or withheld in Lender's sole discretion. Provided that (a) the assignee (i) has  expertise in lending within the commercial solar industry and/or in the project finance industry and (ii) has the ability to fund all Advances up to the maximum Commitment amount in accordance with the terms of this Agreement, and (b) subject to the provisions of Section 4.2 above,  Lender shall have the right without the consent of, but with notice to, Borrower to sell, assign, transfer, negotiate, or grant participation in all or any part of, or any interest in, Lender's obligations, rights and benefits hereunder. Notwithstanding the aforesaid, in the event that all Advances under the Commitment have been exhausted and/or after the expiry of the Availability Period, the Lender shall be entitled at its sole discretion, to assign all or any part of, or any interest in, Lender's obligations, rights and benefits hereunder, and the conditions set forth in this Section 11.2 (a) above shall not apply.

11.3    **Indemnification.** The Loan Parties shall defend, indemnify and hold harmless Lender and its officers, employees, and agents against:  (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all losses or Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and Borrower whether under this Agreement, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by Lender's fraud,  gross negligence or willful misconduct.

**11.4    Time of Essence.**  Time is of the essence for the performance of all obligations set forth in this Agreement.

**11.5    Severability of Provisions.**  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**11.6    Amendments in Writing, Integration.**  Neither this Agreement nor the Loan Documents can be amended, waived or terminated orally, but must be in writing signed by Lender and Borrower.  All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

**11.7    Counterparts.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

**11.8    Survival.**  All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions to Borrower.  The obligations of the Loan Parties to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 11.3 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

**11.9    Relationship.**  The parties acknowledge and agree that, as of the date of this Agreement, Nofar USA LLC is a member of each borrower and nothing in this Agreement shall in any event modify the terms of the A&R Operating Agreement of either Borrower and/or Nofar USA LLC's obligations either such A&R Operating Agreement.

**11.10    Reinstatement.**  This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Borrower or any Loan Party for liquidation or reorganization, should the Borrower or any Loan Party become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Borrower's or Loan Party's property and assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of any Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**11.11    Prima Facie Evidence**.  Accounts maintained by the Lender in connection with this Agreement are prima facie evidence of the matters to which they relate.

*[signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first above written.


**BORROWER:**                          Blue Sky Utility LLC
                                       By: _____

                                       Name:


**BORROWER:**                          Blue Sky Utility Holding LLC
                                       By: _____

                                       Name:


**PLEDGOR:**                           Blue Sky 1007 LLC
                                       By: _____

                                       Name:


**PLEDGOR:**                           Yellow Tree Capital LLC
                                       By: _____

                                       Name:


**LENDER:**                            **NOFAR USA LLC**

                                       By: _____

                                       Name:


                                       **[LENDER]**

                                       By: _____

                                       Name:

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

<u>EXHIBIT A</u>

LOAN PAYMENT/ADVANCE REQUEST FORM

TO: _____ (LENDER)                    DATE: _____

EMAIL/FAX: _____                              TIME: _____

FROM: _____
                              (BORROWER)
REQUESTED BY: _____
                    AUTHORIZED SIGNER'S NAME

AUTHORIZED SIGNATURE: _____

PHONE NUMBER: _____

TO ACCOUNT # _____


<u>REQUESTED TRANSACTION TYPE</u>        <u>REQUEST DOLLAR AMOUNT</u>
                                        $_____
PRINCIPAL INCREASE (ADVANCE)            $_____
PRINCIPAL PAYMENT (ONLY)                $_____
INTEREST PAYMENT (ONLY)                 $_____
PRINCIPAL AND INTEREST (PAYMENT)        $_____


DATE OF REQUESTED PAYMENT/ADVANCE: _____




All representations and warranties stated in the Loan Agreement are true, correct and complete in all material respects as of the date of the request for an Advance confirmed by this Loan Payment/Advance Form; provided, however, that those representations and warranties expressly referring to another date shall be true, correct and complete in all material respects as of such date.

EXHIBIT B

FINANCIAL COVENANTS

1.  Historic Financial Test

As part of this "**Historic Financial Test**", the Borrower shall demonstrate compliance, upon each Advance Request, to the reasonable satisfaction of the Lender, that all the following conditions are met with respect to each Borrower and each Subsidiary, with respect to the Historic Test Period:

1.1.    The total amount of electricity subscribed for by Customers of each applicable Project's electric output or equivalent virtual net energy metering credits is not in breach of any provisions of any Project Document and is at least 95% of each applicable Project's total estimated annual electric production;

1.2.    The aggregate distributions received by Borrower from all Operating Projects (in compliance with the Project Documents and such Subsidiaries' Charter Documents) meet the financial projections of the Borrower, as reflected in the corresponding Financial Models (as defined below) as approved by the Lender, from time to time.

"**Historic Test Period**" shall mean a period of 12 months preceding the date of the Advance Request.

"**Operating Project**" means a Project placed in service.

"**Financial Model**" shall mean the Eligible Project updated business plan and cash flow projection, to be provided by Borrower's management prior to the disbursement of any Advance, in the form of a Microsoft Excel file (or any other form to be agreed between the parties), and as reasonably approved by the Lender.

2.  Forecast Financial Test

As part of the "**Forecast Financial Test**", the Borrower shall demonstrate compliance, upon each Advance Request, to the reasonable satisfaction of the Lender, that all the following conditions are met with respect to the Borrower and each Subsidiary, with respect to the Forecast Test Period, based on the Financial Models:

2.1.    The Maturity Date for the repayment of the requested Advance is no later than the date of the completion of 11 calendar years as of the Closing Date.

2.2.    The Project IRR with respect to each Eligible Project is at least 6.2%; and

2.3.    The Equity IRR with respect to each Eligible Project is at least 13.5%.

"**Forecast Test Period**" shall mean the entire period of commercial operation of each Eligible Project.

"**Project IRR**" shall mean, as reflected in the Financial Model, the projected internal rate of return with respect to each Eligible Project (not including tax equity investment and senior debt), during the Forecast Test Period.

"**Equity IRR**" shall mean, as reflected in the Financial Model, the projected internal rate of return of the Borrower with respect to each Eligible Project, (including tax equity investment and including senior debt), during the Forecast Test Period.

DocuSign Envelope ID: 7D167BD1-0ED9-495A-AF2E-53E52EDE1297

<u>EXHIBIT C</u>

ASSET PLEDGE AGREEMENT

{10764870.2}

DocuSign Envelope ID: 7D167BD1-0ED9-495A-AF2E-53E52EDE1297

EXHIBIT D

EQUITY PLEDGE AGREEMENT

EXHIBIT D

N/A

DocuSign Envelope ID: 7D167BD1-0ED9-495A-AF2E-53E52EDE1297

EXHIBIT E

Accounting Methodologies; Closing Working Capital

[Attached]

### Non-audited balance sheet as at 31 Dec. 2020 - Blue Sky Utility LLC

| USD '000 | Net debt | Working capital | Excluded | Total balance |
|---|---|---|---|---|
| **Current assets** | | | | |
| Cash and Cash Equivalents | 124 | - | - | 124 |
| Accounts receivable | | | | |
| *Billed Receivables* | - | 43 | - | 43 |
| *Accounts Receivable O&M* | - | 142 | - | 142 |
| *Accounts Receivable Other* | - | 231 | - | 231 |
| *Unbilled Receivables* | - | 2 | - | 2 |
| Other Assets | | | | |
| *Other Current Assets* | - | 20 | - | 20 |
| *O&M Receivable - BPI* | - | 39 | - | 39 |
| *Prepaid Assets* | - | 85 | - | 85 |
| *DFC - Current Portion* | 10 | - | - | 10 |
| **Total current assets** | 134 | 561 | - | 695 |
| **Non current assets** | | | | |
| Property and equipment, net | - | - | 15,146 | 15,146 |
| Other Assets | | | | |
| *Restricted Cash - O&M Reserve* | 81 | - | - | 81 |
| *Restricted Cash - Min Pymt Res* | 709 | - | - | 709 |
| *Restricted Cash - Inverter Res.* | 42 | - | - | 42 |
| *Notes Receivable* | 22 | - | - | 22 |
| *Deferred Financing Costs* | 294 | - | - | 294 |
| Investment in Subsidiaries | - | - | 14 | 14 |
| Intercompany Receivables | 5,048 | - | - | 5,048 |
| **Total non-current assets** | 6,197 | - | 15,160 | 21,356 |
| **Totals assets** | 6,330 | 561 | 15,160 | 22,051 |
| **Current liabilities** | | | | |
| Other Current Liabilities | | | | |
| *Accounts Payable* | - | 1,457 | - | 1,457 |
| *Due to BPI* | - | 736 | - | 736 |
| *Accrued Liabilities* | - | 198 | - | 198 |
| *Taxes Payable* | - | 3 | - | 3 |
| *LT Debt - Current Portion* | 369 | - | - | 369 |
| *Interest Payable* | 311 | - | - | 311 |
| *Rent Payable* | - | 192 | - | 192 |
| *Management Fee Liability* | - | 132 | - | 132 |
| **Total current liabilities** | 680 | 2,718 | - | 3,398 |
| **Non current liabilities** | | | | |
| Deferred Revenue | - | 3,696 | - | 3,696 |
| Long-term Debt | | | | |
| *PPP Loan* | 140 | - | - | 140 |
| *Loan Payable - Generate* | 54 | - | - | 54 |
| *SBA Loan* | 200 | - | - | 200 |
| *S. Venter Loan* | 400 | - | - | 400 |
| *Amalgamated Bank Loans* | 9,701 | - | - | 9,701 |
| Other LT Liabilities | 2,400 | - | - | 2,400 |
| **Total non current liabilities** | 12,895 | 3,696 | - | 16,592 |
| **Totals liabilities** | 13,575 | 6,414 | - | 19,989 |
| **Total equity** | - | - | 2,062 | 2,062 |
| **Total liabilities and equity** | 13,575 | 6,414 | 2,062 | 22,051 |

### Non-audited balance sheet as at 31 Dec. 2020 - Blue Sky Utility Holdings LLC

| USD '000 | Net debt | Working capital | Excluded | Total balance |
|---|---|---|---|---|
| **Current assets** | | | | |
| Cash and Cash Equivalents | 46 | - | - | 46 |
| Accounts receivable | | | | |
| *Billed Receivables* | - | 171 | - | 171 |
| *Unbilled Receivables* | - | 11 | - | 11 |
| Other Current Assets | - | 28 | - | 28 |
| **Total current assets** | 46 | 210 | - | 256 |
| **Non current assets** | | | | |
| Property and equipment, net | - | - | 23,016 | 23,016 |
| Other Assets | | | | |
| *Restricted Cash - O&M Reserve* | 67 | - | - | 67 |
| *Restricted Cash - Min Pymt Res* | 410 | - | - | 410 |
| *Restricted Cash - Inverter Res.* | 7 | - | - | 7 |
| *Lease Escrow Deposit* | 16 | - | - | 16 |
| *Deferred Financing Costs* | 243 | - | - | 243 |
| Intercompany Receivables | 2,353 | - | - | 2,353 |
| **Total non-current assets** | 3,095 | - | 23,016 | 26,112 |
| **Total assets** | 3,141 | 210 | 23,016 | 26,368 |
| **Current liabilities** | | | | |
| Other Current Liabilities | | | | |
| *Accounts Payable* | - | 2,053 | - | 2,053 |
| *Accrued Liabilities* | - | 131 | - | 131 |
| *Taxes Payable* | - | 33 | - | 33 |
| *Distribution Payable* | - | 8 | - | 8 |
| *Interest Payable* | 675 | - | - | 675 |
| *Rent Payable* | - | 245 | - | 245 |
| **Total current liabilities** | 675 | 2,470 | - | 3,145 |
| **Non current liabilities** | | | | |
| Long-term Debt | | | | |
| *Due to Deferred Development Fee* | - | 720 | - | 720 |
| *Deferred Revenue* | - | 1 | - | 1 |
| *Long-term Debt* | 14,586 | - | - | 14,586 |
| Other LT Liabilities | 3,906 | - | - | 3,906 |
| **Total non current liabilities** | 18,493 | 721 | - | 19,214 |
| **Totals liabilities** | 19,168 | 3,191 | - | 22,359 |
| **Total equity** | - | - | 4,009 | 4,009 |
| **Total liabilities and equity** | 19,168 | 3,191 | 4,009 | 26,368 |

*Notes*

Restricted deposits...
Restricted deposits...
Restricted deposits...

Investment in Subs...
Intercompany rece...

*Deferred Revenues to be excluded from Net Cash or Working Capital*

Intercompany payables to be excluded or part of the Net debt.

### Additional agreed off-balnce sheet liabilities as at 21 May 2021

| USD '000 | Net debt | Working capital | Excluded | Total balance |
|---|---|---|---|---|
| CDV loan (Amalgamated) | 430 | - | - | 430 |
| PDA Shares Purchase | 990 | - | - | 990 |
| Salary Gap Payment | 1,597 | - | - | 1,597 |
| **Total additional agreed off-balnce sheet liabilities** | 3,017 | - | - | 3,017 |

*Notes*

*Restricted deposits to be excluded from Net Cash or Working Capital*
*Restricted deposits to be excluded from Net Cash or Working Capital*
*Restricted deposits to be excluded from Net Cash or Working Capital*
*Lease deposits to be excluded from Net Cash or Working Capital*

*Intercompany receivables to be excluded or part of the Net Debt.*

*Deferred Development Fee to be excluded from Net Cash or Working Capital*
*Deferred Revenues to be excluded from Net Cash or Working Capital*

Intercompany payables to be excluded or part of the Net debt.

DocuSign Envelope ID: 7D167BD1-0ED9-495A-AF2E-53E52EDE1297

EXHIBIT F

FORM OF AMENDED AND RESTATED OPERATING AGREEMENT

[Attached]

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDF1297

# SECOND AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## BLUE SKY UTILITY HOLDING, LLC

### Dated as of _____ __. 2021

THE SALE OF INTERESTS DESCRIBED IN AND REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION AND/OR QUALIFICATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. IN ADDITION, TRANSFER OF THE INTERESTS IS SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH HEREIN. THE INTERESTS MAY NOT BE OFFERED FOR SALE OR SOLD EXCEPT (I) IN COMPLIANCE WITH THE TERMS AND CONDITIONS SET FORTH HEREIN AND (II) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND/OR QUALIFICATION UNDER THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS OR UNDER CIRCUMSTANCES THAT DO NOT REQUIRE REGISTRATION OR QUALIFICATION UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS.

{10764875.2}

ActiveUS 186356799v.13

**SCHEDULE & EXHIBITS**

| | |
|---|---|
| Exhibit A | Information on Members and Ownership of Membership Interests and Capital Account Balances as of immediately prior to the Effective Date and as of the Effective Date |
| Exhibit B | Current Projects and Pipeline Projects |
| Exhibit C | Budget Plan |
| Exhibit D | List of Existing Contracts with Affiliates |
| Exhibit E | Listing of Managers and Officers[1] |

---

[1] Note to Draft: Officers to be discussed further.

{10764875.2}

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

## SECOND AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### BLUE SKY UTILITY HOLDING, LLC

THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "***Agreement***") of BLUE SKY UTILITY HOLDING, LLC, a California limited liability company (the "***Company***"), is made and entered into as of _____ __, 2021 (the "***Effective Date***"), by and between the Members that are listed as such on the signature pages hereto.

### <u>Recitals</u>

A.      The Company was formed by virtue of Articles of Organization (the "***Articles***"), filed with the Secretary of State of the State of California on January 19, 2017, under the name BLUE SKY UTILITY HOLDING, LLC.

B.      The Company and its Affiliate Blue Sky Utility, LLC, a California limited liability company ("***BSU***"), (a) currently develop, fund, construct, own, operate, manage and maintain rooftop solar power generation and energy efficiency assets located on and serving multitenant retail centers, as further described in <u>Exhibit B</u> under the heading "Current Projects" (the "***Current Projects***"), (b) have a pipeline of projects for the development, funding, construction, ownership, operation, management and maintenance of rooftop and carport solar power generation and storage facilities and energy efficiency and cogeneration assets that will be located on and serve multitenant retail centers, as further described in <u>Exhibit B</u> under the heading "Pipeline Projects" (the "***Pipeline Projects***"), and (c) intend to seek additional locations for the development, funding, construction, ownership, operation, management and maintenance of rooftop solar power generation and storage facilities ("***Future Projects***" and, together with the Current Projects and Pipeline Projects, the "***Projects***").

C.      The original Limited Liability Company Agreement of the Company was entered into on February 1, 2017 (the "***Original Agreement***") by Barend Venter ("***Barend***") and Yellow Tree Capital LLC, a California limited liability company ("***Yellow Tree***") wholly owned by Bujanover.  Effective December 31, 2017, Barend transferred all of his interest in the Company to Blue Sky 1007, LLC, a California limited liability company wholly owned by Barend ("***BS1007***").

D.      On January 1, 2019, following the admission of Palm Drive Associates, LLC ("***PDA***") as a member of the Company, Yellow Tree, BS1007 and PDA entered into an Amended and Restated Limited Liability Company Agreement of the Company (the "***Amended LLCA***"), at which time the Membership Interests in the Company were held as set forth in the applicable section of <u>Exhibit A</u> hereto.

ActiveUS 186356799v.13

E.      Immediately prior to the Effective Date: (a) Nofar USA LLC, a Delaware limited liability company ("**Nofar**"), (i) subscribed for newly issued Membership Interests from the Company, and (ii) purchased a certain amount of Membership Interests from BS1007 and Yellow Tree, all as further described in, and pursuant to the terms and conditions contained in, that certain Membership Interest Subscription and Purchase Agreement dated as of _____, 2021, and (b) PDA sold all of its Membership Interests to the Company pursuant to the Membership Interest Repurchase Agreement such that as of the Effective Date, the Membership Interests in the Company are held as set forth in <u>Exhibit A(2)</u> hereto.

F.      As of the Effective Date, the parties hereto desire to amend, restate, replace and supersede any and all prior limited liability company agreements governing the Company in their entirety, including the Amended LLCA, and to set forth herein, establish and provide for the respective economic and other rights of the current Members of the Company, the management and governance of the Company, and such other terms and conditions as the Members deem appropriate.

## **Agreement**

NOW, THEREFORE, in consideration of the mutual covenants and  agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to adopt this Agreement in its entirety and to continue the Company as a limited liability company under the Act upon the following terms andconditions:

## ARTICLE I
## DEFINITIONS

Section 1.1.    <u>Definitions</u>.    Unless otherwise defined herein, capitalized terms used throughout this Agreement shall have the respective meanings set forth below:

"***Accounting Firm***" means the Company's primary independent accounting firm, which shall be any nationally or regionally recognized firm of certified public accountants selected by Simple Majority Approval.[2]

"***Act***" means the California Revised Uniform Limited Liability Company Act, and any successor statute, as the same may be amended from time to time.

"***Adjusted Capital Account Deficit***" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)      credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the next to the last sentence of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the

---

[2] Note to Draft: Ran/Barend/Nofar to agree on the initial Accounting Firm prior to signing this Agreement (firm to have necessary capabilities, including preparing books and records in accordance with GAAP and IFRS).

{10764875.2}                                    - 2 -

Treasury Regulations after taking into account any changes during such year in Company Minimum Gain and Member Minimum Gain; and

(b)    debit to such Capital Account the items described in Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"*Affiliate*" means, with respect to any designated Person, any other Person that directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such designated Person.  The term "*control*" (including the terms "*controlled by*" or "*under common control with*") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract, or otherwise; provided, however, that, in any event, any Person that owns directly or indirectly fifty percent (50%) or more of the securities having ordinary voting power for the election of directors or other governing body of a corporation or fifty percent (50%) or more of the partnership or other ownership interests of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

"*Agreement*" has the meaning set forth in the Preamble hereof, as the same may be amended, modified or supplemented from time to time.

"*Audit Rules*" means Chapter 63 of the Code, together with any applicable Regulations or other guidance thereunder or successor provisions thereto, and any similar provisions of state, local, or non-U.S. law, including regulations, guidance or provisions issued or enacted after the date hereof.

"*Bankruptcy*" of a Person means the occurrence of any of the following events: (i) the filing by such Person of a voluntary case or the seeking of relief under any chapter of Title 11 of the United States Bankruptcy Code, as now constituted or hereafter amended (the "*Bankruptcy Code*"), (ii) the making by such Person of a general assignment for the benefit of its creditors, the admission in writing by such Person of its inability to pay its debts as they mature, the filing by such Person of an application for, or consent to, the appointment of any receiver or a permanent or interim trustee of such Person or of all or any portion of its property, including the appointment or authorization of a trustee, receiver or agent under applicable Law or under a contract to take charge of its property for the purposes of enforcing a lien against such property or for the purpose of general administration of such property for the benefit of its creditors, the filing by such Person of a petition seeking a reorganization of its financial affairs or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt or liquidation Law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such Law or statute, (vi) an involuntary case is commenced against such Person by the filing of a petition under any chapter of Title 11 of the Bankruptcy Code and within sixty (60) days after the filing thereof either the petition is not dismissed or the order for

relief is not stayed or dismissed, (vii) an order, judgment or decree is entered appointing a receiver or a permanent or interim trustee of such Person or of all or any portion of its property, including the entry of an order, judgment or decree appointing or authorizing a trustee, receiver or agent to take charge of the property of such Person for the purpose of enforcing a lien against such property or for the purpose of general administration of such property for the benefit of the creditors of such Person, and such order, judgment or decree shall continue unstayed and in effect for a period of sixty (60) days, or (viii) an order, judgment or decree is entered, without the approval or consent of such Person, approving or authorizing the reorganization, insolvency, readjustment of debt or liquidation of such Person under any such Law or statute, and such order, judgment or decree shall continue unstayed and in effect for a period of sixty (60) days.

"***Barend***" has the meaning set forth in the Recitals.

"***Board***" has the meaning set forth in Section 8.1(a).

"***BPI***" means Bright Power, Inc., a California corporation partially owned by Barend.

"***BS1007***" has the meaning set forth in the Recitals.

"***BS1007 Manager***" has the meaning set forth in Section 8.1(c)(ii).

"***BSU***" has the meaning set forth in the Recitals.

"***Budget Plan***" has the meaning set forth in Section 8.13(a).

"***Bujanover***" means, collectively, Ran and Anat Bujanover, or either of them, as the case may be.

"***Business***" has the meaning set forth in Section 2.3.

"***Business Day***" means any day other than Saturday, Sunday or any day that is a legal holiday or a day on which banking institutions in New York, California or Israel are authorized by Law or governmental action to close.  For avoidance of doubt, Friday will be deemed a Business Day (except for any Friday that is also a federal or state banking holiday in New York, California or Israel).

"***Capital Account***" has the meaning set forth in Section 4.2(a).

"***Capital Contribution***" means, with respect to any Member, the amount of money and Gross Asset Value of any property contributed to the Company from time to time with respect to the Membership Interests in the Company held, purchased or otherwise acquired by such Member.

"***Capital Event***" has the meaning set forth in Section 10.3.

"***Certificate of Cancellation***" has the meaning set forth in Section 10.5(a).

"**_Claims_**" means all claims, suits, demands, injunctions, actions, causes of action, assessments, cleanup and remedial obligations, judgments, awards, liabilities, losses (including amounts paid in settlement of claims), damages (including any consequential, punitive, incidental or special damages recovered by any third party), fines, fees, taxes, penalties, costs and expenses of every kind and character (including litigation costs and reasonable attorneys' fees).

"**_Code_**" means the United States Internal Revenue Code of 1986, as amended from time to time.

"**_Company_**" has the meaning set forth in the Preamble.

"**_Company Minimum Gain_**" has the meaning ascribed to the term "partnership minimum gain" in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"**_Company Tax Returns_**" has the meaning set forth in Section 7.6.

"**_Confidential Information_**" has the meaning set forth in Section 11.12.

"**_Current Projects_**" has the meaning set forth in the Recitals.

"**_Depreciation_**" means for each Fiscal Year or part thereof, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for United States federal income tax purposes with respect to an asset for such Fiscal Year or part thereof; except that if the Gross Asset Value of an asset differs from its adjusted basis for United States federal income tax purposes anytime during such Fiscal Year, the depreciation, amortization, or other cost recovery deduction for such Fiscal Year or part thereof shall be an amount which bears the same ratio to such Gross Asset Value as the United States federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or part thereof bears to such adjusted tax basis.  If such asset has a zero adjusted tax basis, Depreciation with respect to such asset shall be determined under a method reasonably selected by the Managers with the consent of Nofar.

"**_Disposition_**" by a Member means any sale, assignment or other disposition of all rights, title and interest in and to such Member's Membership Interests.

"**_Distributable Cash_**" means the total amount of cash available to be distributed by the Company to the Members, which shall be calculated as: (a) the total amount of distributable cash and cash equivalents then held by the Company and its Subsidiaries, minus (b) the amount necessary to satisfy and discharge all liabilities and obligations of the Company that are then due, pending or are reasonably expected (including all obligations of the Company under the Nofar Loan Agreement and any other Member Loans), and such other reasonable reserves as the Board in good faith may determine; each of the foregoing as determined by the Board and subject to and in accordance with applicable Laws.

"**_Economic Capital Account_**" means, for each Member, such Member's Capital Account balance increased by such Member's share of "minimum gain" and of "partner nonrecourse debt

ActiveUS 186356799v.13

minimum gain" (as determined pursuant to Treasury Regulation Sections 1.704-2(g) and 1.704-2(i)(5), respectively).

"***Economic Risk of Loss***" shall have the meaning specified in Treasury Regulations Section 1.752-2.

"***Effective Date***" has the meaning set forth in the Preamble.

"***Equity Interest***" means (i) any capital stock of a corporation, any partnership interest, any limited liability company interest and any other equity interest; (ii) any security or right convertible into, exchangeable for, or evidencing the right to subscribe for any such stock, equity interest or security referred to in clause (i) and (iii) any stock appreciation right, contingent value right or similar security or right that is derivative of or otherwise gives any Person the right to receive any economic benefit or right similar to or derived from any such stock, equity interest or security referred to in clause (i) or (ii).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means any entity, trade or business, whether or not incorporated, which together with another entity, trade or business, would be deemed a "single employer" within the meaning of Section 4001 of ERISA or Sections 414(b), (c), (m) or (o) of the Code.

"***Family Member***" of an individual means a spouse or child of such individual.

"***FERC***" means the Federal Energy Regulatory Commission.

"***Fiscal Year***" has the meaning set forth in <u>Section 7.1</u>.

"***GAAP***" means United States generally accepted accounting principles as in effect from time to time, consistently applied throughout the applicable period.

"***Governmental Entity***" means any domestic or foreign federal, state, municipal or local governmental or regulatory authority, agency, commission, body, court or other legislative, executive or judicial governmental entity.

"***Gross Asset Value***" means, with respect to any asset, the asset's adjusted tax basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be such asset's gross fair market value (as determined by the Board) at the time of such contribution;

(b)    The Gross Asset Value shall be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that the depreciation deduction taken into account each Fiscal Year for purposes of adjusting the Gross Asset Value of an asset shall be the amount of Depreciation with respect to such asset taken into account for purposes of computing Net Profits or Net Losses for the Fiscal Year;

ActiveUS 186356799v.13

(c)     Without limiting the generality of the foregoing and subparagraph (f), below, the Gross Asset Values of all Company assets may be adjusted to equal their respective gross fair market values, as determined by the Managers, as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution, (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company assets or money as consideration for a Membership Interest in the Company, and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Managers (A) reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company and (B) such adjustments are approved by the Managers;

(d)     The Gross Asset Value of any asset distributed to a Member by the Company shall be such asset's gross fair market value at the time of such distribution;

(e)     The Gross Asset Value of any Company asset shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such asset pursuant to Section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and pursuant to paragraph (f) of the definition of "Net Profits" and "Net Losses" and Section 5.2(g); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (e) to the extent the Managers determine that an adjustment pursuant to subparagraph (c) immediately above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (e); and

(f)     The Gross Asset Value of all Company assets shall be adjusted upon the events in the manner specified in Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) or (s).

(g)     On the date hereof, immediately prior to the acquisition of a Membership Interest in the Company by Nofar, the Gross Asset Value of the Company's assets shall be adjusted pursuant to clause (c) above to equal their fair market value.

"***IFRS***" means International Financial Reporting Standards, as in effect from time to time, consistently applied throughout the applicable periods.

"***IRS***" means the Internal Revenue Service.

"***Laws***" means, collectively, any federal, state, local or foreign law, statute or ordinance, common law, or any rule, regulation, standard, judgment, order, writ, injunction, decree, arbitration award, agency requirement, license or Permit issued, promulgated, enforced or entered into by any Governmental Entity.

"***Liquidation***" has the meaning set forth in Section 10.2.

"***Manager***" or "***Managers***" has the meaning set forth in Section 8.1(a).

ActiveUS 186356799v.13

"*Member*" or "*Members*" means the Persons named in the signature pages hereto as "Members," in each case in their capacity as members of the Company within the meaning of the Act, and any other Person that has been admitted as a member of the Company pursuant to the terms hereof.

"*Member Loan*" means any loan made by a Member or its Affiliates to the Company, including any loan made in accordance with Section 4.1(a)(iii) and under the Nofar Loan Agreement, subject to the other terms and conditions of this Agreement.

"*Member Minimum Gain*" has the meaning ascribed to the term "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i)(2).

"*Member Nonrecourse Debt*" has the meaning ascribed to the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"*Member Nonrecourse Deductions*" means items of Company loss, deduction, or Code Section 705(a)(2)(b) expenditures that are attributable to Member Nonrecourse Debt within the meaning of Treasury Regulations Section 1.704-2(i).

"*Membership Interest*" means the limited liability company interest of a Member in the Company, which shall consist of the Member's Capital Account and rights to an allocation of income, gain, credit, deduction and loss and to distributions of the Company, in each case as herein provided, and which interest entitles such Member to receive information and to consent to or approve such actions or omissions of the Company or another Member with respect to which the consent or approval of such Member is permitted or expressly required hereunder or required under the Act, and all other rights and obligations of such Member.

"*Membership Interest Purchase Agreement*" means that certain _____ dated of even date herewith between the Company and PDA.

"*Net Profits*" and "*Net Losses*" means, for any period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Losses shall be subtracted from Net Profits or Net Losses;

(c)     Gains or losses resulting from any disposition of Company asset with respect to which gains or losses are recognized for federal income tax purposes shall be

ActiveUS 186356799v.13

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

computed with reference to the Gross Asset Value of the Company asset disposed of, notwithstanding the fact that the adjusted tax basis of such Company asset differs from its Gross Asset Value;

(d)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing the taxable income or loss, there will be taken into account Depreciation;

(e)    If the Gross Asset Value of any Company asset is adjusted pursuant to the definition of "Gross Asset Value," the amount of the adjustment will be taken into account as gain or loss from the disposition of the asset for purposes of computing Net Profits or Net Losses;

(f)    If an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or 743(b) of the Code is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses to the extent not taken into account under paragraph (e); and

(g)    Notwithstanding any other provision of this subsection, any items of income, gain, loss or deduction that are specially allocated pursuant to this Agreement shall not be taken into account in computing Net Profits or Net Losses.

"*Nofar*" has the meaning set forth in the Recitals.

"*Nofar Loan Agreement*" means that certain Loan Agreement, dated as of the Effective Date, by and among [Nofar], the Company and BSU.

"*Nofar Manager*" has the meaning set forth in Section 8.1(c)(i).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.752-1(a)(2).

"*Notice*" has the meaning set forth in Section 11.1.

"*Offered Interests*" has the meaning set forth in Section 9.5(a).

"*Officers*" has the meaning set forth in Section 8.8.

"*Partnership Representative*" has the meaning set forth in Section 7.7(a).

"*PDA*" has the meaning set forth in the Recitals.

ActiveUS 186356799v.13

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

"*Percentage Interest*" means, with respect to each Member and subject to the earlier Disposition of Membership Interests by a Member consistent with the terms hereof, the percentage set forth opposite such Member's name under the column entitled "Percentage Interest" on <u>Exhibit A(2)</u>.

"*Permit*" means any authorization, license, certification, approval, consent, registration or permit issued or granted by or under the authority of any Governmental Entity or pursuant to any Laws.

"*Permitted Investments*" means (i) domestic or Eurodollar time deposits, money market instruments or certificates of deposit with banks rated at least "A" by Standard & Poor's Ratings Services or Moody's Investors Service, Inc., (ii) commercial paper of industrial corporations rated at least "A-1" by Standard & Poor's Ratings Services or "P-1" by Moody's Investors Services, Inc., (iii) direct obligations of, or obligations unconditionally guaranteed by, the United States of America or an agency or instrumentality thereof and backed by the full faith and credit of the United States of America, or (iv) mutual funds that invest primarily in the securities described in (i) through (iii) above; provided that, in each case, the respective investment can be liquidated and converted into cash within two Business Days following the request therefor by the Board, acting by Simple Majority Approval.

"*Permitted Transferee*" means (a) a trust, the trustee of which is such Person and/or any Family Member of such Person, (b) a corporation, partnership, or limited liability company, all of the stockholders, partners, or members of which are at all times only such Person and/or Family Members of such Person, or (c) the Family Members of such Person by will or by the laws of intestate succession.

"*Person*" means any natural person, corporation, company, partnership (general or limited), limited liability company, trust or other entity.

"*Pipeline Projects*" has the meaning set forth in the Recitals.

"*Projects*" has the meaning set forth in the Recitals.

"*Project Company*" means any company, whether existing as of the Effective Date or established thereafter, that is a direct or indirect Subsidiary of the Company or BSU and that owns and/or operates, directly or indirectly, a Project.

"*Proposal*" has the meaning set forth in <u>Section 8.13(c)</u>.

"*Proposed Transfer*" has the meaning set forth in <u>Section 9.4(a)</u>.

"*Prudent Industry Practice*" means any of the practices, methods and acts engaged in or approved by managers of independent power generation facilities in North America similar in size and type to the Projects during the relevant time period, or any of the practices, methods and acts which, in the exercise of commercially reasonable judgment in light of the facts known at the time a decision was made by the Company, any Manager or any Officer on behalf of the Company, could have been expected to accomplish the desired result at a reasonable cost

ActiveUS 186356799v.13

consistent with good management practices utilized by similar facilities in the independent power industry. Prudent Industry Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is intended to include acceptable practices, methods and acts generally accepted in North America as applicable to the management of independent power facilities.

"***Purchase Offer***" has the meaning set forth in <u>Section 9.5(a)</u>.

"***PURPA***" means Public Utility Regulatory Policies Act of 1978, as amended, and FERC's implementing regulations related thereto.

"***Qualifying Facility***" **or** "***QF***" means a qualifying small power production facility as defined under PURPA and 16 USC §796(17)(C).

"***Recapture Event***" means an event that causes any disallowance, denial or recapture (whether in whole or in part) of a Tax Credit claimed by the Company by the United States Department of the Treasury, the IRS, or any other Governmental Entity.

"***Representatives***" means, with respect to any Person, the managing member(s), officers, directors, employees, representatives or agents (including investment bankers, financial advisors, attorneys, accountants, brokers and other advisors) of such Person, to the extent that such officer, director, employee, representative or agent of such Person is acting in his or her capacity as an officer, director, employee, representative or agent of such Person.

"***Required Notice***" has the meaning set forth in <u>Section 6.3</u>.

"***Simple Majority Approval***" of an action to be taken by the Board means affirmative votes representing more than 50% of the total votes cast with respect to such action. A Manager shall only be entitled to cast votes if such Manager is present at a meeting of the Board or is executing a written consent of the Board in lieu of a meeting, as the case may be.

"***Subsidiary***" of a Person means any other Person whose equity interests are held, in whole or in part, directly or indirectly, by such first Person.

"***Super-Majority Approval***" has the meaning set forth in <u>Section 8.1(e)</u>.

"***Target Balance***" means, for each Member at any point in time, either (i) a positive amount equal to the net amount, if any, the Member would be entitled to receive or (ii) a negative amount equal to the net amount the Member would be required to pay or contribute to the Company or to any third party, assuming, in each case that (A) the Company sold all of its assets for an aggregate purchase price equal to their aggregate Gross Asset Value (assuming for this purpose only that the Gross Asset Value of any asset that secures a liability that is treated as "nonrecourse" for purposes of Treasury Regulation Section 1.1001-2 is no less than the amount of such liability that is allocated to such asset in accordance with Treasury Regulation Section 1.704-2(d)(2)); (B) all liabilities of the Company were paid in accordance with their terms from the amounts specified in clause (A) of this sentence; (C) any Member that was obligated to contribute any amount to the Company pursuant to this Agreement or otherwise (including the

{10764875.2}                                    - 11 -

amount a Member would be obligated to pay to any third party pursuant to the terms of any liability or pursuant to any guaranty, indemnity or similar ancillary agreement or arrangement entered into in connection with any liability of the Company) contributed such amount to the Company; (D) all liabilities of the Company that were not completely repaid pursuant to clause (B) of this sentence were paid in accordance with their terms from the amounts specified in clause (C) of this sentence; and (E) the balance, if any, of any amounts held by the Company was distributed in accordance with Section 6.1.

"*Tax Credits*" means the investment tax credits provided by Section 48(a)(1) of the Code or any successor provision thereto.

"*Termination Date*" has the meaning set forth in Section 2.4.

"*Third Party*" has the meaning set forth in Section 9.5(a).

"*Transfer*" has the meaning set forth in Section 9.1.

"*Transfer Notice*" has the meaning set forth in Section 9.4(b).

"*Transfer Price*" has the meaning set forth in Section 9.4(b).

"*Treasury Regulations*" means the regulations promulgated under the Code, as such regulations are in effect on the date hereof.

"*Withholding Payment*" has the meaning set forth in Section 6.3.

"*Yellow Tree*" has the meaning set forth in the Recitals.

"*Yellow Tree Manager*" has the meaning set forth in Section 8.1(c)(iii).

Section 1.2.    References; Gender; Number; Certain Phrases; Construction and Interpretation.    All references in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" are to an Article, Section, Exhibitor Schedule of this Agreement, and any reference to a subsection or other subdivision, without further reference to a Section, is a reference to such subsection or subdivision as contained in the same Section in which the reference appears, in each case unless the context requires otherwise.    The words "this Agreement," "hereof," "hereunder," "herein," "hereby," "thereof," "thereunder," or words of similar import refer to this Agreement as a whole and not to a particular Article, Section, subsection, clause or other subdivision hereof, unless the context requires otherwise.    Whenever the context requires, the words used herein include the masculine, feminine and neuter gender, and the singular and the plural.    The words "include," "includes" and "including" mean "include, without limitation," "includes, without limitation," and "including, without limitation," respectively.    Any reference in this Agreement to $ or dollars shall mean U.S. dollars.    Words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders.    Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.    Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action

ActiveUS 186356799v.13

may be validly taken on or by the next day that is a Business Day. Each Party acknowledges that it, he or she and its, her or his attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party or any similar rule operating against the drafter of an agreement shall not be applicable to the construction or interpretation of this Agreement.

## ARTICLE II
## FORMATION; OFFICES; TERM

Section 2.1.    <u>Formation and Continuation of the Company</u>.  The Company was formed on January 19, 2017, by virtue of the filing of the Articles with the Secretary of State of the State of California.  The Members hereby acknowledge the continuation of the Company as a limited liability company pursuant to the Act.  This Agreement is effective as of the Effective Date and supersedes and replaces entirely all prior agreements governing the operations of the Company and the rights and obligations of its Members and any prior members, including the Original Agreement and the Amended LLCA.  The rights and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein, and the terms of this Agreement will control over the Act in the event of any inconsistencies, to the extent permitted by the Act.  As of the Effective Date, all powers of persons designated as "authorized persons" under the Act shall cease, and the Managers hereupon become the designated "authorized persons" and shall continue as the designated "authorized persons" within the meaning of the Act.

Section 2.2.    <u>Name, Office and Registered Agent</u>.

(a)    The name of the Company shall be "BLUE SKY UTILITY HOLDING, LLC" or such other name or names as may be agreed to by Super-Majority Approval from time to time; <u>provided</u>, <u>however</u>, that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."  The principal office of the Company as of the Effective Date is located at 860 R Napa Valley Corporate Way, Napa, CA 94558.  The Board may at any time and from time to time agree by Simple Majority Approval to change the location of the principal office of the Company to any other location; provided that the Board shall give prompt written notice of any such change to all Members and the registered agent of the Company; and provided, further, that any proposed change in the location of the then-existing principal office of the Company to a location that would increase the one-way commute of either the BS1007 Manager or the Yellow Tree Manager (as compared to the then-existing principal office of the Company) by more than thirty (30) minutes shall require the prior written consent of such Manager.

(b)    The registered agent of the Company for service of process is New Season Corporate Services, and the registered office of the Company is 4600 Larson Way, Sacramento, CA 95822.  The registered office and registered agent may be changed at any time and from time to time by Simple Majority Approval in accordance with the Act, provided that the Managers give prompt written notice of any such change to all Members.  The registered agent's primary duty as such is to forward to the Company at its principal office and place of business any notice that is served on it as registered agent.

Section 2.3.    <u>Purpose</u>.  The purposes and business of the Company and BSU are to (a) own, hold, develop, construct, operate, maintain, manage, provide or obtain financing for, and sell or otherwise dispose of the Projects (and the assets connected therewith) or the output of the Projects, (b) pursue additional projects that are similar to or incidental to the Projects, as determined by and subject to approval of the Board, and (c) otherwise do all things reasonably necessary, advisable or appropriate in connection with all of the foregoing (the foregoing in this <u>Section 2.3</u>, the "***Business***").  The Company may engage in any kind of activity and perform and carry out contracts of any kind necessary to, or in connection with or convenient or incidental to, the accomplishment of such purpose, so long as such activities and contracts may be lawfully carried on or performed by a limited liability company under the applicable Laws of the State of California.

Section 2.4.    <u>Term</u>.  The term of the Company commenced on January 19, 2017, and shall continue until the date that the Company is dissolved pursuant to <u>Section 10.1</u> (the "***Termination Date***").

Section 2.5.    <u>Organizational and Fictitious Name Filings; Preservation of Limited Liability</u>.  The Managers shall cause the Company to register or qualify as a foreign limited liability company, and file such fictitious or trade names, statements or certificates in such jurisdictions and offices, as necessary or appropriate for the conduct of the Company's business.  The Managers may take any and all other actions as may be reasonably necessary or appropriate to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the applicable Laws of California and any other state or jurisdiction other than California in which the Company engages in business, owns or operates property or otherwise engages in any activity that would require a qualification to do business in such jurisdiction, to continue the Company as a limited liability company, and to protect the limited liability of the Members as contemplated by the Act.

Section 2.6.    <u>No Partnership Intended</u>.  Other than for purposes of determining the status of the Company under the Code and the applicable Treasury Regulations and under any applicable state, municipal or other income tax Law or regulation, the Members intend that the Company not be a partnership, limited partnership or joint venture and this Agreement shall not be construed to suggest otherwise.

## ARTICLE III
## RIGHTS AND OBLIGATIONS OF THE MEMBERS

Section 3.1.    <u>Members; Membership Interest</u>.

(a)    The Company shall have as Members only those Persons who have been properly admitted as Members pursuant to the terms of this Agreement, including any proposed assignee of a Member.

(i)    Immediately prior to the Effective Date, BS1007, Yellow Tree and PDA were the only Members of the Company.  BS1007 is wholly owned and controlled by Barend.  Yellow Tree is owned and controlled 50% by Ran Bujanover and 50% by Anat

Bujanover (husband and wife). Effective on the Effective Date (subject to the Disposition of Membership Interests by a Member in accordance with the terms of this Agreement), the Members of the Company shall be as listed on Exhibit A(2), and each Member holds the Membership Interests and Percentage Interest listed opposite such Member's name on Exhibit A(2).

(ii) If a Member Disposes of all of its Membership Interest pursuant to and in accordance with the terms of this Agreement (including to the Company), the Disposing Member shall automatically cease to be a Member and shall have no further rights or obligations under this Agreement (but such Disposition shall not have any effect on the rights and obligations of such Member, or of the Company in respect of such Member, under any other agreement or arrangement between such Member and the Company). If Nofar Disposes of all of its Membership Interests hereunder, it may, but shall not be obligated to, sell, transfer or assign all of its right, title and interest in and to the Nofar Loan Agreement.

(b) The Membership Interests shall (i) have the rights and obligations ascribed to such Membership Interests in this Agreement and the Act, (ii) be Transferable only in accordance with the terms of this Agreement and the Act and upon recordation of such Transfer in the register of Membership Interest in Exhibit A(2), and (iii) be personal property.

(c) From and after the Effective Date (until a Disposition of Membership Interests occurs pursuant to and in accordance with the terms hereof), the Company shall be entitled to treat the registered holder of a Membership Interest, as shown in Exhibit A(2), as a Member for all purposes of this Agreement, and the Managers shall record in Exhibit A(2) any security interest of a secured party pursuant to any security interest granted by a Member that is permitted by this Agreement. Each Membership Interest shall be a "security" governed by and within the meaning of Article 8 of the California Uniform Commercial Code – Investment Securities (including Section 8102(a)(15) thereof) and applicable federal securities Laws.

(d) The Membership Interests shall initially be uncertificated. Upon the request of a Member holding uncertificated Membership Interests, such Member shall be entitled to have a certificate signed by or in the name of the Company, by any Officer designated by the Board, representing the number of Membership Interests held by such Member. Such certificate shall be in such form as the Board may determine, to the extent consistent with applicable Laws, the Articles and this Agreement. Any or all of such signatures on any certificate representing one or more Membership Interests may be a facsimile, engraved or printed, to the extent permitted by applicable Laws.

(e) In the event that the Company issues certificates representing Membership Interests in accordance with Section 3.1(d), then in addition to any other legend required by applicable Laws, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE

OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT, AS AMENDED FROM TIME TO TIME.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

Any certificates representing Membership Interests shall be replaced, at the expense of the Company, with certificates or instruments not bearing the legends required by this Section 3.1(e) at such time as they are no longer required for purposes of applicable securities Laws; provided that the Company may condition such replacement of certificates upon the receipt of an opinion of securities counsel reasonably satisfactory to the Company.

(f)     The Board may direct that a new certificate representing one or more Membership Interests be issued in place of any certificate theretofore issued by the Company alleged to have been lost, stolen or destroyed, upon delivery to the Board of an affidavit of the owner or owners of such certificate, setting forth such allegation.  The Board may require the owner of such lost, stolen or destroyed certificate, or his or her legal representative, to give the Company a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate.

(g)     The Board may appoint one or more transfer agents, one or more exchange agents and one or more registrars with respect to the Membership Interests, and may require all certificates representing one or more Membership Interests to bear the signature of any such transfer agents, exchange agents or registrars.  Upon surrender to the Company or the transfer agent of the Company, if any, of a certificate for one or more Membership Interests, duly endorsed or accompanied by appropriate evidence of succession, assignment or authority to transfer, in compliance with the provisions of this Agreement, the Company shall issue a new certificate representing one or more Membership Interests to the Person entitled thereto, cancel the old certificate and record the transaction upon its books.  Subject to the provisions of the Articles and this Agreement, the Board may prescribe such additional rules and regulations as it may deem appropriate relating to the issuance, Transfer and registration of Membership Interests.

ActiveUS 186356799v.13

Section 3.2.    Meetings.

(a)    Except as otherwise permitted by this Agreement, all actions of the Members shall be taken at meetings of the Members, any which meeting may be called from time to time by any Member for any reason as set forth in Section 3.2(c). The Members may conduct at such meeting any Company business that is permitted under the Act or this Agreement. Meetings of Members shall be held at a reasonable time and place (within or outside of the State of California) as shall be specified in the notice of meeting delivered to the Members. Upon the request of any Member, any meeting of the Members pursuant to this Section 3.2 may be held virtually via conference call or video conferencing. Accurate minutes of any meeting of the Members shall be taken and filed with the minute books of the Company. Promptly following each meeting of the Members, the minutes of the meeting shall be sent to the Managers and each Member.

(b)    The presence in person or by proxy of Members representing a majority of the then-outstanding Percentage Interests shall constitute a quorum for purposes of transacting business at any meeting of the Members, provided that a representative of Nofar, on the one hand, and BS1007 or Yellow Tree, on the other hand, must be present at any meeting of the Members to constitute a quorum at such meeting. If a quorum is not present due to the absence of BS1007 and Yellow Tree, then the meeting of the Members shall be adjourned to a time and date not more than ten (10) days following the originally scheduled meeting in accordance with the terms of Section 3.2(a) and 3.2(c), at which meeting the presence of BS1007 or Yellow Tree shall not be required to constitute a quorum, provided that the requirements of Section 3.2(a) and 3.2(c) have been met. Except as otherwise provided in this Agreement, with respect to those matters required or permitted to be voted upon by the Members, the affirmative vote of a majority of the then-outstanding Membership Interests shall be required to approve any such matter, in addition to any other approval required by this Agreement or the Act. Members may participate in a meeting of the Members by means of conference telephone, video conferencing or similar communications equipment that permits all persons participating in the meeting to speak to and hear each other. Such participation shall constitute presence in person at such meeting.

(c)    Written notice stating the place, day and hour of the meeting of the Members, and the purpose or purposes for which the meeting is called, shall be delivered either personally, via electronic mail or facsimile or by mail to each Member of record entitled to vote at such meeting not less than five (5) days nor more than thirty (30) days prior to the meeting. Notwithstanding the foregoing, meetings of the Members may be held without notice so long as all the Members are present in person or by proxy (unless such presence is solely to dispute the effectiveness of the notice provided with respect to such meeting). The attendance of any Member at a meeting shall constitute waiver of notice of such meeting, except when a Member attends the meeting for the express purpose of objecting to the effectiveness of the notice provided with respect to such meeting.

(d)    Except as otherwise provided in this Agreement, any action of the Company on which the Members are required or permitted to vote may be authorized or approved by the Members without a meeting if a written consent is executed and delivered by

Members holding the aggregate Percentage Interests required for the taking of such action; provided that a draft of such written consent shall first be circulated to all of the Members at least ten (10) Business Days prior to the taking of the respective action. Each Member agrees to respond to any written request as promptly as practicable after delivery of such request for consent. If any Member does not respond within five (5) Business Days after delivery of the draft consent, a second written request shall be sent to such non-responding Member. If BS1007 and/or Yellow Tree fails to provide a response within five (5) Business Days of delivery of such second written request for consent, such non-responding Member will be deemed to have consented to the applicable action. The Members agree that if the applicable action must be taken promptly, the time periods set forth herein will be reduced to the maximum amount of Business Days practicable. In no instance where action is authorized by written consent pursuant to this Section 3.2(d) need a meeting of Members be called or noticed; provided, however, a copy of the action taken by written consent must be sent promptly to all Members and all actions by written consent shall be filed with the minute books of the Company.

Section 3.3.    No Management Rights. Except as otherwise provided herein, and for the avoidance of doubt, except for any Member who is also a Manager when acting in its capacity as Manager pursuant hereto, no Member shall have any right, power or authority to take part in the management or control of the business of, or transact any business for or on behalf of, the Company, to sign for or on behalf of the Company or to bind the Company in any manner whatsoever. Neither the Managers nor any Member shall hold out or represent to any third party that any Member, exceptthe Managers, acting in their capacity as Managers of the Company pursuant hereto, has any such power or right or that any Member is anything other than a member in the Company (provided that if a Member serves as a Manager, its rights in its capacity as a Manager shall not be limited by this sentence and are instead addressed in Article VIII). A Member shall not be deemed to be participating in the control of the business of the Company by virtue of itspossessing or exercising any rights set forth in this Agreement or the Act or any other agreement relating to the Company.

Section 3.4.    Other Activities of Members.

(a)    Notwithstanding any duty otherwise existing at law or in equity, but in all cases subject to Article VIII and any other agreement (including any employment agreement) to which a relevant Person is a party, each Member and its Affiliates, officers, directors, managers and equityholders may presently or in the future engage or be involved in, or possess an economic or other interest in, other business ventures, product or service offerings, transactions, investments and other business or strategic relationships, independently or with others, including with entities other than the Company or Affiliates of the Company, and such activities shall not constitute any violation of any duty, fiduciary or otherwise, of such Member or its Affiliates, officers, directors, managers or equityholders to the Company, any of its Affiliates or any other Member, and, subject to Section 3.4(b), neither the Company nor any of the other Members shall have any rights by virtue of this Agreement in and to such other business ventures or the profits derived from them; provided, however, that from the date hereof until the later of (i) the third anniversary of the Effective Date and (ii) the third anniversary of the date on which BS1007 or Yellow Tree, as the case may be, ceases to be a Member, neither such Member nor any of its Affiliates, officers, directors, managers or equityholders shall be permitted, directly or indirectly,

{10764875.2}                                                - 18 -

to (i) engage in any such activity, business venture, product or service offering or transaction, or hold any investment in or have any other commercial involvement or relationship with any entity, that competes with the Company, BSU, any Project Company, any Project or the Business, (ii) request, induce or attempt to influence, directly or indirectly, any employee or consultant of the Company, BSU, or any Project Company to leave the employ of such entity, or in any way interfere with the relationship between such entity and any employee or consultant thereof, (iii) induce or attempt to induce, directly or indirectly, any customer, supplier, distributor, licensee or other business relation of the Company, BSU or any Project Company to cease or curtail its business with such Person, or in any way interfere with the relationship between any such customer, supplier, distributor, licensee or business relation and such Person, or (iv) hire, retain or attempt to hire or retain any employee or consultant of the Company, BSU or any Project Company.  Bujanover and Barend hereby agree that if Yellow Tree or BS1007, as the case may be, ceases to be a Member hereunder, Bujanover or Barend, as the case may be, shall execute and deliver to the Company an acknowledgement, in form and substance reasonably acceptable to the Company, pursuant to which such Person agrees to comply with the obligations set forth in this Section 3.4(a).

(b)     Until the later of (i) the third anniversary of the Effective Date and (ii) the third anniversary of the date on which Nofar ceases to be a Member, (x) Nofar shall not request, induce or attempt to influence, directly or indirectly, any employee or consultant of the Company, BSU, any Project Company or BPI to leave the employ of such entity, or in any way interfere with the relationship between such entity and any employee or consultant thereof; and (y) the Company shall not request, induce or attempt to influence, directly or indirectly, any employee or consultant of BPI to leave the employ of BPI, or in any way interfere with the relationship between BPI and any employee or consultant thereof.  Nofar agrees that if Nofar ceases to be a Member hereunder, it shall cause its parent company to execute and deliver to the Company an acknowledgement, in form and substance reasonably acceptable to the Company, pursuant to which such Person agrees to comply with the obligations set forth in this Section 3.4(b).

(c)     Except as set forth below in this Section 3.4(c) or otherwise in this Agreement, none of the Members or their Affiliates shall be obligated to inform the Company or any other Member of any, or to present to the Company any, opportunity, relationship or investment in any other business venture or transaction, and the Company and each Member hereby renounces any interest in any such opportunity, relationship or investment of another Member and any expectancy that such opportunity, relationship or investment of another Member will be offered to it, and the Parties expressly waive, to the fullest extent permitted by applicable Laws, any rights to assert any claim that such involvement breaches any fiduciary or other duty or obligation owed to the Company or any Member; provided, however, that the foregoing shall not affect any Member's obligations with respect to, and no Member or any of their respective Affiliates shall be permitted to use, Confidential Information of the Company or BSU or any other Company or BSU property in connection with any such opportunity, relationship or investment.  Notwithstanding the foregoing, (i) each Member shall be obligated to, and shall cause its Affiliates to, inform the Company of each opportunity that such Member or its Affiliate becomes aware of or that is presented to it and that relates specifically to the development, construction, operation and maintenance of rooftop self-generation renewable

{10764875.2}                                           - 19 -

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

energy, energy storage and services ancillary thereto, with respect to real property in the United States of America zoned for commercial multi-tenant retail locations, and in each case consistent with the Business as conducted as of the date hereof; and (ii) BS1007, Yellow Tree, Bujanover and Barend shall, and shall cause their Affiliates to, inform the Company of each opportunity such Person becomes aware of or that is presented to it and that relates to the development, construction, ownership, operation, maintenance, management, or financing of self-generation renewable energy, energy storage and services ancillary thereto, with respect to real property in the United States of America zoned for commercial or industrial (or mixed commercial-industrial) locations, whether multi-tenant, single-tenant or no tenant (each such opportunity described in the foregoing subclauses (i) and (ii), a "**_Business Opportunity_**"). Any Business Opportunity presented to the Board in accordance with the preceding sentence and that is not a Project may be approved by Simple Majority Approval, with respect to any such Business Opportunity presented by BS1007, Yellow Tree, Ran or Barend, or Super-Majority Approval with respect to any such Business Opportunity presented by Nofar, and any Business Opportunity approved by the Board as set forth herein shall thereafter be deemed a Project for all purposes under this Agreement, including the Budget Plan. For clarity, any Business Opportunity that is already a Project shall be subject to Section 8.13(b).

(d)     Notwithstanding anything to the contrary contained herein, the activities disclosed on Schedule 3.4(d) shall in all events be permitted to continue through and until the Termination Date.

Section 3.5.    No Right to Withdraw.  Except as otherwise provided in this Agreement, so long as a Member continues to hold any Membership Interests, no Member shall have any right to voluntarily resign or otherwise withdraw from the Company without the prior written consent of all remaining Members of the Company, in their sole and absolute discretion. As soon as any Member ceases to hold any Membership Interests, such Person shall no longer be a Member.

Section 3.6.    Limitation of Liability of Members.  Each Member's liability shall be limited as set forth in the Act and other applicable Law.  Except as otherwise required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and none of the Members shall be obligated personally for any of such debts, obligations or liabilities solely by reason of being a Member of the Company, unless such debt, obligation or liability arises as a result of a breach or violation of such Member's obligations to the Company, whether hereunder or under any other agreement between such Member and the Company, or any reckless or intentional violation of Law or fraud of such Member.

Section 3.7.    Deficit upon Liquidation.  Upon the dissolution, liquidation, winding-up or termination of the Company, none of the Members shall be liable to the Company, to the other Members, to the creditors of the Company or to any other third party for or on account of any deficit in its Capital Account, nor shall such deficits be deemed assets of the Company.

Section 3.8.    Company Property; Membership Interests.  All property owned by the Company, whether real or personal, tangible or intangible and wherever located, shall be deemed

ActiveUS 186356799v.13

to be owned by the Company and no Member, individually, shall have any ownership of such property.

Section 3.9.   Retirement, Resignation, Expulsion, Bankruptcy, Death or Dissolution of a Member.  The retirement, resignation, expulsion, Bankruptcy, death or dissolution of a Member shall not, in and of itself, dissolve the Company.  The personal representative of the bankrupt or deceased Member shall, for the purpose of settling the estate, have all of the rights of such Member, including the same rights and subject to the same limitations that such Member would have had under the provisions of this Agreement to Transfer its Membership Interest.  The personal representative of a Member shall not become a substituted Member except as provided in this Agreement.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 4.1.   Additional Funding; Capital Contributions.

(a)   Each Member shall be deemed to have made the Capital Contributions to the Company set forth opposite the name of such Member in Exhibit A(2).  In the event that the Board by Simple Majority Approval determines that additional capital or credit support is required by the Company, it will be funded through the following mechanisms approved by the Board in the following order of priority:

(i)   first, by drawing under the Nofar Loan Agreement; provided, that, at such time that (A) borrowings under the Nofar Loan Agreement have met or exceeded $40,000,000.00 in the aggregate, (B) Projects generating at least 70 megawatts have achieved a commercial operation date, and (C) Projects expected to generate at least 30 megawatts are under construction, the BS1007 Manager and the Yellow Tree Manager may propose to the Board alternative sources of financing to be considered by the Board in good faith, and any such alternative financing may be approved by Simple Majority Approval (it being agreed that the Nofar Manager shall not be required to consider, and the Company will not undertake, any such loan that the Nofar Manager determines in good faith will adversely affect Nofar, any of its Affiliates or the Nofar Loan);

(ii)   second, to the extent that available credit under the Nofar Loan Agreement is exhausted or unavailable, by credit facilities or other credit support from third party lenders selected by, and on terms and conditions approved by, Simple Majority Approval;

(iii)   third, to the extent available credit from third party lenders is exhausted or unavailable on terms acceptable to the Board, then the Board may, by Simple Majority Approval, seek additional loans from the Members, in each case in accordance with each Member's Percentage Interest and bearing interest at a rate of 4% per annum; provided, that if a Member elects not to, or is unable to, lend to the Company the full amount it is entitled to lend according to its Percentage Interest, the other Members may make additional loans to the Company to make up the shortfall, which loans shall bear interest at a rate equal to the lower of (x) 14% per annum and (y) the highest interest rate then permitted under applicable Laws; and

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE129F

(iv)    fourth, in the event Member Loans have been exhausted or are unavailable, or the Board determines not to undertake any additional Member Loans, the Board may, subject to unanimous approval of the Members, request additional capital from the Members in the form of additional Capital Contributions.  In such event, the Company shall notify each Member in writing of the Capital Contribution being requested by such Member and the additional Membership Interests to be issued to each Member in respect of its Capital Contribution. If any Member does not make its respective Capital Contribution hereunder within thirty days following delivery of the Company's written notice, the other Members shall be permitted to increase their respective Capital Contributions to make up for such shortfall (with each other Member being permitted to contribute its pro rata percentage (calculated as though only such contributing Members are members in the Company) of the shortfall), and the respective Percentage Interests of the Members shall be modified accordingly.

Section 4.2.    Capital Accounts.

(a)    There shall be established and maintained throughout the full term of the Company in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv) for each Member, a capital account (a "*Capital Account*") which shall be credited with (i) such Member's Capital Contributions, (ii) allocations of income and gain to such Member pursuant to Section 5.1 and Section 5.2, (iii) the amount of any Company liabilities assumed by such Member or which are secured by any property distributed by the Company to such Member and (iv) such Member's share of any upward basis adjustment caused by a recapture of a Tax Credit as described in Treasury Regulations Section 1.704-1(b)(2)(iv)(*j*).  Each Member's Capital Account shall be debited with (i) the amount of cash and the Gross Asset Value of other property distributed to such Member, (ii) allocations of deductions and losses to such Member pursuant to Section 5.1 and Section 5.2, (iii) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company and (iv) such Member's share of any downward basis adjustment attributable to a Tax Credit as described in Treasury Regulations Section 1.704-1(b)(2)(iv)(*j*).

(b)    The Capital Account balance of each Member as of the Effective Date is as set forth in Exhibit A(2).

(c)    If a Member Disposes of all or a portion of its Membership Interest is in accordance with the terms of this Agreement, the Person acquiring such Membership Interests shall succeed to the Capital Account of the Disposing Member to the extent it relates to the Membership Interest so Disposed of.

(d)    The provisions of this Agreement relating to maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulation and modified or supplemented, if needed, to fully incorporate any relevant provisions thereof.

(e)    If any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the

ActiveUS 186356799v.13

Company by reason thereof, except as may be required by applicable Laws or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement or applicable Laws.

Section 4.3.    No Third Party Beneficiary.  To the fullest extent permitted by applicable Laws, no creditor or other third party having dealings with the Company shall have the right to enforce the right or obligation of any Member to make Capital Contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the parties hereto and their respective successors and permitted assigns.  None of the rights or obligations of the Members herein set forth to make Capital Contributions or loans to the Company shall be deemed an asset of the Company for any purpose by any creditor or other third party, nor may such rights or obligations be sold, transferred or assigned by the Company or pledged or encumbered by the Company to secure any debt or other obligation of the Company or of any of the Members.

# ARTICLE V
# ALLOCATIONS

Section 5.1.    Profit and Loss Allocations.

(a)    Except as provided in Section 5.2, which shall be applied prior to this Section 5.1, Net Profits and Net Losses of the Company for any Fiscal Year (or other period) shall be allocated among the Members in such proportions and in such amounts as may be necessary so that following such allocations, the Economic Capital Account balance of each Member (as adjusted to reflect all required allocations pursuant to Section 5.2 and all distributions made to such Member during the applicable period) equals such Member's then Target Balance.

(b)    If the amount of Net Profits or Net Losses allocable to the Members pursuant to Section 5.1(a) for a period is insufficient to allow the Economic Capital Account balance of each Member to equal such Member's Target Balance, such Net Profits or Net Losses shall be allocated among the Members in such a manner as to decrease the differences between the Members' respective Adjusted Capital Account balances and their respective Target Balances in proportion to such differences.

(c)    Notwithstanding Section 5.1(a), allocations of Net Losses to a Member shall be made only to the extent that such allocations of Net Losses will not cause or increase an Adjusted Capital Account Deficit for that Member.  Any Net Losses not allocated to a Member because of the foregoing sentence shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of Net Losses under the previous sentence) in accordance with the relative Percentage Interests of such other Members.  Any Net Losses reallocated under this provision shall be taken into account in computing subsequent allocations of Net Profits and Net Losses so that the net aggregate amount of  Net Profits and Net Losses allocated to each Member, to the extent possible, shall be equal to the amount that would have

been allocated to each such Member if no reallocation of losses had occurred under this provision.

(d)    For purposes of maintaining the Capital Accounts of the Members pursuant to Section 4.2, all items of Company credits (including Tax Credits) shall be allocated in the same manner as the allocations of book items of Company gross income are made pursuant to Section 5.1.

Section 5.2.    Regulatory Allocations.  Notwithstanding any other provision of this Agreement, the following special allocations shall be made in the following order:

(a)    *Minimum Gain Chargeback*.  If there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, as determined under Treasury Regulations Section 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 5.2(a) is intended to comply with the "minimum gain chargeback" requirements of Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    *Chargeback Attributable to Member Nonrecourse Debt*.  If there is a net decrease in Member Minimum Gain during any Fiscal Year, each Member with a share of Member Minimum Gain at the beginning of such Fiscal Year shall be specially allocated items of income and gain for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4) and (5).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2)(i).  This Section 5.2(b) is intended to comply with the "partner nonrecourse debt minimum gain chargeback" requirements of Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    *Qualified Income Offset*.  If any Member unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which results in an Adjusted Capital Account Deficit for the Member, such Member shall be allocated items of income and book gain in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible; provided, that an allocation pursuant to this Section 5.2(c) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided in this Article V have been tentatively made as if this Section 5.2(c) were not in the Agreement. This Section 5.2(c) is intended to constitute a "qualified income offset" as provided by Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

ActiveUS 186356799v.13

(d)     *Member Nonrecourse Deductions*.  Member Nonrecourse Deductions shall be allocated among the Members who bear the Economic Risk of Loss for the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in the ratio in which they share Economic Risk of Loss for such Member Nonrecourse Debt.  This provision is to be interpreted in a manner consistent with the requirements of Treasury Regulations Section 1.704-2(b)(4) and (i)(1).

(e)     *Nonrecourse Deductions*.  Any Nonrecourse Deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in accordance with their respective Percentage Interests.

(f)     In the event that items of income, gain, loss or deduction are allocated to one or more Members pursuant to any of subsections (a) through (e) above (the "***Original Allocation***"), subsequent items of income, gain, loss or deduction will first be allocated (subject to the provisions of subsections (a) through (e)) to the Members in a manner designed to result in each Member having a Capital Account balance equal to what it would have been had the Original Allocation not occurred; provided, however, that no such allocation shall be made pursuant to this subsection (f) if (i) the Original Allocation had the effect of offsetting a prior Original Allocation or (ii) the Original Allocation likely (in the opinion of the Company's accountants) will be offset by another Original Allocation in the future (*e.g.*, an Original Allocation of "nonrecourse deductions" under subsection (e) that likely will be offset by a subsequent "minimum gain chargeback" under subsection (a)).

(g)     *Regulatory Allocations*.  The allocations set forth in this Section 5.2 (the "***Regulatory Allocations***") are intended to comply with certain requirements of the applicable Treasury Regulations promulgated under Code Section 704(b).

Section 5.3.    Tax Allocations.

(a)     Except as otherwise provided in this Section 5.3, allocations of tax items of Company income, gain, credits, deductions and losses and Tax Credits for any period shall be allocated in the same manner as the corresponding allocations of book items of  Company income, gain, credits, deductions and losses were made for such period pursuant to Section 5.1 (as a component of Net Profits or Net Losses) or Section 5.2.

(b)     Notwithstanding Section 5.3(a), if, as a result of contributions of property by a Member to the Company or an adjustment to the Gross Asset Value of Company assets, there exists a variation between the adjusted basis of an item of Company property for federal income tax purposes and such property's Gross Asset Value, allocations of income, gain, loss, and deduction shall, solely for tax purposes, be allocated among the Members so as to take into account such variation using a method set forth in Treasury Regulations Section 1.704-3 as determined by the Board with the consent of Nofar.

(c)     Subject to the terms of this Agreement, any elections or other decisions relating to Capital Accounts (including allocations pursuant to Section 5.1) and tax allocations (including allocations pursuant to this Section 5.3) shall be made by Partnership Representative.

ActiveUS 186356799v.13

Allocations pursuant to this Section 5.3 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of book income, gain, deductions or losses or distributions pursuant to any provision of this Agreement.

Section 5.4.    Dispositions or Changes in Company Interest.    If the respective Membership Interests of the existing Members in the Company change or if a Member Disposes of its Membership Interests to any other Person in compliance with this Agreement, or if the Company adjusts the Gross Asset Value of its assets, then, the date of the change, Disposition or adjustment shall be treated as the end of a Fiscal Year, all income, gains, credits (including Tax Credits), losses, deductions, and other tax items resulting from the operations of the Company shall be allocated to the period before such date and after such date using the closing of the books method in accordance with Section 706 of the Code, unless otherwise determined by the Partnership Representative.

## ARTICLE VI
## DISTRIBUTIONS

Section 6.1.    Distributions.  From time to time following the Effective Date, the Board shall determine whether to cause the Company to distribute any Distributable Cash to the Members.  For the avoidance of doubt, no distributions shall be made to the Members until the Company has repaid in full all Member Loans, including any and all principal and accrued but unpaid interest, costs and expenses outstanding under the Nofar Loan Agreement. Except as provided in Sections 6.6, 6.7 and 10.3, distributions of Distributable Cash to the Members shall be made as follows:

       (a)    First, until a total amount of $40,000,000 has been distributed to the Members, all distributions of Distributable Cash shall be made 50% to Nofar, 35% to BS1007 and 15% to Yellow Tree; and

       (b)    Thereafter, all distributions of Distributable Cash shall be made in proportion to the Members' respective Percentage Interests.

Section 6.2.    Withdrawal of Capital.  No Member shall have the right to withdraw capital from the Company or to receive or demand distributions or return of its Capital Contributions by the Company until the Company is dissolved in accordance with this Agreement and applicable provisions of the Act, and then such distribution or return of capital shall be made in accordance with Article X.  No Member shall be entitled to demand or receive any interest on its Capital Contributions.

Section 6.3.    Withholding Taxes.  If the Company incurs any obligation to pay any amount in respect of any taxes (including withholding taxes imposed on any Member's or former Member's share of the Company's items of income or gain or pursuant to the Audit Rules that is attributable to such Member (including any Imputed Underpayment) or such Member's predecessor), and any interest, penalties or additions to such taxes, or the amount of cash or other property to which the Company otherwise would be entitled is reduced as a result of withholding

or payment by other parties in satisfaction of any such amounts, the Company may withhold such amounts and make such payments to taxing authorities as are necessary to ensure compliance with such tax Laws (any such amount paid over, a "***Withholding Payment***"). The Company shall, no later than March 31 of the calendar year following the calendar year in which a Withholding Payment is made, provide each Member with written notice that such Withholding Payment has been paid ("***Required Notice***"). Any funds withheld by reason of this <u>Section 6.3</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. If the Company did not withhold from actual distributions any such amounts the Company may, at its option, (a) require the Member to which the Withholding Payment related to reimburse the Company for such Withholding Payment; or (b) reduce any subsequent distributions by the amount of such Withholding Payment. This obligation of a Member to reimburse the Company for any Withholding Payment shall continue after such Member Disposes of or liquidates its Membership Interest in the Company, but only with respect to obligations that relate to the period through the date of such Disposition or liquidation. Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have. The obligations of this <u>Section 6.3</u>, including a Member's obligation to reimburse the Company, shall survive any liquidation and dissolution of the Company, any Transfer or liquidation of a Member's interest in the Company or the Member ceasing to be a Member of the Company; provided, however, that in the event the Company fails to timely provide any Member a Required Notice, such Member's obligation to reimburse the Company shall survive for a period of three (3) years after the date the Required Notice was to be delivered. If any Member ceases to be a Member, such Member shall keep the Company advised of its contact information until the expiration of such Member's obligation under this <u>Section 6.3</u>.

Section 6.4.    <u>Distributions in Kind</u>.  Unless approved by Super-Majority Approval, there shall be no distributions of the assets of the Company (other than cash) in kind.

Section 6.5.    <u>Limitation upon Distributions</u>.  Notwithstanding the provisions of this Agreement, including the foregoing provisions of this <u>Article VI</u>, to the contrary, no distribution shall be made: (a) if such distribution would violate any contract or agreement to which the Company is then a party or any Laws then applicable to the Company; (b) to the extent that making such distribution would be inconsistent with the Budget Plan then in effect; or (c) to the extent that the cash available to the Company is insufficient to permit such distribution.

Section 6.6.    <u>Proceeds from a Capital Event or Liquidation</u>.  In the event of a Capital Event or Liquidation, distributions shall be made to Members in accordance with <u>Section 10.3</u>.

Section 6.7.    <u>Distributions with Respect to Taxes</u>.

(a)    Within ninety (90) days after the conclusion of each Fiscal Year, if the Board (based on input from the Company's accountant) (1) determines there to be any taxable income of the Company allocable to any of the Members and (2) reasonably determines that the Company has sufficient available cash to fund its working capital needs for the following six months (after taking into account the following provisions), the Company shall make a

ActiveUS 186356799v.13

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

distribution to each Member (a "**Tax Distribution**") which is equal to the amount by which (A) the product of (i) the highest combined marginal Federal and State of California income tax rates imposed on the taxable income of individuals who are residents of California for tax purposes (taking into account the character of the taxable income allocated to the Members); and (ii) the Company's taxable income for federal income tax purposes allocated to such Member for such Fiscal Year, exceeds (B) the aggregate amount of distributions made by the Company to such Member pursuant to Section 6.1 with respect to such Fiscal Year; provided, however, that the Board shall make such Tax Distributions quarterly (subject to the conditions in (1) and (2) above in this Section 6.7(a)) in order to facilitate the Members' ability to make quarterly estimated tax payments with respect to the taxable income of the Company allocated to them, and in determining and making the required Tax Distribution after the end of each Fiscal Year, the Company shall make appropriate adjustments to reflect the actual results of such Fiscal Year and take into account any quarterly Tax Distributions made during such Fiscal Year.

(b)    The amount of any Tax Distributions made to a Member under Section 6.7(a) shall be treated as an advance and shall offset against future distributions to which such Member is entitled under Section 6.1 and Section 10.2 (but not this Section 6.7) as quickly as possible in such a manner that, immediately after any distribution has been made pursuant to Section 6.1 or Section 10.2, the cumulative amount of distributions that have actually been received by each Member pursuant to Section 6.7(a), Section 6.1, and Section 10.2 equals (to the extent possible) the distributions that such Member would have received if all amounts distributed by the Company (including amounts distributed pursuant to Section 6.7(a)) had been distributed in the absence of this Section 6.7.

## ARTICLE VII
## ACCOUNTING AND RECORDS

Section 7.1.    Fiscal Year.  The fiscal year of the Company shall be the calendar year (the "**Fiscal Year**").  Unless otherwise required by the Code, the Company shall have the same Fiscal Year for income tax and for financial and accounting purposes.

Section 7.2.    Books and Records and Inspection.

(a)    The Board shall cause the Company to keep full and accurate books of account, financial records and supporting documents, which shall reflect, completely, accurately and in reasonable detail, each transaction of the Company and such other matters as are usually entered into the records or maintained by Persons engaged in a business of like character or as are required by applicable Law, and all other documents and writings of the Company.  The books of account, financial records, and supporting documents and the other documents and writings of the Company shall be kept and maintained at the principal office of the Company. The financial records and reports of the Company shall be kept in accordance with IFRS and with GAAP and kept on an accrual basis.

(b)    In addition to and without limiting the generality of Section 7.2(a), the Board shall cause the Company to keep at its principal office:

ActiveUS 186356799v.13

              (i)       true and full information regarding the status of the business and financial condition of the Company, including financial statements for the three most recent years;

              (ii)      promptly after becoming available, a copy of the Company's federal, state, and local income tax returns for each year;

              (iii)     a current list of the name and last known business, residence or mailing address of each Member and the Managers;

              (iv)     a copy of this Agreement and the Articles, and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which this Agreement and such Articles and all amendments thereto have been executed;

              (v)       true and full information regarding the amount of cash and a description and statement of the agreed value of any other property and services contributed by each Member and which each Member has agreed to contribute in the future, and the date upon which each became a Member;

              (vi)     copies of records and supporting documents relating to expenses incurred by the Managers or its Affiliates on behalf of the Company and subject to reimbursement pursuant to <u>Section 8.4</u>;

              (vii)    copies of records that would enable a Member to determine the Member's relative shares of the Company's distributions and the Member's relative voting rights; and

              (viii)   any other records required by Section 17701.13 of the Act.

        (c)       All books and records of the Company shall be open to inspection and copying by any of the Members, former members or their authorized Representatives during normal business hours and at such Member's or former member's expense, for any purpose reasonably related to such Member's interest, or such former member's prior interest, in the Company, and the Managers shall maintain the books and records of the Company for a period of five (5) years following the dissolution of the Company. A Member may provide the Company with written notice prior to the expiration of such five (5)-year period if the Member desires to make copies of such books and records prior to destruction thereof. The Members' or their authorized Representatives' rights under this <u>Section 7.2(c)</u> shall continue during the five (5)-year period despite termination or expiration of this Agreement. For avoidance of doubt, no former member of the Company shall be permitted to inspect or copy any books or records of the Company that do not specifically relate to the period in which such former member held an interest in the Company and that are not reasonably required by such Person in connection with such Person's prior ownership of an interest in the Company.

        Section 7.3.    <u>Bank Accounts, Notes and Drafts</u>.

ActiveUS 186356799v.13

(a)    All funds not required for the immediate needs of the Company, including the repayment of Member Loans or other loans and the financing of Projects, shall be placed in Permitted Investments, which investments shall have a maturity appropriate for the anticipated cash flow needs of the Company. All Company funds shall be deposited and held in accounts which are in the name of the Company and separate from all other accounts maintained by the Managers and the Members. The Company's funds shall not be commingled with any other funds of any other Person, including any Manager, any Member or any Affiliate of a Manager or a Member.

(b)    Members acknowledge that the Managers may maintain Company funds in accounts, money market funds, certificates of deposit, or other liquid assets in excess of the insurance provided by the Federal Deposit Insurance Corporation or other depository insurance institutions and that the Managers shall not be accountable or liable for any loss of such funds resulting from failure or insolvency of the depository institution, except in instances of reckless or intentional violation of any Law or fraud by any Manager.

(c)    Checks, notes, drafts and other orders for the payment of money shall be signed by such Persons as the Managers may authorize from time to time after the Effective Date.  Any such authorization, whether explicit or implicit, prior to the Effective Date shall be void and of no effect from and after the Effective Date. When the Managers so authorize, the signature of any such Person may be a facsimile.

Section 7.4.    Financial Statements.  **[TO BE DISCUSSED]**

Section 7.5.    Partnership Status and Tax Elections.  It is the intent of the Members that the Company be a partnership for United States federal, state and local income tax purposes. The Members hereby agree not to elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar state statute and agree not to elect for the Company to be treated as a corporation, or an association taxable as a corporation, under the Code or any similar state statute.

Section 7.6.    Company Tax Returns.  **[TO BE DISCUSSED]**

Section 7.7.    Tax Audits. **[TO BE DISCUSSED]**

**ARTICLE VIII**
**MANAGEMENT**

Section 8.1.    Managers.

(a)    The Company is a "manager-managed" limited liability company within the meaning of the Act.  Except as otherwise provided in Section 8.1(b), the powers of the Company shall be exercised by or under the authority of, and the business and  affairs of the Company shall be managed under the direction of, a board of managers (each a "***Manager***" and, collectively, the "***Board***"), which shall have the same role in the governance of the Company as a board of directors of a Delaware corporation, subject to the other terms, conditions and

limitations set forth in this Agreement, and which shall take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company set forth in <u>Section 2.3</u>. In addition, the Board may appoint Officers as specified in <u>Section 8.8</u> below.

(b)    The number of Managers constituting the Board shall initially be set at five (5) Managers.  No single Manager may bind the Company, and the Board shall have the power to act only collectively in the manner specified herein.  The Managers shall vote on matters presented to the Board as set forth in <u>Section 8.6</u>.

(c)    The Members agree to vote their respective Membership Interests to elect the following individuals to serve as Managers:

(i)    Three (3) persons designated by Nofar from time to time, which individuals shall initially be those set forth in <u>Exhibit E</u> (each such person, a "***Nofar Manager***"), and one of whom shall act as Chairperson of each meeting of the Board; and

(ii)    Barend Venter, who is hereby designated by BS1007 as the "***BS1007 Manager***", for so long as BS1007 or one of its Permitted Transferees is a Member; and

(iii)    Ran Bujanover, who is hereby designated by Yellow Tree as the "***Yellow Tree Manager***", for so long as Yellow Tree or one of its Permitted Transferees is a Member.

(d)    Without limitation of the foregoing, it is understood and acknowledged that the Board shall provide the following services to the Company:

(i)    review all applicable Laws containing or establishing compliance requirements in connection with the operation and maintenance of the Projects and applicable to the Company and assist the Company in securing and complying with, as appropriate, all permits, licenses and government authorizations and approvals necessary for the ownership, operation and maintenance of the Projects (and renewals and replacements of the same);

(ii)    maintain operating logs and reports documenting the performance of its obligations under this Agreement, all consistent with Prudent Industry Practices, including maintaining information reasonably necessary to verify any calculations made pursuant to this Agreement;

(iii)    deliver to the Company copies of any notices received by any of the Managers on the Company's behalf and provide information necessary for the Company to create reports required to be produced by the Company, and deliver any information related to any Project or the Company as any Member may reasonably request;

(iv)    maintain true, complete and accurate cost ledgers and accounting records for the Company in accordance with IFRS and GAAP applicable to the Projects and this Agreement and reflect the services provided and expenses paid or incurred by the Company pursuant to this Agreement or in connection with the Projects;

ActiveUS 186356799v.13

(v)     provide (or arrange for the provision of) such operating and maintenance and engineering consulting for the Projects as may be necessary or desirable from time to time in accordance with Prudent Industry Practices; and

(vi)     respond in a reasonably timely manner to written requests for information regarding the Projects from the Members to the extent such information is reasonably accessible to the Managers.

(e)     Each Manager covenants and agrees that it shall not, cause or permit the Company to do or take, or cause the Company to authorize or allow any Project Company to do or take, or consent to any Project Company or Project doing or taking, any of the following actions without obtaining prior Super-Majority Approval:

(i)     issue Membership Interests to any Person, or issue any equity interests in any Project Company to any Person (except that the issuance of equity interests in any Project Company to any tax equity investor shall require only Simple Majority Approval);

(ii)     make any loan, advance or capital contribution in any Person, except to the extent approved or authorized in the Budget Plan;

(iii)     amend the definition of "Permitted Investments" in this Agreement;

(iv)     initiate or consummate an initial public offering or make a public offering and sale of the Membership Interests or any other securities of the Company; or

(v)     engage in any business or activity other than that described in Section 2.3.

For purposes of this Agreement, "***Super-Majority Approval***" of an action to be taken by the Board means affirmative votes representing more than 66% of the total votes cast with respect to such action, including at least one of the BS1007 Manager or the Yellow Tree Manager, subject to Section 8.6(d) and Section 8.6(f); provided, however, that the affirmative vote of neither the BS1007 Manager nor the Yellow Tree Manager shall be required for any action of the Board during a period in which the aggregate Membership Interests of BS1007 and Yellow Tree are less than 16%, it being agreed that during any such period in which the aggregate Membership Interests of BS1007 and Yellow Tree are less than 16%, all references in this Agreement to "Super-Majority Approval" shall be deemed amended to "Simple Majority Approval" without any further action required by any party hereto.

(f)     Neither the Board nor any Manager nor any Officer shall have any authority to, and each Manager covenants and agrees that it shall not, cause or permit the Company to do or take, or cause the Company to authorize or allow any Project Company to do or take, or consent to any Project Company or Project doing or taking, any of the following actions without the prior written consent of all of the Members:

ActiveUS 186356799v.13

(i)     enter into or amend any agreement between the Company or any of the Project Companies, on the one hand, and any Member of the Company, any Manager or any Affiliate or Family Member of a Member or Manager, on the other hand (except that any borrowings under the Nofar Loan Agreement shall not require the approval of BS1007 or Yellow Tree, and any other financing contemplated by Section 4.1(a) shall only require the approvals set forth in such Section);

(ii)     dissolve, wind-up or liquidate the Company or any of the Project Companies or initiate a Bankruptcy proceeding involving the Company or any of the Project Companies;

(iii)     amend the Articles in a manner that would disproportionately adversely affect any Member relative to any other Member.

(g)     Without derogating from any employment agreement between the Company and each of Barend and Bujanover, and without derogating from Section 3.4(a) above, each Manager shall devote all such time, effort and skill to the Company's and BSU's business affairs as is necessary and proper to promote the Company's and BSU's welfare and success in accordance with Prudent Industry Practice.  Without limiting the foregoing, the Members expressly acknowledge and agree that each Nofar Manager (and Barend and Bujanover, if and when either such individual is no longer an employee of the Company or BSU) has or may have other business activities and may engage in other business activities for his or her own account and for the accounts of others, and such Nofar Manager (and Barend and Bujanover, if and when either such individual is no longer an employee of the Company or BSU) shall not be bound to devote all of his or her business time to the affairs of the Company and BSU; provided that each Manager acknowledges and agrees that prompt attention to such Manager's obligations under this Agreement, including, without limitation, such Manager's obligations under Section 8.1(e) and Section 8.5, shall be necessary and proper to promote the Company's and BSU's welfare and success in accordance with Prudent Industry Practice; and provided, further, that the foregoing shall not supersede or in any way affect such Person's other obligations under this Agreement, including under Section 3.4.

(h)     Notwithstanding any duty otherwise existing at law or in equity, each Manager shall act in good faith and in the best interests of the Company at all times and in accordance with the covenants and agreements made in this Agreement; provided, however, that the Nofar Managers shall not be required to prefer the business or properties of the Company over the business or properties of any other entity in which any such Manager or any of his or her Affiliates may have an interest; provided further, however, that the Nofar Managers shall nevertheless comply with their obligations under Section 8.6(f); and provided further, that the Managers shall cause the Company to use its reasonable efforts (for a reasonable period of time) to cure any default by the Company under any agreement to which the Company is a party, including an Event of Default (as defined in the Nofar Loan Agreement) under the Nofar Loan Agreement, or to avoid any imminent such default or Event of Default by the Company (it being agreed that the foregoing shall not limit or affect any of the lender's rights under the Nofar Loan Agreement, or any of Nofar's rights under any other agreement between Nofar and the Company).  In carrying out his or her duties hereunder, except as otherwise provided in this

Agreement, no Manager shall be liable to the Company or to any Member for such Manager's good faith actions or omissions (including actions taken or omitted to be taken in good faith in accordance with the consent of the appropriate parties) or for any errors of judgment, in each case to the extent believed in good faith by such Manager to be within the scope of authority conferred by this Agreement, but nothing herein shall relieve a Manager for any liability for fraud or a reckless or intentional violation of Law in the performance of such Manager's duties under this Agreement.

(i)       Except as otherwise provided in this Agreement:

(i)       each of the Members and each Manager shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any other Person who is a Member, Manager or any Officer or employee of the Company, or by any other individual as to matters the Members or the Managers reasonably believe are within such other individual's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distribution to the Members might properly be paid;

(ii)      the Managers shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent or other paper or document, but each Manager, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit; and

(iii)     the Managers shall not be required to take any action hereunder, nor shall any other provision of this Agreement be deemed to impose a duty on any Manager to take any action, if the Managers shall reasonably determine, or shall have been advised by counsel, that such action is contrary to any applicable Law or this Agreement.

Section 8.2.    <u>Board Committees</u>.    The Board may establish such committees as the Board shall approve, and each such committee shall have the authority as the Board shall so determine from time to time. The number and composition of each committee of the Board shall be determined from time to time by the Board; *provided*, that, each of the Members shall have the right to appoint a number of Managers to any committee directly proportionate to the composition of the Board.

Section 8.3.    <u>No Compensation of the Managers</u>.    During the period serving as Manager, the Company will reimburse each Manager on a timely basis for reasonable and appropriately incurred out-of-pocket expenses incurred on behalf of the Company, including without limitation amounts paid to third-party non-Affiliate consultants and contractors engaged to perform services on behalf of the Company as permitted hereunder.    Except for any compensation payable to a Manager pursuant to any other agreement between the Company and such Manager, the Managers shall not be entitled to any other compensation in respect of their service to the Company as Managers.

Section 8.4.    <u>Removal or Resignation of the Managers.</u>

(a)    A Manager may only be removed by the Member that designated such Manager, except that (i) subject to subclause (ii), for so long as Yellow Tree and BS1007 are Members, Yellow Tree shall not remove Ran Bujanover as its appointed Manager and BS1007 shall not remove Barend as its appointed Manager, unless such Person becomes unable to fulfill his duties as a Manager, in which case the respective Member shall appoint a replacement Manager reasonably acceptable to Nofar, and (ii) a Manager may otherwise be removed by the remainder of the Board for "cause"; <u>provided</u>, <u>however</u>, that, upon the removal of a Manager, only the Member that appointed the removed Manager shall be entitled to appoint such Manager's replacement, which, in the case of replacement of the BS1007 Manager or Yellow Tree Manager, shall be subject to the reasonable approval of Nofar.  For purposes of this <u>Section 8.4</u>, "<u>cause</u>" means (a) reckless or intentional violation of Law or fraud by the Manager in the performance of its duties and obligations under this Agreement; (b) violation of any applicable Law caused by the Manager's dereliction of its duty which violation is reasonably expected to have a material adverse effect on the Company, including any environmental Law, if such violation is not remedied within thirty (30) days of notice; <u>provided</u>, that if such violation is not capable of being remedied within such time period, such violation is not remedied within a reasonable period of time (having due regard for the circumstances of the violation); (c) breach of any material provision of this Agreement caused by the Manager's dereliction of its duty that is not cured within thirty (30) days of notice; <u>provided</u>, that if such breach is not capable of being cured within such time period such breach is not cured within a reasonable period of time (having due regard to the circumstances of the breach); (d) the Bankruptcy or dissolution of a Manager; or (e) any action or omission by a Manager that would cause the Company to be in violation of any applicable Law.

(b)    A Manager may resign at any time from the Board by delivering a written resignation to the Board.  Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event.  The Board's acceptance of a resignation shall not be necessary to make it effective.  A resignation of a Manager shall constitute "removal" of such Manager for purposes of <u>Section 8.4(a)</u> and, upon the resignation of a Manager (except for any such resignation following an event that constitutes "cause" as described above), or if there shall be a vacancy on the Board as a result of the death of a Manager, a new Manager shall be selected by the Member who appointed or was deemed to have appointed the former Manager under <u>Section 8.1(c)</u> above, subject to <u>Section 8.4(a)</u>.  Notwithstanding the foregoing, if at any time a Member that appointed a Manager under <u>Section 8.1(c)</u> no longer holds a Membership Interest, the remaining Members shall, as soon as reasonably practicable, determine whether to (i) affirm the Manager appointed by such former Member or (ii) remove and replace such Manager by naming a successor Manager mutually agreeable to such remaining Members.  If such a successor Manager is selected, the former Manager will resign and assign its rights as Manager to such successor Manager and shall have no further rights or obligations under this Agreement, except with respect to actions taken or failed to have been taken prior to such resignation and except that the provisions of <u>Sections 11.1</u> (<em>Notices</em>), <u>11.5</u> (<em>Severability</em>), <u>11.7</u> (<em>Entire Agreement</em>), <u>11.8</u> (<em>Public Statements</em>), <u>11.9</u> (<em>Governing Law</em>), <u>11.11</u> (<em>Counterparts</em>) and <u>11.12</u> (<em>Confidentiality</em>) shall survive such resignation.

{10764875.2}                          - 35 -

Section 8.5.    Signing Authority; Third Party Reliance.  Any document or instrument to be executed and delivered by or on behalf of the Company shall require the signature of a Nofar Manager, on the one hand, and a BS1007 Manager or Yellow Tree Manager, on the other hand; provided, however, that the Board may from time to time, by Simple Majority Approval, modify the foregoing signatory rights in the Company.  Third parties dealing with the Company shall be entitled to rely conclusively on the power and authority of the Managers so to execute such documents and instruments.  No third Person dealing with the Company shall be required to ascertain whether any Manager is acting in accordance with the provisions of this Agreement. All third Persons may rely on a document executed by the Managers as set forth herein as binding on the Company.

Section 8.6.    Meetings of the Board; Voting.

(a)    The Board shall meet at such time and at such place as the Board may designate, *provided* that such meetings shall occur no less than once per calendar quarter. Managers may participate in a meeting of the Board at the offices of the Company or such other place as may be determined from time to time by the Board or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to speak and to hear each other, and such participation in a meeting shall constitute presence in person at such meeting. Upon the request of any Manager, any meeting of the Managers pursuant to this Section 8.6 may be held virtually via conference call or video conferencing.  Written notice of each meeting (which may be delivered electronically) of the Board shall be given to each Manager at least five (5) Business Days prior to each such meeting.

(b)    Any Manager then in office may call a special meeting of the Board upon at least ten (10) days' written notice (such notice shall state the purpose or purposes for which such meeting is being called) if the meeting is to be held in person or five (5) Business Days' written notice if the meeting is to be held by telephone communications, video conference or other communication device.  Notwithstanding the foregoing, Managers may participate in a special meeting of the Board at the offices of the Company or such other place as may be determined from time to time by the Board by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to speak and to hear each other, and such participation in a meeting shall constitute presence in person at such meeting. Any Manager may waive such notice as to himself, including by being present at a meeting (unless such presence is solely to dispute that proper notice was given).

(c)    Each Manager voting on an action to be taken by the Company, whether at a meeting of the Board or by written consent, shall be able to cast a number of votes equal to the Percentage Interest of the Member that appointed such Manager (but, for purposes of clarity, the maximum amount of votes that can collectively be cast by all of the Managers appointed by a Member shall not exceed the Percentage Interest of such Member).  A Manager shall only be entitled to cast votes if such Manager is present at a meeting of the Board or is executing a written consent of the Board in lieu of a meeting, as the case may be.

(d)    The presence of Managers at a meeting of the Board representing a majority of the then-outstanding Percentage Interests shall constitute a quorum for the conduct of

business at such meeting; provided that a Nofar Manager, on the one hand, and the BS1007 Manager or the Yellow Tree Manager, on the other hand, must be present at each meeting of the Board for a quorum to exist at such meeting.  If a quorum is not present due to the absence of the BS1007 Manager and the Yellow Tree Manager, then the meeting of the Board shall be adjourned to a time and date not more than ten (10) days following the originally scheduled meeting in accordance with the terms of <u>Section 8.6(a)</u> and <u>Section 8.6(b)</u>, at which meeting the presence of the BS1007 Manager and the Yellow Tree Manager shall not be required to constitute a quorum, provided that the requirements of <u>Section 8.6(a)</u> and <u>Section 8.6(b)</u> have been met.  Unless otherwise set forth in this Agreement, any action to be taken by the Company for which the approval of the Board is required or permitted shall require Simple Majority Approval.

(e)    Managers may vote at a meeting of the Board or any committee thereof either in person or by proxy executed in writing (which, for the avoidance of doubt, may be given by Electronic Transmission) by such Manager. Proxies for use at any meeting of the Board or any committee thereof or in connection with the taking of any action by written consent shall be filed with the Board, before or at the time of the meeting or execution of the written consent as the case may be. No proxy shall be valid after eleven months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and that the proxy is coupled with an interest.

(f)    Unless otherwise restricted by this Agreement, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if Managers representing the required vote with respect to such action vote in favor of such action by written consent, which written consent shall be circulated to all of the Managers at least ten (10) Business Days prior to the taking of such action.  The BS1007 Manager and Yellow Tree Manager each agrees to respond to any written request for consent hereunder within five (5) Business Days after delivery of such request for consent.  If either such Manager does not respond within such five (5)-Business Day period, a second written request shall be sent to such non-responding Manager.  If the BS1007 Manager or Yellow Tree Manager, as the case may be, fails to provide a response within five (5) Business Days after delivery of such second written request for consent, such non-responding Manager will be deemed to have consented to the applicable action.  The Managers agree that if the applicable action must be taken promptly, the time periods set forth herein will be reduced to the maximum amount of Business Days practicable.

Section 8.7.    <u>Certain Standards</u>.

(a)    The Members and Managers shall perform their obligations (and shall cause their respective Affiliates to perform their respective obligations) under this Agreement in accordance with applicable Laws and shall promptly notify the Company and the other Members in writing of any failure thereof.

(b)    Without limiting the duty of the Members and the Managers to act in good faith and in a commercially reasonable manner, and except as expressly provided otherwise in this Agreement, the Members recognize and agree that if a Member or a Manager appointed by

DocuSign Envelope ID: 7D167BD1-0ED9-495A-AF2E-53E52EDE1297

such Member takes any action or fails to take any action (which action or failure to act is not in breach of a specific provision of this Agreement) pursuant to the terms of this Agreement, including a failure to provide discretionary capital or loans pursuant to this Agreement or otherwise, even if such action or inaction is motivated solely by what such Member perceives to be in its own best interest or such Manager perceives to be in the best interest of the designating Member and not necessarily in the best interest of the other Members or of the Company, such Member's or such Manager's taking or failing to take such action shall not in and of itself be deemed a breach of any of its duties or obligations, including without limitation, fiduciary duties, if any, owed to the other Members or to the Company.

(c) Notwithstanding anything that is or may appear to be to the contrary in applicable Law or contained in this Agreement, the Members recognize and agree that from time to time any Member or Manager appointed by such Member has the right to refuse to consent to or approve any act or decision to be made by the Company:

(i) even if such refusal prevents the Company from pursuing its stated purpose;

(ii) whether or not such refusal to consent or approve is motivated by what such Member perceives to be in its own best interest or such Manager perceives to be in the best interest of the appointing Member and not necessarily in the best interest of the other Members or of the Company; and

(iii) such refusal shall not be deemed to be a breach of such Member's or such Manager's duties or obligations, including fiduciary duties, owed to the other Members or to the Company, except in each case for breaches of duties to act in good faith.

Section 8.8. Officers. The Board may, from time to time as they deem advisable and by Simple Majority Approval, appoint, remove or change officers of the Company (the "*Officers*") and assign, in writing, titles (including CEO, President, Vice President, Secretary and Treasurer) and authority to each such person. Unless the Board decides otherwise by Simple Majority Approval, if the title assigned to an Officer is one commonly used for officers of a business corporation formed under the Act, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Upon the Effective Date, the Managers hereby appoint the Officers as listed in Exhibit E. Subject to any delegation made to an Officer pursuant to a written employment agreement between the Company and such Officer (but subject to any termination or amendment to such agreement in accordance with its terms), any delegation pursuant to this Section 8.8 may be amended or revoked at any time by Simple Majority Approval; in such event, the Managers will update Exhibit E accordingly. Except as otherwise provided in this Section 8.6, all Officers shall serve at the discretion of and subject to the direction of the Board.

Section 8.9. Contracts with Affiliates. Subject to Section 8.1(e)(i), the Company may enter into contracts and agreements with any Member, any Manager, or any Affiliate or Family Member of any Member or Manager (other than the Company) for the rendering of services, the sale or lease of any product or other property, or any other transaction necessary or appropriate

ActiveUS 186356799v.13

for the operation of the Company's business consistent with its purposes stated herein (each, a "*Related Party Agreement*")  The Member or Manager that is a party (or whose Family Member or Affiliate is a party) to such Related Party Agreement shall inform the other Members, in writing, of any negotiations between the Company or any of its Affiliates, on the one hand, and such Member, Manager, Affiliate or Family Member of such Member or Manager, on the other hand, and must provide, ina timely manner, any information reasonably requested by the other Members regarding said negotiations and transaction terms.  Exhibit D lists all current Related Party Agreements.  The Managers will update Exhibit D promptly following the execution of any additional Related Party Agreements.

Section 8.10.   Insurance.  The Company shall, and shall cause the Projects to, acquire and maintain (including making changes to coverage and carriers) such casualty, general liability (including product liability), property damage and other types of insurance with respect to the Project and/or the operations of the Company, as is required by all contracts to which the Company and/or the Projects are party to, and such additional insurance as may otherwise be determined by the Managers to be necessary or advisable from time to time.

Section 8.11.   Duties; Indemnification.

(a)    No Member or Manager shall have any duty to the Company or any Member except as expressly set forth in this Agreement or as required by applicable Law.  A Member or Manager acting under this Agreement shall not be liable to the Company or to any Member or other Person bound by this Agreement for its good faith reliance on the provisions of this Agreement or for any act or omission performed or omitted in good faith on behalf of the Company (and in a manner reasonably believed to be within the scope of such Person's authority hereunder), except in the case of reckless or intentional violation of Law or fraud by such Person, or a breach of such Person's obligations under this Agreement.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Manager or Member otherwise existing at law or in equity to the Company or its Members or Manager, are agreed by the Company, the Managers and the Members to replace such other duties and liabilities of such Manager or Member.

(b)    To the fullest extent permitted by applicable Law, each Member, Manager, Officer, Partnership Representative and their respective Affiliates, officer, directors, managers, employees and agents shall  be entitled to indemnification from the Company for any Claims incurred by such Person by reason of any act or omission performed or omitted by such Person in performing its duties hereunder or relating to the Company's activities or business, in each case, subject to and in accordance with the terms of this Agreement, provided that: (i) any such act or omission was undertaken in good faith on behalf of the Company and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company; (ii) any such act or omission was reasonably believed to be within the scope of authority conferred on such Person by this Agreement; (iii) any such act or omission was not in willful breach of this Agreement and (iv) with respect to any criminal action or proceeding, such Person had no reasonable cause to believe his action or omission was unlawful, except that no Person shall be entitled to be indemnified in respect of any damages or loss incurred by such Person by reason of fraud or reckless or intentional violation of Law in the performance of its duties under this

Agreement; provided, however, that any indemnity under this Section 8.11(b) shall be provided out of and to the extent of Company assets only (including the proceeds of any insurance policy), and no Member shall have any personal liability on account thereof, including without limitation, any obligation to contribute money or other property to the Company.

(c)    Except in instances of a reckless or intentional violation of Law or fraud by any Manager or any Member or in the case of any breach by any Member or Manager of this Agreement or any other agreement between such Member or Manager and the Company, neither the Managers nor any Member shall be liable to the Company or to another Member for any lost profits or any special, incidental, exemplary, indirect or consequential damages of any nature, whether arising under contract, tort (including negligence), strict liability or otherwise.

Section 8.12.    Tax Credit Matters.

Notwithstanding any provision of this Agreement to the contrary, the Managers shall not, and shall cause each of its Affiliates not to, cause or permit the Company or any Person acting on behalf of the Company to take any action that would result in, or refrain, and shall cause each of its Affiliates to refrain, from taking any action reasonably within its control that is necessary to prevent, all or any portion of the Project failing to qualify for Tax Credits.

Section 8.13.    Budget Plan.

(a)    The budget and business plan of the Company, as it exists on the Effective Date for the remainder of Fiscal Year 2021 and as modified thereafter in accordance with Section 8.13(b) (in all such cases, the "**Budget Plan**"), is attached hereto as Exhibit C.   The Budget Plan shall set forth separate budgets for (i) the overhead of the Company and (ii) the Projects, and in each case shall include detailed capital and operating expense budgets, cash flow projections and profit and loss projections.

(b)    At least thirty (30) days before the end of each Fiscal Year, the CEO shall prepare and deliver to the Company and each Member a revised Budget Plan for the upcoming Fiscal Year in accordance with Section 11.1.   The Budget Plan shall be subject to Simple Majority Approval; provided, however, that with respect to the portion of each Budget Plan relating to the Projects: (i) any proposed deviation from a Budget Plan presented by the CEO that would involve a reduction in the aggregate amount of megawatts to be developed as Projects in such fiscal year will require Super-Majority Approval; and (ii) any proposed Projects contained in a Budget Plan that conform to the terms, conditions and covenants contained in the Nofar Loan Agreement shall be deemed approved without requiring Simple Majority Approval.   If a Budget Plan for any Fiscal Year is not adopted by Simple Majority Approval, then the Budget Plan then in effect shall continue to be the Budget Plan for the upcoming Fiscal Year and the Board shall continue to operate the Company in accordance with the Budget Plan then in effect until a revised Budget Plan is approved by Simple Majority Approval.

(c)    From time to time a Member or Manager may present to the Board one or more proposals for capital upgrades or other ideas to improve the performance and operational efficiency and reliability of any Project that are outside of the Budget Plan (each, a "**Proposal**").

The Board will review all Proposals in good faith and will consider their potential impact on the Distributable Cash of the Company, and the implementation of any Proposal will be subject to Simple Majority Approval.  If such approval is obtained, the Managers will update the Budget Plan accordingly.

(d)    If at the end of any Fiscal Year, the aggregate amount of megawatts produced by the Projects is less than 50% of the amount set forth in the Budget Plan for such Fiscal year, all references in Section 8.1(e)(i), Section 8.1(e)(ii) and Section 8.13(b) to "Super Majority Approval" shall thereafter be deemed amended to "Simple Majority Approval" without any further action required by any party hereto.

Section 8.14.  Company Counsel.  The Board shall cause the Company to engage a U.S.-based law firm with attorneys licensed in the United States for all commercial transactions concerning Projects located in the United States.  The Company's preferred counsel for such purposes is Garrett Stiepel Ryder LLP.

## ARTICLE IX
## TRANSFERS

Section 9.1.    Transfers Generally Prohibited.

(a)    Until the earlier of (a) the fifth anniversary of the Effective Date and (b) the date that the Company and the Project Companies have collectively placed Projects in service that generate 100 megawatts of power in the aggregate, neither BS1007 nor Yellow Tree shall sell, transfer, assign, convey, pledge, mortgage, encumber, hypothecate or otherwise dispose of (each, a "*Transfer*") all or any part of its Membership Interests or any interest, rights or obligations with respect thereto, whether directly or indirectly by the Transfer by Bujanover or Barend of direct or indirect ownership interests in the applicable Member, in each case except as provided in this Article IX.  Any attempted Transfer by BS1007 or Yellow Tree (or by Bujanover or Barend, as the case may be), other than in strict accordance with this Article IX, shall be null and void, *ab* initio, and the purported transferee shall have no rights as a Member or otherwise in or to the Membership Interest.

(b)    Any Disposition or other Transfer, including by consolidation, merger, or reorganization, of any of the equity interests of BS1007 or Yellow Tree shall constitute a "Transfer" for purposes of this Article IX.  In addition, all Capital Events shall constitute "Transfers" for purposes of this Article IX.

Section 9.2.  Certain Permitted Transfers.  Notwithstanding the general restriction on Transfers under Section 9.1(a), BS1007 and Yellow Tree shall be entitled to Transfer their respective Membership Interests as follows, in each case subject to the other terms and conditions of this Agreement, including Section 9.3:

(a)    with Simple Majority Approval of the Board;

ActiveUS 186356799v.13

DocuSign Envelope ID: 7D167BD1-0FD9-495A-AF2E-53E52EDE1297

(b)     to a Permitted Transferee (provided, however, that such Permitted Transferee shall not be permitted to further Transfer such Membership Interests except in accordance with Section 9.2(a) or Section 9.2(c));

(c)     in accordance with Section 9.4, Section 9.5 or Section 9.6.

Section 9.3.     Conditions to Transfers and Admission as Members.  A Transfer shall only be permitted hereunder, and a transferee of all or part of a Membership Interest pursuant to a Transfer made in accordance with this Agreement, whether by assignment or by operation of law, shall only be admitted to the Company as a substitute or additional Member, upon satisfaction of the requirements in Section 9.1 and the following, in each case as determined by (or waived by) the Board by Simple Majority Approval:

(a)     the Transferring Member and the prospective transferee each execute, acknowledge and deliver to the Company instruments of Transfer and assignment with respect to such Transfer and such other instruments as are reasonably necessary and satisfactory in form and substance to the Board to effect such Transfer and to confirm the Transferring Member's intention that the transferee become a Member in its place in respect of the Membership Interests Transferred;

(b)     the transferee executes, adopts and acknowledges this Agreement (or a joinder hereto or, with respect to any Member acquiring additional interests, a confirmation that such additional interests continue to be bound by this Agreement), and executes such other agreements as the Board may reasonably deem necessary or appropriate to confirm the undertaking of the transferee to be bound by the terms of this Agreement and to assume the obligations of Member under this Agreement in respect of the Transferred Membership Interests;

(c)     confirmation that the Transfer will not violate any applicable securities Laws or any other applicable federal or state Laws or the order of any court having jurisdiction over the Company or any of its assets;

(d)     confirmation that the Transfer will not cause the Company to be classified as a corporation or publicly traded partnership for tax purposes;

(e)     confirmation that the Transfer will not result in any Project ceasing to be a Qualifying Facility eligible for the QF Exemption;

(f)     confirmation that the Transfer does not require the Company to register as an "investment company" under the Investment Company Act of 1940, as amended;

(g)     confirmation that the Transfer will not result in a Recapture Event, unless the transferor has agreed in writing to indemnify the other Members against any adverse effects in a manner acceptable to the other Members;

(h)     the Company shall have received (i) either a copy of a nonforeign affidavit provided to the transferee by the transferor in accordance with Code Section 1446(f)(2) or evidence that any tax required to be deducted and withheld pursuant to Code Section 1446(f)(1)

ActiveUS 186356799v.13

has been so deducted and withheld and properly remitted, and (ii) any other tax forms reasonably requested by the Company; and

(i)     confirmation that the Transfer will not cause all or part of the assets of the Company to be "tax-exempt use property" within the meaning of Section 168(h) of the Code or to be subject to the alternative depreciation system under Section 168(g) of the Code.

Section 9.4.    <u>Right to Compel Participation in Certain Transfers</u>.

(a)     If Nofar proposes, in any transaction or series of related transactions, to Transfer all of its Membership Interests in the Company to a bona fide third party that is not an Affiliate or Permitted Transferee (a "***Third Party***") (a "***Proposed Transfer***"), Nofar may, at its option, require either of BS1007 and/or Yellow Tree to Transfer all of the Membership Interests owned or held by them to such third party for the same consideration per Membership Interest, and otherwise on the same terms and conditions, as the Proposed Transfer.  For the avoidance of doubt, this <u>Section 9.4</u> shall not apply to transfers by Nofar of its Membership Interests to an Affiliate.

(b)     Nofar shall provide a written notice (a "***Transfer Notice***") of such Proposed Transfer as promptly as practicable after commencing negotiations regarding such Proposed Transfer.  The Transfer Notice shall set forth all of the material terms and conditions of the Proposed Transfer, including the purchase price per Membership Interest (the "***Transfer Price***") to be Transferred, and notification from Nofar that it is exercising its rights under this <u>Section 9.4</u> with respect to the Proposed Transfer.  Within five days after Nofar's delivery of the Transfer Notice, each other Member shall deliver to Nofar (A) the certificate or certificates evidencing all the Membership Interests owned or held by such Member, if any, duly endorsed in blank or accompanied by written instruments of transfer in form satisfactory to Nofar, executed by such Member, and (B) a special irrevocable power-of-attorney authorizing Nofar, on behalf of such Member, to Transfer all such Membership Interests pursuant to the terms of the Proposed Transfer and to take all such actions as shall be necessary or appropriate in order to consummate such sale or disposition, including executing any document or instrument in connection with the Proposed Transfer on behalf of such Member.  From time to time thereafter, as and when required in connection with the Proposed Transfer, each other Member shall deliver to Nofar such other documents and instruments required to be delivered in connection with the Proposed Transfer, duly executed by such Member to the extent applicable.

(c)     Promptly after the consummation of the Proposed Transfer, Nofar shall notify each other Member of such consummation and shall remit to each other Member the total consideration to which such Member is entitled in connection with the Proposed Transfer, less a prorated portion of the expenses (including legal expenses) incurred by Nofar and the Company in connection with the Proposed Transfer.  In connection with a Proposed Transfer, Nofar may, but shall not be obligated to, Transfer all of its right, title and interest in and to the Nofar Loan Agreement.

(d)     If at any time Nofar abandons the Proposed Transfer, then Nofar shall return to each other Member all certificates evidencing Membership Interests that such Member

delivered to Nofar pursuant to <u>Section 9.4(b)</u> and all powers of attorney granted by such other Members to Nofar shall terminate and be of no further force or effect.

(e)    Anything herein to the contrary notwithstanding, Nofar shall have no obligation to any other Member to sell or otherwise dispose of any Membership Interests pursuant to this <u>Section 9.4</u> or as a result of any decision by Nofar not to accept or consummate any Proposed Transfer with respect to its Membership Interests, it being understood that any and all such decisions shall be made by Nofar in its sole and individual discretion. None of the other Members shall be entitled to offer any Membership Interests directly to any Third Party in connection with a Proposed Transfer, it being understood that all such Transfers shall be made only on the terms and pursuant to the procedures set forth in this <u>Section 9.4</u>. Nothing in this <u>Section 9.4</u> shall affect any of the obligations of any of the Members under any other provision of this Agreement.

Section 9.5.    <u>Tag-Along Right</u>.

(a)    With respect to any Proposed Transfer, BS1007 and/or Yellow Tree may, at its option, participate in the Proposed Transfer by Transferring all of the Membership Interests owned or held by them to such third party for the same consideration per Membership Interest, and otherwise on the same terms and conditions, as the Proposed Transfer. For the avoidance of doubt, this <u>Section 9.5</u> shall not apply to transfers by Nofar of its Membership Interests to an Affiliate.

(b)    Nofar shall provide a Transfer Notice as promptly as practicable after commencing negotiations regarding such Proposed Transfer. The Transfer Notice shall set forth all of the material terms and conditions of the Proposed Transfer, including the Transfer Price, to be Transferred. Within twenty (20) days after Nofar's delivery of the Transfer Notice, each other Member shall deliver to Nofar written notice indicating whether such Member desires to exercise its right to participate in the Proposed Transfer pursuant to <u>Section 9.5(a)</u>. If a Member does elect to participate in the Proposed Transfer, such Member shall also deliver to Nofar a special irrevocable power-of-attorney authorizing Nofar, on behalf of such Member, to Transfer all such Membership Interests pursuant to the terms of the Proposed Transfer and to take all such actions as shall be necessary or appropriate in order to consummate such sale or disposition, including executing any document or instrument in connection with the Proposed Transfer on behalf of such Member. From time to time thereafter, as and when required in connection with the Proposed Transfer, each other Member shall deliver to Nofar such other documents and instruments required to be delivered in connection with the Proposed Transfer, duly executed by such Member to the extent applicable.

(c)    Promptly after the consummation of the Proposed Transfer, Nofar shall notify each other Member of such consummation and shall remit to each other Member the total consideration to which such Member is entitled in connection with the Proposed Transfer, less a prorated portion of the expenses (including legal expenses) incurred by Nofar and the Company in connection with the Proposed Transfer.

ActiveUS 186356799v.13

(d)     Anything herein to the contrary notwithstanding, Nofar shall have no obligation to any other Member to sell or otherwise dispose of any Membership Interests pursuant to this <u>Section 9.5</u> or as a result of any decision by Nofar not to accept or consummate any Proposed Transfer with respect to its Membership Interests, it being understood that any and all such decisions shall be made by Nofar in its sole and individual discretion.

Section 9.6.     <u>Right of First Refusal</u>.

(a)     Subject to <u>Section 9.1(a)</u>, if BS1007 or Yellow Tree receives a binding offer (the "***Purchase Offer***") to validly Transfer all or a portion of such Member's Membership Interests (the "***Offered Interests***") to a Third Party, then such Member (the "***Transferring Member***") shall deliver written notice to Nofar regarding such Purchase Offer, which notice shall include a copy of the Purchase Offer.

(b)     Nofar shall have twenty (20) days to submit to the Transferring Member an offer to purchase all or any portion of the Offered Interests on the same terms and conditions per Membership Interests as are set forth in the Purchase Offer.  In such event, the parties shall consummate such purchase and sale as promptly as practicable thereafter, at which time Nofar shall deliver to the Transferring Member the consideration payable in respect of the Offered Interests being acquired and the Transferring Member shall deliver to Nofar certificates representing such Offered Interests, if any, and any other documents and instruments reasonably requested by Nofar in connection with such purchase and sale.

(c)     If Nofar elects not to purchase all of the Offered Interests, then, at any time prior to the 60th Business Day following the date of the Transferring Member's initial written notice to Nofar, the Transferring Member may sale the remaining portion of the Offered Interests to the Third Party on the same terms and conditions as are contained in the Purchase Offer.

(d)     If the Transferring Member has not Transferred all of the Offered Interests by the end of the 60-Business Day period set forth in subclause (c), then the Transferring Member shall not Transfer any remaining Offered Units unless it shall have re-offered them to Nofar in accordance with this <u>Section 9.5</u>.  Any transferee of the Offered Interests shall be bound by and subject to the terms and conditions of this Agreement applicable to the Transferring Member.

(e)     All offers made by Nofar shall be subject to the Transferring Member delivering the Offered Interest free from all encumbrances (other than encumbrances created by this Agreement) and together with all rights attaching to them.

# ARTICLE X
## DISSOLUTION AND WINDING-UP

Section 10.1.  <u>Events of Dissolution</u>. The Company shall be dissolved and its affairs shall be wound up upon the first to occur of any of the following:

(a)    the unanimous written consent of the Members to dissolve and terminate the Company;

(b)    the entry of a decree of judicial dissolution under the Act; or

(c)    at any time there are no members of the Company unless the Company is continued in accordance with the Act.

Section 10.2.   <u>Distribution of Assets</u>.  Upon the occurrence of one of the events set forth in <u>Section 10.1</u> (a "***Liquidation***"), Nofar shall select and appoint a liquidator (the "***Liquidator***"), and the Liquidator shall proceed diligently to wind-up the affairs of the Company and shall make final distributions as provided herein and in the Act by the later of the end of the Company Taxable year in whichsuch event occurs or ninety (90) days after such event.  The Liquidator shall sell any and all Company property, including to Members.  The Liquidator shall first pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including Member Loans and all expenses incurred in Liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent, conditional or unmatured liabilities in such amount and for such term as the liquidators may reasonably determine) in the order of priority as provided by Law.  Items of income and gain for the taxable year in which the Liquidation occurs shall first be allocated to the Members such that, to the extent possible, each Member's Capital Account is in the ratio of their respective Percentage Interests.

Section 10.3.   <u>Distributions upon Liquidation or Capital Event</u>.  Upon any Liquidation, the balance of the assets of the Company in Liquidation, or the proceeds of such Capital Event, as applicable, shall be distributed to the Members in accordance with <u>Section 6.1</u>.  "***Capital Event***" means (1) any consolidation, reorganization, membership interest exchange, sale of membership interests or merger of the Company with or into any other company or other entity or person, or any other corporate reorganization, in which the equity owners of the Company immediately prior to such transaction, own less than fifty percent (50%) of the voting power of the surviving entity (or if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger, stock exchange, or reorganization; or (2) any other transaction or series of related transactions to which the Company is/are a party in which in excess of fifty percent (50%) of the Company's voting power is transferred to one or more third parties or (3) or a sale, lease or other disposition of all or substantially all of the assets of the Company.  The distribution of cash and/or property to a Member in accordance with the provisions of this <u>Section 10.3</u> constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member on its Membership Interest in the Company of all the Company's property and constitutes a compromise to which all Members have consented within the meaning of the Act.

Section 10.4.   <u>Negative Capital Accounts</u>.  If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company are insufficient to return the positive Capital Account balance (if any) of each Member, such Member shall have no recourse against the Company or any other Member.

ActiveUS 186356799v.13

Section 10.5.  De-Commissioning of the Projects.  Any obligations for the de-commissioning of any Project will be the obligations of the Company, and the Members shall have no responsibility or liability relating thereto.

Section 10.6.  In-Kind Distributions.  There shall be no distribution of assets of the Company in kind without the prior written consent of all of the Members.

Section 10.7.  Certificate of Cancellation.

(a)    When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, a Certificate of Cancellation (the "***Certificate of Cancellation***") shall be executed and filed by the liquidators with the Secretary of State of the State of California, which certificate shall set forth the information required by the Act.

(b)    Upon the filing of the Certificate of Cancellation, the existence of the Company shall cease.

# ARTICLE XI
# MISCELLANEOUS

Section 11.1.  Notices.  Unless otherwise provided herein, any offer, acceptance, election, approval, consent, certification, request, waiver, notice or other communication required or permitted to be given under this Agreement (collectively referred to as a "***Notice***"), shall be in writing and deemed delivered (a) upon receipt, if delivered in person, (b) three Business Days after delivery by registered or certified mail with postage prepaid and return receipt requested, (c) the next Business Day if transmitted by recognized overnight courier service with charges prepaid, or (d) upon delivery by facsimile or email transmission, if transmitted prior to 5:00 p.m. recipient's local time on a Business Day, otherwise the following Business Day, in each case directed to the intended recipient at the address of such Member set forth in Exhibit A(2), or at such other address as any Member hereafter may designate to the others in accordance with a Notice under this Section 11.1.

Section 11.2.  Amendments.

(a)    Except as otherwise provided in this Section 11.2, this Agreement may not be modified or amended in a manner that disproportionately adversely affects any Member relative to the other Members without the prior written consent of such disproportionately affected Member.  The consent to and execution of any such written instrument shall not be unreasonably withheld or delayed by the applicable Member.

(b)    Notwithstanding Section 11.2(a), a Manager may amend Exhibit A(2) to reflect the following transactions occurring during the applicable time period: a resignation or withdrawal of a Member from the Company in accordance with the terms of this Agreement, a Transfer of a Membership Interest in accordance with the terms of this Agreement, the admission of a new Member in accordance with the terms of this Agreement, or a change in the Percentage

ActiveUS 186356799v.13

Interest resulting from any of the foregoing events. The Manager making such amendments will give the Members prompt notice thereof. Any reference in this Agreement to <u>Exhibit A(2)</u> shall be deemed to be a reference to <u>Exhibit A(2)</u> as amended and in effect from time to time.

(c)    Notwithstanding <u>Section 11.2(a)</u>, a Manager may amend <u>Exhibit E</u> to the extent required by this Agreement. The Manager making such amendments will give the Members prompt notice thereof. Any reference in this Agreement to <u>Exhibit E</u> shallbe deemed to be a reference to <u>Exhibit E</u> as amended and in effect from time to time.

Section 11.3.    <u>Partition</u>. Each of the Members hereby irrevocably waives, to the extent it may lawfully do so, any right that such Member may have to maintain any action for partition with respect to the Company property.

Section 11.4.    <u>Waivers and Modifications</u>.  Any waiver or consent, express, implied or deemed, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company or any action inconsistent with this Agreement is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company or any other such action. Failure on the part of a Person to insist in any one or more instances upon strict performance of any provisions of this Agreement, to take advantage of any of its rights hereunder, or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that Person or its rights with respect to that default until the applicable statute of limitations period has lapsed. All waivers and consents hereunder shall be in writing and shall be delivered to the other Members in the manner set forth in <u>Section 11.1</u>. All remedies afforded under this Agreement shall be taken and construed as cumulative and in addition to every remedy provided for herein and by applicable Law.

Section 11.5.    <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions thereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 11.6.    <u>Successors; No Third-Party Beneficiaries</u>.  This Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors and permitted assigns. Nothing in this Agreement shall provide any benefit to any third party or entitle any third party to any Claim, it being the intent of the Members that this Agreement shall not be construed as a third-party beneficiary contract.

Section 11.7.    <u>Entire Agreement</u>. This Agreement, including the Exhibits and Schedules attached hereto or incorporated herein by reference, constitutes the entire agreement of the Members with respect to the matters covered herein. This Agreement supersedes all prior agreements and oral understandings among the parties hereto with respect to such matters.

Section 11.8.    <u>Public Statements</u>.  No Member shall issue a public announcement, statement or other disclosure relating to the Company, any Project Company or any Project

ActiveUS 186356799v.13

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

without the written consent of the other Members unless, based upon the advice of legal counsel to the issuing Member, such public announcement, statement or other disclosure is required by any Laws or by obligations pursuant to any listing agreement with any national securities exchange in order to discharge such Member's disclosure obligations, in which case the issuing Member may release such statement and, upon such release, shall promptly furnish the other Members with a copy thereof.  Without limiting the generality of the foregoing, each Member, upon the request of another Member, shall provide to such Member, and such Member shall have the right to review in advance all information relating to the transactions contemplated by the transaction documents that appear in any filing made in connection with the transactions contemplated hereby or thereby.

Section 11.9.   Governing Law.  This Agreement shall be governed by and construed in accordance with the applicable Laws of the State of California, excluding any conflict of Laws rule or principle that might refer the governance or construction of this Agreement to the Law of another jurisdiction.  Any mediation, arbitration or lawsuit involving any dispute or matter arising under or relating to this Agreement may only be brought before the appropriate tribunal or court in Napa County California, unless the parties to the mediation, arbitration or lawsuit otherwise agree.  All Members hereby consent to the exercise of personal jurisdiction by any such tribunal or court with respect to any such proceeding.

Section 11.10. Further Assurances.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

Section 11.11. Counterparts.  This Agreement may be executed in any number of counterparts, each of which may be delivered by facsimile transmission or electronically in portable document format (PDF) format and each of which shall be an original but all of which together will constitute one instrument, binding upon all parties hereto, notwithstanding that all such parties may not have executed the same counterpart.

Section 11.12. Confidentiality.   The Members acknowledge and agree that this Agreement, the terms and conditions set forth herein and therein, and all documents and information obtained by a Member from another Member, Manager or the Company in connection with the transactions contemplated hereby and thereby, including any and all information they may have or obtain concerning the Company and its assets, business, operations or prospects (collectively, the "*Confidential Information*") are to be kept confidential, and the Members shall, and shall cause their respective Affiliates and Representatives to, use all due care to hold confidential and not use in any manner detrimental to the Company or either Member any and all Confidential Information provided, however, that Confidential Information shall not include information that (a) is or becomes generally available to the public other than as a result of a disclosure by a Member or any of its Representatives in violation of this Agreement, (b) becomes available to a Member or any of its Representatives on a non-confidential basis prior to its disclosure by the Company or its Representatives or (c) is independently developed by a Member without reference to the Confidential Information.  Notwithstanding anything to

ActiveUS 186356799v.13

DocuSign Envelope ID: 7D367BD1-0ED9-495A-AF2E-53E52EDE1297

the contrary, a party or any of its Affiliates or Representatives may disclose Confidential Information to the extent that it (1) is required or requested to be disclosed as a result of any applicable Laws or rule or regulation of any stock exchange, (2) is required or requested by the IRS or any other taxing authority in connection with the Project or Tax Credits relating thereto, including in connection with a request for any private letter ruling, any determination letter or any audit, (3) is voluntarily disclosed by a Member to the IRS or other Governmental Entity with jurisdiction over such Member in connection with such authority's review or approval of the transactions contemplated by this Agreement, or (4) is disclosed on a similarly confidential basis by such a Member to its officers, directors, partners, members, shareholders, advisors, employees, auditors and legal counsel and other Affiliates on a need-to-know basis, provided such Member directs such recipients to keep such Confidential Information confidential under the same terms as provided herein. If a Member is required is advised by legal counsel that disclosure or delivery of Confidential Information is required by Law, legal process, regulation, judicial or administrative order or requirements of a securities exchange, such disclosing Member will provide the Managers (if the Confidential Information relates to the Company) or the impacted Member (if the Confidential Information is personal information of such Member) with prompt notice (unless such notice is prohibited by Law or otherwise impractical) so that the Managers or impacted Member (as applicable) may seek a protective order or other appropriate remedy at the sole cost of the impacted Member (as applicable) seeking such protective order or appropriate remedy or waive compliance with the non-disclosure provisions of this <u>Section 11.12</u> with respect to the information required to be disclosed. If such protective order or other remedy is not obtained, or the Managers or impacted Member waives compliance with the non-disclosure provisions of this <u>Section 11.12</u> with respect to the information required to be disclosed, the disclosing Member will furnish only that portion of such information that it is advised by counsel is legally required to be furnished and will use its commercially reasonable efforts, at the Company's or impacted Member's expense, to obtain reliable assurance that confidential treatment will be accorded such information. In the event that a Member is requested by any banking, securities, securities exchange or other regulatory or self-regulatory organization in connection with any general audit, examination or inquiry of a Member or its regulated Affiliates to disclose Confidential Information, such Member may disclose or deliver any Confidential Information to such authority that such Member reasonably concludes is responsive to such request; <u>provided</u> that such disclosing Member shall advise such authority of the confidential nature of such Confidential Information. Notwithstanding anything herein to the contrary, nothing in this Agreement shall be construed to prevent any Person (including all employees, representatives and agents of such Person) from disclosing to any and all Persons, without limitation of any kind, the United States federal income "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4 and applicable U.S. state and local Law). Nothing herein shall be construed as prohibiting a party hereunder from using such Confidential Information in connection with (i) any claim against another Member or the Company hereunder, (ii) any exercise by a party hereunder of any of its rights hereunder or (iii) a disposition by a Member of all or a portion of its Membership Interest or a disposition of an Equity Interest in such Member or its Affiliates, provided that such potential purchaser shall have entered into a confidentiality agreement with respect to Confidential Information on customary terms used in confidentiality

ActiveUS 186356799v.13

agreements in connection with corporate acquisitions before any such information may be disclosed.

Section 11.13. <u>Joint Efforts</u>.  To the full extent permitted by applicable Law, neither this Agreement nor any ambiguity or uncertainty herein will be construed against any of the parties hereto, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been prepared by the joint efforts of the respective attorneys for, and has been reviewed by, each ofthe parties hereto.

Section 11.14. <u>Specific Performance</u>.  The Members agree that irreparable damage will result if this Agreement is not performed in accordance with its terms, and the Members agree that any damages available at law for a breach of this Agreement would not be an adequate remedy.  Therefore, to the full extent permitted by applicable Law, the provisions hereof and the obligations of the Members hereunder shall be enforceable in a court of equity, or other tribunal with jurisdiction, by a decree of specific performance, and appropriate injunctive relief may  be applied for and granted in connection therewith.  Such remedies and all other remedies provided for in this Agreement shall, however, be cumulative and not exclusive and shall be in addition to any other remedies that a Member may have under this Agreement, at law or in equity, without proof of damages or posting a bond.

Section 11.15. <u>Survival</u>.  All indemnities and reimbursement obligations made pursuant to this Agreement shall survive dissolution and liquidation of the Company until expiration of the longest applicable statute of limitations (including extensions and waivers) with respect to the matter for which a Person would be entitled to be indemnified or reimbursed, as the case may be.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties have caused this Second Amended and Restated Limited Liability Company Agreement to be signed by their respective duly authorized officers as of the date first above written.

**MEMBERS:**

**Blue Sky 1007, LLC**,
a California limited liability company


By: _____
Name: Barend Venter
Title:   Member


**Yellow Tree Capital LLC**
a California limited liability company


By: _____
Name: Ran Bujanover
Title:   Member



**NOFAR USA LLC**
a Delaware limited liability company


By: _____
Name:
Title:

ActiveUS 186356799v.13

**MANAGERS:**

_____

Barend Venter (in his capacity as Manager and in his individual capacity for all applicable purposes under this Agreement, including Section 3.4(a))

_____

Ran Bujanover (in his capacity as Manager and in his individual capacity for all applicable purposes under this Agreement, including Section 3.4(a))

_____

[NAME]

_____

[NAME]

_____

[NAME]

# EXHIBIT A
## LISTING OF MEMBERS, PERCENTAGE INTERESTS, CAPITAL ACCOUNT BALANCES AND SECURITY INTERESTS

(1)    Immediately prior to the Effective Date:

| Member Names | Percentage Interest | Capital Account Balance | Security Interest |
|---|---|---|---|
| Blue Sky 1007, LLC | 57.5% | $ | None |
| Yellow Tree Capital LLC | 37.5% | $ | None |
| Palm Drive Associates LLC | 5% | | |

(2)    As of the Effective Date:

| Member Names | Percentage Interest | Capital Account Balance | Security Interest |
|---|---|---|---|
| Blue Sky 1007, LLC<br>860 R Napa Valley Corporate Way<br>P.O. Box 5571 Napa, CA 94581<br>Attention: Barend Venter<br>Email: barend@blueskyutility.com<br>Facsimile: 707-754-2553 | 16.5% | $[_____] | |
| Yellow Tree Capital LLC<br>860 R Napa Valley Corporate Way<br>P.O. Box 5571 Napa, CA 94581<br>Attention: Ran Bujanover<br>Email: ran@blueskyutility.com<br>Facsimile: 707-754-2553 | 16.5% | $[_____] | |
| [NOFAR BLOCKER] | 67% | $[_____] | None |

**EXHIBIT B**

**PROJECTS**

Current Projects

| Project | Location | Size (MW) | Retail Market |
|---|---|---|---|
| Passco Hanford Mall | Hanford, CA | 1.6 | SCE |
| Phillips Edison & Co - Winery Plaza | Fairfield, CA | 0.3 | PG&E |
| Orland North State Grocer | Orland, CA | 0.6 | PG&E |
| Colusa North State Grocer | Colusa, CA | 0.6 | PG&E |
| Phillips Edison & Co. - Boronda Plaza | Salinas, CA | 1.1 | PG&E |
| Paytner Reality - Clovis Commons | Clovis, CA | 0.5 | PG&E |
| Brixmor - San Dimas Plaza | San Dimas, CA | 0.6 | SCE |
| Phillips Edison & Co - Broadway | Santa Maria, CA | 0.4 | PG&E |
| DRA - Esplanade Center | Oxnard, CA | 1.4 | SCE |
| Shea Properties - Bressi Village | Carlsbad, CA | 0.3 | SDG&E |
| YMCA Shasta | Redding, CA | 0.2 | REU |
| Brixmor – Vail Ranch | Temecula, CA | 0.6 | SCE |
| Brixmor – Carmen Plaza | Camarillo, CA | 0.6 | SCE |
| Brixmor – Ocean View | San Clamente, CA | 0.5 | SDG&E |
| Brixmor – Felicita Plaza | Escondido, CA | 0.3 | SDG&E |
| Brixmor – Felicita Town Center | Escondido, CA | 0.6 | SDG&E |
| Brixmor – Plaza by the Sea | San Clamente, CA | N/A | SDG&E |
| Brixmor – Puente Hills | Rowland Heights, CA | 1.4 | SCE |
| Merlone Geier Partners - Palmsdale | Palmsdale, CA | 1.1 | SCE |
| Merlone Geier Partners - Blue Oak | Rocklin, CA | 1.5 | PG&E |
| CT Batch 1 | Enfield, Willimantic, Montville, CT | 0.4 | Eversource |

Pipeline Projects

| | |
|---|---|
| Brixmor – Arbor Faire | Fresno, CA |
| Hanford Mall Battery (SGIP Grant $1.7M) | Hanford, CA |
| Brixmor – Santa Paula | Santa Paula, CA |
| Brixmor – Montebello | Montebello, CA |
| Brixmor – Gateway (Santa Fe) | Santa Fe Springs, CA |
| Brixmor – Bristol Plaza | Santa Ana, CA |
| Phillips Edison & Co - Driftwood Village | Ontario, CA |
| Phillips Edison & Co - Upper Deerfield | Bridgeton, NJ |
| Phillips Edison & Co - Plaza 23 | Pompton Plains, NJ |
| Phillips Edison & Co - Ceres | Fresno, CA |

{10764875.2}                                    Exhibit B

| | |
|---|---|
| ROIC - Diamond Hills | Diamond Bar, CA |
| ROIC - Fullerton Crossroads | Fullerton, CA |
| ROIC - Jackson Square | Hayward, CA |
| ROIC - Santa Teresa Village | San Jose, CA |
| ROIC - Creekside Plaza | Poway, CA |
| ROIC - Hawthorne Crossings | San Diego, CA |
| ROIC - Desert Springs | Palm Desert, CA |
| ROIC - Marketplace Del Rio | Oceanside, CA |
| Phillips Edison & Co - Five Town Plaza | Springfield, MA |
| Phillips Edison & Co - Carriagetown Plaza | Amesbury, MA |
| Phillips Edison & Co - Cushing Plaza | Cohasset, MA |
| Phillips Edison & Co - Highland Plaza | Easton, MA |
| Phillips Edison & Co - Shaw's Plaza Easton | Easton, MA |
| Phillips Edison & Co - Sudbury Crossing | Sudbury, MA |
| MGP - Mountaingate Plaza | Simi Valley, CA |
| MGP - Hayward | Hayward, CA |
| Investec - Camarillo | Camarillo, CA |
| Investec - Central Shopping Center | Camarillo, CA |
| Investec - De Se Re III | Goleta, CA |
| Investec - Downey Landing | Downey, CA |
| Investec - Five Cities | Arroyo Grande, CA |
| Investec - Mesa Center | Santa Barbara, CA |
| Investec - Plaza at Sunbow | Chula Vista, CA |
| Investec - Skypark Plaza | Chico, CA |
| DLC - Oxom | Oxom Hill, MD |
| DLC - Eastover | Oxom Hill, MD |
| DLC - Beach | Peekskill, NY |
| DLC - Shoppes at South Hills | Poughkeepsie, NY |

{10764875.2}                                   Exhibit B

DocuSign Envelope ID: 7D167BD1-0ED9-495A-AF2E-53E52EDE1297

# EXHIBIT C

## BUDGET PLAN

To be mutually agreed by the parties prior to MIPA closing.

{10764875.2}                    Exhibit C

ActiveUS 186356799v.13

**EXHIBIT D**

**AFFILIATE TRANSACTIONS**

| | | Counter Parties | |
| --- | --- | --- | --- |
| Project Agreements | EPC | O&M | Development Services Agreement |
| Blue Sky Utility 2017 LLC | Bright Power Inc. | Bright Power Inc. | Blue Sky Utility LLC |
| Blue Sky Utility- Sub 1 LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2017 II LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2017 III LLC | Bright Power Inc. | Bright Power Inc. | Blue Sky Utility LLC |
| Blue Sky Utility 2018 I LLC | Bright Power Inc. | Bright Power Inc. | Blue Sky Utility LLC |
| Blue Sky Utility 2018 II LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2018 III LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2018 IV LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2018 V LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2018 VI LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 I LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 II LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 III LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 IV LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 V LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 VI LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 VII LLC | Bright Power Inc. | Bright Power Inc. | |

| | | | |
|---|---|---|---|
| Blue Sky Utility 2019 VIII LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2019 XI LLC | Bright Power Inc. | Bright Power Inc. | Blue Sky Utility LLC |
| Blue Sky Utility 2020 I LLC | Bright Power Inc. | Bright Power Inc. | |
| Blue Sky Utility 2020 II LLC | Bright Power Inc. | Bright Power Inc. | |

| Holding Companies Agreements | Counter Party Asset Mangement Agreement |
|---|---|
| Blue Sky Utility Portfolio I 2017 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio II 2017 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio III 2017 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio I 2018 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio II 2018 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio I 2020 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio II 2020 LLC | Blue Sky Utility LLC |
| Blue Sky Utility Portfolio III 2020 LLC | Blue Sky Utility LLC |

| Development Agreements | BSU Party | Counter Party | Scope |
|---|---|---|---|
| Limited Notice to Proceed | Blue Sky Utility LLC | Bright Power Inc. | DLC NE Assets |
| Limited Notice to Proceed | Blue Sky Utility LLC | Bright Power Inc. | PECO NE Assets |

_____  _____  _____  _____

{10764875.2}                    Exhibit D

# EXHIBIT E

## LISTING OF MANAGERS AND OFFICERS

| NAME | TITLE |
| --- | --- |
| Barend Venter | CEO, Manager |
| Ran Bujanover | President, Manager |
| [Nofar Manager] | Manager |
| [Nofar Manager] | Manager |
| [Nofar Manager] | Manager |

DocuSign Envelope ID: 7D167BD1-05D9-495A-AF2E-53E52EDE1297

Schedule 3.4(c)

Permitted Activities of Ran, Barend and Affiliates

1. Bright Power, Inc., as a general contractor, shall be permitted to continue its business relating to engineering, procurement and construction of solar projects (but not the development and/or ownership of renewable energy projects or power storage, or any other business similar to the Business). Bright Power, Inc. shall also be permitted to continue with component manufacturing, roofing as a roofing contractor and electrical and an electrical contractor.

2. Ran, Barend and/or each of their spouses may, for their personal ownership, acquire, develop, construct and own solar facilities and storage on real property they own, in whole or in part, individually or in their capacity as trustees of personal or family trusts, including, without limitation, Clos du Val.

{10764875.2}

**Schedule 1.1(b)**

**Creditors to whom Creditor Fund Debt is owed**

| Creditor Fund Debt | Lender | Amount Outstanding as of May 21, 2021 |
|---|---|---|
| PDA Loan | Palm Drive Associates, LLC | $5,749,896.83 |
| Blue Sky 1007 Loan | Blue Sky 1007, LLC | $732,831.39 |
| SBA Loan | The Small Business Administration | $205,168.20 |
| Affiliate Loan | Amalgamated Bank | $430,031.52 |
| Salary Gap Payment | Blue Sky Utility, LLC | $1,597,402.51* |

**\*Salary Gap Payments in the amount of $1,597,402.51 are payable to the following (the "Salary Gap Payment Recipients"):**

| | |
|---|---|
| Blue Sky 1007 LLC | $ 749,951.25 |
| Yellow Tree Capital LLC | $ 749,951.26 |
| Johann Smit | $ 60,000.00 |
| John Ruiz | $ 10,000.00 |
| Daniel Pino | $ 5,000.00 |
| Courtney Lafayett | $ 7,000.00 |
| Rapahael Durst | $ 10,000.00 |
| Elani Moss | $ 4,000.00 |
| Joanne Ferreira | $ 1,000.00 |
| Ruchelle Briel | $ 500.00 |

**Schedule 1.1(c)**

**Projects**

**<u>CURRENT PROJECTS</u>**

| | <u>Project Name</u> | <u>Location</u> | <u>MW</u> | <u>Lender</u> | <u>Project |
|---|---|---|---|---|---|
| 1. | Winery Square | Fairfield, CA | 0.3 | New Resource Bank | Blue Sky |
| 2. | Hanford Mall | Hanford, CA | 1.6 | New Resource Bank | Blue Sky |
| 3. | NSG Colusa | Colusa, CA | 0.6 | New Resource Bank | Blue Sky |
| 4. | NSG Orland | Orland, CA | 0.6 | New Resource Bank | Blue Sky |
| 5. | Boronda Plaza | Salinas, CA | 1.1 | New Resource Bank | Blue Sky |
| 6. | Vail Ranch | Temecula, CA | 0.6 | The Wunder Company | Blue Sky |
| 7. | Carmen Plaza | Camarillo, CA | 0.6 | The Wunder Company | Blue Sky |
| 8. | Ocean View | San Clemente, CA | 0.5 | The Wunder Company | Blue Sky |
| 9. | Felicita Plaza | Escondido, CA | 0.3 | The Wunder Company | Blue Sky |
| 10. | Puente Hills Town Center | Rowland Heights, CA | 1.4 | The Wunder Company | Blue Sky |
| 11. | Palmdale Marketplace | Palmdale, CA | 1.1 | The Wunder Company | Blue Sky |
| 12. | Felicita Town Center | Escondido, CA | 0.3 | The Wunder Company | Blue Sky |
| 13. | Plaza by the Sea | San Clemente, CA | NA | The Wunder Company | Blue Sky |

| 14. | Montville Commons | Montville, CT | 0.1 | | The Wunder Company | Blue Sky |
| 15. | Willimantic Plaza | Willimantic, CT | 0.1 | | The Wunder Company | Blue Sky |
| 16. | Stop & Shop Plaza | Enfield, CT | 0.1 | | The Wunder Company | Blue Sky |
| 17. | Blue Oak Town Center | Rocklin, CA | 1.5 | | The Wunder Company | Blue Sky |
| 18. | Clovis Commons | Clovis, CA | 0.5 | | Amalgamated Bank | Blue Sky |
| 19. | San Dimas Plaza | San Dimas, CA | 0.6 | | Amalgamated Bank | Blue Sky |
| 20. | Esplanade Shopping Center | Oxnard, CA | 1.4 | | Amalgamated Bank | Blue Sky |
| 21. | Broadway Center | Santa Maria, CA | 0.4 | | Amalgamated Bank | Blue Sky |
| 22. | Bressi Ranch | Carlsbad, CA | 0.3 | | Amalgamated Bank | Blue Sky |
| 23. | YMCA Shasta | Redding, CA | 0.2 | | Amalgamated Bank | Blue Sky |

**PIPELINE PROJECTS**. Note: The following projects, unlike the "Current Projects" described above, have not yet achieved notice to start construction.

| 24. | Arbor Faire | Fresno, CA | 0.6 |
| 25. | Hanford Mall Battery | Hanford, CA | 2 |
| 26. | Santa Paula | Santa Paula, CA | 1.1 |
| 27. | Montebello | Montebello, CA | 1.6 |
| 28. | Gateway (Santa Fe) | Santa Fe Springs, CA | 0.8 |
| 29. | Bristol Plaza | Santa Ana, CA | 0.7 |
| 30. | Driftwood Village | Ontario, CA | 0.6 |
| 31. | Upper Deerfield | Bridgeton, NJ | 0.9 |
| 32. | Plaza 23 | Pompton Plains, NJ | 1.1 |
| 33. | Ceres | Fresno, CA | 0.5 |

| | | | |
|---|---|---|---|
| 34. | Diamond Hills | Diamond Bar, CA | 1.3 |
| 35. | Fullerton Crossroads | Fullerton, CA | 0.8 |
| 36. | Jackson Square | Hayward, CA | 0.8 |
| 37. | Santa Teresa Village | San Jose, CA | 1 |
| 38. | Creekside Plaza | Poway, CA | 1.2 |
| 39. | Hawthorne Crossings | San Diego, CA | 0.9 |
| 40. | Desert Springs | Palm Desert, CA | 2.2 |
| 41. | Marketplace Del Rio | Oceanside, CA | 1.1 |
| 42. | Five Town Plaza | Springfield, MA | 2.6 |
| 43. | Carriagetown Plaza | Amesbury, MA | 0.9 |
| 44. | Cushing Plaza | Cohasset, MA | 1 |
| 45. | Highland Plaza | Easton, MA | 2.1 |
| 46. | Shaw's Plaza Easton | Easton, MA | 1.9 |
| 47. | Sudbury Crossing | Sudbury, MA | 1.2 |
| 48. | Mountaingate Plaza | Simi Valley, CA | 1.1 |
| 49. | Hayward | Hayward, CA | 0.7 |
| 50. | Camarillo | Camarillo, CA | 1 |
| 51. | Central Shopping Center | Camarillo, CA | 0.7 |
| 52. | De Se Re III | Goleta, CA | 0.4 |
| 53. | Downey Landing | Downey, CA | 2.5 |
| 54. | Five Cities | Arroyo Grande, CA | 1 |
| 55. | Mesa Center | Santa Barbara, CA | 0.4 |
| 56. | Plaza at Sunbow | Chula Vista, CA | 0.8 |
| 57. | Oxom | Oxom Hill, MD | 1.2 |
| 58. | Eastover | Oxom Hill, MD | 0.6 |
| 59. | Beach | Peekskill, NY | 1.3 |
| 60. | Shoppes at South Hills | Poughkeepsie, NY | 1.4 |

**Schedule 2.6(g)**

**Letters of Termination**

1. Palm Drive Associates, LLC
2. Blue Sky 1007, LLC
3. Amalgamated Bank

**Schedule 2.6(h)**

**Required Third Party Consents**

1.  The consent of each of the "Lenders" identified on Schedule 1.1(c) is required in connection with the transactions contemplated by this Agreement.

2.  The consent of each of the "Tax Equity Investors" identified on Schedule 1.1(c) is required in connection with the transactions contemplated by this Agreement.

**Schedule 2.6(i)**

**Preemptive Rights Waivers**

None.

**Schedule 2.6(q)**

**Termination of Certain Agreements**

1. Indemnity Agreement, dated as of December 29, 2016, between Blue Sky Utility, LLC and Blue Sky 1007, LLC.

**Schedule 2.6(r)**

**Signatories**

Buyer to provide.

**Schedule 2.10(f)**

**Sources and Uses**

**Sources and Use**

| | | Uses | Sources | | | | Net |
|---|---|---|---|---|---|---|---|
| | | | TEI | Debt | Total Sources | | |
| | Boronda | 147,898 | | - | - | - | 147,898 |
| | Carmen Plaza 2 | 481,985 | | 524,015 | 119,340 | 643,356 | (161,371) |
| | Vail Ranch Center | 296,677 | 68,011 | - | 68,011 | | 228,666 |
| | Felicita Plaza | 229,655 | | 254,612 | 525,652 | 780,264 | (550,609) |
| | Felicita Town Center | 882,530 | | 596,525 | 396,066 | 992,591 | (110,061) |
| | Puente Hills | 925,698 | | 1,795,782 | 245,000 | 2,040,782 | (1,115,084) |
| | Ocean View | 735,884 | | 539,942 | 394,817 | 934,760 | (198,876) |
| | Palmdale | 1,817,156 | | 1,384,268 | 371,453 | 1,755,720 | 61,436 |
| | Williamantic | 224,641 | | 149,670 | 22,467 | 172,137 | 52,504 |
| | Stop & Shop | 252,619 | | 178,081 | 22,467 | 200,548 | 52,071 |
| | Montville Commons | 272,690 | | 201,526 | 22,467 | 223,992 | 48,698 |
| | Blue Oak | 2,269,053 | | 1,832,119 | 1,713,171 | 3,545,290 | (1,276,237) |
| | Rent Escrow | 111,000 | | | | - | 111,000 |
| | Contingency Share | - | | | | 347,167 | (347,167) |
| | Prepayment on SGIP | - | | | | 85,000 | (85,000) |
| | Red bridge | 38,715 | | | | - | 38,715 |
| | | | | | | - | - |
| | | | | | | | |
| | **Total** | **8,686,202** | **7,524,552** | **3,832,899** | **11,789,617** | | **(3,103,416)** |

**Schedule 3.1(c)**

**Organizational Chart**











### As of 4/30/2021 –Blue Sky Utility, LLC and Direct Subsidiaries


















As of 12/31/2020  – Blue Sky Utility Portfolio I 2020 LLC





As of 12/31/2020  – Blue Sky Utility Portfolio II 2020 LLC





As of 12/31/2020 – Blue Sky Utility Portfolio III 2020 LLC



12

**Schedule 3.1(f)**

**Third Party Consents**

Notice to each of the following parties is required in connection with the transactions contemplated by the Agreement:

- Bressi Retail, LLC (landlord of the Bressi Ranch project in Carlsbad, CA)
- Hanford Mall 2020, LLC (landlord of the Hanford Mall project in Hanford, CA)
- Winery Square Station LP (landlord of the Winery Plaza project in Fairfield, CA)
- Boronda Station LLC (landlord of the Boronda Plaza project in Salinas, CA)
- Broadway Pavilion Station LLC (landlord of the Broadway Center project in Santa Maria, CA)

The consent of each of the following parties is required in connection with the transactions contemplated by the Agreement:

- The consent of each of the "Lenders" identified on Schedule 1.1(c) is required in connection with the transactions contemplated by this Agreement.

- The consent of each of the "Tax Equity Investors" identified on Schedule 1.1(c) is required in connection with the transactions contemplated by this Agreement.

**Schedule 3.1(g)**

**Company Approvals**

Schedule 3.1(f) is incorporated herein by reference.

**Schedule 3.2(c)**

**Post-Closing Capitalization**

| Member | Percentage Interest |
|---|---|
| Nofar USA, LLC | 67.0% |
| Blue Sky 1007, LLC | 16.5% |
| Yellow Tree Capital, LLC | 16.5% |

**Schedule 3.2(f)**

None.

**Schedule 3.2(g)**

**Organizational Chart**

Schedule 3.1(c) is incorporated herein by reference.

**Schedule 3.2(h)**

**Organizational Chart**

Schedule 3.1(c) is incorporated herein by reference.

**Schedule 3.2(j)**

Schedule 3.1(f) is incorporated herein by reference.

**Schedule 3.5**

**Affiliate Transactions**

1. Bright Power, Inc., as a general contractor, conducts its business relating to engineering, procurement and construction of solar projects, component manufacturing, roofing as a roofing contractor and electrical as an electrical contractor.

2. Ran, Barend and/or each of their spouses from time to time, for their personal ownership, acquire, develop, construct and own solar facilities and storage on real property they own, in whole or in part, individually or in their capacity as trustees of personal or family trusts, including, without limitation, Clos du Val.

| | | | Counter Parties | | |
|---|---|---|---|---|---|
| | Project Agreements | EPC | O&M | Development Services Agreement | |
| | Blue Sky Utility 2017 LLC | Bright Power Inc. | Bright Power In | Blue Sky Utility LLC | |
| | Blue Sky Utility- Sub 1 LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2017 II LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2017 III LLC | Bright Power Inc. | Bright Power In | Blue Sky Utility LLC | |
| | Blue Sky Utility 2018 I LLC | Bright Power Inc. | Bright Power In | Blue Sky Utility LLC | |
| | Blue Sky Utility 2018 II LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2018 III LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2018 IV LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2018 V LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2018 VI LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 I LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 II LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 III LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 IV LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 V LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 VI LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 VII LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 VIII LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2019 XI LLC | Bright Power Inc. | Bright Power In | Blue Sky Utility LLC | |
| | Blue Sky Utility 2020 I LLC | Bright Power Inc. | Bright Power Inc. | | |
| | Blue Sky Utility 2020 II LLC | Bright Power Inc. | Bright Power Inc. | | |
| | | | | | |
| | | | | | |
| | | | Counter Party Asset Mangement Agreement | | |
| | Holding Companies Agreements | | | | |
| | Blue Sky Utility Portfolio I 2017 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio II 2017 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio III 2017 | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio I 2018 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio II 2018 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio I 2020 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio II 2020 L | Blue Sky Utility LLC | | | |
| | Blue Sky Utility Portfolio III 2020 | Blue Sky Utility LLC | | | |
| | | | | | |
| | Development Agreements | BSU Party | Counter Party | Scope | |
| | Limited Notice to Proceed | Blue Sky Utility LLC | Bright Power In | DLC NE Assets | |
| | Limited Notice to Proceed | Blue Sky Utility LLC | Bright Power In | PECO NE Assets | |
| | | | | | |

**Schedule 3.7(g)**

**Financial Models**

Reference is made to the financial models provided in the data room prior to the date of the Agreement.

**Schedule 3.7(i)**

**Usage**

**Summary - All Signed Up & Lease Controlled Tenants Usage**

| Site | PVSyst | 12 Month Usage | % |
|------|--------|----------------|---|
| San Dimas | 1,091,000 | 1,535,774 | 141% |
| Broadway | 783,801 | 367,005 | 47% |
| Bressi | 478,970 | 443,298 | 93% |
| Boronda | 1,750,585 | 1,972,717 | 113% |
| Winery | 473,355 | 572,854 | 121% |
| Clovis | 914,049 | 1,394,485 | 153% |
| Vail Ranch | 1,014,900 | 1,028,543 | 101% |
| Carmen Plaza | 1,036,800 | 1,035,489 | 100% |
| Esplanade | 2,677,000 | 3,522,019 | 132% |
| Felicita Town Center | 1,030,000 | 1,699,471 | 165% |
| Felicita Plaza | 441,800 | 1,110,937 | 251% |
| Ocean View Plaza | 1,382,806 | 1,561,876 | 113% |
| Puente Hills | 2,301,600 | 2,367,411 | 103% |
| Palmdale | 2,028,852 | 802,014 | 40% |
| Blue Oaks | 2,450,324 | 4,050,808 | 165% |
| Orland | 921,612 | 1,083,665 | 118% |
| Colusa | 927,812 | 1,047,283 | 113% |
| Hanford | 2,531,229 | 3,636,563 | 144% |
| YMCA | 316,700 | 389,982 | 123% |
| CT Montville | 172,000 | 166,010 | 97% |
| CT Willimatic | 153,566 | 158,066 | 103% |
| CT Stop&Shop | 123,618 | 124,870 | 101% |
| | 25,002,379.00 | 30,071,139.06 | 120% |

**Schedule 3.8**

**Material Contracts**

(a)(i)

(ii)

1. PDA Loan Agreement

2. Affiliate Loan

3. SBA Loan

4. BS1007 Loan

5. PPP Loan

6. Loan Documents

7. All Agreements with the "Lenders" identified on Schedule 1.1(c)

(iii)

1. Schedule 3.2(j) is incorporated herein by reference.

(iv)

1. The Company grants powers of attorney to the "Tax Equity Investors" identified on Schedule 1.1(c).

(v)

1. Schedule 3.18(d) is incorporated herein by reference.

(vi)

1. The Operating Agreements with respect to the entities identified as "Portfolio Co."s on Schedule 1.1(c) are incorporated herein by reference.

(vii)

1. Schedule 1.1(c) is incorporated herein by reference.

(viii)

None.

(ix)

All of the Company's SSPA's potentially result in payments by Customers to the Company in excess of $10,000 per year.

Development Agreement between Company and Generate Capital (and its related agreements)

(x)

None.

(xi)

None.

(xii)

None.

(xiii)

    1.   Schedule 3.11 is incorporated herein by reference.

(xiv)

    1.   Schedule 3.5 is incorporated herein by reference.

(xv)

    1.   Subsections (ii) and (vii) are incorporated herein by reference.

(xvi)

    1.   SBA Loan

    2.   PPP Loan

**Schedule 3.9(a)**

**Customers**

|  |  | 2021 | Net Revenue |
|---|---|---|---|
| 1 | Hanford | | $ 121,765.50 |
| 2 | PAQ Food4Less | | $ 53,905.95 |
| 3 | Colusa | | $ 39,572.56 |
| 4 | Orland | | $ 33,642.64 |
| 5 | YMCA | | $ 28,049.38 |
| 6 | Clovis: TJ Maxx | | $ 12,864.82 |
| 7 | Broadway: Party City | | $ 7,044.50 |
| 8 | Clovis: Mad Duck | | $ 6,306.45 |
| 9 | Clovis: Subway | | $ 4,879.57 |
| 10 | Broadway: CAM5 | | $ 4,455.98 |

|  |  | 2020 | Net Revenue |
|---|---|---|---|
| 1 | PAQ Food4Less | | $ 240,560.59 |
| 2 | Hanford | | $ 211,194.14 |
| 3 | Colusa | | $ 172,510.03 |
| 4 | Orland | | $ 167,584.41 |
| 5 | YMCA | | $ 54,049.92 |
| 6 | Clovis: Office Depot | | $ 23,888.23 |
| 7 | Bressi: Bevmo | | $ 15,892.43 |
| 8 | Winery: Cenerios | | $ 14,306.53 |
| 9 | Winery: Frank & Yuens | | $ 11,080.57 |
| 10 | Clovis: Nothing Bundt | | $ 11,004.73 |

|    |                         | 2019 | Net Revenue     |
|----|-------------------------|------|-----------------|
| 1  | Hanford                 |      | $ 464,041.36    |
| 2  | PAQ Food4Less           |      | $ 200,623.21    |
| 3  | Orland                  |      | $ 172,314.17    |
| 4  | Colusa                  |      | $ 140,027.71    |
| 5  | Clovis: Office Depot    |      | $ 39,674.63     |
| 6  | Clovis: Mad Duck        |      | $ 33,335.00     |
| 7  | Clovis: Nothing Bundt   |      | $ 16,549.00     |
| 8  | Clovis:CAM8             |      | $ 16,466.00     |
| 9  | Winery: CAM1            |      | $ 15,364.24     |
| 10 | Winery: Anytime Fitness M1 |   | $ 14,269.07     |

**Schedule 3.10(c)**

**Warranties**

Sunpreme Solar, the panel manufacturer of the panels at Hanford Mall, no longer functions as an operating business.

**Schedule 3.11**

**Leases**

| | **Project Name** | **Location** | **Landlord/Licensor** | **Tenant/Licensee** | **Document Type** | **Original Date** |
|---|---|---|---|---|---|---|
| | **CURRENT PROJECTS** | | | | | |
| 1. | Winery Square | Fairfield, CA | Winery Square Station LP | Blue Sky Utility 2017, LLC | License | June 17, 2016 |
| 2. | Hanford Mall | Hanford, CA | Hanford Mall 2020, LLC | Blue Sky Utility 2017 II, LLC | Lease | February 1, 2016 |
| 3. | NSG Colusa | Colusa, CA | Gregory Partners, L.P., Hart Snyder Holdings, LLC, David C. Lee, Bruno's Property Management, LLC, Clayton K. Lee Family Living Trust, and John. McNamee and Susan Diane McNamee, husband and wife, as joint tenants | Blue Sky Utility 2017 III, LLC | Lease | September 12, 2016 |
| 4. | NSG Orland | Orland, CA | XYZ Orland, LLC | Blue Sky Utility – Sub 1, LLC | Lease | September 12, 2016 |
| 5. | Boronda Plaza | Salinas, CA | Boronda Station LLC | Blue Sky Utility 2018 I, LLC | License | February 15, 2017 |
| 6. | Vail Ranch | Temecula, CA | Brixmor GA Vail Ranch, LP | Blue Sky Utility 2019 VI LLC | Lease | July 22, 2019 |
| 7. | Carmen Plaza | Camarillo, CA | Brixmor Holdings 1 SPE, LLC | Blue Sky Utility 2019 II  LLC | Lease | July 22, 2019 |
| 8. | Ocean View | San Clemente, CA | California Property Owner I, LLC | Blue Sky Utility 2019 IV  LLC | Lease | July 22, 2019 |

| 9. | Felicita Plaza | Escondido, CA | California Property Owner I, LLC | Blue Sky Utility 2019 III LLC | Lease | July 22, 2019 |
| 10. | Puente Hills Town Center | Rowland Heights, CA | Brixmor Property Owner II, LLC | Blue Sky Utility 2019 VII LLC | Lease | September 30, 2019 |
| 11. | Palmdale Marketplace | Palmdale, CA | MGP X Properties, LLC | Blue Sky Utility 2020 I LLC | Lease | May 15, 2020 |
| 12. | Felicita Town Center | Escondido, CA | Brixmor Felicita Town Center LLC | Blue Sky Utility 2019 V LLC | Lease | September 30, 2019 |
| 13. | Plaza by the Sea | San Clemente, CA | Brixmor Plaza By The Sea LLC | Blue Sky Utility 2019 VIII LLC | Lease | September 30, 2019 |
| 14. | Montville Commons | Montville, CT | Montville Station LLC | Blue Sky Utility 2019 IX LLC | License | October 29, 2019 |
| 15. | Willimantic Plaza | Willimantic, CT | Willimantic Station LLC | Blue Sky Utility 2019 IX LLC | License | October 29, 2019 |
| 16. | Stop & Shop Plaza | Enfield, CT | Enfield Station LLC | Blue Sky Utility 2019 IX LLC | License | October 29, 2019 |
| 17. | Blue Oak Town Center | Rocklin, CA | MGP X Properties, LLC | Blue Sky Utility 2020 II LLC | Lease | May 13, 2020 |
| 18. | Clovis Commons | Clovis, CA | RLO, LLC, Clovis Commons LLC, and Willow Herndon Partners, LLC, collectively as tenants in common | Blue Sky Utility 2018 II, LLC | Lease | December 18, 2017 |
| 19. | San Dimas Plaza | San Dimas, CA | Brixmor GA San Dimas, LP | Blue Sky Utility 2018 IV, LLC | Lease | December 18, 2017 |
| 20. | Esplanade Shopping Center | Oxnard, CA | California Property Owner I, LLC | Blue Sky Utility 2018 III, LLC | Lease | December 18, 2017 |
| 21. | Broadway Center | Santa Maria, CA | Broadway Pavilion Station LLC | Blue Sky Utility 2018 V, LLC | License | September 12, 2016 |

| 22. | Bressi Ranch | Carlsbad, CA | Bressi Retail, LLC | Blue Sky Utility 2018 VI, LLC | Lease | October 24, 2018 |
| 23. | YMCA Shasta | Redding, CA | Shasta County Young Men's Christian Association (YMCA) | Blue Sky Utility 2019 I, LLC | Lease | May 1, 2017 |

**PIPELINE PROJECTS**

| 24. | Arbor Faire | Fresno, CA | Brixmor Arbor Faire Owner, LP | Blue Sky Utility Holding, LLC | Lease | 9/30/19 |
| 30. | Driftwood Village | Ontario, CA | Driftwood Village Station LLC | Blue Sky Utility LLC | License | 9/12/16 |
| 34. | Diamond Hills | Diamond Bar, CA | ROIC Diamond Hills Plaza, LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 35. | Fullerton Crossroads | Fullerton, CA | ROIC Fullerton Crossroads, LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 36. | Jackson Square | Hayward, CA | ROIC California LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 37. | Santa Teresa Village | San Jose, CA | ROIC California, LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 38. | Creekside Plaza | Poway, CA | ROIC Creekside Plaza LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 39. | Hawthorne Crossings | San Diego, CA | ROIC California, LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 40. | Desert Springs | Palm Desert, CA | ROIC California, LLC | Blue Sky Utility LLC | Lease | 5/6/21 |
| 41. | Marketplace Del Rio | Oceanside, CA | ROIC California LLC | Blue Sky Utility LLC | Lease | 5/6/21 |

**Schedule 3.11 (a)**

Colusa -  There is an outstanding mortgage on the NS building

Hanford  - change of ownership resulted in new loan issuance to LL. Currently no SNDA has been provided

**Schedule 3.11(b)**

None.

**Schedule 3.13**

**Indebtedness (as of May 20, 2021)**

**Outstanding AP**

| | | |
|---|---|---|
| | Gogetit | 13,603 |
| | Garett | 75,974 |
| | Rent | 155,705 |
| | Novo | 106,170 |
| | Harmer | 1,235 |
| | Munibilling | 6,068 |
| | Yardi | 42,725 |
| | Sitelogiq | 71,133 |
| | Northstate | - |
| | Tax | 27,900 |
| | PbtS Refunding | 143,940 |
| | **Total** | **644,453** |

**Loans**

| | | |
|---|---|---|
| | PDA Mezz | 5,767,221 |
| | BS 1007 | 734,990 |
| | CDV | 430,032 |
| | SBA loan | 205,397 |
| | PDA purchase | 989,788 |
| | Salary gap | 1,597,403 |
| | Reserve Gap | 170,066 |
| | **Total** | **9,894,896** |

**CAPEX**

| | | |
|---|---|---|
| | BPI | 1,708,643 |
| | TEI payments | 80,196 |
| | **Total** | **1,788,839** |

| | |
|---|---|
| **Total Uses** | **12,328,187** |

Subsidiary Loans:

| Project | Lender | Original |
|---|---|---|
| Hanford | Amalgamated | 2,165,000 |
| Winery | Amalgamated | 600,000 |
| Boronda | Amalgamated | 1,800,000 |
| Clovis | Amalgamated | 960,000 |
| Espalanade | Amalgamated | 1,640,000 |
| San dimas | Amalgamated | 762,000 |

{10764729.5}

| | | |
|---|---|---|
| Broadway | Amalgamated | 761,000 |
| Bressi | Amalgamated | 650,000 |
| YMCA | Amalgamated | 535,000 |
| Colusa | Amalgamated | 1,200,000 |
| Orland | Amalgamated | 1,200,000 |
| Blue Oak | Wunder | 4,700,000 |
| CT | Wunder | 674,000 |
| Plaza by the sea | Wunder | 302,950 |
| Felicita Town Center | Wunder | 1,295,500 |
| Palmdale | Wunder | 1,708,000 |
| Puente Hills | Wunder | 2,450,000 |
| Vail Ranch | Wunder | 950,000 |
| Ocean View | Wunder | 705,000 |
| Carmen Plaza | Wunder | 960,000 |
| Felicita Plaza | Wunder | 565,000 |

**Schedule 3.15(a)**

**Tax Matters**

None.

**Schedule 3.15(d)**

The Company has granted power-of-attorney to certain tax equity partners pursuant to the Company's tax equity arrangements.

**Schedule 3.15(e)**

All of the Company's tax equity partnerships, each of which has been disclosed in documentation provided in the data room prior to the date of the Agreement.

**Schedule 3.15(f)**

Blue Sky Utility, LLC changed its method of accounting in 2017.

**Schedule 3.15(n)**

None.

**Schedule 3.15(s)**

None.

**Schedule 3.16(a)**

None.

**Schedule 3.16(a)(i)**

**Employees**

Diego Monson $21.00/hour

Cruz Ruiz $21.00/hour

Antonio Torres $21.00/hour

**Schedule 3.16(a)(ii)**

**Independent Contractors**

Rafi Durst, $12,500 per month

Nancy Zinder $65.00/Hr

Salvador Estrada $21.00/Hr

Elani Moss $2,100/month

Joanne Ferreira $800/month

Ruchelle Briel $1000/month

Monique Harcourt  $700/month

| Personnel Name | Start Date | Job Title | | Location |
|---|---|---|---|---|
| Raphael Durst | 2/14/2021 | CFO | | California |
| Nancy Zinder | 4/6/2018 | Tax Consultant | | Chicago |
| Salvador Estrada | | Independent Contractor | Panel Cleaner | California |
| Diego Monzon | | Independent Contractor | Panel Cleaner | California |
| Cruz Ruiz | | Independent Contractor | Panel Cleaner | California |
| Antonio Torres | 9/3/2019 | Independent Contractor | Technical Assistant | California |
| Elani Moss | 6/24/2020 | Independent Contractor | Billing Manager | South Africa |
| Joanne Ferreira | 3/15/2021 | Independent Contractor | Billing Specialist | South Africa |
| Ruchelle Briel | 9/4/2020 | Independent Contractor | Sales Assistant | South Africa |

| | | | | |
|---|---|---|---|---|
| Monique Harcourt | 5/10/2021 | Independant Contractor | Billing Administration | South Africa |

**Schedule 3.16(h)**

None.

**Schedule 3.17(a)**

**Employee Benefit Plans**

The Company pays a portion of the premiums for employees under its Health Coverage Participation program.

The Company offers employees paid vacation based on such employee's tenure with the Company.

**Schedule 3.18(a)**

**Intellectual Property**

None.

**Schedule 3.18(d)**

**Licensed Intellectual Property**

Yardi

Go-Get-It

Munibilling

Utility API

**Schedule 3.21(a)**

None.

**Schedule 3.22**

**Insurance**

Ran Bujanover and Barend Venter each are the beneficiaries of "key man" insurance policies taken out with respect to the life and/or disability of the other.

| Location | Project Name | Property Damage Limit | Bodily Injury Limit | Total Insurable Value | Rated Capacity (kW DC) | Mount (ground/ roof/ carport) |
|---|---|---|---|---|---|---|
| 955 West Texas St, Fairfield, CA 94533 | Winery Square | $950,000 | $10,000 | $960,000 | 293.1 | Roof |
| 1675 W. Lacey Blvd, Hanford, CA 93230 | Hanford Mall | $4,200,000 | $300,000 | $4,500,000 | 1621.7 | Roof |
| 1015-1017 Bridge St, Colusa, CA 95932 | NSG Colusa | $1,675,070 | $150,000 | $1,825,070 | 574 | Roof & Carport |
| 35 E. Walker St, Orland, CA 95963 | NSG Orland | $1,627,113 | $150,000 | $1,777,113 | 575 | Roof & Carport |
| 1576 N. Sanborn Rd. Salinas, CA 93905 | Boronda Plaza | $2,600,000 | $300,000 | $2,900,000 | 1068 | Roof & Carport |
| 31685-31845 Hwy 79 S., Temecula, CA 92592 | Vail Ranch | $1,533,595 | $130,000 | $1,663,595 | 604.71 | Roof |
| 311-487 Carmen Drive, Camarillo, CA 93010 | Carmen Plaza | $1,462,152 | $130,000 | $1,592,152 | 623.88 | Roof |
| 638 Camino de Los Mares, San Clemente, CA 92673 | Ocean View | $995,420 | $100,000 | $1,095,420 | 341.62 | Roof |
| 329-421 West Felicita Avenue & South Cen, Escondido, CA 92025 | Felicita Plaza | $716,922 | $85,000 | $801,922 | 273.6 | Roof |
| 1600 S. Azusa Ave, Rowland Heights, CA 91748 | Puente Hills Town Center | $3,702,869 | $315,000 | $4,017,869 | 1429.56 | Roof |
| 39340 10th St. W, Palmdale, CA 93551 | Palmdale Marketplace | $2,776,974 | $230,000 | $3,006,974 | 1051.2 | Roof |
| 1855 South Centre City Parkway, Escondido, CA 92025 | Felicita Town Center | $1,785,000 | $195,000 | $1,980,000 | 640.68 | Roof |
| 616 Camino De Los Mares, San Clamente, CA 92673 | Plaza by the Sea | $535,000 | $55,000 | $590,000 | 177.84 | Roof |
| 2020 Norwich-New London Turn, Montville, CT 06382 | Montville Commons | $515,000 | $36,000 | $875,000 | 142.835 | Roof |
| 1743 Main Street, Willimatic, CT 06226 | Willimatic Station | $362,000 | $32,000 | $394,000 | 121.275 | Roof |

| Address | Name | | | | Type |
|---|---|---|---|---|---|
| 54 Hazard Avenue, Enfield, CT 06082 | Stop & Shop | $436,000 | $26,000 | $462,000 | 93.555 | Roof |
| 6600 Lonetree Blvd., Rocklin, CA 95765 | Blue Oak Town Center | $4,985,000 | $700,000 | $5,685,000 | 1999.98 | Roof & Carport |
| 775 W Herndon Ave, Clovis, California 93612 | Clovis Commons | $1,800,000 | $200,000 | $2,000,000 | 505.44 | Roof |
| 853-1073 West Arrow Hwy, San Dimas, CA 91773 | San Dimas Plaza | $2,100,000 | $150,000 | $2,250,000 | 603.72 | Roof |
| 195 W Esplanade Dr, Oxnard, California 93036 | Esplanade Shopping Center | $4,000,000 | $350,000 | $4,350,000 | 1557.09 | Roof |
| 2440 South Broadway Santa Maria, CA 93454 | Broadway Center | $1,400,000 | $150,000 | $1,550,000 | 437.88 | Roof |
| 2622 Gateway Road, Carlsbad, CA 92009 | Bressi Ranch | $1,100,000 | $85,000 | $1,185,000 | 277.68 | Roof & Carport |
| 1155 Court St, Redding, CA 96001 | YMCA | $800,000 | $70,000 | $870,000 | 220.37 | Carport |

**Schedule 3.23**

**Bank Accounts**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Checking at Amalgmated XXXXX3537 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX1863 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX1905 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2085 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3695 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3794 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2457 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2390 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3380 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3515 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3422 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3526 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2184 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5336 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5344 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5351 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5369 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5914 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3548 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5930 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3559 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3133 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5955 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3570 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3141 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX5971 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Checking at Amalgmated XXXXX3581 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3262 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3273 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX3295 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX7663 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX7674 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX7685 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2275 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2283 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Amalgmated XXXXX2580 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6819 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX9973 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX4357 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6897 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX7812 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX7652 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX0507 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6670 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX2568 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX4166 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6436 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX2465 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX1839 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX5520 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX4048 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6886 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX9388 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX5264 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Checking at Umpqua XXXXX0233 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |
| Checking at Umpqua XXXXX6465 | Debit | Reg | Bal | 7 | 0 | 1049-9999 | Cash |

**Schedule 3.24**

**Government Grants**

SGIP Equity Incentive reserved in connection with the Hanford Battery Project, details of which have been provided to Buyer in the virtual data room.

**Schedule 3.25**

**Brokers**

None.

**Schedule 4.4**

**Brokers**

None.

**Schedule 5.1**

**Buyer Approvals**

[Buyer to provide.]

**Schedule 6.2**

**Regulatory Approvals**

None.

**Schedule 6.9**

**Annual Budget**

[Annual budget contemplated under the Amended and Restated Operating Agreement to be attached hereto.]

**Schedule 6.10**

**Bonuses to Employees**

Notwithstanding anything to the contrary in the Agreement, Buyer and the Selling Parties agree that Schedule 6.10 will be prepared by mutual written agreement of Buyer and the Selling Parties prior to the Closing; provided, however, that the final Schedule 6.10 shall include the following provisions:

- To the extent that from the Closing until no later than July 1, 2022 the Company shall commence the installment of 30MWP to be calculated as the aggregate of Wp of nameplate solar and Wh of energy storage of the 2021 Portfolio (as defined in that certain Term Sheet for Proposed Investment in Blue Sky Utility, LLC and Blue Sky Utility Holding, LLC, dated as of March 17, 2021, between Blue Sky Utility, LLC and O.Y. Nofar Energy Ltd.), Yellow Tree  and BS1007 shall be entitled to receive one-time  deferred purchase payments equal to $1,00,000 USD each, payable by the Company in addition to any other proceeds or compensation contemplated by this Agreement or the Amended and Restated Operating Agreement (the "**Initial Bonus**").
- In the event that from the Closing until no later than April 1, 2023 the Company shall commence the installment of an additional 50MWP to be calculated as the aggregate of Wp of nameplate solar and Wh of energy storage , Yellow Tree  and BS1007 shall be entitled to receive  additional one-time deferred purchase payment equal to $1,00,000 USD each, payable by the Company in addition to the Initial Bonus and any other proceeds or compensation contemplated by this Agreement or the Amended and Restated Operating Agreement (the "Second Bonus" and, together with the Initial Bonus, the "**Bonus Payments**").
- Upon achieving each of the Bonus Payments, an additional amount equal to $1,000,000 USD with respect to each Bonus Payment shall be payable by the Company to the employees of the Company, to be paid and allocated among such employees in accordance with the terms of this Schedule 6.10.

**Schedule 9.5**

**Allocation Schedule**

[Buyer to prepare initial draft.]

# EXHIBIT 3



FILED

AUG 29 2024

Clerk of the Napa Superior Court
By:_____
Deputy

SUPERIOR COURT FOR THE STATE OF CALIFORNIA,

COUNTY OF NAPA

| | |
|---|---|
| BAREND VENTER, *et al.* | Case No. 24CV000715 |
| Plaintiffs, | ORDER AFTER HEARING ON NOFAR USA LLC'S MOTION TO DISMISS THE FIRST CAUSE OF ACTION ON THE GROUND OF INCONVENIENT FORUM |
| vs. | |
| OFER YANNAY, *et al.* | |
| Defendants. | |

## I.    INTRODUCTION

Defendant Nofar USA LLC moves, pursuant to Code of Civil Procedure sections 418.10, subdivision (a)(2) and 410.30, for an order dismissing, or in the alternative staying, the first cause of action asserted against it on grounds of inconvenient forum. The matter came on regularly for hearing on July 26, 2024, with the Honorable Cynthia P. Smith presiding. Attorney Martin Neil Glickfeld appeared on behalf of Plaintiffs Venter Ventures, LLC and Barend Venter, attorney David Michael Grable appeared on behalf of Defendant Nofar USA LLC. At the conclusion of the hearing, the matter was deemed submitted.

The Court has reviewed the parties' briefs, considered the arguments of counsel, and the evidence submitted in this matter, and now issues its decision.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to the allegations of the Complaint, in or around 2017, Plaintiffs Barend Venter and Venter Ventures LLC, together with others, formed Blue Sky Utility LLC for purposes of serving as a holding company for several other companies referred to collectively as "the BlueSky entities." (See Complaint at ¶¶ 1-5.) Plaintiff further alleges that, "[a]s a result of

discussions and negotiations between Blue Sky and Nofar, an agreement was reached whereby Nofar agreed to purchase a 67% interest in Blue Sky in exchange for cash payment of $26 million and a binding commitment by Nofar to provide a debt facility of $65 million for future projects." (*Id.* at ¶ 16.) "The Agreement between Blue Sky and Nofar was confirmed in written Membership Interest Subscription and Purchase Agreement ("MIPA") dated May 25, 2021." (*Id.* at ¶ 27.) By the first cause of action Plaintiff asserts a claim for fraud and concealment against Nofar USA, and O.Y. Nofar, relating to the alleged purchase. (See *id.* at ¶¶ 103-108.)

No copy of the MIPA is attached to the Complaint. Nofar USA provides a purported copy thereof as Exhibit A to the Declaration of Roger Huddle filed June 10, 2024 (Huddle Decl.). Plaintiff appears to concede that exhibits' authenticity by failing to raise any objection thereto.

Plaintiff Barend Venter and Defendant Nofar USA are named parties in and to the MIPA. (See Hubble Decl., Exh. A at preamble.) The MIPA provides, in relevant part, that, "[e]ach of the Parties (a) consents to submit itself or himself exclusively to the personal jurisdiction of the Chancery Court of the State of Delaware or, if unavailable any federal court located in the State of Delaware, in either case, in the event any dispute arises out of this Agreement or any of the transactions contemplated hereby, (b) agrees that it or he will not attempt to deny or defeat the jurisdiction of such courts by motion or other request for leave from any such court, (c) waives any claim that such proceedings have been brought in an inconvenient forum, and (d) agrees that it or he will not bring any Claim relating to this Agreement in any court or other tribunal other than the Chancery Court of the State of Delaware or federal court sitting in the State of Delaware." (See Huddle Decl., Exh. A at § 13.2, p. 70.)

By the present motion NoFar USA seeks to enforce this forum selection clause.

### III. LEGAL ANALYSIS

The Court finds that, pursuant to the allegations of the Complaint, the first cause of action for fraud and concealment arises out of and relates to the MIPA.

"When a court upon motion of a party or its own motion finds that in the interest of substantial justice an action should be heard in a forum outside this state, the court shall stay or dismiss the action in whole or in part on any conditions that may be just." (Code Civ. Proc.,

§ 410.30.) "'"A defendant may enforce a forum-selection clause by bringing a motion pursuant to sections 410.30 and 418.10, the statutes governing forum *non conveniens* motions, because they are the ones which generally authorize a trial court to decline jurisdiction when unreasonably invoked and provide a procedure for the motion."' [Citations.]" (*EpicentRx, Inc. v. Super. Ct.* (2023) 95 Cal.App.5th 890, 899 (*EpicentRx*).) "Typically, when a party files a forum *non conveniens* motion, and the motion is not based on a forum selection clause, the adjudicating court must weigh "'a gamut of factors of public and private convenience....'" (Citation.) However, these generally applicable factors do not control when the forum *non conveniens* motion is based on a forum selection clause. (Citation.) Rather, the forum selection clause typically will be enforced, absent a showing that enforcement of the forum selection clause would be unfair or unreasonable. (Citations.) 'This favorable treatment is attributed to our law's devotion to the concept of one's free right to contract, and flows from the important practical effect such contractual rights have on commerce generally.' (Citation.)" (*Ibid.*)

Plaintiffs argue that the subject forum selection clause is unenforceable because the clause contains a jury waiver. Moreover, Plaintiffs would not be entitled to a jury trial in the Delaware Court of Chancery, in part because it sits as a court of equity. (See *Preston Hollow Capital LLC v. Nuveen LLC* (Del. Ch. 2019) 216 A.3d 1, 11, fn. 64 ["historically, a jury trial was available in the Court of Chancery; however, '[a] jury trial in Chancery is advisory only....' In other words, to the extent a jury in the Court of Chancery is not extinct, it is a vestig[i]al structure, more evocative of the human appendix or coccyx than that vital organ, the Superior Court petit jury"]; see also *Pennzoil Co. v. Getty Oil Co.* (Del. Ch. 1984) 473 A.2d 358, 364 ["there is no right of a litigant to a trial by jury in the Delaware Court of Chancery"], *EpicentRx, supra,* 95 Cal.App.5th at 904-905.)

Where, as here, a forum selection clause includes a predispute jury trial waiver – which is unenforceable under California law – and where the laws of the chosen forum, here the Chancery Court of Delaware, do not include a similar bar to enforceability of predispute jury trial waivers, then on a motion to dismiss based on forum non-convenience, the moving party bears the burden "to show that enforcement of the forum selection clause would not substantially diminish the

3

rights of California residents in a way that violates our state's public policy." (*Handoush v. Lease Finance Group, LLC* (2019) 41 Cal.App.5th 729, 741 (*Handoush*).)

Through its Reply, Nofar USA offers to stipulate to waive the jury waiver in the MIPA. (See *id.* at 5:7-10.) At hearing, Nofar USA further offered to submit the matter to the alternative forum listed in the MIPA – the U.S. District Court for the District of Delaware (U.S. Dist. Ct. Del.), which does provide for jury trials. The Court finds that enforcement of the forum selection clause *subject to* these conditions would not substantially diminish Plaintiffs' rights to a jury trial of the matter.

As noted above, Code of Civil Procedure section 410.30 provides that upon a finding that, "in the interest of substantial justice an action should be heard in a forum outside this state, the court shall stay or dismiss the action in whole or in part on any conditions that may be just." The Court finds that Plaintiff's first cause of action should be heard in the selected forum *so long as* Plaintiffs' right to a jury trial is preserved.

Based on the foregoing, the motion is GRANTED IN PART. The Court orders the first cause of action for fraud and concealment asserted against Nofar USA STAYED, subject to the following conditions: (a) Nofar USA waives its rights to enforce against Plaintiffs, and each of them, the jury waiver contained in the MIPA; (b) Nofar USA waives its rights to have the matter litigated in the Delaware Court of Chancery; (c) Nofar USA waives any and all objections as to forum in the U.S. Dist. Ct. Del, and consents to have the matter litigated in that court; and (d) the U.S. Dist. Ct. Del. enjoys jurisdiction over the dispute and the litigation is not otherwise barred from proceeding in that forum. Upon the Court's satisfaction that the foregoing conditions have been satisfied, the Court will dismiss the first cause of action against Nofar USA.

The Court orders the matter set for an OSC re: Dismissal of First Cause of Action on October 30, 2024, at 8:30 a.m. in Dept. A. The Clerk is to provide notice to the parties.

IT IS SO ORDERED.

Dated:  8/27/24

Cynthia P. Smith, Judge

4

# Superior Court of California
County of Napa
825 Brown Street
Napa. CA 94559

**Case #:** 24CV000715    **Barend Venter et al vs Ofer  Yannay et al**

Martin Neil Glickfeld
mglickfeld@gmail.com

David Michael Grable
davegrable@quinnemanuel.com

## Certificate of Mailing/Service

I hereby certify that I am not a party to this cause and that a copy of the Order After Hearing On NOFAR USA LLC's Motion To Dismiss The First Cause Of Action On The Ground Of Inconvenient Forum was:

☒ **E-mailed**
☐ **certified copy faxed** to Napa Sheriff's Department at (707) 253-4193
☐ **personal service** – personally delivered to the party listed above
☐ **placed in attorney/agency folders** in the ☐ Criminal Courthouse ☐ Historic Courthouse

at Napa, California on this date and that this certificate is executed at Napa, California this Date. I am readily familiar with the Court's standard practice for collection and processing of correspondence for mailing within the United States Postal Service and, in the ordinary course of business, the correspondence would be deposited with the United States Postal Service on the day on which it is collected at the Courthouse.

**Date:** 8/29/2024          **Robert E Fleshman, Court Executive Officer**

Isabel Rodriguez, Deputy Court Executive Officer